**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ROCHELLE GARZA, as guardian ad litem to unaccompanied minor J.D., on behalf of J.D. and others similarly situated, | ) ) ) | |
| | ) | Civil No. 17-cv- |
| Plaintiff, | ) ) | |
| | ) | |
| v. | ) ) | |
| ERIC D. HARGAN, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**

**PRELIMINARY STATEMENT**

Rochelle Garza, as court-appointed guardian ad litem for J.D., seeks a temporary restraining order to prohibit the federal government from continuing to block J.D. from getting an abortion, and a preliminary injunction to prohibit the federal government from interfering with the Plaintiff Class's ability to obtain abortions, if they decide to do so.[1]

J.D. is a 17-year-old unaccompanied immigrant minor who is currently in the federal government's legal custody, living in a government-funded shelter in Texas. J.D. is 17 years old, pregnant and has decided to have an abortion. Because Texas law requires parental consent or a judicial waiver of that requirement before a minor may obtain an abortion, J.D., with the assistance of a court-appointed attorney ad litem and a guardian ad litem, went to court and obtained judicial authorization to consent on her own to the care. Defendants are nevertheless

---

[1] "J.D." stands for "Jane Doe," and Plaintiff's motion to proceed using pseudonymous initials will be forthcoming.

refusing to transport, or allow anyone else to transport, J.D. to the health center to obtain counseling or the abortion procedure itself.  They are holding her hostage to ensure that she does not have an abortion, but rather continues the pregnancy, and has a baby, against her will. Defendants' actions are blatantly unconstitutional.  Entirely shutting off a person's access to abortion services is the greatest conceivable "undue burden" on a person's constitutional right to an abortion — it prohibits her from exercising her rights at all.

J.D. seeks immediate, emergency injunctive relief to prevent Defendants from continuing to obstruct her access to abortion and to allow her out of the shelter to get the care she seeks. Defendants' actions have already delayed J.D. from getting her abortion for several weeks. Because of requirements imposed by Texas law, the next time J.D. would be able to see the abortion provider for the state-mandated counseling (which must occur at least 24 hours prior to the abortion), and to obtain the abortion is on October 19, 20, and/or 21.  If she does not get the abortion during that window she will be delayed at least an additional week.  Thus, absent an immediate temporary restraining order, J.D. will be pushed further into her pregnancy, which increases the health risks associated with the procedure, and at some point will be forced to carry to term against her will.

Unfortunately, J.D. is not the only unaccompanied minor subject to Defendants' unconstitutional actions.  Indeed, Defendants' actions stem from newly adopted policies that apply to unaccompanied immigrant minors nationwide and that purport to grant Defendants unfettered veto power over a minor's abortion decision, and that erect other unconstitutional barriers in the path of minors seeking abortion access.  Therefore, Plaintiff also seeks a preliminary injunction to prohibit Defendants from obstructing or interfering with abortion access for a class of similarly situated pregnant unaccompanied immigrant minors.

**FACTUAL BACKGROUND**

Unaccompanied immigrant minors come to the United States without their parents, often fleeing violence or abuse. By statutory definition, unaccompanied immigrant minors are under 18 years old, have no legal immigration status, and either have no parent or legal guardian in the United States, or have no parent or legal guardian in the United States who is able to provide care and physical custody. *See* 6 U.S.C. § 279(g)(2). After their initial apprehension, the Office of Refugee Resettlement (ORR) bears responsibility for the "care and custody of all unaccompanied [] children, including responsibility for their detention, where appropriate." 8 U.S.C. § 1232(b)(1). The federal government and all of its programs are required to ensure that the best interests of the unaccompanied immigrant minor are protected. *See* 6 U.S.C. § 279(b)(1)(B); 8 U.S.C. § 1232(c)(2)(A).

Protecting the minors' best interests includes ensuring access to health care, including reproductive health care. Indeed, the federal government is legally obligated to ensure that all programs that provide care to these young people comply with the minimum requirements detailed in the Settlement Agreement in *Flores v. Reno*, CV-85-4544-RJK (C.D. Cal. Jan. 17, 1997) ("*Flores* agreement"). The *Flores* agreement is a nationwide consent decree that requires the government to provide or arrange for, among other things, "appropriate routine medical . . . care," including specifically "family planning services[] and emergency health care services." [2] Additionally, an ORR regulation requires all ORR-funded care provider facilities to, among

_____

[2] Federal prisoners and those detained by Immigration Customs and Enforcement (ICE) also have a legal right to access abortion. 28 C.F.R. § 551.23 (a federal inmate may decide whether to have an abortion, and if she does, "the Clinical Director shall arrange for an abortion to take place"); ICE Guidelines, Detention Standard 4.4, Medical Care (if an ICE detainee requests abortion, ICE "shall arrange for transportation at no cost" to the detainee), available at https://www.ice.gov/doclib/detention-standards/2011/medical_care_women.pdf.

other things, provide unaccompanied immigrant minors who are victims of sexual assault while

in federal custody with access to reproductive healthcare. 45 C.F.R. § 411.92(a) *et seq*.

Unaccompanied immigrant minors have an acute need for reproductive health care, in part

because a high number of these young women are victims of sexual assault, immediately before,

during and after their journeys to the United States.

Nevertheless, Defendants have implemented a newly revised policy that allows them to

wield an unconstitutional veto power over unaccompanied immigrant minors' access to abortion.

In March 2017, ORR announced that all federally funded shelters are prohibited from taking

"any action that facilitates" abortion access for unaccompanied minors in their care without

"direction and approval from the Director of ORR."  Ex. 1, Decl. of Brigitte Amiri in Supp. of

Pls' Mot. for TRO/PI ("Amiri Decl."), Ex. A.  This includes arranging for pregnancy options

counseling, ensuring access to court to seek a judicial bypass in lieu of parental consent, and

providing access to the abortion itself.  *See, e.g.*, *id.*, Ex. B.  For example, one email from the

then-Acting ORR Director summarized that: "Grantees should not conduct [abortion]

procedures, or take any steps that facilitate future [abortion] procedures *such as scheduling*

*appointments, transportation, or other arrangements* without signed written authorization from

the ORR Director."  *Id.*, Ex. B (emphasis added).  In fact, it is the current ORR Director's

position that "[g]rantees should not be supporting abortion services pre or post-release; only

pregnancy services and life-affirming options counseling."  *Id.*, Ex. C.

Defendants are currently implementing this unconstitutional policy to deny J.D. access to

abortion.  J.D. is 17 years old, and came to the United States from her home country without her

parents. Ex. 2, Declaration of J.D. ("Doe Decl.") ¶¶ 2–3.  She was apprehended and placed into

federal custody.  *Id.* ¶ 4.  She is currently in a shelter in Texas.  *Id.*  She is pregnant, and decided

to have an abortion. *Id*. ¶ 5. Instead of arranging for J.D.'s requested medical care, Defendants

forced J.D. to visit a religious, anti-abortion crisis pregnancy center where she was required to

undergo an ultrasound for no medical purpose, made to reveal intimate details about herself, and

subjected to the center's attempts to dissuade her from having an abortion. *Id*. ¶ 13. Despite her

ordeal, J.D. continued to be resolute in her decision to have an abortion. With the assistance of

court-appointed guardian and attorney ad litems, J.D. obtained a judicial bypass of the state's

parental consent requirement and therefore now has the legal right to consent to the procedure.

*Id*. ¶ 6-7.

Thereafter, J.D. had an appointment scheduled with a health center for counseling, but

ORR refused to transport, or allow J.D. to be transported by anyone, to the health center. *Id*. ¶¶

9–11. Defendants also made clear that J.D. would be prohibited from obtaining the abortion

itself. Since that time, Defendants have continued to prevent J.D. from accessing abortion, and

have told her mother about her pregnancy over J.D.'s objection. *Id*. ¶ 15. ORR has ordered the

shelter to place J.D. under close supervision at the shelter, and has prohibited the shelter from

allowing J.D. to leave the facility for the purpose of accessing abortion counseling or an

abortion.

Defendants' actions have already caused J.D. to delay her abortion by several weeks.

Defendants first obstructed her access to the judicial bypass process. After Plaintiff's counsel

called Defendants' lawyers and she was permitted to seek the bypass, Defendants forced her to

miss her original appointment scheduled for September 28, 2017. Faced with this

unconstitutional obstruction, J.D. sought to obtain emergency relief on October 5, 2017, by

joining as a named plaintiff in *American Civil Liberties Union of Northern California v. Burwell*,

No. 3:16-cv-03539-LB, (N.D. Cal), a case arising from other ORR practices that interfere with

unaccompanied immigrant minors' ability to obtain reproductive health care, proceeding against the same Defendants in the District Court for the Northern District of California.  Amiri Decl. at ¶ 6.  On October 11, 2017, after expedited briefing, Magistrate Judge Beeler issued an order denying Plaintiffs leave to amend the complaint to add J.D., finding that venue and joinder would be improper.  In that ruling, however, the court noted that had it granted leave to amend it would have granted the TRO and ordered the requested relief, as the government has "no justification for restricting J.D.'s access."  *See American Civil Liberties Union of Northern California v. Burwell.*, No. 3:16-cv-03539-LB, (N.D. Cal), October 11, 2017 Order Denying Motions for Leave to Amend and a TRO (attached as Ex. J to Amiri Decl.).[3]

J.D. is not alone.  Defendants have interfered with other minors' access to abortion.  For example, in March 2017, an unaccompanied minor at a federally funded shelter in Texas decided to have an abortion.  After obtaining a judicial bypass and receiving the state-mandated counseling, she decided to have a medication abortion.  This regimen begins with a dose of mifepristone, which stops the pregnancy from growing, followed by a dose of misoprostol, which expels the pregnancy, within 48 hours.  After the minor took the mifepristone, ORR intervened, and forced her to go to an "emergency room of a local hospital in order to determine the health status of [her] and her unborn child."  Amiri Decl., Ex. A.  The then-Acting Director of ORR, Ken Tota, directed ORR as follows: "[i]f steps can be taken to preserve the life of . . . her unborn child, those steps should be taken."  *Id.*  Eventually, ORR allowed the minor to complete the medication abortion and take the second dose of pills.

---

[3] J.D., with the assistance of her guardian and attorney ad litems, also has initiated a confidential and sealed state court proceeding, under state law, against the shelter for abuse and neglect for failure to ensure that her medical care needs are met.  Although the case raises no federal question and involves no federal defendant, the Department of Justice is now representing the shelter, has removed the state case to federal court, and is seeking its dismissal.

Indeed, high-level officials at ORR in Washington, D.C., have taken the extraordinary step of becoming personally involved with individual minors' pregnancy and abortion decisions. For example, Scott Lloyd has *personally* contacted unaccompanied immigrant minors who were pregnant and seeking abortion, and discussed with them their decision to have an abortion. *Id.*, Exs. D, E.  This raises serious concerns that Defendant Lloyd is using his position of power to coerce young women to carry their pregnancies to term.

J.D.'s experience, and the experience of other minors described above, is a direct result of policies put in place by ORR.  In addition to the policy allowing them to prohibit young women in their care from accessing abortion, ORR has also adopted a policy requiring young women who indicate that they are considering abortion to meet with anti-abortion staff at an HHS-approved site.  These sites, contained on a nationwide list of "Trusted Providers in HHS Cities," are predominately anti-abortion crisis pregnancy centers ("CPCs").  *Id.*, Ex. F.  CPCs are categorically opposed to abortion, and generally do not provide information about pregnancy options in a neutral way.  In fact, many provide factually inaccurate information about pregnancy and/or abortion.  Many are also religiously affiliated, and proselytize to women.[4]  In addition to Plaintiff J.D., ORR requires other minors seeking abortions to be "counseled" by these CPCs, including some at the explicit direction of ORR Director Scott Lloyd.  *See id.* Ex. G; *see also id.* Ex. E.

As a matter of practice, ORR is also unconstitutionally forcing unaccompanied immigrant minors to tell their parents and/or immigration sponsors of their pregnancy and abortion decision, or ORR is itself telling minors' parents and/or sponsors about the minors' pregnancy and

---

[4] *See* Minority Staff of the H. Comm. on Gov't Reform, False and Misleading Health Information Provided By Federally Funded Pregnancy Resource Centers, 109th Cong. 1 (2006), *available at* http:// www.chsourcebook.com/articles/waxman2.pdf.

abortion decision, against the express wishes of the minors.  For example, Defendants contacted J.D.'s mother in her home country about J.D.'s pregnancy, over J.D.'s objections.  Defendants are also trying to force J.D. to tell her mother that she is considering an abortion, despite the fact that J.D. has suffered abuse at the hands of her parents.  In the case of another minor, Defendant Lloyd, in an email, directed that "the grantee or the federal field staff must notify her parents of the termination," even after the minor had obtained a judicial bypass to prevent her parents learning of her decision to terminate her pregnancy.  *Id.*, Exs. H, I.  J.D. is concerned about her privacy, and does not want any other family members to know of her abortion decision.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must establish (1) "that [s]he is likely to succeed on the merits," (2) "that [s]he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [her] favor," and (4) "that an injunction is in the public interest."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts in this Circuit have traditionally applied these factors on a "sliding scale," where a stronger showing on some factors can compensate for a weaker showing others. *See, e.g.*, *Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356, 360 (D.C. Cir. 1999).  It has been suggested, but not decided, that a likelihood of success on the merits may be required. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (citing *Winter*, 555 U.S. at 20-22). Under either approach, Plaintiff makes the necessary showing here. Standards for issuing a temporary restraining order and a preliminary injunction are "the same" and can therefore be analyzed together.  *Singh v. Carter*, 168 F. Supp. 3d 216, 223 (D.D.C. 2016).

I.      **Plaintiff J.D. Is Likely to Succeed on the Merits of Her Claims.**

A.  **Defendants' Conduct Violates Plaintiff's Fifth Amendment Rights.**

**1.   Defendants Cannot Block J.D.'s Access to Abortion.**

In 1992, the Supreme Court in *Planned Parenthood v. Casey* reaffirmed what it characterized as the "central holding" of *Roe v. Wade,* namely that the government may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability. 505 U.S. 833, 871 (1992).  In *Casey*, the Supreme Court adopted the "undue burden" standard for assessing state laws or regulations that restrict abortion.  The Court explained:

> A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

*Id*. at 877.  Subsequent Supreme Court decisions reaffirm this principle, most recently in the Court's decision in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), *as revised* (June 27, 2016).

There is no question that Defendants are violating J.D.'s Fifth Amendment rights by preventing J.D. from obtaining an abortion.  Indeed, Defendants are not only refusing to transport her, but are preventing anyone else from transporting her, to the health care facility to obtain an abortion.  J.D. has secured private funding for the abortion itself, and her guardian and attorney ad litems stand ready to transport her, and, absent a prohibition from ORR, the shelter would allow her to go.  Defendants are essentially holding her hostage to prevent her from exercising her fundamental constitutional right to abortion.  The constitutional violation could

not be more blatant or straightforward: Defendants cannot ban abortion for J.D., or any unaccompanied minor.[5]

The fact that J.D. is a minor in no way mitigates the constitutional violation here.  As the Supreme Court has explained, "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority.  Minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Planned Parenthood of Cent. Missouri v. Danforth*, 428 U.S 52, 74 (1976) (quoted with approval in *Bellotti v. Baird*, 443 U.S. 622, 634, n.12 (1979)).  Thus, even in the context of a minors' parents, the Court has held that "the unique nature and consequences of the abortion decision make it inappropriate to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy." *Bellotti*, 443 U.S. at 643 (internal quotations and citation omitted); *see also Casey*, 505 U.S. at 899.  Accordingly, although the Court has upheld laws requiring parental consent, it has only done so if there is an alternative confidential mechanism for the minor to obtain authorization for the procedure, such as the judicial bypass process in Texas.  *Id*.  And, indeed, J.D. obtained authorization from a Texas court to consent on her own to the abortion.  But under ORR's new policy, ORR has nonetheless vetoed J.D.'s abortion decision.  Defendants' actions, and policy, are a blatant violation of the Fifth Amendment.

---

[5] J.D.'s constitutional rights are not diminished because of her immigration status. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 187–88 (D.D.C. 2015) ("[T]he Supreme Court has made clear that 'once an alien enters the country, the legal circumstances changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.'") (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

**2.   Defendants Cannot Tell Minors' Parents About Their Abortion Decisions.**

Moreover, Defendants are also violating the Fifth Amendment by forcing minors to tell

their parents or sponsors about their abortion decision, or telling the parents or sponsors

themselves.  In the context of analyzing the constitutionality of parental consent laws, the

Supreme Court has been clear that the minor must have an avenue to obtain an abortion, without

consultation or notification to her parents.  *Bellotti*, 443 U.S at 647.  As one court put it, if

*Bellotti* means anything, "it surely means that States seeking to regulate minors' access to

abortion must offer a credible bypass procedure, *independent of parents or legal guardians*."

*Causeway Med. Suite v. Ieyoub*, 109 F.3d 1096, 1112 (5th Cir. 1997); *see also Bellotti*, 443 U.S.

at 647 (holding that if a state requires parental involvement in a minor's abortion decision the

state must provide an procedure through which "every minor must have the opportunity—if she

so desires—to go directly to court without first consulting or notifying her parents").  Indeed,

"[c]onfidentiality during and after the [judicial bypass] proceeding" is paramount, *Indiana*

*Planned Parenthood Affiliates Ass'n v. Pearson*, 716 F.2d 1127 (7th Cir. 1983), for the myriad

reasons that minors decide not to tell their parents of their abortion decision, including fear of

"abuse at the hands of one or more of their parents," *Planned Parenthood of Ind. and Ky., Inc. v.*

*Comm'r, Indiana State Dep't of Health*, No. 1:17-cv-01636SEBDML, 2017 WL 2797757, at *13

(S.D. Ind. June 28, 2017).

Once a minor has been granted a judicial bypass, the government ceases to have any

legitimate interest in notifying the minor's parents.  As courts have explained, "[w]hen the minor

is mature enough to make her own decisions independent of her parents, the State has no more

interest in notifying her parents than it would in notifying the parents of an adult woman —

namely, none."  *Planned Parenthood v. Wasden*, 376 F. Supp. 2d 1012, 1020 (D. Idaho 2005)

(preliminarily enjoining law that allowed for notice to a parent after a minor obtained an

emergency abortion); *see also Planned Parenthood v. Miller*, 63 F.3d 1452, (8th Cir. 1995)

(holding that "[b]y showing that they are capable of mature, informed consideration, such minors

establish that the State has no legitimate reason for imposing a restriction on their liberty

interests that it could not impose on adult women").  Similarly, in cases where a judicial bypass

court finds that it is in the best interest of the minor to proceed without telling her parents, "the

State has no further reasons for requiring such notice."  *Id*. at 1460.  For all of these reasons,

Plaintiff is likely to succeed on the merits of her Fifth Amendment claim.

### B.     Defendants' Policies and Conduct Violates Minors' Free Speech Rights.

By compelling a young woman to disclose her decision to have an abortion and discuss

the circumstances surrounding that decision—one of the most intimate and personal decisions a

person can make—to a third party who is opposed to her decision, Defendants' policy violates

the First Amendment prohibition on government-compelled speech.  *See Planned Parenthood

Minnesota, N. Dakota, S. Dakota v. Daugaard*, 799 F. Supp. 2d 1048, 1054–58 (D.S.D. 2011)

(preliminarily enjoining under the First Amendment a law requiring patients seeking abortion to

first be counseled by a crisis pregnancy center).

The First Amendment protects both "[t]he right to speak and the right to refrain from

speaking."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  Moreover, the Supreme Court has

repeatedly emphasized that "this general rule, that the speaker has the right to tailor the speech,

applies not only to expressions of value, opinion, or endorsement, but equally to statements of

fact the speaker would rather avoid."  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of

Boston*, 515 U.S. 557, 573 (1995) (citing cases); *accord Rumsfeld v. Forum for Acad. &

Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("compelled statements of fact . . . like

compelled statements of opinion, are subject to First Amendment scrutiny"); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 797–98 (1988) (law that compels "statements of 'fact'" subject to same First Amendment scrutiny as law compelling statements of belief).  These cases make clear that, subject to limited exceptions not applicable here, laws that compel speech are subject to strict scrutiny.  *See Riley*, 487 U.S. at 798; *Wooley*, 430 U.S. at 715–16; *Gralike v. Cook*, 191 F.3d 911, 919–21 (8th Cir. 1999), *aff'd*, 531 U.S. 510 (2001).  As such, a law that compels this kind of private speech can be upheld only if it is narrowly tailored to achieve a compelling state interest.

Defendants' policy forces minors to be counseled by a CPC, either before and/or after the abortion.  J.D. has already been forced to go to a religiously affiliated CPC, where she was forced to look at a sonogram of her fetus, *see* J.D. Dec ¶ 13, and she does not want to go to one again.  Defendants' policy unquestionably compels speech.  Indeed, under Defendants' policy, minors seeking an abortion must discuss their abortion decision, one of "the most intimate and personal choices a person may make in a lifetime, [a] choice[] [that is] central to personal dignity and autonomy," *Casey*, 505 U.S. at 851, with an entity that is hostile to the minors' abortion decision.  Compelling speech in such a manner is unconstitutional unless the Act (1) serves a compelling state interest, and (2) is narrowly drawn to achieve that end.  *See, e.g.*, *Riley*, 487 U.S. at 800; *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).  Defendants' policy fails both prongs of this demanding standard.

Defendants' policy does not further any compelling interest.  Even assuming, *arguendo*, that it did, Defendants' policy is not "narrowly tailored."  Most obviously, Defendants' policy is neither "necessary" nor the least restrictive means, *i.e.*, the means that least infringes on the woman's First Amendment rights, to further the government's purported interest in fetal life or

the woman's health by ensuring informed and voluntary decision making. The most obvious

alternative to Defendants' policy is both the most sensible and the one universally employed

across the country and across virtually all medical circumstances: relying on the patient's chosen

medical providers to ensure that her decision is informed and voluntary.  *Planned Parenthood of

Minnesota*, 799 F. Supp. 2d at 1057; *see also Casey*, 505 U.S. at 884 ("the doctor-patient relation

here is entitled to the same solicitude it receives in other contexts"); *Doe v. Bolton*, 410 U.S. 179,

199–200 (1973).  The fact that the Supreme Court has generally upheld laws that require a

patient to obtain counseling *from the abortion provider* prior to obtaining an abortion, *see, e.g.,

Casey*, 505 U.S. at 881-84, is irrelevant.  Here, J.D. was forced to go to a non-medical,

ideological, religiously affiliated anti-abortion entity and discuss her abortion decision.  Thus,

the Defendants alleged interest can be met without compelling minors to speak to a CPC.

Accordingly, Plaintiff is likely to succeed on her First Amendment claim.

### C.      Plaintiff Will Suffer Irreparable Injury Unless Defendants are Enjoined.

Plaintiff J.D. will suffer immediate and irreparable harm if this Court does not require

Defendants to provide her with immediate access to medical services to terminate her pregnancy.

The right to choose to terminate a pregnancy is, by its nature, of limited duration.  A woman who

is blocked or seriously delayed in her effort to obtain abortion cannot later exercise her choice

even if the impediment to doing so is later removed.

That denial of a woman's right to choose to terminate her pregnancy constitutes

irreparable injury was made clear in *Roe*, 410 U.S. at 153:

> The detriment that the State would impose upon the pregnant woman by denying this
> choice altogether is apparent.  Specific and direct harm medically diagnosable even
> in early pregnancy may be involved.  Maternity, or additional offspring, may force
> upon the woman a distressful life and future.  Psychological harm may be imminent.
> Mental and physical health may be taxed by child care.  There is also the distress, for
> all concerned, associated with the unwanted child, and there is the problem of

bringing a child into a family already unable, psychologically and otherwise, to care for it.

Here, Plaintiff J.D. faces irreparable harm if she is not granted the relief that she seeks and she is forced to carry the pregnancy to term against her will. Other similarly situated young women likewise face irreparable harm from ORR's policies, which place them in the same position.

Irreparable harm here is caused not only by the denial of access to abortion but by any delay caused by Defendants as well. J.D.'s request for an abortion has already been delayed by Defendants' conduct. Plaintiff is being exposed to increased medical risks by the delay caused by Defendants; although abortion is very safe, each week the pregnancy progresses, the risks to the woman increase. *See Williams v. Zbaraz*, 442 U.S. 1309, 1314–15 (1979) (Stevens, J., sitting as Circuit Justice) (increased risk of "maternal morbidity and mortality" supports claim of irreparable injury). "[T]ime is likely to be of the essence in an abortion decision." *H.L. v. Matheson*, 450 U.S. 398, 412 (1981). Similar delays imposed on similarly situated young women will cause the same irreparable harm to them.

Plaintiff J.D., and others similarly situated, will also be irreparably harmed if they are forced to tell (or if Defendants tell) family members or immigration sponsors that they are seeking or have obtained an abortion. There are myriad reasons why some minors do not want to tell their parents, or immigration sponsors, including fear of abuse and rejection. *See, e.g.*, *Planned Parenthood of Ind. & Ky.*, 2017 WL 2797757, at *13.

Plaintiff J.D. and the Plaintiff Class will also be irreparably harmed by being forced to be "counseled" by a CPC, in violation of their First Amendment free speech rights. "[A] woman who chooses to undergo an abortion [and who is forced into counseling at a CPC] will experience a high degree of degradation because she will be forced to disclose to her decision to someone who is fundamentally opposed to it." *Planned Parenthood of Minnesota*, 799 F. Supp.

2d at 1063.  In addition, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

**D.      The Balance of Harm Strongly Favors Plaintiff.**

As discussed, *supra*, Plaintiff J.D., and others similarly situated, will suffer irreparable harm in the absence of relief from this Court.  In contrast, the injunction would impose no measurable harm on Defendants. Defendants have no legal right to prevent young women from accessing abortion care, to force them to go anti-abortion counseling, or to inform their parents or sponsors of the pregnancy or desired abortion against their wishes.  J.D. has secured funding for the abortion, and transportation to the abortion provider, and thus there is not even any financial cost to Defendants to allowing J.D. to seek the care that she seeks and is constitutionally entitled to obtained.

**E.      A TRO/Preliminary Injunction Serves the Public Interest.**

The public interest is served when constitutional rights are protected.  "It is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quoting *Abdah v. Bush*, No. 04-cv-1254, 2005 WL 711814 at *6 (D.D.C. Mar. 29, 2005)); *accord Lamprecht v. F.C.C.*, 958 F.2d 382, 390 (D.C. Cir. 1992) ("a [government] policy that is unconstitutional would inherently conflict with the public interest"); *see also Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017); *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("Surely, upholding constitutional rights serves the public interest."); *Planned Parenthood Ass'n of City of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) ("the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional"); *Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980) ("the public interest …

requires obedience to the Constitution"). In the instant case, there is no conceivable way the public interest will be adversely affected by Plaintiff J.D.'s ability to terminate her pregnancy, the most private and intimate of decisions. Thus, there is no harm done to the public interest.

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests that this Court issue a temporary restraining order prohibiting the Defendants from continuing to interfere with her right to obtain an abortion, and a preliminary injunction prohibiting the Defendants from continuing to interfere with the reproductive health rights of the Plaintiff Class.

DATED: October 13, 2017       Respectfully submitted,

/s/ Arthur B. Spitzer

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
4301 Connecticut Avenue NW, Suite 434
Washington, D.C. 20008
Tel. 202-457-0800
Fax 202-457-0805
*aspitzer@acludc.org*
*smichelman@acludc.org*

Brigitte Amiri*
Meagan Burrows*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2633
Fax (212) 549-2652
*bamiri@aclu.org*

Daniel Mach (D.C. Bar No. 461652)
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Telephone: (202) 675-2330
*dmach@aclu.org*

Jennifer L. Chou*
Mishan R. Wroe*

American Civil Liberties Union Foundation of
Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel. (415) 621-2493
Fax (415) 255-8437
*jchou@aclunc.org*
*mwroe@aclunc.org*

Melissa Goodman*
American Civil Liberties Union Foundation of
Southern California
1313 West 8th Street
Los Angeles, California 90017
Tel. (213) 977-9500
Fax (213) 977-5299
*mgoodman@aclusocal.org*

*\*Admission for pro hac vice forthcoming*

*Attorneys for Plaintiff*