## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROCHELLE GARZA, as guardian ad litem to unaccompanied minor J.D., on behalf of herself and others similarly situated, | ) ) ) | |
| | ) | No. 17-cv-02122-TSC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERIC D. HARGAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S REPLY IN FURTHER SUPPORT OF PLAINTIFF'S
## APPLICATION FOR A TRO AND MOTION FOR A PRELIMINARY INJUNCTION

J.D. is seventeen years old, pregnant, and seeks an abortion, which she is legally entitled to obtain. A state court has granted her legal authority to consent to the procedure on her own in lieu of obtaining parental consent, which is a requirement of the state in which she resides. J.D.'s court-appointed guardian and attorney ad litems are able to transport her to a health clinic for the procedure; the clinic stands ready to see J.D.; and J.D. has secured her own funding for the abortion. Nonetheless, the federal government is preventing her from accessing an abortion.

Since 1973, the Supreme Court has held that the government cannot ban abortion. Although the Court has recognized that the government has a legitimate interest in encouraging a woman to continue a pregnancy, the Court has made clear that the government cannot effectuate that interest by creating unreasonable legal roadblocks—not to mention actual physical confinement, as here—that prevent a woman from obtaining an abortion.

Time is of the essence. Defendants' actions have already delayed J.D.'s ability to access abortion, and forced her to continue her pregnancy for weeks. In addition to forcing her to remain pregnant against her will, each week of delay needlessly increases the risks associated

with the abortion procedure.  If J.D. is unable to obtain an abortion this week, the procedure she

will require will be more complex and she will be no longer be able to obtain an abortion in the

Rio Grande Valley.  If this Court does not intervene, J.D. will be pushed so far into her

pregnancy that she will be forced to carry the pregnancy to term against her will and permanently

lose her constitutional right to have an abortion altogether.  For the reasons stated below, and for

the reasons stated in Plaintiff's opening brief, J.D.'s motion for a temporary restraining order

should be granted.

### I.        Plaintiff Is Likely to Succeed on the Merits of Her Claims.

Defendants have it backward when they argue that Plaintiff is seeking to change the

status quo.  Defendants are legally required to ensure that unaccompanied minors have access to

medical care.  *See, e.g.*, *Flores v. Reno Settlement Agreement*, CV-85-4544-RJK (C.D. Cal. Jan.

17, 1997) (requiring the government to provide or arrange for, among other things, "appropriate

routine . . . medical care," including specifically "family planning services");[1] *see also* 45 C.F.R.

§ 411.92(a) *et seq.* (requiring access to reproductive care for UCs who experience sexual abuse

and assault in federal custody).  Thus, until J.D.'s case, they had been providing transportation

for unaccompanied minors to an abortion provider, just as they do for any other medical

procedure.  In any event, as discussed below, Plaintiff is able to meet any standard of review

because she is clearly entitled to relief, and J.D. will suffer very serious damage if she is forced

to delay her abortion further, or forced to carry her pregnancy to term against her will.  *See, e.g.*,

*Daily Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1, 6 (D.D.C. 2015).  Under any standard of

review, therefore, this Court should grant J.D. a temporary restraining order.

---

[1] *See Flores v. Reno Settlement Agreement*, CV-85-4544-RJK (C.D. Cal. Jan. 17, 1997), Exhibit 1, "Minimum Standards for Licensed Programs", at 15, *available at* https://cliniclegal.org/sites/default/files/attachments/flores_v._reno_settlement_agreement_1.pdf.

### A.      Defendants Cannot Prohibit J.D. From Accessing Abortion.

Plaintiff's likelihood of success on the merits could not be greater.  Under *Roe v. Wade*

the government cannot ban abortion.[2]  But that is precisely what Defendants have done here.

Defendants admit they will not transport J.D. to the abortion facility, and that they will not allow

her court-appointed attorney and/or guardian ad litem to transport her.

Defendants make essentially three arguments in an attempt to justify their actions.  First,

they argue they are entitled to prevent J.D. from obtaining an abortion to further a governmental

interest in promoting fetal life.  Defs.' Br. at 9-10.  But it has been well settled for decades that

such an interest cannot justify actively preventing a woman from getting an abortion.  *See*

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 877 (1992) (holding that "the means

---

[2] Defendants seem to imply that J.D.'s constitutional rights are diminished because of her immigration status, and proposed amici make the argument head-on, but "the Supreme Court has made clear that 'once an alien enters the country, the legal circumstances changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.'"  *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 187 (D.D.C. 2015) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)); *see also Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."); *Mathews v. Diaz,* 426 U.S. 67, 77 (1976) (explaining that "[t]here are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection."); *Kwai Fun Wong v. U.S.*, 373 F.3d 952, 971 (9th Cir. 2004) ("Aliens inside the US, *regardless of whether their presence here is temporary or unlawful*, are entitled to certain constitutional protections unavailable to those outside [US] borders.") (internal citation omitted) (emphasis added); *Lynch v. Cannatella*, 810 F.2d 1363, 1374 (5th Cir. 1987) ("Counsel has not suggested and we cannot conceive of any national interests that would justify the malicious infliction of cruel treatment on a person in United States territory simply because that person is an excludable alien.").

chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it.").

Second, Defendants attempt to rely on the Supreme Court's line of cases related to whether the government must pay for an abortion in the context of the Medicaid program.  Defs.' Br. at 10-11.  But those cases are inapposite.  As the Supreme Court held:  The "conclusion [that the government does not have to cover abortion in the Medicaid program] signals no retreat from *Roe* . . . .  There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy."  *Maher v. Roe*, 432 U.S. 464, 475 (1977); *see also Harris v. McRae*, 448 U.S. 297, 314 (1979) (upholding restriction on Medicaid coverage of abortion because it "places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion").  As the Court explained, "[c]onstitutional concerns are greatest when the State attempts to impose its will by force of law."  *Maher*, 432 U.S. at 476.  That is precisely what the federal government has done here by preventing J.D. from leaving the shelter to obtain the abortion.  Thus, while Plaintiff strongly believes that Defendants do have an obligation to transport unaccompanied immigrant minors seeking abortions to their appointments, Defendants need not even do that in this instance.  All they need to do is to step aside and let J.D.'s court-appointed representatives transport her to her appointments.[3]  As Judge Beeler noted, "[t]he government may not want to facilitate abortion, but it cannot block it.  It is doing that here.  Standing aside—and not any facilitative step—is all that is required of the government and its grantees because her guardian or attorney ad litem can

---

[3] Defendants suggest that this isn't feasible because a background check might be required in order to allow her court-appointed representatives to transport her to the clinic.  But, in fact, by Defendants' own admission no such check is required where, as here, both the representatives are attorneys who have entered appearances in her case.  White Decl. ¶¶ 18-19, Doc. 10-1.

transport [J.D.].  There is no justification for restricting [J.D.'s] access." *ACLU of Northern California v. Burwell*, No. 3:16-cv-3539-LB, Order of October 11, 2017, at 13 (Exhibit J to Declaration of B. Amiri).

Defendants attempt to avoid this result by suggesting that an injunction would require them to take "affirmatives steps" to allow J.D. to access abortion, Defs.' Br. at 4, 12, is unavailing.  These "steps," such as monitoring J.D.'s health, are already required of them by their own policies and the *Flores* agreement, and they would be required to provide considerably more monitoring and medical care if J.D. carried to term and gave birth, which entails far more risk and is more medically complicated than abortion.[4]  In any event, those "steps" involve minimal effort on behalf of Defendants, and no more—indeed, less—than what is required of the government in other settings such as Immigration and Customs Enforcement detention or federal prison.[5]  Indeed, every court to consider the issue has held that the right to abortion survives incarceration.  *See, e.g.*, *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 334 n.11 (3d Cir. 1987), *cert. denied*, 486. U.S. 1006 (1988); *Doe v. Arpaio*, No. CV 2004-009286, 2005

---

[4] Defendants also argue that they must "draft approval documents" and "determine that the procedure is in her best interest." Defs.' Br. at 12. But Defendants are simply reiterating their own policy that unconstitutionally grants them veto power over J.D.'s abortion that Plaintiff is challenging.  Furthermore, such a policy is not grounded in any statute or regulation.  Indeed, 6 U.S.C. § 279(b)(1)(B) directs Defendants to ensure that the "interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child."  The statute does not give Defendants the authority to supplant their decision-making about health care for the minor, particularly where, as here, the minor has a court order allowing her to make her own health care decision with respect to an abortion.  In any event, Defendants cannot manufacture a policy that allows them to interfere with a minors' abortion decision, and then claim to be burdened by it.

[5] *See* 28 C.F.R. § 551.23 (a federal inmate may decide whether to have an abortion, and if she does, "the Clinical Director shall arrange for an abortion to take place"); ICE Guidelines, Detention Standard 4.4, Medical Care (if an ICE detainee requests abortion, ICE "shall arrange for transportation at no cost" to the detainee), 307, *available at* https://www.ice.gov/doclib/detention-standards/2011/medical_care_women.pdf.

WL 2173988, *1 (Ariz. Super. Aug. 25, 2005), *aff'd*, 150 P.3d 1258 (Ariz. App. 2007), *cert. denied*, 552 U.S. 1280 (2008); *Doe v. Barron*, 92 F. Supp. 2d 694 (S.D. Ohio 1999).

Finally, Defendants argue that J.D. can get the care she needs if she agrees to allow the government to immediately deport her back to her home country, where she suffered abuse at the hands of her parents.  Alternatively, the government argues, she can simply delay her abortion for weeks or months in the hopes that she will be reunited with family here in the United States in time to still get the care she wants and needs.  But the Constitution does not permit the government to penalize J.D. for seeking to exercise her right to an abortion by forcing her to give up her opportunity to be reunited with family here in the United States, or forcing her to return to her home country and abuse.  The government should not be allowed to use her constitutional right to access abortion as a bargaining chip to trade for immigration status, any more than it could require a person in J.D.'s situation to convert to another religion, or to *obtain* an abortion, in exchange for immigration status.  Moreover, Defendants' speculation about when J.D. might be able to obtain an abortion upon reunification with family in the United States is just that: speculation.  Defendants know that the timing of the reunification process is unpredictable, and there is no way to guarantee that J.D. would not be pushed so far into her pregnancy that she would cross the line of viability.  In any event, it is not an acceptable alternative for J.D. to delay her abortion by weeks, if not months, given the attendant risks discussed *infra*.

**B.      It Is Unconstitutional For Defendants To Tell J.D.'s Parents About Her Abortion Decision.**

Defendants assert that they are entitled to tell J.D.'s parents about her abortion decision. Although the Supreme Court has upheld statutes requiring parental involvement in a minor's abortion decision, it has done so only so long as minors who are mature enough to make the decision on their own, or for whom parental involvement is not in their best interest, can bypass

that requirement. *Bellotti v. Baird*, 443 U.S 622, 647 (1979). "[W]hen the minor is mature enough to make her own decisions independent of her parents, the State has no more interest in notifying her parents than it would in notifying the parents of an adult woman—namely, none." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F. Supp. 2d 1012, 1019 (D. Idaho 2005) (preliminarily enjoining law that allowed for notice to a parent after a minor obtained an emergency abortion); *see also Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1460 (8th Cir. 1995) (holding that "[b]y showing that they are capable of mature, informed consideration, such minors establish that the State has no legitimate reason for imposing a restriction on their liberty interests that it could not impose on adult women"). Similarly, in cases where a judicial bypass court finds that it is in the best interest of the minor to proceed without telling her parents, "the State has no further reason for requiring such notice." *Id*. at 1460.[6]

Here, a state court judge has already determined that J.D. meets the criteria for a bypass under Texas law (she is mature enough to make the decision independently or requiring notification and consent is not in her best interest) and therefore has ruled that she is legally entitled to consent to the abortion on her own without notifying her parents. The federal government cannot unilaterally disregard the state court's order, and tell J.D.'s parents or other family members—doing so only serves to penalize J.D.

Defendants' only other argument is that because they have already told her mother of her *pregnancy* a TRO would not provide her any relief. Defs.' Br. at 15. But Defendants are also

---

[6] Indeed, even the one case relied on by Defendants acknowledges the constitutional problems inherent in requiring notice to "abusive parents, noncustodial parents who have refused to accept their parental responsibilities, and parents with similar relationships to their children." *Planned Parenthood of Blue Ridge v. Camblos*, 155 F.3d 352, 372 (4th Cir. 1998).

trying to force J.D. to tell her mother about *the abortion decision*, and J.D. fears that Defendants

will tell other family members, including potential immigration sponsors, about both the

pregnancy and abortion decision.  Injunctive relief should issue to prohibit those actions.

### C.      Defendants Cannot Force J.D. To Be "Counseled" By a Crisis Pregnancy Center.

Defendants do not dispute that they forced J.D. to obtain counseling at a religiously

affiliated crisis pregnancy center (CPC).  Instead, Defendants argue that J.D.'s speech claim fails

because it is not clear that she was forced to "espouse or agree with any particular viewpoint."

Defs.' Br. at 16.  But in order to be "counseled" by a CPC, a person must *at least* reveal that they

seek an abortion—this *is* forced government speech.  *See, e.g., Planned Parenthood Minn., N.D.,*

*S.D. v. Daugaard*, 799 F. Supp. 2d 1048, 1056 (D.S.D. 2011) (holding that law requiring visit to

CPC compelled speech even if the woman simply had to reveal that she was seeking an

abortion).  Defendants also rely on the fact that courts have upheld "informed consent"

requirements prior to abortion.  Defs.' Br. at 16.  But the fact that the Supreme Court has

generally upheld laws that require a patient to obtain counseling *from the abortion provider* prior

to obtaining an abortion, *see, e.g., Casey*, 505 U.S. at 881-84, is irrelevant.  Here, J.D. was forced

to go to a non-medical, ideological, religiously affiliated anti-abortion entity and discuss her

abortion decision.  Moreover, Defendants' reliance on government speech doctrine cases, Defs.'

Br. at 16-17, is misplaced:  The issue is not whether the government can speak through private

entities, but rather, whether Defendants can force J.D. to speak to an entity that is hostile to her

abortion decision.  Defendants also claim that J.D.'s forced speech claim is moot—it is not.

Defendants have forced unaccompanied minors to obtain counseling from a CPC after the

abortion procedure itself.  *See, e.g*., Ex. H to Decl. of B. Amiri in Supp. of Pls.' Mot. for

TRO/PI, Doc. 3-12, PRICE_PROD_00010867 (S. Lloyd directing staff to notify minor's parents

of her abortion "alongside of resources to the UAC for post-abortion counseling as part of post-release care."). Defendants can, and should, be restrained from forcing J.D. to—yet again—discuss the most intimate details of her life with an entity hostile to her abortion decision.

## II.     J.D. Will Be Seriously Harmed Absent Immediate Relief.

For all of the reasons discussed in Plaintiff's opening brief, J.D. will be irreparably harmed absent immediate relief. Defendants contend that J.D. will not suffer irreparable harm if her request for a TRO is denied because she is weeks away from the legal abortion limit. This argument ignores two critical facts. First, every week that the government prevents J.D. from getting the care she seeks is another week that she must remain pregnant against her will, subject to both the physical and emotional realities that entails. Second, each week of delay substantially increases the risks associated with the abortion. *See, e.g.,* Linda A. Bartlett et al., *Risk Factors For Legal Induced Abortion-Related Mortality In the United States*, 103:4 Obstetrics & Gynecology 729 (Apr. 2004) (relative risk of abortion increases *38% per gestational week*). Defendants' callous disregard of these harms should not be countenanced by this Court.

## III.    The Balance of Hardships and Public Interest Weighs Strongly in J.D.'s Favor.

Defendants do not argue that they would suffer real harm if a TRO were granted—they only point to an "interest" in ensuring that they do not facilitate abortion. Defs.' Br. at 18. But Defendants' claim that they are "harmed" by transporting J.D. to her health care provider is undermined by the fact that they are legally obligated to facilitate access to medical care for unaccompanied immigrant minors, as discussed *supra*. In other words, they cannot claim to be harmed by something they are legally obligated to do. But even if "facilitating" abortion could

constitute harm, J.D.'s guardian and attorney ad litem have offered to transport J.D. to the abortion facility. All Defendants need do here is step aside.

Moreover, there is no harm to the public if J.D.'s constitutional right to make an intimate health care decision is protected. Defendants claim that the public interest is not served by a TRO because it would "incentivize" pregnant minors to leave their home countries and come to the United States to seek an elective abortion. There is no evidence to support their concern. As Defendants themselves have explained, minors leave their home country to "join family already in the United States, escape abuse, persecution or exploitation in the home country, or to seek employment or educational opportunities in the United States."[7] There is no evidence that they come to the United States to seek abortions. In any event, as Defendants admit, J.D. did not learn that she was pregnant until after her arrival in the United States. White Dec ¶ 7, Doc. 10-1.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that this Court grant J.D.'s application for a Temporary Restraining Order.

Date: October 18, 2017

Respectfully submitted,

/s Arthur B. Spitzer

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
4301 Connecticut Avenue NW, Suite 434

---

[7] Administration for Children and Families Factsheet, *available at* https://www.acf.hhs.gov/sites/default/files/orr/orr_uc_updated_fact_sheet_1416.pdf.

Washington, D.C. 20008
Tel. 202-457-0800
Fax 202-457-0805
*aspitzer@acludc.org*
*smichelman@acludc.org*

Brigitte Amiri*
Meagan Burrows*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2633
Fax (212) 549-2652
*bamiri@aclu.org*
*mburrows@aclu.org*

Daniel Mach (D.C. Bar No. 461652)
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Telephone: (202) 675-2330
*dmach@aclu.org*

Jennifer L. Chou
Mishan R. Wroe
American Civil Liberties Union Foundation of
Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel. (415) 621-2493
Fax (415) 255-8437
*jchou@aclunc.org*
*mwroe@aclunc.org*

Melissa Goodman
American Civil Liberties Union Foundation of
Southern California
1313 West 8th Street
Los Angeles, California 90017
Tel. (213) 977-9500
Fax (213) 977-5299
*mgoodman@aclusocal.org*

*Admission for pro hac vice pending/forthcoming*

*Attorneys for Plaintiff*