## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROCHELLE GARZA, as guardian ad litem to
unaccompanied minor J.D., on behalf of
herself and others similarly situated,

                         Plaintiff,

  v.

ERIC D. HARGAN, *et al.*,

                       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

No. 17-cv-02122-TSC

---

## PLAINTIFF'S REPLY IN FURTHER SUPPORT OF CLASS CERTIFICATION

Defendants ignore key facts and well-established precedent in an attempt to insulate from adjudication their unconstitutional policy of preventing unaccompanied immigrant minors (or "unaccompanied children" or "UC") from obtaining information about their pregnancy options, coercing them to carry their pregnancies to term, and obstructing them from accessing abortion. Defendants present four main arguments, none of which withstand scrutiny. First, Defendants point to a series of irrelevant potential factual differences between class members (such as the minors' age, length of pregnancy, and state of residence), to argue that Plaintiff fails to meet the criteria for commonality and typicality. But none of those facts have any bearing on the central common question in this case: whether Defendants' anti-abortion policy, which applies to all pregnant minors, is constitutional. The presence of this common policy alone suffices to meet the commonality and typicality requirements.

Second, as to the adequacy of representation prong, Defendants' primary argument is that because J.D. had an abortion, she no longer has a sufficient interest in litigating this case. But this argument ignores the fact that J.D. shares many claims with the class that are currently live, including that Defendants seek to violate her and other minors' constitutional rights by telling

others about their pregnancies and abortion decisions. Moreover, J.D.'s abortion access claim fits within well-established exceptions to the mootness doctrine, especially given that claims related to pregnancy and abortion are classic examples of those that are "capable of repetition, yet evading review" and "inherently transitory."

Third, Defendants assert that only 18 UCs requested abortions in the past year and, as a result, Plaintiffs cannot meet the numerosity requirement. This argument fails on multiple levels: As an initial matter, the class includes all pregnant UC, and the parties agree both that there are hundreds of such young women every year, which far exceeds the threshold for numerosity. But even if the Court focused only on the number of young women who seek abortions, Plaintiff still meets this requirement. Given Defendants' policies of discouraging and prohibiting abortion, the actual number of pregnant minors who would seek an abortion is likely much higher than the 18 requests that have been formally transmitted to ORR.  Moreover, given the vulnerability of this population, its transitory nature, and widespread geographic diversity, joinder is impractical.

Lastly, Defendants' arguments under Rule 23(b)(2) are meritless. Plaintiff has clearly shown that Defendants "acted … on grounds that apply generally to the class" by implementing and enforcing a policy against unaccompanied minors that robs them of their ability to freely decide whether to have an abortion. For all of these reasons, Defendants' arguments should be rejected, and this Court should certify the proposed class.

## ARGUMENT

## I.    Plaintiff Satisfies the Requirements of Rule 23(a).

### A.    J.D.'s Claims are Common and Typical of the Class.

Defendants argue that Plaintiff cannot establish commonality or typicality because not all members of the class will face exactly the same "obstacles" as J.D., and different class members

2

may have slightly different factual scenarios depending on their location and personal circumstances. Defs.' Opp. to Pl.'s Mot. for Class Certification ("Opp.") at 13-15. But this argument ignores that commonality and typicality requirements are clearly met where, as here, (1) the core legal and factual questions in the case revolve around a uniform and coherent policy (here, to coerce and control all UCs' pregnancy decisions to ensure that they carry their pregnancies to term while in ORR custody, at least unless doing so would pose a risk of death or serious injury); (2) the class members share a common injury (here, invading all class members' rights to control their own reproductive decision-making and private information disclosure, free of government coercion); and (3) all class members' claims can be resolved though the relief the class representative seeks (here, enjoining the policy and declaring it unconstitutional).

First, commonality and typicality requirements are easily met where "[t]here is a uniform policy or practice that affects all class members" in the case. *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 181 (D.D.C. 2015) (provisionally certifying a class where a uniform "unlawful [immigration] detention policy aimed at deterring mass migration" applied to all class members); *Little v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 419 (D.D.C. 2017) (finding commonality and typicality where the "harm alleged by each class member was the result of the same corporate-wide policies, because a question common to all members will be whether that policy was unlawful.") (internal quotation marks omitted); *DL v. District of Columbia*, 302 F.R.D. 1, 12 (D.D.C. 2013), *aff'd,* 860 F.3d 713 (D.C. Cir. 2017) (finding commonality and typicality "where plaintiffs allege[d] widespread wrongdoing by a defendant because [of] a uniform policy or practice that affects all class members"). In *Wal-Mart Stores v. Dukes*, the Court made clear that even in fact-

intensive workplace discrimination cases, commonality and typicality are met when a company "operated under a general policy of discrimination." 564 U.S. 338, 353 (2011).

Here, since March 2017, Defendants have had a uniform policy, applicable to all pregnant UCs in their custody, of ensuring that all pregnant young people continue their pregnancies while in government custody, unless doing so would pose a risk of death or serious injury, and that the government and federally funded shelters support only "pregnancy services and life-affirming options counseling," never abortion, regardless of a young person's decision about her pregnancy. Dec. of Brigitte Amiri in Supp. of Pl.'s Mot. for TRO/PI ("TRO Amiri Dec."), Ex. C (ECF No. 5-6). The government effectuates this policy through close monitoring of each pregnant UC's pregnancy, and coercion tactics to ensure that the UC remains pregnant while in ORR custody. For example, ORR's policy is to require shelters to notify ORR immediately when a pregnancy is discovered, "before" any action is taken to "explore" options. Ex. A to Dec. of Brigitte Amiri ("Reply Amiri Dec."). ORR requires reporting and monitoring of all pregnancies, even if a UC originally states she wants to carry to term. Ex. B to Reply Amiri Dec. (requiring notification in all cases because "[w]e also know these girls change their minds"); *see also* Ex. A (requiring notification for all positive pregnancy tests). Government documents suggest that ORR Director Scott Lloyd receives, or for some time this year received, weekly updates concerning each pregnant UC's location, the circumstances of her pregnancy, her gestational age, and whether she requested information regarding abortion. *See, e.g.*, Ex. C to Reply Amiri Dec.; *see also* Ex. D to Reply Amiri Dec. Rather than send pregnant UCs to regular medical clinics that provide comprehensive family planning services and unbiased options counseling, ORR requires, as a matter of policy, shelters to send pregnant UCs to "trusted" providers, most of which are anti-abortion "counseling" centers. TRO Amiri Dec., Exs. E-G

4

(ECF Nos. 5-8, 5-9, 5-10). ORR requires parents and potential sponsors to be notified about the UC's pregnancy decision, regardless of the young person's need to keep her abortion decision private. TRO Amiri Dec., Exs. H-I (ECF Nos. 5-11, 5-12). Mr. Lloyd also has spoken directly with pregnant UCs to dissuade them from abortion. TRO Amiri Dec., Exs. D-E (ECF Nos. 5-7, 5-8); Rachel Siegel, *The Trump Official Who Tried to Stop a Detained Immigrant from Getting An Abortion*, The Washington Post, Oct. 26, 2017, *available at* https://www.washingtonpost.com/news/post-nation/wp/2017/10/26/the-trump-official-who-tried-to-stop-a-detained-immigrant-from-getting-an-abortion/?utm_term=.d1751bfed674 ("Lloyd has personally intervened to try to persuade unaccompanied minor girls not to have abortions, according to an HHS official. 'When there's a child in the program who is pregnant, he has been reaching out to her and trying to help as much as possible with life-affirming options,' the spokesman said. 'He by law has custody of these children, and just like a foster parent, he knows that that's a lot of responsibility and he is going to make choices that he thinks are best for both the mother and the child.'"). Contrary to the government's suggestion, Opp. at 18, the government's policy applies to *all* proposed class members because the policy is aimed at monitoring and steering *all* pregnant UCs, not only those who affirmatively seek abortions, to childbirth and away from abortion.

Where dissuasion and coercion fail, and a minor continues to ask for abortion access, ORR imposes an outright ban on abortion, again as a matter of policy. If a UC requests an abortion, ORR requires the shelter to notify ORR immediately. TRO Amiri Dec. Ex. B-C (ECF Nos. 5-5, 5-6). ORR will not "facilitate" access to abortion and prohibits grantee shelters from taking "any steps that facilitate [abortion] procedures" under any circumstances, without ORR approval. *Id.*, Ex. B (ECF No. 5-5) (emphasis added); *see also id.*, Ex. C (ECF No. 5-6); Ex. E to

Reply Amiri Dec (making clear grantees can take no steps, even where a minor has a state judicial bypass court order).[1] This policy applies regardless of whether federal funding is necessary. *See* TRO Amiri Dec. Ex. B (ECF No. 5-5). All pregnant UCs in ORR custody are subject to this policy of ensuring that all pregnant unaccompanied minors remain pregnant until they give birth or leave ORR custody.[2]

That all pregnant minors are subject to this policy is sufficient to meet the requirements for class certification. *See DL*, 302 F.R.D. at 12.  In addition, all pregnant UCs suffer the same injuries as a result of this policy: (1) they are deprived of comprehensive and unbiased options counseling, and instead are subjected to coercive counseling not designed to meet their medical needs but rather to skew their decision-making; (2) they are denied the power to decide for themselves whether to involve their parents in their pregnancy decision-making; and (3) they are stripped of their right to make autonomous decisions about whether and when to become a parent—a power the government cannot constitutionally take away through coercion, undue burden, or a de facto abortion ban.

Moreover, J.D.'s and other class members' claims "are based on the same legal theory" and arise from the same government policy and "course of conduct" to ensure that UCs carry their pregnancies while in government custody. *Bynum v. District of Columbia*, 214 F.R.D. 27, 35 (D.D.C. 2003); *accord Vista Healthplan, Inc. v. Warner Holdings Co. III*, 246 F.R.D. 349,

---

[1] The government's briefing suggests that the only exception the government might make is when the pregnancy poses "a risk of death or serious injury to the mother." Opp. at 25.

[2] The government suggests that it does not have a specific policy concerning pregnancy and abortion access but rather that it simply applies a standard policy for approval of serious surgical procedures. Opp. at 25. The government's own documents show this is patently untrue. *See, e.g.*, Ex. F to Reply Amiri Dec. ("The email was intended to reinforce the policy concerning pregnancy terminations . . . . The email was not intended to focus on other significant medical procedures or medical costs.").

357 (D.D.C. 2007) (resolution "will affect all or a significant number of the putative class

members"). Although "for purposes of Rule 23(a)(2) even a single common question will do,"

*Wal-Mart Stores, Inc.*, 564 U.S. at 359, proposed class members here share many common

issues, chief among them whether the government can constitutionally deprive young women of

access to unbiased abortion counseling, whether they can coerce young people to carry their

pregnancies to term, block their access to abortion if those coercion efforts fail, and whether the

government can force them to disclose highly personal information. The resolution of any of

these common issues "will generate common answers apt to drive the resolution of the

litigation," *id*. at 350, because the relevant questions will concern whether the government can

strip any pregnant UCs of their constitutional right to privacy, bodily autonomy, and freedom

from coerced speech.

That not all pregnant UCs in the proposed class may ultimately decide to have an

abortion, Opp. at 14, is irrelevant. Defendants' policy affects all pregnant UCs by steering their

pregnancy decisions in coercive ways, limiting them from obtaining unbiased information,

taking away their decision to involve their parents, and by ultimately taking the power to

determine the outcomes of their pregnancies out of their hands and placing it, unconstitutionally,

into the hands of Defendant Lloyd. All pregnant UCs are subject to, affected by, and injured by

the policy regardless of their ultimate pregnancy decisions.[3]

The litany of potential factual differences between J.D. and other pregnant UCs the

government recites, Opp. at 14-15, 18-19, are both irrelevant to the claims at issue, and would

---

[3] Even if this Court agrees with Defendants' that the proposed class should be confined to those who have explicitly requested abortion, Plaintiff should be permitted to proceed as the class representative for the reasons stated herein, and Plaintiff meets the test for numerosity as discussed *infra*.

not defeat commonality and typicality in any event. Defendants argue that class members may be of different ages, at different stages of pregnancy, have different relationships with their parents, or have differing abilities to find sponsors, but none of this has any bearing on the questions at hand here:  Whether Defendants can enforce this policy against young women while they are in ORR custody. Moreover, even if these factual distinctions had some bearing on this case—which they do not—"[f]actual variations between the claims of the class representatives and claims of the other class members do not negate typicality" nor do "factual variations among the class members . . . defeat the commonality," so long as a single aspect or feature of the claim is common to all proposed class members and the claims arise from the same course of conduct.[4] *Bynum*, 214 F.R.D. at 33-35; *Little*, 249 F. Supp. 3d at 420 (holding that "[f]actual variations between the claims of class representatives and the claims of other class members do not negate typicality" and that "[p]laintiffs' claims are typical if they arise from the same course of events" such as "application of [a] [p]olicy" and "class members make similar legal arguments")(citing *Wagner v. Taylor*, 836 F.2d 578, 591 (D.C. Cir. 1987)); *Nio v. U.S. Dep't of Homeland Sec.,* No. CV 17-998 (ESH), 2017 WL 4876276, at *3 (D.D.C. Oct. 27, 2017) ("factual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members.").

In *R.I.L-R*, 80 F. Supp. 3d at 181-82, for example, the court rejected the government's argument that there was no commonality or typicality among a proposed class challenging consideration of mass migration patterns as a factor in immigration detention determinations just

---

[4] For the same reasons, the government's reliance on *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), is misplaced. Moreover, the Supreme Court's focus on factual variations among class members in that case focused primarily on a predominance analysis not relevant here because this is not a Rule 23(b)(3) class.

because "ICE officers can consider a number of factors" when making an individual detention decision. Even though the "exact role" the challenged detention factor "played in any specific [individual detention] determination [was] unknowable," commonality and typicality were still satisfied because ICE policy required consideration of the challenged factor, the policy was being applied, and "all (or nearly all) class members were subjected to a determination that included it." In *DL v. District of Columbia*, the D.C. Circuit very recently rejected the argument that a proposed class challenging the District's failure to comply with the IDEA could not meet commonality or typicality because "there [were] many different reasons" the District denied individual class members special education services. 860 F.3d 713, 725 (D.C. Cir. 2017). Because IDEA liability did not depend on "the reason" for the District's failure but rather whether it failed to meet its statutory obligations and have procedures required to meet the needs of all children, the court found commonality and typicality were easily met. *Id.* at 725-26; *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1122-23 (9th Cir. 2010) (rejecting argument that proposed class of immigrants detained more than six months without a bond hearing failed to meet commonality and typicality requirements just because individuals "suffer detention for different reasons and under the authority of different statutes" where "the constitutional [due process] issue at the heart of each class member's claim for relief [was] common"). Here, as in those cases, J.D.'s and the proposed class members' claims stem from a single policy designed to steer all pregnant UCs away from considering abortion or having an abortion while in ORR custody, no matter what their personal circumstances or desires may be, and resolution of the legal questions about the government's power does not turn on individualized factual circumstances.[5]

---

[5] The government grossly misreads Judge Millett's concurring *en banc* opinion. Opp. at 16-17.

Finally, the government also suggests that J.D.'s interests do not align with other

proposed class members' because no other young people have been injured by Defendants'

policy, Opp. at 15, or are actively seeking access to abortion, Opp. at 22. First, plaintiff has

offered evidence that other members of the proposed class have been injured. *See infra* at 20-21.

Second, even if Defendants' assertion that there are no other UCs in ORR custody who are

seeking access to abortion at this particular moment is true, it ignores the fact that it is just a

matter of time before one does so, and when she does so, she will be subject to Defendants'

policy of coercion and obstruction. Even by the government's own admission, at least 18 young

people have requested abortion services this year and it is impossible to know how many of those

18 or others not included in the base number were unconstitutionally swayed or forced away

from that decision, particularly the five young people the government reports "rescinded their

requests." Opp. at 5-6. For all of these reasons, Plaintiff has shown that J.D.'s claims are

common and typical of the proposed class.

---

Judge Millett's conclusion is that under settled Supreme Court law, the "government may not put substantial and unjustified obstacles in the way of a woman's exercise of her right to an abortion pre-viability," and that the government had no "constitutionally sufficient justification for asserting a veto right over J.D. and Texas law." *Garza v. Hargan*, 874 F.3d 735, 737 (D.C. Cir. 2017) (en banc) (Millett, J., concurring). Indeed, none of the facts the government cites to oppose commonality and typicality did or could justify any further delay and are, thus, irrelevant: a young person's undocumented status, *id.* ("Surely the mere act of entry into the United States without documentation does not mean that an immigrant's body is no longer her or his own"); ability to find a sponsor, *id.* at 739 ("Nor does sponsorship bear any logical relationship to J.D.'s decision to terminate the pregnancy. . . . a sponsor would have no ability to control or influence J.D.'s decision. Accordingly, finding a sponsor and allowing J.D. to exercise her unchallenged constitutional right are not mutually exclusive. The two can and should proceed simultaneously.") (internal citations omitted); and voluntary departure, *id.* at 738 (finding J.D. "need not wait additional weeks just because she—in the government's inimitably ironic phrasing—'refuses to leave' its custody"); *id.* at 742-43 ("The government's mere hope" that J.D. would take voluntary departure or eventually a sponsor would be found "is not a remotely constitutionally sufficient reason for depriving J.D. of any control over this most intimate and life-altering decision.").

**B.    Plaintiff J.D. Will Continue to Adequately Protect the Interests of the Proposed Class Through Qualified Class Counsel.**

Defendants' assertion that J.D. is unable to adequately represent the class is similarly unavailing. Defendants' primary argument here is that J.D.'s success in obtaining an abortion on October 25, 2017 moots *all* of her interests in this case and thereby precludes her from "vigorously prosecut[ing] the interests of the proposed class." [6] Opp. at 11; Fed. R. Civ. P. 23(a). This argument fails at multiple levels. As an initial matter, Defendants are forced to acknowledge that J.D. indisputably has live claims stemming from Defendants' uniform "anti-abortion" policy. *See* Pet. for Cert., No. 17-654, at 24 ("Ms. Doe's abortion did not necessarily moot all of her claims."). Indeed, despite J.D.'s abortion, coercive aspects of this policy continue to actively affect her, particularly forced disclosure of private information. *See, e.g.*, Defs.' Mot. to Recons. (ECF No. 45). As recent filings in this case show, J.D. continues to "vigorously prosecute" these claims. *See* Pl.'s Opp. to Defs.' Mot. for Recons. of Extending Am. TRO (ECF No. 52). Defendants therefore cannot—and do not—dispute that J.D. has a continuing interest in invalidating Defendants' anti-abortion policy, on behalf of both herself and the class.[7]

But even assuming—as Defendants wrongly do—that J.D.'s *only* claim concerns her ability to access the abortion procedure, class certification would still be warranted here. J.D.

---

[6] Defendants concede that J.D.'s claim for monetary relief under *Bivens* is not moot. Opp. at 20. But Defendants are wrong to suggest that this claim for relief hinders her ability to vindicate the rights of other pregnant UCs to have the freedom to make their own decisions about pregnancy by obtaining declaratory and injunctive relief against the government policy.  J.D.'s goals of obtaining monetary relief and striking down the policy are in harmony, not in tension.

[7] Though Defendants apparently "do not concede that Plaintiff's counsel are qualified," Opp. at n.4, all evidence indicates that class counsel will zealously represent both J.D. and the putative class. As set forth in Plaintiff's Complaint and Motion for Class Certification, Plaintiff's attorneys are experienced civil rights lawyers and are considered able practitioners in federal constitutional litigation. Compl. ¶ 52 (ECF No. 1); *see also* Declarations of A. Spitzer, S. Michelman, and B. Amiri in Supp. of Pl.'s Mot. for Class Cert. (ECF Nos. 18-1, 18-2, 18-3).

filed her complaint on October 13, 2017 (ECF No. 1), and her motion to certify a class on October 18, 2017 (ECF No. 18). These events occurred well before she finally obtained her abortion on October 25, 2017. In other words, because J.D. had a live claim when she filed her complaint and when she sought class certification, there would be no question of mootness here *but for* the fact that she succeeded in obtaining her abortion before her class certification motion was ruled upon. *See Sosna v. Iowa*, 419 U.S. 393, 400-402 (1975). But the Supreme Court has recognized at least two exceptions to mootness doctrine that permit class certification in such cases, both of which apply here.[8]

First, class certification is appropriate where claims are "capable of repetition, yet evading review." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 398 (1980) (noting that the "capable of repetition, yet evading review" exception has been applied to permit class certification); *Basel v. Knebel*, 551 F.2d 395, 397 n.1 (D.C. Cir. 1977) (applying the "capable of repetition, yet evading review" exception where "[t]he challenged regulations are still in effect and can be applied against appellant when she seeks food stamp recertification in the future").

Second, class certification is also appropriate where the claims are "so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *Geraghty*, 445 U.S. at 399 (citing *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975)); *Cty. of Riverside v. McLaughlin*,

---

[8] There is also precedent in other courts for finding that so long as the named plaintiff's individual claim was live when she *filed* the motion for class certification the class action is not moot and, accordingly, it is not necessary for a court to determine that a mootness exception applies in order for the case to proceed. *See Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135–36 (3d Cir. 2000) ("So long as a class representative has a live claim at the time he moves for class certification, neither a pending motion nor a certified class action need be dismissed if his individual claim subsequently becomes moot.").

500 U.S. 44, 52 (1991) (retaining jurisdiction in class action even though "the class was not

certified until after the named plaintiffs' claims had become moot [by their receipt of probable

cause hearings or their release from custody]" because the claims were "inherently transitory")

(quotation marks omitted); *Thorpe v. D.C.*, 916 F. Supp. 2d 65, 66–67 (D.D.C. 2013) (noting that

the "inherently transitory" exception to mootness applies "where the population of the claimant

population is fluid, but the population as a whole retains a continuing live claim" and applying it

because the "[t]he length of any individual's stay in a nursing facility is impossible to predict, so

even though there are certainly individuals whose claims will not expire within the time it would

take to litigate their claims, there is no way for plaintiffs to ensure that the Named Plaintiffs will

be those individuals.") (quotation marks omitted).

   Both exceptions are applicable in this case.  Challenges related to pregnancy and access

to abortion have come to be viewed as quintessential examples of claims that are "capable of

repetition, yet evad[e] review," *id.*, and, based on the same rationale, have also been

characterized as "inherently transitory" in nature. *See, e.g.*, *Geraghty*, 445 U.S. at 398 (citing *Roe*

*v. Wade* as an example of a case concerning a claim "capable of repetition, yet evading review.")

(quotation marks omitted); *Doe v. Bolton*, 410 U.S. 179, 187 (1973) (declining to dismiss case as

moot despite termination of pregnancy before appeal); *Doe v. Charleston Area Med. Ctr., Inc.*,

529 F.2d 638, 644 (4th Cir. 1975) (*Roe* "clearly establishes that a woman retains standing and

the case is not rendered moot by an abortion subsequent to the initiation of the action but before

appellate review"); *Doe v. Poelker*, 497 F.2d 1063, 1065–67 (8th Cir. 1974) (finding "that the

plaintiff Jane Doe in this case presents a justiciable controversy and the termination of her

pregnancy sometime after the filing of the complaint, but prior to trial, does not render her case

moot."); *Ciarpaglini v. Norwood*, 817 F.3d 541, 547 (7th Cir. 2016) (characterizing pregnancy as an "inherently transitory" situation).

Indeed, it is very unlikely that this "inherently transitory" claim will remain live for *any* pregnant unaccompanied immigrant minor long enough for a court to certify the class, and certainly will not do so without unnecessarily prolonging the application of the challenged policy to such a young woman. Like all pregnant women, every unaccompanied minor who is pregnant in ORR custody faces a limited gestational period, as well as risks associated with pregnancy and abortion that increase as the pregnancy progresses, including the risk that, if she is delayed from accessing abortion care too long, she will be forced to carry her pregnancy to term against her will.[9] Added to the classically transitory nature of these minors' pregnancies is the fact that the minors are literally "transitory" themselves—moving into ORR custody as they enter the United States, and moving out of ORR custody as they are released to sponsors or are deported. Indeed, the average length of stay in the program in FY 2015 was a mere 34 days.[10] As such – and as the proceedings thus far show[11]—it is highly unlikely that any one pregnant unaccompanied minor

---

[9] Indeed, Defendants still fail to acknowledge the well-accepted medical fact that the risks associated with pregnancy and abortion increase as the pregnancy progresses and thus, it is critical that young women who wish to obtain abortions do so as quickly as possible to protect their health. *See* Pl.'s Mem. in Supp. of App. for TRO & Prelim. Inj. 15 (ECF No. 5-1) (citing *Williams v. Zbaraz*, 442 U.S. 1309, 1314–15 (1979) (Stevens, J., sitting as Circuit Justice) and *H.L. v. Matheson*, 450 U.S. 398, 412 (1981)). Thus, contrary to Defendants' assertion, Opp. at 11, state abortion limits are not goalposts that Defendants can use to defeat class certification.

[10] *See* U.S. Department of Human Services, Administration for Children and Families, ORR, Unaccompanied Children's Program, Fact Sheet, *available at* https://www.acf.hhs.gov/sites/default/files/orr/orr_uc_updated_fact_sheet_1416.pdf.

[11] J.D.'s situation illustrates the time-limited nature of the claim at issue here: by the time this Court decides this motion, even in this highly-expedited case, J.D. would have been past the point of an abortion in Texas. Tex. Health & Safety Code Ann. § 171.044 (prohibiting abortion at 20 weeks post-fertilization).

seeking to enforce her right to make her pregnancy-related decision free from government

obstruction will remain both pregnant and in ORR custody long enough to certify a class. But

those short stays will be long enough for the government to apply their coercion to get minors to

continue their pregnancies and, for those who still decide they want an abortion, cause

unconstitutional and problematic delays and possibly even force a young person to carry to term

against her will.

Nevertheless, and despite acknowledging that "there is no set time before the 'inherently

transitory' doctrine can be invoked," Opp. at 10, Defendants argue that the doctrine is

inapplicable here because it is possible that other minors may file earlier in their pregnancies

than J.D. did and may be forced to stay pregnant against their will for longer than J.D., thereby

permitting a court more time to rule on class certification. Opp. at 9-11.[12] This is absurd. Indeed,

Defendants' argument elucidates exactly why exceptions to mootness are necessary: following

Defendants' argument through to its logical conclusion, the only way in which a class could be

certified in this case is if a pregnant unaccompanied minor is forced to endure the irreparable

harm of carrying a pregnancy against her will (and all associated risks) until briefing on a motion

for class certification is complete and a court renders a decision. Defendants should not be

allowed to rely on their ability to inflict harm on *additional* minors in the future for *longer*

periods of time for the purposes of evading class certification now.

---

[12] Contrary to Defendants' implication, J.D. did not unduly delay in filing her complaint, such
that it can be assumed that other similarly situated pregnant minors would be certain to file
sooner. Soon after learning of her pregnancy, J.D. sought and obtained a judicial bypass. When it
became clear that Defendants would nevertheless persist in physically blocking her from
obtaining an abortion, J.D. quickly moved to vindicate her rights in the Northern District of
California and – when that court found venue to be improper – promptly filed in this Court. *See*
Dec. of B. Amiri in Supp. of Pl.'s App. for TRO and Mot. for Prelim. Inj. ¶ 5 (ECF No. 5-3).

Defendants also attempt to undermine J.D.'s adequacy by asserting that J.D.'s interests are "antithetical" to interests of the class, because some proposed class members will decide to carry their pregnancies to term or may be comfortable divulging highly private information to their parents, sponsors, and religious "crisis pregnancy centers." Opp. at 14-15.[13] But as explained *supra*, J.D.'s interests are perfectly aligned with the interests of the proposed class. Similarly, that some members of the proposed class might ultimately find sponsors or choose to voluntarily depart the country, Opp. at 16, has no bearing on their right to privacy, bodily autonomy and free speech while still in government custody.

The government cites the Ninth Circuit's decision in *Mayfield v. Dalton*, but there the court found that the plaintiffs were inappropriate class representatives because of an actual "conflict between the interests of the putative representative and members of the class" because some class members actively supported the government's policy and wanted it enforced. 109 F.3d 1423, 1427 (9th Cir. 1997). The court distinguished an actual conflict from a situation akin to this case where "some class members might prefer to leave violation of their rights unremedied" — a circumstance that does not make class representative's interests antithetical to the rest of the class. *Id.; see also Wilder v. Bernstein*, 499 F. Supp. 980, 993 (S.D.N.Y. 1980) ("Similarly unpersuasive is defendants' additional argument . . . that there may be conflicting interests within the class because some children may be happy with the present system). Here,

---

[13] While Defendants make this argument when discussing commonality or typicality, Opp. at 14-15, this is in fact an argument regarding J.D.'s ability to serve as an adequate representative. *See* Opp. at 2 (previewing the same points in the introductory discussion of Plaintiff's ability to adequately represent the class); *Nat'l Veterans Legal Servs. Program v. United States*, 235 F. Supp. 3d 32, 41 (D.D.C. 2017) (*quoting Twelve John Does v. Dist. of Columbia*, 117 F.3d 571, 575–76 (D.C. Cir. 1997)) ("Two criteria for determining the adequacy of representation are generally recognized: 1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel.").

the government is hard pressed to credibly assert that pregnant UCs in their custody, even if they have no desire to terminate their pregnancies, affirmatively *want* that decision taken away from them and placed in the government's hands. Similarly, no pregnant UC in ORR custody *wants* the government to decide *for her* if and when to involve her parents or to be sent to unnecessary non-medical appointments where they are forced to talk about intimate matters. *See Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (to defeat the adequacy requirement, a conflict "must be fundamental" and not "merely speculative or hypothetical") (quotation and citation omitted). Thus, there is no conflict between J.D.'s desire to ensure she is free to make her own decisions about her pregnancy, private information, and speech without government coercion or interference and other proposed class members' similar right and desire, even if they ultimately make different choices than J.D. has made.[14]

In sum, given that J.D.'s claims align with the class, and that she retains live claims, shared with the class, that she will continue to "vigorously prosecute," and that the one inherently transitory claim on which she has already obtained TRO relief is subject to mootness exceptions, there is no need to start the process all over again by replacing her with another class member, as Defendants suggest. Opp. at 10.[15] Instead, this Court should certify the class to permit J.D. and the putative class members to continue to vigorously litigate all the claims in this case. *McLaughlin*, 500 U.S. at 51; *see also Samuels v. District of Columbia*, 770 F.2d 184, 193,

---

[14] Nor is J.D. in any way "work[ing] to steer minors toward abortion services." Opp. at 19. Rather, J.D. seeks to vindicate every UC's fundamental freedom to decide if and when to become a parent, as the Constitution has guaranteed people in the United States for decades.

[15] Nor, as Defendants also seem to suggest, *id.*, does Plaintiff's not doing so somehow prove that there are actually no other pregnant minors in ORR custody whose interests align with J.D.'s. To the contrary, as set forth *infra* 18-21, the class is sufficiently numerous so as to make joinder impracticable, warranting certification here.

n.5 (D.C. Cir. 1985) (finding that defendants' provision of "partial and long-delayed relief" to named plaintiffs in the action did not render the case moot, where the plaintiffs "sought class certification to represent all public housing tenants in the District, [and] allege[d] that the District has *systematically* refused to provide an administrative forum for certain tenant complaints on a *classwide* basis.").

## C.      Plaintiff Meets the Numerosity/Impracticability of Joinder Requirement

Defendants do not dispute that each year there are hundreds of pregnant unaccompanied immigrant minors in ORR's legal custody. *See* Op. at 22 (noting that there were 420 pregnant UC in ORR's custody in FY 2017). As discussed *supra*, Defendants' policy applies to all pregnant UCs. Accordingly, Plaintiff's class is several hundred UCs, which is plainly numerous under Rule 23(a). *See, e.g., Coleman through Bunn v. District of Columbia,* 306 F.R.D. 68, 76 (D.D.C. 2015) (noting that numerosity is satisfied when a proposed class has at least forty members).

Unable to dispute that a class of several hundred meets the numerosity test, Defendants instead state that ORR received 18 abortion requests in FY 2017, and argue that Plaintiff's putative class consists of 18 young women. But even if the court accepted Defendants' argument that the only relevant members of the class are those who have explicitly asked for an abortion, Plaintiff has still met the numerosity requirement. The fact that, according to Defendants, only 18 requests for an abortion have been formally transmitted to ORR says little about the actual number of class members who would seek an abortion absent Defendants' policy, which is designed to coerce, intimidate, and prevent young women from seeking abortion care, including by sending them to anti-abortion counseling centers and informing their parents about their pregnancies against their will. Tellingly, in March 2017 alone, just as Defendants began

18

developing the challenged policy, four minors requested abortion. Ex. G. to Reply Amiri Dec.;

TRO Amiri Dec., Ex. G (ECF No. 5-10). Once Defendants' policy was in place, other minors

have undoubtedly been dissuaded from seeking abortion. Defendants cannot, by their own

unconstitutional actions, drive down the number of identifiable class members and then claim the

class size is not numerous. *See Coleman through Bunn*, 306 F.R.D. at 77 (rejecting the District's

attempt to calculate the class by excluding members who acquiesced to the District's challenged

policy).

Even if this Court confined its analysis to the 18 abortion requests in FY 2017, Plaintiff

would nevertheless meet the numerosity requirement. As Defendants correctly point out, Opp. at

21, there is no specific threshold that must be met to satisfy Rule 23(a). A class of 25-40

members is presumed to be adequately numerous, but even a class that encompasses fewer than

20 members may be certified upon a showing of impracticability of joinder. *Coleman through*

*Bunn*, 306 F.R.D. at 76 & n.2. Plaintiff has made such a showing. The factors courts consider in

assessing joinder include: "(1) "judicial economy arising from avoidance of a multiplicity of

actions"; (2) "geographic dispersion of class members"; (3) "size of individual claims"; (4)

"financial resources of class members"; and (5) "the ability of claimants to institute individual

suits." *Id.* at 80 (citation omitted). As discussed in Plaintiff's opening brief, factors (2), (4), and

(5) are particularly pertinent here:  unaccompanied immigrant minors are in shelters across the

United States, and they generally lack the financial resources, the knowledge, and the ability to

bring their own cases. Pl.'s Mot. for Class Certification (ECF No. 18) at 5. The ability of these

minors to bring their own cases is particularly hampered given ORR's policy of preventing them

from meeting with attorneys about abortion access without ORR's prior approval. *See* TRO

Amiri Dec., Ex. G (ECF No. 5-10) (email from Defendant Scott Lloyd instructing that "UC

should not be meeting with an attorney regarding her termination or otherwise pursuing judicial

bypass at this point"). Indeed, given their specific circumstances, "[t]he members of the proposed

class[] in this case are, by definition, uniquely vulnerable." *Coleman*, 306 F.R.D. at 81.

Furthermore, "the class seeks prospective relief for future class members, whose identities are

currently unknown and who are therefore impossible to join." *DL*, 302 F.R.D. at 11. Thus,

joinder is impractical regardless of the precise class size.

      Defendants fail to address any of Plaintiff's arguments related to impossibility of joinder,

but instead assert that J.D.'s case is "very rare." Opp. at 22. However, as demonstrated by

Defendants' own documents, ORR has subjected multiple young women to their unconstitutional

policies since March 2017. Based on Plaintiff's limited information, which ends in April 2017,

the minors affected by Defendants' policy include: 1) a young woman in San Antonio who was

in the process of a medication abortion when ORR intervened to try to stop her from having the

abortion, *see* Ex. G to Amiri Reply Dec.; TRO Amiri Dec., Ex. A (ECF No. 5-4); 2) another

young woman in San Antonio who requested abortion but ORR instructed her shelter to refrain

from acting on the request without prior ORR authorization, and likely forced her to go to a crisis

pregnancy center ("CPC") and told her mother about her abortion, *see* Ex. G to Amiri Reply

Dec.; *id.* at Exs. D, H; TRO Amiri Dec., Ex. D (ECF No. 5-7); 3) a young woman in Arizona

who requested an abortion, but whom ORR forced to go to an abortion-abortion center, to tell her

parents about her abortion decision despite obtaining a judicial bypass, and whom ORR

prohibited from meeting with her attorney about the abortion, *see* TRO Amiri Dec. Exs. C, G

(ECF Nos. 5-6, 5-10); 4) another young woman in Arizona who requested and obtained an

abortion after securing a judicial bypass, and whose parents ORR told over her objection and

despite the fact that her advocate expressed concern that the young woman's father might

retaliate against her mother in her home country because the minor had an abortion, *see* Ex. G to

Reply Amiri Dec.; TRO Amiri Dec., Exs. H, I (ECF Nos. 5-11, 5-12); Ex. I to Amiri Reply Dec.;

5) yet another young woman in Arizona who requested an abortion but "changed her mind," *see*

Ex. J to Amiri Reply Dec.; 6) a young woman in California who requested an abortion, and

"changed her mind," but shelter staff expressed concerns over her deteriorating mental health

and asked ORR for permission to explore pregnancy options with the minor, *see* Ex. K to Amiri

Reply Dec. It is inevitable that Defendants' policy will be imposed on other minors in the future.

For all of the reasons above and in Plaintiff's opening brief, the policy applies to a class too

numerous to join.

## II.      Plaintiff Satisfies the Requirements of Rule 23(b)(2).

Defendants appear to either misunderstand the requirements of Rule 23(b)(2) or

incorrectly assume Plaintiff is moving under Rule 23(b)(3). Defendants argue that Plaintiff's

proposed class does not satisfy Rule 23(b)(2) because "the circumstance of all class members

will vary broadly, and any agency action will depend on considerations [specific to each UC]…"

Opp. at 23. Their opposition reads as though Plaintiff was moving to certify the class under Rule

23(b)(3), which requires the Court to find "the questions of law or fact common to class

members predominate over any questions affecting only individual members…" Fed. R. Civ. P.

23(b)(3). In fact, Plaintiff is moving under Rule 23(b)(2) and therefore must show that "the party

opposing the class has acted or refused to act on grounds that apply generally to the class, so that

final injunctive relief or corresponding declaratory relief is appropriate to the class as a whole."

Fed. R. Civ. P. 23(b)(2). To satisfy Rule 23(b)(2), "it is enough to show that a defendant has

acted in a consistent manner toward members of the class so that his actions may be viewed as

part of a pattern of activity." *Bynum*, 214 F.R.D. at 37 (internal citation omitted). Plaintiff clearly

meets this requirement because ORR's policy to coerce and control all UCs' pregnancy decisions to ensure they carry pregnancies while in ORR custody applies to *all* class members. *See supra* at 4-5.

Indeed, the government's own documents show that Defendants have adopted a policy that ensures all pregnant UCs carry their pregnancies while in ORR custody, and it applies to all pregnant minors regardless of their age, physical location, length of pregnancy, the applicable abortion-related laws in the state she resides in, her access to funds, etc. Defendants' reliance on the particularities of each unaccompanied pregnant minor is misplaced—those differences are irrelevant to ORR's unconstitutional policy of coercing and/or obstructing pregnant minors. Defendants recognize *only* one exception to their policy, namely for minors who would face death or "serious injury" if they carried their pregnancies to term. Opp. at 25. By Defendants' implicit admission, therefore, the policy otherwise applies across the board. Moreover, these factual differences Defendants raise are also irrelevant to the applicability of any injunctive relief awarded. Certification of a class under Rule 23(b)(2) does not require every class member to have been injured or aggrieved in the same way by a defendant's conduct. Rather, a class may properly be certified under Rule 23(b)(2) if the opposing party's "[a]ction or inaction is directed to a class … even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class." Fed. R. Civ. P. 23(b)(2) Advisory Committee's Note (1966). "And Rule 23(b)(2) was intended for civil rights cases." *In re D.C.*, 792 F.3d 96, 102 (D.C. Cir. 2015). Thus, it is sufficient if the defendant has engaged in a pattern of activity that is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct. *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994). The proposed class also requests uniform relief,

prohibiting future implementation of Defendants' unconstitutional policy. Because a single injunction would afford this relief to all members of the proposed class, certification under Rule 23(b)(2) is appropriate. *See Taylor*, 241 F.R.D. at 47 (classwide declaratory and injunctive relief proper where defendant "is alleged to have acted or refused to act on grounds generally applicable to all class members and that injunctive relief would be applicable to the entire class.").

Moreover, certification of the proposed class is appropriate to further judicial economy, avoid mootness, and facilitate enforcement of judgments given the temporal nature of pregnancy. *See supra* at 13-15. Defendants suggestion that each class member should be forced to come forward to file her own claims is entirely unrealistic. First, Defendants' claim that a class action "would likely degenerate into individual evidentiary hearings and litigation over particularized relief orders" is simply unfounded. Opp. at 25. The injunctive relief sought would simply enjoin application of Defendants' unconstitutional policy to all class members and prevent ORR from denying class members their constitutional rights. There would be no need for any individualized hearings because, as discussed *supra*, their specific details are not relevant to a permanent injunction. Second, Defendants argue that the transitory nature of pregnancy is irrelevant because courts can move quickly to issue necessary injunctive relief, citing J.D.'s case as an example. On the contrary, J.D. is the exception that proves the rule: despite having a committed guardian ad litem and attorney ad litem and a team of eight civil rights litigators across the country, it took J.D. weeks to obtain her bypass and then a federal court order permitting her to exercise her constitutional right. To suggest that all others in J.D.'s circumstances will be able to access counsel (which ORR has actively discouraged) and similarly enforce their rights in the teeth of ORR's opposition is farfetched. Even if proposed class members could easily litigate their cases

as individuals, doing so would constitute a tremendous waste of judicial resources. *Matyasovszky v. Hous. Auth. of the City of Bridgeport*, 226 F.R.D. 35, 40 (D. Conn. 2005) ("when making a determination of joinder impracticability, relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersions of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members") (citing *Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993)). Accordingly, all the requirements of Rule 23 are met.

## CONCLUSION

For the reasons given above, and for the reasons stated in Plaintiff's opening brief, Plaintiff's motion for class certification should be granted.


Date: November 27, 2017                    Respectfully submitted,

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
4301 Connecticut Avenue NW, Suite 434
Washington, D.C. 20008
Tel. 202-457-0800
Fax 202-457-0805
*aspitzer@acludc.org*
*smichelman@acludc.org*

s/Brigitte Amiri
Brigitte Amiri*
Meagan Burrows
Jennifer Dalven
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2633
Fax (212) 549-2652
*bamiri@aclu.org*
*mburrows@aclu.org*

*jdalven@aclu.org*

Daniel Mach (D.C. Bar No. 461652)
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Telephone: (202) 675-2330
*dmach@aclu.org*

Mishan R. Wroe
American Civil Liberties Union Foundation of
Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel. (415) 621-2493
Fax (415) 255-8437
*mwroe@aclunc.org*

Melissa Goodman
American Civil Liberties Union Foundation of
Southern California
1313 West 8th Street
Los Angeles, California 90017
Tel. (213) 977-9500
Fax (213) 977-5299
*mgoodman@aclusocal.org*

*\*Admitted pro hac vice*

*Attorneys for Plaintiff*