UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


ROCHELLE GARZA,                      .
                                     .
            Plaintiff,               .  CA No. 17-2122 (TSC)
                                     .
     v.                              .
                                     .
ERIC HARGAN, et al.,                 .  Washington, D.C.
                                     .  Monday, December 18, 2017
            Defendants.              .  10:38 a.m.
. . . . . . . . . . . . . . . . . .


TRANSCRIPT OF MOTION HEARING
FOR TEMPORARY RESTRAINING ORDER
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Plaintiff:        BRIGITTE AMIRI, ESQ.
                          MEAGAN BURROWS, ESQ.
                          American Civil Liberties Union Foundation
                          125 Broad Street
                          18th Floor
                          New York, New York 10004
                          (212) 549-2500

                          ARTHUR B. SPITZER, ESQ.
                          SCOTT MICHELMAN, ESQ.
                          American Civil Liberties Union
                          of the District of Columbia
                          4301 Connecticut Avenue, NW
                          Suite 434
                          Washington, DC 20008
                          (202) 457-0800

For the Defendants:       AUGUST E. FLENTJE, ESQ.
                          U.S. Department of Justice
                          950 Pennsylvania Avenue, NW
                          Room 3613
                          Washington, DC 20530
                          (202) 514-1278

For Defendants:                 SABATINO F. LEO, ESQ.
                                WOEI-TYNG D. SHIEH, ESQ.
                                ERNESTO H. MOLINA, JR. ESQ.
                                CATHERINE DORSEY, ESQ.
                                U.S. Department of Justice
                                Office of Immigration Litigation
                                Appellate Section
                                P.O. Box 878
                                Washington, DC 20044

For Individual                  PATRICK N. STRAWBRIDGE, ESQ.
Defendants:                     CAROLINE A. COOK, ESQ.
                                Consovoy McCarthy Park PLLC
                                Ten Post Office Square
                                8th Floor South PMB #706
                                Boston, Massachusetts 02109
                                (617) 227-0548

Court Reporter:                 BRYAN A. WAYNE, RPR, CRR
                                U.S. Courthouse, Room 4704-A
                                333 Constitution Avenue, NW
                                Washington, DC 20001
                                (202) 354-3186

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
 1                      P R O C E E D I N G S
 2            THE DEPUTY CLERK:  Your Honor, this is Civil
 3   Action 17-2122, Rochelle Garza versus Eric Hargan, et al.
 4        Will counsel please approach the podium and identify
 5   yourselves for the record, as well as any additional parties at
 6   your table.
 7            MS. AMIRI:  Brigitte Amiri for the plaintiff.  I'm
 8   also joined by my colleagues, Arthur Spitzer, Meagan Burrows,
 9   and Scott Michelman.
10            THE COURT:  Good morning.
11            MS. AMIRI:  Good morning.
12            MR. FLENTJE:  August Flentje for the defendants.
13   At counsel table is Ernie Molina, Sabatino Leo, Daniel Shieh,
14   and Cathy Dorsey.  Also at counsel table are attorneys for the
15   private -- private counsel for the individual defendants,
16   Patrick Strawbridge and Caroline Cook.
17            THE COURT:  And your name is pronounced Flentje?
18            MR. FLENTJE:  Flentje.
19            THE COURT:  Thank you.  And you'll be arguing?
20            MR. FLENTJE:  Yes.
21            THE COURT:  All right.  Thank you.
22        Ms. Amiri, and you'll be arguing?
23            MS. AMIRI:  Yes.
24            THE COURT:  All right.  Here we are again.  I've
25   reviewed the parties' filings, including the plaintiff's reply
```

1   that was filed this morning.  It appears that while there are

2   some difference in the case of the two plaintiffs, the same

3   principles are at issue as were at issue in the October hearing.

4       So let me hear from you, Ms. Amiri, although I'm going to

5   have more questions for both sides, given that we have a record

6   here and a Court of Appeals opinion.

7       MS. AMIRI:  Yes, Your Honor.  It's absolutely *déjà vu*.

8   This is the same precise legal principle at issue.  There are no

9   factual differences with respect to Ms. Roe or Ms. Poe which

10  would dictate a different outcome than for Jane Doe.  The

11  government is blocking access to abortion for two unaccompanied

12  minors in their care right now.

13      One of them, Ms. Roe, has already delayed in seeking care

14  by three weeks, and the other is close to the point at which she

15  will no longer be able to get an abortion in the state in which

16  she resides.  Time is of the essence.  The harm to these young

17  woman have already been inflicted by the defendants, and they

18  should be prohibited from inflicting further harm by further

19  delaying their access to abortion.

20      Even though abortion is very safe, each week increases the

21  risks associated with the procedure, and for all of the reasons

22  that Your Honor granted the TRO with respect to Jane Doe, we

23  believe that Jane Poe and Jane Roe are also entitled to a TRO as

24  well.

25      THE COURT:  Let me ask you, Ms. Amiri.  I'm concerned

1   with regard to Ms. Jane Poe, who is further along and fast
2   approaching a point at which it might not be legal or medically
3   advisable to have this procedure.  Now, according to your
4   pleadings, she initially stated that, as of December 4, she said
5   she wanted to carry her pregnancy to term and that she recently
6   decided to have an abortion as of last week.
7       Have you ascertained her position as of today?
8           MS. AMIRI:  Yes, Your Honor, and the position that she
9   was desiring to carry her pregnancy to term as of December 4 is
10  a representation made by the government.  The position that
11  Ms. Poe sought to carry her pregnancy to term on December 4 is a
12  position of the federal government.  We don't know that to be
13  true.  What we do know is that is one of the members of our
14  legal team has now met with Ms. Poe twice, and she --
15          THE COURT:  Can you give me the dates of those
16  meetings?
17          MS. AMIRI:  Yes.  She met with her twice on Friday,
18  this past Friday.
19          THE COURT:  The 15th.
20          MS. AMIRI:  Yes, the 15th, and she was adamant in her
21  decision to have an abortion, understood that the limit was
22  quickly approaching, and was repeated in her request to have
23  access to abortion as soon as possible.
24          THE COURT:  All right.  You can continue, Ms. Amiri.
25          MS. AMIRI:  So, Your Honor, with respect to the harm

1   with Ms. Poe, the limit is quickly approaching.  We want

2   to be able to make sure that she gets the care that she is

3   constitutionally entitled to receive, and also that she has

4   decided to have, without further delays.

5       And with Ms. Poe -- Ms. Roe, rather -- she has been delayed

6   three weeks already.  The government's suggestion that she

7   should be delayed two weeks further on the hope that they place

8   her with a sponsor is, frankly, absurd.  Not only would that

9   mean that she was delayed five weeks in obtaining an abortion,

10  but as we know from Jane Doe, this promise of quick sponsorship

11  reunification is illusory.

12      THE COURT:  Ms. Amiri, what of the government's

13  argument that, with regard to Jane Poe, she should be -- because

14  she is the proponent of the motion for a temporary restraining

15  order, she should be required -- it's her burden to show

16  nonviability?

17      MS. AMIRI:  Your Honor, that's not our burden, number

18  one; and number two, it would be impossible given that they have

19  obstructed access to medical care.  She has not had an ultrasound.

20  We don't have proper dating at this point.  She needs to be

21  allowed to go to a proper physician who will give her a medical

22  examination that is appropriate, make a determination about her

23  pregnancy, provide neutral options counseling, and allow her to

24  proceed with her desired course of action.

25      THE COURT:  And can you respond also to the

government's assertion that this case does not fall under the

D.C. Circuit's *en banc* opinion in the earlier TRO because of the

availability of -- the potential availability of a sponsor for

Ms. Roe?

MS. AMIRI:  Well, Your Honor, in Ms. Doe's case, they

had promised a sponsor in -- I believe it was 11 days.  And here

they are seeking 14 days to do that for Ms. Roe.

And as we know, Jane Doe, to this day, remains in a

shelter.  She has not been reunified with a sponsor.  We put

evidence before this Court from the former director of the

Office of Refugee Resettlement, explaining the steps that it

takes for a sponsorship process to happen.  We knew that it was

going to take longer than 11 days.  We can assume it's going to

take longer than 14 days.

But even if it could happen in that short period of time,

the government can't force Ms. Roe to remain pregnant against

her will for another two weeks on the hopes that she may be

reunified with her sponsor.

THE COURT:  Can you address the government's argument

as to why Judge Millett's opinion doesn't apply to these

particular plaintiffs?

MS. AMIRI:  Your Honor, I believe that this case is

on all fours.  The *en banc* decision was a stay opinion.  It is

instructive for this Court.  It is not preclusive.  But with

respect to the facts at hand, there are no real differences that

would dictate a different outcome.  With respect to Supreme
Court precedent, it is very clear that the government cannot ban
abortion, and that is precisely what they are doing in these
cases with respect to Ms. Roe and Ms. Poe, just as they did with
Jane Doe.

THE COURT:  Are the two plaintiffs in different states
or in the same state?

MS. AMIRI:  They're in different states, Your Honor.

THE COURT:  All right.

MS. AMIRI:  Thank you, Your Honor.

THE COURT:  Thank you, Ms. Amiri.

Mr. Flentje?

MR. FLENTJE:  May it please the Court.  We think
that under Judge Millett's opinion, and if you look at both
opinions that she wrote, there are a lot of difficult factual
circumstances that are relevant to the difficult issues ORR is
facing when asked to facilitate the ability to obtain an
abortion by a minor in its care.

THE COURT:  Let me ask you, Mr. Flentje, I have some
question as to how does this work with Mr. Lloyd.  These girls
are being held in different states, in various states in various
detention facilities.  For example, Jane Doe was held in Texas.
It doesn't say where these two --

MR. FLENTJE:  The location of these women is not in
the --

1          THE COURT:  I know.  It doesn't say where they're

2     being held, but it's not in Texas because there's no judicial

3     approval mechanism involved.

4          According to the regulation that -- according to the ORR's

5     new procedure that was announced in March -- and I'm quoting --

6     it says that all federally funded shelters are prohibited from

7     taking -- and I'm not quoting; this is my summary -- any action

8     that facilitates is a quote -- any action that facilitates

9     abortion access for unaccompanied minors absent direction and

10     approval from the director of ORR, who is Mr. Lloyd.

11          How does that actually work?  Does Mr. Lloyd travel from

12     facility to facility to meet with the girls individually and

13     find out -- I mean, how does that actually work?

14          MR. FLENTJE:  I'm not aware of that, but I mean

15     since -- there is a policy that major medical care, including

16     abortion, requires approval from ORR.

17          THE COURT:  Yeah, but ORR seems to have -- with regard

18     to abortion specifically, it appears from the regulation or from

19     the policy that Mr. Lloyd has to be consulted and give approval

20     in the case of every girl in one of these facilities who is

21     pregnant.  Is that right?

22          I mean, does he go around and does he get a call and say

23     there's a -- we have a young woman who's pregnant in this state,

24     in this facility; can you come and talk to her?  I mean, how

25     does that actually work logistically?

1          MR. FLENTJE:  We've seen a few instances of this; but

2     I think the request goes to ORR, that request is considered,

3     options other than abortion are considered, sponsorship --

4          THE COURT:  By whom?

5          MR. FLENTJE:  Like finding a sponsor.  Well, by ORR,

6     and the ultimate decision is made by the director, which is sort

7     of normal for agency actions.  So, I mean, it shouldn't be seen

8     as unusual that the director is the ultimate decision-maker --

9          THE COURT:  I'm not -- that's not the import of my

10    question.  What I'm wondering is how it works.  In other words,

11    is -- does the ORR director make the final decision for every

12    girl, or does he delegate that -- I mean, does the detention

13    facility say we have -- does he personally meet with the girls?

14    Does he consider a report from this facility?  How does that

15    work?

16         MR. FLENTJE:  I don't know those details of how the

17    policy is implemented.

18         THE COURT:  Okay.

19         MR. FLENTJE:  I do know that an ORR approval is

20    required, and I know that ORR tries to find alternatives such

21    as sponsorship.  And if I can kind of turn --

22         THE COURT:  And ORR does this even in the face of a

23    girl who has made clear her desire to terminate her pregnancy?

24         MR. FLENTJE:  Yes.

25         THE COURT:  So does the girl's decision, the young

1   woman's decision and desire factor in at all in this process?

2          MR. FLENTJE:  Well, I think it probably varies because

3   there are different regimes in different states, and how this

4   works -- in Jane Doe's case, there was a bypass procedure that

5   played a role --

6          THE COURT:  But the Constitution doesn't require that.

7   Right?  I mean --

8          MR. FLENTJE:  The Constitution certainly doesn't

9   require it, but it allows it.  But I think ORR is -- their

10  statute obligates them to look out for the interests of the

11  child.  So that is one thing that they consider.  But I think,

12  certainly, in the facts of these cases, we have a lot fewer

13  facts on the record for these cases.

14      And I think -- if I can say, I think Judge Millett's

15  opinion acknowledged that sponsorship is an ideal situation,

16  but it just took too long the last time.  I think, for Ms. Roe,

17  we're very early in the pregnancy and very advanced in the

18  sponsorship search, and ORR estimates it would take just two

19  more weeks if, you know, the application comes in, for that to

20  be approved.  This is a much easier sponsorship situation than

21  what we faced before, because the potential sponsor is a U.S.

22  citizen.  That makes a lot of things more straightforward.

23         THE COURT:  Well, I'm not sure if I read Judge

24  Millett's opinion in the same way that you do, but let me ask

25  you, with regard to this sponsorship application, how do you

1    respond to Ms. Amiri's point that, given how long the government

2    said it needed for sponsorship in Ms. Doe's case, and Ms. Doe

3    remains in a detention center, what makes you think that two

4    weeks is even a realistic -- this is assuming that I agree with

5    your argument about the import of Judge Millett's opinion, but

6    why do you -- what makes you think that a two-week estimate is

7    reasonable?  For one thing -- let me ask you, how many documents

8    need to be gathered?

9             MR. FLENTJE:  Well, I mean, I think the application

10   has been made, but there's fingerprinting, there's an interview,

11   so there's things that the sponsor needs to submit.  ORR will

12   move very quickly --

13            THE COURT:  Do you have any reason to believe that

14   that documentation can be easily provided?  I mean, you know,

15   the person, whoever it is, has to be approved.  As I recall, the

16   last time I think when we had argument -- or maybe this was from

17   the appellate argument; I don't remember.  But there were some

18   rules about sponsorship like you couldn't be, like, a single

19   male, or there were age requirements.  I mean, there are a lot

20   of requirements just to be eligible to be a sponsor, correct,

21   before you even get into the application process?  Is that right?

22            MR. FLENTJE:  Sure.

23            THE COURT:  Okay.  Has this potential sponsor -- does

24   this potential sponsor even meet those minimum requirements?  I

25   mean, is this person, you know, within all the requirements that

1    were described before?

2         MR. FLENTJE:  I mean, I don't want to talk beyond the

3    record, and it is a limited record, but the application has been

4    submitted.  ORR does not have any information to suggest that

5    it's not a sponsorship that can get approved.

6         THE COURT:  How long do background checks take to

7    implement?

8         MR. FLENTJE:  ORR has estimated that if the paperwork

9    gets in quickly, the whole thing can be done in two weeks.

10        THE COURT:  Okay.

11        MR. FLENTJE:  That is an estimate --

12        THE COURT:  How many home visits are required?

13        MR. FLENTJE:  Well, a home study --

14        THE COURT:  A home study.

15        MR. FLENTJE:  -- is required, and I don't know how

16   many visits that entails, I'm sorry.

17        THE COURT:  All right.  And if the background check or

18   the home visit turns up something of concern, how long does that

19   take to resolve?

20        MR. FLENTJE:  Obviously, if the sponsor has problems

21   and it won't be approvable, then, you know, that would -- I

22   think ORR thinks a decision can be made in two weeks and --

23        THE COURT:  So ORR's estimate of a decision in two

24   weeks is based upon an assumption that everything will go

25   smoothly --

1        MR. FLENTJE:  I think it's based --

2        THE COURT:  -- in other words, the documents will

3   be provided promptly, there won't be any major problems --

4        MR. FLENTJE:  Yeah, things do have to go smoothly.

5   I mean, obviously, the sponsor is in control of the timing,

6   somewhat, because papers and fingerprints are due.

7        THE COURT:  In determining the eligibility of a

8   sponsor for girls who are pregnant, does the government ask the

9   sponsor whether they would be willing to allow an abortion, or,

10  conversely, are sponsors only considered who would not allow an

11  abortion?  Is that a factor that's considered?

12       MR. FLENTJE:  I can tell you on -- in answer to the

13  second question, no, they do not consider that.  I don't know

14  what questions are asked.  But they do not -- they do not base

15  sponsorship on views about abortion.

16       THE COURT:  Is that an inquiry that is made of the

17  sponsor?

18       MR. FLENTJE:  I just don't know.

19       THE COURT:  And is the potential sponsor told that the

20  young woman is pregnant?

21       MR. FLENTJE:  I think -- you entered an order in the

22  first case that that couldn't happen.  I think that they would

23  normally probably talk about issues like that.

24       THE COURT:  I'm sorry.  I didn't even let you get into

25  your argument.  Please continue.

1           MR. FLENTJE:  Well, I mean, our main point is that

2   Judge Millett recognized that there are a variety of factors

3   that are relevant.  The most pressing one that was at issue in

4   the last case was the significant period of time.

5       In that case, it had already been seven weeks of sponsor

6   search, no applicant had been identified at the time, there had

7   been two who had applied and failed, and the government was

8   unable to provide a timeline for completing or finding an

9   applicant.  All those facts are different here.

10          THE COURT:  Well, the government's timeline in this

11  case is only an optimistic estimate, isn't it?  I mean, it's two

12  weeks if everything goes well.

13          MR. FLENTJE:  It's an estimate of within two weeks,

14  and that's -- you know, I don't want to get to the end of my

15  argument.  That's one reason why we'd ask for a two-week stay of

16  whatever this Court rules.

17      We're also -- for Ms. Roe, it's earlier in the pregnancy,

18  which I think gives a small amount of flexibility on timing.

19  I think there are other issues of concern given the speed with

20  which they have requested a court order.  Neither minor has a --

21          THE COURT:  Well, the speed is a factor of the fact

22  that time is of the essence, especially with regard to Ms. Poe.

23  I mean --

24          MR. FLENTJE:  Absolutely.

25          THE COURT:  -- it's literally a matter of every day

counts.  How does, then -- how is Ms. Poe, then, not in danger of suffering irreparable harm if every day moves her fact towards a position where she will not be able to avail herself of a termination of her pregnancy?  How is that not irreparable harm?

MR. FLENTJE:  We'd certainly agree that time is of the essence in that case.  We do have concerns that that time has already passed.

THE COURT:  As to Ms. Poe, is the government's position that, because it's unclear how far along she is, that she should be required to prove that -- required to prove nonviability?  Is that her burden here?  Is that how I read your motion?

MR. FLENTJE:  Our declaration indicates she's approximately 22 weeks into pregnancy.

THE COURT:  But has she been able to meet with a physician?  Has she received an ultrasound?  I mean, these are approximate dates, and people are different, pregnancies are different.  Has she been allowed to meet with a physician?

MR. FLENTJE:  These details aren't in the record yet, but my understanding is that she's received appropriate medical care other than her request to obtain an abortion.  So I do think she -- I do understand that she has met with, you know, OB/GYN and --

THE COURT:  What would Ms. Poe have to do in order to

```
1    satisfy the government that she was making an informed choice?
2              MR. FLENTJE:  There is -- with respect to Ms. Poe,
3    I wanted to let the Court know a decision was made yesterday,
4    late yesterday, by ORR that abortion would not be in the best
5    interest in that situation.
6              THE COURT:  Based on what?
7              MR. FLENTJE:  Well, there is -- I think based on
8    concerns about the impact on her --
9              THE COURT:  On whom?  On Ms. Poe?
10             MR. FLENTJE:  On Ms. Poe.  So there is actually a
11   decision that's been made there.  That is something that, you
12   know, we could review -- it would have to be under seal -- and
13   provide to the Court.
14             THE COURT:  I would like that provided by five o'clock
15   today.  I mean, is that decision any -- so she has no sponsor,
16   but a decision has been made that she will not be allowed to
17   terminate her pregnancy.
18             MR. FLENTJE:  Obviously, a sponsorship search will
19   continue, but that --
20             THE COURT:  Yes.
21             MR. FLENTJE:  -- is a decision of the agency that's
22   been made.
23             THE COURT:  But there's no potential sponsor on the
24   horizon at this time, correct?
25             MR. FLENTJE:  We have not identified one in our
```

1    declaration.

2              THE COURT:  And is it the government's position that

3    despite Ms. Poe's last-stated desire to terminate her pregnancy

4    as quickly as possible, that ORR has determined that under no

5    circumstance -- or that -- forget that -- that Ms. Poe will not

6    be permitted to do that, and it's done so based on --

7              MR. FLENTJE:  Basically, a best-interest termination.

8    ORR has --

9              THE COURT:  How does that overcome her constitutional

10   right?

11             MR. FLENTJE:  Well, we're --

12             THE COURT:  It may be certainly ORR's opinion that it

13   is in her interest, but how does ORR have more rights over her

14   than, for example, a parent?  A parent wouldn't be allowed to

15   make that decision, right?

16             MR. FLENTJE:  Well, I mean, the Supreme Court has

17   authorized sort of parental consent procedures that allow a

18   court ultimately to make a best-interest determination, and

19   there's state law.

20             THE COURT:  But the states in this case don't have

21   those procedures.  The states have determined, by the absence of

22   judicial procedures, that the decision can be made by the young

23   women.  Okay.  This isn't Texas, and so *Casey* isn't really

24   applicable here.

25         So it appears to me that what ORR has done -- has said,

```
 1   well, despite the fact that her parents wouldn't have the right

 2   to stop her, ORR has some right that extinguishes her

 3   constitutional rights?  I don't understand.

 4           MR. FLENTJE:  There's going to be no extinguishing

 5   of her constitutional rights.  Those will be heard by you,

 6   Your Honor.  I do want to say ORR has the statutory

 7   responsibility to determine the interests of the child in

 8   medical care.  That is the --

 9           THE COURT:  ORR's -- tell me, is ORR's policy that in

10   no case other than, say, danger to the life of the mother would

11   a young woman in federal custody at a detention facility be

12   permitted to terminate a pregnancy?  It seems to me it's not a

13   case-by-case determination; it's a blanket determination.  Isn't

14   that right?

15           MR. FLENTJE:  No.  It was a case-by-case determination.

16   In Ms. --

17           THE COURT:  Has ORR allowed --

18           MR. FLENTJE:  There's been no determination in

19   Ms. Roe --

20           THE COURT:  Has ORR allowed a young woman in custody

21   so far to have -- to terminate her pregnancy?  Has that been

22   permitted?

23           MR. FLENTJE:  I don't know the answer to that.  I

24   do know that, in our class certification paper, we submitted a

25   declaration identifying around 17 instances.  Some of the women
```

changed their mind.  Some obtained sponsors.  So, I mean, that

is sort of the best evidence we have.  And that's a little

dated, obviously, now that we have Ms. Roe and Ms. Doe -- excuse

me, Ms. Poe.

      So our primary point is, is that the facts in each case are

different.  Some of them are more difficult.  Some of them I

think warrant time for ORR to do its normal process so it's not

required to facilitate an abortion.  The request here is a step

beyond a legal prohibition that applies in a state.  It is

seeking actual facilitation, and we request --

            THE COURT:  No.  There's no legal -- I mean, I

disagree with that characterization only because Texas had a

judicial approval process which Jane Doe went through, and even

so, ORR sought to stop her from exercising her right to

terminate her pregnancy.

      The states in which the two plaintiffs here currently

are -- in which they're currently being held do not have similar

judicial process.  And what it seems to me the government is

asking is for this Court to say, "well, they should," and

initiate another layer of process.

      Why would that even be sufficient given what happened in

Jane Doe?  I mean --

            MR. FLENTJE:  Well, I mean, because of the --

            THE COURT:  -- in Jane Doe, there was a judicial

process.  A state court judge had to approve her right, and

1    there was a judicial -- I think two guardians appointed for her.

2    So even with all of that process, the government asserted that

3    she -- they wouldn't allow her to have -- to terminate her

4    pregnancy.  So what difference does it make?

5              MR. FLENTJE:  Our ultimate argument in that case,

6    which we're preserving here but understand we can't make, is

7    that the ability to return to the country of nationality means

8    that the United States doesn't --

9              THE COURT:  I did read Judge Henderson's dissent.

10             MR. FLENTJE:  Well, it's a little different from

11   Judge Henderson's dissent.  It's an application of the undue

12   burden test.  That being said, I think Judge Millett recognized

13   that there are circumstances where ORR should have more time,

14   and that's kind of what we're asking about with respect to

15   Ms. Roe.

16             THE COURT:  And as to Ms. Poe, there is -- time is

17   running out.

18             MR. FLENTJE:  Time has --

19             THE COURT:  In fact, the time has run because --

20             MR. FLENTJE:  -- may have already run out.  It's

21   certainly running out.  I think our point in that case is that,

22   you know, she obviously struggled with the decision.  There's

23   evidence that very recently she was going to keep the child and,

24   you know, this is sort of -- I mean, it's a difficult situation.

25   We acknowledge that.

1          THE COURT:  It's always a -- I mean, I think it would

2    be somewhat cavalier of us not to acknowledge that every

3    decision to terminate a pregnancy is a difficult one.  And the

4    fact that it is a difficult one, and often the case is a very

5    difficult one, doesn't negate the fact that ultimately it is her

6    right to choose.  So if she, as one would expect, has struggled,

7    that doesn't mean that simply because she arrived at her

8    decision after a struggle lessens her right.  Isn't that correct?

9          MR. FLENTJE:  I certainly understand that, Your Honor.

10   I mean, I think because ORR has this custodial relationship and

11   because some facilitation is required -- and I think the D.C.

12   Circuit acknowledged that -- what is happening here is more than

13   what *Casey* addressed and what cases dealing with prohibitions on

14   abortion address.  It's something more.  And because it's

15   something more, there has to be time to allow the government not

16   to have to facilitate the abortion.

17          THE COURT:  What something more is it?

18          MR. FLENTJE:  It is the facilitation that's required

19   by the government.

20          THE COURT:  But that was considered in Jane Doe's

21   case.  The government --

22          MR. FLENTJE:  It was considered , and it didn't

23   outweigh the interests of Jane Doe, which are based on the

24   specific facts, and those facts include the long sponsorship

25   search, running out of time, different factors that, at least in

1    case of Ms. Roe, are not yet present.  And that case could be

2    resolved in two weeks with a sponsorship approval.

3         THE COURT:  All right.  Let me ask you, with regard to

4    either of these plaintiffs, if -- well, I guess you've already

5    answered that question.

6         So is it your position that, with its decision that was

7    made I think yesterday, or recently, that it would not permit

8    Ms. Poe to have the procedure, does ORR consider its rights or

9    its control over Ms. Poe to be greater than parental rights?

10   In other words, if ORR were her parent, would it have the right

11   to completely veto her choice to terminate her pregnancy?

12        MR. FLENTJE:  I think section -- 6 U.S.C. 279 says ORR

13   is charged with, quote, ensuring that the interests of the child

14   are considered in decisions, and I think that is the authority

15   that's being exercised.  Whether that -- how that maps on to how

16   a parent would operate in a household I think is very different,

17   but it's an institution engaging in a governmental custodial

18   responsibility.

19        THE COURT:  If Jane Poe has decided that she wishes to

20   terminate her pregnancy, and she has a right to do so, how is it

21   ORR's decision that it is in her interest not to?  What is that

22   based on?

23        MR. FLENTJE:  It's just a best-interest determination.

24        THE COURT:  And is ORR's position that that would be

25   the case for every young woman seeking to terminate a pregnancy;

1    it would never be in their interest?

2              MR. FLENTJE:  That it would reach the same conclusion

3    every time?  I don't know.  I mean, I think the policy is an

4    abortion would need to be -- facilitation of an abortion would

5    need to be approved by ORR though the director, but there's no

6    general policy that it will never be approved.

7              THE COURT:  All right.  Thank you.

8              MR. FLENTJE:  I do want to ask, before I sit down,

9    we've asked for a stay pending appeal on three tiers:  The first

10   is pending appeal, the second is for at least two weeks for

11   Ms. Roe, and the last is for 24 hours to allow us to immediately

12   seek relief in the Court of Appeals and the Supreme Court.  I

13   would only ask that the Court rule on our stay request

14   simultaneously with its ruling.

15             THE COURT:  All right.  Thank you, Mr. Flentje.

16      Ms. Amiri.

17             MS. AMIRI:  Your Honor, with respect to approval of

18   medical procedures for unaccompanied minors, it's obviously not

19   a two-way street.  If Ms. Roe and Ms. Poe and Ms. Doe had all

20   wanted to carry their pregnancies to term, the director of ORR

21   would not have approved that process even though carrying a

22   pregnancy to term is 14 more times more dangerous in terms of

23   morbidity than an abortion.  So that right there, Your Honor,

24   I think really focuses on what the issue is here, and that is

25   the government's opposition to abortion.

1    The concept that they are using -- in terms of the

2    best-interest standard in the statute, they are dressing it

3    up as basically a way of justifying their veto power.   Their

4    determination of what is in the best interest of these minors

5    cannot supplant the minor's own decision-making.

6    As Your Honor has pointed out, that would be a veto power

7    over the minor's decision, which is blatantly unconstitutional,

8    as the Supreme Court has held in *Planned Parenthood v. Casey* and

9    other Supreme Court cases regarding parental consent and spousal

10   notification.

11   Also, with respect to the voluntary departure, Your Honor,

12   that would require giving up the right to stay in this country

13   to be able to obtain an abortion.   Everything that the

14   government is saying, whether it's sponsor reunification --

15   THE COURT:  Let me ask you, Ms. Amiri, some of these

16   young women who are held in these facilities, do some of them

17   have claims of, for example, asylum or abuse that are being --

18   that they're waiting to have ruled on?

19   MS. AMIRI:  We don't know enough about Ms. Poe and

20   Ms. Roe yet, but with respect to Ms. Doe, we did note that there

21   was abuse in her home country and there would be opportunities

22   to seek special immigration juvenile status for that.   So we

23   just don't know with respect to the other minors.

24   But it shouldn't hinge -- the right to abortion should not

25   hinge on these factors.   Whether there's a possible viable

sponsor or whether the minor is able to be reunified with family
doesn't change the equation.  They are in government custody
right now.  Right now they are being forced to carry their
pregnancies against their will.  Right now the government is
preventing them from obtaining an abortion.

What it comes down to is that the government does not want
these young women to have an abortion while they are in federal
custody, and that is a ban on abortion and is even more extreme
than the substantial obstacles struck down by the court in *Casey*
and *Whole Woman's Health v. Hellerstedt.*

Your Honor, I'd also like to just focus on one other point,
in addition to some housekeeping issues.  Your Honor, with
respect to the decision-making process that Ms. Poe is facing,
what we are asking is for ORR to not prohibit her from obtaining
an abortion.  We are not seeking anything other than the ability
for her to obtain proper care and make a decision on her own.

Whether she decides then to carry her pregnancy to term or
to have an abortion is completely of her own.  It is not the
government's decision to make, and we are simply asking that the
government not stand in her way or supplant her decision for
theirs.

With respect to some of the housekeeping, Your Honor,
I'm wondering if we could request that the deadline for any
submissions under seal be moved up.  We would appreciate a
ruling today on our TRO motion.  So if they don't submit

1    something until 5 p.m., that might delay the process.

2              THE COURT:  I think that's fair.

3         Given the time constraints, Mr. Flentje, I'm going to ask

4    that any further information that I requested from you be

5    submitted by 3 p.m.

6              MS. AMIRI:  Thank you, Your Honor.

7         The other thing, Your Honor, we will submit a proposed

8    order that encompasses any sort of communications with respect

9    to the ACLU and the shelters.  It came to our attention last

10   night that the shelters are being prohibited by ORR from

11   communicating directly with the ACLU, and we are concerned about

12   that and are concerned about any sort of routing of those

13   communications through ORR -- or Department of Justice,

14   rather -- would delay any sort of access to abortion for these

15   young women.

16             THE COURT:  I believe you stated that, in both the

17   case of Ms. Poe and Ms. Roe, federal funds are not being used

18   for these procedures.  Correct?

19             MS. AMIRI:  Correct, Your Honor.

20             THE COURT:  So you're saying that you have information

21   that these facilities -- which are contracted facilities,

22   correct?

23             MS. AMIRI:  Yes, Your Honor.

24             THE COURT:  -- are not being allowed to have contact

25   with the ACLU?

1        MS. AMIRI:  Not absent the presence of DOJ.  And

2    certainly they can speak to this, but it is our concern that

3    it will slow down the process if we have to route all our

4    communications with the shelter through Department of Justice.

5        And so, you know, we will consider submitting a proposed

6    order, with Your Honor's permission, to address this issue and

7    to ensure that there are no delays in communication between the

8    counsel for the plaintiffs and the shelters directly.

9        THE COURT:  If you can submit that by three o'clock.

10       MS. AMIRI:  Yes, Your Honor.  We certainly will.

11       And the last thing, Your Honor, I want to mention, just

12   as a flag, you know, we have before Your Honor also the motion

13   for class certification and the motion for the preliminary

14   injunction as to the class.

15       And, you know, as we have seen now with Ms. Poe and

16   Ms. Roe, their circumstances completely undermine the

17   government's position that Jane Doe was *sui generis*, that

18   she was unique, that there was nobody else like her in their

19   custody.

20       We now know that the government is doing this to other

21   young women, prohibiting them from accessing abortion, and we

22   think it's crucial that we are allowed to proceed as a class

23   action and that we get preliminary relief as to the class.

24       THE COURT:  Yes, thank you.  I was working on that,

25   but I had to stop because I have this case.

1          MS. AMIRI:  I appreciate it, Your Honor.

2          THE COURT:  But the fact of this case, obviously,

3    does inform that one.  So, Mr. Flentje, let me ask you, what

4    information do you have regarding the -- is that true?  Do the

5    facilities have to -- are they prohibited from having contact

6    with ACLU absent the presence of DOJ?

7          MR. FLENTJE:  We're looking into that this morning.

8    We've told the facilities that any request from ACLU that has to

9    do with contacting their clients, they should not involve us;

10   they should be free to allow -- to enable those communications.

11         As far as communicating with the facilities on case-related

12   or injunction-related materials, the facilities are acting as

13   our agents in implementing any of this, so we have asked that

14   DOJ be included.  But we're willing to --

15         THE COURT:  Included in what?  In other words --

16         MR. FLENTJE:  To be a party to those communications

17   because they are the agents of ORR, which is our client, in

18   dealing with case-related matters.

19         THE COURT:  Okay.  Say there is a young woman at one

20   of these facilities who says to someone at the facility, "I need

21   the help of the ACLU; can you contact them for me, please?"

22   Is it your position that that contact cannot be made by the

23   facility until it's been routed through DOJ?

24         MR. FLENTJE:  No.  No.  There's been nothing like that.

25         THE COURT:  Thank you.

1          All right.   Thank you, all.   I will try to rule on this

2    expeditiously.

3          (Proceedings adjourned at 11:17 a.m.)

\*   \*   \*   \*   \*   \*

CERTIFICATE

     I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.


_Bryan A. Wayne_
BRYAN A. WAYNE