## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROCHELLE GARZA, as guardian ad litem to unaccompanied minor J.D., on behalf of herself and others similarly situated; JANE ROE and JANE MOE on behalf of themselves and others similarly situated, and JANE POE, | ) ) ) ) ) ) | No. 17-cv-02122-TSC |
| c/o ACLU 125 Broad Street, 18th Fl. New York, NY 10004, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ERIC HARGAN, Acting Secretary of Health and Human Services U.S. Department of Health & Human Services 200 Independence Avenue, S.W. Washington, D.C. 20201; | ) ) ) ) ) ) ) | |
| STEPHEN WAGNER, Acting Assistant Secretary for Administration for Children and Families, in his official capacity 330 C Street, S.W. Washington, D.C. 20201; and | ) ) ) ) ) ) | |
| SCOTT LLOYD, Director of Office of Refugee Resettlement, in his official capacity 330 C Street, S.W. Washington, D.C. 20201, | ) ) ) ) ) ) | |
| Defendants. | | |

---

## SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF
(Interference with minors' constitutional right to obtain an abortion)

Plaintiff Rochelle Garza, court-appointed guardian ad litem to minor J.D., Plaintiffs Jane

Roe and Jane Moe, on behalf a class of similarly situated pregnant unaccompanied immigrant

minors in the legal custody of the federal government, and Plaintiff Jane Poe, for their complaint in the above-captioned matter, allege as follows:

## PRELIMINARY STATEMENT

1.      There are currently thousands of unaccompanied immigrant minors (also known as unaccompanied children, or "UCs") in the legal custody of the federal government. These young people are extremely vulnerable: Many have come to the United States fleeing abuse and torture in their home countries; many have been sexually abused or assaulted either in their home countries, during their long journey to the United States, or after their arrival; some have also been trafficked for labor or prostitution in the United States or some other country; and many have been separated from their families.

2.      The federal government is legally required to provide these young people with basic necessities, such as housing, food, and access to emergency and routine medical care, including family planning services, post-sexual assault care, and abortion. And as is true with everyone in the United States, the Constitution prohibits the government from imposing an "undue burden" on their right to obtain an abortion.

3.      Defendants have recently revised nationwide policies that allow them to wield an unconstitutional veto power over unaccompanied immigrant minors' access to abortion in violation of their Fifth Amendment rights. Under these nationwide policies, Defendants also force unaccompanied minors who request abortion to visit a pre-approved anti-abortion crisis pregnancy center, which requires the minor to divulge the most intimate details of her life to an entity hostile to her abortion decision, in violation of her First and Fifth Amendment rights. Defendants also force minors to notify parents or other family members of their request for abortion and/or the termination of their pregnancy, or notify family members themselves, in violation of the First and Fifth Amendments.

4.      Plaintiff "Jane Moe," an unaccompanied minor in the legal custody of the federal government (a motion to allow her to proceed by a pseudonym will be filed herewith), is pregnant and seeking an abortion. Ms. Moe first requested access to abortion approximately two

weeks ago but, to date, Defendants have not allowed her to access abortion. Defendants have pushed Ms. Moe further into her pregnancy. Without this Court's immediate intervention, Defendants will continue to deny Ms. Moe the ability to access abortion, and ultimately will force her to carry to term against her will.

5.     Previously, two unaccompanied minors in the legal custody of the federal government, "Jane Roe" and "Jane Poe" (a motion to allow them to proceed by pseudonyms was granted), were pregnant and sought an abortion. Ms. Roe first requested an abortion on November 21, 2017, but Defendants did not allow her to access abortion. Defendants pushed Jane Roe further into her pregnancy, forcing her to forgo a medication abortion. Ms. Poe also sought an abortion, and she was quickly approaching the limit for abortion in the state where she was being detained. Ms. Poe urgently needed access to an abortion provider, but Defendants did not allow her to see one. Absent this Court's immediate intervention, Defendants would have continued to block Ms. Roe's and Ms. Poe's ability to access abortion, and ultimately would have forced them to carry their pregnancies to term against their will.

6.     Previously, an unaccompanied immigrant minor in the legal custody of the federal government, J.D. (for "Jane Doe"; an unopposed motion to allow her to proceed by those pseudonymous initials is pending), learned she was pregnant and told the shelter in Texas where she lives that she would like to have an abortion. Because Texas requires parental consent or a judicial waiver of that requirement, J.D. went to court and, with the assistance of an attorney ad litem and a guardian ad litem, received judicial permission to consent to the abortion on her own. Defendants took the position that J.D. was prohibited from accessing an abortion: Defendants would not transport her for the abortion, nor would they allow anyone else to do so. Defendants essentially held J.D. hostage to prevent her from getting an abortion in blatant violation of J.D.'s constitutional rights.

7.     Defendants also forced J.D. to visit a religious, anti-abortion crisis pregnancy center, and, over J.D.'s objections, told J.D.'s mother that J.D. was pregnant. To vindicate her constitutional rights to terminate her pregnancy and to avoid compelled speech, her court-

appointed guardian ad litem, Rochelle Garza, sought an immediate TRO to grant J.D. access to judicially approved abortion, and, on behalf of the class of similarly situated unaccompanied immigrant minors, a preliminary injunction to prevent Defendants from obstructing, interfering with, or blocking other individuals' access to abortion.

8.      Although J.D., Jane Roe, and Jane Poe were able to obtain abortions after this Court's intervention, Defendants are now preventing Jane Moe from accessing abortion.

9.      While abortion is a very safe procedure, each week of delay increases the risk associated with it.

10.     Absent emergency injunctive relief, Defendants' actions will have the effect of forcing Jane Moe to continue her pregnancy against her will.

## JURISDICTION AND VENUE

11.     This action arises under the First and Fifth Amendments to the United States Constitution and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331.

12.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Federal Rules of Civil Procedure 57 and 65, and by the inherent equitable powers of this Court.

13.     The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

14.     Venue is proper in this district under 28 U.S.C. § 1391(e).

## PARTIES

15.     Plaintiff Rochelle Garza is the court-appointed guardian ad litem for J.D., a minor who came to the United States without her parents from her home country. J.D. was detained by the federal government and placed in a federally funded shelter in Texas. J.D. is 17 years old. She was pregnant and told the staff at the shelter where she is currently housed that she wanted an abortion. J.D. faced extreme resistance from Defendants. After Plaintiffs' counsel contacted Defendants' counsel, J.D. was allowed to pursue a judicial bypass in lieu of securing parental

consent for the abortion, as required by Texas law. With the assistance of attorney and guardian ad litems, J.D. secured a court order permitting her to have an abortion without parental consent. Nevertheless, Defendants took the position that they would not allow J.D. to access abortion.

16.     J.D. was forced to cancel multiple appointments for state-mandated counseling and the abortion due to Defendants' obstruction, which pushed J.D. later into pregnancy; although abortion is very safe, each week of delay increases the risks. Abortion is approximately 14 times safer than childbirth in terms of morbidity. J.D. remains in Defendants' custody, and absent a TRO from this Court, J.D. would have been forced to carry to term against her will.

17.     Defendants also forced J.D. to visit an anti-abortion crisis pregnancy center, and over J.D.'s objection, Defendants told J.D.'s mother about her pregnancy.

18.     J.D. moved this Court to be referred to in this litigation by the initials "J.D." for "Jane Doe" to protect her privacy. She fears retaliation because of her abortion decision, and she does not want her family to know she sought and obtained abortion.

19.     J.D. sues on her own behalf and as the class representative of other similarly situated young women.

20.     Plaintiff Jane Roe came to the United States without her parents, was detained by the federal government, and was residing in a private, federally funded shelter. On November 21, 2017, she discovered she was pregnant during a medical examination after she was in federal custody. The physician discussed her pregnancy options, and she decided to have an abortion. She asked her doctor and her shelter for an abortion, but Defendants did not allow her to have one. Jane Roe requested to terminate her pregnancy by taking medications (known as a medication abortion) that end the pregnancy and essentially cause a miscarriage. However, because of Defendants' obstruction, a medication abortion was no longer an option. Jane Roe nonetheless still wanted an abortion.

21.     Jane Roe was granted leave from this Court to proceed in this litigation as "Jane Roe" to protect her privacy. She fears retaliation because she requested and obtained an abortion, and she does not want her family or others to know she sought or obtained an abortion.

22.     Upon information and belief, based on Defendants' policy, Jane Roe has or will be forced to disclose, or Defendants will disclose, highly personal and confidential information about her pregnancy against her will, including to family members and/or to an anti-abortion counseling center.

23.     Jane Roe sues on her own behalf and as class representative of other similarly situated young women.

24.     Plaintiff Jane Poe came to the United States without her parents, was detained by the federal government, and is residing in a private, federally funded shelter. She discussed her pregnancy options with a physician, and decided to have an abortion. She asked the shelter for access to abortion but was not permitted to access abortion.

25.     Upon information and belief, based on Defendants' policy, Jane Poe has or will be forced to disclose highly personal and confidential information about her pregnancy against her will, including to family members and to an anti-abortion counseling center. In fact, when Ms. Poe was required to tell her mother and potential sponsor about her pregnancy, they threatened to physically abuse her if she had an abortion.

26.     Jane Poe was granted leave by this Court to proceed in this litigation as "Jane Poe" to protect her privacy. She fears retaliation because she requested and obtained an abortion, and she does not want her family or others to know she sought and obtained an abortion.

27.     Jane Moe came to the United States without her parents, was detained by the federal government, and is residing in a private, federally funded shelter. She has decided to have an abortion. She asked the shelter for access to abortion but, to date, has not been permitted to access abortion.

28.     Pursuant to Defendants' policy, Jane Moe was required to visit an anti-abortion crisis pregnancy center to discuss her pregnancy.

29.     Upon information and belief, based on Defendants' policy, Defendants are seeking to require Ms. Moe to disclose her pregnancy and abortion decision to her parents, despite her desire that this information be kept private. Ms. Moe does not want to be forced to

disclose, or have Defendants disclose, highly personal and confidential information about her pregnancy against her will to family members and/or potential sponsors.

30.     Jane Moe requests leave from this Court to proceed in this litigation as "Jane Moe" to protect her privacy. She fears retaliation because she has requested an abortion, and she does not want her family or others to know she is seeking an abortion.

31.     Jane Moe sues on her own behalf and as class representative of other similarly situated young women.

32.     Defendant Eric Hargan is the Acting Secretary of the United States Department of Health and Human Services ("HHS") and is responsible for the administration and oversight of the Department. Defendant Hargan has authority over the Administration for Children and Families, a subdivision of HHS. By interfering with, prohibiting and/or obstructing unaccompanied immigrant minors' access to abortion, Defendant Hargan is violating the First and Fifth Amendment rights of those unaccompanied immigrant minors. Defendant Hargan is sued in his official capacity.

33.     Defendant Steven Wagner is the Acting Assistant Secretary for Administration for Children and Families. Defendant Wagner has authority over the Office of Refugee Resettlement ("ORR"), a subdivision of Administration for Children and Families. By interfering with, prohibiting and/or obstructing unaccompanied immigrant minors' access to abortion, Defendant Wagner is violating the First and Fifth Amendment rights of those unaccompanied immigrant minors. Defendant Wagner is sued in his official capacity.

34.     Defendant Scott Lloyd is the Director of ORR. By interfering with, prohibiting and/or obstructing unaccompanied immigrant minors' access to abortion, Defendant Lloyd is violating the First and Fifth Amendment rights of those unaccompanied immigrant minors. Defendant Lloyd is sued in his official capacity.

## FACTS GIVING RISE TO THIS ACTION

## The Unaccompanied Children ("UC") Program

35.     ORR has responsibility for the "care and custody of all unaccompanied []

children, including responsibility for their detention, where appropriate." 8 U.S.C. § 1232(b)(1).

Unaccompanied immigrant minors are under 18 years old, have no legal immigration status, and

either have no parent or legal guardian in the United States, or there is no parent or legal

guardian in the United States able to provide care and physical custody. 6 U.S.C. § 279(g)(2).

36.      By statute, any federal department or agency that determines that it has an

unaccompanied immigrant minor in its custody must transfer the minor to ORR within 72 hours

of making that determination. *Id.* § 1232(b)(3). The federal government reports that in Fiscal

Year 2016, 59,692 unaccompanied immigrant minors were referred to ORR.

37.     The federal government and all of its programs are required to ensure that the best

interests of the unaccompanied immigrant minor are protected. Section 462 of the Homeland

Security Act requires ORR to "ensur[e] that the interests of the child are considered in decisions

and actions relating to the care and custody of an unaccompanied child." 6 U.S.C. §

279(b)(1)(B).

38.     In addition, Section 235 of the Trafficking Victims Protection Act directs HHS to

ensure that unaccompanied immigrant minors are "promptly placed in the least restrictive setting

that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A).

39.     Most unaccompanied immigrant minors who are referred to ORR are eventually

released from custody to parents or sponsors who live in the United States. Such minors are often

held in short-term facilities or shelters while they await release to their parents or sponsors. A

significant number of unaccompanied immigrant minors are not released to parents or sponsors,

and spend longer periods of time in custody. For some minors, ORR cannot identify an

individual who can serve as a viable sponsor. Young people who are expected to be in the

government's custody for an extended period or those who have special needs are sometimes

transferred to group homes or a foster family. For others, ORR may determine that the minor

should be placed in a more restrictive custodial setting. Young people who are flight risks, for

example, are held in jail-like facilities with limited, if any, freedom.

**Unaccompanied Immigrant Minors Are Legally Entitled to Receive Access to Reproductive Health Care**

40.     Unaccompanied immigrant minors have an acute need for reproductive health care, which is both time-sensitive and is necessary over the course of their time in federal custody. For example, a high number of these young women are victims of sexual assault. Some of these women will need access to emergency contraception, and some will need access to abortion. Any female aged 10 or older must undergo a pregnancy test within 48 hours of admission to an ORR-funded facility. This is the point at which many young women first learn they are pregnant. Many unaccompanied minors need pregnancy prevention services and/or access to abortion during their short or long periods in ORR custody.

41.     The federal government is legally obligated to ensure that all programs that provide care to these young people comply with the minimum requirements detailed in the *Flores v. Reno* Settlement Agreement, CV-85-4544-RJK (C.D. Cal. Jan. 17, 1997) ("*Flores* agreement"). The *Flores* agreement is a nationwide consent decree that requires the government to provide or arrange for, among other things, "appropriate routine medical . . . care," including specifically "family planning services[] and emergency health care services."

42.     Additionally, in response to its obligations under the Prison Rape Elimination Act and the Violence Against Women Reauthorization Act of 2013, ORR issued a regulation requiring all ORR-funded care provider facilities to, among other things, provide unaccompanied immigrant minors who are victims of sexual assault with access to reproductive healthcare. The regulation states, in relevant part, that grantees providing care to unaccompanied immigrant minors who have experienced sexual abuse while in federal custody must ensure "unimpeded access to emergency medical treatment, crisis intervention services, emergency contraception, and sexually transmitted infections prophylaxis." 45 C.F.R. § 411.92(a). The regulation further provides that grantees must ensure that a young person subject to sexual abuse is offered a pregnancy test, and "[i]f pregnancy results from an instance of sexual abuse, [the] care provider facility must ensure that the victim receives timely and comprehensive information about all

lawful pregnancy-related medical services." *Id*. § 411.93(d). Grantees were required to comply with this regulation by June 24, 2015.

43.     Upon information and belief, unaccompanied immigrant minors face significant barriers to obtaining services not provided by the government and/or its grantees. For example, even if a teen can leave the shelter, she still may not be able to obtain access to abortion or contraceptives without assistance because she likely speaks little or no English; she may have no support system, other than that provided by the federal program; she may have no means of transportation to the doctor's office; and she may have little or no financial resources. If she is not informed that contraceptives and abortions are available in the United States, she may not even know that these options exist, given that many of these young people come from countries where abortion is illegal.

## Defendants' Interference With, Obstruction, or Prohibition On Unaccompanied Immigrant Minors' Access to Abortion

44.     Defendants are wielding an unconstitutional veto power over unaccompanied immigrant minors' access to abortion. In March 2017, ORR revised its policies to prohibit all federally funded shelters from taking "any action that facilitates" abortion access for unaccompanied minors in their care without "direction and approval from the Director of ORR." This includes scheduling appointments with medical providers, ensuring access to non-directive options counseling, ensuring access to court to seek a judicial bypass in lieu of parental consent, and providing access to the abortion itself.

45.     In an email to all ORR staff, then-Acting Director of ORR Ken Tota summarized the policy: "Grantees are prohibited from taking any actions in [requests for abortion] without . . . signed authorization from the Director of ORR."

46.     As part of the revised policy, the minor is forced to tell her parents that she is seeking an abortion; if she refuses, ORR instructs the shelter to tell her parents against her

wishes. Moreover, ORR requires minors considering an abortion to visit an anti-abortion – often

religiously affiliated – crisis pregnancy center. If these attempts to coerce the minor into carrying

to term fail, ORR prevents the minor from obtaining an abortion while in its custody unless the

pregnancy would pose risk of death or serious injury to the minor.

47.     Defendants have exercised their unconstitutional veto power to deny J.D., Jane

Roe, Jane Poe, and Jane Moe access to abortion. After Plaintiffs' counsel's intervention,

Defendants permitted J.D. to seek a judicial bypass in lieu of parental consent required by Texas

law. J.D. secured that court order with the assistance of an attorney ad litem and a guardian ad

litem, Plaintiff Garza. J.D. had an appointment scheduled with a health center for options

counseling (the first step in the process of obtaining an abortion under Texas law), but

Defendants told the ad litems, Plaintiffs' counsel, and the shelter that Defendants prohibited J.D.

to be transported by her ad litems to the health center. Defendants also made clear that J.D.

would be prohibited from obtaining the abortion itself.

48.     The judicial bypass order obtained for J.D. remained valid. Plaintiff Garza stood

ready and able to transport J.D. to all appointments necessary for the abortion, including the

state-mandated options counseling sessions and the medical procedure itself.

49.     Upon information and belief, Defendants instructed the shelter in which J.D.

resides to prohibit J.D. from leaving the facility to access abortion, and told the shelter that if

they allowed her access, Defendants would revoke the shelter's government grant. But for that

instruction, the shelter was willing to allow Plaintiff Garza to transport J.D. to the abortion

facility.

50.     Defendants also withheld permission that would have allowed Jane Roe's and

Jane Poe's respective shelters to transport them to an abortion clinic. This means that they were

prohibited from accessing abortion. The shelters were ready and willing to transport them, or to allow them to be transported, to an abortion facility, but lacked Defendants' permission.

51.     Defendants are currently withholding permission that would allow Jane Moe's shelter to transport her to an abortion clinic. This means that Ms. Moe is prohibited from accessing abortion. If the shelter was to obtain Defendants' permission, it is ready and willing to transport her, or allow her to be transported, to an abortion facility.

52.     Defendants have also interfered with abortion access for other minors. In fact, the Director of ORR, Scott Lloyd, has taken the position that "[g]rantees should not be supporting abortion services pre or post-release; only pregnancy services and life-affirming options counseling."

53.     Defendants' actions toward J.D., Jane Roe, Jane Poe, and Jane Moe are consistent with their policy, which has been enforced against other young women as well.

54.     For example, in March 2017, another unaccompanied minor at a federally funded shelter in Texas decided to have an abortion. After obtaining a judicial bypass and receiving counseling, she started the medical abortion regimen for terminating a pregnancy. This regimen begins with a dose of mifepristone, followed by a dose of misoprostol within 48 hours later. After the minor took the mifepristone, ORR intervened, and forced her to go to an "emergency room of a local hospital in order to determine the health status of [her] and her unborn child." The Acting Director of ORR, Ken Tota, directed ORR as follows:  "[i]f steps can be taken to preserve the life of . . . her unborn child, those steps should be taken." Eventually, after the intervention of other advocates, ORR allowed the minor to complete the medication abortion and take the second dose of pills.

55.     Furthermore, Defendant ORR Director, Scott Lloyd, has personally contacted one or more unaccompanied immigrant minors who was pregnant and seeking abortion, and discussed with them their decision to have an abortion. Upon information and belief, Defendant Lloyd is trying to use his position of power to coerce minors to carry their pregnancies to term.

56.     ORR has also created a nationwide list of "Trusted Providers in HHS Cities," which is predominately comprised of anti-abortion crisis pregnancy centers.

57.     Crisis pregnancy centers ("CPCs") are categorically opposed to abortion, and generally do not provide information about pregnancy options in a neutral way. Many are also religiously affiliated, and proselytize to women.

58.     Defendants forced J.D. to visit one of these centers for "counseling," forcing her to share her most private personal and medical information to an entity that is hostile to her decisions to have an abortion.

59.     Defendants have also required other minors to be counseled by crisis pregnancy centers, including Jane Moe, both before and after the abortion, including at the explicit direction of Defendant ORR Director Scott Lloyd.

60.     Defendants have also unconstitutionally forced unaccompanied immigrant minors to tell their parents and/or immigration sponsors about their abortion decision, or Defendants themselves have told minors' family members or sponsors about the minors' pregnancy and/or abortion decision, against the express wishes of the minor, both before and after the abortion.

61.     Defendants told J.D.'s mother about J.D.'s pregnancy – over J.D.'s objections – and tried to force J.D. to also tell her mother she was pregnant and seeking an abortion. In at least one other minor's case, Defendant Lloyd explicitly required "the grantee or the federal field

staff [to] notify her parents of the termination," even after she had obtained a judicial bypass to be allowed to access abortion without her parents' involvement or knowledge.

## CLASS ALLEGATIONS

62.     Pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2), Plaintiff Rochelle Garza, on behalf of J.D., brings this action as a class action on behalf of all other pregnant unaccompanied immigrant minors in ORR custody nationwide, including those who will become pregnant during the pendency of this lawsuit. Plaintiffs Jane Roe and Jane Moe also bring this action as a class action on behalf of the same class.

63.     The class is so numerous that joinder is impracticable. In any given year, there are hundreds of pregnant unaccompanied minors in Defendants' custody. Joinder is inherently impractical because the number of unnamed, future class members who will be pregnant while in ORR custody is unknown and unknowable, especially given the transient nature of the unaccompanied minors population and the temporal limitations of pregnancy. The young people affected by ORR's abortion restriction policy are geographically dispersed across the country. Proposed class members are highly unlikely to file individual suits on their own behalf given the practical, legal, linguistic, monetary, and fear-based barriers that prevent their ability to access independent counsel to challenge ORR's abortion restrictions.

64.     The claims of the Plaintiff Class members share common issues of law, including but not limited to: (i) whether ORR's policy of exercising a veto power over a UC's abortion access violates class members' constitutional rights; (ii) whether HHS's policy of requiring a forced visit to an anti-abortion crisis pregnancy center violates class members' constitutional rights; and (iii) whether disclosing – or forcing the class members to disclose – to parents or immigration sponsors their abortion decisions violate class members' constitutional rights.

65.     The claims of the Plaintiff Class members share common issues of fact, including but not limited to the implementation of Defendants' policy and practice of obstructing or preventing of access to abortion in the various ways detailed above.

66.     The claims of J.D., Jane Roe, and Jane Moe are typical of the claims of members of the Plaintiff Class.

67.     The named Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class. The named Plaintiffs have no interest that is now or may potentially be antagonistic to the interests of the Plaintiff Class. The attorneys representing the named Plaintiffs are experienced civil rights attorneys and are considered able practitioners in federal constitutional litigation. These attorneys should be appointed as class counsel.

68.     Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole. The Plaintiff Class may therefore be properly certified under Fed. R. Civ. P. 23(b)(2).

69.     Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class. The Plaintiff Class may therefore be properly certified under Fed. R. Civ. P. 23(b)(1).

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### FIFTH AMENDMENT RIGHT TO PRIVACY AND LIBERTY
### (PLAINTIFFS J.D., JANE ROE, JANE POE, JANE MOE, AND CLASS AGAINST DEFENDANTS)

70.     Defendants violate unaccompanied immigrant minors' right to privacy guaranteed by the Fifth Amendment by wielding a veto power over their abortion decisions, and obstructing,

interfering with, or blocking access to abortion, including by forcing minors to visit crisis pregnancy centers and preventing them from going to medical facilities where they can obtain legal abortions.

71.     Defendants violate the Fifth Amendment rights of unaccompanied minors by revealing, or forcing the minors to reveal, information about their pregnancy and abortions to their parents or other family members, including immigration sponsors, both before and after the abortion.

## SECOND CLAIM FOR RELIEF
### FIRST AMENDMENT - COMPELLED SPEECH
**(PLAINTIFFS J.D., JANE ROE, JANE POE, JANE MOE, AND CLASS AGAINST DEFENDANTS)**

72.     By compelling unaccompanied immigrant minors to discuss their decisions to have abortions and the circumstances surrounding those decisions with crisis pregnancy centers, and with their parents or immigration sponsors, Defendants violate the unaccompanied immigrant minors' rights against compelled speech guaranteed by the First Amendment.

## THIRD CLAIM FOR RELIEF
### INFORMATIONAL PRIVACY
**(PLAINTIFFS J.D., JANE ROE, JANE POE, JANE MOE, AND CLASS AGAINST DEFENDANTS)**

73.     By requiring unaccompanied immigrant minors to disclose their identities, their pregnancies, and their decisions to seek or have an abortion, to a crisis pregnancy center, parents, and/or immigration sponsors, Defendants violate the minors' rights to informational privacy guaranteed by the Fifth Amendment.

## FOURTH CLAIM FOR RELIEF
### FIRST AMENDMENT – ESTABLISHMENT CLAUSE
**(PLAINTIFFS J.D., JANE ROE, JANE POE, JANE MOE, AND CLASS AGAINST DEFENDANTS)**

74.     Defendants violate the Establishment Clause by requiring unaccompanied immigrant minors to obtain counseling at crisis pregnancy centers that are often religiously affiliated, and that proselytize to the unaccompanied immigrant minors who are forced to go there.

75.     Defendants' actions alleged herein endorse and impose upon the class members a particular set of religious beliefs.

76.     Defendants' actions alleged herein have the predominant purpose of advancing a particular set of religious beliefs.

77.     Defendants' actions alleged herein have the predominant effect of advancing a particular set of religious beliefs.

78.     Defendants' actions alleged herein are religiously coercive.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

1.     Certify this action as a class action under Federal Rule of Civil Procedure 23.

2.     Declare, pursuant to 28 U.S.C. § 2201, that Defendants' actions, as set forth above, violate the Establishment and Free Speech Clauses of the First Amendment to the United States Constitution, and the Fifth Amendment right to privacy, liberty, and informational privacy;

3.     Enter a Temporary Restraining Order preventing Defendants from obstructing Jane Moe's access to abortion;

4.     Enter a preliminary injunction as to the Plaintiff Class;

5.      Enter a permanent injunction preventing Defendants from wielding a veto power over an unaccompanied minors' abortion decision, including interfering, obstructing, or blocking her abortion;

6.      Enter a permanent injunction preventing Defendants from forcing unaccompanied immigrant minors to visit crisis pregnancy centers as a condition of having an abortion or after an abortion;

7.      Enter a permanent injunction preventing Defendants from revealing, or forcing unaccompanied immigrant minors to reveal, to the minors' parents or immigration sponsors information about the minors' pregnancies and/or abortion decisions, either prior to or after the abortion decisions;

8.      Enter a permanent injunction preventing Defendants from retaliating against unaccompanied immigrant minors for seeking or obtaining abortions;

9.      Award costs and fees for this action, including attorneys' fees;

10.     Award such further relief as this Court deems appropriate.


January 11, 2017

                                        Respectfully Submitted,

                                        Arthur B. Spitzer (D.C. Bar No. 235960)
                                        Scott Michelman (D.C. Bar No. 1006945)
                                        American Civil Liberties Union Foundation
                                        of the District of Columbia
                                        4301 Connecticut Avenue NW, Suite 434
                                        Washington, D.C. 20008
                                        Tel. 202-457-0800
                                        Fax 202-457-0805
                                        *aspitzer@acludc.org*
                                        *smichelman@acludc.org*

                                        /s/Brigitte Amiri
                                        Brigitte Amiri*

Meagan Burrows
Jennifer Dalven
Lindsey Kaley
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2633
Fax (212) 549-2652
*bamiri@aclu.org*
*mburrows@aclu.org*
*jdalven@aclu.org*
*lkaley@aclu.org*

Daniel Mach (D.C. Bar No. 461652)
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Telephone: (202) 675-2330
*dmach@aclu.org*

Elizabeth Gill
Mishan R. Wroe
American Civil Liberties Union Foundation of
Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel. (415) 621-2493
Fax (415) 255-8437
*egill@aclunc.org*
*mwroe@aclunc.org*

Melissa Goodman
American Civil Liberties Union Foundation of
Southern California
1313 West 8th Street
Los Angeles, California 90017
Tel. (213) 977-9500
Fax (213) 977-5299
*mgoodman@aclusocal.org*

*Motion for admission *pro hac vice* granted

*Attorneys for Plaintiffs*