# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ROCHELLE GARZA, as guardian ad litem to )
unaccompanied minor J.D., on behalf of )
herself and others similarly situated; )
JANE ROE and JANE MOE on behalf of )
themselves and others similarly situated; )
and JANE POE, )
 )
   Plaintiffs, )  No. 17-cv-02122-TSC
 )
v. )
 )
ERIC D. HARGAN,[1] et al., )
 )
   Defendants. )
 )
 )
_____ )

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. PRO. 12(b)(1) AND 12(b)(6)

The Defendants, Eric Hargan, Steven Wagner,[2] and Scott Lloyd, in their official capacities ("the United States"), hereby move to dismiss Plaintiffs' Second Amended Complaint for Injunctive Relief (ECF No. 104) ("Second Amended Complaint") pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Plaintiffs Jane Doe ("Ms. Doe"), Jane Roe ("Ms. Roe"), Jane Poe ("Ms. Poe") and Jane Moe ("Ms. Moe") allege that the U.S. Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR") has adopted a policy of responding to requests for elective abortions that poses an undue burden on the Plaintiffs' access to abortion procedures under the Fifth Amendment; compels them to speak in violation of the First

---

[1] Defendants respectfully request that this Court hereby substitute Secretary of Health & Human Services Alex M. Azar II, for Eric D. Hargan, the former Acting Secretary of Health & Human Services pursuant to Fed. R. Civ. P. 25(d) ("The officer's successor is automatically substituted as a party.").

[2] The proper spelling of Defendant, Steven Wagner.

Amendment; and favors religion in a manner that violates the Establishment Clause.  Based on those allegations, Plaintiffs' Second Amended Complaint alleges four claims on behalf of themselves and a putative class, seeking equitable relief based on alleged violations of: (1) Fifth Amendment interests in privacy and liberty (Count 1); (2) First Amendment freedom of speech (Count 2); (3) Fifth Amendment "informational privacy" (Count 3); (4) and the Establishment Clause (Count 4).  ECF No. 104 at 15-17, ¶¶ 70-78. [3]

Those claims are moot.  Ms. Doe has had an abortion (ECF No. 53 at 6) and has been released from ORR care (ECF No. 115-1 at 2); Ms. Poe has had an abortion (ECF No. 94 at 1); Ms. Roe is an adult who has been released from DHS custody on her own recognizance and has had an abortion (ECF Nos. 84 at 2, No. 94 at 1); and Ms. Moe has been released from ORR custody to her sponsor (ECF No. 113-1 at ¶ 4, ECF No. 114).  Consequently, none of the plaintiffs alleges a live case or controversy, and none fits within any exception to mootness.  The putative class claims do not save the case from mootness either.  A class action that has not been certified generally will become moot once the named plaintiff's claims no longer present a live controversy.  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013).  Here, no class was certified at the time that each of the named representatives' claims became moot,[4] and the case does not fit within any exception that would permit a certification decision at this stage to relate back to a time when there existed a controversy.  As a result, there is no live controversy before this Court on those issues, and Plaintiffs' Second Amended Complaint should be dismissed for lack of jurisdiction.

---

[3] Plaintiffs have dropped their claims against Defendants in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).
[4] The Second Amended Complaint specifically excludes Ms. Poe as a class representative.  ECF No. 104 at 14, ¶ 62.

In any event, Plaintiffs' claims are without merit.  ORR has adopted reasonable policies that are fully consistent with the Constitution, and designed to preserve the government's interest in life and in avoiding the active facilitation of elective abortions.  Such policies do not impose any undue burden on the ability of an alien arriving at our border to obtain an abortion.  Any alleged obstacle to an alien's ability to obtain an abortion exists only by virtue of the alien's own choices:  an alien is in federal custody only as a result of entering the United States illegally, and remaining in custody (rather than returning home) is a self-imposed obstacle, not an obstacle imposed by the government.  Plaintiffs cannot show that the challenged policies violate the Constitution in every application, in a large fraction of applications, or indeed in *any* application.  Rather, they are policies appropriate for handling the difficult circumstances presented when a noncitizen illegally enters this country and then seeks to obtain an elective abortion within this country as a minor in the care of the federal government.  It is appropriate for ORR to provide pregnancy counseling in its custodial capacity.  It is critically important to involve the minor's parents in her home country when possible.  And it is appropriate that the Director of ORR, while charged with their custody, be involved in this decision-making.  It is black-letter law that the United States may pursue its legitimate interest in promoting life and in not taking any action to facilitate an abortion.  Non-facilitation does not impose an undue burden given that an illegal alien in government custody has the option to return to her country of nationality.  And it certainly is not an undue burden in a large fraction of applications, given the ability to go home, as well as the opportunity for release to a sponsor or parent.  Nor do these policies work an establishment of religion.  Finally, the D.C. Circuit's preliminary ruling does not preclude dismissal here.  Accordingly, these class action claims that the policies are invalid on their face must be dismissed.

## BACKGROUND

### I.      Background Facts And Proceedings

This case is about the procedures that ORR follows when caring for UACs under its watch.  Each year, ORR cares for thousands of UACs who are mostly from countries that prohibit or restrict abortion.  Only a small number of those UACs are pregnant, and an even smaller number request abortions while in ORR custody.  ORR is charged with considering the interests of each pregnant UAC when providing care and resolving any request for an abortion.  This case arises from the efforts of Ms. Doe, Ms. Poe, Ms. Roe and Ms. Moe to compel Defendants to approve and implement their requests for abortions.[5]

Ms. Doe is an 18-year-old alien adult who entered the country illegally when she was 17 years old, and was apprehended and placed in the care and custody of ORR in Texas.  ECF No. 10 at 3.  While in the care and custody of ORR, Ms. Doe requested an elective abortion.  *Id.*  She obtained a judicial bypass of Texas' parental notification and consent requirement from a Texas state court.  *Id.*  HHS policy requires that ORR approve all terminations of pregnancy for minors in its custody.  *Id.* at 4.  ORR, acting in this custodial capacity, denied Ms. Doe's request to obtain an abortion and to be transported from her shelter so that she could attend the abortion and associated appointments.  *Id.* at 5.

On October 13, 2017, Ms. Doe and her guardian filed this suit as a putative class action on behalf of herself and "all other pregnant unaccompanied immigrant minors in ORR custody nationwide, including those who will become pregnant." [6]  ECF No. 1 ¶ 47.  Ms. Doe requested a

---

[5] Defendants incorporate by reference the factual and procedural background from their prior briefing.  ECF No. 10 at 3-7, ECF No. 53 at 4-6, ECF No. 66 at 3-4, ECF No. 108 at 4-5.
[6] The Second Amended Complaint filed with this Court suggests a class "of all other pregnant unaccompanied immigrant minors in ORR custody nationwide, including those who will become pregnant during the pendency of this lawsuit."  ECF No. 104 at ¶ 62.  However, in their motion

Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI"), releasing Ms. Doe to obtain abortion counseling and an abortion if she so elected. ECF Nos. 3, 5. On October 18, 2017, Ms. Doe filed her Motion to Certify a Class, ECF No. 18, requesting the Court to certify a class of "of all pregnant [UACs] who are or will be in the legal custody of the federal Government." *Id.* at 1.

On October 18, 2017, this Court granted Ms. Doe's request for a TRO. ECF No. 20. The United States appealed and initially obtained a stay of the TRO from a panel of the U.S. Court of Appeals for the D.C. Circuit. But the *en banc* D.C. Circuit subsequently dissolved the stay, essentially affirming the injunction, *Garza v. Hargan*, No. 17-5236 (Oct. 24, 2017) (recalling mandate), and remanded the case to this Court. In compliance with this Court's order, ECF No. 29, the United States released Ms. Doe to the care of her guardian ad litem for transportation to an abortion provider. On October 25, 2017, Ms. Doe reportedly underwent an abortion.[7] *Id.* On January 15, 2018, Ms. Doe was released from ORR's care into the custody of a sponsor. ECF No. 115-1.[8]

On December 15, 2017, Plaintiffs filed a consent motion for leave to amend the complaint, seeking to add Ms. Roe as an additional plaintiff and class representative, and Ms. Poe as an additional plaintiff. *See* ECF No. 61; ECF No. 83. Ms. Poe is a 17-year-old

---

requesting class certification, Plaintiffs set forth a putative class of "all pregnant unaccompanied immigrant minors ['UCs'] who are or will be in the legal custody of the federal Government." ECF No. 18 at 1-2 (bracket in original); *See* ECF No. 65 and ECF No. 107.

[7] *See* Jackie Wang, "Unauthorized immigrant minor 'Jane Doe' has abortion after back-and-forth court battle," Dallas Morning News, https://www.dallasnews.com/business/health-care/2017/10/25/undocumented-teen-texas-abortion (last updated Oct. 25, 2017).

[8] On November 3, 2017, the United States filed a petition for certiorari, asking that the Supreme Court vacate the judgment of the Court of Appeals, and remand this case with instructions to dismiss all claims for prospective relief as moot. That petition remains pending before the Supreme Court.

unaccompanied minor currently in ORR custody.  ECF No. 66-1 (December 16, 2017 Jonathan

White Decl.) at ¶ 4.  At the time of her placement into ORR custody Ms. Poe "was estimated to

be approximately 9 weeks pregnant," though it subsequently became clear her pregnancy was

much further along.  *Id.* at ¶ 5.  Ms. Poe contemplated an abortion shortly after entering ORR

custody.  But after voluntarily informing her parents, Ms. Poe indicated to ORR on December 4,

2017, that "she no longer requested an abortion."  *Id.*  Thereafter, Ms. Poe changed her mind

again and requested an abortion.  *Id.*  Ms. Roe presented herself as a 17-year-old unaccompanied

minor and was also initially placed in ORR custody.  ECF No. 63-2 (December 14, 2017 Jane

Roe Decl.) at ¶¶ 3- 4.  Ms. Roe learned she was pregnant during a medical examination provided

while in ORR custody and also requested an abortion.  *Id.* at 5.  Plaintiffs contended that

Defendants had refused to allow Ms. Roe and Ms. Poe abortion access.  ECF No. 61 at ¶ 1.

 Contemporaneously with the filing of their First Amended Complaint, Ms. Roe and Ms.

Poe sought a TRO to prohibit the government from blocking them from obtaining an abortion.

ECF No. 63-1.  The government opposed the TRO, ECF No. 66, and on December 18, 2017, this

Court granted the TRO.  ECF No. 73.  Initially, Defendants filed an emergency motion for stay

pending appeal with the D.C. Circuit seeking an order staying application of the TRO as to Ms.

Roe.[9]  *See Garza v. Hargan*, No. 17-5276 (D.C. Cir. 2017), D.C. Cir. ECF No. 1709385.  After

the government obtained a copy of Ms. Roe's birth certificate from her home country indicating

that Ms. Roe was actually 19 years old — and thus not properly within ORR's custody — it

immediately began the process of transferring Ms. Roe into DHS custody as an adult.  *Garza v.*

*Hargan,* No. 17-5276 (D.C. Cir. 2017), D.C. Cir. ECF No. 1709677 at 1-2.  Once the transfer

---

[9] Because of the differing circumstances surrounding Ms. Poe's case, the government did not
seek a stay of the TRO as it related to Ms. Poe.  *Garza v. Hargan*, No. 17-5276 (D.C. Cir. 2017),
D.C. Cir. ECF No. 1709385 at 1.

was complete, Defendants moved to voluntarily dismiss its appeal in the D.C. Circuit, which the court granted. *Garza v. Hargan*, No. 17-5276 (D.C. Cir. 2017), D.C. Cir. ECF Nos. 1709679 and 1709941. On December 19, 2017, Ms. Roe was released on her own recognizance and is no longer in government custody. *Id.*; *see* 8 U.S.C § 1232(c)(2)(B). According to news reports, both Ms. Poe and Ms. Roe have obtained abortions.[10]

On January 11, 2018, Plaintiffs filed the Second Amended Complaint adding Ms. Moe as a plaintiff. ECF No. 104. Ms. Moe is a 17-year-old unaccompanied minor who arrived in the custody of ORR on December 22, 2017, (ECF No. 108-1 (January 11, 2018 Jonathan White Decl.) at ¶ 4), and who alleges that she requested an abortion approximately four days following her placement with ORR, (ECF No. 105-2 (January 10, 2018 Jane Moe Decl.) at ¶ 6). ORR records indicated that Ms. Moe was approximately 17 weeks into her pregnancy when the Second Amended Complaint was filed. ECF Mo. 108-1 (January 11, 2018 Jonathan White Decl.) at  ¶ 6. Shortly upon her arrival into ORR custody, Ms. Moe "identified a potential sponsor," and "[t]he prospects for possibly placing her with that sponsor [we]re favorable." *Id.* at ¶ 5.

Contemporaneously with the filing of their Second Amended Complaint, Ms. Moe sought a TRO to prohibit the government from blocking her from obtaining an abortion. The government opposed the TRO. While the motion for a TRO was pending, Ms. Moe's sponsor completed all required documentation, including the submission of fingerprints and the completion of all background checks, and on January 14, 2018, Ms. Moe was released to the custody of her sponsor. ECF No. 114.

---

[10] *See* http://www.latimes.com/politics/la-na-pol-abortion-trump-migrant-20171221-story.html.

## II.     Statutory Framework Governing ORR Custody Of Unaccompanied Alien Minors

Congress generally has mandated that non-admitted aliens attempting to enter the country without valid entry documentation be detained for expedited removal, credible fear proceedings, and/or potentially to establish eligibility for admission or relief from removal.  *See* 8 U.S.C. § 1225(b)(1), (b)(1)(B)(ii), (b)(1)(B)(iii)(IV), & (b)(2)(A).  The only statutory mechanism to obtain release from such detention pending a determination on admission is discretionary parole, which is granted on a "case-by-case basis" for "urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A).  Discretionary parole is available in credible fear proceedings where release "is required to meet a medical emergency."  8 C.F.R. § 235.3(b)(2)(iii).  At the same time, an alien has the ability to request voluntary departure at any time.  *See* 8 U.S.C. §§ 1232(c)(3), (c)(5), 1229c.  Indeed, aliens apprehended after approaching or attempting illegally to cross the border into the United States are "aliens at the threshold of initial entry," and have no right to obtain admission to the United States in lawful status. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).

Congress has also set forth special admissions and custody provisions for unaccompanied alien minors arriving in the United States through the Trafficking Victims Prevention Reauthorization Act ("TVPRA"), Pub L. No. 110-457, 122 Stat. 5044 (principally codified in relevant part at 8 U.S.C. § 1232), which places the care and custody of UACs with HHS.  8 U.S.C § 1232(b)(1).  The TVPRA was enacted "to enhance the efforts of the United States to prevent trafficking in persons," and reflects the legislative goal of ensuring that UACs "are safely repatriated to their country of nationality or of last habitual residence" to avoid incentives that would lead to alien smuggling and dangerous travel for minor children.  8 U.S.C. § 1232(a).  A UAC is a person under age 18 who lacks lawful immigration status in the United States and

for whom (a) no parent or legal guardian is in the United States, or (b) no parent or legal guardian is available to provide care and physical custody. 6 U.S.C. § 279(g)(2). UACs apprehended at the border from contiguous countries may be repatriated if there is no evidence they have been trafficked, they do not have a credible fear of persecution or torture in their home country, and they are capable of making an independent decision to withdraw their application for admission to the United States. *Id.* § 1232(a)(2)(A)-(B). Children who meet any of those criteria — which speak to bases for applying for admission or relief from removal — or who are from noncontiguous countries are placed into HHS custody. *See id.* § 1232(a)(3)-(4), (a)(5)(D), (d)(8). UACs are not eligible for expedited removal proceedings; those from contiguous countries receive a similar screening for credible fear prior to rapid repatriation, *see* 8 U.S.C. § 1232(a)(2), while those from noncontiguous countries or those passing such a screening are placed into full removal proceedings under 8 U.S.C. § 1229a if charged as removable by DHS. *See id.* § 1232(a)(5)(D).

Congress charged HHS with serving in the role of the child's legal custodian. As part of that role, HHS is directed to place UACs "in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A), while in HHS custody—that is, until they are released to a suitable sponsor, obtain lawful status, or leave the country.[11] *See* 6 U.S.C. § 279(g); 8 U.S.C

---

[11] Once a UAC attains age 18, she is also by definition no longer a UAC and thus no longer entrusted to HHS custody. Such minors are transferred to DHS custody, which then is directed to consider placement in the "least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." 8 U.S.C § 1232(c)(2)(B). The statute also provides that "such aliens shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement of the alien with an individual or an organizational sponsor, or in a supervised group home." *Id.*

§ 1232(b)(1), (g).  In placing children in the least restrictive setting, HHS also "consider[s]

danger to self, danger to the community, and risk of flight."  *Id.*

Within HHS, ORR is responsible for the care and placement of UACs who enter the

United States illegally and are "in federal custody by reason of their immigration status."  6

U.S.C. § 279(b)(1)(A).  ORR's Director is responsible for "ensuring that the interests of the child

are considered in decisions and actions relating to the care and custody of an unaccompanied

alien child," and for "implementing policies with respect to the care and placement of

unaccompanied alien children." *Id.* § 279(b)(1)(A), (B).  As part of Congress's efforts to protect

the child, federal law provides that the Director "shall not release" unaccompanied minor

children "upon their own recognizance."  *Id.* § 279(b)(2)(B).  Organizations that provide shelter

and services to unaccompanied minor children do so at ORR's direction and in compliance with

ORR policies and procedures.  *See* ECF No. 10-1.  Notably, and in line with this standard, ORR

mandates that personnel obtain necessary medical treatment for UACs faced with medical

emergencies, including transporting them offsite where necessary.  *See* U.S. Department of

Health and Human Services, ORR Guide: Children Entering the United States Unaccompanied

("ORR Guide") at § 3.4.5, https://www.acf.hhs.gov/orr/resource/children-entering-the-united-

states-unaccompanied (last visited January 22, 2018) (providing, in cases of "medical

emergencies," defined as "a serious medical condition caused by injury, illness, or toxic

exposure that is life threatening in nature," that UAC may be transported to off-site medical care

provider and accommodations made to "implement treatment recommendations").  The ORR

Guide also addresses certain routine care, certain family planning services, medical

examinations, appropriate mental health care, immunizations, and prescribed medications and

special diets, but does not address elective serious medical procedures, outside of an emergency. *See* ORR Guide at § 3.4.

Additionally, HHS procedure provides several mechanisms for obtaining a UAC's release. *See generally* ORR Guide § 2; *Flores v. Sessions*, 862 F.3d 863, 871 & n.8 (9th Cir. 2017). "Parents, other relatives, or close family friends can apply to have the child released to their care." ORR Guide, § 2.2; *see* ECF No. 10-1 ¶¶ 20-21. If release is denied to a sponsor, a parent or legal guardian may appeal that decision and request a hearing before the Assistant Secretary. *Id.* § 2.7.8. Further, the Ninth Circuit has interpreted the settlement agreement in the *Flores* case to provide UACs in ORR custody the right to challenge in a *Flores* bond hearing a continued custody that is based upon the danger the UAC would present upon release. *Id.* at § 2.7.8; *Flores*, 862 F.3d at 881.[12] Finally, the UAC can request voluntary departure, at no cost to the UAC, removing herself from the jurisdiction and custody of HHS. *See* 8 U.S.C. § 1232(a)(5)(D)(ii); 8 C.F.R. § 240.25.

## ARGUMENT

### I.    Plaintiffs' Claims In Their Second Amended Complaint Are Moot

Under Article III of the Constitution, federal courts are limited to "the adjudication of actual, ongoing controversies between litigants." *Deakins v. Monaghan*, 484 U.S. 193, 199 (1988). A case becomes moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis*, 440 U.S. 625, 631, (internal quotation marks and citation omitted). A defendant who asserts that a complaint is

---

[12] The United States disagrees with the Ninth Circuit's interpretation of the *Flores* settlement agreement. Additionally, a favorable finding at a *Flores* bond hearing does not automatically entitle a UAC to release as ORR must still determine the suitability of the sponsor. *Flores*, 862 F.3d at 878.

moot because of developments subsequent to its filing raises a challenge to the court's subject matter jurisdiction, *see Flores ex rel. J.F. v. District of Columbia*, 437 F. Supp. 2d 22, 28 (D.D.C. 2006), because federal courts only have constitutional authority to adjudicate "actual, ongoing controversies," *Honig v. Doe*, 484 U.S. 305, 317 (1988).  Rule 12(b)(1) is the proper mechanism for a defendant to assert that an action is moot.  *See Young v. D.C. Housing Auth.*, 31 F. Supp. 3d 90, 92-95 (D.D.C. Mar. 12, 2014) ("A motion to dismiss for mootness is properly brought under Federal Rule of Civil Procedure 12(b)(1)."); *Toxco, Inc. v. Chu*, 801 F.Supp.2d 1, 5 (D.D.C. 2011) ("Under Rule 12(b)(1), a party may move to dismiss a case on grounds of mootness.").  A motion to dismiss under Rule 12(b)(1) presents "a threshold challenge to the [C]ourt's jurisdiction."  *Morrow v. United States*, 723 F.Supp.2d 71, 75 (D.D.C. 2010) (Walton, J.) (quoting *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)).

Under "the capable of repetition yet evading review" doctrine, a plaintiff may avoid dismissal for mootness by demonstrating that "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the *same complaining party* would be subjected to the same action again."  *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (internal quotation marks and alterations omitted; emphasis added).  While this Court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged,'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)), the non-movant bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Here, Plaintiffs assert that ORR's policy puts an unconstitutional obstacle in the path of unaccompanied minors who seek an elective abortion, but no such claim remains.  Ms. Doe and Ms. Poe have undergone their requested abortions.  Ms. Roe was found not to be a minor, and her custody was transferred to DHS, which immediately released her on her own recognizance, and she then obtained an abortion.  And Ms. Moe was released to the custody of her sponsor. ECF No. 114.  Given that the named Plaintiffs no longer have a personal interest in obtaining release from ORR custody to obtain an abortion, and no class has been certified, Plaintiffs' claims for equitable relief are moot.  Consequently, this Court should dismiss their second amended complaint for lack of jurisdiction pursuant to Fed. R. Civ. Pro. 12(b)(1).

Plaintiffs' claims are not capable of repetition because there is no reasonable expectation that these individuals will be subject to ORR's alleged policy again, and the cases that Plaintiffs have previously cited when trying to squeeze their claims into the exception to the mootness doctrine are unpersuasive.  In *Doe v. Charleston Area Med. Ctr., Inc.,* 529 F.2d 638, 644-45 (4th Cir. 1975), and *Doe v. Poelker*, 497 F.2d 1063, 1066-67 (8th Cir. 1974), the plaintiffs challenged general access to, and limitations on a woman's right to, abortion.  Their pregnancies were terminated, and their claims survived a mootness challenge as "capable of repetition, yet evading review."  *Id.*  Unlike those plaintiffs, Ms. Doe was released from ORR's care into the custody of a sponsor, and she has since turned 18.  ECF No. 115-1.  *See Del Monte Fresh Produce Co.,* 570 F.3d at 321 (D.C. Cir. 2009) ("A case is moot when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated . . . .").  Ms. Poe similarly obtained an abortion under the court's TRO, and she will soon be released from ORR custody once she turns 18; given that she is currently 17 years old and in a supervised setting, it is highly unlikely she will become pregnant during her few remaining months in ORR custody.  ECF No.

66-1 (December 16, 2017 Jonathan White Decl.) at ¶ 4, ECF No. 94 at 1.  Ms. Roe is an adult

who is not in ORR custody, and she has already obtained an abortion.  ECF. No. 84 at 2.  The

fourth plaintiff, Ms. Moe, has been released from ORR care into the custody of her sponsor.

ECF No. 114.  Accordingly, none of Plaintiffs qualifies for this exception to mootness.

That Ms. Doe, Ms. Roe, and Ms. Moe seek to represent a putative class does not change

the analysis.  *See* ECF No. 104 at 14-15, ¶¶ 62-69.  A putative class action, or particular claims

within it, generally will become moot once the named plaintiff's claims no longer present a live

controversy.  *Bd. of Sch. Comm'rs v. Jacobs*, 420 U.S. 128, 129 (1975) (per curiam).  The

Supreme Court has recognized an exception when "the named plaintiff's individual claim

becomes moot after" the district court rules on class certification, *Genesis Healthcare Corp. v.*

*Symczyk*, 569 U.S. 66, 74 (2013), but that rule does not apply here because this case never

reached that juncture.  Here, Plaintiffs filed a motion for class certification on October 18 (ECF

No. 18), and this Court had not yet ruled when Ms. Doe's, Ms. Roe's and Ms. Moe's individual

claims became moot.

Nor can Plaintiffs' class claims survive a mootness challenge because they are

"inherently transitory."  *Genesis*, 569 U.S. at 76.  The "inherently transitory" exception applies

only where a claim is so fleeting that "no plaintiff [will] possess[] a personal stake in the suit

long enough" to obtain a decision on class certification.  *Id.*  Here, as discussed more fully in

Defendants' opposition to class certification, it is far from clear that this Court could not have

ruled on Plaintiffs' motion for class certification before Ms. Doe's, Ms. Roe's, and Ms. Moe's

interest would have expired in the ordinary course — much less that "no plaintiff" in the future

would be able to litigate a challenge through a class-certification decision.  *Id.* at 76.

Accordingly, any assertion that Plaintiffs' class claims are "inherently transitory" is without merit.

Because Plaintiffs' claims are now moot, and there is no live controversy, this Court lacks jurisdiction to entertain Plaintiffs' claims and should dismiss the Second Amended Complaint as moot.

## II.     Plaintiffs Fail To Allege A Cognizable Legal Theory Under The Fifth And First Amendments

### A.     To Survive A Motion To Dismiss, Plaintiffs Must Establish That ORR's Policies Violate The Constitution In All — Or A Large Fraction Of — Their Applications

To survive a motion to dismiss, Plaintiffs must show that the alleged ORR policies being challenged are unconstitutional in all of their applications, or at least in a large fraction of applications.  *See Gonzalez v. Carhart*, 550 U.S. 125, 168 (2007) (recognizing the "heavy burden" when making a facial challenge to abortion restriction, and not deciding whether plaintiff must show "no set of circumstances under which the Act would be valid" or whether policy "impose[d] an undue burden 'in a large fraction of the cases in which [it] is relevant"). They cannot make this showing because ORR's putative policies are a reasonable response to the difficult situation presented when an alien minor attempts to illegally enter the country without her parents, and then requests that the United States facilitate her ability to obtain an abortion.

A complaint will survive a motion to dismiss for failure to state a claim under Rule 12(b)(6) if the plaintiff alleges facts that "state a claim to relief that is plausible on its face" and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "'The plausibility standard is

not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).  And a complaint may always be dismissed as a matter of law where a claim is not legally cognizable, such as where the plaintiff "fails to state any cognizable legal theory entitling her to relief." *See, e.g.*, *Shinabargar v. Bd. of Trustees of Univ. of D.C.*, 164 F. Supp. 3d 1, 15 n.5 (D.D.C. 2016); *Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52, 78 (D.D.C. 2015), *aff'd*, No. 15-7053 (D.C. Cir. 2016).  A Rule 12(b)(6) motion considers the sufficiency of the pleadings, and thus a Court's inquiry is limited to "consider[ing] only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which . . . judicial notice" may be taken. *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997).  The Court may take "judicial notice of facts on the public record." *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

To invalidate a uniform policy like the ones alleged here, Plaintiffs must show that the policy violates the Constitution in all of its applications, or at least a large fraction of its applications. *See Carhart*, 550 U.S. at 168; *Reno v. Flores*, 507 U.S. 292, 301 (1993) (to prevail in challenge to regulation governing custody of illegal alien minors, plaintiffs "must establish that no set of circumstances exists under which the [regulation] would be valid").  Such challenges are "disfavored" because they "often rest on speculation," "run contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied,'" and

"short circuit the democratic process." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008). Here, to the extent Plaintiffs allege there are uniform policies, they cannot show that those policies are unconstitutional at all, much less in all or a large fraction of their applications.

### B. Plaintiffs Fail To Allege A Cognizable Legal Theory That Government Refusal To Facilitate An Abortion For Members Of The Putative Class Constitutes An Undue Burden Under The Fifth Amendment

The government does not impose an undue burden when it declines to facilitate an abortion in circumstances like those presented by Ms. Doe, Ms. Poe, and Ms. Moe, much less in every circumstance where a minor is captured while trying to illegally cross the border, and is in custody only because that individual seeks entry into the United States. In such circumstances, the minor can end federal custody at any time, or be reunited with a parent or a sponsor well before an abortion is needed. Accordingly, the minor's claim that ORR's policies, in every application, violate the Fifth Amendment—and instead that the Constitution in every factual circumstance requires the type of facilitation that would enable her to enter the United States for an elective abortion—is incorrect, and the claim should be dismissed as a matter of law under Rule 12(b)(6). *See, e.g.*, *Shinabargar*, 164 F. Supp. 3d at 15 n.5.[13]

### 1. The D.C. Circuit Ruling Does Not Preclude Dismissal

As an initial matter, the D.C. Circuit's *en banc* denial of the government's appeal of the preliminary injunction does not prevent this Court from granting the government's motion to dismiss on the merits. The D.C. Circuit did not address the application of the ORR policy in every circumstance or in a large fraction of circumstances, only in the specific circumstance

---

[13] For purposes of this motion, the government assumes, but does not concede, that the undue burden framework applies in this situation where a minor is captured at or near the border, and seeks abortion services while in temporary immigration custody of HHS.

presented by Ms. Doe, and even then only in a preliminary ruling.  "The decision of a trial or appellate court whether to grant or deny a preliminary injunction [or TRO] does not constitute the law of the case for the purposes of further proceedings and does not limit or preclude the parties from litigating the merits," unless the temporary-relief hearing was consolidated with the trial under Fed. R. Civ. P. 65(a)(2), which is not the case here.  *Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C. Cir. 1974).  This concern is particularly warranted given the highly expedited nature of the prior court review.  Thus, the rulings as to Ms. Doe's TRO do not govern a dispositive ruling on Plaintiffs' claims under Rule 12(b).

### 2. Plaintiffs Cannot Show That The Due Process Clause Requires The Government To Facilitate An Abortion

Under the framework established by *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), the government may pursue its legitimate interest in protecting life.  Accordingly, the government may restrict abortion where its action does not impose an "undue burden" on a woman's choice to terminate her pregnancy before viability.  *Id.* at 870. Plaintiffs cannot show that the alleged ORR policy necessarily imposes such an undue burden in every application or a large fraction of applications for one fundamental reason:  an alien who illegally crosses the border is normally able to leave the United States' custody by either requesting voluntary departure to her country of nationality or being released to the custody of a sponsor in the United States.  The United States therefore imposes no *governmental* burden on the ability of that alien to obtain an abortion.  This class claim must, therefore, fail as a matter of law.

**a.**  As the Supreme Court has repeatedly recognized, the government has a "legitimate and substantial interest" in promoting childbirth and protecting the life of an unborn child.  *See, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 145, 157, 163 (2007) ("the government has a legitimate

and substantial interest in preserving and promoting fetal life"); *Casey*, 505 U.S. at 846 (joint opinion of O'Conner, Kennedy, and Souter, JJ.) ("The government may use its voice and its regulatory authority to show its profound respect for the life within the woman.").  That interest begins at the start of pregnancy.  *See Gonzales*, 550 U.S. at 158; *Casey*, 505 U.S. at 846.  Courts have recognized that a broad variety of affirmative restrictions on abortion are valid so long as they do not impose an "undue burden" on a woman's choice to terminate her pregnancy prior to viability.  *See, e.g.*, *Casey*, 505 U.S. at 877; *Gonzales*, 550 U.S. at 157 (upholding Partial-Birth Abortion Ban Act); *Lambert v. Wicklund*, 520 U.S. 292 (1997) (upholding Montana parental notification statute that had a judicial bypass provision); *Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570 (5th Cir. 2012) (upholding Texas statute requiring informed consent); *Barnes v. Moore*, 970 F.2d 12 (5th Cir. 1992) (upholding Mississippi statute requiring physicians to inform the patient of medical risks of abortion and holding that requiring a 24-hour waiting period before procedure did not impose an undue burden); *Karlin v. Foust*, 188 F.3d 446, 471 (7th Cir. 1999) (upholding Wisconsin statute requiring "a physician to inform a woman seeking an abortion of the 'probable gestational age' of the fetus, the 'probable anatomical and physiological characteristics' of the fetus, and the 'medical risks' associated with abortion including the risk of 'psychological trauma' and any 'danger to subsequent pregnancies,'" and requiring a face-to-face meeting between an attending physician and a patient 24 hours before an abortion procedure).

The United States' refusal to affirmatively facilitate an abortion does not impose an undue burden, and no court has ever held otherwise.  Rather, to impose an "undue burden," a statute or regulation must impose a restriction on private actors that has "the effect of placing *a substantial obstacle* in the path of a woman's choice" to terminate her pregnancy.  *Casey*, 505

U.S. at 877 (emphasis added).  There is a significant difference between affirmatively imposing a substantial obstacle and merely refusing a request to the government to facilitate the termination of a pregnancy.  In light of the substantial governmental interest in protecting fetal life and promoting childbirth, the government may refuse to facilitate an abortion without unduly burdening a woman's choice to terminate her pregnancy.  *See, e.g., Harris v. McRae*, 448 U.S. 297, 315, 317-19 (1980) (holding that the Due Process Clause does not confer an entitlement to government assistance in obtaining an elective abortion procedure; decision not to fund abortion does not pose any "governmental obstacle"); *see also Maher v. Roe*, 432 U.S. 464, 471-74 (1977) (rejecting claim that unequal subsidization for child birth, as opposed to abortion, was unconstitutional); *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 510 (1989) (holding that the government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected and specifically that government has no affirmative duty to "commit any resources to facilitating abortions").  In *Harris* and *Maher*, the Court explained that the fact that a lack of facilitation may "make it difficult — and in some cases, perhaps, impossible — for some women to have abortions" does not alter the conclusion that the Due Process Clause does not require the government to facilitate abortion services.  *Harris*, 448 U.S. at 314 (quoting *Maher*, 432 U.S. at 474).

    **b.**  In the circumstances presented here — where an illegal alien arrives at the border, is temporarily placed in government custody, and then seeks an elective abortion, the government's refusal to facilitate that abortion does not impose an undue burden under *Casey*.  Rather, such an alien may always obtain release from government custody by returning to her country of nationality through voluntary departure, being reunited with parents, or obtaining a timely sponsorship.  The United States is accordingly not imposing any burden on the right to abortion.

And in no event does the alleged policy create an undue burden in all or a large fraction of the wide-ranging circumstances faced by ORR — including where a sponsor can be readily and promptly found; where reunification with a parent abroad is possible; where a prompt return to the alien's country of nationality is otherwise called for, in accordance with the aims of the TVPRA; where no immigration relief may be available; or where the minor is willing to or obligated to return home.  Moreover, HHS retains responsibility to ensure that the interests of every minor in its custody are considered in decision-making about the minor's care.  Thus, the undue burden test cannot properly be applied without accounting for ORR's special role, which inherently involves ongoing counseling, consultation with parents, and other policy elements, which may result in a minor deciding not to seek an abortion.

In this case, the government has not imposed any "undue burden" on the ability of an illegal alien to obtain an abortion.  An illegal alien who has entered the United States without authorization may contend that the fact of being in federal custody stands as an obstacle to her ability obtain an abortion, but that alien is only in federal custody because she entered the United States illegally.  Moreover, the alien may end that custody at any time by voluntarily departing from federal custody, if a suitable sponsor is identified, vetted, and approved, or if reunification with her parents abroad is appropriate.  Plaintiffs have not pointed to any precedent holding that this sort of self-imposed obstacle, as opposed to a government-imposed obstacle, can constitute an "undue burden."

At the same time, this lawsuit seeks to require HHS to facilitate abortions by all minors who have been put into HHS temporary custody after entering this country illegally — precisely the sort of facilitation that may not be required of the government.  Indeed, ample case law recognizes that the government need not provide funding or "commit any resources to

facilitating abortions." *Webster*, 492 U.S. at 511.  An order requiring HHS to provide abortion services would require government staff (or their caretaker delegates) to draft approval documents, review information relevant to the alien's health and the procedure, determine that the abortion procedure is in her best interests, and maintain custody of the alien (while ensuring her health remains stable) both during and after any the abortion procedure.  In doing so, HHS would be forced to take affirmative action to monitor and supervise the alien's release — incurring the personnel and resource costs associated with such monitoring and supervision — to ensure the UAC was not placed in dangerous conditions and was instead safely returned to ORR care and custody following the abortion and any other necessary related procedures.  ECF No. 10-1 ¶¶ 13, 15-16.  This is precisely the type of facilitation the Supreme Court does not require.

The undue burden test does not require the government to facilitate an abortion in these circumstances, where an alien minor herself has the choice of ending her own government custody, and therefore putting herself back in the same circumstances she would have been in before she attempted to illegally enter the United States.  It is undisputed that the government could deny an alien entry when she arrives at the border.  The principle would hold true even if that alien's ultimate purpose in seeking entry was to obtain any form of medical care, including an elective abortion in the United States; the Government is not required to afford an alien unlawful entry in order to afford her the opportunity to seek such medical care or an elective abortion.  And, denial of entry in those circumstances would not place any undue burden on the alien.  That same conclusion is compelled here; the alien minor can seek voluntary departure at any time to end her custody, returning her to the same position held by any alien minor seeking to enter the United States at the border.  In such circumstances, the government's refusal to facilitate an abortion cannot constitute an undue burden.  Instead, the Congressional preference

for repatriation underscores that it is appropriate for the United States to avoid facilitating an abortion in these circumstances, particularly where repatriation is a viable alternative and where the alien's country of origin may have equities.

Plaintiffs have relied on cases addressing state laws permitting a judicial bypass mechanism for minors seeking an abortion without their parents' consent, as support for the contention that the federal government must not only defer to the minor's choice to terminate her pregnancy, but also assist her in obtaining an abortion.  *See* ECF No. 3 at 10 (citing *Bellotti v. Baird*, 443 U.S. 622 (1979)); ECF No. 5 at 10 (same).  But those cases hold merely that state laws prohibiting the right to abortion absent parental consent may, in some circumstances, impose an undue burden unless there is a judicial bypass procedure—they do not go a step further to say that the government must affirmatively facilitate the child's desire to obtain an abortion.  *See, e.g.*, *Cincinnati Women's Services, Inc. v. Taft*, 486 F.3d 361 (6th Cir. 2006).

Cases addressing prisoner access to abortion are also inapposite.  *See, e.g.*, *Roe v. Crawford*, 514 F.3d 789 (8th Cir. 2008); *Monmouth Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987).  In the prison setting, a prisoner is coercively confined with no freedom to leave custody and thus the procedure would be "entirely unavailable" given the mandatory incarceration.  *Crawford*, 514 F.3d at 796.  Here, a UAC can opt to leave federal custody by applying for and obtaining lawful admission to, or relief for removal from, the United States, voluntarily departing the United States, or by finding an approved sponsor—such as a parent—to take custody of them.  8 U.S.C. §§ 1229c, 1232(a)(5)(D); 8 C.F.R. § 240.25; *cf. Parra v. Perryman,* 172 F.3d 954, 958 (7th Cir. 1999) ("An alien in Parra's position can withdraw his defense of the removal proceeding and return home to his native land, thus ending his detention immediately.  He has the keys in his pocket.").  But until she does — unlike for adults in the

custody of the Bureau of Prisons — the ORR is charged by Congress with overseeing her care and custody.  *See* 6 U.S.C. 279.  In that circumstance, the government should not be required to facilitate an abortion, whatever the level of time, attention, or resources it would have to devote.  Holding that all pregnant aliens have a right to illegally enter the country and evade the immigration process in the United States in order to obtain abortions creates an unwarranted incentive for children worldwide to make this dangerous journey to seek to enter the United States without a lawful basis for doing so.  Further, such a holding has the potential to affect foreign relations with UACs' home countries, many of which prohibit abortion and may be concerned about a United States policy that permits their citizens to enter the United States without authorization to gain access to abortion services.  *See, e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 81 (1976) (explaining that "decisions in [immigration] matters may implicate our relations with foreign powers").  And, in balancing the relevant interests, the strong government interest in not facilitating an abortion significantly outweighs the interest of an alien who has violated our immigration laws and insists on obtaining an elective abortion in the United States rather than returning to her country of origin.  These reasons strongly counsel against holding that any such right exists under the Fifth Amendment.

### C.    Plaintiffs' Fifth Amendment Parental-Notification Claim Fails To State A Cognizable Claim For Relief

Plaintiffs lacks any cognizable legal right to relief based on a claim that the government is violating due process "by forcing minors to tell their parents or sponsors about their abortion decision, or telling the parents or sponsors themselves."  ECF No. 5-1 at 11.  Plaintiffs cannot show, as would be necessary in a class action challenge to this policy, that involving parents in this difficult decision violates the Due Process Clause — much less that it does so in all or the large fraction of circumstances.  Instead, the government does not impose an "undue burden"

through a policy that provides for informing parents with respect to difficult issues relating to the abortion decision.  Rather, given that Congress has affirmatively charged the government with communicating with UACs' parents in their home country and/or potential guardians in the United States in its custodial role, these types of communications do not.

In certain circumstances, a parental *consent* requirement might impose an undue burden on a woman's choice to have an abortion, which may require in turn a judicial bypass procedure that protects the woman's anonymity.  *See, e.g.*, *Cincinnati Women's Services*, 468 F.3d at 370 (holding that Ohio provision limiting minors to one petition for a judicial bypass per pregnancy was an undue burden).  But such a rule bears no relationship to the circumstances alleged here, where Plaintiffs have not alleged the imposition of any requirement that UACs obtain parental consent, but only that ORR has either required UACs to notify their parents of abortion decisions, or has notified the parents themselves.  Here, the government has custody of unaccompanied alien minors who have attempted to illegally enter the United States.  Given the separation of the child from the parent inherent in this context, discussions with a parent would not impose the sort of undue burden that was addressed by the courts in other contexts where the child was in parental custody.

The parental-notification claim rests on their assertion that, "[o]nce a minor has been granted a judicial bypass, the government ceases to have any legitimate interest in notifying the minor's parents."  ECF No. 5-1 at 11.  However, the government's decision to provide parental notification is constitutionally different in kind from a government requirement to obtain parental consent.  "[A] parental notice statute — unlike either a spousal notice or a blanket parental consent statute — has neither 'the purpose [n]or effect of placing a substantial obstacle in the path of a woman seeking an abortion,' and therefore cannot reasonably be said to unduly burden

the minor's abortion right." *Planned Parenthood of Blue Ridge v. Camblos*, 155 F.3d 352, 367

(4th Cir. 1998) (*en banc*) (quoting *Casey*, 505 U.S. at 877 (joint opinion)).  It is not an undue

burden to require parental notification so long as there are appropriate exceptions.  *See id.* at 372-

74 (holding that a "state may constitutionally require that mothers and fathers of teenage

daughters be informed of their daughters' life-defining decisions to abort their pregnancies,

provided that the state excepts from its requirement notice to abusive parents, noncustodial

parents who have refused to accept their parental responsibilities, and parents with similar

relationships to their children").  Plaintiffs have failed to make any allegations that would

provide a basis for finding that these exceptions apply.  *See* ECF No. 104 (nowhere alleging that

any Plaintiffs' parents are abusive or have refused to accept their parental responsibilities).  In

fact, Ms. Poe herself "informed her parents of her pregnancy and of her contemplation of

abortion."  ECF No. 66-1 (December 16, 2017 Jonathan White Decl.) at ¶ 5.  Ms. Roe and Ms.

Moe make no allegation that they have been forced to inform their parents of their pregnancy or

abortion.  *See* ECF No. 104 at 6, ¶¶ 23-29.  And Ms. Moe's parents were never informed of her

request, and she was subsequently released from federal custody to that of her sponsor.  ECF No.

114.

Any challenge to parental notification is particularly weak in the context of UACs in

ORR custody, given that in rare circumstances, HHS might assist with "reuniting unaccompanied

alien children with a parent abroad in appropriate cases."  6 U.S.C. § 279(b)(1)(H).  Information

regarding the UAC's health status — including whether she is currently pregnant or just

underwent a serious medical procedure implicating her physical health — might be essential in

this regard.  Similarly, the TVPRA directs that ORR ensure that UACs are placed in settings with

the United States where they are not at risk, *see* 6 U.S.C. § 279(b)(2)(A)(iii), and provides that

"an unaccompanied alien child may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). In order to accommodate any health needs or conditions related to the pregnancy or abortion procedure, ORR's communications with potential custodians may require notification regarding the abortion and surrounding circumstances.

In sum, Plaintiffs fail to state a claim here because, even accepting the truth of their allegations, a parental notification policy, in contrast with a policy requiring parental consent, does not impose an undue burden. *See Camblos*, 155 F.3d at 367. Moreover, the government's unique custodial statutory obligations to ensure that upon release, the UAC's sponsor is capable of providing for the child's physical and mental wellbeing indicates that imposing any bar on parental notification in these circumstances is especially problematic. This claim must therefore be dismissed under Rule 12(b)(6).

### D. Plaintiffs' First Amendment Compelled-Speech Claim Fails To State A Cognizable Claim For Relief

Plaintiffs cannot succeed on a claim that the United States violates pregnant UACs' First Amendment right against compelled speech. Plaintiffs contend that they and all putative class members are being "compel[led] . . . to discuss their decisions to have abortions and the circumstances surrounding those decisions with crisis pregnancy centers . . . ." ECF No. 104 at 16, ¶ 72. The government, however, only impermissibly compels speech when it forces a speaker to convey a message and "the complaining speaker's own message was affected by the speech it was forced to accommodate." *Rumsfeld v. FAIR*, 547 U.S. 47, 63 (2006); *see Nat'l Assoc. of Manufacturers v. NLRB*, 717 F.3d 947, 958 (D.C. Cir. 2013) (a "compelled-speech violation' occur[s] when 'the complaining speaker's own message was affected by the speech it

was forced to accommodate'"); *see also Nat'l Assoc. of Manufacturers v. SEC*, 800 F.3d 518, 521-23 (D.C. Cir. 2015) (collecting compelled speech cases).  It is not compelled speech when the individual is not required to say anything.  *Cf. Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (The First Amendment contemplates that listeners may be exposed to messages that "in someone's eyes are misguided.").

It is well-settled that the government may require pregnancy-related counseling to ensure the counselee understands the legal rights and requirements surrounding abortion procedures. *Texas Med. Providers Providing Abortion Servs.*, 667 F.3d at 574-80 (rejecting First Amendment challenge by abortion providers to a Texas law that required them to provide a sonogram and other information to women seeking abortion services); *see also Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d at 1467 (upholding a state mandatory-information provision that required providing information regarding pregnancy, fetal development, child care, and child support among other things).  Indeed, ORR in this circumstance — where medical care while in custody is at issue — must consider the child's welfare interests.  *See* 8 U.S.C. § 1232(b)(1). The Supreme Court has long recognized "that when a parent or another person has assumed 'primary responsibility' for a minor's well-being, the State may properly enact 'laws designed to aid discharge of that responsibility.'"  *Hodgson v. Minn.*, 497 U.S. 417, 448 (1990) (*quoting Ginsberg v. New York*, 390 U.S. 629, 639 (1968)).  This is because "[t]he State has a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely."  *Id.* at 444.

Here, HHS serves in the role of the child's legal custodian and is directed to place UACs "in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A), while in HHS custody—that is, until they are released to a suitable sponsor, obtain lawful status

or leave the country.  *See* 6 U.S.C. § 279(g); 8 U.S.C § 1232(b)(1), (g).  When caring for a

child's medical needs, HHS exercises custodial responsibility, and in these circumstances must

consider child welfare.  In addressing the UAC's welfare, and more specifically, the needs of a

pregnant minor, ORR provides pregnancy counseling in this custodial capacity.  ORR provides

these services through cooperative agreements with care providers, which in turn use various

external medical centers and professionals as well as professionals on staff. *See*

https://www.acf.hhs.gov/orr/programs/ucs/about ("care providers operate under cooperative

agreements and contracts").  Certain external medical providers conduct initial medical exams,

and then UACs believed to be pregnant receive confirmation of pregnancy and care from other

providers who are obstetrician/gynecologists. ORR further offers UACs medical and social

service counseling, and sometimes does so from medical professionals that specialize in

pregnancy counseling (which plaintiffs call "crisis pregnancy centers").  During all these care

appointments, UACs are provided with medical and other pertinent information, which is a key

component of engaging in any medical communications and in obtaining informed consent at

each step.

Despite their allegation that named Plaintiffs and members of the putative class are being

"compelled" to speak during counseling, ECF No. 104 at 16, ¶ 72, neither Ms. Doe, Ms. Poe,

Ms. Moe, nor any UAC is forced to engage in discourse or respond to any inquiries, and may in

fact remain completely silent during any such counseling.  In fact, Ms. Roe, Ms. Poe and Ms.

Moe report freely discussing pregnancy options with physicians and/or ORR staff, and arrived at

the choice to abort the fetus with no report of being compelled to say anything against their will.

*See* ECF No. 104 at 5-6, ¶¶ 20, 24, 27.  ORR simply ensures that UACs are provided medical

and social information about their pregnancies and options.  For these reasons, Plaintiffs' First

Amendment compelled-speech claim must fail.

> **E.      Plaintiffs' Establishment Clause Claim Fails As A Matter Of Law And Should Be Dismissed**

"The Establishment Clause of the First Amendment, made binding upon the States

through the Fourteenth Amendment, provides that the Government 'shall make no law respecting

an establishment of religion.'"  *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S.

753, 757 (1995) (quoting U.S. Const. Amend I).

ORR may provide counseling before and after any abortion procedure to protect the

minor's mental and physical well-being.  *See* 8 U.S.C. § 1232(c)(2)(A), (c)(3)(A).  There is

nothing about ORR policy that contains a purpose to support religion, and the primary effect of

the policy is to assist UACs, and not to promote religion.  The Second Amended Complaint

contains no allegations that Plaintiffs received any religious or non-secular messages relating to

any particular religion, or that ORR screens service providers on the basis of religious affiliation.

*See* ECF No. 104 (nowhere alleging that Plaintiffs were subjected to any specific religious

messages).  Consequently, even accepting *arguendo* the truth of Plaintiffs' factual allegations,

Plaintiffs' claim under the Establishment Clause must fail.

This is not a case where "the Government was actively and directly communicating a

religious message through religious words or religious symbols."  *See In re Navy Chaplaincy*,

534 F.3d 756, 764 (D.C. Cir. 2008).  Plaintiffs have alleged an Establishment Clause violation

based on the mere fact that some private nonprofit organizations with which the Federal

government arranges to provide pregnancy counseling services — not even necessarily the

organizations that actually house the Plaintiffs — are religiously affiliated.  ECF No. 104 at 16-

17, ¶¶ 74-78.  What these allegations lack is the contention that ORR requires the Plaintiffs to

receive unwanted religious instruction — Plaintiffs simply contend UACs cannot be provided with secular services if the provider is religious.  In any event, the Government may fund general secular activities of "religiously affiliated" institutions without violating the Establishment Clause, so long as such institutions are capable of separating their secular services from sectarian indoctrination.  *See Agostini v. Felton*, 521 U.S. 203 (1997) (students attending religious schools eligible for federal remedial assistance); *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819 (1995) (Christian student organization eligible for student activity funds); *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1 (1993) (publicly funded sign language interpreter could assist student in a Catholic school); *Witters v. Washington Dept. of Servs. for Blind*, 474 U.S. 481 (1986) (blind student free to use public vocational assistance to attend bible college); *Columbia Union Coll. v. Clarke*, 159 F.3d 151, 157-58 (4th Cir. 1998); *see also* 45 C.F.R. § 87.3(b) ("Organizations that apply for or receive direct financial assistance from an HHS awarding agency may not support or engage in any explicitly religious activities . . . as part of the programs or services funded with direct financial assistance from the HHS awarding agency, or in any other manner prohibited by law.").  Pregnancy counseling services "are not themselves 'specifically religious activities,' and they are not converted into such activities by the fact that they are carried out by organizations with religious affiliations."  *Bowen v. Kendrick*, 487 U.S. 589, 613 (1988).  As the Supreme Court has recognized, the fact that a religious message may overlap with the government's secular interest in promoting life over abortion is insufficient on its own to warrant a finding that a governmental action has the primary effect of advancing religion.  *Id.*  Thus, Plaintiffs lack any claim under the Establishment Clause.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss all claims in this case against

Defendants.

DATED: February 1, 2018                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

AUGUST E. FLENTJE
Special Counsel
Civil Division

ERNESTO H. MOLINA
Deputy Director
Office of Immigration Litigation


BY:  /s/ *Sabatino F. Leo*
SABATINO F. LEO
W. DANIEL SHIEH
JOSEPH A. DARROW
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C.  20044
Phone: (202) 598-2445
Fax: (202) 305-7000
sabatino.f.leo@usdoj.gov
daniel.shieh@usdoj.gov
*Attorneys for Defendants*                 joseph.a.darrow@usdoj.gov