## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROCHELLE GARZA, as guardian ad litem to unaccompanied minor J.D., on behalf of herself and others similarly situated, *et al.*, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 17-cv-02122-TSC |
| | ) | |
| ALEX M. AZAR II, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' MOTION FOR LEAVE TO AMEND THE COMPLAINT

Plaintiffs, pursuant to Fed. R. Civ. P. 15(a) and Local Civil Rule 7(i), hereby move to amend their complaint to make adjustments to the existing parties; add and update the facts and allegations giving rise to this action; and make adjustments to their existing claims for relief. Plaintiffs' counsel has reached out to Defendants' counsel regarding their position on the relief requested in this motion. Defendants' counsel replied that they would not consent until after having seen the motion itself. The motion should be granted for the following reasons.

1.  Since Plaintiffs filed their second amended complaint, there have been changes to the existing Defendants, including the appointment of a new Health and Human Services Director. Plaintiff J.D. also turned 18, and therefore Rochelle Garza's guardianship appointment has ended. Furthermore, Plaintiffs have learned additional facts regarding the named plaintiffs, and Defendants' implementation of the challenged policy as to plaintiffs and members of the putative class. Plaintiffs' amendments also clarify facts related to voluntary departure and sponsorship. Finally, Plaintiffs' amendments make some adjustments to legal claims.

2.  Fed. R. Civ. P. 15(a)(2) provides that the Court "should freely give leave" to amend a complaint "when justice so requires." This rule must be construed liberally, *In re Bank Funding*

*Corp. Securities Litigation*, 629 F. 3d 213, 218 (D.C. Cir. 2010), and courts should grant leave to

amend pleadings unless some countervailing factor exists, "such as undue delay, bad faith or

dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of allowance of the

amendment, futility of the amendment, etc.," *Harris v. Sec., U.S. Dep't of Veterans Affairs*, 126

F. 3d 339, 344 (D.C. Cir. 1997) (quoting *Forman v. Davis*, 371 U.S. 178, 182 (1962)); *see also*

*Abdullah v. Washington*, 530 F.Supp.2d 112, 115 (D.D.C. 2008) ("Because amendments are to

be liberally granted, the non-movant bears the burden of showing why an amendment should not

be allowed."). No such countervailing factors exist in this case. Therefore, in the interests of

justice, and in order to promote judicial efficiency and ensure meaningful relief, Plaintiffs

respectfully request that this Court grant their motion for leave to amend.

A copy of Plaintiffs' proposed Amended Complaint is filed herewith, as required by

Local Civil Rule 7(i).


DATE: February 15, 2018                          Respectfully submitted,


Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
Shana Knizhnik (D.C. Bar No. 1020840)
American Civil Liberties Union Foundation
of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel. 202-457-0800
Fax 202-457-0805
*aspitzer@acludc.org*
*smichelman@acludc.org*
*sknizhnik@acludc.org*

/s/Brigitte Amiri
Brigitte Amiri*
Meagan Burrows
Jennifer Dalven

Lindsey Kaley
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2633
Fax (212) 549-2652
*bamiri@aclu.org*
*mburrows@aclu.org*
*jdalven@aclu.org*
*lkaley@aclu.org*

Daniel Mach (D.C. Bar No. 461652)
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Tel. (202) 675-2330
*dmach@aclu.org*

Elizabeth Gill
American Civil Liberties Union Foundation of
Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel. (415) 621-2493
Fax (415) 255-8437
*egill@aclunc.org*

Melissa Goodman
American Civil Liberties Union Foundation of
Southern California
1313 West 8th Street
Los Angeles, California 90017
Tel. (213) 977-9500
Fax (213) 977-5299
*mgoodman@aclusocal.org*

Mishan Wroe
Riley Safer Holmes & Cancila LLP
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Tel. (415) 275-8522
*mwroe@rshc-law.com*

\* Motion for admission *pro hac vice granted*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| J.D. and JANE ROE on behalf of themselves and others similarly situated; and JANE POE and JANE MOE, | ) ) ) | |
| | ) | No. 17-cv-02122-TSC |
|    c/o ACLU | ) | |
|    125 Broad Street, 18th Fl. | ) | |
|    New York, NY  10004, | ) | |
| | ) | |
|             Plaintiffs, | ) | |
| | ) | |
|  v. | ) | |
| | ) | |
| ALEX M. AZAR II,  Secretary of Health and Human Services | ) ) | |
| U.S. Department of Health & Human Services | ) ) | |
|    200 Independence Avenue, S.W. | ) | |
|    Washington, D.C. 20201; | ) | |
| | ) | |
| STEVEN WAGNER, Acting Assistant Secretary for Administration for Children and Families, in his official capacity | ) ) ) | |
|    330 C Street, S.W. | ) | |
|    Washington, D.C. 20201; and | ) | |
| | ) | |
| E. SCOTT LLOYD, Director of Office of Refugee Resettlement, in his official capacity | ) ) | |
|    330 C Street, S.W. | ) | |
|    Washington, D.C. 20201, | ) | |
| | ) | |
|             Defendants. | ) | |
| | ) | |
|   | ) | |

## THIRD AMENDED COMPLAINT FOR INJUNCTIVE RELIEF
(Interference with minors' constitutional right to obtain an abortion)

Plaintiffs J.D. and Jane Roe, on behalf of themselves and a class of similarly situated

pregnant unaccompanied immigrant minors in the legal custody of the federal government, and

Plaintiffs Jane Poe and Jane Moe, on behalf of themselves, for their complaint in the above-captioned matter, allege as follows:

## PRELIMINARY STATEMENT

1.      There are currently thousands of unaccompanied immigrant minors (also known as unaccompanied children, or "UCs") in the legal custody of the federal government. These young people are extremely vulnerable: Many have come to the United States fleeing abuse and torture in their home countries; many have been sexually abused or assaulted either in their home countries, during their long journey to the United States, or after their arrival; some have also been trafficked for labor or prostitution in the United States or some other country; and many have been separated from their families.

2.      The federal government is legally required to provide these young people with basic necessities, such as housing, food, and access to emergency and routine medical care, including family planning services, post-sexual assault care, and abortion. And, as is true with everyone in the United States, the Constitution prohibits the government from imposing an "undue burden" on their right to obtain an abortion.

3.      In 2017, Defendants revised nationwide policies to allow them to wield an unconstitutional veto power over unaccompanied immigrant minors' access to abortion in violation of their Fifth Amendment rights. Under these nationwide policies, Defendants also attempt to coerce minors to carry their pregnancies to term, including by forcing unaccompanied minors who request abortion to visit pre-approved anti-abortion crisis pregnancy centers, which require the minors to divulge the most intimate details of their lives to entities hostile to their abortion decisions, in violation of their First and Fifth Amendment rights. Defendants also force minors to notify parents or other family members of their pregnancies and/or their requests for abortions, or notify family members themselves, in violation of the First and Fifth Amendments. In some instances, the Director of the Office of Refugee Resettlement (ORR) has personally attempted to coerce minors to continue their pregnancies. When these efforts at coercion fail, Defendants bar minors from attending appointments necessary to secure an abortion.

4.      In the last several months, at least four pregnant unaccompanied minors in the legal custody of the federal government who sought to access abortions — "J.D." or "Jane Doe", "Jane Moe", "Jane Roe," and "Jane Poe"[1]— were, pursuant to Defendants' policy, subjected to various coercion attempts, and ultimately blocked from accessing abortion. Plaintiffs were only able to access abortion after they sought emergency relief in this Court.

## JURISDICTION AND VENUE

5.      This action arises under the First and Fifth Amendments to the United States Constitution, and the Administrative Procedure Act, and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331.

6.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Federal Rules of Civil Procedure 57 and 65, and by the inherent equitable powers of this Court.

7.      The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

8.      Venue is proper in this district under 28 U.S.C. § 1391(e).

## PARTIES

### *Plaintiff J.D.*

9.      Plaintiff J.D. came to the United States from her home country as a minor without her parents. J.D. was detained by the federal government and placed in a federally funded shelter in Texas. She was pregnant and in September 2017 told the staff at the shelter where she was housed that she wanted an abortion. J.D. faced extreme resistance from Defendants. With the assistance of court-appointed attorney and guardian ad litems, J.D. secured a court order permitting her to bypass state law requiring parental consent for abortion, and allowing her to

---

[1] The named Plaintiffs have all filed motions to proceed under pseudonyms, which are either pending or have been granted.

consent to the abortion on her own. Nevertheless, Defendants took the position that they would not allow J.D. to access abortion.

10.    J.D. was forced to cancel multiple appointments for state-mandated counseling and the abortion due to Defendants' obstruction, which unnecessarily pushed J.D. later into pregnancy.

11.    Defendants also forced J.D. to visit an anti-abortion crisis pregnancy center.

12.    Over J.D.'s objection, Defendants told J.D.'s mother about her pregnancy.

13.    Defendants also subjected J.D. to medically unnecessary ultrasounds.

14.    J.D. moved this Court to be referred to in this litigation by the initials "J.D." for "Jane Doe" to protect her privacy.

15.    This Court granted a TRO preventing Defendants from continuing to block J.D. from obtaining abortion.

16.    Defendants' obstruction delayed J.D.'s abortion by four weeks.  If this Court had not granted a TRO, J.D. would have been forced to carry the pregnancy to term against her will.

17.    J.D. has turned 18, and is no longer in Defendants' custody. She continues to fear retaliation because of her abortion decision, and she does not want her family or others to know she obtained an abortion.

18.    J.D. sues on her own behalf and as the class representative of other similarly situated young women.

*Plaintiff Jane Roe*

19.    Plaintiff Jane Roe came to the United States from her home country as a minor without her parents. She was detained by the federal government, and was residing in a private, federally funded shelter.

20.    On November 21, 2017, she discovered she was pregnant during a medical examination after she was in federal custody. The physician discussed her pregnancy options, and she decided to have an abortion.

21.     She asked her doctor and her shelter for an abortion, but Defendants did not allow her to have one. Ms. Roe requested to terminate her pregnancy by taking medications (known as a medication abortion) that end the pregnancy and essentially cause a miscarriage. However, because of Defendants' obstruction, Defendants pushed her further into her pregnancy, past the point in pregnancy in which medication abortion is available. Ms. Roe nonetheless still wanted an abortion, but Defendants refused to allow her to obtain one.

22.     Defendants required Ms. Roe's sister and potential sponsor to be notified of her abortion request.

23.     Ms. Roe was also subjected to a medically unnecessary ultrasound.

24.     Ms. Roe filed suit seeking emergency relief preventing Defendants from continuing to obstruct her access to abortion. Ms. Roe was granted leave from this Court to proceed in this litigation as "Jane Roe" to protect her privacy.

25.     This Court granted Ms. Roe the relief she requested and Defendants appealed. Before the appeal was briefed or the Circuit Court could rule, Defendants released Ms. Roe from custody.

26.     Ms. Roe continues to fear retaliation because she requested and obtained an abortion.

27.     She does not want her family or others to know she obtained an abortion.

28.     Ms. Roe sues on her own behalf and as class representative of other similarly situated young women.

*Plaintiff Jane Poe*

29.     Plaintiff Jane Poe came to the United States from her home country as a minor without her parents, was detained by the federal government, and is residing in a private, federally funded shelter.

30.     Ms. Poe was raped in her home country. She discussed her pregnancy options with a physician, and in November 2017 requested an abortion.

31.     Ms. Poe expressed thoughts of self-harm if she were unable to obtain an abortion.

32.     Nonetheless, ORR subjected Ms. Poe to various coercion tactics, and unnecessarily pushed her further into her pregnancy.

33.     For example, based on Defendants' policy, Defendants instructed the shelter that either Ms. Poe tell her mother and potential sponsor about her pregnancy, or the shelter must do so. As a result, Ms. Poe told her mother and potential sponsor about her pregnancy. They threatened to physically abuse her if she had an abortion.

34.     Despite the circumstances surrounding Ms. Poe's pregnancy, her threats of self-harm, and the threats of abuse, Defendant Lloyd nevertheless determined that it was not in Ms. Poe's "best interest" to have an abortion, citing anti-abortion arguments and anti-abortion sources.

35.     Defendant Lloyd's denial of Ms. Poe's abortion request was issued on December 17, more than two weeks after Ms. Poe's initial request.

36.     Ms. Poe filed suit seeking emergency relief preventing Defendants from continuing to obstruct her access to abortion. This Court granted the requested relief. If this Court had not intervened, Ms. Poe would have been forced to carry her pregnancy to term.

37.     Ms. Poe was granted leave by this Court to proceed in this litigation as "Jane Poe" to protect her privacy.

38.     Ms. Poe fears retaliation because she obtained an abortion, and she does not want her family or others to know she obtained an abortion.

*Plaintiff Jane Moe*

39.     Plaintiff Jane Moe came to the United States from her home country as a minor without her parents, was detained by the federal government, and resided in a private, federally funded shelter.

40.     She decided to have an abortion. For two weeks, she asked the shelter for access to abortion but was not permitted to access abortion.

6

41.     Pursuant to Defendants' policy, Jane Moe was required to visit an anti-abortion crisis pregnancy center to discuss her pregnancy where she was subjected to a medically unnecessary ultrasound.

42.     Defendant Lloyd instructed that Ms. Moe be read and given a copy of a personalized letter from a family offering to adopt her baby if she continued the pregnancy.

43.     Based on Defendants' policy, Defendants required Ms. Moe to disclose her pregnancy and request for an abortion to her sponsor.

44.     Ms. Moe filed suit seeking emergency relief preventing Defendants from continuing to obstruct her access to abortion.

45.     Three days later, before this Court could rule on that request, Defendants transferred her out of their custody.

46.     Jane Moe also requested leave from this Court to proceed in this litigation as "Jane Moe" to protect her privacy. She fears retaliation because she has requested an abortion, and she does not want her family or others to know she requested an abortion.

47.     Jane Moe sues on her own behalf.

*Defendants*

48.     Defendant Alex M. Azar II is the Secretary of the United States Department of Health and Human Services ("HHS") and is responsible for the administration and oversight of the Department. Defendant Azar has authority over the Administration for Children and Families, a subdivision of HHS. By interfering with, prohibiting and/or obstructing unaccompanied immigrant minors' access to abortion, Defendant Azar is violating the First and Fifth Amendment rights of those unaccompanied immigrant minors. Defendant Azar is sued in his official capacity.

49.     Defendant Steven Wagner is the Acting Assistant Secretary for Administration for Children and Families. Defendant Wagner has authority over the Office of Refugee Resettlement ("ORR"), a subdivision of Administration for Children and Families. By interfering with, prohibiting and/or obstructing unaccompanied immigrant minors' access to abortion, Defendant

Wagner is violating the First and Fifth Amendment rights of those unaccompanied immigrant minors. Defendant Wagner is sued in his official capacity.

50.     Defendant E. Scott Lloyd is the Director of ORR. ORR oversees the unaccompanied children program. By interfering with, prohibiting and/or obstructing unaccompanied immigrant minors' access to abortion, and imposing his religious beliefs on these minors, Defendant Lloyd is violating the First and Fifth Amendment rights of those unaccompanied immigrant minors. Defendant Lloyd is sued in his official capacity.

## FACTS GIVING RISE TO THIS ACTION

### The Unaccompanied Children ("UC") Program

51.     ORR has responsibility for the "care and custody of all unaccompanied [] children, including responsibility for their detention, where appropriate." 8 U.S.C. § 1232(b)(1). Unaccompanied immigrant minors are under 18 years old, have no legal immigration status, and either have no parent or legal guardian in the United States, or there is no parent or legal guardian in the United States able to provide care and physical custody. 6 U.S.C. § 279(g)(2). ORR determines whether a minor qualifies for this designation at the point the minor enters ORR custody.

52.      By statute, any federal department or agency that determines that it has an unaccompanied immigrant minor in its custody must, absent "exceptional circumstances," transfer the minor to ORR within 72 hours of making that determination. *Id.* § 1232(b)(3). The federal government reports that in Fiscal Year 2017, 40,810 unaccompanied immigrant minors were referred to ORR.

53.     The federal government and all of its programs are required to ensure that the best interests of the unaccompanied immigrant minor are protected. Section 462 of the Homeland Security Act requires ORR to "ensur[e] that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied child." 6 U.S.C. § 279(b)(1)(B).

54.     In addition, Section 235 of the Trafficking Victims Protection Reauthorization Act directs HHS to ensure that unaccompanied immigrant minors are "promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A).

55.     Most unaccompanied immigrant minors who are referred to ORR are eventually released from custody to parents or sponsors who live in the United States. Such minors are often held in short-term facilities or shelters while they await release to their parents or sponsors. A significant number of unaccompanied immigrant minors are not released to parents or sponsors, and spend longer periods of time in custody.

56.     Although the majority of minors are eventually reunified with family members in the United States, some minors have no viable sponsor.

57.     For those minors who do have a potential sponsor, the process for identifying, contacting, vetting and approving a qualified sponsor can take weeks or months. The process for sponsor vetting includes submission by a sponsor of the application for release and supporting documentation, the evaluation of the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child, background checks, and in some cases home studies. This process is largely outside of the control of the individual minor.

58.     Some minors may seek to return to their home country voluntarily, but that process also involves multiple steps, and can take at least several months. Unaccompanied minors in ORR custody must be placed in removal proceedings before an immigration judge, and only once in removal proceedings can a minor request voluntary departure. Once an immigration judge holds a hearing and determines that the minor is eligible for voluntary departure, he or she has discretion to grant it, but the government may oppose. Even if the judge grants voluntary departure, the process to repatriate the minor requires further steps, including involving the minor's home country's consulate. Overall, it can take months from the time the minor requests voluntary departure until she is returned to her home country, and the timing of many of the necessary steps is out of the minor's control. Moreover, asking for voluntary departure prior to the conclusion of the removal proceeding necessarily means that the minor gives up any defenses

to removal proceedings, including the opportunity to obtain Special Immigration Juvenile Status
or asylum.

**Unaccompanied Immigrant Minors Have an Acute Need for and Are Legally Entitled to
Receive Access to Reproductive Health Care**

59.     Unaccompanied immigrant minors have an acute need for reproductive health
care, which is both time-sensitive and is necessary over the course of their time in federal
custody. For example, a high number of these young women are victims of sexual assault. Some
of these women will need access to emergency contraception, and some will need access to
abortion. Any female aged 10 or older must undergo a pregnancy test within 48 hours of
admission to an ORR-funded facility. This is the point at which many young women first learn
they are pregnant.

60.     The federal government is legally obligated to ensure that all programs that
provide care to these young people comply with the minimum requirements detailed in the
*Flores v. Reno* Settlement Agreement, CV-85-4544-RJK (C.D. Cal. Jan. 17, 1997) ("*Flores*
agreement"). The *Flores* agreement is a nationwide consent decree that requires the government
to provide or arrange for, among other things, "appropriate routine medical . . . care," including
specifically "family planning services[] and emergency health care services."

61.     Additionally, in response to its obligations under the Prison Rape Elimination Act
and the Violence Against Women Reauthorization Act of 2013, ORR issued a regulation
requiring all ORR-funded care provider facilities to, among other things, provide unaccompanied
immigrant with access to reproductive healthcare if they are sexually assaulted in ORR custody.
The regulation states, in relevant part, that grantees providing care to unaccompanied immigrant
minors who have experienced sexual abuse while in federal custody must ensure "unimpeded
access to emergency medical treatment, crisis intervention services, emergency contraception,
and sexually transmitted infections prophylaxis." 45 C.F.R. § 411.92(a). The regulation further
provides that grantees must ensure that a young person subject to sexual abuse in ORR custody is
offered a pregnancy test, and "[i]f pregnancy results from an instance of sexual abuse, [the] care

provider facility must ensure that the victim receives timely and comprehensive information about all lawful pregnancy-related medical services." *Id.* § 411.93(d).

62.     Adult women in Immigration and Customs Enforcement detention, and inmates in federal prison, are expressly granted the right to access abortion services.  *See* ICE, *Detention Standard 4.4, Medical Care (Women)*, at 35 (revised Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/4-4.pdf; 28 C.F.R. § 551.23(c).

## Defendants' Interference With, Obstruction, And Prohibition On Unaccompanied Immigrant Minors' Access to Abortion

63.     Since March 2017, Defendants have had a policy, applicable to all pregnant UCs in their custody, of ensuring that young people continue their pregnancies while in ORR custody, unless doing so would pose a risk of death or serious injury. Defendants prohibit all federally funded shelters from taking "any action that facilitates" abortion access for unaccompanied minors in their care without "direction and approval from the Director of ORR." This includes scheduling appointments with medical providers, ensuring access to non-directive options counseling, ensuring access to court to seek a judicial bypass in lieu of parental consent, and providing access to the abortion itself. Defendant Lloyd has taken the position that "[g]rantees should not be supporting abortion services pre or post-release; only pregnancy services and life-affirming options counseling."

64.     In an email to all ORR staff, then-Acting Director of ORR Ken Tota summarized the policy: "Grantees are prohibited from taking any actions in [requests for abortion] without . . . signed authorization from the Director of ORR."

65.     As part of the revised policy, pregnant minors seeking abortion are also subject to coercion tactics. For example, such minors are forced to tell their parents that they are pregnant

and seeking an abortion; if they refuse, ORR instructs the shelter to tell their parents against their wishes.

66.     As described below, ORR also requires minors considering an abortion to visit a pre-approved anti-abortion crisis pregnancy center.

67.     If these attempts to coerce the minor into carrying to term fail, ORR prevents the minor from obtaining an abortion while she is in its custody, unless the pregnancy would pose a risk of death or serious injury to the minor.

68.     Defendants have exercised their unconstitutional veto power to deny minors access to abortion by prohibiting their shelters from transporting or allowing them to be transported to appointments related to abortion access.

69.     Defendants' actions toward the named Plaintiffs are consistent with their policy, which has been enforced against other young women as well.

70.     For example, in March 2017, another unaccompanied minor at a federally funded shelter in Texas decided to have an abortion. After obtaining a judicial bypass and receiving counseling, she started the medical abortion regimen for terminating a pregnancy. This regimen begins with a dose of mifepristone, followed by a dose of misoprostol within 48 hours later. After the minor took the mifepristone, ORR intervened, and forced her to go to an "emergency room of a local hospital in order to determine the health status of [her] and her unborn child." The Acting Director of ORR, Ken Tota, directed ORR as follows: "[i]f steps can be taken to preserve the life of . . . her unborn child, those steps should be taken." At the hospital, the minor was subjected to a medically unnecessary ultrasound. Defendants contemplated trying to "reverse" the minor's abortion against her will by forcing her to undergo an untested regimen of

progesterone. Eventually, after the intervention of other advocates, ORR allowed the minor to complete the medication abortion and take the second dose of pills.

71.     Defendant Lloyd has personally contacted one or more unaccompanied immigrant minors who were pregnant and seeking abortion, and discussed with them their decision to have an abortion. Defendant Lloyd is trying to use his position of power to coerce minors to carry their pregnancies to term. Defendant Lloyd has a religious opposition to abortion and he is imposing his personal beliefs on unaccompanied minors.

72.     ORR has also created a nationwide list of "Trusted Providers in HHS Cities," which comprises anti-abortion crisis pregnancy centers. The list was created by two anti-abortion, religiously affiliated organizations called CareNet and Heartbeat International. As part of ORR's policy, if a minor expresses that she is contemplating abortion, ORR requires her to visit one of these pre-approved centers.

73.     Crisis pregnancy centers are categorically opposed to abortion, and generally do not provide information about pregnancy options in a neutral way. Many are also religiously affiliated, and proselytize to women.

74.     Defendants forced J.D. to visit one of these centers for "counseling," forcing her to share her private personal and medical information, namely that she was pregnant and seeking an abortion, to an entity that is hostile to her decision to have an abortion. The center also prayed for J.D. in her presence during her mandatory visit.

75.     Defendants have also required other minors to be counseled by crisis pregnancy centers, both before and after their abortions, including at the explicit direction of Defendant ORR Director Lloyd.

76.     Defendants have also forced unaccompanied immigrant minors to tell their parents and/or immigration sponsors about their abortion decision, or Defendants themselves have told minors' family members or sponsors about the minors' pregnancy and/or abortion decision, against the express wishes of the minors, both before and after their abortions. Forcing parental notification over the minors' objection can cause the minor or other family members harm.

77.     Defendants told J.D.'s mother about J.D.'s pregnancy – over J.D.'s objections – and tried to force J.D. to also tell her mother she was seeking an abortion, despite the fact that J.D had been abused by her parents.

78.     Defendants also required Jane Poe to tell her mother in her home country and her potential sponsor that she was pregnant and seeking an abortion. They then threatened to beat her if she had an abortion.

79.     In another minor's case, Defendant Lloyd explicitly required "the grantee or the federal field staff [to] notify her parents of the termination," even after she had obtained a judicial bypass to be allowed to access abortion without her parents' involvement or knowledge.

80.     In another instance, ORR directed such parental notification despite being warned by the minors' advocate that the minor's father would retaliate against the mother because of the minor's abortion decision.

81.     Defendant Lloyd has also obstructed minors' access to counsel and the courts for the purpose of impeding minors' access to abortion. In March 2017, Lloyd sent a directive saying that a minor seeking abortion "should not be meeting with an attorney regarding her termination or otherwise pursuing a judicial bypass at this point."

## **CLASS ALLEGATIONS**

82.     Pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2), Plaintiffs J.D. and Jane Roe bring this action as a class action on behalf of all other pregnant unaccompanied immigrant minors in ORR custody nationwide, including those who will become pregnant during the pendency of this lawsuit.

83.     The class is so numerous that joinder is impracticable. In any given year, there are hundreds of pregnant unaccompanied minors in Defendants' custody. Joinder is inherently impractical because the number of unnamed, future class members who will be pregnant while in ORR custody is unknown and unknowable, especially given the transient nature of the unaccompanied minors population and the temporal limitations of pregnancy. The young people affected by ORR's abortion restriction policy are geographically dispersed across the country. Many proposed class members are highly unlikely to file individual suits on their own behalf given the practical, legal, linguistic, monetary, and fear-based barriers that prevent their ability to access independent counsel to challenge ORR's abortion restrictions.

84.     The claims of the Plaintiff Class members share common issues of law related to Defendants' coercion and obstruction, including but not limited to: (i) whether ORR's policy of coercing unaccompanied immigrant minors into carrying their pregnancies to term and, if they still seek an abortion, blocking their access to abortion procedures, violates class members' constitutional rights; (ii) whether ORR's policy of requiring a forced visit to an anti-abortion crisis pregnancy center violates class members' constitutional rights; (iii) whether disclosing or forcing the class members to disclose their pregnancies and abortion decisions to parents and/or immigration sponsors violates class members' constitutional rights; and (iv) whether Defendant Lloyd's imposition of his religious faith on the minors violates the Establishment Clause.

15

85.     The claims of the Plaintiff Class members share common issues of fact, including but not limited to the implementation of Defendants' policy and practice of obstructing or preventing of access to abortion and of coercing minors into carrying their pregnancies to term in the various ways detailed above.

86.     The claims of J.D. and Jane Roe are typical of the claims of members of the Plaintiff Class.

87.     The named class representatives will fairly and adequately protect the interests of the Plaintiff Class. The named class representatives have no interest that is now or may potentially be antagonistic to the interests of the Plaintiff Class. The attorneys representing the named class representatives are experienced civil rights attorneys and are considered able practitioners in federal constitutional litigation. These attorneys should be appointed as class counsel.

88.     Defendants have acted, have threatened to act, and will continue to act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole. The Plaintiff Class may therefore be properly certified under Fed. R. Civ. P. 23(b)(2).

89.     Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class. The Plaintiff Class may therefore be properly certified under Fed. R. Civ. P. 23(b)(1).

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### FIFTH AMENDMENT RIGHT TO PRIVACY AND LIBERTY
### (INDIVIDUAL PLAINTIFFS AND CLASS AGAINST DEFENDANTS)

90. Defendants violate unaccompanied immigrant minors' right to privacy guaranteed by the Fifth Amendment by wielding a veto power over their abortion decisions, and by obstructing, interfering with, or blocking access to abortion, including by trying to coerce minors to carry to term by such tactics as forcing minors to visit crisis pregnancy centers, and when those tactics fail, preventing them from accessing the courts for the purpose of obtaining judicial bypasses, and from going to medical facilities where they can obtain legal abortions.

91. Defendants violate the Fifth Amendment rights of unaccompanied minors by revealing, or forcing the minors to reveal, information about their pregnancy and abortions to their parents or other family members, including immigration sponsors, both before and after the abortion.

92. Defendants violate unaccompanied minors' Fifth Amendment right to bodily integrity by subjecting them to medically unnecessary ultrasounds.

## SECOND CLAIM FOR RELIEF
## FIRST AMENDMENT - COMPELLED SPEECH
## (INDIVIDUAL PLAINTIFFS AND CLASS AGAINST DEFENDANTS)

93. By compelling unaccompanied immigrant minors to disclose their pregnancy and decision to have an abortion to crisis pregnancy centers, and to their parents, family members and/or immigration sponsors, Defendants violate the unaccompanied immigrant minors' rights against compelled speech guaranteed by the First Amendment. The compelled disclosure reveals private, intimate information to others, including to entities hostile to the minors' abortion decision.

## THIRD CLAIM FOR RELIEF
## INFORMATIONAL PRIVACY
## (INDIVIDUAL PLAINTIFFS AND CLASS AGAINST DEFENDANTS)

94.     By requiring unaccompanied immigrant minors to disclose their identities, their pregnancies, and their decisions to seek or have an abortion, to a crisis pregnancy center, parents, family members, and/or immigration sponsors, or doing so themselves, Defendants violate the minors' rights to informational privacy guaranteed by the Fifth Amendment.

## FOURTH CLAIM FOR RELIEF
## FIRST AMENDMENT – ESTABLISHMENT CLAUSE
## (INDIVIDUAL PLAINTIFFS AND CLASS AGAINST DEFENDANTS)

95.     Defendants violate the Establishment Clause by requiring unaccompanied immigrant minors to obtain counseling at crisis pregnancy centers that are often religiously affiliated, and that proselytize to the unaccompanied immigrant minors who are forced to go there.

96.     Defendant Lloyd's actions violate the Establishment Clause by imposing his religious beliefs on unaccompanied minors, and directing that they hear unwanted religious messages about their pregnancies and pregnancy outcomes.

97.     Defendants' actions alleged herein endorse and impose upon the class members a particular set of religious beliefs.

98.     Defendants' actions alleged herein have the predominant purpose of advancing a particular set of religious beliefs.

99.     Defendants' actions alleged herein have the predominant effect of advancing a particular set of religious beliefs.

100.    Defendants' actions alleged herein are religiously coercive.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

1.      Certify this action as a class action under Federal Rule of Civil Procedure 23;

2.      Declare, pursuant to 28 U.S.C. § 2201, that Defendants' actions, as set forth above, violate the Establishment and Free Speech Clauses of the First Amendment to the United States Constitution, and the Fifth Amendment right to privacy, liberty, informational privacy, and bodily integrity;

3.      Enter a preliminary and permanent injunction as to the Class to prevent Defendants from wielding a veto power over an unaccompanied minors' abortion decision, including interfering, obstructing, or blocking their access to abortion;

4.      Enter a preliminary and permanent injunction as to the Class to prevent Defendants from pressuring or coercing pregnant minors to carry their pregnancies to term, including by forcing unaccompanied immigrant minors to visit crisis pregnancy centers as a condition of having an abortion or after an abortion;

5.      Enter a preliminary and permanent injunction as to the Class preventing Defendants from imposing religious beliefs on unaccompanied minors;

6.      Enter a preliminary and permanent injunction as to the Class preventing Defendants from revealing, or forcing unaccompanied immigrant minors to reveal, to the minors' parents, family members or immigration sponsors information about the minors' pregnancies and/or abortion decisions, either prior to or after an abortion against the minors' will;

7.      Enter a preliminary and permanent injunction to prevent Defendants from retaliating against unaccompanied immigrant minors for seeking or obtaining abortions, and from retaliating against shelters, shelter staff, or immigration attorneys for assisting minors in accessing abortion;

8.      Award costs and fees for this action, including attorneys' fees;

9.      Award such further relief as this Court deems appropriate.


February 15, 2017

                                    Respectfully Submitted,

                                    Arthur B. Spitzer (D.C. Bar No. 235960)
                                    Scott Michelman (D.C. Bar No. 1006945)
                                    Shana Knizhnik (D.C. Bar No. 1020840)
                                    American Civil Liberties Union Foundation
                                    of the District of Columbia
                                    915 15th Street NW, Second Floor
                                    Washington, D.C. 20005
                                    Tel. 202-457-0800
                                    Fax 202-457-0805
                                    *aspitzer@acludc.org*
                                    *smichelman@acludc.org*
                                    *sknizhnik@acludc.org*

                                    /s/Brigitte Amiri
                                    Brigitte Amiri*
                                    Meagan Burrows
                                    Jennifer Dalven
                                    Lindsey Kaley
                                    American Civil Liberties Union Foundation
                                    125 Broad Street, 18th Floor
                                    New York, NY 10004
                                    Tel. (212) 549-2633
                                    Fax (212) 549-2652
                                    *bamiri@aclu.org*
                                    *mburrows@aclu.org*
                                    *jdalven@aclu.org*
                                    *lkaley@aclu.org*

                                    Daniel Mach (D.C. Bar No. 461652)
                                    American Civil Liberties Union Foundation
                                    915 15th Street NW
                                    Washington, DC 20005
                                    Tel. (202) 675-2330
                                    *dmach@aclu.org*

                                    Elizabeth Gill
                                    American Civil Liberties Union Foundation of
                                    Northern California, Inc.
                                    39 Drumm Street
                                    San Francisco, CA 94111
                                    Tel. (415) 621-2493
                                    Fax (415) 255-8437
                                    *egill@aclunc.org*

Melissa Goodman
American Civil Liberties Union Foundation of
Southern California
1313 West 8th Street
Los Angeles, California 90017
Tel. (213) 977-9500
Fax (213) 977-5299
*mgoodman@aclusocal.org*

Mishan Wroe
Riley Safer Holmes & Cancila LLP
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Tel. (415) 275-8522
Fax (415) 275-8550
*mwroe@rshc-law.com*

*Motion for admission *pro hac vice granted*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ROCHELLE GARZA, as guardian ad litem to unaccompanied minor J.D., on behalf of herself and others similarly situated, *et al.,* | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 17-cv-02122-TSC |
| ALEX M. AZAR II, *et al.,* | ) ) | |
| Defendants. | ) ) ) | |

**[PROPOSED] ORDER GRANTING PLAINTIFFS'**
**MOTION FOR LEAVE TO AMEND THE COMPLAINT**

Upon consideration of Plaintiffs' motion for leave to amend their complaint, it is hereby

ORDERED that the motion is GRANTED and the proposed amended complaint is

deemed to be filed.

Dated: February ___, 2018                              _____
                                                        Tanya S. Chutkan
                                                        United States District Judge