# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

```
- - - - - - - - - - - - - - -+
                              |
AMERICAN CIVIL LIBERTIES      |
UNION OF NORTHERN             |
CALIFORNIA,                   |
                              |
          Plaintiff,          |    Case Number:
                              |
    vs.                       |    3:16-cv-3539-LB
                              |
ERIC G. HARGAN, Acting        |
Secretary of Health and       |
Human Services, et al,        |
                              |
          Defendants,         |
                              |
U.S. CONFERENCE OF            |
CATHOLIC BISHOPS,             |
                              |
    Defendant-Intervenor.     |
                              |
- - - - - - - - - - - - - - -+
```

Rule 30(b)(6) Videotaped Deposition of

The Department of Health and Human Services,

by and through its designated representative,

JONATHAN WHITE

Washington, D.C.

Tuesday, December 19, 2017 - 3:14 p.m.

Reported by:

Laurie Donovan, RPR, CRR, CSR

Job no: 20318

Page 2

1    Rule 30(b)(6) Videotaped Deposition of
2    The Department of Health and Human Services,
3    by and through its designated representative,
4    JONATHAN WHITE
5
6
7    Held at the offices of:
8        U.S. Department of Justice
9        20 Massachusetts Avenue, N.W.
10       Room 6139
11       Washington, D.C. 20001
12       (202)353-4556
13
14
15
16
17
18       Taken pursuant to notice, before
19   Laurie Donovan, Registered Professional
20   Reporter, Certified Realtime Reporter, and
21   Notary public in and for the District of
22   Columbia.
23
24
25

Page 4

1    (Appearances continued)
2    ON BEHALF OF OFFICIAL CAPACITY FEDERAL DEFENDANTS
3    ERIC G. HARGAN AND DEPARTMENT OF HEALTH AND HUMAN
4    SERVICES:
5        U.S. Department of Justice
6        20 Massachusetts Avenue, N.W.
7        Room 6139
8        Washington, D.C. 20001
9        (202)353-4556
10       By:  Martin M. Tomlinson, Esq.
11           martin.m.tomlinson@usdoj.gov
12           Peter J. Phipps, Esq.
13           peter.phipps@usdoj.gov
14   ALSO PRESENT:
15       Martin Sherrill, Videographer
16       Llewellyn Woolford, Esq. (HHS)
17       Caitlin Palacios, Esq. (HHS)
18       Jeffrey Hunter Moon, Esq, (USCCB)
19       Rachel Chrisinger, paralegal
20
21
22
23
24
25

Page 3

1        A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFF AMERICAN CIVIL LIBERTIES
3    UNION OF NORTHERN CALIFORNIA:
4        ACLU Foundation
5        125 Broad Street, 18th Floor
6        New York, New York 10004
7        (212)519-7897
8        By:  Brigitte Amiri, Esq.
9            bamiri@aclu.org
10           Meagan Burrows, Esq.
11           mburrows@aclu.org
12   ON BEHALF OF THE DEFENDANT-INTERVENOR USCCB:
13       Gibson, Dunn & Crutcher, LLP
14       333 South Grand Avenue
15       Los Angeles, California 90071
16       (213)229-7000
17       By:  Daniel Nowicki, Esq.
18           dnowicki@gibsondunn.com
19           Robert Dunn, Esq. (phone)
20           rdunn@gibsondunn.com
21
22
23
24
25

Page 5

1        EXAMINATION INDEX
2                PAGE
3    EXAMINATION BY MS. AMIRI . . . . . . . . .   7
4    EXAMINATION BY MR. PHIPPS . . . . . . . . .  97
5    EXAMINATION BY MR. NOWICKI . . . . . . . .  98
6
7
8
9
10
11
12       E X H I B I T S
13       (None marked)
14
15
16
17
18
19
20
21
22
23
24
25

2  (Pages 2 to 5)

```
1              P R O C E E D I N G S
2              THE VIDEOGRAPHER:  This is tape
3    number 1A of the videotaped deposition of
4    Jonathan White in the matter of ACLU of
5    Northern California versus Burwell.  This
6    deposition is being held at 20 Massachusetts
7    Avenue, Northwest, Washington, D.C. on
8    December 19, 2017, at approximately 3:14.
9              My name is Martin Sherrill from the
10   firm of TransPerfect, and I'm the legal video
11   specialist.  The court reporter today is
12   Laurie Donovan in association with
13   TransPerfect.
14             Will counsel please introduce
15   themselves.
16             MS. AMIRI:  Brigitte Amiri for
17   plaintiff.
18             MS. BURROWS:  Meagan Burrows for
19   plaintiff.
20             MR. NOWICKI:  Daniel Nowicki for
21   defendant-intervenor USCCB.
22             MR. MOON:  Jeffrey Moon with the
23   USCCB.
24             MR. PHIPPS:  Peter Phipps for the
25   official capacity defendants.
```

```
1              MR. TOMLINSON:  Martin Tomlinson
2    for official capacity federal defendants.
3              MR. WOOLFORD:  Llewellen Woolford
4    for defendant US Department of Health and
5    Human Services.
6              MS. PALACIOS:  Caitlin Palacios for
7    defendant United States Department of Health
8    and Human Services.
9              MS. CHRISINGER:  Rachel Chrisinger,
10   paralegal with the Department of Justice.
11             THE VIDEOGRAPHER:  Would the court
12   reporter please swear in the witness.
13             JONATHAN WHITE,
14   having been first duly sworn, testified
15   upon his oath as follows:
16      EXAMINATION BY COUNSEL FOR PLAINTIFF
17   BY MS. AMIRI:
18      Q   Mr. White, I'm Brigitte Amiri.  I am the
19   plaintiff's, the plaintiff's attorney, and thank
20   you so much for making the time today.
21             Have you ever been deposed before?
22      A   I have not been deposed before.
23      Q   Okay.  So I'm sure that your counsel has
24   already told you some of the ground rules, but
25   just to quickly go over them, if you need a break
```

```
1    at any time, just let me know, and we'll take a
2    break, as long as a question is not pending.
3              And if you don't understand something I
4    have said, feel free to ask me to repeat it.
5              If your attorney objects, you may still
6    answer the question unless he instructs you not to
7    answer it.
8              And we'll both try to be mindful of not
9    talking at the same time that the other one is
10   talking, because that makes it hard for the court
11   reporter.
12             And also along those lines, we also try
13   to make sure that we have verbal responses to the
14   questions so that the court reporter can take that
15   down.
16             Does that all make sense?
17      A   It does, yes, ma'am.
18      Q   Great.  Can you start by telling me
19   about your educational and work background.
20      A   Certainly.
21             So I'm a career officer in the US Public
22   Health Service Commission Corps.  I have been in
23   the Public Health Service Commission Corps since
24   February of 2008.  I am a clinical social worker
25   and emergency manager by training.
```

```
1              In terms of degrees, I have a bachelor's
2    degree in English from New College.  I have a
3    Ph.D. in American literature from George
4    Washington University.  I have a master's in
5    social work from Catholic University of America,
6    and I, in the Public Health Service, have been
7    stationed at the Administration for Children and
8    Families since June of 2010.
9              I spent most of that time in ACF
10   disaster shop, the Office of Human Services
11   Emergency Preparedness and Response.  In that role
12   I worked on unaccompanied children influx events
13   in 2012, 2014 and 2016, and so on the basis of
14   that, I applied and was selected in fall of 2016
15   to be the deputy director of ORR for the UAC
16   program, and I officially started those duties on
17   the 9th of January of this year.
18      Q   Is that your current title now?
19      A   Deputy director for Children's Services,
20   yes, ma'am.
21      Q   Who do you directly report to in your
22   current role?
23      A   I report to Scott Lloyd, the director of
24   ORR.
25      Q   Who directly reports to you?
```

1    A   Those who directly report to me are,
2  first of all, Tricia Swartz, the associate deputy
3  director; the division directors for the three
4  divisions in the Unaccompanied Alien Children
5  Program; that's Captain          who is the
6  head of our logistics and emergency response
7  office; Jallyn Sualog, who runs operations; and
8  Michael Bartholomew, who runs DHUC, which is our
9  health shop; and also Commander          ,
10 who is our child welfare senior advisor.
11       Those are the people who report to me
12 directly.
13    Q   So prior to fall 2016 -- I may have
14 missed this, but were you involved with ORR's
15 Division of Unaccompanied Children?
16    A   I was assisting them first as an
17 emergency management specialist, and then in the
18 last administration I was a senior advisor to the
19 agency head, and I was assigned to help ORR
20 through its influx event in 2016.
21    Q   Does your knowledge of unaccompanied
22 minors' access to abortion and contraception go
23 back further than January of this year or fall of
24 last year in terms of your prior involvement with
25 ORR?

1    A   I had limited personal involvement prior
2  to I would say fall of 2015, very limited, but
3  more involvement following that.
4    Q   So some of the questions I may ask,
5  there may be -- it might not be perfectly explicit
6  which time period I'm talking about, so if at any
7  point you're confused about kind of what I'm
8  talking about in terms of time frame, just let me
9  know, and I'm sure Mr. Phipps will also keep me on
10 my toes, but I understand there may be
11 differences, depending on what time of, of year
12 that we're talking about.
13       So I just want you to look at what's
14 been marked as Lloyd Exhibit 1, which is in front
15 of you.  This is our deposition notice under
16 Federal Rule 30(b)(6) which allows parties to
17 designate certain topics that -- or identify
18 certain topics, then to have the other party send
19 someone who is a designee.
20       Do you understand -- and you don't have
21 to read all of it, but that you're here as a
22 designee for the defendants to speak to some of
23 the topics on this list?
24    A   Yes.
25    Q   And do you understand that you're here

1  to speak about the topics on this list that relate
2  to unaccompanied immigrant minors and their access
3  to abortion and contraception and the HPV vaccine?
4    A   Yes.
5    Q   I might use "unaccompanied immigrant
6  minors," I might use "UAC," I might use "UC," but
7  you'll know what I'm talking about; is that fair?
8    A   Sure.
9    Q   Okay.
10   A   Yes, yes.  I'll ask for clarification
11 when --
12   Q   Great.
13   A   But yeah, we use all those terms.
14   Q   Great.
15       MR. PHIPPS:  Synonymously.
16       THE WITNESS:  We in the program
17 use -- have used at different times
18 "unaccompanied children" and "unaccompanied
19 alien children" synonymously.  We often
20 encounter unaccompanied immigrant minors in
21 others' language, so it's familiar to us.
22 BY MS. AMIRI:
23   Q   We talked a little bit about the, the
24 chain of command, and I wanted to ask a question
25 about where, where Ken Tota fits in the chain of

1  command.  Is he above you or below you in the
2  chain of command?
3    A   He is my peer --
4    Q   Okay.
5    A   -- at this time.
6    Q   And was he above you in the chain of
7  command at some point previously?
8    A   At the start of this administration,
9  prior to the appointment of an appointed director,
10 he was acting director of ORR.  At that time he
11 was my direct superior.
12   Q   If you could look at Lloyd Exhibit 2,
13 please.  It's the, the next one in the pile there.
14   A   Yes, ma'am.
15   Q   If you could take a minute to look at
16 it, and I'd like to ask you if you recognize it
17 and some questions about it.
18       (Witness peruses document.)
19       THE WITNESS:  Okay.  Yes, I do
20 recognize this document.
21 BY MS. AMIRI:
22   Q   What is this document?
23   A   This is the March 2008 Policy Memorandum
24 on Medical Services that require heightened ORR
25 involvement.

1    Q   Is this the policy that is currently in
2  place today?
3    A   It is.
4    Q   Have there been any alterations or
5  changes made to it since March 2017?
6    A   There have not been changes made to this
7  policy since March 2017.
8    Q   Are there things that you would
9  characterize as clarifications that have been made
10 to this policy?
11         MR. PHIPPS:  Since March 2017?
12 BY MS. AMIRI:
13   Q   Mm-hmm.
14   A   No, I wouldn't characterize them as
15 clarifications.
16   Q   Okay.
17   A   I wouldn't characterize them as
18 clarifications since March of 2017.
19   Q   Looking at footnote 1 there, do you have
20 any reason to think that the -- there have been
21 any changes to the, the statutory language that
22 has been referenced in footnote 1 since this memo
23 was --
24   A   No.
25   Q   -- adopted?

1    A   No.
2    Q   So this is the policy for heightened
3  involvement for ORR with respect to abortion and
4  other medical procedures; is that fair?
5    A   That, that's correct.
6    Q   So can you walk me through just step by
7  step.  When there is a request for an abortion
8  from a grantee, what are the steps that happen
9  along the way pursuant to this policy and internal
10 ORR practice as they exist from March 2017 until
11 present?
12   A   Could -- when you say the, the
13 "steps" --
14   Q   Yeah, so let's say --
15   A   For, for whom?
16   Q   -- just to kind of play it out in real
17 life, that a shelter contacts someone at ORR and
18 says pursuant to the policy of heightened
19 involvement, I am contacting ORR because there is
20 a minor in our care, and she's requested an
21 abortion.
22         And so then what happens at ORR once
23 that request is received?
24   A   That would be elevated to the director,
25 and we would receive instruction from the director

1  on how to proceed in that minor's case.
2    Q   What information is provided to the
3  director?
4    A   What would certainly be provided would
5  be that there is a minor with a pregnancy test or,
6  or whatever is sort of known at that time, and
7  that the minor has expressed interest in or made a
8  request for TOP.
9    Q   And by "TOP," you mean termination --
10   A   "Termination of pregnancy," correct.
11   Q   What is your role then while the
12 director is considering a request for an abortion?
13   A   My primary role is that I funnel
14 information up and direction down.
15   Q   Do you yourself ever make
16 recommendations to the director about whether he
17 should grant approval for a termination of
18 pregnancy?
19   A   I have made, I have made
20 recommendations.
21   Q   On how many occasions?
22         MR. PHIPPS:  March 2017 until
23 present or --
24 BY MS. AMIRI:
25   Q   Just I mean I think probably since

1  you've been in your position.  I think I would
2  like to encompass both when Scott Lloyd was the
3  director and when Ken Tota was the acting
4  director.
5    A   I have made a written recommendation in
6  memo form once.  There are likely other occasions
7  where I made verbal or email recommendations.
8    Q   And have you ever recommended that the
9  director approve an abortion?
10   A   I have.
11   Q   On more than one occasion?
12   A   On one -- I can speak with certainty on
13 the one occasion where I made that in memo form.
14   Q   And on -- and the other forms, email or
15 verbal, do you know whether it was a
16 recommendation for or a recommendation against
17 approval for termination of pregnancy?
18   A   I have never recommended against a
19 termination.
20   Q   For the time that Ken Tota was acting
21 director and the time that Scott Lloyd became
22 director until present, have either of the two men
23 ever approved an abortion request?
24   A   There, there have been two instances in
25 which a medical abortion procedure that has begun

Page 18

1  in which the director/acting director at that time
2  was informed that it was in progress that has been
3  allowed to be completed.
4      Q   And that was when Ken Tota was acting
5  director?
6      A   Once when Ken Tota was acting director
7  and once when Scott Lloyd was director.
8      Q   What criteria are used by ORR to
9  determine whether an abortion request will be
10  approved or denied?
11      A   The director makes that determination
12  based on the totality of the circumstances.
13      Q   Does any of the agency staff either
14  below or above the director work with the director
15  to make the ultimate determination based on the
16  totality of circumstances whether to approve or
17  deny an abortion request?
18      A   Staff in ORR who work for Scott,
19  including myself, may be tasked to gather
20  information.  That is a frequent occurrence.
21      Q   Do, do you know what criteria Scott
22  Lloyd uses to make a determination about whether
23  to approve or deny an abortion request?
24      A   I do not.
25      Q   Is it your understanding that he makes

Page 19

1  the decision based on criteria that he has
2  developed himself, based on the information that
3  you have provided him?
4      A   I'm aware that he makes a determination
5  based on the available information and the
6  totality of the circumstances, but I couldn't, I
7  couldn't itemize what those components are.
8      Q   And for the approval and denial
9  considerations, is one of the considerations
10  what's in, what's in the best interest of the
11  minor?
12      A   Any decision made by ORR, including the
13  director, regarding medical care, would be based
14  on an assessment of the best interest of the
15  child.
16      Q   Are there any other considerations that
17  would be used other than the best interest of the
18  minor to decide whether a minor could have access
19  to a particular medical procedure?
20      A   When you say "a particular medical
21  procedure," are we speaking narrowly about
22  abortion or more broadly?
23      Q   Let's talk -- let's start with abortion.
24      A   I think the -- I believe that it is
25  based on the director's assessment of the best

Page 20

1  interests of the child.  I'm not aware of any
2  other written criteria that would inform his
3  decision.
4      Q   Then let's move to other medical
5  procedures besides abortion.
6          Do you know whether there's any other
7  criteria than the best interest standard to
8  determine whether a minor can have access to a
9  medical procedure other than abortion?
10          MS. BURROWS:  We need to break.
11          MS. AMIRI:  Okay.  I'm sorry.
12          THE VIDEOGRAPHER:  Going off record
13  at 3:30.
14          (Whereupon, a short recess was
15  taken.)
16          THE VIDEOGRAPHER:  We are going
17  back on record at 3:35.
18  BY MS. AMIRI:
19      Q   All right.  I apologize for the
20  interruption.
21          So turning back to the policies at ORR
22  for unaccompanied immigrant minors' access to
23  abortion and contraception, if you could please
24  look at what's been marked as Lloyd Exhibit 3.
25      A   Yes.

Page 21

1      Q   Do you recognize this document?
2      A   I do.  This is from our online policy
3  guide.
4      Q   And looking at the second bullet under
5  the sentence that starts "under the terms of the
6  Flores Settlement Agreement."
7      A   Okay.
8      Q   What is your understanding of what is
9  required under this policy?  And we'll talk about
10  Flores separately just in case there is any
11  distinction.  What is your understanding, under
12  the policy in front of you, about what is included
13  in terms of what care providers must provide in
14  terms of appropriate, routine medical and dental
15  care, family planning services, including
16  pregnancy tests and comprehensive information
17  about and access to medical reproductive health
18  services and emergency contraception?
19          That wasn't a question yet, but the
20  question is:  Does -- do you -- is it your
21  understanding that includes access to abortion?
22      A   At what point in time?
23      Q   At what point in time in pregnancy?
24      A   No, what -- at what point in time, to
25  answer that question.

Page 22

1    Q   Oh, in terms of the administration.
2  Since 2017.
3    A   So at this time?
4    Q   Yes, at this time.
5    A   At this time it is my understanding that
6  HHS does not view abortion as included in family
7  planning services.
8    Q   Okay, and does HHS at this time consider
9  abortion to be part of access to medical
10 reproductive health services?
11   A   Not at this time.
12   Q   Are you aware of a time in which HHS did
13 consider access to medical reproductive health
14 services or family planning to include abortion?
15   A   Yes.
16   Q   And when was that time?
17   A   That was the operational interpretation
18 in the last administration.
19   Q   So the actual language of the policy has
20 not changed, right?
21   A   Correct.
22   Q   It's just the interpretation of the
23 policy has changed between the last administration
24 and this administration?
25   A   The operational understanding of what

Page 23

1  family planning services and medical reproductive
2  health services and emergency contraception refers
3  to has changed.
4    Q   Has there been any change in the
5  understanding of whether this includes -- this
6  definition in bullet 2 includes contraception?
7    A   Routine contraception for contraception
8  purposes has not been understood to be part of
9  family planning, as I understand it, in either of
10 those points in time.
11   Q   What is the definition of "family
12 planning services" then for -- let's start with
13 this administration.
14   A   Family planning services would include
15 prenatal care.  It would include general
16 reproductive health, such as Ob-Gyn visits or
17 urology visits.  It would include sexual health
18 education, particularly where required under the
19 state licensure laws of the state in which the
20 shelter is domiciled.
21   Q   Is contraception for contraceptive
22 purposes included in the phrase "access to medical
23 reproductive health services"?
24   A   It is my understanding it has not been.
25 Children while in our care are not permitted to

Page 24

1  engage in sexual behavior and, therefore, do not
2  routinely receive routine contraception.
3    Q   Is that true both with respect to this
4  presidential administration and the last
5  presidential administration?
6    A   That's my understanding, yes.
7    Q   With respect to "emergency
8  contraception," what does that mean?
9    A   Emergency -- at this time?
10   Q   Yes.
11   A   Emergency contraception would be a
12 requirement under the Interim Final Rule for
13 minors who were sexually assaulted while in ORR
14 care.
15   Q   So do you believe that a minor who had
16 not been sexually assaulted while at an ORR-funded
17 facility would not be permitted to have access to
18 emergency contraception?
19   A   I don't think we have a policy on that
20 at this time.
21   Q   When medical care is provided to
22 unaccompanied minors, there is a treatment
23 authorization request that is submitted; is that
24 right?
25   A   For some, for some medical interventions

Page 25

1  and not others.
2    Q   Is there a treatment authorization
3  request for contraception?
4    A   So not as such.  This is -- some minors
5  might receive a medication which is also a
6  contraceptive for non-contraceptive purposes.
7        For example, a girl who suffered from
8  dysmenorrhea might receive the same medication
9  that is also used for contraceptive purposes, but
10 she would be prescribed it for her, for her
11 illness rather than to prevent conception.
12 Ordinarily that would not require any
13 director-level review or, or review, headquarters-
14 level review to fill that prescription.  That
15 would be routine care.
16   Q   That's routine care, but is there a
17 treatment authorization request that would be
18 submitted for that?
19   A   Explain what you mean by "treatment
20 authorization request."
21   Q   So my understanding -- and maybe you can
22 help me -- is that when an unaccompanied minor
23 requests a service that will be paid for by ORR,
24 that there is some request to do so, and I thought
25 it was a treatment authorization request, but

7 (Pages 22 to 25)

Page 26

```
1   maybe it's called something else.
2       A   So there is a, there is a process for
3   using -- we call it ATAR.  That is an
4   administrative tool that's really for
5   reimbursement, but there isn't headquarters-level
6   review every time a child gets a routine
7   medication.  Headquarters-level review only occurs
8   in cases that are covered by the heightened
9   medical policy.
10      Q   Okay.  Fair enough.
11          So if a shelter has a teen in her care
12  and they have taken her to the doctor or the
13  doctor determines that she needs to be on oral
14  contraceptives, and the shelter submits a request
15  for reimbursement for that, no one at ORR
16  overrules or can overrule that decision?
17      A   I don't know.  I don't know that that
18  situation has come up.
19      Q   Okay.  Do you understand whether minors
20  who are in the care of ORR grantees have the
21  ability to obtain contraceptive prescriptions and
22  have them paid by ORR?
23      A   For purposes of contraception?
24      Q   Yeah.  No.  Sorry.  Let's start with
25  medical indications.
```

Page 27

```
1       A   I'm aware of no impediment that would
2   prevent them from accessing medications to treat a
3   medical condition.
4       Q   Okay, and that includes contraception?
5       A   If it were for, for those medical
6   purposes, yes.
7       Q   Okay, and if a shelter submitted a
8   request for reimbursement for contraceptive for
9   contraceptive purposes, would ORR have the ability
10  to review and possibly deny that request?
11      A   We certainly might have -- would have
12  the ability to review.  I don't know whether we
13  would routinely review every prescription, but if
14  it were elevated to us as a question, yes, we
15  would review them.  It would inherently raise
16  questions why a minor in our care would require
17  contraception.
18      Q   There are some shelters that are more
19  like group homes, and the minors go to public
20  school and things like that; is that fair?
21      A   Yes.
22      Q   Okay.
23      A   There are long-term foster care.  That
24  is one level of care within our system.
25      Q   Okay, and so it would be fair to assume
```

Page 28

```
1   that those teenagers, just like teenagers in the
2   general population, might have "significant
3   others" with whom they are sexually active on a
4   consensual basis?
5       A   We -- I don't know that -- I think we
6   might have concerns about kids in long-term foster
7   care having that much unsupervised time.  So I
8   don't -- they do attend public school.  That does
9   not mean that they have the same, the same sort of
10  social liberty that other minors in the general
11  population might have.
12      Q   Why?  What restricts their social
13  liberty?
14          MR. PHIPPS:  I might just impose --
15  I don't know that this is within the
16  30(b)(6).
17          MS. AMIRI:  That's fine.
18  BY MS. AMIRI:
19      Q   You can still answer.
20          MR. PHIPPS:  To the extent you
21  know.
22  BY MS. AMIRI:
23      Q   Yeah.
24      A   So kids at the LTFC level of care do
25  attend -- long-term foster care, which is one of
```

Page 29

```
1   our levels of care, they do attend public school,
2   but they are still in ORR care and custody, and I,
3   I do not believe at this time a request for
4   contraceptive medication for them -- I'm not aware
5   of any policy that prohibits it, but I'm also not
6   aware -- I don't, I don't believe that's something
7   that we are in the -- routinely approving.
8       Q   Okay.  If you can turn to what's marked
9   as Lloyd Exhibit 4, I believe.  It should say, it
10  should say "4.9.2" at the top.
11      A   Yes.
12      Q   Okay, great.
13          Take a minute to look at this, and let
14  me know if you're familiar with it, and then I
15  will ask you some questions.
16          (Witness peruses document.)
17          THE WITNESS:  Yes, I'm familiar
18  with 4.9.2.
19  BY MS. AMIRI:
20      Q   Are you also familiar with 4.9.3 and
21  4.9.4?
22      A   I am.
23      Q   This is also from the policy guide
24  online?
25      A   Correct.
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

1    Q   What is your understanding of, in 4.9.2,
2   the -- in the second paragraph and the second
3   sentence that starts "Care providers also must
4   ensure the victim has access to all lawful
5   pregnancy-related medical services within the time
6   frame the services may be provided under
7   applicable state laws."
8        Since 2017, how has the Agency
9   interpreted that phrase?
10   A   This situation has not arisen, because
11  this is specific to a minor who becomes pregnant
12  as a result of sexual abuse while in our care, and
13  we have not had that, that -- we have not had any
14  minors become pregnant as a result of sexual abuse
15  while in our care.
16   Q   Has there been -- even if it hasn't come
17  up, has there been a determination of how this
18  would be interpreted if that did come up?
19   A   The, the Interim Final Rule has not
20  been, has not been changed.
21   Q   Right, but has there been, since 2017, a
22  determination by ORR about how to interpret that
23  phrase?
24   A   I'm not aware that we've had -- I don't
25  think there's been any official interpretation of

1   this phrase.
2    Q   With respect to the 4.9.4 religious
3   objections, at the bottom it talks about the plan
4   must be preapproved by ORR, and my question is
5   whether you know whether any plan has been
6   submitted to ORR under this religious objection
7   clause in 4.9.4.
8    A   I believe there have been religious
9   objections raised, but none, to my knowledge, have
10  ever been raised regarding access to any of the
11  required services for a child victim of sexual
12  abuse.
13   Q   While at the shelter?
14   A   As outlined in this policy, yes.
15   Q   Okay, and we'll talk about some of the
16  other religious objections that have manifested,
17  but I wanted to specifically ask about whether
18  there was any plan under 4.9.4 that you are aware
19  of that has been submitted to ORR under this
20  policy.
21   A   I'm not -- I don't, I don't think
22  there's been a plan specific to 4.9.4.
23   Q   Okay.  Before, when I asked you about
24  Lloyd Exhibit 3 and we talked specifically about
25  the policy, and the policy is based on the Flores

1   Settlement Agreement, but I wanted to ask you
2   specifically, putting this policy aside, whether
3   there is a different interpretation about the
4   Flores Settlement Agreement itself, and it should
5   be marked as Exhibit 5 in front of you if you
6   wanted to look at it, and specifically I believe
7   it's Exhibit 1 to the settlement agreement, A2.
8    A   Fine.
9    Q   I'd asked you some questions about the
10  definition of "family planning services" and
11  "medical care," and I'm just going to ask whether
12  your answers with respect to the policy that we
13  looked at before would be the same for the Flores
14  agreement itself or whether there is a difference
15  between the interpretation of the policy and the
16  Flores agreement itself.
17   A   I'm -- with regard to which one?
18   Q   The Flores Settlement Agreement, whether
19  there is a distinction in interpretation between
20  the two.
21        So, for example, we talked about --
22  maybe I'll just ask you whether, under the Flores
23  Settlement Agreement, the Agency, sitting here
24  today, interprets appropriate "routine medical
25  care" and "family planning services" to include

1   abortion.
2    A   My understanding is that is not
3   understood as included.
4    Q   But was it in a prior, prior
5   administration?
6    A   Yes.
7    Q   I'd like to show you -- skip Lloyd
8   Exhibit 7.  It might be Lloyd Exhibit 8 in front
9   of you, and turn to page 3 of -- are those the
10  interrogatories?  No.  Sorry.
11        MR. PHIPPS:  That's 7.
12        MS. AMIRI:  7?
13        MR. PHIPPS:  Skip 6 and go to 7.
14  BY MS. AMIRI:
15   Q   Skip 6 and go to 7.  Okay.  There you
16  go, and start by looking at page 3 of Exhibit 7,
17  and actually, if you could just take a quick look
18  at the whole thing, and I believe you signed the
19  verification page for these.
20   A   For some of them, yes.
21   Q   For some of them, correct.
22        So on page 3, I was going to ask you
23  about the sentence that starts about a third of
24  the way down, "If pregnancy results from an
25  instance of sexual abuse, care provider facility

Page 34

1  must ensure that the victim receives timely and
2  comprehensive information about all lawful
3  pregnancy-related medical services and timely
4  access to all lawful pregnancy-related medical
5  care."
6        Is that -- is the answer to this
7  interrogatory, does it track the policy that we
8  were talking about before in terms of 4.9.4, and
9  it, it results only to -- it relates -- sorry --
10  only to sexual abuse in the shelter?
11    A   So the sentence beforehand says "similar
12  to the PREA regulation state," so this is, by
13  context, narrowly focused on the cases where a boy
14  or girl is sexually abused while in our care.
15    Q   Okay, and you said to date that has not
16  happened?
17    A   There has not been, to my knowledge, any
18  pregnancy which has resulted from the sexual abuse
19  of a minor while in our care.
20    Q   Has there been an instance of sexual
21  assault in which emergency contraception was
22  needed to be accessed by the minor?
23    A   I'm not aware of any instance where
24  emergency contraception was required.
25    Q   If you can also turn to page 4 and

Page 35

1  interrogatory number 3, if it helps to read the
2  question, and then I wanted to ask you about the
3  supplemental response.
4        (Witness peruses document.)
5        THE WITNESS:  Yes.
6  BY MS. AMIRI:
7    Q   I wanted to ask you about how it works
8  when a UC requested abortion services and where
9  the religiously affiliated grantee or subgrantee
10  had objections to such services, the federal field
11  specialist, in conjunction with the central
12  office, effectuated the transfer of the UC.
13        So I want to talk to you about the, the
14  process of where there was a religiously
15  affiliated entity that had an objection to
16  providing access to abortion, what happens in
17  terms of facilitating the transfer of that minor
18  to a grantee that does not have a religiously
19  affiliated -- I'm sorry -- does not have a
20  religious objection to providing abortion, has
21  that happened in your time at ORR?
22    A   When you say in my time at ORR, do you
23  mean since January 9, or do you mean in the --
24    Q   In the --
25    A   -- five years that I've worked with ORR?

Page 36

1    Q   Well, let's say five, five years.
2    A   It has happened.
3    Q   Okay.  Has it happened since
4  January 2017?
5    A   It has not happened, to my knowledge,
6  since January of 2017.
7    Q   Is it possible that it could have
8  happened without your knowledge since 2017?
9    A   It is possible but unlikely that it
10  would have happened without my knowledge since
11  January of 2017.
12    Q   Is it fair to say since March 2017,
13  let's say, you have been aware of all abortion
14  requests that have been brought to ORR's
15  attention?
16    A   Yes.  If they have been brought to ORR
17  headquarters' attention, I have been aware of them
18  all.
19    Q   It's possible that some abortion
20  requests may not have made it to ORR?  Is that
21  possible?
22    A   It is possible that some abortion
23  requests may never have been brought to ORR's
24  attention.
25    Q   Do you have a sense from speaking with

Page 37

1  grantees or doing field visits whether that
2  happens in terms of a request for abortion doesn't
3  make it either because it doesn't get communicated
4  from the shelter to ORR or some other gap in
5  communication elsewhere in the chain?
6    A   I am aware of instances where minors
7  received abortion without director-level
8  authorization.
9    Q   Are you aware of the converse, where a
10  minor has wanted an abortion but has not been able
11  to obtain one because her request has not been
12  brought up the chain?
13    A   No, I'm not aware of any instances like
14  that.
15    Q   Are you aware of any instance where a
16  minor was unable to obtain an abortion because of
17  the religious affiliation of the shelter within
18  which she resided?
19    A   I am not aware of any such instance.
20    Q   So sitting here today in terms of -- oh,
21  now I forgot if I've asked this.
22        I believe you said that since March 2017
23  there has not been an instance where there has
24  been an abortion request from a religiously
25  affiliated shelter that had a religious objection

Page 38

1   to providing an abortion; is that right?
2       A    That's correct.
3       Q    Okay.  So prior to March 2017, how did
4   it work when a religiously affiliated shelter had
5   an objection to providing access to abortion for a
6   minor?  If you can walk me through the steps.
7   Presumably they contacted ORR and said we have a
8   minor who is requesting an abortion, and then ORR
9   took what next steps?
10      A    So in those cases where that occurred, I
11  think it's substantially, as you see it here, that
12  the, the grantee program that would have a
13  religious or other objection to facilitating
14  termination of pregnancy would notify their
15  federal field specialist, which is the ORR
16  official regionally responsible for that program.
17  The FFS would then -- in most cases, FFSs would
18  then coordinate with the medical team within those
19  on the FFS team to transfer the minor to a program
20  that would enable her to receive the TOP.
21      Q    Do you have a sense of the average
22  length of time it took to make that transfer
23  between the religiously affiliated entity and an
24  entity that did not have an objection to providing
25  access to abortion?

Page 39

1       A    I don't have any firm measures.
2   Transfer of a UAC from one shelter to another is
3   generally a one- to three-day process.
4       Q    Regardless of whether that transfer is
5   related to an abortion, just in general, I presume
6   there are transfers for other reasons?
7       A    There are numerous transfers shelter to
8   shelter, and that is, that is typical.  I'm not
9   aware of anything that would be different
10  operationally for a transfer in order to enable a
11  minor to access TOP.
12      Q    Do you have a sense of how long it takes
13  from the time ORR receives an abortion request to
14  make a decision one way or another about whether
15  to grant or deny that request?
16      A    There's not a specific time frame in my
17  experience.
18      Q    Is there -- there's not a specific time
19  frame within which the ORR director has to act on
20  a request?  Is that the -- I just wanted to
21  clarify.
22      A    That's correct.  There is not a scripted
23  time frame for the process.
24      Q    Do you have a sense just in practice how
25  long it takes between the time the director gets a

Page 40

1   request and decides whether to approve the
2   abortion or not since 2017 of March -- March of
3   2017?
4       A    I would say it has varied.
5       Q    Okay.  Do you have a sense of whether
6   that variation is several days, weeks, any just
7   ballpark estimates of averages of time between a
8   request and the ORR directing -- ORR actor,
9   director acting on that request?
10      A    The, the process is typically that, upon
11  notification, there is then an instruction for
12  next steps.  Those steps are completed, and there
13  may be steps subsequent.
14      Q    What are those next steps?
15      A    It has varied.
16      Q    Since March 2017, has one of those steps
17  been a visit to a crisis pregnancy or crisis
18  resource center?
19      A    In some cases, yes.
20      Q    In some but not all?
21      A    Correct.
22      Q    The majority of cases?
23      A    I don't know that I have a count.
24  Certainly in a number of cases.
25      Q    Do you know how many abortion requests

Page 41

1   there have been to ORR since March 2017?
2       A    I believe there have been -- again, the,
3   the requests elevated to ORR headquarters?
4       Q    Yes.
5       A    I believe it's been about seven.
6       Q    Going back to the steps, is one of those
7   steps mandatory parent notification of the
8   pregnancy and/or the abortion decision?
9       A    Could you break that out a little more?
10      Q    Sure.
11          You were talking about the steps that,
12  that happen once the director -- and let's just
13  stick with Scott Lloyd -- once Scott Lloyd
14  receives an abortion request.  We talked about one
15  of the steps possibly being a visit to a crisis
16  pregnancy center, and so I'm trying to figure out
17  another step that may have to happen along the
18  way, and so my question is whether one of those
19  steps is a requirement that the parent in the home
20  country be notified of the minor's abortion
21  decision.
22      A    In many cases, there has been a
23  notification of the parents in home country.
24      Q    Is that true even over the minor's
25  objection?

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

1    A   In some cases it has been without -- it
2  has been over the objection of the minor.
3    Q   Based on your social work background, do
4  you think it's wise to notify a parent of a
5  minor's abortion decision over her objection?
6        This is outside 30(b)(6).
7        MR. PHIPPS:  I'll object.  Beyond
8    the scope of 30(b)(6).  Clarifying that in
9    this instance "you" means "the witness you,"
10   not you, "designee by HHS you"?
11       MS. AMIRI:  Yes.
12       THE WITNESS:  Could you ask the
13   question again?
14 BY MS. AMIRI:
15   Q   Sure.
16       Subject to Peter's, Mr. Phipps'
17 objections, which will stand after I finish my
18 question, but based on your social worker
19 background and, and training, do you think it's
20 wise to notify a minor's parents of her abortion
21 decision over the minor's objection?
22   A   I would not recommend such a
23 notification.
24   Q   Why is that?
25   A   Because of the potential of additional

1  harm or risk.
2    Q   Do you -- we talked a little bit about
3  whether there have been any transfers since March
4  of 2017 from a religiously affiliated grantee to a
5  secular facility since March of 2017, but my
6  question is going to be slightly different,
7  whether, since March of 2017, there have been any
8  initial placement decisions about whether a minor
9  should be placed in a particular location because
10 she's pregnant and seeking an abortion.
11   A   So I have to answer that in -- could
12 you -- so --
13   Q   Let me rephrase it, yeah, and so we'll
14 start with the time frame.
15   A   Right.
16   Q   Since March 2017 --
17   A   Right.
18   Q   -- has ORR made any placement decisions
19 about whether a minor is pregnant and seeking an
20 abortion?
21   A   We have made no placement decisions
22 based on a minor expressing an interest in
23 abortion.  We do routinely make placement
24 decisions based on knowing that a minor is
25 pregnant -- if we know that -- to a bed licensed

1  to receive a pregnant girl.  We have made no
2  decisions, no placements differently on the basis
3  of awareness that the minor was interested in
4  terminating the pregnancy.
5    Q   Do you know whether prior to 2017 there
6  were placement decisions based on a minor's
7  request for an abortion specifically to avoid
8  putting her in a shelter where there might be a
9  religious objection to providing her access to
10 abortion?
11   A   I'm not aware of any such placement
12 decisions.
13   Q   Do you know how many current ORR
14 grantees have religious objections to providing
15 access to abortion or contraception?
16   A   I think the ones of which I'm aware,
17 they sort of have a documented objection, I
18 believe is the the, the USCCB network.
19   Q   Any others that you're aware of?
20   A   There may be, there may be others.
21 That's the one that I'm aware from my, my
22 reading of the, of the documents.
23   Q   Have you personally been involved in
24 negotiating the terms of a cooperative agreement
25 with religiously affiliated entities that have a

1  religious objection to providing abortion or
2  contraception?
3    A   I have not.
4    Q   Do you have knowledge of the process by
5  which such cooperative agreements were negotiated
6  by your colleagues at ORR?
7    A   I don't believe that cooperative
8  agreements are negotiated in that way with
9  individual providers.  I think there's a standard
10 cooperative agreement produced for a period of
11 time.
12   Q   So you're not aware, for example, of a
13 situation where a religiously affiliated grantee
14 had asked to remove certain terms from the
15 cooperative agreement related to access to
16 abortion or contraception?
17   A   I am aware that, that grantees may have
18 sought a reasonable accommodation to the terms of
19 the cooperative agreement.  That's not a
20 negotiation of the cooperative agreement.
21   Q   Okay, but is it your understanding that
22 the actual language in the cooperative agreement
23 may have changed based on a religious objection to
24 providing access to abortion or contraception?
25       MR. PHIPPS:  Just I'll impose --

12 (Pages 42 to 45)

1  within the scope of 30(b)(6), this relates to
2  cooperative agreements regarding
3  unaccompanied alien children?
4          MS. AMIRI:  Yes.
5          MR. PHIPPS:  Okay.
6  Clarification --
7          MS. AMIRI:  Yep.
8          MR. PHIPPS:  -- not an objection.
9  BY MS. AMIRI:
10    Q   Yes, and all my questions -- I mean we
11  can just lay that out right now.  All my questions
12  are about the unaccompanied children program.  So
13  lest there be any confusion about other grants or
14  other things, unless I say otherwise, all we're
15  talking about is unaccompanied minors.
16    A   Could you ask the question again?  I'm
17  sorry.
18    Q   Sure.
19        I believe I said something along the
20  lines of whether you were aware of whether the
21  language in a particular cooperative agreement was
22  changed because of a religious objection to
23  providing access to abortion or contraception.
24    A   I don't believe the language has
25  changed.  I believe that -- I'm aware that the

1  cooperative agreements provide for proposals to
2  include an alternate approach to satisfy
3  religious-based objections to requirements under
4  the cooperative agreement.
5    Q   And would that alternative approach be
6  reduced to writing somewhere outside of the
7  cooperative agreement, whether it's in an email
8  exchange or a letter?
9    A   I think the process is contained both in
10  the formal proposal for the grant and also in the
11  surrounding sort of operational engagement between
12  each grantee and the federal government.
13    Q   And, well, we could pull up some
14  additional documents and see if you're familiar
15  with them --
16    A   That would be helpful.
17    Q   -- and, and, and talk about how such an
18  accommodation was operationalized.
19        I had asked whether any minor was unable
20  to receive an abortion based on the religious
21  objection of a grantee.
22        My next question is whether you know of
23  whether there has been any minor in ORR care since
24  March of 2017 that has not been able to receive an
25  abortion because the director denied an abortion

1  request.
2    A   Yes.
3    Q   How many times has that happened?
4    A   There have been denials which a minor
5  subsequently was able to access abortion through
6  court intervention.  There have been denials where
7  minors exited our care prior to receiving the, the
8  procedure.
9    Q   Do you know of any minors that carried
10  their pregnancies to term as a result of a
11  director's denial of access to abortion?
12    A   No.
13        (Discussion was held off the
14  record.)
15  BY MS. AMIRI:
16    Q   All right.  If you could look at Exhibit
17  9, please.  Lloyd Exhibit 9.  I'm sorry.  Yes.
18        Have you seen this document before?
19    A   I have.
20    Q   And what is it?
21    A   This is a memorandum from Ken Tota,
22  then-acting director of ORR.
23    Q   It's to whom it may, "to whom it may
24  concern."  Do you know who this was addressed to?
25    A   It had three potential intended

1  audiences.  The first was, it was directing ORR
2  staff.  The second is, it was understood as
3  directive to the staff of the grantee shelter that
4  was sheltering a specific minor whose case is
5  referenced here.  The third was it was intended to
6  be proffered in event of need by ORR staff to
7  community healthcare providers.
8    Q   Were you involved in drafting this memo?
9    A   I was not involved in drafting this
10  memo.
11    Q   Were you involved in discussions about
12  the minor at issue in this memo?
13    A   I was.
14    Q   And so tell me what, what, what
15  transpired with this minor who sought a medication
16  abortion.
17    A   The minor in question had begun a
18  medical chemical procedural abortion using a
19  two-dose regimen.  She received the first dose
20  prior to notification to ORR.  ORR became aware
21  after that initial dose was administered, and
22  there was then a federal effort and a discussion
23  to determine what would be the course of action
24  following that first dose.
25    Q   Who made the determination to direct

13 (Pages 46 to 49)

Page 50

1  that the UAC be taken to an emergency room of a
2  local hospital?
3      A   I, I know from whom we received that
4  direction.  I, I don't know who ultimately made
5  that decision.
6      Q   Who did, who did you receive that
7  direction from?
8      A   We received that direction from Maggie
9  Wynne, counselor to the Secretary for Human
10 Services.
11     Q   But you don't know from whom she
12 received that, that direction?
13     A   I would not know that.
14     Q   Is it possible that she made the
15 directive herself rather than having it come from
16 somebody else?
17     A   I really couldn't speak to what was
18 possible.
19     Q   What was the purpose of taking the, the
20 UC to the emergency room after she had taken,
21 presumably it was mifepristone?
22     A   The memorandum specifies that the minor
23 is to be brought to the emergency room in order to
24 determine the health status of the UAC.  It's also
25 to determine at the time if there was a fetal

Page 51

1  heartbeat.
2      Q   And if there was a fetal heartbeat, do
3  you have an understanding of what ORR would have
4  directed to have happened?
5      A   Prior to that time, we were not aware of
6  what the outcome would be.  We understood what
7  we -- we had received direction on what we should
8  do if there were no heartbeat.
9      Q   And what was that direction?
10     A   To allow the procedure, the second part
11 of the chemical procedure, which, as you know, is
12 the use of a chemical agent to expel uterine
13 contents, that that medical intervention could
14 then be administered.
15     Q   And was a fetal or embryonic heartbeat
16 detected?
17     A   It was.
18     Q   And nevertheless she was allowed to
19 complete the medication abortion?
20     A   Correct.
21     Q   And why was the ultimate decision made
22 to allow her to continue with the medication
23 abortion procedure?
24     A   I don't know.  That was direction that
25 we received.

Page 52

1      Q   Did ORR explore whether the mifepristone
2  could have been reversed through progesterone?
3      A   We were directed to explore that.
4      Q   And is all this direction coming from
5  Maggie Wynne?
6      A   That direction came from Maggie Wynne.
7      Q   Who made the direction to allow her to
8  continue with the medication abortion and take the
9  misoprostol?
10     A   We received that direction, I believe,
11 from HHS OGC.
12     Q   OGC?
13         Do you believe -- and now I'm just
14 talking about you -- believe that progesterone can
15 reverse mifepristone?
16     A   You're asking me, Jonathan White?
17     Q   Yes.
18         MR. PHIPPS:  And object to the
19     scope.  Beyond 30(b)(6).  You've limited that
20     way.  It's outside the 30(b)(6).
21 BY MS. AMIRI:
22     Q   Yes.
23     A   My understanding is that progesterone,
24 there are no studies regarding the safety or
25 efficacy of progesterone for that purpose, and it

Page 53

1  is, it is not an evidence-based medical
2  intervention.
3      Q   Do you, Mr. White -- not as a 30(b)(6)
4  designee -- believe it would have been detrimental
5  to this minor to prohibit her from taking
6  misoprostol after she had taken mifepristone?
7      A   I am not an obstetrician.  I'm not a
8  medical doctor.  I could not speak to her medical
9  risk.
10     Q   Did you understand there were
11 conversations in ORR about the medical risks to
12 her if she were not allowed to --
13     A   Yes.
14     Q   -- take the misoprostol?
15         And what were those conversations?
16     A   Could you be more specific?
17     Q   Sure.
18         So, so there's -- I have seen some,
19 some email traffic about this, that, that there
20 was conversations within ORR about whether the
21 minor's health would be at risk or whether there
22 would be some sort of adverse outcome for her if
23 she were prohibited from taking misoprostol after
24 she had taken mifepristone.
25         So I believe there was a discussion

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 54

1  about that, and --
2      A   Yes.
3      Q   -- so I'm just asking you about what was
4  that discussion in terms of whether it would have
5  been detrimental for this minor to be prohibited
6  from completing the medication abortion.
7          MR. PHIPPS:  I just -- rather than
8      take a break, I'll just instruct the witness
9      not to answer in a way that would reveal any
10     attorney/client communication, should any of
11     those exist, or any, any matters that would
12     be squarely within the deliberative process
13     privilege, should any of those exist.  I, I
14     don't want to take a break and find out if
15     those do.  I would just as soon --
16         MS. AMIRI:  Sure.
17         MR. PHIPPS:  -- give that
18     instruction and see, see where we go.
19         MS. AMIRI:  Sure, and we can also
20     pull the emails, because presumably you
21     didn't give me anything that was privileged.
22         MR. PHIPPS:  Right.
23         MS. AMIRI:  So we can also grab
24     those if that's helpful.
25         THE WITNESS:  At the crew level, we

Page 55

1  did have discussions regarding the potential
2  for medical risk and interrupting the
3  sequence of interventions.
4  BY MS. AMIRI:
5      Q   And what were some of the risks that
6  were discussed that would have happened or
7  possibly could have happened if the minor was
8  unable to complete the medication abortion?
9      A   We did discuss infection risks and other
10 medical risks to the minor.
11     Q   In this memo in the first paragraph,
12 there's a line that says, at the very end, "This
13 means that the director of ORR is empowered by
14 Congress to make all medical decisions for the
15 unaccompanied alien child (UAC) in place of the
16 child's parents."
17         I understand that this was written by
18 the acting ORR director, and so my question is:
19 Sitting here today, is that statement a current
20 understanding of the power of the director of ORR?
21     A   It is my understanding that the -- that
22 we work operationally on the basis that the
23 director of ORR makes medical decisions for all
24 UACs in ORR care.
25     Q   Does the director of ORR make all

Page 56

1  medical decisions for the minor even when the
2  minor has requested another medical course of
3  action?  In other words -- I can rephrase that.
4          Does the ORR director's decision about a
5  medical course of conduct supplant the minor's
6  desired medical course of conduct?
7      A   Yes, in some cases.
8      Q   And is one of those cases abortion?
9      A   I'm not sure -- I don't know that that's
10 actually ever been formulated.
11     Q   So in the context of abortion, has the
12 director of ORR decided that an abortion is not in
13 the best interest of a minor, despite the fact
14 that the minor has asked for an abortion?
15     A   Yes, I believe so.
16     Q   Scott Lloyd wasn't yet the director of
17 ORR when this memo was issued, but he was at HHS
18 in some capacity; is that right?
19     A   Yes.
20     Q   Do you know if Mr. Lloyd was involved in
21 writing this memo?
22     A   I do not know who authored the memo.
23     Q   Were you involved in conversations with
24 Mr. Lloyd about the minor at issue in this memo?
25         MR. PHIPPS:  Objection.  Is the

Page 57

1      time period before the writing of the memo?
2  BY MS. AMIRI:
3      Q   Anytime before, after, around the memo.
4  Conversations about this particular minor.  We can
5  make it broad.
6          Have you ever had a conversation with
7  Mr. Lloyd about this particular minor in this
8  memo?
9      A   Yes.
10     Q   And what were those conversations?
11     A   He was involved subsequently as director
12 in discussions attempting to determine what had
13 resulted in, in terminations of minors in ORR
14 custody.  We talked about this case then.  It, it
15 may be -- it would be helpful if you had emails to
16 point me to.  I'm not sure I can recall in this
17 moment whether we had discussions about this case
18 prior to this memo.
19     Q   Okay.
20     A   I would really need to be directed to,
21 to sort of emails to --
22     Q   Sure.  Oh, let's put aside for any
23 conversations about kind of historical reflection
24 about this memo --
25     A   Sure.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 58

1    Q  -- but just kind of focus it on what was
2  happening in that particular moment. So right
3  around this time, in early March, while this was
4  all happening.
5    So when the minor is seeking to finish
6  the medication abortion, when the decision is
7  being made to take her to the hospital, what --
8  were you talking to Scott Lloyd at that point?
9    A  Scott Lloyd is one of the HHS officials
10  that we were talking to about this and other
11  cases.
12    Q  Okay. So it was Maggie Wynne, HHS, OGC,
13  Scott Lloyd, Ken Tota, yourself. Anyone else?
14    A  At some parts of the conversation, also
15  our medical division director was involved in some
16  of those conversations.
17    Q  Is that Dr. Bartholomew?
18    A  That's Commander Michael Bartholomew,
19  right. So on my team and various other members of
20  our team -- there were other career staff involved
21  in, in the execution of, of direction.
22    Q  You had mentioned that there was another
23  circumstance in which a minor had started a
24  medication abortion, and there was some
25  "interruption" -- I believe was the word that you

Page 59

1  had used -- when Scott Lloyd was director.
2    Can you tell me about what happened in
3  that circumstance?
4    A  I don't believe there was an
5  interruption. We became aware that a chemical
6  procedure had begun. We became aware during the
7  sequence, and that was elevated up to the
8  director's awareness. The minor was permitted to
9  continue the procedure.
10    Q  Was that minor also taken to an
11  emergency room to assess whether there was an
12  embryonic or fetal heartbeat?
13    A  No.
14    Q  Was there any discussion about that
15  minor about using progesterone to reverse the
16  mifepristone?
17    A  We received no direction to pursue that
18  or investigate that.
19    MS. AMIRI: We've been going for a
20  little while. Do you want a break?
21    MR. PHIPPS: A short one?
22    MS. AMIRI: Yeah.
23    MR. PHIPPS: Yeah, okay.
24    MS. AMIRI: Five, ten minutes.
25    MR. PHIPPS: Yeah, that's great.

Page 60

1    THE VIDEOGRAPHER: Going off the
2  record at 4:28.
3    (Whereupon, a short recess was
4    taken.)
5    THE VIDEOGRAPHER: We are going
6  back on the record at 4:42. This begins disc
7  number 2.
8  BY MS. AMIRI:
9    Q  So if you could look in the pile of
10  exhibits in front of you and see what that next
11  one is labeled. That's Exhibit 10.
12    A  Would that be Lloyd Exhibit 10?
13    Q  Lloyd Exhibit 10, yeah. Let's move to
14  that one. Thank you.
15    Let me ask a general question.
16    A  Sure.
17    Q  Is Maggie -- it looks like Maggie Wynne
18  was involved in requests for termination of
19  pregnancy before Scott Lloyd became the director
20  of ORR; is that fair?
21    A  That's correct.
22    Q  After Scott Lloyd was appointed as
23  director of ORR, has Maggie Wynne been involved in
24  setting policy with respect to unaccompanied
25  minors' access to abortion?

Page 61

1    A  She's been among the, among the staff
2  involved.
3    Q  Do you know if Maggie Wynne has a
4  religious opposition to abortion?
5    A  I believe so.
6    Q  Do you believe that Maggie Wynne's
7  religious opposition to abortion leads her to give
8  preference to religiously affiliated grantees?
9    MR. PHIPPS: Objection. Scope.
10  Calls for speculation.
11  BY MS. AMIRI:
12    Q  You can answer.
13    A  I really don't -- I don't know. I'm not
14  aware of -- I'm not aware of any decisions that
15  she's been involved in that, that have involved
16  giving preference to a grantee, so I, I really
17  couldn't comment.
18    Q  Do you believe Maggie Wynne's religious
19  opposition to abortion influences her decision as
20  to whether individual unaccompanied minors should
21  be allowed to access abortion while in ORR
22  custody?
23    MR. PHIPPS: Objection. Scope.
24  Speculation.
25    THE WITNESS: I really couldn't

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 62

```
 1       speak to the motivations of administration
 2       personnel.
 3   BY MS. AMIRI:
 4       Q   Have you had conversations with Scott
 5   Lloyd about his opposition to abortion?
 6           MR. PHIPPS: Objection. Assumes
 7       faxes not in evidence.
 8   BY MS. AMIRI:
 9       Q   Well, I'll back up and say that
10   yesterday he testified that he believes abortion
11   is the destruction of human life.  So have you had
12   conversation with Scott Lloyd about his belief
13   that abortion is the destruction of human life?
14       A   I have had conversations with him that
15   would suggest that he has those views.
16       Q   Do you believe that those views are
17   motivated by his religion?
18           MR. PHIPPS: Objection.  Scope.
19       Calls for speculation.
20           THE WITNESS:  I have no way of
21       knowing the origin of, of his views on
22       abortion's legality or its policy
23       implications.
24   BY MS. AMIRI:
25       Q   He's never talked to you about the
```

Page 63

```
 1   Biblical interpretation of whether abortion is
 2   right or wrong?
 3       A   We have never had a theological
 4   discussion.
 5       Q   Do you know if Scott Lloyd has ever
 6   prayed with unaccompanied minors?
 7       A   I don't know.
 8       Q   Do you know if Scott Lloyd has ever
 9   spoken to unaccompanied minors about the Bible
10   before?
11       A   I don't know.
12       Q   So the -- what's been marked as Lloyd
13   Exhibit 10 that's before you is an email chain,
14   and I just wanted to focus your attention on the
15   Bates stamp at the bottom is PRICE-PROD-4529.
16       A   Mm-hmm.
17       Q   That's the, the meat of the email that
18   went out from Ken Tota.
19           Are you familiar with this email?
20       A   Give me a moment.
21       Q   Sure.
22           (Witness peruses document.)
23           THE WITNESS:  Yes, I remember this
24   email.
25
```

Page 64

```
 1   BY MS. AMIRI:
 2       Q   Were you involved in drafting this
 3   email?
 4       A   I was not involved in drafting this
 5   email.
 6       Q   Do you have an understanding as to what
 7   motivated Ken Tota to send this email?
 8       A   He was directed to send this email.
 9       Q   Directed by whom?
10       A   Political appointees at HHS.
11       Q   Any particular political appointee?
12       A   My -- I don't know if this is
13   deliberative, but --
14       Q   I think who, who directed -- as long as
15   it wasn't an attorney.
16           MS. AMIRI:  I'll let you counsel
17       your own witness.
18           MR. PHIPPS:  Yeah, to the extent it
19       would reveal any communications with an
20       attorney, I instruct you not to answer and
21       limit your, your answer accordingly.  As long
22       as your answer is to conclusions only that
23       don't reveal the mechanics or the substance
24       of deliberative process, then you can answer.
25       Otherwise, I instruct you not to answer.
```

Page 65

```
 1       Maybe we take a break if there's
 2       any question about the contours of that.
 3           MS. AMIRI:  Yes.
 4           MR. PHIPPS:  But I, I'd just as
 5       soon let him go without --
 6           MS. AMIRI:  Sure, but as to whom,
 7       whom, which political directee [sic] made the
 8       appointment, that is not deliberative
 9       process.
10           MR. PHIPPS:  Result, yes.  I'm just
11       saying the limit is -- sometimes people give
12       an answer --
13           MS. AMIRI:  Yeah.
14           MR. PHIPPS:  -- and then they go on
15       about --
16           MS. AMIRI:  We'll take it step by
17       step.  So we'll -- yeah, just --
18           MR. PHIPPS:  Step by step, I'm
19       fine.  Yeah, step by step, perfectly fine.
20   BY MS. AMIRI:
21       Q   Which political appointee directed Ken
22   Tota to send this email?
23       A   This would have been -- this would have
24   been the policy team, which was comprised of
25   Maggie Wynne, Scott Lloyd, and, and then also OGC.
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 66

1  Q  So some combination of those individuals
2  directed Ken Tota to send this email?
3  A  Correct.
4  Q  Where is Anna Marie Bena in the command
5  chain?
6  A  Anna Marie Bena is the division director
7  for Division of Policy and Procedure.  She reports
8  directly to Scott Lloyd.  She is career.
9  Q  Career?  Okay.  Do you know if she was
10  involved in writing this email?
11  A  She was not involved in writing this
12  email, to my knowledge.
13  Q  Do you have an understanding of whether
14  this email alters the 2008 memo that we talked
15  about which was marked Exhibit 2, I believe?
16  A  It does not alter it.  This represents
17  this administration's operational interpretation
18  of the 2008 email, which has been interpreted
19  different ways in different times by different
20  administrations.
21  Q  So let's talk about this administration
22  and its interpretation of the 2008 memo.  What --
23  is, is this email an accurate reflection of the
24  interpretation of that memo as we sit here today?
25  A  I guess I'd say this substantially does

Page 67

1  reflect the current interpretation of the 2008
2  memorandum.
3  Q  What was the interpretation of the 2008
4  memorandum in the prior administration, if you
5  know?
6  A  Yes.  It was the operational direction
7  provided by political appointees during the prior
8  administration was that the ORR director's
9  approval was only required for abortions which
10  would be Hyde Amendment excepted abortions
11  requiring federal funding.
12  Q  So in the prior administration, written
13  approval from the director was needed if federal
14  funds were to pay for the abortion; is that
15  correct?
16  A  Correct, and it would not be needed if
17  federal funds by grant were used for facilitation
18  or other activities other than the direct
19  provision of the procedure.
20  Q  So in other words, a grantee who was
21  assisting a minor accessing abortion, and federal
22  funds were not requested, that grantee could
23  proceed absent explicit authorization from ORR?
24  A  If permitted under state law.
25  Q  Fair enough, but in terms of ORR's

Page 68

1  authority?
2  A  That was the operational interpretation
3  at that time of the 2008 memorandum.
4  Q  And as we sit here today, the
5  interpretation is that grantees are prohibited
6  from taking any steps that facilitate abortion
7  without --
8  A  Without director level approval?  That
9  is correct.  That is the current understanding.
10  Q  Thank you.
11  Did you have conversations with any
12  grantees that were concerned about this change in
13  interpretation by the new administration?
14  A  When you say "you," do you mean Jonathan
15  White or ORR?
16  Q  Let's start with you Jonathan White.
17  A  Sure.  I don't -- actually, yes, I did
18  have at least one conversation with staff at one
19  grantee who was really just seeking clarification
20  of the import.  There may have been others, but
21  there's one that I recall.
22  Q  Do you remember which grantee that was?
23  A  I believe that would have been
24  Health and Human Services, Inc. in
25  Q  What was the clarification that they

Page 69

1  were seeking?
2  A  Just to understand what was permitted
3  and not permitted.
4  Q  So this email that is on the next page,
5  the "from" has been redacted, but it's
6  PRICE-PROD-4530.
7  Do you know if you've ever seen this
8  email -- presumably from a grantee, although I
9  don't necessarily know -- asking questions about
10  the judicial bypass?
11  A  I have seen this email before.  I
12  recognize some of the language.
13  One moment.
14  Q  Sure.
15  A  I need to read it more closely.
16  (Witness peruses document.)
17  THE WITNESS:  My, my recollection
18  is that this is an email that was received by
19  an ORR staff person from a, from a grantee,
20  and it was elevated up to headquarters.
21  BY MS. AMIRI:
22  Q  Is it current ORR policy to prohibit
23  grantees from allowing unaccompanied minors from
24  meeting with attorneys for the purposes of seeking
25  a judicial bypass absent explicit approval from

18 (Pages 66 to 69)

Page 70

1  the director of ORR?
2      A   I apologize.  Could you ask that
3  again --
4      Q   Sure.
5      A   -- because this one is complicated.
6      Q   Is it the current policy of ORR to
7  prohibit grantees from allowing minors to meet
8  with attorneys for the purposes of seeking a
9  judicial bypass absent explicit authority or
10  approval by the director of ORR?
11      A   I'm not sure.
12      Q   Are you aware of directions given by
13  Scott Lloyd while he was the director of ORR that
14  prohibited a grantee from allowing a minor to meet
15  with an attorney about a judicial bypass until he
16  explicitly approved of that meeting?
17      A   Yes, I believe that occurred.
18      Q   Do you know if that occurred on more
19  than one occasion?
20      A   I, I believe that there was only one
21  instance where that was an issue.
22      Q   Do you have Exhibit 11 in front of you,
23  Lloyd Exhibit 11?
24      A   Lloyd Exhibit 11, yes.
25      Q   You can take a minute to look at it.

Page 71

1  I'd like to ask you some questions.
2      A   Sure.
3          (Witness peruses document.)
4          THE WITNESS:  Yes.
5  BY MS. AMIRI:
6      Q   So part of this looks like you're
7  involved in an email exchange here.
8      A   Yes.
9      Q   What was the context of this email
10  exchange?
11      A   This was a minor who had sought TOP
12  while in our care, who had proceeded through the
13  case management process and was ready for
14  reunification with a sponsor.  That's the context
15  for this particular exchange of emails.
16      Q   So the minor had requested pregnancy
17  termination but had not yet received it?
18      A   Correct.
19      Q   And the email from Scott Lloyd to you in
20  the middle there where Mr. Lloyd says, "Grantees
21  should not be supporting abortion services pre- or
22  post-release, only pregnancy services and
23  life-affirming options counseling."
24      A   Yes.
25      Q   What is your understanding of that

Page 72

1  directive?
2      A   When we reunify minors, we provide the
3  sponsor and the minor with referrals to resources
4  in the community related to their individual
5  needs.  In this case, because the minor was
6  seeking abortion services, the provider initially
7  provided, among the resources, also a referral to
8  a resource to receive abortion services in the
9  community.  This is essentially contact
10  information, these resource referrals.  That is
11  what Scott is referring to.
12      Q   So did the minor, upon release to the
13  sponsor, receive information about where -- or did
14  the sponsor receive information about where the
15  minor could obtain an abortion?
16      A   My understanding is that they did not.
17      Q   And that's because of Scott Lloyd's
18  directive in the email?
19      A   Correct.  I cannot speak with certainty.
20  It may be that the, that some of these referrals
21  had already been provided prior to the email, but
22  that is the intent of the email.
23      Q   Do you have an understanding of what
24  Mr. Lloyd says when he talks about "life-affirming
25  options counseling"?

Page 73

1      A   I think I understand what that is.
2      Q   And what is that?
3      A   My understanding is that life-affirming
4  options counseling is a form of intervention by
5  providers, designed to educate pregnant women
6  about their, about their options in a way that
7  emphasizes the risks and harms of abortion and the
8  benefits of other alternatives.
9      Q   This directive with respect to this
10  particular grantee, does it apply also to other
11  grantees?  In other words, is this a policy or
12  practice that other grantees should be following?
13      A   We've not promulgated this message
14  widely, to my knowledge, no.
15      Q   Is it your understanding that Scott
16  Lloyd believes that all grantees should not be
17  supporting abortion services pre- or post-release,
18  only pregnancy services and life-affirming options
19  counseling?
20      A   He has --
21          MR. PHIPPS:  Objection.
22  Foundation.
23  BY MS. AMIRI:
24      Q   You can answer.
25      A   I have not received a subsequent message

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

1    that contradicts his statement made here.
2        Q   Okay.  Thank you.
3            If you could look at Lloyd Exhibit 13, I
4    believe.
5        A   13.
6        Q   But maybe I have the number wrong.  It
7    should have "Exhibit D" on the cover page.
8        A   Exhibit D is Exhibit 13 on mine.
9            MR. PHIPPS:  Oh, oh, 12 and 13.
10           MS. AMIRI:  Oh, they both have --
11           THE WITNESS:  Oh, I'm sorry.
12       They're both Exhibit D.  I apologize.
13   BY MS. AMIRI:
14       Q   Well, if you look at the next page, and
15   it's PRICE-PROD-10950.
16       A   10950, that is Lloyd Exhibit 13.  I have
17   it, yes.
18       Q   Great.  If you could take a quick look
19   at that, and I'd like to ask you some questions
20   about that.
21           (Witness peruses document.)
22           THE WITNESS:  Yes.  What about
23       this?
24   BY MS. AMIRI:
25       Q   Can you explain about the particular

1    minor that the email chain is referring to?  I
2    guess my first question is -- looking at 10951,
3    that's an email from Scott Lloyd, and I'm not sure
4    who it's to.  I'm assuming a grantee, and there
5    are three paragraphs.
6            Do you know whether this email relates
7    to one minor or more than one minor?
8        A   I believe this is referring to a single
9    minor.
10       Q   Do you know the circumstances about this
11   particular minor that is being referred to in this
12   email?
13       A   This is a minor who was in ORR custody,
14   a pregnant girl who expressed interest in
15   terminating the pregnancy, desire for information
16   regarding terminating pregnancy.
17       Q   Do you know if Mr. Lloyd spoke with her
18   at the shelter at
19       A   He did speak with the minor at the
20   shelter.
21       Q   Do you know, at the time that he spoke
22   with her, whether she was still considering an
23   abortion?
24       A   I believe that at the time that he spoke
25   with her, she was still expressing interest in or

1    requesting information regarding abortion.
2        Q   Do you know much about the sponsorship
3    process?
4        A   Yes.
5        Q   So in item 4, he, Mr. Lloyd, talks about
6    "If things get dicey with the sponsor, I know a
7    few good families with a heart for these
8    situations, who would take her in a heartbeat and
9    see her through her pregnancy and beyond."
10           Do you know whether it is possible for a
11   family who is not connected to the minor to be a
12   sponsor?
13       A   It may be possible.  Wait.  Let me pause
14   for a moment.  You said "a family who is not
15   connected."
16       Q   Yes.
17       A   I, I inferred something by that.  Could
18   you amplify that a little more?
19       Q   Sure, absolutely.
20           So if there has been no prior connection
21   to the minor, could a random family become a
22   sponsor?
23       A   I believe that is possible.
24       Q   At, at -- in your time at ORR, have you
25   ever seen that happen?

1        A   I have never seen such a reunification,
2    which doesn't mean it has not happened, but I'm
3    not aware of them.
4        Q   Do you know what Mr. Lloyd was talking
5    about here with respect to "good families with a
6    heart for these situations"?
7        A   I don't know what he was speaking of,
8    because my knowledge is, is limited to the
9    sentences that you see in front of you.
10       Q   Okay.  Did you -- did he have a
11   conversation with you about the conversation he
12   had with this particular minor?
13       A   We did discuss briefly his conversation
14   with the minor, but we did not discuss the part
15   addressed in number 4.
16       Q   Okay.  Did you talk about the part
17   addressed in number 3?
18       A   Yes.  I was asked, as I recall, more
19   information about what psychosocial and counseling
20   supports we have in place for minors both sort of
21   globally and in her case.
22       Q   And is that because, as he says, in his
23   opinion, "these girls start to regret abortion"?
24       A   I, I don't believe we had a conversation
25   about, about those individuals who expressed

1  distress or regret related to abortion in the
2  context of this minor.
3      Q   You are on the email then, I think --
4      A   Yes, I was on this --
5      Q   -- following?
6      A   Yes, I was on this email chain.
7      Q   Okay.
8      A   Yep.  I was CC'd on it, on the, on the
9  response back.
10     Q   I see, and it looks like maybe three
11 days later, Mr. Lloyd sends an email to you asking
12 about whether there are updates on her placement,
13 and --
14     A   It, it was not to me.  I was CC'd on
15 that one.
16     Q   Oh, sorry.  You're right.  You were CC'd
17 on that one.
18         Do you know what the outcome was with
19 this particular minor with respect to her sponsor?
20     A   I believe this minor was reunified with,
21 with a sponsor, but -- one moment.  Let me just
22 look there.
23     Q   Sure.
24     A   I can reacquaint myself.
25     Q   And if you don't know without looking at

1  further emails, there may be some other emails
2  that talk about it.
3      A   Yeah, I'm -- I apologize.  I don't --
4  I'm not totally sure I recall in this case what
5  her reunification outcome was.
6      Q   Do you recall whether she had the
7  abortion while in ORR custody or not?
8      A   She did not, I believe.
9      Q   Do you know anything about the
10 circumstances by which she was transferred from
11         that had a religious objection to providing
12 access to abortion, to         that did not have an
13 objection to providing access to abortion
14 services?
15         MR. PHIPPS:  Objection.  Assumes
16 facts not in evidence.
17         THE WITNESS:  I don't know much
18 about her prior to this time period.  My
19 recollection is that she had previously been
20 in       and under the operational procedures
21 that we were following at that point.  She
22 was transferred to       as a result of her
23 expressing an interest in termination.
24 BY MS. AMIRI:
25     Q   The operational procedures you were

1  following, what, what are those specifically?
2      A   That when minors who are sheltered in
3  programs expressing religious objection to
4  facilitating abortion make that request, the FFS
5  will work to facilitate her transfer.
6      Q   Do you know anything about how long it
7  took her to be transferred from        to
8      A   I don't have that information.
9      Q   Do you know whether       is part of the
10 USCCB network?
11     A   I believe, I believe they are, but I
12 could be mistaken.  We, we generally deal with the
13 providers at the shelter level.  So if they have a
14 common name -- like       know they're all part
15 of       I don't always know for the networks
16 that don't share a name.  And I apologize, I don't
17 always know which one, which ones are parts --
18     Q   If you could look at Exhibit 14, Lloyd
19 Exhibit 14.
20     A   Right.
21     Q   So earlier we had talked about a
22 situation in which Mr. Lloyd directed a grantee to
23 prohibit a minor from meeting with an attorney for
24 pursuing a judicial bypass.
25         Is that referenced in PRICE-PROD-10709?

1          MR. PHIPPS:  I . . .
2          MS. AMIRI:  Am I on the wrong page?
3  Yes?  I'm on the wrong page?
4          MR. PHIPPS:  Yeah, I don't know.  I
5  don't know where you're going.  I'm --
6          MS. AMIRI:  The --
7          MR. PHIPPS:  Maybe a little more
8  direction.
9  BY MS. AMIRI:
10     Q   PRICE-PROD-10709 --
11     A   Yeah.
12     Q   -- and then at the very top, number 6,
13 "The UC should not be meeting with an attorney
14 regarding her termination or otherwise pursuing
15 judicial bypass at this point."
16     A   Yes, that's my understanding of what
17 that means.
18     Q   Do you know whether, other than this
19 instance, whether Mr. Lloyd prohibited a grantee
20 or required a grantee to prohibit a minor from
21 meeting with an attorney for the purposes of
22 seeking a judicial bypass?
23     A   I don't know that he prohibited.  I
24 think he may have at that time had a requirement
25 that they seek his authorization prior to that

Page 82

1   step.
2       Q   Do you know whether that requirement
3   stands, as we're sitting here today, for all
4   grantees?
5       A   I don't know.
6       Q   Based on your experience with Mr. Lloyd
7   to date, do you believe -- do you, Mr. White,
8   believe that Mr. Lloyd will ever approve any
9   abortion request?
10          MR. PHIPPS: Objection. Scope.
11  Calls for speculation.
12          THE WITNESS: I don't know. I
13  don't know.
14  BY MS. AMIRI:
15      Q   Mr. Lloyd does not think that pregnancy
16  as a result of rape is a sufficient basis alone
17  for his authorization to proceed with a
18  termination of pregnancy; is that fair?
19      A   That is fair.
20      Q   Have you spoken with him about any
21  constellation of facts or other criteria that
22  would lead him to authorize an abortion?
23      A   We have not had a conversation that
24  resulted in that. We have identified some facts
25  in which he believes his authorization would not

Page 83

1   be required.
2       Q   And that would be in the context of an
3   emergency?
4       A   Correct.
5       Q   If I could have you look at Exhibit 15,
6   please, Lloyd Exhibit 15. It's been redacted, so
7   I actually don't know if you were -- if you saw
8   this email, if you have seen this document before.
9       A   I don't believe I've seen this Young
10  Center report before. I have seen Young Center
11  reports on other minors not, not related to issues
12  of abortion. I've certainly seen plenty of Young
13  Center best-interest statements. I don't believe
14  I've seen this best-interest recommendation
15  before, but I may have.
16      Q   Even if you haven't seen this particular
17  one, are you -- were you aware at this time, this
18  time, the time that this was happening, rather --
19  so at the end of March 2017 is when this was
20  sent -- that the Young Center was advocating to
21  someone in ORR that a minor's decision to have an
22  abortion be kept confidential? Are you familiar
23  with the circumstances in, in this, in this
24  letter?
25      A   Give me just a moment to read it --

Page 84

1       Q   Sure. Take your time.
2       A   -- to sort of develop clues on which
3   case this is.
4       Q   Yep, yep, absolutely.
5           (Witness peruses document.)
6           THE WITNESS: I believe I recall
7   the case that's being referenced here.
8   BY MS. AMIRI:
9       Q   Do you know that -- whether, despite the
10  concerns raised by the Young Center about
11  revealing the minor's abortion decision to her
12  parents in her home country, whether the parents
13  were, in fact, notified of the minor's abortion
14  decision?
15      A   If this is the, the, the -- if this is
16  the case that I think it is, I believe the parents
17  were notified.
18      Q   If you could look at Exhibit 16, please,
19  Lloyd Exhibit 16.
20          If you want to just skim through. You
21  don't -- I mean I'm happy to give you --
22      A   Sure.
23      Q   -- time to read anything that you need,
24  obviously, but --
25      A   Sure.

Page 85

1       Q   -- just to get a general sense of the,
2   the minor we're talking about here.
3       A   Right. Yes, I'm fairly confident I know
4   the minor in this case.
5       Q   So it's, it's Jane Doe, correct, who --
6       A   I believe this is the minor who in, as
7   far as that case, is referred to as "Jane Doe."
8       Q   Okay. So if we can talk about the time
9   prior to litigation about the, what was required
10  of the shelter in terms of the abortion request,
11  it looks like there was a clinical visit with
12  someone named Dr. R
13      A   Where, where is that? I apologize.
14      Q   So flip all the way to the back. Oh,
15  sorry. Maybe not all the way. Maybe
16  PRICE-PROD-15164 and going on to 15165.
17      A   Mm-hmm, yes.
18      Q   Do you know who Mr. R        is? I'm
19  sorry. Dr. R
20      A   I do not know who Dr. R        is. I
21  know he is the, he is the healthcare provider whom
22  Scott Lloyd directed the program director of the
23  program sheltering this minor to, to take her to.
24      Q   Is Dr. R        associated with a crisis
25  pregnancy center?

22 (Pages 82 to 85)

1      A   I, I don't know for certain, but that
2  would be consistent.
3      Q   Does -- do you know if Dr. R        went
4  to meet with the minor in the shelter, or was the
5  minor taken to visit Dr. R        in some office?
6      A   If you give me just a moment to sort of
7  reacquaint myself --
8      Q   Sure.
9      A   -- because this, this was, this was
10  complicated, and I was not funneling these
11  particular directions, so --
12      Q   Okay.
13      A   -- I don't have as much firsthand
14  knowledge.
15      Q   Sure, and if you don't have firsthand
16  knowledge, that's fine, too.
17      A   But I, I was aware of it by emails.
18      Q   Yes.
19      A   I believe that the minor was initially
20  to, scheduled to be taken to a crisis pregnancy
21  center.  The distance was somewhat prohibitive
22  from the location where the minor was sheltered,
23  and this resulted in, I believe, Dr. R
24  seeing the minor at the shelter.  This is my
25  recollection of the facts.

1      Q   What was Maggie Wynne's role in this
2  particular minor's abortion request?
3      A   I don't, I don't recall a significant
4  role for, for Maggie Wynne.
5      Q   Around the same time that this
6  particular minor had requested an abortion, was
7  there another abortion, abortion request from the
8  same shelter?
9      A   I believe so.
10      Q   Do you know what happened with that
11  particular abortion request?
12      A   I apologize.  Sometimes I get these --
13      Q   That's okay.  We might be able to --
14      A   If you have something to point me to, it
15  will help me differentiate cases.
16      Q   Sure, sure.  Yeah, we might be able
17  to -- we might be finding it at some point.
18          Do you have any facts about what
19  happened with this particular minor in Exhibit --
20      A   Sorry.
21      Q   Sure.  Happy to take a break if you need
22  to.
23      A   No, no.  I just need to turn that off.
24  That's all.
25      Q   Do you have any particular information

1  pre-litigation about what happened to the, this
2  particular minor in Exhibit 16 that isn't
3  contained in these emails?
4      A   Pre-litigation that's not contained in
5  these emails?
6      Q   For example, is there a meeting that you
7  attended where this particular minor was discussed
8  pre-litigation?
9      A   There were, I'm sure, a number of
10  meetings.
11      Q   So who, who would have been at those
12  meetings?
13      A   Scott Lloyd and a number of us who are
14  career staff in these cases.  There may have been
15  other meetings that involved other political
16  officials.
17      Q   And pre-litigation, what was the
18  substance of those meetings?
19      A   Much of it was to share information
20  about the specifics of the request and the updates
21  on the, on the director's instructions.
22      Q   Did ultimately Scott Lloyd make a
23  determination about whether this minor could
24  obtain an abortion?
25      A   There was not an ultimate sort of

1  signing of a memorandum.  There was, of course --
2  because, because approval had not been granted,
3  and the minor was represented by counsel, it
4  became a matter for litigation.
5      Q   Was -- did Scott Lloyd -- did you have
6  any conversation with Scott Lloyd about what was
7  in this minor's best interest?
8      A   Yes.
9      Q   And what was that discussion?
10          MR. PHIPPS:  I'm -- can we take
11  this as to what was the result of that
12  discussion, and then if there's internal
13  deliberations that maybe I -- I don't know
14  where we are on this, but I don't want -- we
15  could take a break and find out if, if the
16  answer is going to implicate deliberative
17  process.
18          MS. AMIRI:  Why don't we do that
19  on, on your break, and we can come back to
20  it, but I mean maybe I can phrase it this
21  way.
22  BY MS. AMIRI:
23      Q   Ultimately did ORR make a determination
24  about whether an abortion would be in this
25  particular minor's best interest?

23  (Pages 86 to 89)

Page 90

1    A   The director determined that abortion
2 would not be in this minor's best interest.
3    Q   Did he articulate why?
4    A   He, he did articulate.  He did
5 articulate that the, that the, that the fetus and
6 the pregnancy was also a minor in care.
7    Q   Mr. Lloyd has said before that when a
8 minor is pregnant, that the unborn child is a
9 child in his care, has he not?
10    A   He has said that.
11    Q   And was that a similar sentiment in this
12 particular minor's case that he was expressing?
13    A   That was one component of his best
14 interest determination.
15    Q   Was there another component?
16    A   That, that abortion causes harm to the
17 young lady involved as well.
18    Q   In terms of psychological harm or
19 physical harm?
20    A   He articulated psychological harm.
21    Q   Do you, Mr. White, believe that abortion
22 causes psychological harm?
23    A   Not in, not in the 30(b)(6), but as
24 myself?
25    Q   Yes.

Page 91

1    A   I do not believe that abortion per se
2 causes psychological harm.  I think, I think
3 individuals can experience traumatic consequences
4 as a result of abortion.  They can also experience
5 traumatic -- have a traumatic experience and
6 consequences of being denied abortion.
7    Q   So pre, pre-litigation, in terms of the
8 meetings that were happening with this particular
9 minor in Exhibit 6, it looks like the steps were a
10 visit from Dr. R          , it looks like
11 notification of the minor's parents in her home
12 country.
13        Were there other steps that were
14 required of this particular minor leading up to
15 Mr. Lloyd's decision about whether the abortion
16 would be in her best interest?
17    A   Give me a moment --
18    Q   Sure.
19    A   -- to reacquaint myself.  So . . .
20        (Witness peruses document.)
21        THE WITNESS:  Correct.
22        The, the steps that were
23 communicated to us were that there would be
24 parental notification, and to seek their
25 written, I think at that point written and

Page 92

1 notarized consent to termination; second,
2 that the minor should receive options
3 counseling from an approved -- a provider
4 from the approved, HHS-approved providers.
5 Or excuse me.  An HHS -- an approved provider
6 of his selection.
7 BY MS. AMIRI:
8    Q   So when you talk about the "approved
9 provider," what does that mean?
10    A   This would be consistent with his prior
11 direction that minors would receive life-affirming
12 options counseling.  So in this case we were
13 directed to -- this is one of the cases in which
14 we were -- it was indicated to us which provider
15 should be used.
16    Q   I know we're, we're getting sadly close
17 to my, my time limit, but on that subject, I just
18 wanted you to take a look at Exhibit 18 and
19 Exhibit 19, Lloyd Exhibits 18 and 19.
20    A   Exhibit 18 and --
21    Q   Exhibit 19.
22    A   Give me a moment.
23    Q   Sure.
24        (Witness peruses document.)
25        THE WITNESS:  Yes, I remember this.

Page 93

1 BY MS. AMIRI:
2    Q   So in terms of the list of approved
3 providers that you had mentioned before, do Lloyd
4 Exhibit 18 and Exhibit 19 reflect the genesis of,
5 of those lists?
6    A   Yes.
7    Q   And it looks like a list came from
8 CareNet Centers; is that fair?  That's one of the
9 attachments on Exhibit 18.
10    A   The, the list was provided by the HHS,
11 what we call the Partnership Center, which is an
12 HHS Center for Faith-based and Neighborhood
13 Partnerships.  That's, that's a staff division of
14 HHS.
15    Q   And -- but they got the list, it looks
16 like, from CareNet?
17    A   CareNet is one of the two provider
18 networks that they provided us.  CareNet was in
19 the initial package, and the other network of
20 providers was in the second package.
21    Q   And that second one was Heartbeat
22 International?
23    A   I think that's correct.
24    Q   Do you have any knowledge as to what the
25 counseling looks like at one of these centers that

24 (Pages 90 to 93)

Page 94

```
 1   are approved as trusted providers by HHS?
 2        A   I don't know what it looks like. I've
 3   never observed it. I only know what I have read.
 4        Q   Do you know whether it is religious in
 5   nature?
 6        A   I believe it is religious in nature.
 7            MS. AMIRI: Okay. I want to be
 8   prompt. I promised you 5:30, so . . .
 9            MR. PHIPPS: Okay. All right.
10   Well, thank you.
11            MS. AMIRI: Yeah, I mean I want to
12   be respectful, respectful of the witness,
13   although I feel like there's, there's more I
14   would love to ask, but -- so maybe we can
15   take a break, and you can -- I can see if I
16   have like any burning things that I just
17   can't let go, and then -- and, and you can
18   be -- have your time, and, and Dan can have
19   his time, and we'll go from there.
20            MR. PHIPPS: That's great.
21            MS. AMIRI: Okay.
22            THE VIDEOGRAPHER: Going off the
23   record at 5:29.
24            (Whereupon, a short recess was
25        taken.)
```

Page 95

```
 1            THE VIDEOGRAPHER: We are going
 2        back on the record at 5:39.
 3   BY MS. AMIRI:
 4        Q   One follow-up question.
 5            Before, you had talked about the
 6   cooperative agreements for religiously affiliated
 7   shelters that have religious objections to
 8   providing care, and my question is whether, since
 9   the new administration, there has been a change in
10   approach with cooperative agreements with
11   religiously affiliated entities, either within the
12   text of the cooperative agreements or the
13   application of the ACF faith-based grant policy.
14        A   We don't yet have new cooperative
15   agreements. Those are still in development at
16   this time.
17        Q   Okay.
18        A   So we have not issued new cooperative
19   agreements in the current administration.
20        Q   Okay. Have you made a decision -- and
21   I'm being careful to avoid deliberative process,
22   but a decision about how the faith-based policy or
23   any alternative arrangements will be
24   operationalized for religiously affiliated
25   entities that have an objection to providing
```

Page 96

```
 1   access to abortion or contraception?
 2        A   No. There's been no new decision or
 3   policy formulation that's been shared with me.
 4            MS. AMIRI: Okay. I don't have
 5   anything further at this time. I would like
 6   to say, before I forget, though, that we have
 7   an agreement to keep this deposition open in
 8   case we need to come back and have a quick
 9   conversation after we get additional
10   documents that the government is to produce
11   by the close of discovery this week.
12            MR. PHIPPS: Oh, and just to
13   clarify --
14            MS. AMIRI: Yes.
15            MR. PHIPPS: -- we're going to
16   produce documents through the close of
17   discovery --
18            MS. AMIRI: Correct.
19            MR. PHIPPS: -- but I don't think
20   we're going to produce them this week.
21            MS. AMIRI: By close? By the end
22   of --
23            MR. PHIPPS: Yeah, it will be
24   through that date, but --
25            MS. AMIRI: Fair enough. Okay.
```

Page 97

```
 1   We'll talk about it.
 2            EXAMINATION BY COUNSEL FOR
 3        OFFICIAL CAPACITY DEFENDANTS
 4   BY MR. PHIPPS:
 5        Q   Good afternoon, Mr. White. My name is
 6   Peter Phipps. I'm an attorney at the Department
 7   of Justice, and I represent the defendants in
 8   their official capacity in this case. I have a
 9   few follow-up questions for you about your
10   testimony today.
11        A   Yes, sir.
12        Q   First, are you aware of any instance in
13   which any grantee shelter has made a final
14   decision that an unaccompanied alien child in its
15   custody may not receive contraception?
16        A   No.
17        Q   Are you aware of any instance in which
18   any grantee shelter has made the final decision
19   that an unaccompanied alien child in its custody
20   may not receive access to an abortion?
21        A   No.
22        Q   As deputy director of ORR, are you aware
23   of any preferential treatment that HHS or ORR has
24   given to any faith-based grantee or faith-based
25   applicant for the care and custody of
```

25 (Pages 94 to 97)

Page 98

1  unaccompanied alien children?
2      A   No.
3          MR. PHIPPS:  Thank you.  That's all
4  I have.
5      EXAMINATION BY COUNSEL FOR DEFENDANT USCCB
6  BY MR. NOWICKI:
7      Q   Good afternoon.  I'm Dan Nowicki for
8  USCCB.  I just have maybe just one quick follow-up
9  question.
10         So you were asked a question about
11 Home and their affiliation with certain grantee
12 networks, and I believe you may have already
13 clarified this, but do you know which grantee
14 network        Home is part of?
15     A   I don't.  I would need to check.
16         MR. NOWICKI:  I have no further
17 questions.
18         THE WITNESS:  Right.
19         THE VIDEOGRAPHER:  Going off the
20 record at 5:53.
21         THE REPORTER:  And do you still
22 want a rough draft?
23         MS. AMIRI:  Sure.
24         MR. PHIPPS:  We get a transcript.
25         MR. NOWICKI:  I get a transcript.

Page 99

1          MS. AMIRI:  Yes.
2          THE REPORTER:  Okay.
3          (Signature having not been
4          waived, the Rule 30b6 video
5          deposition of Department of Health
6          and Human Services, by and through
7          its designated representative,
8          JONATHAN WHITE, was concluded at
9          5:53 p.m.)

Page 100

1
2
3
4
5
6              ACKNOWLEDGEMENT OF WITNESS
7          I, Jonathan White, do hereby
8  acknowledge that I have read and examined the
9  foregoing testimony, and the same is a true,
10 correct and complete transcription of the
11 testimony given by me, and any corrections
12 appear on the attached Errata sheet signed by
13 me.
14
15
16 _____
17 (DATE)        (SIGNATURE)

Page 101

1          E R R A T A   S H E E T
2  IN RE:  ACLU vs. HARGAN & USCCB
3  RETURN BY:
4  PAGE   LINE              CORRECTION AND REASON
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 _____  _____
25 (DATE)        (SIGNATURE)

26 (Pages 98 to 101)

Page 102

```
 1
 2
 3
 4
 5
 6      CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
 7             I, Laurie Donovan, Registered
        Professional Reporter, Certified Realtime
 8      Reporter, the officer before whom the
        foregoing deposition was taken, do hereby
 9      certify that the foregoing transcript is a
        true and correct record of the testimony
10      given; that said testimony was taken by me
        stenographically and thereafter reduced to
11      typewriting under my supervision; and that I
        am neither counsel for, related to, nor
12      employed by any of the parties to this case
        and have no interest, financial or otherwise,
13      in its outcome.
14             IN WITNESS WHEREOF, I have hereunto
        set my hand and affixed my notarial seal this
15      2nd day of January, 2018.
16      My commission expires:  March 14th, 2021
17
18
19      _____
20      LAURIE DONOVAN
        NOTARY PUBLIC IN AND FOR
21      THE DISTRICT OF COLUMBIA
22
23
24
25
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com