# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

- - - - - - - - - - - - - - -+
                              |
AMERICAN CIVIL LIBERTIES      |
UNION OF NORTHERN             |
CALIFORNIA,                   |
                              |
         Plaintiff,           |    Case Number:
                              |
   vs.                        |    3:16-cv-3539-LB
                              |
ERIC G. HARGAN, Acting        |
Secretary of Health and       |
Human Services, et al,        |
                              |
         Defendants,          |
                              |
U.S. CONFERENCE OF            |
CATHOLIC BISHOPS,             |
                              |
   Defendant-Intervenor.      |
                              |
- - - - - - - - - - - - - - -+


Videotaped Deposition of Scott Lloyd, Esq.

Washington, D.C.

Monday, December 18, 2017 – 12:10 p.m.




Reported by:

Laurie Donovan, RPR, CRR, CSR

Job no: 20317

## Page 2

1   Videotaped Deposition of
2   SCOTT LLOYD, ESQ.
3
4   Held at the offices of:
5      U.S. Department of Justice
6      20 Massachusetts Avenue, N.W.
7      Room 6139
8      Washington, D.C. 20001
9      (202)353-4556
10
11
12
13
14
15
16
17      Taken pursuant to notice, before
18   Laurie Donovan, Registered Professional
19   Reporter, Certified Realtime Reporter, and
20   Notary public in and for the District of
21   Columbia.
22
23
24
25

## Page 4

1   (Appearances continued)
2   ON BEHALF OF OFFICIAL CAPACITY FEDERAL DEFENDANTS
3   ERIC G. HARGAN AND DEPARTMENT OF HEALTH AND HUMAN
4   SERVICES:
5      U.S. Department of Justice
6      20 Massachusetts Avenue, N.W.
7      Room 6139
8      Washington, D.C. 20001
9      (202)353-4556
10      By:  Martin M. Tomlinson, Esq.
11         martin.m.tomlinson@usdoj.gov
12         Peter J. Phipps, Esq.
13         peter phipps@usdoj.gov
14   ALSO PRESENT:
15      Martin Sherrill, Videographer
16      Llewellyn Woolford, Esq. (HHS)
17      Caitlin Palacios, Esq. (HHS)
18      Jeffrey Hunter Moon, Esq. (USCCB)
19      Rachel Chrisinger, paralegal
20
21
22
23
24
25

## Page 3

1      A P P E A R A N C E S
2   ON BEHALF OF PLAINTIFF AMERICAN CIVIL LIBERTIES
3   UNION OF NORTHERN CALIFORNIA:
4      ACLU Foundation
5      125 Broad Street
6      New York, New York 10004
7      (212)519-7897
8      By:  Brigitte Amiri, Esq.
9         bamiri@aclu.org
10         Meagan Burrows, Esq.
11         mburrows@aclu.org
12   ON BEHALF OF THE DEFENDANT-INTERVENOR USCCB:
13      Gibson, Dunn & Crutcher, LLP
14      333 South Grand Avenue
15      Los Angeles, California 90071
16      (213)229-7000
17      By: Daniel Nowicki, Esq.
18         dnowicki@gibsondunn.com
19         Robert Dunn, Esq. (phone)
20         rdunn@gibsondunn.com
21
22
23
24
25

## Page 5

1      EXAMINATION INDEX
2                PAGE
3   EXAMINATION BY MS. AMIRI . . . . . . . . .  10
4   EXAMINATION BY MR. PHIPPS  . . . . . . . . 174
5   EXAMINATION BY MR. NOWICKI . . . . . . . . 177
6
7
8
9
10
11
12      E X H I B I T S
13   EXHIBIT   DESCRIPTION         PAGE
14   Exhibit 1  Plaintiff's Deposition Notice . .  18
15   Exhibit 2  Memo from David Siegel to DUCS
16         staff and others, dated March 21,
17         2008, regarding medical services
18         requiring heightened ORR
19         involvement . . . . . . . . . .  19
20   Exhibit 3   Section 3.3, Care Provider
21         Required Services per the Flores
22         Settlement Agreement . . . . . .  25
23   Exhibit 4   Sections 4.9.2, 4.9.3 and 4.9.4
24         regarding services for UACs . . .  35
25

Page 6

1   (Exhibits continued)
2   EXHIBIT    DESCRIPTION          PAGE
3   Exhibit 5  Flores Settlement Agreement . . .  42
4   Exhibit 6  Copy of 45 CFR Part 411 regarding
5        UACs . . . . . . . . . . . . . .  49
6   Exhibit 7  Defendants' Objections and
7        Supplemental Responses  . . . . .  69
8   Exhibit 8  Email chain with attachments,
9        Bates PRICE-PROD 00010684 . . . .  89
10  Exhibit 9  Memo to Whom it May Concern from
11       Kenneth Tota, March 4, 2017,
12       Bates PRICE-PROD-00005146 . . . .  97
13  Exhibit 10  Email chain with some redactions,
14       "Exhibit B," Bates PRICE-PROD-
15       00004528 . . . . . . . . . . . .  104
16  Exhibit 11  Email chain, "Exhibit C," Bates
17       PRICE-PROD-00010706 . . . . . . . 111
18  Exhibit 12  Email chain with some redactions,
19       "Exhibit D," Bates PRICE-PROD-
20       00011343 . . . . . . . . . . . .  124
21  Exhibit 13  Email chain with some redactions,
22       also "Exhibit D," Bates
23       PRICE-PROD-00010950 . . . . . . .  128
24
25

Page 7

1   (Exhibits continued)
2   EXHIBIT    DESCRIPTION          PAGE
3   Exhibit 14  Email chain with some redactions,
4        "Exhibit G," Bates PRICE-PROD-
5        00010709 . . . . . . . . . . .  134
6   Exhibit 15  Email chain with some redactions,
7        "Exhibit I," Bates PRICE-PROD-
8        00012935 . . . . . . . . . . .  143
9   Exhibit 16  Long email chain, various Bates
10       numbers, beginning with Bates
11       PRICE-PROD-00014786 . . . . . . .  150
12  Exhibit 17  Long email chain, beginning with
13       Bates PRICE-PROD-00014814 . . . .  157
14  Exhibit 18  Email exchange between Jonathan
15       White and Shannon Royce on
16       July 11 and September 20, 2017,
17       Bates PRICE-PROD-00014997 . . . .  159
18  Exhibit 19  Email from Jonathan White to
19       Shannon Royce, dated July 5,
20       2017, Bates PRICE-PROD-00014996 .  161
21  Exhibit 20  Memo from Maggie Wynne, Scott
22       Lloyd and Matt Bowman to ASPA
23       regarding significant medical
24       procedures in UAC program, Bates
25       PRICE-PROD-00005375 . . . . . . .  169

Page 8

1   (Exhibits continued)
2   EXHIBIT    DESCRIPTION          PAGE
3   Exhibit 21  Email chain, Bates PRICE-PROD-
4        00010976 . . . . . . . . . . .  172
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1              P R O C E E D I N G S
2        THE VIDEOGRAPHER:  This is tape
3   number 1 of the video deposition of Scott
4   Lloyd in the matter of ACLU of Northern
5   California versus Burwell.  This deposition
6   is being held at 20 Massachusetts Avenue,
7   Northwest, Washington, D.C., at approximately
8   12:10 on December 18, 2017.
9        My name is Martin Sherrill from the
10  firm of TransPerfect Video, and I'm the video
11  legal specialist.  The court reporter today
12  is Laurie Donovan in association with
13  TransPerfect Video.
14        Would counsel please introduce
15  themselves.
16        MS. AMIRI:  Brigitte Amiri for the
17  plaintiff.
18        MS. BURROWS:  Meagan Burrows for
19  the plaintiff.
20        MR. NOWICKI:  Daniel Nowicki for
21  the defendant-intervenor USCCB.
22        MR. MOON:  Jeffrey Moon for
23  defendant-intervenor.
24        MR. PHIPPS:  Peter Phipps for the
25  official capacity federal defendants.

3  (Pages 6 to 9)

1      MR. TOMLINSON:  Martin Tomlinson
2  for the official capacity federal defendants.
3      MR. WOOLFORD:  Llewellyn Woolford
4  for the defendant U.S. Department of Health
5  and Human Services.
6      MS. PALACIOS:  Caitlin Palacios for
7  defendant U.S. Department of Health and Human
8  Services.
9      MS. CHRISINGER:  Rachel Chrisinger
10  with the official capacity federal
11  defendants.
12      THE VIDEOGRAPHER:  Will the court
13  reporter please swear in the witness.
14      SCOTT LLOYD, ESQUIRE,
15  having been first duly sworn, testified
16  upon his oath as follows:
17    EXAMINATION BY COUNSEL FOR PLAINTIFF
18  BY MS. AMIRI:
19    Q   Good afternoon, Mr. Lloyd.  Thank you
20  for taking the time to be here today.
21      Other than speaking with your attorneys,
22  what did you do to prepare for today's deposition?
23    A   Just thought about the subject matter.
24    Q   Did you review any documents that were
25  not provided to you by counsel?

1    A   No.
2    Q   Did you speak with anyone other than
3  your attorneys?
4    A   No.
5    Q   Can you walk me through your educational
6  background and then your work history.
7    A   Sure.  I graduated undergrad James
8  Madison University, and then law school at
9  Catholic University.  Employed at the US
10  Department of Health and Human Services, then in
11  private practice for a couple years, then for the
12  Knights of Columbus, and then again for the US
13  Department of Health and Human Services.
14    Q   What was your major in undergrad?
15    A   English.
16    Q   When you worked at HHS after you
17  graduated from law school, in what capacity did
18  you work at HHS then?
19    A   Office of General Counsel.  I think when
20  I first came there, I was an ASPE, Assistant
21  Secretary for Planning and Evaluation.
22    Q   What years was that?
23    A   2007 to 2009.
24    Q   And from there you went to private
25  practice; is that right?

1    A   Yes.
2    Q   And when did you start working at HHS
3  in 2017?
4    A   The end of February.
5    Q   And what capacity did you begin
6  employment at HHS at the end of February?
7    A   Second wave of the transition team.
8    Q   What was your title when you first
9  started working at the end of February in 2017?
10    A   By my recollection, it's special
11  advisor.
12    Q   How did you become involved in the
13  second wave transition team?
14    A   There's a formal application process,
15  and then, and then an interview process.
16    Q   Did anyone in particular encourage you
17  to apply?
18    A   Yes.
19    Q   And who was that?
20    A   Friends of mine in my former employment.
21    Q   Would that be Knights of Columbus?
22    A   Yes.
23    Q   Anyone in government at the time
24  encourage you to apply?
25    A   Not that I recall.

1    Q   At some point you became the Director of
2  the Office of Refugee Resettlement, correct?
3    A   Yes.
4    Q   And when was that?
5    A   It's either March 24 or March 27.
6    Q   And until the time that you took on the
7  official title of Director of Office of Refugee
8  Resettlement, were you in the title of special
9  advisor, or did you go from special advisor to a
10  different title before you became the director of
11  ORR?
12    A   I don't think my title changed before
13  becoming director.
14    Q   What was the appointment process to
15  become the director of ORR?
16    A   Eventually the kind of HR and related --
17  I guess office of White House Liaison made an
18  announcement that I'm the director, and that
19  happened on the 24th or the 27th.
20    Q   Is it a Senate confirmed position?
21    A   No.
22    Q   Did you particularly apply for the
23  position of ORR director?
24    A   No.
25    Q   Someone reached out to you and selected

Page 14

1  you to be the director of ORR?
2      A  Yes.
3      Q  And who was that person?
4      A  Tim Clark, who is Office of White House
5  Liaison.
6      Q  Do you have any experience working with
7  immigrants?
8      A  Yes.
9      Q  And what is that experience?
10     A  I've been the director of Office of
11 Refugee Resettlement since March, and if you could
12 be more specific about immigrants.
13     Q  Sure.
14         So prior to the time that you became
15 Office of Refugee Resettlement director and
16 actually before you even came on to the second
17 wave of the transition team, were you -- did you
18 ever provide any sort of, for example, legal
19 services to immigrants or refugees?  Have you
20 worked with the community at all in any capacity?
21     A  You're using terms of art that are
22 confusing to me, so to the community, I guess I
23 could say yes.  Most of my work was with IDPs,
24 internally displaced people, but later those
25 specific IDPs ended up becoming categorized as

Page 15

1  refugees through UN kind of legal analysis, and
2  then also less closely with refugees in other
3  parts.
4      Q  And what specifically did you do in
5  terms of your work with IDPs?
6      A  I visited camps in, in places where
7  there are displaced populations and interviewed
8  IDPs, refugees to catalog kind of the offenses
9  that they had undergone through their
10 displacement, but before their displacement,
11 through violent regimes and such.
12         Then led a legal team to compile those,
13 that evidence and submit it to the State
14 Department and Congress, and then continued to
15 meet with the same communities to provide
16 follow-up to those submissions and the eventual
17 Genocide Declaration against certain minorities in
18 the Middle East to continue to advise the State
19 Department and Congress on matters related to
20 those IDP refugees.
21     Q  And in what capacity were you doing this
22 work?  Was it with the federal government or with
23 your private practice?
24     A  It was with the Knights of Columbus.
25     Q  What countries were you working in?

Page 16

1      A  Mostly Iraq, but also less directly in
2  Syria, Lebanon and Jordan.
3      Q  And you talked about minorities.  Can
4  you explain to me what you meant by that?
5      A  Minorities in the region, which for the
6  most part we were closest, just by affiliation,
7  with Christian minorities, but also Yazidi
8  minorities, and there are smaller minorities,
9  including Shabak and Ka'kai that are also part of
10 that universe.
11     Q  For how long did you do this work?
12     A  About a year.
13     Q  To whom did you directly report?
14     A  To the assistant secretary of the
15 Administration for Children and Families.
16     Q  And that's Steven Wagner?
17     A  Yes, Steven Wagner who is acting in that
18 position.
19     Q  Does Jonathan White directly report to
20 you?
21     A  Yes.
22     Q  Ad what is his role?
23     A  He is the direct -- deputy director for
24 Children's Programs.
25     Q  Does Ken Tota directly report to you?

Page 17

1      A  Yes.
2      Q  What is his role?
3      A  He's deputy director for Refugee
4  Programs.
5      Q  And does Dr. Michael Bartholomew
6  directly report to you?
7      A  No.
8      Q  To whom does he report?
9      A  No.  Sorry.  He does report to me
10 directly, yes.
11     Q  What is his title?
12     A  He's the director of, director of Health
13 for Unaccompanied Children.
14     Q  Are there other physicians besides
15 Dr. Bartholomew working in ORR?
16     A  Yes.
17     Q  And who are those doctors?
18     A                      , another gentleman whose
19 name I'm blanking on, and Curi Kim.  We also have
20 another contractor who works off site.
21     Q  Do they directly report to
22 Dr. Bartholomew, or do they directly report to
23 you?
24     A  Dr. Bartholomew.  Mostly -- all except
25         report directly to Dr. Bartholomew.

5 (Pages 14 to 17)

Page 18

1  Q  And how did Dr. Bartholomew come to work
2  for ORR?  Well, let's back up and strike that.
3  A  Sure.
4  Q  When did Dr. Bartholomew come to work
5  for ORR?
6  A  I don't know.
7  Q  You don't know?
8  A  No.
9  Q  Was Dr. Bartholomew working at ORR when
10 you arrived in February?
11 A  Yes.
12     (Exhibit 1 was marked for
13     identification.)
14 BY MS. AMIRI:
15 Q  So I'm going to hand you what's been
16 marked as Exhibit 1.  It is the 30(b)(6)
17 deposition notice.
18     Do you understand that you are here to
19 speak as a Rule 30(b)(6) designee on behalf of
20 certain subject matters, or are you not?
21 A  No.
22 Q  Oh, you're not?
23     MS. AMIRI:  Okay.  I'm sorry.  I
24 thought perhaps in your email you were saying
25 that Mr. Lloyd would be the designee for some

Page 19

1  30(b)(6) subject matters.
2     MR. PHIPPS:  No.
3     MS. AMIRI:  Okay.
4     MR. PHIPPS:  We divide that between
5  Katherine Chon and Jonathan White.
6     MS. AMIRI:  I see.  Then never
7  mind.
8     (Exhibit 2 was marked for
9     identification.)
10 BY MS. AMIRI:
11 Q  I'll hand you what's been marked as
12 Exhibit 2.
13    Do you recognize what's been marked as
14 Exhibit 2?
15 A  Yes.
16 Q  And what is it?
17 A  This is a letter from the director, then
18 acting director David Siegel of Office of Refugee
19 Resettlement regarding medical services requiring
20 heightened ORR involvement.
21 Q  Is this still the policy of ORR with
22 respect to the process for minors seeking
23 abortions in ORR custody?
24     MR. PHIPPS:  Objection.  Assumes
25 facts not in evidence regarding "still the

Page 20

1  policy."
2     THE WITNESS:  It forms the basis of
3  the current policy.
4  BY MS. AMIRI:
5  Q  Do you understand this memo, Exhibit 2,
6  to be a policy memo?
7  A  Yes.
8  Q  Okay.  So to the extent that this forms
9  the basis, maybe we can look specifically at
10 Exhibit 2.
11    Are there any alterations that have been
12 made by ORR, since you've taken office, to this
13 policy?
14 A  We've sent a, an email -- since I've
15 taken office?  I'm sorry.
16 Q  Yes.
17 A  No.
18     MR. PHIPPS:  Just taken office as
19 ORR director?
20     MS. AMIRI:  Yes.
21     MR. PHIPPS:  Okay.
22 BY MS. AMIRI:
23 Q  So then I'll back up and encompass the
24 time that you were on the transition team.  I
25 believe you were starting to say there was an

Page 21

1  email.  Was that when you were on the transition
2  team?
3  A  Yes.
4  Q  And what did that email say with respect
5  to the policy or medical services requiring
6  heightened ORR involvement?
7  A  It clarified how we would operationalize
8  this policy.
9  Q  And are you familiar with that email
10 that went out?
11 A  Yes.
12 Q  And did you talk to anyone about the
13 contents of that email before it went out?
14 A  Yes.
15 Q  And Ken Tota was the acting director of
16 ORR at the time that email was sent out, right?
17 A  Yes.
18 Q  And what were the changes in that email
19 that were made to the Exhibit 1?  I'm sorry.
20 Exhibit 2.
21 A  Sure.  I don't think there were any
22 changes.
23 Q  How would you characterize the email
24 then that was sent?
25 A  Providing clarification of this policy.

6 (Pages 18 to 21)

Page 22

1    Q    And what was --
2    A    Operationalization of this policy.
3    Q    And maybe we'll pull that email in a
4  minute, but what was your understanding of the
5  clarification in that email?
6    A    The clarification made clear that -- I
7  don't know exactly how to say it, but that this
8  remains the policy and that, and that, you know,
9  and that -- as I'm sure you have seen by reading
10 it, it goes into different parts of the, of the
11 letter to, to clarify, you know, this is how we're
12 going to proceed.
13   Q    Well, we'll try to find that, but in the
14 meantime I wanted to ask you if you can look at
15 Exhibit 2 under "Procedures," and it references
16 "Significant Incident Documentation and Reporting
17 at Section 1.03 and for Medical Services at
18 Section 3.04."
19   A    Mm-hmm.
20   Q    Do you know what that's in reference to
21 and whether those documents still are in existence
22 at ORR?
23   A    Yes.
24        MR. PHIPPS:  Objection.  Compound.
25

Page 23

1  BY MS. AMIRI:
2    Q    They are?
3    A    Well, to the first question, do I know
4  what the, these reference, yes.
5    Q    Okay.  So what do they reference?  Let's
6  start there.
7    A    The Unaccompanied Alien Children Policy
8  Guide.
9    Q    Okay.  Do you believe that those
10 citations are still accurate with respect to the
11 numbers provided for the Policy Guide sections?
12   A    Yes.
13   Q    Looking at Footnote 1 referencing the,
14 the best interest statutory reference, what, what
15 is your understanding of what ORR's obligation is
16 of the statutory manner to ensure that the best --
17 or sorry -- the interests of the child are
18 considered in decisions and actions relating to
19 the care of unaccompanied minors?
20        MR. PHIPPS:  Objection to the
21     extent it calls for a legal conclusion.
22        THE WITNESS:  My understanding of
23     our statutory obligation is that we act in
24     the best interest, interest of the child,
25     subject to considerations of -- yeah, I'll

Page 24

1  just leave it there.
2  BY MS. AMIRI:
3    Q    Do you have any understanding that your
4  obligations changed with the passage of the
5  Trafficking Victims Protection Act of 2008?
6        Again, I'm not asking for your legal
7  conclusion, and maybe we can kind of have that
8  standing, standing objection.  I know you're a
9  lawyer.  You are here as the director of ORR who
10 is responsible for implementing these statutes, so
11 I'm not asking you in the capacity of -- you know,
12 it's a slightly strange animal, because you are an
13 attorney.
14   A    Right, right.
15   Q    But I --
16   A    I live with that animal every day.
17   Q    But I take Peter's objection, and you
18 can have a standing objection.
19        So kind of with that, do you know
20 whether the interests of the child or the best
21 interest statutory discussion was changed with the
22 passage of the Trafficking Victims Protection Act
23 in 2008?
24   A    No, not to my knowledge.
25   Q    So we'll look at the policy manual, and

Page 25

1  maybe I only have certain sections that may not be
2  the right ones, but . . .
3        (Exhibit 3 was marked for
4        identification.)
5  BY MS. AMIRI:
6    Q    I'm going to hand you what's been marked
7  as Exhibit 3, if you want to take a look at that.
8        (Witness peruses document.)
9        THE WITNESS:  Okay.
10 BY MS. AMIRI:
11   Q    Do you recognize this document?
12   A    Yes.
13   Q    What is it?
14   A    It appears to be Section 3.3 of our USC
15 Policy Guide.
16   Q    In the second bullet under the terms of
17 the Flores Settlement Agreement -- there is a
18 discussion of how care providers "must provide the
19 following minimum services for each unaccompanied
20 alien child in their care," and the second bullet
21 says "appropriate routine medical and dental care,
22 family planning services, including pregnancy
23 tests and comprehensive information about and
24 access to medical reproductive health services and
25 emergency contraception."

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 26

1    Is that current? Is this a current
2 policy statement?
3    A   Yes.
4    Q   What is your understanding of whether
5 abortion is included in that phrase I just read?
6    A   Could you restate the question?
7    Q   Sure.
8    What is your understanding of whether
9 abortion is included in appropriate routine
10 medical care? Let's just start there.
11   A   It is not.
12   Q   Why is it not?
13   A   It just falls outside of the definition
14 of routine, "appropriate routine medical care."
15   Q   Is there a policy document that says
16 that abortion falls outside of the definition of
17 routine medical care?
18   A   Yeah, could you rephrase the question?
19   Q   Sure.
20   Does ORR have a policy document that
21 says that abortion is not included in the
22 definition of "routine medical care"?
23   A   Not to my knowledge.
24   Q   So if it's your understanding that
25 abortion falls outside of routine medical care

Page 27

1 required under this policy guidance, where does
2 your understanding come from?
3    A   A number of, a number of places.
4    Q   Okay. Please enumerate them.
5    A   Well, gosh. It comes from kind of, in a
6 certain sense, the chain of command within our
7 department; it comes from legal advice from our,
8 from our policy division; it comes from
9 established policy and so on.
10   Q   So taking the first one with respect to
11 chain of command, has someone above you told you
12 that routine medical care does not include
13 abortion?
14   A   No.
15   Q   Have you, yourself, made the
16 determination that routine medical care does not
17 include abortion?
18   A   I'm sorry?
19   Q   Have you, yourself, made the
20 determination that routine medical care does not
21 include abortion?
22   A   What do you mean by have I myself made
23 that --
24   Q   Well, I'm confused about what you said.
25 You said the "chain of command." So if someone

Page 28

1 above you has not told you that abortion is not
2 included in routine medical care, I'm wondering if
3 you, yourself, have made the pronouncement or
4 decided that abortion is not part of routine
5 medical care.
6    A   I can't say it was myself, so no.
7    Q   Okay. So who was it?
8    A   It was the chain of command. It was
9 kind of everybody.
10   Q   But if there was nobody above you that
11 communicated to you that abortion is not included
12 in routine medical care under this policy, then
13 how did you come to learn that abortion is not
14 included in routine medical care as indicated in
15 this policy?
16   A   Well, part -- again it goes partly back
17 to established policy, but also I think this is a
18 governing assumption.
19   Q   Have you had any conversations with
20 anyone either above or below you in the chain of
21 command about whether abortion is included in
22 routine medical care in the policy that is marked
23 as Exhibit 3?
24   A   I don't know.
25   Q   You don't know?

Page 29

1    A   Right.
2    Q   With respect to the phrase in the
3 second, second bullet that references "access to
4 medical reproductive health services," what do you
5 interpret that to mean?
6    A   You know, any -- I mean it's kind of
7 self-evident. Health services relating to
8 reproduction.
9    Q   Does that include abortion?
10   A   No.
11   Q   Does abortion relate to reproductive
12 health services, putting this policy aside?
13   A   Can you repeat the question?
14   Q   So putting aside the policy and just in
15 terms of your regular lay opinion, if someone
16 asked you, does abortion relate to reproductive
17 health services?
18   A   It relates to it, yes.
19   Q   Okay. So then why is this policy
20 interpreted different from that lay understanding
21 of what abortion relates to?
22   A   Well, that's, that's a very broad
23 question. I don't think I'm authorized or -- I'm
24 not the person to answer that question.
25   Q   Who would be the person to answer that

8 (Pages 26 to 29)

1  question?
2      A   I don't know.
3      Q   As the ORR director, is it your position
4  that access to medical reproductive health
5  services does not include abortion?
6      A   Yes.
7      Q   Have you had conversations with you --
8  sorry.  Have you had conversations with anyone
9  above you with respect to that phrase "access to
10  medical reproductive health services" in this
11  policy marked as Exhibit 3?
12      A   I don't recall.
13      Q   Have you had any conversations with
14  anyone below you in the chain of command related
15  to this phrase "access to medical reproductive
16  health services"?
17      A   I don't recall.
18      Q   The policy also references
19  comprehensive, "comprehensive information about,"
20  and I'm curious as to your definition of
21  "comprehensive information" in this policy and
22  whether it involves information about abortion.
23      A   It could.
24      Q   When could it?
25      A   When the circumstances are appropriate.

1      Q   When are the circumstances appropriate?
2      A   That's a case-by-case determination.
3      Q   And who makes that determination?
4      A   It depends.
5      Q   Depends on what?
6      A   On the circumstances of the individual
7  case.
8      Q   Does anyone other than you make the
9  determination about whether comprehensive
10  information about medical reproductive health
11  services includes abortion other than you?
12      A   It could, yes.  It could happen that
13  way.
14      Q   Who are the other people who work at ORR
15  that could make a determination about whether
16  access to comprehensive information about abortion
17  is included in this policy manual?
18      A   That seems to me like a different
19  question than whether a specific UAC would receive
20  comprehensive -- what the UAC receives is going to
21  depend on the circumstance.
22      Q   I'm trying to ascertain:  Who makes the
23  determination about what services with respect to
24  comprehensive information about abortion the minor
25  receives?

1      A   That would be me.
2      Q   Okay.  Anyone other than you at ORR who
3  is permitted or has the authority to make that
4  determination?
5      A   No, not without my -- not without my
6  approval.
7      Q   So when this policy says "Under the
8  terms of the Flores Settlement Agreement, care
9  providers must provide the following minimum
10  services for each unaccompanied alien child in
11  their care," and it goes on to say that that
12  includes comprehensive, "comprehensive information
13  about medical reproductive health services," it's
14  your testimony that you make the determination
15  about whether "comprehensive information" can be
16  interpreted to include information about abortion?
17      A   Yes.
18      Q   Doesn't that seem to contradict the
19  policy?  Doesn't the policy say that care
20  providers "must" provide the following minimum
21  services?
22      A   I'm sorry?  Which policy?
23      Q   Exhibit 3.
24      A   I'm not following you.  Sorry.
25      Q   So above the first bullet, it says,

1  "Under the terms of the Flores Settlement
2  Agreement, care providers must provide the
3  following minimum services for each unaccompanied
4  alien child in their care."
5      A   Mm-hmm.
6      Q   "Must" is mandatory, right?
7      A   Yes.
8      Q   So if care providers "must" provide the
9  following information -- I'm sorry -- the
10  following minimum services, and then the second
11  bullet it includes "comprehensive information
12  about medical reproductive health services," then
13  how do you, as the director of ORR, have the
14  discretion to determine whether a particular minor
15  can have access to information about abortion?
16      A   I see.
17          The -- well, on the one hand, to the
18  extent that anything contained in here is policy
19  and just ORR policy, then that's something that
20  the director is, I guess, empowered to alter but
21  would be done as part of an internal deliberative
22  process.
23          To the extent that this reflects finding
24  a precedent, you know, as in the case of Flores or
25  statutory requirements, then, then the Office of

Page 34

1  the Director and all personnel would be following
2  statutes, settlements and such.
3        Q   So we'll definitely talk about the
4  Flores Settlement Agreement and statutes and
5  regulations, but I just wanted to focus
6  particularly on the policies right now.
7        A   Mm-hmm.
8        Q   So are you saying that, as the director
9  of ORR for the policy, that you have the ability
10 to override what's written in Exhibit 3?
11       A   To override?  I -- no.  I -- yeah, uh,
12 no.
13       Q   So as the director of ORR, you are
14 required to follow the policy in Exhibit 3 as
15 written?
16       A   I, I think, I think so.
17             MR. PHIPPS:  Again, I've got the
18 standing objection here on legal conclusions
19 here.
20             MS. AMIRI:  Sure.
21             MR. PHIPPS:  I'm not reraising it
22 out of just smoothness, but, but it is a
23 standing objection.
24             MS. AMIRI:  Absolutely.
25

Page 35

1  BY MS. AMIRI:
2        Q   With respect to the phrase "family
3  planning services" in the second bullet, what is
4  your understanding of what that term means?
5        A   A number of interventions related to
6  family planning.
7        Q   Does it include contraception?
8        A   It could.
9        Q   When could it?
10       A   When the circumstances are appropriate.
11       Q   And who makes the determination about
12 whether circumstances are appropriate?
13       A   Usually that's done at the program
14 level.
15       Q   Do you have any involvement, as the
16 director of ORR, in making determinations about
17 when an unaccompanied minor can have access to
18 contraception?
19       A   No.
20             (Exhibit 4 was marked for
21             identification.)
22 BY MS. AMIRI:
23       Q   I've marked as Exhibit 4 another aspect
24 of the policy manual.
25             (Witness peruses document.)

Page 36

1             THE WITNESS:  Okay.
2  BY MS. AMIRI:
3        Q   Do you recognize this document that's
4  been marked as Exhibit 4?
5        A   Yes.
6        Q   What is it?
7        A   It appears to be section 4.9.2, 4.9.3
8  and 4.9.4 of our Unaccompanied Alien Children
9  Policy Guide.
10       Q   So let's start with 4.9.2, and if you
11 could look at the second paragraph, and it says,
12 "If pregnancy results from an instance of sexual
13 abuse, the care provider must ensure that the
14 victim receives comprehensive information about
15 all lawful pregnancy-related medical services
16 within 24 hours of the positive pregnancy test."
17       A   Okay.
18       Q   Does "comprehensive information" in that
19 sentence include information about abortion?
20       A   It could.
21       Q   When could it?
22       A   At any, any time that that's
23 appropriate.
24       Q   Do you make the determination in the
25 context of a sexual assault in a shelter whether

Page 37

1  "comprehensive information" includes abortion when
2  there's a positive pregnancy test for a minor?
3        A   No.
4        Q   Who makes that determination?
5        A   Do I or -- so do I?  No.  I don't get
6  involved in that.  Who makes the determination?
7  This arises out of an Interim Final Rule and also
8  out of statutory languages, language, so in a
9  sense, Congress made that determination along with
10 the Department when the IFR was released.
11       Q   So when you're talking about the "IFR,"
12 you're talking about the Interim Final Rule
13 related to the Prison Rape Elimination Act?
14       A   Yes, yes.
15       Q   And we'll certainly talk about that
16 regulation, but just with respect to the Policy
17 Manual, I'm trying to understand what your
18 understanding is with respect to what
19 "comprehensive information" is interpreted to mean
20 by the Agency with respect to the policy manual.
21       A   Sure.
22             It -- well, I mean it's "comprehensive
23 information," whatever, whatever that means to the
24 person reading it.
25       Q   What does it mean to you?

10 (Pages 34 to 37)

Page 38

```
1           MR. PHIPPS:  Just for
2    clarification, is this in his layperson
3    capacity?  I know you asked previously about
4    laypersons.
5    BY MS. AMIRI:
6       Q   Correct.  No, this is in your, in your
7    position as the head of ORR.  What does
8    "comprehensive information about all lawful
9    pregnancy-related medical services" mean to you?
10      A   It means exactly what the language says,
11   so comprehensive information, so enough
12   information to make it comprehensive about what's
13   lawful and pregnancy-related and that are medical
14   services.
15      Q   Does it include abortion?
16      A   It could.
17      Q   As director of ORR, when do you think it
18   could?
19      A   Whenever the circumstances deem it
20   appropriate.
21      Q   Are there certain circumstances that
22   you, as the head of the Agency, have encountered
23   where you have believed that it was inappropriate
24   to provide information about abortion in the
25   context of a sexual assault at a shelter?
```

Page 39

```
1       A   No.
2       Q   Has a situation ever arisen where there
3    has been a positive pregnancy test of a minor as a
4    result of sexual abuse in a shelter in your time
5    at ORR?  And that includes both the transition
6    team and your current position.
7       A   No.
8       Q   So as director of ORR, you have not had
9    an opportunity to apply this policy, 4.9.2?
10      A   I don't know.
11      Q   Because you don't remember?
12      A   No.  Because of the phrasing of your
13   question.  Sorry.
14      Q   Well, I was trying to understand if --
15   let's back up.
16      A   Sure.
17      Q   4.9.2 relates to when a minor is
18   sexually abused while in ORR care.
19      A   Mm-hmm.
20      Q   Has there been a circumstance while you
21   have been at ORR, either as director or as part of
22   the transition team, where there has been a minor
23   who has been sexually abused at a shelter and has
24   a positive pregnancy test?  I believe you said no.
25      A   Right.
```

Page 40

```
1       Q   Okay.  So then my next question was:  So
2    it sounds then, it would follow that you have not
3    had an opportunity to interpret, in a concrete
4    situation, 4.9.2 as it relates to a particular
5    minor; is that fair?
6       A   Yes.
7       Q   If you could look at 4.9.4 related to
8    religious objections.
9       A   Mm-hmm.
10      Q   Do you know whether there are any care
11   providers that have submitted a plan to ORR under
12   4.9.4?
13      A   I don't know.
14      Q   Who would know?
15          MR. PHIPPS:  Object as to time
16   period of the submission of the plan.  Vague.
17          THE WITNESS:  Jonathan White
18   probably would know.  I guess he could,
19   could, yeah.
20   BY MS. AMIRI:
21      Q   Putting aside whether a formal plan has
22   been submitted to ORR, do you know whether there
23   are care providers that have a religious objection
24   to providing information for and/or access to any
25   of the required services outlined in this policy?
```

Page 41

```
1           MR. PHIPPS:  Objection.  Vague as
2    to "care provider."  I assume it's a care
3    provider working with ORR?
4           MS. AMIRI:  Yes.
5           MR. PHIPPS:  Just want to make
6    sure.
7    BY MS. AMIRI:
8       Q   Yeah, whatever the language is in the
9    policy is how I'm using it.
10      A   I don't know.
11      Q   Who would know the answer to that?
12      A   Perhaps Jonathan White.
13      Q   But as director of ORR, you have not
14   been asked to approve a plan submitted by a
15   religiously affiliated care provider related to
16   their religious objection to providing medical
17   care information that is required under this
18   policy?
19      A   No, not to my recollection.
20      Q   Okay.
21          Do you know whether, prior to you
22   becoming the director of ORR and prior to the
23   transition team, any prior ORR director has
24   approved a plan by a religiously affiliated care
25   provider that had an objection to providing
```

11  (Pages 38 to 41)

1    information or medical care under this policy?
2        A    No, I don't know.
3        Q    We were talking before about the Flores
4    Settlement Agreement, so let's take a look at
5    that.  We will mark it as Exhibit 5.
6            (Exhibit 5 was marked for
7            identification.)
8    BY MS. AMIRI:
9        Q    And I will tell you, so you don't have
10   to sit here and read the whole thing --
11       A    Sure.
12       Q    -- but what I'm going to ask you
13   about --
14       A    Thank you.
15       Q    -- yes -- is Exhibit 1.
16       A    Yes.
17       Q    And under "Minimum Standards for
18   Licensed Programs," I'm going to be asking about
19   A2.
20       A    Okay.
21       Q    So under A2 it says "Appropriate" -- I'm
22   sorry.
23           Let me back up and say under "A" it says
24   "Licensed programs shall comply with all
25   applicable state child welfare laws and

1    regulations and all state and local building,
2    fire, health and safety codes, and shall provide
3    or arrange for the following services for each
4    minor in its care," and number 2 says,
5    "Appropriate routine medical and dental care,
6    family planning services, and emergency health
7    care services."
8            With respect to the language in Flores,
9    what is your position, as ORR director, as to what
10   "routine medical care" means with respect to
11   abortion?  Does -- is abortion included in
12   "appropriate routine medical care"?
13       A    No.
14       Q    Where do you obtain that understanding?
15       A    In a number of places.  It's kind of the
16   same answer as the earlier question.
17       Q    We can go through that.
18           So we talked about the chain of command.
19   Have you had conversations with anyone above you
20   in the chain of command at HHS about whether the
21   Flores Settlement Agreement includes access to
22   abortion?
23       A    No.
24       Q    Have you had conversations with anyone
25   below you in the chain of command about whether

1    the Flores Settlement Agreement includes access to
2    abortion?
3        A    No.
4        Q    So before when you talked about your
5    understanding -- or I think when you were
6    referring to "it was the same answer," I assumed
7    that that was the answer, so when you talk about
8    the, the chain of command, I think previously you
9    had testified that it's just generally assumed.
10           Is that the same answer with respect to
11   the Flores Settlement Agreement?
12       A    I think so.
13       Q    So it is generally assumed in the chain
14   of command at HHS that the Flores Settlement
15   Agreement does not include access to abortion?
16       A    Yes.
17       Q    But you have not had a specific
18   conversation with anyone in the chain of command
19   about whether the Flores Settlement Agreement
20   includes access to abortion?
21       A    Right.
22       Q    With respect to family planning services
23   referenced in the Flores Settlement Agreement, is
24   it your understanding, as the director of ORR,
25   that that includes contraception?

1        A    It could.
2        Q    And who makes that determination about
3    whether it could?
4        A    As to a specific UAC, it's the, it's
5    the -- it's a number of people, but it's a
6    case-by-case determination.
7        Q    Who is involved in the decision whether
8    to allow a UAC to have access to family planning
9    other than the physician who is providing care to
10   the minor and the minor herself?
11       A    Well, the minor, the minor themselves --
12   so the physician providing care, potentially the
13   case manager, potentially the medical director of
14   the grantee, and -- yes, and it, it could, you
15   know, it could potentially go all the way up to
16   our medical department and so on.
17       Q    In what situation would it go all the
18   way up to the medical department of ORR, this
19   request for contraception for a minor?
20       A    Some, some wacky medical situation.
21       Q    Have you ever seen such a wacky medical
22   situation?
23       A    No.
24       Q    Has there ever been a minor's request
25   for contraception that has reached your level, a

Page 46

1  request for contraception?
2      A  No.
3      Q  Do you know if a request for
4  contraception has reached the level of
5  Dr. Bartholomew or any of the physicians that are
6  working with ORR?
7      A  I don't know.
8      Q  Do any of the people that you mentioned
9  get to override the minor's decision to have
10  access to contraception?
11     A  Well, they could.
12     Q  How so?
13     A  If it's medically contraindicated for
14  some reason.
15     Q  Would that be a medical decision or a
16  decision by someone else, like the grantee?
17     A  No.  It would, it would be a medical
18  decision.
19     Q  So in the context of religiously
20  affiliated shelters that have an objection to
21  providing access to family planning services
22  because they have an objection to providing access
23  to contraception, how are those grantees
24  complying -- well, I should say are those grantees
25  complying with the Flores Settlement Agreement?

Page 47

1      A  I'm sorry.  Could you, could you
2  rephrase the question?
3      Q  Yes.  Well, let me ask you this --
4      A  Sure.
5      Q  -- and I'll back up a little bit
6  further.
7          Do you know whether there are any
8  religiously affiliated shelters that refuse to
9  provide access to contraception for unaccompanied
10  minors?
11     A  I don't know.
12     Q  You don't know?
13     A  Right.
14     Q  Who would know the answer to that?
15     A  Potentially Jonathan White.
16     Q  Has anyone had a conversation with
17  you -- and I mean anyone at ORR -- about
18  religiously affiliated shelters' objection to
19  providing contraception or abortion?
20     A  Yes.
21     Q  And who -- we can go through them if
22  there's more than one, but let's start with one.
23  Who have you had those conversations with?
24     A  Oh, a number of people.  Jonathan,
25  Jonathan White was there, but our, our director of

Page 48

1  policy, my special assistant, and Ken Tota may
2  have been there.
3      Q  So was this a meeting?
4      A  Mm-hmm.
5      Q  Was counsel present at that meeting?
6      A  Anna Marie is legal counsel.  She's the
7  director of our policy division.
8      Q  That's Anna Marie Bena?
9      A  Yes.
10         MS. AMIRI:  Is there -- are you
11  asserting a privilege to Anna Marie Bena's
12  presence in that meeting?
13         MR. PHIPPS:  I don't know right
14  now.  If you want to know, we can, we can --
15         MS. AMIRI:  Let's put a pin it,
16  and let's come back.
17         I think we'll do this and then take
18  a break.
19         THE VIDEOGRAPHER:  Going off the
20  record at --
21         MS. AMIRI:  Oh, no, sorry.  Not
22  yet.  We are going to do one more exhibit.  I
23  was just giving a little preview.
24         THE WITNESS:  Okay.
25

Page 49

1          (Exhibit 6 was marked for
2          identification.)
3  BY MS. AMIRI:
4      Q  You don't have to look through
5  everything.
6      A  Sure.
7      Q  I wanted to first -- we talked before
8  about the Interim Final Rule with respect to the
9  Prison Rape Elimination Act.
10     A  Yes.
11     Q  If I say "PREA," you'll know what that
12  means?
13     A  Yes.
14     Q  Does Exhibit 6 look like what was
15  published in the Federal Register in terms of the,
16  the Preamble and the Final Rule itself?
17     A  It looks like it, yes.
18     Q  I wanted to ask you about the Preamble
19  in PREA related to working with faith-based
20  entities.
21         I can't find it.  If anyone finds it,
22  let me know.  It will be a race.
23         Yeah, okay, I found it.  I win.
24         77784 is the page number in the Federal
25  Register in the middle column, and I think it's

13  (Pages 46 to 49)

1  the first full paragraph.
2       "ORR is mindful that some potential and
3  existing grantees and contractors may have
4  religious or moral objections to providing certain
5  kinds of services, including referrals, for
6  example, for emergency contraception.  ORR is
7  committed to providing resources and referrals for
8  the full range of legally permissible services to
9  UCs who need them, helping to facilitate access to
10 these options and doing so in a timely fashion and
11 in a manner that respects diverse religious and
12 cultural background of UCs.  At the same time, ORR
13 is committed to finding ways for organizations to
14 partner with us, even if they object to providing
15 specific services on religious grounds."
16      As ORR director, have you
17 operationalized -- I guess is the best word --
18 this accommodation for religious objectors that is
19 here in the Preamble?
20    A   Yes.
21    Q   In what way?
22    A   By proceeding along, along -- by
23 proceeding according to its terms.
24    Q   So you follow the regulations in the
25 Preamble?

1     A   Yes.
2     Q   Is there a specific circumstance in
3  which there has been a religiously affiliated
4  shelter who has objected to providing something
5  that is required under the PREA IFR, and you
6  have -- you or someone in your office has made a
7  religious accommodation?
8     A   Since me coming on?
9     Q   Yes.
10    A   No.
11    Q   Are you aware of that happening prior to
12 you coming on?
13    A   I don't know.
14    Q   So when you had -- when you said that
15 you, you follow the Preamble, is there anything
16 that you have done in your time as ORR director in
17 your day-to-day work that has been -- or has
18 involved this Preamble?
19    A   No.
20    Q   But you're familiar with it?
21    A   Yes.
22    Q   And how did you become familiar with it?
23    A   Just by reading it.
24    Q   Does the Policy Manual that we looked at
25 before, 4.9.2, 4.9.3, 4.9.4, does it track

1  verbatim the PREA IFR?
2     A   I think so.
3         MR. PHIPPS:  Objection.  Personal
4     knowledge.
5  BY MS. AMIRI:
6     Q   Okay.  If it does, I don't think that we
7  necessarily need to go through the the, the same
8  questions.  I'm wondering, though, if your, your
9  questions about how you interpret the policy with
10 respect to the PREA IFR is different than how you
11 would interpret the regulations.
12    A   I would interpret both the same.
13    Q   Okay.  So -- just as an example, so when
14 the policy in 4.9.2, I think, references
15 comprehensive -- or sorry -- "lawful pregnancy
16 services" and I had asked you about whether that
17 encompasses abortion, to the extent that the PREA
18 IFR uses the same knowledge, you would interpret
19 both the PREA regulation and the policy the same?
20    A   Yes.
21        MS. AMIRI:  Okay.  Do you want to
22    take a break?
23        MR. PHIPPS:  Yeah, sure.
24        MS. AMIRI:  Do you want this to be
25    our lunch break?

1         MR. PHIPPS:  Yes.
2         MS. AMIRI:  Do you want to take a
3     half hour?
4         MR. PHIPPS:  Yes.
5         THE VIDEOGRAPHER:  Going off the
6     record at 1:11.
7         (Whereupon, the lunch recess was
8         taken.)
9         THE VIDEOGRAPHER:  We are going
10    back on the record at 1:53.
11 BY MS. AMIRI:
12    Q   So before the break we were talking
13 about a meeting where abortion would have been
14 discussed, and I believe that you talked that
15 there were different people in that meeting,
16 including Anna Marie Bena, and I wanted to make
17 sure that there wasn't going to be an assertion of
18 attorney/client privilege that would prevent me
19 from asking questions about that meeting, ad I
20 understand that there is not, although there may
21 be other objections that may come back, I just
22 wanted to turn our attention back to that meeting,
23 and, and maybe if you can restate who was at the
24 meeting and what, what the purpose of the meeting
25 was for.

1    A   Sure.
2        Going by memory, Jonathan White, Anna
3    Marie Bena, perhaps Ken Tota,                , my
4    assistant.  That's all I recall.
5    Q   And when was this meeting?
6    A   Oh, that would be early.  I'm going to
7    guess March/April.
8    Q   2017, obviously?
9    A   Yeah.
10   Q   Okay, and what was the purpose of the
11   meeting?
12   A   I don't recall, just because we, we have
13   a lot of meetings, and it may have come up in a --
14   I don't remember if it was a discrete meeting on
15   this issue or if it was brought up in a broader
16   meeting.
17   Q   But abortion was discussed?
18   A   No.  This is, this is, as I recall, a
19   religious accommodation.
20   Q   I see.  Okay, but when we're talking
21   about "religious accommodation," we're talking
22   about religious accommodation to access to
23   abortion and contraception?
24   A   I, I, I don't recall in a sense.  Yeah,
25   I don't recall.

1    Q   So when you talk about the religious
2    accommodation at issue in this case, you
3    understand it to be that it's a religious
4    accommodation to access to abortion and
5    contraception?
6    A   That would be my assumption in this
7    case.
8    Q   Okay.  Do you know whether, as a result
9    of that meeting, new policies were adopted with
10   respect to religious accommodations for access to
11   abortion and contraception?
12   A   Yes.
13   Q   And what was that policy?
14   A   Sorry.  The question was do I recall?
15   Yes, I recall.
16   Q   And also then what was that policy?  If
17   a policy came out of that meeting, what was that
18   policy?
19   A   No policy came out of the meeting.
20   Q   Did a practice come out of that meeting?
21   A   No.
22   Q   Okay.  So were there any -- were there
23   any changes in the way that ORR handled religious
24   accommodations by religiously affiliated
25   contractors that had -- or grantees that had

1    objections to providing contraception or abortion?
2    A   No, no.
3    Q   So there were no changes after that
4    meeting?
5    A   Right.
6    Q   Okay.  So then what was the purpose of
7    that meeting?
8    A   I don't recall what information
9    regarding a request for -- I don't recall the
10   overall purpose, but specific to this issue,
11   informational to advise me of a religious
12   accommodation request.
13   Q   So it was a religious accommodation
14   request by a grantee?
15   A   Yes, I believe.
16   Q   Okay, and do you remember which grantee?
17   A   No.
18   Q   Have you been involved personally, at
19   your time at ORR, either before you became the
20   director or after, in negotiating any cooperative
21   agreements with religiously affiliated entities
22   and as they pertain to this accommodation for
23   religious -- sorry -- accommodation for
24   abortion/contraception?
25   A   Prior to --

1    Q   Anytime that you've been at ORR in any
2    capacity.
3    A   Oh, since -- I misheard you.  So since
4    coming on ORR, have I been involved in negotiating
5    any --
6    Q   Cooperative agreements with any
7    religiously affiliated grantees as those
8    cooperative agreements pertain to abortion and
9    contraception.
10   A   No.
11   Q   Are you aware of whether anyone at your
12   agency has negotiated cooperative agreements with
13   religiously affiliated entities that pertain to an
14   objection to providing access to
15   abortion/contraception?
16   A   I don't know.
17   Q   Who would know the answer?
18   A   It would depend on which, which grantee,
19   which program.
20   Q   Do you personally sign cooperative
21   agreements?
22   A   Yes.
23   Q   Do you personally approve the terms of
24   cooperative agreements?
25   A   Yes.  That's implicit in signing.

Page 58

1    Q   Have you signed any cooperative
2  agreements with religiously affiliated grantees
3  that contain a religious objection to
4  contraception or abortion?
5    A   I don't know.
6    Q   You don't know if you, you signed an
7  agreement, or you don't remember if that
8  accommodation was in there?
9    A   Oh, yeah, I don't remember if it was in
10  there.
11    Q   Do you remember seeing any language at
12  all in any cooperative agreement with any entity
13  related to a religious objection to providing
14  abortion or contraception?
15    A   Yes.
16    Q   And do you remember the grantee?
17    A   Oh, no.
18    Q   Do you remember what the language said?
19    A   I remember some of the language.
20    Q   What is -- I'm not asking for a direct
21  quote.
22    A   Sure.
23    Q   But if you can paraphrase for me what
24  the cooperative agreement that you remember said.
25    A   By my memory?

Page 59

1    Q   Yes.
2    A   It's similar, similar language to what
3  you find in the Preamble to PREA --
4    Q   Okay.
5    A   -- regarding religious accommodations.
6    Q   Okay.
7        Have you personally been involved in
8  placement decisions related to a minor who is
9  seeking an abortion and a placement decision that
10  was affected by whether a grantee had a religious
11  objection to abortion or contraception?
12    A   No.
13    Q   Have you been involved in any individual
14  minor's circumstances where she has requested an
15  abortion and needed to be transferred because the
16  grantee where she was residing had a religious
17  objection to providing access to abortion?
18    A   I'm sorry. Could you -- I missed the
19  first part.
20    Q   Yes.
21        Have you personally been involved in the
22  decision to transfer a minor out of a religiously
23  affiliated shelter that has a religious objection
24  to abortion to another facility because she
25  requested an abortion?

Page 60

1    A   No.
2    Q   Do you know whether, since your time at
3  ORR, that has happened, that a minor has requested
4  an abortion at a religiously affiliated shelter
5  and has been transferred to a shelter that doesn't
6  have a religious objection to abortion?
7    A   I don't recall.
8    Q   Can you walk me through how it works
9  when a minor requests an abortion at ORR.
10    A   All of our UACs receive routine medical
11  services and also regular clinical intervention
12  counseling services, both on an individual and
13  group basis, and there's just counseling or
14  clinical services available generally.
15        And so at some point it's raised to
16  either -- oftentimes a UAC will find out she's
17  pregnant during a, during the initial medical exam
18  or will have known and will disclose at some
19  point during the initial process. Usually it
20  happens by one of those two means, by
21  self-disclosure or discovering it during the
22  initial medical exam.
23    Q   And let's say then the minor requests an
24  abortion to her doctor or the grantee. Then what
25  happens?

Page 61

1    A   Then, then it would be essentially
2  through the medical staff -- I was about to say
3  staff. Through the grantee medical staff, it
4  would go to ORR medical staff, sometimes perhaps
5  through federal field staff who aren't necessarily
6  medical personnel, and then would go through our
7  medical department, DHUC, Division of Health for
8  Unaccompanied Children. Sometimes directly to me,
9  with Jonathan White copied, or sometimes through
10  Jonathan White to me.
11    Q   And when you talk about how this comes
12  through, is it through a Significant Incident
13  Report or some other mechanism?
14    A   It's, it's, it's more through -- a
15  Significant Incident Report may trigger it, or it
16  could be a less formal means of communication. It
17  usually wouldn't come to me in the form of a
18  Significant Incident Report. It would be more of
19  an email, usually, either from Michael Bartholomew
20  or Jonathan White.
21    Q   And when you get the request for an
22  abortion, what is your role at that point?
23    A   To, to gather information.
24    Q   And how do you do that?
25    A   I read the record that's provided, and

16 (Pages 58 to 61)

1  if there's anything that needs to be further
2  developed, I'll, I'll request that information.
3      Q   What would be an example of something
4  that needs to be further developed?
5      A   Oh, you know, sometimes the, the nature
6  of the relationship that gave rise to pregnancy,
7  prospects for sponsorship, any medical conditions,
8  how far along she is in the pregnancy.  It could
9  be, could be any of those factors.
10     Q   Why does the manner in which she became
11 pregnant affect your analysis?
12     A   It's just the number of -- it's one
13 among the many potentially relevant facts.
14 It's -- we, we are seeking to understand the
15 totality of the circumstances, and so I guess it
16 goes to the totality of the circumstances,
17 understanding that.
18     Q   To, to what end?  To make the final
19 determination of whether to approve the abortion?
20     A   Yeah, I mean that would be -- it would
21 be a piece of information we would need to know to
22 make that determination.
23     Q   Is there a difference in your mind of
24 whether a minor is pregnant as a result of rape or
25 if she's not in terms of whether she may be

1  granted the permission to have the abortion?
2      A   There, there is a difference.
3      Q   And why is that?
4      A   It's just from the 2008 policy, it
5  treats the two differently.
6      Q   Does it treat the two differently with
7  respect to the substantive decision about whether
8  she can have the abortion or with respect to
9  funding?
10     A   Well, does the 2008 policy?
11     Q   Yes.
12     A   My understanding is that it's related to
13 the funding.
14     Q   So if there's a decision about funding
15 with respect to the nature of the pregnancy, does
16 the nature of the pregnancy matter to you in terms
17 of your decision about whether to permit the
18 abortion or not?
19     A   Yeah.  All circumstances, the nature of
20 the pregnancy among them, matter.
21     Q   You also mentioned how far along she is.
22 Why does that matter in terms of your decision to
23 permit the abortion or not?
24     A   It's just some information that you
25 expect to be part of a like well-developed medical

1  record, and its absence would be puzzling.  I
2  don't know that we really had to chase that
3  information down, but it's -- it's possible that
4  we may have, but in any case just to understand
5  the totality of the circumstances.
6      Q   Why is the sponsor relevant in your
7  determination -- or the possibility of a sponsor
8  relevant in your determination about a minor's
9  request for abortion?
10     A   This is a person who is going to inherit
11 that, you know, care for that individual, and we
12 need to have some rudimentary understanding of --
13 not just rudimentary -- actually a detailed
14 understanding of what that individual is prepared
15 to take on, and also, also factors related to
16 whether the UAC is related to the sponsor or how
17 far along the sponsorship process is could affect
18 a determination about a pregnancy termination.
19     Q   Have you ever approved an abortion
20 request in your time as ORR director?
21     A   No.
22     Q   Are there any circumstances under which
23 you would approve an abortion request?
24         MR. PHIPPS:  Objection.  Calls for
25 speculation.

1          THE WITNESS:  Well, I was going to
2      not answer that.
3  BY MS. AMIRI:
4      Q   Well, you can still answer it.
5      A   I don't, I don't know.
6      Q   Are there any -- let me back up.
7          You have denied abortion requests,
8  correct?
9      A   Yes.
10     Q   You have denied abortion requests even
11 in the context where the pregnancy is as a result
12 of rape, right?
13     A   Yes.
14     Q   So it sounds like if the young woman has
15 been raped, that is not a determining factor about
16 whether you would allow the abortion, right?
17     A   It could be.
18     Q   But it hasn't yet?
19     A   No.
20     Q   You're personally opposed to abortion,
21 correct?
22     A   Yes.
23     Q   You've written on the subject?
24     A   Yes.
25     Q   You're personally opposed to

17 (Pages 62 to 65)

Page 66

1  contraception, correct?
2      A   Depends.
3      Q   You wrote an article that said in order
4  to be pro-life, you need to be anti-contraception?
5      A   That was the title of the article,
6  something along those lines.
7      Q   Right.  So you have, have written on the
8  subject?
9      A   I have written on subjects related to
10  those things, yes.
11      Q   And you believe that unaccompanied
12  minors have no constitutional right to abortion?
13      A   That's legal speculation.
14          MR. PHIPPS:  Objection.
15          THE WITNESS:  I mean --
16  BY MS. AMIRI:
17      Q   You're an attorney.  I'm not asking you
18  for your, your legal understanding in like the
19  context of the defense of this proceeding.  I'm
20  asking you in terms of what you as the ORR
21  director believe.
22      A   Okay.  Then please restate the question.
23      Q   Do you believe that unaccompanied
24  immigrant minors maintain a constitutional right
25  to access abortion?

Page 67

1          MR. PHIPPS:  I'll object.  I know
2  there's a standing objection, but this is,
3  this is such a pure legal question that I am
4  going to, for the sake of it calls for a
5  legal conclusion.
6          MS. AMIRI:  Duly noted.
7          THE WITNESS:  And I've declined to
8  answer that in a number of settings, because
9  we have legal representation on that, on that
10  point.
11  BY MS. AMIRI:
12      Q   I understand that, but we're here at a
13  deposition, and absent an instruction by counsel
14  for you not to answer the question, you must
15  answer the question.
16      A   Okay.  So do I believe --
17      Q   Yes.  Do you believe that unaccompanied
18  minors have no constitutional right to abortion
19  because of their immigration status?
20      A   Do I believe that unaccompanied children
21  have no constitutional right to abortion --
22      Q   Because of their immigration status.
23      A   Yes.
24      Q   So in what universe of facts could
25  present themselves to you that would lead you to

Page 68

1  approve an abortion request?
2      A   I don't know.
3          MR. PHIPPS:  Objection.  Calls for
4  speculation.
5  BY MS. AMIRI:
6      Q   If the young woman's life was in
7  jeopardy if she carried the pregnancy to term.
8      A   Potentially.
9      Q   Potentially that would lead you to
10  approve the abortion?
11      A   (Nods.)
12      Q   Do you believe that --
13      A   Actually, if I could, that wouldn't even
14  come up to my desk.  That would be a -- that would
15  be an emergency, and there's a, there's a blanket
16  emergency exception.
17      Q   To the policy?
18      A   Well, I mean it's not an exception to
19  the policy.  It's a part of the policy that any
20  medical emergencies -- I mean, you know, as part
21  of the 2008 policy, no medical emergency requires
22  approval from me in any circumstance.
23      Q   So if there was a true medical
24  emergency, then you would not be in a position to
25  grant or deny the abortion?

Page 69

1      A   Right, or any medical procedure.
2      Q   And if a woman, young woman is raped in
3  the shelter and becomes pregnant as a result and
4  requests an abortion, would you approve an
5  abortion in that circumstance?
6          MR. PHIPPS:  Objection.  Calls for
7  speculation.
8          THE WITNESS:  Potentially.
9  BY MS. AMIRI:
10      Q   Isn't that what the regulations require
11  under PREA?
12      A   Well, again, I mean it's speculative, so
13  we would look at the circumstances and/or
14  requirements under regulations and the law and
15  everything else.
16      Q   Doesn't PREA explicitly say that she
17  must have access to all lawful pregnancy-related
18  services?
19      A   Yes.  If that's what it says, that's
20  what it says.
21      Q   Is abortion a lawful pregnancy-related
22  service?
23      A   Yeah.
24          (Exhibit 7 was marked for
25          identification.)

18 (Pages 66 to 69)

Page 70

```
 1              (Discussion was held off the
 2        record.)
 3   BY MS. AMIRI:
 4     Q    Okay.  Exhibit 7.  You may not have seen
 5   these.  These are the interrogatories that we
 6   propounded to counsel.  Jonathan White is the one
 7   who signed them, but I wanted to draw your
 8   attention to a couple of the answers to
 9   interrogatories and ask you about whether they
10   reflect ORR policy.
11          So if you can turn to page 3.
12     A    Okay.
13     Q    So about halfway down the page, it says
14   that "if pregnancy results from an instance of
15   sexual abuse, care provider facility must ensure
16   the victim receives timely and comprehensive
17   information about all lawful pregnancy-related
18   medical [care] and timely access to all lawful
19   pregnancy-related medical services."
20          So this is an answer that your attorneys
21   wrote in response to our interrogatory request,
22   which is described "defendant's interpretation of
23   the extent of their obligation and their grantee's
24   obligation under regulations implementing the
25   Prison Rape Elimination Act to provide UCs with
```

Page 71

```
 1   access to family planning information services,
 2   including abortion."
 3          So I wanted to ask you, given our
 4   conversation a couple minutes ago, whether what is
 5   in this interrogatory response on page 3 that I
 6   read you reflects your understanding of what ORR's
 7   policy is with respect to permitting abortion
 8   access for minors who have suffered sexual abuse
 9   in a shelter.
10     A    Yes.
11     Q    And if you turn to page number 4 -- oh,
12   I'm sorry.  Can we back up for just a second and
13   talk about the faith-based policy there?
14          On the bottom of page 3, this is the
15   accommodation we talked about before that is in
16   the IFR, and it says that "ORR is committed to
17   providing resources and referrals for the full
18   range of legally permissible services to UCs who
19   need them, helping to facilitate access to these
20   options, and doing so in a timely fashion and in a
21   manner that respects the [diverse] religious and
22   cultural backgrounds of UCs."
23          So when it talks about ORR's commitment
24   to providing resources and referrals for the full
25   range of legally permissible services and helping
```

Page 72

```
 1   to facilitate these options, do you understand
 2   that to mean that when a religiously affiliated
 3   shelter has an objection to providing access to
 4   abortion to a minor who has suffered sexual abuse
 5   in a shelter, that ORR will help instead
 6   facilitate access to abortion?
 7     A    Yeah, I mean it's a speculative question
 8   potentially, I mean as we're going to follow the,
 9   the regulations as written.
10     Q    It also then says "and doing so in a
11   timely fashion."
12          Do you know what guarantees are in place
13   to ensure that a minor receives access to abortion
14   in a timely fashion if the religiously affiliated
15   shelter has an objection?
16     A    Our, our policy itself is, is a
17   guarantee.
18     Q    Are there any requirements, for example,
19   that within 24 hours of the minor requesting an
20   abortion after she's been sexually abused at a
21   shelter, there must be an appointment with a care
22   provider who can talk to her about her options?
23     A    I'm not aware of of, of that.  Just, just
24   our policy, what the policy says.
25     Q    So is there any policy or guidance or
```

Page 73

```
 1   practice that explicates what it means to ensure
 2   access in a, quote, "timely fashion"?
 3     A    I don't know.
 4     Q    If there is, you're not aware of one?
 5     A    If there is, I'm aware of where it would
 6   be, which is our Operational Guide.
 7     Q    Okay, and your Operational Guide is
 8   different than the Policy Manual, correct?
 9     A    Yes.
10     Q    If you look on page 4, interrogatory 3
11   asks, "Describe the criteria Defendants have used
12   to transfer UCs between grantees when a UC
13   requests abortion services."
14     A    Sorry.  I don't see --
15     Q    On page 4.
16     A    On page 4?
17     Q    Interrogatory number 3.  I was just
18   reading the interrogatory.
19     A    Oh, gotcha.  Yep.
20     Q    And if you want to take a minute and
21   read the supplemental response.
22          (Witness peruses document.)
23          THE WITNESS:  Okay.
24   BY MS. AMIRI:
25     Q    So the supplemental response to
```

19 (Pages 70 to 73)

Page 74

```
 1   interrogatory 3 says, "There are no published
 2   criteria governing transfer of UCs when a UC
 3   requests abortion services, but, when a UC
 4   requested abortion services, and where the
 5   religiously affiliated grantee or subgrantee had
 6   objections to such services, the federal field
 7   specialist, in conjunction with the central
 8   office, effectuated the transfer of the UC."
 9           My question is:  Is that still ORR's
10   policy?
11       A   Yeah, I mean that describes a, kind of a
12   series of events, and that's how those series of
13   events would unfold.
14       Q   I noticed that this is written in the
15   past tense, and so my question is whether this is
16   the current policy of ORR when there's a religious
17   objection by a shelter to provide access to
18   abortion.
19           MR. PHIPPS:  I just object to the
20   use of the word --
21           MS. AMIRI:  Characterization?
22           MR. PHIPPS:  "Policy" and then,
23   yeah --
24   BY MS. AMIRI:
25       Q   Sure.
```

Page 75

```
 1       A   I would, I would expect things to unfold
 2   as described here.
 3       Q   But only after you approve the abortion?
 4       A   No, no.  I'm sorry.
 5       Q   So just --
 6       A   Yeah, I mean this hasn't come up, and
 7   so -- I mean this is -- I don't know how we
 8   would -- how exactly it would unfold, in light of
 9   the policy that kind of already exists.
10       Q   Well, it did come up in the context of a
11   minor who was transferred between ███ and ███
12   correct?
13       A   Yeah.  I mean that's my recollection.
14       Q   So this has happened while you've been
15   at ORR even though you haven't necessarily been
16   the director of ORR when it happened?
17       A   Well, I don't recall.
18       Q   Well, we'll get some documents that
19   maybe will refresh your recollection --
20       A   Sure.
21       Q   -- but my question is:  Sitting here
22   today as the ORR director, if a UC requests
23   abortion services, and she's at a religiously
24   affiliated grantee, do you at that point transfer
25   her to a grantee that has no objection to
```

Page 76

```
 1   providing the services?
 2       A   I said, yeah, I believe that's the
 3   standing policy.
 4       Q   Or would you continue to have her placed
 5   at a religiously affiliated entity that has a
 6   religious objection to abortion because you would
 7   just deny her abortion?
 8       A   That's, that's speculative.  I don't
 9   know.
10       Q   Well, when we get to the ███ documents,
11   perhaps then will . . . .
12           Do you know whether any minor has been
13   unable to receive abortion or contraception
14   because of the religious entity's objection to
15   providing that service?
16       A   No.
17       Q   No, you don't know, or no, that hasn't
18   happened?
19       A   I don't recall that happening.
20       Q   If it happened, would you know?
21           MR. PHIPPS:  Objection as to time
22   period.  This is during his time --
23   BY MS. AMIRI:
24       Q   Sure, during your time period -- unless
25   otherwise stated, at your time at ORR, regardless
```

Page 77

```
 1   of what title you have held.
 2       A   Sure.  Okay.
 3       Q   So during that period of time that
 4   you've been at ORR, are you aware of whether any
 5   minor has been unable to receive abortion or
 6   contraception because of the religious objection
 7   of the shelter within which she resides?
 8       A   I, I am aware.  I have a pretty firm
 9   recollection.
10       Q   You are aware that that has happened?
11       A   No, that that has not happened.
12       Q   Okay.  So just to clarify, you -- it is
13   your recollection that no minor has been unable to
14   receive abortion or contraception because of the
15   religious objection of a grantee?
16       A   Yes, in my recollection.
17       Q   Okay.
18           In the 2008 Significant Incident
19   Policy -- do you want to go back to Exhibit 2?
20       A   Exhibit 2?
21       Q   Yeah.  Does this policy cover pregnancy
22   in general?
23       A   Not necessarily.
24       Q   When would it necessarily?
25       A   When it involves a medical service
```

20  (Pages 74 to 77)

1  requiring heightened ORR involvement.
2      Q   So if a minor becomes pregnant and she
3  has an uncomplicated pregnancy, an uncomplicated
4  delivery, that pregnancy doesn't --
5      A   Probably delivery would, would be a
6  significant -- or yeah -- sorry -- medical service
7  requiring heightened ORR involvement.
8      Q   And what does that look like?  Does
9  that -- do you approve how a minor gives birth or
10  a C section?
11      A   No, no.  It's, it's -- and, and
12  actually, I'll just back up and describe any, any
13  significant medical procedure, and we'll use the
14  example of wisdom teeth, which is a common one.
15      We contract with a medical services --
16  not exactly a provider, but they're an entity that
17  negotiates with the providers on ORR's behalf on
18  price and related details, and so that -- wisdom
19  teeth would be something that we contact -- or I
20  guess program medical staff contact the PSC and
21  coordinate with, with our medical staff to find a
22  provider in the area who can provide and --
23  provide the wisdom teeth extraction and then give
24  an indication as to what the price would be, and
25  that, that's kind of written up in a document.

1      I mean if you were to have the document
2  in your hand, it would be a folder with background
3  materials, and then also kind of a decision memo
4  where the -- in most cases, the, the question of
5  payment is before me where I would say approved or
6  disapproved, and I would check the appropriate box
7  at signing.
8      Q   But the March 21, 2008 memo, which is
9  marked as Exhibit 2, is not just about payment,
10  correct?
11      A   Correct.
12      Q   So in the context of the wisdom teeth
13  example, do you personally approve whether a minor
14  can get her wisdom teeth removed?
15      A   The, the question of payment is
16  essentially, in most cases, prohibitive.  If we
17  were ever to say no, it probably wouldn't happen.
18  So usually there's only one question, and that's
19  the question of payment.
20      Q   Payment, okay, but let's talk about
21  pregnancy, and I wasn't actually joking about
22  whether -- what it means for you to be involved in
23  the delivery decisions.
24      This is -- this policy is not just --
25  this policy that's marked as Exhibit 2 is not just

1  about payment.  It's about making -- having
2  certain involvement by ORR in certain decisions.
3      And so, you know, we mentioned delivery,
4  and so in what context does it come up where the
5  minor who is delivering a baby has some sort of
6  medical issue that reaches your desk?
7      A   It hasn't come up, to my recollection,
8  since being ORR director, but, you know,
9  potentially any procedure related to pregnancy
10  could come across my desk, but your question, I
11  think, went to, to my involvement, which is
12  somebody has to -- the director has to put his
13  signature on the payment in that instance, but my
14  involvement is not as a medical professional, but
15  as, you know, somebody who needs to provide the
16  authorization.
17      And usually the record is very well
18  developed by the time it gets to my desk, and so
19  there's not much for me to consider, but if
20  anything looks weird, I would, I would ask a
21  question about it.
22      Q   So have you had any minors deliver their
23  babies while in ORR custody since you've been in
24  ORR?
25      A   Yes, I think so.

1      Q   And so when that has happened at the
2  delivery stage, something comes to you with
3  respect to their delivery, and you, you approve it
4  or you approve the payment for it?
5      A   Actually, I don't recall a delivery ever
6  coming to, to my desk, so it may be that we're
7  categorizing that as like "routine."
8      Q   I see.
9      So you, you think that the delivery may
10  be routine medical care, and it's not coming to
11  you under this heightened involvement policy?
12      A   Right.
13      Q   Okay.
14      You mentioned in the context of
15  pregnancy that you're not a medical provider and
16  don't make medical decisions, but in the abortion
17  context you were listing a number of factors that
18  you consider when deciding to approve an abortion
19  decision or not.
20      So can you explain to me the difference
21  between those factors that you consider for
22  permitting an abortion versus the factors that are
23  medical relating to delivery.
24      A   Well, we, we would receive -- or if we
25  didn't receive it, we would request it -- an

Page 82

1   analysis as to whether there's a medical
2   indication for the abortion, whether it's
3   medically indicated, and then beyond that, there
4   are other factors that go into the decision for
5   abortion.
6        Q   But those other decisions are not
7   medical factors, right?
8        A   No.
9        Q   Okay.  So what, what determines -- or
10  how, how do you determine what factors to consider
11  in approving or denying abortion requests if there
12  are nonmedical factors?
13       A   What we're going for is the totality of
14  the circumstances, so whether we know -- whether
15  it's been communicated, I guess, everything we
16  know about the case up to you, know, the
17  decision-makers, Office of the Director, I would
18  say is what's going to be relevant.
19       Q   But totality of the circumstances to
20  what end?  I think that I'm missing something,
21  because usually there is some, you know, criteria
22  that you are employing and thinking about the
23  totality of the circumstances for some sort of
24  result.
25       So what, what ultimately are you doing

Page 83

1   in your analysis if it's not a medical
2   decision-making process?
3            MR. PHIPPS:  Characterization.  I'm
4        not sure he said it wasn't medical.  I think
5        he said it wasn't entirely medical.  I mean I
6        don't know, I don't know if that's right, but
7        I just want to --
8            MS. AMIRI:  Okay.
9   BY MS. AMIRI:
10       Q   You're not a medical provider?
11       A   Right.
12       Q   So you don't make, you don't make
13  medical decisions on behalf of the unaccompanied
14  minors in your care?
15       A   Well, I'm involved in the approval
16  process, but I don't make the medical
17  recommendation.  The medical team makes the
18  medical recommendations.
19       Q   So I mean, for example, a minor had a
20  placenta previa and she was at risk for
21  chorioamnionitis, would you be in a position to
22  make a determination about whether that abortion
23  was medically indicated or not?
24       A   No, no.  That would be the medical staff
25  who makes that determination.

Page 84

1        Q   Okay.  So let's talk about the
2   non-medical factors that you talked about before,
3   which involved the way in which she became
4   pregnant, sponsorship.  You also talked about how
5   far along she was in pregnancy.
6            Where does that criteria come from?  Did
7   you determine that those are the things that you
8   wanted to consider in deciding whether to allow an
9   abortion to happen?
10       A   There's -- the criteria is totality of
11  circumstances, and there's no formal written
12  criteria.  It's people working together as a team
13  to develop the record as fully as possible, given
14  our limitations.
15       Q   Right, but I'm trying to understand
16  where those criteria come from.
17           For example, did Steven Wagner say to
18  you:  "Welcome to the job of being ORR director.
19  When an abortion request comes to you, these are
20  the three things that you need to consider, and
21  then you make a determination of whether to allow
22  the abortion or not."
23           Did anyone in your higher chain of
24  command say that those were the criteria to
25  consider?

Page 85

1        A   No.
2        Q   Did anyone in the chain of command
3   beneath you suggest that those were the criteria
4   to use to determine whether to allow an abortion
5   to happen?
6        A   No.
7        Q   So my question to you is like where,
8   where did they come from, like how were they
9   arrived at?
10       A   Deliberative process.
11       Q   So that is you -- are you invoking a
12  privilege by saying "deliberative process"?
13       A   I'm just describing the reality.
14       Q   So it's you and your other colleagues
15  deliberated and came up with this criteria?
16       A   Yes.  Yeah.  I mean yeah.
17       Q   All right.  So the criteria is how far
18  along the woman is, young woman is, whether she
19  became pregnant as a result of rape --
20       A   It's case by case.
21       Q   I understand the ultimate determination
22  is case by case, but I'm trying to understand what
23  criteria you use to make the ultimate
24  determination.
25           And so when you talk about how you have

22 (Pages 82 to 85)

Page 86

1  deliberated over this with your colleagues, I'm
2  trying to understand the various criteria that are
3  used in that deliberation.
4      A   The totality of the circumstances.
5      Q   I understand that is what you
6  consider, but before you had also talked about
7  very specific things that you considered,
8  including whether she was pregnant as a result of
9  rape; is that right?
10     A   Yes.
11     Q   Okay.  You also consider whether there
12 is a sponsor available, correct?  Yes?
13     A   Yes.
14     Q   For the court reporter, you need to have
15 a verbal answer.
16     A   Sure.
17     Q   Also you talked about how far along she
18 was in her pregnancy, correct?
19     A   Yes.
20     Q   Okay, and you also talked about whether
21 there are medical indications?
22     A   Yes.
23     Q   Are there any other criteria that I have
24 not covered that you consider when making an
25 abortion decision?

Page 87

1      A   Clinical criteria?  They're receiving
2  clinical psychological services, so mental
3  condition, I guess you would say.
4      Q   Her mental health?
5      A   Mm-hmm.
6      Q   Okay.
7      A   And, and other factors.
8      Q   But you are not a psychologist?
9      A   No, I'm not a psychologist.
10     Q   Okay, and I think at the end you said
11 there might be other factors.  Are there other
12 factors?
13     A   Yes, there could be.
14     Q   Anything that comes to mind from the
15 past -- let's start there -- of the abortion
16 requests that come across your desk since you've
17 been at ORR?
18     A   Family circumstances.
19     Q   In what sense?
20     A   Well, you know, the condition of the
21 family, who, who lives where, are the family -- is
22 the family involved in sponsorship, and, you know,
23 are they aware of the pregnancy and so on.
24     Q   Do you have a requirement that all
25 pregnant minors either tell their parents about

Page 88

1  their pregnancy or you instruct the federal field
2  staff or the shelter to do so?
3      A   It's a case-by-case basis.
4      Q   So as, you know, we have seen from the
5  documents, there are times when a minor has been
6  adamant that her parents not be notified, and you
7  have instructed that the parents be notified
8  against her wishes.
9          Is that true?
10     A   Yeah, I mean you're characterizing it,
11 so you're asking me to accept a characterization.
12     Q   We can, we can pull up, we can pull up
13 the email if that would be helpful.
14     A   Sure.
15     Q   And we'll certainly get to that.  We'll
16 get to that.
17         Do you remember doing an interview with
18 Eternal World television network?
19     A   Yes.
20     Q   On that interview you said that you
21 were, were potentially considering making changes
22 to ORR's policy with respect to abortion.
23     A   That's not what I said.
24     Q   What did you say?
25     A   I don't recall, but do you have the

Page 89

1  transcript?
2      Q   I don't.  We could probably get it
3  during a break.
4      A   Okay.
5      Q   Are you considering making any changes
6  to the policy with respect to abortion?
7          MR. PHIPPS:  Wait.  This may be
8  deliberative process privilege.  I might need
9  a minute.
10         MS. AMIRI:  Do you want -- or we
11 can put a pin in it and come back.
12         MR. PHIPPS:  Yeah.
13         (Discussion was held off the
14         record.)
15 BY MS. AMIRI:
16     Q   Let us look quickly at a Significant
17 Incident Report just so I have a sense of whether
18 this is still the process.
19         (Exhibit 8 was marked for
20         identification.)
21         MS. AMIRI:  I should also say that
22 some of these documents are from the new
23 batch, and so we have not done the redactions
24 pursuant to any sort of confidentiality
25 protection, because I need to know what the

23  (Pages 86 to 89)

1    Bates range is for certain things.  So to the
2    extent that we're -- this, this deposition is
3    under the protective order, and the exhibits
4    will be, until we can figure out what is --
5    needs to be redacted, right?
6         MR. PHIPPS:  Right.
7         MS. AMIRI:  Okay.  I think this is
8    one of the new ones.
9    BY MS. AMIRI:
10    Q    I just wanted to ask you, at least in
11   the first instance -- and then we need to take a
12   break to switch over the tape -- about the
13   Significant Incident Report, and actually what I
14   wanted to ask you about was the -- starting on
15   page 2 of this exhibit, about what is required in
16   the SIR reporting.
17        You can flip through the whole exhibit.
18        (Witness peruses document.)
19        THE WITNESS:  Okay.
20   BY MS. AMIRI:
21    Q    This is more of a question in terms of
22   process, so this exhibit, starting on page 2,
23   looks like the process that grantees follow when
24   submitting an SIR when there is an abortion
25   request, and different steps that are required.  I

1    understand that this is dated March 6, it's before
2    you became director, but I wanted to ask whether
3    this significant incident reporting process is
4    still the same process today.
5     A    I can't, I can't say for certain.
6     Q    Do you know who at the Agency would
7    know?
8     A    Yeah, I mean Jonathan White would know,
9    but this -- it wouldn't be vastly different than
10   this.
11    Q    Have any requests to use federal funds
12   for a pregnancy termination come to you since
13   you've been ORR director?
14    A    Yes.
15    Q    And have you granted any of those
16   requests?
17    A    No.
18    Q    Are they circumstances in which the
19   minor had been raped or whether she was the victim
20   of incest or whether her life was endangered?
21    A    Could -- I missed the first part.
22    Q    Yes.  So federal funds can only be used
23   in the context of where the woman is pregnant as a
24   result of rape, whether her life is in danger, or
25   whether she was the victim of incest.

1     A    Sure.
2     Q    So using those three categories, I was
3    trying to ask:  When a request for the use of
4    federal funds has come across your desk, in what
5    category did the request fall?
6     A    Oh, all of the termination requests have
7    had the question of funding attached, so it
8    wouldn't necessarily be in those cases.
9     Q    I see.
10        So as a part of all the requests for
11   abortion, it is both the approval for the abortion
12   itself and also the approval for federal funding?
13    A    Yes.
14    Q    And is a request for federal funding
15   made even if federal funds prohibit the use of
16   money to pay for an abortion --
17    A    Right.
18    Q    -- except in those three circumstances?
19    A    No, no.
20    Q    Okay, and because you haven't approved
21   any abortion requests, you also have not approved
22   any request to use federal funds to pay for the
23   abortions?
24    A    That's correct.
25        MS. AMIRI:  We need to take a break

1    to change out the tape.
2         THE VIDEOGRAPHER:  Going off the
3    record at 2:46.
4         (Whereupon, a short recess was
5    taken.)
6         THE VIDEOGRAPHER:  We are going
7    back on the record at 3:02.  This begins disc
8    number 2.
9         MR. PHIPPS:  As we discussed during
10   the break, there was a question that we had
11   and we kind of left pending, roughly, about
12   contemplated changes in policy that the ORR
13   director was or was not contemplating.  This
14   question prompts -- could prompt, depending
15   on the scope of the response, deliberative
16   process and attorney/client privilege issues.
17   It may not.
18        What I would like to do is -- we've
19   talked a little bit with the witness about
20   that issue, and the witness is prepared to
21   make a statement in response to that
22   question, and then we'll turn it back over to
23   you for more questions that we may or may not
24   have to implicate privileges on, but this
25   statement, we're fine with him making it

Page 94

1    without privilege.
2         MS. AMIRI:  Okay, great.  Thank
3    you.
4         THE WITNESS:  So the question kind
5    of that I touched on in the interview with
6    EWTN, the answer was intended to describe a
7    general sense of, of any policy being under
8    review by virtue of a new team coming in and
9    just also the need to improve where
10   improvements are needed.
11        So in a certain sense, all of our
12   policies are under review.
13   BY MS. AMIRI:
14        Q   But the interview with EWTN was about
15   the young woman who is known as "Jane Doe" in the
16   public, correct?
17        A   Well, I mean it was -- it arose out of
18   those circumstances.
19        Q   And the interview was about access to
20   abortion?
21        A   Parts of it.
22        Q   This isn't about a policy that, for
23   example, would be relevant in the context of
24   access to proper food in a shelter, right?
25        A   Sure.

Page 95

1        Q   When the question came up with the
2    interviewer, and I -- our phone seems to not be
3    working so great here, so I wasn't able to pull it
4    up, but my recollection is something like the
5    interviewer asked -- and it was in the context of
6    abortion access -- whether you were considering
7    changing policies, and I believe you said
8    something like "we're looking at it" or something
9    like that.
10       A   Yeah, or it's under review, but I mean
11   all of our policies are under review.
12       Q   At all times?  All policies?
13       A   Well, sure.  So if, if some, some fact
14   pattern arises, and we find that our policy
15   doesn't serve it very well, and there's a way that
16   we can improve the policy to make it better the
17   next time that fact pattern arises, then yeah,
18   we're going to change that policy.
19       Q   So without -- and I'll give Peter a
20   chance to jump in here.  Without getting into the
21   substance, let's start first with whether you can
22   answer the question of:  Is the policy with
23   respect to abortion access under review?
24       A   And would I be answering that?
25           MR. PHIPPS:  I think -- I don't

Page 96

1    think -- for privilege reasons, I don't think
2    that he can answer that question beyond his
3    general answer, which is I guess all policies
4    are under review.
5         If it's something unique to that
6    policy that's looking at unique components of
7    a potential review, then we have to assert
8    deliberative process and potentially
9    attorney/client.  I don't think either of
10   those privileges are ripe yet.  I don't think
11   there's a question that goes to those.
12        MS. AMIRI:  Okay.
13        MR. PHIPPS:  I think as your
14   question is phrased, there's a way he can
15   answer it that doesn't go to those, but it's
16   -- I don't think it's going to provide any
17   new information.
18        MS. AMIRI:  Right, and I guess it's
19   a yes-or-no question.  I mean like the fact
20   that the specific policy with respect to
21   abortion access is under review or not
22   doesn't tell me what the actual meat is about
23   whether it could be changed.  You know, it's
24   just whether it's under review or not.
25        THE WITNESS:  Like I said, all of

Page 97

1    our policies are in a sense under review.
2         MS. AMIRI:  Okay, and so are you
3    asking him not to --
4         MR. PHIPPS:  I think beyond that
5    response, if it's going to single out a
6    specific policy -- I mean I understand him
7    saying the answer is yes, much like all of
8    our other policies are under --
9         MS. AMIRI:  Okay.
10        MR. PHIPPS:  If the answer is what
11   is unique about it, then we're going to maybe
12   touch on other stuff.
13        MS. AMIRI:  Okay.
14        MR. PHIPPS:  So I don't know how
15   satisfying that is, but I'm not asserting
16   privileges yet.
17        MS. AMIRI:  Okay.  Well, let's keep
18   going, and maybe some of these other, more
19   recent documentation will allow for some
20   conversation that is out already.
21        So let's go to 15.  I'm going to
22   mark this as Exhibit 9.
23        (Exhibit 9 was marked for
24        identification.)
25        (Witness peruses document.)

25 (Pages 94 to 97)

Page 98

1    THE WITNESS:  Okay.
2  BY MS. AMIRI:
3    Q   Have you seen Exhibit 9 before?
4    A   I don't think so.
5    Q   On March 4, 2017, were you a member of
6  the second transition team, I believe you had
7  said?
8    A   Yes.
9    Q   Did you have a conversation with Ken
10  Tota around the time this memo was issued about
11  access to abortion for unaccompanied minors?
12    A   Yes.
13    Q   And what was that conversation?
14    A   It was related to specific unaccompanied
15  minors.
16    Q   So individual --
17    A   UACs, yes.
18    Q   Individual requests?
19    A   Yeah.
20    Q   Did you speak to Ken Tota about issuing
21  this particular memorandum?
22    A   I don't recall.
23    Q   More specifically, in the first
24  paragraph at the last sentence, it says, "This
25  means that the Director of ORR is empowered by

Page 99

1  Congress to make all medical decisions for the
2  unaccompanied alien child (UAC) in place of the
3  child's parents."
4    A   Okay.
5    Q   Is it your understanding that that is an
6  accurate reflection of the director of ORR's
7  power?
8    A   That's not the way I would put it --
9    Q   Okay.
10    A   -- but, you know, there's accuracy in
11  it.
12    Q   What is your -- so put this aside for a
13  second.
14    A   Sure.
15    Q   And just in terms of how, how would you
16  put what ORR's role is with respect to making
17  medical decisions or evaluating medical decisions
18  for the unaccompanied minors in their care?
19    A   Well, I mean so ORR broadly does, does
20  review and in the end provides or arranges for
21  providing all medical care for a UAC in our
22  custody.
23    Q   In the context of abortion explicitly,
24  is it your opinion as the director of ORR that you
25  have more power than a parent would with respect

Page 100

1  to a particular minor's abortion in the sense that
2  you are prohibiting a minor from accessing
3  abortion where a parent could not?
4    MR. PHIPPS:  Objection.  Calls for
5    speculation.
6    THE WITNESS:  And that's, that's
7    not -- no.
8  BY MS. AMIRI:
9    Q   That's not your sense?
10    A   No.
11    Q   Okay.  So in the context of parents, is
12  it your understanding -- putting aside
13  unaccompanied minors just in the normal world,
14  normal country -- that parents can override their
15  minor's desire to have an abortion?
16    A   I'm sorry.  You need to repeat the first
17  part.
18    Q   Sure.  Yes.
19    In the context of just the normal
20  country, putting aside federally detained
21  minors --
22    A   Just in the United States?
23    Q   -- in general in the United States.
24    A   Okay.
25    Q   Is it your opinion that parents can

Page 101

1  override their child's decision to have an
2  abortion?
3    A   It's a state-by-state determination.
4    Q   Is there any state in the union --
5    A   Oh, okay.
6    Q   Sorry.  I'll finish the question.
7    Is there any state in the union that
8  gives a parent the ability to prevent their child
9  from having an abortion?
10    MR. PHIPPS:  Objection.
11    Foundation.  You haven't established a basis
12    of personal knowledge for this, but go ahead.
13  BY MS. AMIRI:
14    Q   You can answer.
15    A   I'm not aware of a state where that's
16  operationally the case.
17    Q   So then back to my question, which was:
18  Do you believe that the director of ORR has more
19  power than a parent would in the sense that ORR is
20  prohibiting minors from accessing abortion where
21  parents cannot?
22    A   No.
23    Q   That's not your belief?
24    A   No.
25    Q   When you disapprove a minor's request

26 (Pages 98 to 101)

1 for abortion, what do you -- what does that mean
2 to you?
3     A   It means that we are declining to assist
4 her in obtaining an abortion.
5     Q   Assist her or allow her to have access
6 to?
7     A   Assist her.
8     Q   And in what ways do you think that she
9 will need to be assisted in having an abortion?
10     A   We're statutorily mandated that we
11 cannot release a UAC on their own recognizance, so
12 we have to staff it.
13     Q   I believe that there are two different
14 things.  One is a requirement that ORR cannot
15 release unaccompanied minors by their own
16 recognizance, but there is another aspect of the
17 statute that talks about -- or maybe it's
18 regulations that talk about others who can take
19 custody of the minor, including attorneys of
20 record.
21         Do you know what I'm talking about?
22     A   No.
23     Q   Okay.
24         So because you can't release her on her
25 own, and you are prohibiting your grantees from

1 assisting a minor in any way, how else is the
2 minor supposed to get the abortion?
3     A   Well, if they're released to their
4 sponsor in the interim, that's one way.
5     Q   While they're still in ORR custody.
6 Let's stick with while they're in ORR custody.
7     A   Without -- functionally, if an abortion
8 is to occur, our program has to be there.
9     Q   Under what authority do you make that
10 determination?
11     A   The homeland Security Act.
12     Q   Where in the Homeland Security Act does
13 it say that?
14     A   462 -- section 462 -- I'm forgetting the
15 last part.  A2A or A2B?  B2A?
16     Q   Is it Homeland Security or is it the
17 TVPA?
18     A   It's Homeland Security.
19     Q   Okay, and to the best of your
20 recollection, what provision are you stating?
21 What's the substance?
22     A   A UAC shall not, under any
23 circumstances, be left to their own recognizance.
24     Q   So it's the recognizance piece of it?
25     A   Yes.

1     Q   So Congress hasn't spoken about the
2 specific issue of abortion for minors, to your
3 knowledge?
4     A   In the UAC context?
5     Q   Yes.
6         MR. PHIPPS:  Objection.  It's
7 ambiguous.  Spoken through statute?
8 BY MS. AMIRI:
9     Q   Yes.
10     A   Not to my knowledge, no.
11     Q   Okay.
12         So a minor's in ORR custody.  She's
13 requesting an abortion.  The only way she can
14 obtain the abortion while still in ORR custody is
15 if you approve the abortion request, correct?
16     A   I think so, yeah.
17         (Exhibit 10 was marked for
18         identification.)
19 BY MS. AMIRI:
20     Q   I've handed you what's been marked as
21 Exhibit 10.
22         (Witness peruses document.)
23         THE WITNESS:  Okay.
24 BY MS. AMIRI:
25     Q   So earlier in the deposition you had

1 mentioned an email that went out, clarifying --
2 I'm not trying to recharacterize your testimony --
3     A   Okay.
4     Q   -- but you mentioned an email that was
5 clarifying the 2008 heightened medical
6 involvement, and I wanted to see if there was some
7 piece of this Exhibit 10 that you were
8 referencing.
9     A   It appears that, beginning on page 1,
10 the piece that begins -- entitled "ORR Director"
11 and "Dear Colleagues" and continues on page 2,
12 down through "Ken Tota, Acting Director," and ends
13 after page 2.
14     Q   So this is the email that you were
15 referring to that is a clarification of the 2008
16 heightened medical procedures memo; is that fair?
17     A   Yes.
18     Q   All right, and so in -- on page 2 there,
19 it, it says like in the second paragraph,
20 "Grantees should not conduct procedures, or take
21 any steps that facilitate future procedures such
22 as scheduling appointments, transportation, or
23 other arrangements without signed written
24 authorization from the ORR Director.  Note that
25 the requirement for written authorization by the

Page 106

1  ORR Director applies whether the procedure will be
2  paid for with Federal funds or by other means."
3        Is that currently the policy at ORR now?
4     A  Yes.
5     Q  Were you speaking to Ken Tota at the
6  time that he wrote this email?
7     A  Could you rephrase the question?
8     Q  Sure.
9        Were you speaking to Ken Tota, at the
10  time he wrote this email, about the, this
11  particular email?
12    A  He, he wrote this email within a time
13  period after I had begun communications with him,
14  after I had met him, essentially.
15    Q  Oh, so you were still in the transition
16  team?  He wasn't reporting to you and you weren't
17  reporting to him; is that fair?
18    A  Yes.
19    Q  Okay.  Did you work with him on the
20  language for this email?
21    A  I don't recall.
22    Q  Was the email sent to all shelter staff?
23       MR. PHIPPS:  Objection.  Lack of
24    personal knowledge.
25       THE WITNESS:  I believe it was sent

Page 107

1    to all grantees, which wouldn't necessarily
2    include all, all staff.
3  BY MS. AMIRI:
4     Q  Okay.  So if it's current policy that
5  "grantees should not conduct procedures or take
6  any steps that facilitate future procedures, such
7  as scheduling appointments, transportation, or
8  other arrangements, without signed written
9  authorization" from ORR, what is the way in which
10  this policy is operationalized?  How does it work
11  in practice?
12    A  Okay.  Well, Ken, who has described
13  before, termination requests come up through the
14  chain to the Office of Director and me personally.
15    Q  And that's for every, quote,
16  "facilitative step"?
17    A  I think it's more the situation
18  generally.
19    Q  Well, let's break it down.
20    A  Sure.
21    Q  If a grantee wanted to provide an
22  unaccompanied minor with access to nondirectives,
23  nondirective options counseling at an abortion
24  facility, would that grantee need your explicit
25  approval to do that?

Page 108

1     A  Yes.
2     Q  If a grantee wanted to help a minor
3  navigate a judicial bypass, would the grantee need
4  your explicit approval to do that?
5     A  I don't know.
6     Q  The issue of grantees' involvement in
7  judicial bypasses has come up before, hasn't it?
8     A  Yes.
9     Q  All right.  So in those contexts, what
10  has your response been when the grantee has
11  requested the ability to facilitate a judicial
12  bypass for a minor in their care?
13    A  The question doesn't really work the way
14  you asked it.
15    Q  Okay.  So explain to me:  How is it
16  operationalized?  How does it work in practice?
17    A  Legal, legal services are provided to a
18  UAC through our contractors, and the attorneys
19  involved with the legal services pursue whatever
20  legal services are warranted in any particular
21  situation.
22    Q  You have instructed a grantee to
23  prohibit a minor from meeting with an attorney for
24  the purposes of pursuing a judicial bypass before,
25  though, haven't you?

Page 109

1     A  No.
2     Q  Okay.  Well, we'll get to that email,
3  and perhaps you can explain at that point.
4     A  Sure.
5     Q  Why is this policy in place?
6     A  This one?
7     Q  Yes.  Why does a grantee need the ORR
8  director's permission to provide any facilitative
9  step in the path for an abortion?
10    A  This, this is the policy, essentially,
11  and, and it existed since 2008, but when we, we,
12  the transition team, arrived on the scene, we
13  found that grantees' staff weren't necessarily
14  following the 2008 policy.
15    Q  Do you believe that this email reflects
16  a verbatim recitation of what is in the 2008
17  policy, or is there a change that is indicated in
18  this email to the 2008 policy?
19    A  I would say it's a clarification.
20    Q  A clarification.  Does the 2008 policy
21  prohibit grantees from taking any facilitative
22  steps?
23    A  With this clarification, it does.
24    Q  Why don't we take a look at the policy
25  from 2008.  I think it's Exhibit 1, maybe.

28  (Pages 106 to 109)

Page 110

1          MR. PHIPPS:  Exhibit 2.
2    BY MS. AMIRI:
3      Q   Exhibit 2.  Thank you.
4      A   Okay.
5      Q   So I just wanted to give you an
6    opportunity to look at Exhibit 2 and see if there
7    is something in the 2008 policy that leads you to
8    believe that the email that we were just looking
9    at on Exhibit 10 is a clarification of or addition
10   to the 2008 policy.
11     A   "Grantees are prohibited from taking any
12   actions in these cases without direction and
13   approval from ORR."
14     Q   So you read "in these cases" to mean
15   abortion requests?
16     A   "Serious medical services, including
17   significant surgical or medical procedures,
18   abortions, and services that may threaten the life
19   of a UAC, require heightened" our involvement, so
20   yes, in those enumerated situations.
21     Q   So for other significant surgical or
22   medical procedures, has ORR clarified, since the
23   time you've been there in any capacity, that
24   grantees must submit requests to the ORR director
25   for any facilitative steps?

Page 111

1      A   No.
2          (Exhibit 11 was marked for
3           identification.)
4    BY MS. AMIRI:
5      Q   I want to ask you about your email to
6    Jonathan White on March 30, and you say grantees
7    "should not be supporting abortion services pre or
8    post release; only pregnancy services and
9    life-affirming options counseling."
10     A   Okay.
11     Q   What did you mean?
12     A   Should not be supporting abortion -- I
13   mean really what it says.
14     Q   What do you mean by "life-affirming
15   options counseling"?
16     A   Options counseling that affirms life.
17     Q   Whose life?
18     A   Well, life generally.  Anybody's life.
19   In the context of pregnancy, it would be the
20   mother and the child.
21     Q   So that would not include counseling
22   about abortion?
23     A   Not necessarily.
24     Q   Not necessarily it doesn't include it?
25   So I'm confused.

Page 112

1      A   So am I.
2      Q   Okay.
3          So are there any circumstances under
4    which your phrase, "life-affirming options
5    counseling," would include abortion?
6      A   Yes.
7      Q   What are those circumstances?
8      A   Potentially all circumstances with
9    regard to options counseling.
10     Q   Yes.  So normally when we think of
11   options counseling, we think of here are your
12   options with respect to your pregnancy.
13     A   Yeah.
14     Q   You can have an abortion, you can carry
15   the pregnancy to term.
16     A   Sure.
17     Q   Really those are the two options,
18   correct?
19     A   No.  Adoption.
20     Q   Right, but with respect to the actual
21   pregnancy.  That's after she gives birth, right?
22     A   Oh, okay, fair enough, but I mean if
23   we're defining the term "options counseling," that
24   would include adoption in what's meant there.
25     Q   Okay.

Page 113

1      A   If it were lacking adoption --
2      Q   It's not really an option.
3      A   -- we would, we would fix that.
4      Q   Okay.  So carry the pregnancy to term,
5    option 1, and parent the child; carry the
6    pregnancy to term and place the child for
7    adoption, number 2; or have an abortion, number 3.
8      A   Mm-hmm.
9      Q   So my question is:  When you use the
10   phrase "life-affirming options counseling," does
11   that include number 3, the option for abortion?
12     A   Yes.
13     Q   In all circumstances?
14     A   Potentially.  I mean I'm an attorney, so
15   I don't really answer in absolutes, but
16   potentially in all circumstances it can include
17   abortion.
18     Q   Then I'm confused by this sentence then,
19   because it says grantees "should not be supporting
20   abortion services pre or post release."
21     A   Right, right.
22     Q   "Only pregnancy services and
23   life-affirming options counseling."
24     A   Sure.
25     Q   So if you implicitly mean abortion in

29  (Pages 110 to 113)

Page 114

1  the context of life-affirming options counseling,
2  then the first clause of the sentence is
3  inherently contradictory.
4      A   No, it's not.
5      Q   So explain to me why it's not.
6      A   Well, life-affirming options counseling
7  does not exclude information about life-negating
8  options.  It just affirms the life, the life
9  options, the ones that involve or don't, don't
10 involve the destruction of life.
11     Q   Do you believe abortion is the
12 destruction of human life?
13     A   Yes.
14     Q   So then I'm not sure how life-affirming
15 options counseling can include abortion.
16     A   Okay.
17     Q   So you told me -- so you -- I'm, I'm
18 extra confused now, so if you believe that
19 abortion is the termination or -- sorry -- the
20 destruction of human life --
21     A   Mm-hmm.
22     Q   -- and grantees should only be
23 supporting life-affirming options counseling --
24     A   Mm-hmm.
25     Q   -- it would seem then, by definition,

Page 115

1  that any options counseling that included
2  presenting abortion as a neutral option --
3      A   Sure.
4      Q   -- would not be life-affirming, in your
5  opinion.
6      A   I don't share that characterization.
7      Q   You do not?
8      A   Yes.  Well, yeah, I mean right.
9      Q   Do you believe that an abortion provider
10 provides life-affirming options counseling?
11     A   I believe they could.
12     Q   You were on the board of a crisis
13 pregnancy center, correct?
14     A   Yes.
15     Q   What were the counseling services
16 offered at that pregnancy center?
17     A   Ultrasound services, limited medical
18 services related to the ultrasound, and then
19 counseling about options for the pregnancy.
20     Q   And do you believe that that crisis
21 pregnancy center that you were on the board of
22 provided life-affirming options counseling?
23     A   Yeah.
24     Q   Did they include a discussion of
25 abortion in a neutral manner in their counseling?

Page 116

1      A   I, I didn't witness any of the
2  discussions.
3      Q   You never saw any counseling sessions
4  yourself?
5      A   No.
6      Q   Did you see any materials that were used
7  to counsel?
8      A   Yeah, yeah.
9      Q   And what were those materials?
10     A   I, I don't remember.  I mean really just
11 information related to, to pregnancy and options
12 in pregnancy.
13     Q   What was the name of the crisis
14 pregnancy center that you were on the board of?
15     A   Front Royal Pregnancy Center.
16     Q   Are they associated with Heartbeat
17 International or CareNet?
18     A   I, I don't recall.  It's kind of
19 actually a pretty technical question.
20     Q   Okay.  Are they -- sorry.  Does the CPC
21 that you were on the board of, did it have a
22 religious mission?
23         MR. PHIPPS:  The subject is vague
24     in terms of what's meant by "religious
25     mission."

Page 117

1          THE WITNESS:  Yeah, yeah, that's --
2  BY MS. AMIRI:
3      Q   Often crisis pregnancy centers have a
4  mission statement, correct?
5      A   Yes, yeah.
6      Q   So for this particular crisis pregnancy
7  center, did they have a mission statement?
8      A   Yes.
9      Q   And did that mission statement include
10 references to God or the Bible or a particular
11 religion?
12     A   I, I don't remember.
13     Q   So in this email to Jonathan White, you
14 say that grantees "should not be supporting
15 abortion services pre or post release."
16     A   Mm-hmm.
17     Q   Is that full stop?  Is there any way in
18 which a grantee could be supporting abortion
19 services pre or post release?
20     A   Potentially.
21     Q   And how would that happen?
22     A   I don't know.
23     Q   So it could happen, but you --
24     A   Yeah, it could, but I don't know how it
25 could happen.

30  (Pages 114 to 117)

Page 118

1    Q    Because they're prohibited from doing
2  so?
3    A    Within the confines of our program, yes.
4    Q    Okay.  So are you saying that if a
5  grantee went rogue and ignored the rules, then it
6  could do this?
7    A    No.
8    Q    Okay.  So then in what context could a
9  grantee support abortion services pre or post
10  release?
11    A    Well, it couldn't within the context of
12  our program, but some of our grantees serve other
13  programs that aren't, that aren't ours.  State
14  programs, et cetera.
15    Q    Okay.  What do you mean by the word
16  "supporting" there, "should not be supporting
17  abortion services"?
18    A    Well, providing.
19    Q    Okay, but grantees don't provide
20  abortions themselves, right?
21    A    Right.
22    Q    So then we're talking about something
23  beyond the actual provision of the abortion
24  itself, right?
25    A    Yeah.

Page 119

1    Q    So you mean access to abortion?
2    A    Well, right, yeah, so -- right.
3    Q    With this particular minor that is being
4  discussed in Exhibit 11 --
5    A    Yeah.
6    Q    -- do you remember the circumstances?
7  It looks like she had requested a pregnancy
8  termination.
9    A    Yeah, I mean that, that sounds right.
10    Q    Do you remember anything about her
11  request for an abortion, the circumstances by
12  which she got pregnant, any of the factors that
13  you had laid out before in terms of --
14    A    No, I, I remember the circumstances, but
15  from this email I can't determine which, which
16  case it is necessarily.
17    Q    Okay.
18        On the bottom you talk about confirming
19  whether "the minor has received options counseling
20  for the pregnancy as discussed."
21    A    Mm-hmm.
22    Q    Is that specifically an options
23  counseling session with a crisis pregnancy or
24  crisis resource center?
25    A    In, in this particular case, I believe

Page 120

1  so.
2    Q    And with respect to confirming the
3  sponsor and the minor's parents have been notified
4  of the pregnancy, is that a requirement that
5  you're imposing?
6    A    I don't, I don't recall in this case.
7    Q    Is there any minor who has requested an
8  abortion -- well, strike that.
9        For all minors who have requested an
10  abortion since your time at ORR, have you required
11  them to visit a crisis pregnancy or crisis
12  resource center?
13    A    I don't recall.
14    Q    You have, in fact, though, made that
15  requirement of some minors, correct?
16    A    Yes.
17    Q    And HHS has a list of trusted providers,
18  correct?
19    A    I think that's correct.
20    Q    And this list was developed by Heartbeat
21  International and CareNet; is that correct?
22    A    I don't know.
23    Q    Who would know?
24    A    I don't know, actually.
25    Q    You had a conversation with Maggie Wynne

Page 121

1  about crisis pregnancy centers and where to send
2  minors, correct?
3    A    About -- conversations with Maggie Wynne
4  about --
5    Q    Crisis pregnancy centers --
6    A    Yes.
7    Q    -- and where to send a particular minor.
8    A    Probably.
9    Q    What is Maggie Wynne's role?
10    A    Counselor to the Secretary.
11    Q    Of ACF?
12    A    Of HHS.
13    Q    Has that always been her role since you
14  have been the director of ORR?
15    A    I don't recall, but I think so.
16        No.
17    Q    No?  Do you know what her prior role is?
18    A    General transition.
19    Q    Have you had conversations with Maggie
20  Wynne about access to abortion for unaccompanied
21  immigrant minors?
22    A    Yes.
23    Q    Particular minors' requests or the
24  policy?
25        MR. PHIPPS:  Just to interject, if

31 (Pages 118 to 121)

he testified that she currently serves as counselor, and counselor involves legal advice --
MS. AMIRI: Oh, I don't think she's an attorney.
MR. PHIPPS: Okay. So is it nonlegal?
THE WITNESS: Yeah, it's --
MR. PHIPPS: Okay.
THE WITNESS: -- it's kind of one of those weird things where she's a counselor but not counsel.
MR. PHIPPS: Okay. Sorry. Okay. I just wanted to make sure that we -- please continue on, uninterrupted.
THE WITNESS: And that's always confusing. That happens a lot.
BY MS. AMIRI:
Q Right.
So have you spoken with Maggie Wynne about certain abortion requests for minors?
A Yes.
Q Have you spoken with Maggie Wynne about the policy for abortion access for minors?
A Yes.

Q Have you had a conversation with Maggie Wynne about the policy for abortion access for unaccompanied minors that has been formalized? I'm trying to get around, you know, the deliberative process, but something that has then been sent out into the world.
A Okay, yeah.
Q Okay, and so what was the, the ultimate policy that came out of the conversation?
A The email from Ken Tota.
Q I see. So Maggie Wynne was involved in that email?
A Yes.
Q Okay. Was -- do you know if Maggie Wynne was also involved in obtaining the list of approved -- or sorry -- trusted HHS providers that was sent to shelters?
A I don't know.
Q Have you told any grantee or grantee's staff, after you took office as ORR, that there would be no abortion access for minors upon your taking office?
A Have I told grantees' staff?
Q Yes.
A Not that I recall.

(Exhibit 12 was marked for identification.)
(Witness peruses document.)
THE WITNESS: Okay.
BY MS. AMIRI:
Q Do you recognize this chain of emails?
A Yeah.
Q And it looks like this is an email between you and Maggie Wynne in the middle of March, which would have been official -- before your official appointment as ORR director, correct?
A Yes, yes.
Q So what was your role at this time on March 12, in the context of this email exchange with Maggie Wynne about pregnancy care centers?
A Kind of a general policy advisor. It had not changed, changed from my, from my onboarding at that point.
Q And why were you talking to Maggie Wynne about pregnancy resource centers in
A This related to a specific UAC.
Q Is she the minor who was in and
A I don't recall.

Q You went to visit a minor in when she was pregnant, correct?
A Not exactly.
Q What do you mean "not exactly"?
A I went to to do a number of things, and one of the things that happened while I was there is that I met one of the UACs who was pregnant.
Q Did you ask to meet with her?
A I don't recall.
Q So she was pregnant, considering abortion. You met with her. What did you say to her?
A Um, yeah, that's, that's not accurate, actually.
Q Okay. You did not meet with her face to face?
A No. She was not considering abortion.
Q At the time you met with her?
A Right.
Q Okay. She had previously been considering an abortion?
A Yes.
Q What did you say to her at that meeting?
A I kind of asked her questions about how

Page 126

1    she's doing.
2        Q   Did you talk to her about her pregnancy?
3        A   Generally.
4        Q   Did you talk to her about her pregnancy
5    decision?
6        A   I don't, I don't know.  I don't think I
7    did.
8        Q   Did you pray with her?
9        A   No.
10       Q   Did you speak to her about God?
11       A   I don't know.  I don't know.
12       Q   Did you speak with her about the Bible?
13       A   I don't think so.
14       Q   This is the minor who had been in
15           care, and because she requested an
16   abortion, she was transferred out of        s care
17   and into        .
18       A   Okay.
19       Q   Does that ring a bell?
20       A   It rings a bell, yes.
21       Q   Okay.
22           Were you aware -- I believe this is
23   before you were the ORR director, right, that she
24   was transferred from        into        correct?
25       A   Yes.

Page 127

1        Q   Okay.
2            At the time she was being transferred
3    out of        into -- that's 19 -- out of
4    because she requested an abortion, were you having
5    conversations with anybody in ORR about her
6    transfer because she requested an abortion?
7        A   Possibly.
8        Q   So if you "possibly" were, what were
9    those conversations?
10       A   Informational in nature.
11       Q   What information did you learn?
12       A   Just the fact of it, of I guess the
13   transfer.
14       Q   Okay.  So she requested an abortion, but
15   she was in a religiously affiliated shelter that
16   had a religious objection to providing abortion,
17   correct?
18       A   Yes.
19       Q   So then she was transferred to
20       A   Yes.
21       Q   -- so that she could obtain an abortion
22   while at        correct?
23       A   I'm not, I'm not exactly sure what the
24   reason for the transfer was.
25       Q   Did you meet with her while she was at

Page 128

1        or at
2        A
3            (Exhibit 13 was marked for
4            identification.)
5            (Witness peruses document.)
6            THE WITNESS:  Okay.
7    BY MS. AMIRI:
8        Q   I'm going to ask you about your email
9    dated March 14.  The "to" has been blacked out.
10       A   You mean the "from"?
11       Q   It's on page 2 of the chain.
12       A   Okay.  Okay.
13       Q   Number 3 in your email, you say, "As
14   I've said, often these girls start to regret
15   abortion."
16           So if she had already decided to carry
17   her pregnancy to term at this point that you met
18   her -- you sent this email after you met with her?
19       A   Yes.
20       Q   So why are you raising the issue of
21   regretting an abortion if she had already made the
22   decision to carry her pregnancy to term?
23       A   I believe this is in reference to a
24   different girl.
25       Q   So items 1, 2 and 4 are about the minor

Page 129

1    you met with in person in                      but
2    number 3 is about another girl?
3        A   I think that's correct.
4        Q   At        or someplace else?
5        A   I don't recall.
6        Q   Is number 4 about the minor that you met
7    with?
8        A   Yes.
9        Q   So 1, 2 and 4 are about the minor you
10   met with, but number 3 is not?
11       A   Yes.  I think that's correct.  That's my
12   recollection.
13       Q   Have you met with other minors in person
14   who are seeking abortion?
15           MR. PHIPPS:  And is this in the
16       context of ORR?
17           THE WITNESS:  Yeah, that's kind of
18       characterizing.
19   BY MS. AMIRI:
20       Q   Other -- yeah.  Sorry.  As ORR director
21   or your time before becoming director, since
22   you've been in ORR, yes.  I didn't mean like in,
23   you know, the span of your whole life have you met
24   with young women who are considering abortion.
25       A   Okay.

33 (Pages 126 to 129)

Page 130

1      Q   At your time at ORR, have you met with
2  young women who are considering abortion?
3      A   I don't know.
4      Q   You don't know because the topic of
5  abortion didn't come up and you don't know if they
6  were considering an abortion?
7      A   Right.
8      Q   Have you ever spoken on the phone with a
9  minor who was considering abortion?
10         MR. PHIPPS:  While at ORR?
11  BY MS. AMIRI:
12     Q   Yes, while at ORR.
13     A   Yes.
14     Q   What was the nature of that
15  conversation?
16     A   To provide information.
17     Q   What kind of information?
18     A   About options.
19     Q   And who -- was it more than one
20  conversation?  More than one girl?
21     A   No.
22     Q   Just one girl?
23     A   Yes.
24     Q   And where was she located?
25     A   I don't recall.

Page 131

1      Q   What did you say to her?
2      A   I gave her information about her various
3  options regarding pregnancy, options we had
4  discussed before.
5      Q   Did you talk to her about God?
6      A   I don't recall.
7      Q   Did you speak with her about religion in
8  general?
9      A   I don't think so.
10     Q   Did you encourage her to carry her
11  pregnancy to term?
12     A   No.
13     Q   So you said here are your three options?
14     A   Essentially.
15     Q   Did you present the option of abortion
16  in a neutral manner?
17     A   I don't recall.  I don't recall how the
18  topic of abortion came up.
19     Q   If you believe that abortion is the
20  destruction of human life --
21     A   Mm-hmm, okay.
22     Q   -- are you able to speak about abortion
23  in a neutral way to these minors?
24     A   Yes.
25     Q   And how, how would you have that

Page 132

1  conversation?
2      A   It's speculative, yeah.
3      Q   So --
4      A   I don't know.  A number of ways.
5      Q   Okay.  You would discuss the option of
6  abortion with a pregnant minor even though you
7  have never approved an abortion request?
8      A   Yeah.
9         MR. PHIPPS:  Is this, is this
10  hypothetically, or is this in actuality?
11         THE WITNESS:  Is it talking about a
12  specific case?
13         MR. PHIPPS:  Is this what actually
14  happened?
15  BY MS. AMIRI:
16     Q   I'm just talking in general.  I'm just
17  asking the question why would you even talk about
18  abortion as an option if you have never approved
19  an abortion request.
20     A   Well, it exists as an option.
21     Q   Even if, while in ORR custody, she will
22  not be able to obtain an abortion?
23     A   It's really I mean hypothetical.
24     Q   But it's not a hypothetical, right?
25  You've never approved an abortion request?

Page 133

1      A   Not to my knowledge, no.
2      Q   Okay.
3         What was the outcome of the woman at
4  ██████ who decided to carry her pregnancy to term?
5      A   She was -- as far as I know, she was
6  reunified with her sponsor, and that's all I know.
7      Q   Did you require this young woman to
8  visit a crisis pregnancy center?
9      A   I think so.
10     Q   The list of ██████ crisis pregnancy
11  centers that Maggie Wynne and you discussed over
12  email, was that for this particular minor?
13     A   I don't recall.
14     Q   Did you require this particular minor to
15  speak with her parents in her home country about
16  her abortion?
17     A   Um, I -- yes.
18     Q   Do you require --
19     A   Well, yeah.  I don't agree with the
20  characterization of that question.  She did, she
21  did have a conversation with her parents.
22     Q   Did you encourage her to have a
23  conversation with her parents?
24     A   The program did.
25     Q   At your direction?

34  (Pages 130 to 133)

Page 134

1    A   Yes.
2    Q   Do you know if she was transferred back
3 to ▮▮▮▮ after she made the decision to have -- to
4 carry the pregnancy to term?
5    A   I don't think that she was.
6         (Exhibit 14 was marked for
7         identification.)
8         (Witness peruses document.)
9         THE WITNESS:  Okay.
10 BY MS. AMIRI:
11    Q   Before we talked about the judicial
12 bypass process, and on page 7 you say in your
13 email to Jonathan --
14    A   Yeah.
15    Q   -- "She should not be meeting with an
16 attorney regarding her termination or otherwise
17 pursuing judicial bypass at this point."
18    A   Yep.  Where are we?  Sorry.
19    Q   Page 7.
20    A   7?  Okay.
21    Q   So before when I asked you whether a
22 grantee needed to obtain explicit approval from
23 you before facilitating the judicial bypass
24 process.  I wanted to reask the question, that
25 question in the context of Exhibit 14.

Page 135

1    A   Okay.  So could you restate the
2 question?
3    Q   Yes.
4         So does a grantee have to get explicit
5 permission from you prior to pursuing a judicial
6 bypass for an unaccompanied minor?
7    A   Generally, no.
8    Q   So what was going on here that you
9 instructed that the minor "should not be meeting
10 with an attorney regarding her termination or
11 otherwise pursuing judicial bypass at this point"?
12    A   UACs are entitled to legal
13 representation, but they're entitled to be free
14 from attorneys when it's not necessary.  We were
15 in the midst of deliberations about the, the legal
16 effect of judicial, state judicial bypass and its
17 binding, uh, binding force on federal programs,
18 and so that's why I was saying at this point she
19 shouldn't be talking to attorneys about that.
20    Q   But why should your policy
21 considerations have anything to do with whether
22 she, this particular minor, seeks a judicial
23 bypass?
24    A   I don't, I don't know.  While it was a
25 question, why would -- why would she meet with an

Page 136

1 attorney about judicial bypass when we're not sure
2 what that even means for us is my point there.
3    Q   So you said something about you tried to
4 keep the minor free from unnecessary attorneys, I
5 think is what you said?
6    A   Yeah.
7    Q   And what does that mean?
8    A   Well, I don't want to read too much into
9 it, you know, just there, there shouldn't be any
10 unnecessary meetings with attorneys.
11    Q   Who gets to make that determination
12 about whether a meeting is unnecessary?
13    A   Usually nobody is making that
14 determination.  They're just meeting with
15 attorneys.
16    Q   Do you know what happened with this
17 particular minor?
18    A   No.
19    Q   Have you --
20    A   I think she was -- no, I don't
21 remember --
22    Q   You mentioned --
23    A   -- for certain.
24    Q   Okay.  You mentioned a, that you were
25 considering your policy or something along those

Page 137

1 lines with respect to what judicial bypasses mean
2 for the Agency.
3         Have you come out with a policy or
4 guideline about the interplay between judicial
5 bypasses and, and the Agency's authority over
6 these minors?
7         MR. PHIPPS:  Just to clarify, you
8    said "you."  Do you mean him personally?  Do
9    you mean ORR --
10 BY MS. AMIRI:
11    Q   ORR.  Sorry.  The Agency.
12    A   No.
13    Q   Is it your policy -- and I mean ORR's
14 policy -- today to prohibit minors from meeting
15 with attorneys for the purposes of pursuing
16 judicial bypass?
17    A   No.
18    Q   In that circumstance, does the grantee
19 need to obtain prior approval from you to allow
20 the minor to meet with an attorney for judicial
21 bypass?
22    A   No.
23    Q   If the grantee wants to facilitate the
24 judicial bypass, for example, by taking the minor
25 to court, does the grantee need to get your

35 (Pages 134 to 137)

1  permission to do that?
2      A   That, I believe, is covered in the 2008
3  policy, if I recall.
4      Q   Well, on page 2 of that, it says -- are
5  you referencing ORR funds may not be used for
6  legal services --
7      A   Right.
8      Q   -- or court costs --
9      A   Right.
10      Q   -- related to the case of a UAC seeking
11  an abortion, jurisdictional bypass process?
12      A   Yes.
13      Q   Do you believe it to be the case that
14  obtaining a judicial bypass costs any money in
15  terms of court costs?
16      A   It depends.
17      Q   So let's say it was free.  Let's say no
18  filing fee for a judicial bypass.  It doesn't cost
19  anything.  The grantee staff accompanied the minor
20  to the courthouse, helped her fill out the papers,
21  submitted judicial bypass papers.
22          Is that prohibited absent your explicit
23  consent?
24      A   Not necessarily.
25      Q   But it might be?

1      A   No.
2      Q   Okay.  So when you say "not
3  necessarily," what do you mean?
4      A   Um, I've lost my train of thought.
5      Q   Okay.  So I was asking whether it would
6  be prohibited, whether, whether -- let me back up.
7          So the 2008 policy says that ORR funds
8  may not be used --
9      A   True.
10      Q   -- to pay for legal services or court
11  costs related to judicial bypass.
12      A   Sure.
13      Q   But I'm asking:  If it's free, can a
14  grantee facilitate the judicial bypass by helping
15  to fill out forms, for example, absent your
16  express approval?
17      A   Potentially.
18      Q   Okay, and so when you say "potentially,"
19  what does that mean?  How is a grantee supposed to
20  know whether they need your explicit approval or
21  not before helping with these things?
22      A   Well, I mean legal, legal services, it
23  is provided, and typically grantee staff don't
24  have any, much or any involvement with the legal
25  services provided except providing a room for that

1  to occur; and so if the attorney fills out a bunch
2  of paperwork with the UAC, there's not going to be
3  anything to stop them from doing that.
4      Q   I understand that, but I'm talking about
5  let's say it's a social worker who works with the
6  grantee, worked at, is employed by the grantee,
7  and she's not an attorney, she's a social worker,
8  but she has agreed to go with the minor to the
9  courthouse and help her fill out the papers.
10          Is that prohibited absent your consent?
11      A   There's nothing that prohibits that
12  absent my consent.
13      Q   Isn't that the email that Ken Tota sent
14  out that -- wouldn't that be a facilitative step?
15      A   Well, potentially.
16      Q   Okay.
17      A   I would expect the Program to ask a
18  question at that point.
19      Q   Ask a question to you about whether they
20  need your permission?
21      A   Through the staff.
22      Q   Also, on page 7 of Exhibit 14, you say,
23  "Will work on formalizing these procedures but
24  will have to do it ad hoc for now."
25      A   Mm-hmm.

1      Q   And that was on March 24.  I'm guessing
2  that's right around the time that you officially
3  became ORR Director; is that right?
4      A   Right around there, yeah.
5      Q   Okay.
6          So you mentioned the intent to formalize
7  these procedures.  Have you done so?
8      A   No.
9      Q   So when you say "will do it ad hoc for
10  now," does that mean there's still some ad hoc
11  procedures happening with respect to abortion
12  access for minors?
13      A   Yes.
14      Q   So can you explain to me what those
15  ad hoc procedures are?
16      A   It's a case-by-case basis.
17      Q   But does it involve those things that we
18  talked about?  For example, parental notification,
19  visits to crisis pregnancy centers --
20      A   Potentially, potentially.
21      Q   Okay.  Notification to sponsors?
22      A   Potentially.
23      Q   And, and anything, anything else in the
24  ad hoc category?
25      A   Anything else that the circumstances

36 (Pages 138 to 141)

Page 142

1    call for.
2        Q    And you make the determination about
3    what those circumstances call for?
4        A    We, the, the staff, along with me, you
5    know.
6        Q    You, Jonathan White, Dr. Bartholomew.
7    Anyone else?
8        A    All staff, clinicians involved, grantee,
9    grantees, grantee staff.
10       Q    Why would you require a parent in a home
11   country to be notified about a minor's pregnancy
12   against the minor's express wishes?
13       A    Generally parents should be aware of the
14   situation of their children, and the government
15   shouldn't be standing in between them in those
16   circumstances.
17       Q    But in those circumstances, it is a
18   demand that the parent know about the pregnancy
19   even if the minor does not want to tell the
20   parent, correct?
21       A    It depends.
22       Q    Okay, but that -- there's a difference
23   between standing, the program standing between the
24   minor and her parents versus affirmatively
25   requiring notification of the pregnancy or the

Page 143

1    abortion to the parent; there's a difference
2    there, right?
3        A    I don't think so.
4        Q    Why not?
5        A    Because withholding the information is
6    standing between the parent and the child.
7        Q    And you would tell a parent or require a
8    parent to be told even if that parent is abusive?
9        A    That's why I said "potentially."
10       Q    So there is a circumstance in ████
11   in you remember, and it was an Advocate for the
12   ████████ that said if you tell this parent
13   against the minor's wishes, then the father is
14   going to retaliate against the mother in the home
15   country.
16            Do you remember that?
17       A    No.
18       Q    Let's bring that up.
19            (Exhibit 15 was marked for
20            identification.)
21   BY MS. AMIRI:
22       Q    We've marked this as Exhibit 15.
23            (Witness peruses document.)
24            THE WITNESS:  Okay.
25

Page 144

1    BY MS. AMIRI:
2        Q    Have you ever seen this document before?
3        A    I don't think so.
4        Q    If you haven't seen this document, were
5    you aware that there was a minor who did not want
6    to disclose to her mother or father or brother her
7    decision to have an abortion?  Does this case
8    sound familiar to you at all?
9        A    No.
10       Q    If you haven't seen the document and
11   aren't familiar with the case, I'm not going to
12   ask you about that exhibit.  It might be something
13   you want to read anyway.
14       A    Sure.  Okay.
15       Q    Going back to Exhibit 9, the Ken Tota
16   memo, at the end of the memo it talks about an
17   individual minor who was obtaining a medication
18   abortion.
19       A    Mm-hmm.
20       Q    Actually, do you know -- backing up.
21   This memo only says "to whom it may concern."  Do
22   you know who, who the intended audience for this
23   was?
24       A    No.  I'm not familiar with the memo.
25       Q    Are you familiar with the case mentioned

Page 145

1    in terms of the medication abortion and the
2    requirement that the minor be brought to an
3    emergency room at a local hospital at the bottom
4    of the memo?
5        A    I think so, yeah.
6        Q    Did you talk to Ken Tota about it at the
7    time?
8        A    I may have.
9        Q    Do you remember anything about that
10   conversation?
11       A    Yeah, it was -- the, the only thing that
12   might have touched on it was just him informing me
13   of the, of the facts of the situation.
14       Q    Were you involved in a decision-making
15   process to require -- at the end it says, "This
16   memorandum directs ORR to bring the UAC to the
17   emergency room of a local hospital in order to
18   determine the health status of the UAC and her
19   unborn child."
20            Were you involved in that decision to
21   make that direction?
22       A    Yes.
23       Q    Okay, and why did you and Ken Tota and
24   anyone else make that direction?
25       A    I'm not sure.  To determine the health

37 (Pages 142 to 145)

Page 146

1  status of the UAC and her unborn child.
2      Q   To what end?
3      A   I can't say.
4      Q   Do you know how medication abortion
5  protocol works?
6      A   I, I have some understanding of it.
7      Q   So, so what is that understanding?
8      A   One pill is administered, and that pill,
9  it blocks certain hormones, I think progestin or
10 progesterone, which blocks nutrients to the baby
11 such that it dies, and then a second course
12 induces labor and expels, expels the baby.
13     Q   So if the first pill terminates the
14 pregnancy and the second one expels the pregnancy,
15 what was the goal of requiring the UAC to go to an
16 emergency room after she had taken the first dose?
17         MR. PHIPPS:  Objection.
18 Foundation.
19         THE WITNESS:  I'm not, I'm not
20 exactly sure.
21 BY MS. AMIRI:
22     Q   Did you have conversations about whether
23 the medication abortion could be reversed?
24     A   I may have.
25     Q   Who did you have those conversations

Page 147

1  with?
2      A   Other transition staff, including
3  attorneys.
4      Q   Why would ORR seek to try to reverse an
5  abortion of an unaccompanied minor?
6      A   I don't know, I mean except to save the
7  life of the baby.
8         MS. AMIRI:  Let's take maybe a
9  break.  What, what's our end stop?
10        MR. PHIPPS:  We're looking at -- so
11 we're off the record?
12        MS. AMIRI:  Yes, let's go off.
13        THE VIDEOGRAPHER:  Going off the
14 record at 4:20.
15        (Whereupon, a short recess was
16 taken.)
17        THE VIDEOGRAPHER:  We are going
18 back on the record at 4:36.  This begins disc
19 number 3.
20 BY MS. AMIRI:
21     Q   Can you walk me through what happened
22 with Jane Doe.
23     A   So we, we received a termination
24 request.  Gosh, I'm sorry.  The, the facts of that
25 case are escaping me right now.

Page 148

1         Oh, so one of our grantees kind of --
2  I'm sorry.  So we received a request from our
3  grantee, the kind of -- according to our
4  notification procedures, the staff let me know
5  that this was occurring.  We began on the
6  information-gathering process, and at some point,
7  at some point that litigation began.
8      Q   So before litigation began, did you
9  require that minor to visit a crisis pregnancy
10 center?
11     A   Perhaps.
12     Q   And perhaps you don't remember or you
13 don't know?
14     A   I don't remember, but I think so.
15     Q   Did you also send an Ob-Gyn to do an
16 examination at the shelter of Jane Doe?
17     A   No.
18     Q   The name Dr. R█████doesn't ring a
19 bell to you?
20     A   It does.
21     Q   Who is Dr. R█████?
22     A   He was medical staff at a crisis
23 pregnancy center.
24     Q   So it's fair to say that he would be
25 opposed to abortion?

Page 149

1         MR. PHIPPS:  Objection.
2  Foundation.
3         THE WITNESS:  Yeah.
4  BY MS. AMIRI:
5      Q   You don't know?
6      A   No, I don't know.  He works at a
7  pregnancy center.
8      Q   How did you come to know who
9  Dr. R█████was?  If you know who he is, how do
10 you know him?
11     A   Sure.  If I recall correctly, I was
12 informed by Maggie Wynne.
13     Q   Informed by her about him in what sense?
14     A   Of his, of his person and of his being a
15 doctor and his affiliation with the pregnancy
16 center.
17     Q   Did you learn about Dr. R█████ in the
18 context of Jane Doe's request for an abortion?
19     A   Yes.
20     Q   And so it came up; either you had a
21 conversation with Maggie Wynne somehow, and she
22 said there's a Dr. R█████ in the valley who
23 could visit Jane?
24     A   Not exactly, but roughly, yes.
25     Q   Okay.  Do you know if Dr. R█████ ever

38 (Pages 146 to 149)

Page 150

1  went to the shelter to, to meet with Jane Doe?
2      A   I don't think that he did.
3      Q   Do you know if Dr. R_____ ever
4  performed an exam on Jane Doe outside the shelter?
5      A   I think that he did, yes.
6      Q   Was it at the pregnancy crisis center he
7  was associated with or someplace else?
8          MR. PHIPPS:  Objection.
9  Foundation.
10         THE WITNESS:  I'm not sure.
11         (Exhibit 16 was marked for
12  identification.)
13 BY MS. AMIRI:
14     Q   Go ahead and take a minute and just
15 thumb through this email set which we believe to
16 be about Jane Doe, and I can ask you some
17 questions.
18     A   Sure.
19         (Witness peruses document.)
20         THE WITNESS:  Okay.
21 BY MS. AMIRI:
22     Q   So in your email on page 1 there, it's
23 dated September 22, the second Page 1, so it's
24 production 14889, you say, "Let's clarify with the
25 program that they are not to take her to get a

Page 151

1  termination, or to any appointments to prepare her
2  for a termination, without consent from the
3  Director, which cannot happen without written and
4  notarized consent of her parents, and will not
5  necessarily follow.  Program should proceed with
6  life-affirming options counseling and notification
7  to the parents of the pregnancy, and if she still
8  desires it, the request for termination."
9      A   Okay.
10     Q   So in this context you're laying out the
11 next steps for the process for Jane Doe's abortion
12 request; is that fair?
13     A   Yes.
14     Q   And in Jonathan White's response right
15 above where I was just reading from, he says that
16 "options counseling using a provider from the list
17 of approved providers received from the
18 Partnership Center is, as I understand it,
19 scheduled for Monday."
20         Do you know what he's talking about in
21 that sentence?
22     A   Which sentence?  Sorry.
23     Q   "Options counseling using a provider
24 from the list of approved providers received from
25 the Partnership Center is, as I understand it,

Page 152

1  scheduled for Monday."
2      A   Okay.
3      Q   Do you know what he's talking about
4  there?
5      A   Yeah, yeah.
6      Q   What list of approved providers is he
7  talking about?
8      A   That's why, that's why I'm hesitating.
9  I've heard of this list, but -- yeah, I don't know
10 much about it.
11     Q   And I should also say that I realize
12 there is some sensitive information about Jane Doe
13 in here, and since this is all pursuant to the
14 protective order, you know, we will -- we can
15 figure out the exhibits afterwards, but these are
16 the more recent batch that have not been redacted.
17         Did you make a determination at any
18 point about whether an abortion would be in the
19 best interest of Jane Doe?
20     A   I don't recall.
21     Q   In the context of abortion requests that
22 come to you, and you talk about the totality of
23 the circumstances that you are considering, are
24 you ultimately looking at the totality of
25 circumstances for these factors to make the

Page 153

1  determination about whether the abortion is in the
2  minor's best interest?
3      A   Yes.
4      Q   Is that the ultimate question that
5  you're asking yourself?
6      A   With all, with all interventions
7  regarding all UACs, that's, that's the standard
8  that applies.  Best interest.
9      Q   And is there any, any circumstance where
10 you would find that an abortion is in the best
11 interest of a minor?
12     A   I don't know.
13     Q   It has not happened yet?
14     A   No.
15     Q   Is that because you believe that
16 abortion is the destruction of human life?
17     A   That's part of it.
18     Q   What's the rest of it?
19     A   The rest of the circumstances
20 surrounding the request.
21     Q   Well, let's talk about Jane Doe.  Why
22 was the abortion not in her best interest?
23     A   I don't recall making that determination
24 in that, that circumstance.
25     Q   So if a minor has asked for an abortion,

39 (Pages 150 to 153)

Page 154

1   is firm in her decision that she wants an
2   abortion, do you believe you could nevertheless
3   make a determination that the abortion is not in
4   her best interest based on your totality of
5   circumstances test?
6       A   I didn't hear part of that question.
7   Sorry.
8       Q   If a minor is firm in her decision that
9   she wants to have an abortion, do you believe you
10  can override that decision and determine that the
11  abortion is not in her best interest using your
12  totality of circumstances test?
13          MR. PHIPPS:  This applies to
14      unaccompanied alien children in the custody
15      of ORR grantees?
16          MS. AMIRI:  Correct.
17          THE WITNESS:  While they are in our
18      custody?
19  BY MS. AMIRI:
20      Q   While they are in your custody.
21      A   Sure.
22      Q   Okay.  The answer is yes?
23      A   Yes.
24      Q   Okay.
25          Did you require the shelter to notify

Page 155

1   Jane Doe's parents, her mother, about her abortion
2   decision against her wishes?
3       A   I don't recall.
4       Q   If you'd turn to PRICE-PROD 15152.
5       A   Okay.
6       Q   So in this email exchange with you and
7   Jonathan White and looks like some other folks,
8   you say, "She does not have to be the person to
9   speak with her parents, but her parents have to
10  know that she is pregnant."
11      A   Mm-hmm.
12      Q   Why is that?
13      A   For the same reasons I gave before.
14      Q   And so you said before that -- or sorry.
15  Regarding the email, the email below, that
16  Jonathan White is informing you that the minor is
17  "strongly opposed to parental notification"?
18      A   Okay.
19      Q   And nevertheless, you're insisting that
20  her parents be notified?
21      A   Yes.
22      Q   And Bates stamp number 15164, discussion
23  of the minor going to get a physical examination,
24  life-affirming options counseling, in that on --
25  do you believe that that is with the Dr. R██████

Page 156

1   that we mentioned before?
2       A   Yes, I think so, yes.  Yep.
3       Q   And you see that she was upset, "cried
4   and appeared distressed" when you brought up her
5   mother?
6       A   Yes.
7       Q   And was notified that the shelter
8   informed her mother that she was pregnant?
9       A   Okay.  Where is that part?
10      Q   In the next paragraph.
11          MR. PHIPPS:  Is there -- so just to
12      clarify by way of semi-objection, I guess,
13      you're asking if this -- if he was familiar
14      with this email and what the email says --
15          MS. AMIRI:  Yes.
16          MR. PHIPPS:  -- or factually
17      whether she was at that -- whether factually
18      this was true?
19  BY MS. AMIRI:
20      Q   Email.  I mean I'm a little confused
21  about the email chain, because it's from Scott
22  Lloyd sent to ████████████  Oh, it says,
23  "Thank you for the update," but I'm guessing
24  ████████████ is the one that sent this to you.
25      A   Yes.

Page 157

1       Q   Okay.  So you had received the update
2   that the minor was upset?
3       A   Mm-hmm.
4           MR. PHIPPS:  Your questions aren't
5       factually what was going on with the
6       unaccompanied child, but whether he --
7           MS. AMIRI:  Received the email
8       indicating this report.
9           MR. PHIPPS:  Okay.
10  BY MS. AMIRI:
11      Q   And similarly with Bates 15165, it's an
12  email from ████████████ to you, saying,
13  "Mr. Lloyd, Dr. R████████ has arrived."
14      A   Okay.
15      Q   You understand that -- what was your
16  understanding about where he had arrived, what was
17  going on?
18      A   Their program staff arrived at a
19  location before Dr. R████ arrived.
20      Q   Did they arrive at a crisis pregnancy
21  center or someplace else?
22      A   I am not sure.
23          (Exhibit 17 was marked for
24          identification.)
25

TransPerfect Legal Solutions
212-400-8845 – Depo@TransPerfect.com

Page 158

1    BY MS. AMIRI:
2        Q    Take a minute to look at Exhibit 17.
3    Also, I believe it hasn't been redacted pursuant
4    to the protective order yet, but . . .
5        A    Okay.
6        Q    Are you familiar with this particular
7    minor's request for an abortion at ███████████
8    ███████
9        A    Yeah.
10       Q    And it would have been sometime this
11   fall, September 2017?
12       A    Okay.  Looks like it.
13       Q    It looks like it, right?  Okay.
14            Do you know what the outcome was of this
15   particular case?
16       A    No.
17       Q    Did you require the shelter staff to
18   notify the parents of the pregnancy, regardless of
19   the UAC's wishes at PRICE-PROD 14822?
20       A    That appears to be what I said, yeah.
21       Q    Okay.
22            MR. PHIPPS:  You said that was
23   14822 or 82?
24            THE WITNESS:  822.
25            MR. PHIPPS:  Oh, 822.  Sorry.

Page 159

1    BY MS. AMIRI:
2        Q    Have you denied an abortion request for
3    a minor based on a report that if the minor had
4    the abortion, that the mother would be physically
5    abusive toward the minor?
6        A    No.
7        Q    If you can look at -- oh, I'm sorry.
8            (Exhibit 18 was marked for
9             identification.)
10           THE WITNESS:  Okay.
11   BY MS. AMIRI:
12       Q    So in the email from Jonathan White, it
13   says, "HHS has identified a set of providers close
14   to each shelter program that is approved to
15   provide counseling to UAC requesting information
16   on pregnancy termination.  Scott has instructed us
17   to have programs use these providers."
18           My question is:  Did you make that
19   instruction?
20       A    I don't recall.
21       Q    Do you have any reason to doubt that
22   this email is wrong?
23       A    No, except that I, I don't recall the,
24   seeing the list.
25       Q    You don't think you've ever seen a list

Page 160

1    of providers?
2        A    I don't recall.
3        Q    Have you had conversations about who
4    should be included in that list?
5        A    I, I don't think so.
6        Q    Was that primarily Jonathan White,
7    Maggie Wynne?  Do you know who was involved in
8    that?
9        A    In --
10       Q    In developing a list of approved
11   providers.
12       A    I don't have direct knowledge of that.
13       Q    Do you know whether all of the entities
14   on the list are crisis pregnancy or crisis
15   resource centers?
16       A    I, I don't recall seeing the list.
17       Q    If you can see in the attachment
18   section, it says that -- on the email it says
19   "CareNetCenters.xlsx."
20       A    Sure.
21       Q    Sorry.  Xlsx.
22            Do you know what CareNet is?
23       A    Yes.
24       Q    What is it?
25       A    It's a, it's a network of crisis

Page 161

1    pregnancy centers, pregnancy resource centers,
2    depending on . . .
3            (Exhibit 19 was marked for
4             identification.)
5    BY MS. AMIRI:
6        Q    Do you know who Shannon Royce is?
7        A    Yes.
8        Q    Who is she or he?
9        A    No, it's a she.  Director for the Center
10   for Faith-based and Neighborhood Partnerships.
11       Q    So it looks like this is an email from
12   Jonathan White to Shannon Royce, and it says, "Per
13   Scott Lloyd's request, ORR would appreciate it if
14   your team would identify pregnancy resource
15   centers in each of these areas to which programs
16   may refer UAC when appropriate."
17       A    Okay.
18       Q    Do you remember making that request?
19       A    I'm not going to deny it.  I mean it
20   sounds, it sounds right.
21       Q    Do you remember anything about the
22   substance of the request, what you were asking
23   for?
24       A    Probably to work with Shannon Royce to
25   come up with a, with a list of life-affirming

41  (Pages 158 to 161)

Page 162

1    resource centers, pregnancy resource centers.
2        Q    And the sentence includes "to which
3    programs may refer UAC when appropriate."
4        Do you have an opinion about when it
5    would be appropriate for a program to refer a
6    minor to one of the pregnancy resource centers on
7    this list?
8        A    Well, if the, if the UAC is pregnant
9    and -- yeah, if they're pregnant and seeking
10   information about their options.
11       Q    Do you get reports on a regular basis
12   about all pregnant unaccompanied minors in ORR
13   custody?
14       A    Yes.
15       Q    What do those reports look like?
16       A    A spreadsheet.
17       Q    A spreadsheet, and what information
18   contained in the spreadsheet?
19       A    Perhaps the A-number or the alien
20   number.
21       Q    Yep.
22       A    Location of the UAC -- I guess estimated
23   gestational age; whether there's information as to
24   whether the pregnancy is the result of sexual
25   assault; if the assault occurred in custody, and

Page 163

1    whether they desire termination or they made any
2    request for termination.
3        Q    Did you request that these reports be
4    made to you on a weekly basis?
5        A    Yeah.
6        Q    And to whom did you make that request?
7        A    Jonathan White or Michael Bartholomew.
8        Q    Why did you make that request?
9        A    Just to know the universe of what exists
10   in our programs.
11       Q    What action do you take when you see a
12   new minor who is pregnant and seeking an abortion?
13       A    Nothing.  I mean usually I would know
14   about it before I got the overall report.
15       Q    I see.  So it's a weekly report that you
16   get?
17       A    Mm-hmm.
18       Q    Can you say "yes" for the court
19   reporter?
20       A    Yes.  Sorry.
21       Q    And it provides updates to you about the
22   situation of each pregnant minor?
23       A    Yes.
24       Q    Is that fair?
25       A    Yes.

Page 164

1        Q    Have you ever spoken with anyone at
2    Immigration and Customs Enforcement about their
3    policies with respect to abortion?
4        A    I think so.
5        Q    What were those conversations?
6        A    I may have asked one or two personnel
7    what their policy is.
8        Q    And what did they say to you?
9        A    One person said that we, we don't
10   provide abortions to people in our custody.
11       Q    And what did the other person say?
12       A    I just don't remember if I've had two
13   conversations on it, but I can remember more
14   clearly the one.
15       Q    And the one that you can remember, who
16   was it with?
17       A    It was with Tom Homan, H-O-M-A-N, who is
18   the director of -- did you say ICE?
19       Q    Yes.
20       A    Customs and Border Patrol [sic]?
21       Q    Yes.
22       A    He's the director of ICE.
23       Q    Do you understand ICE to have a current
24   policy that allows access to abortion?
25       A    I don't know any of the details of that.

Page 165

1        Q    Have you ever seen a policy --
2        A    No.
3        Q    -- of ICE?
4        A    No.
5        Q    And same question with the Bureau of
6    Prisons.
7        A    Yeah, I mean we should back -- sorry.
8    We should back up, because -- yeah, I think your
9    original question was about Customs and Border
10   Patrol, and I don't recall having a discussion
11   with anybody at Customs and Border Patrol.
12       Q    Sorry.  Okay.  So Immigration and
13   Customs Enforcement, so "ICE" is for short.
14       A    Sure.
15       Q    Okay.  So I'm not sure if you're -- if
16   it's the same thing you're thinking about in terms
17   of Border Patrol, but --
18       A    Well, I once made the mistake of calling
19   somebody from ICE the Border Patrol --
20       Q    Right, right.
21       A    -- and they corrected me.
22       Q    Right.  I bet they did.
23       So was your conversation with somebody
24   from ICE or Border Patrol?
25       A    ICE.  The one I recall is from ICE.

42  (Pages 162 to 165)

Page 166

1    Q   Okay.  So then my next question is about
2  whether you had a conversation with anyone from
3  the Bureau of Prisons about access to abortions at
4  the Bureau of Prisons.
5    A   No.
6    Q   Have you had any conversations with the
7  current acting HHS director about access to
8  abortion?
9    A   No.
10    Q   Did you have any conversations with HHS
11  Secretary Price, when he was in office, about
12  access to abortion?
13    A   I don't think so.
14    Q   You don't think you did or you don't
15  remember?
16    A   I don't think that I did.
17    Q   Have you had any conversations further
18  up in government, above HHS's head in the
19  executive branch, about abortion during your time
20  as ORR director?
21    A   Yeah, yeah, I mean yes, I think so.
22    Q   Who --
23    A   From the Office of the White House, but
24  really following how they overlap is not clear.
25    Q   So you've spoken with someone in the

Page 167

1  Office of the White House about abortion?
2    A   Staff.
3    Q   Okay.  What were the substance of those
4  conversations?
5       MR. PHIPPS:  Wait, wait.  I mean
6  I'm in a strange position, because I don't
7  know what privileges come about --
8       MS. AMIRI:  All right.
9       MR. PHIPPS:  -- for White House
10  communication.
11       MS. AMIRI:  Okay.
12       MR. PHIPPS:  I'm not -- I, I --
13       MS. AMIRI:  Let's put a pin in it.
14       MR. PHIPPS:  Yeah, I'm just not
15  familiar with the contours of executive
16  privilege to assert it, to preserve it.
17       MS. AMIRI:  You can figure it out.
18       MR. PHIPPS:  Or maybe not on break.
19       MS. AMIRI:  Maybe there's an easy
20  answer.  I'll let you explore it.
21       MR. PHIPPS:  Okay.  I mean I'll
22  find out what the substance is and see what
23  privilege would apply or further on down.
24       MS. AMIRI:  Yes, okay, so we'll put
25  a pin in that.

Page 168

1  BY MS. AMIRI:
2    Q   Have you ever spoken to any pregnant
3  unaccompanied minor, during your time as ORR
4  director, about religion?
5    A   I don't know.  That's kind of a really
6  broad question.
7    Q   Well, how many pregnant minors have you
8  spoken to when you've been director of ORR?
9    A   I'm not sure.
10    Q   Has it been more than five?
11    A   I'm not sure.  I don't know how many
12  were pregnant.  I spoke to a lot of UACs.
13    Q   So let's talk about UAC in general.  Do
14  you, do you talk to UAC about religion?
15    A   About religion?
16    Q   Yes, or God or the Bible.
17    A   Well, I mean about religion, I mean
18  that, that's so -- no, no, not about religion,
19  about religious faith.  I mean it's -- yeah, about
20  religion, no.
21    Q   So what, what about the question are you
22  struggling with?
23    A   Well, what do you mean "talk about
24  religion"?
25    Q   Talk about God, the Bible, praying.

Page 169

1    A   I've had conversations that involved
2  God --
3    Q   Okay, and what were those conversations?
4    A   -- and praying.  God bless you, many
5  people are praying for you, those sorts of things.
6    Q   Have you ever prayed with a minor?
7    A   I don't think so.
8    Q   Have you ever talked about religious
9  opposition to abortion with a minor?
10    A   No.
11       (Exhibit 20 was marked for
12       identification.)
13  BY MS. AMIRI:
14    Q   So I've handed you what's been marked
15  Exhibit 20.
16       Have you seen this document before?
17    A   Yes, I believe so.
18    Q   It says it's to the "ASPA."  What does
19  that acronym stand for?
20    A   Assistant Secretary for Public Affairs.
21    Q   And who was in that position at the time
22  this memo was sent on March 6?
23    A   I believe there was somebody acting.
24  I'm not, I'm not sure who that was at the time.
25    Q   This memo is from Maggie Wynne, you and

43 (Pages 166 to 169)

Page 170

1  Matt Bowman, correct?
2      A   Yes.
3      Q   And who is Matt Bowman?
4      A   He's deputy general counsel for the
5  department.
6          MR. PHIPPS:  You asked who he is
7      currently, right?
8          MS. AMIRI:  Yes.
9          MR. PHIPPS:  Okay.
10  BY MS. AMIRI:
11     Q   I'm also ask what position did he hold
12  at the time this memo was written.
13     A   Not, not -- I don't, I don't know.  I
14  think he may have already been -- I don't know.
15     Q   Okay.  How did this memo come about?
16     A   I believe somebody requested, probably
17  ASPA -- A-S-P-A, Assistant Secretary for Public
18  Affairs -- background and summary on a few cases
19  of termination requests, and, and the three of us
20  drafted it.  I believe I had the pen on it.
21     Q   Do you know why the ASPA recommended --
22  or I'm sorry -- requested this memo?
23     A   For informational purposes.
24     Q   And how did you learn the information
25  that is included in this memo?

Page 171

1      A   Discussions with UAC program staff and
2  the files, records.
3      Q   Was there some outcome of this memo?  It
4  says that there's "next steps" involved.
5      A   Yeah, yeah, there are, there are
6  outcomes --
7      Q   So what happened after this?
8      A   -- steps involved.
9          So I, so I mean a reference -- this came
10  after the reminder of the request.  There is an
11  investigation into the extent to what programs'
12  understanding of, of policy regarding termination
13  of pregnancy was at the time that they took the
14  actions they did and whether their actions
15  violated their understanding of, of the policy.
16     Q   And were any shelters punished for their
17  actions regarding to abortion access for minors?
18     A   No.
19     Q   Was there an investigation launched?
20     A   Yeah.  "Launched" is a little dramatic,
21  but yeah, there is an investigation.
22     Q   Okay.  No one lost funding?
23     A   No.
24     Q   No one was fired from the shelters?
25     A   No.

Page 172

1          MS. AMIRI:  So I'd like to do 43.
2          (Exhibit 21 was marked for
3          identification.)
4  BY MS. AMIRI:
5      Q   Exhibit 21.  I just wanted to see if
6  this was your -- if it's your understanding that
7  the minor discussed in Exhibit 21 is the one that
8  we discussed earlier that you met with in person
9  in ██████████████.
10     A   Yes.
11     Q   I'm sorry.  What was the date that you
12  came into the transition team?
13     A   The last week of February.
14     Q   Okay.  Did Jonathan White precede you?
15  Was he already in ORR when you came in?
16     A   Yes.
17     Q   Is it still the process at ORR that any
18  shelter who has a minor in their custody who is
19  seeking an abortion sends a memo to the ORR
20  director as it was in the Obama administration?
21         MR. PHIPPS:  Objection.  Assumes
22     facts not in evidence.
23  BY MS. AMIRI:
24     Q   You can scrap the comparison if you
25  want.  Does -- do shelter staff send you a

Page 173

1  memoranda or memorandum requesting abortion
2  approval?
3      A   Yes.
4      Q   Do you tell shelter staff what they need
5  to include in that memo?
6      A   I don't, no.
7      Q   Who does?
8      A   It would be medical staff or program
9  staff, as appropriate.
10         MS. AMIRI:  I want to confer with
11     Meagan, and then I also have a question for
12     you.
13         MR. PHIPPS:  Yeah, sure.
14         MS. AMIRI:  So we can take ten
15     minutes.
16         MR. PHIPPS:  Yes.
17         THE VIDEOGRAPHER:  Going off the
18     record at 5:19.
19         (Whereupon, a short recess was
20         taken.)
21         THE VIDEOGRAPHER:  We are going
22     back on the record at 5:48.
23         MS. AMIRI:  I don't have any
24     further questions at this time.  Questions
25     from counsel may prompt me then to follow up

44  (Pages 170 to 173)

Page 174

1    with another question, but right now I don't.
2         Something that we did talk about,
3    however, on break is that because the
4    government is still going to make a
5    supplemental production before the end of
6    discovery, that we are keeping the deposition
7    open to reserve our right to have a short
8    deposition, if needed, upon receiving the
9    rest of the production.
10        MR. PHIPPS:  Okay.
11   EXAMINATION BY COUNSEL FOR FEDERAL DEFENDANTS
12   BY MR. PHIPPS:
13        Q   Good afternoon, Mr. Lloyd.
14        A   Hi.
15        Q   My name is Peter Phipps.  As you know, I
16   represent the official capacity defendants in this
17   action.  I want to ask you a few follow-up
18   questions.
19        A   Okay.
20        Q   You currently serve as the director of
21   the Office of Refugee Resettlement within the
22   Department of Health and Human Services, correct?
23        A   Yes.
24        Q   Now, that office is known as --
25   abbreviated as "ORR"?

Page 175

1         A   Yes.
2         Q   And you've been in that position since
3    March of 2017 as director, correct?
4         A   Yes.
5         Q   Generally what are your responsibilities
6    as director of ORR?
7         A   I oversee the Unaccompanied Alien
8    Children Program, the Refugee Resettlement
9    Program, and the U.S. Repatriation Program.
10        Q   In carrying out those responsibilities
11   with respect to overseeing the Unaccompanied Alien
12   Children grant program --
13        A   Sure.
14        Q   -- are you motivated by the purpose to
15   promote religion?
16        A   No.
17        Q   In your capacity as ORR director, have
18   you given favorable treatment to a Catholic
19   grantee or a Catholic organization such as the
20   United States Conference of Catholic Bishops
21   because it was Catholic?
22        A   No.
23        Q   Are you aware of anyone within ORR who
24   gives favorable treatment to Catholic grantees
25   such as USCCB because that grantee or those

Page 176

1    grantees are Catholic?
2         A   No.
3         Q   During your tenure -- and again all
4    these questions are to your knowledge -- have any
5    of the grant funds for the care and custody of
6    unaccompanied alien children been used for
7    religious instruction?
8         A   No.
9         Q   Religious teaching?
10        A   No.
11        Q   Religious items?
12        A   No.
13        Q   To promote religion in any way?
14        A   No.
15        Q   Again during your tenure as ORR
16   director -- and again this is to the best of your
17   knowledge -- has ORR assigned or delegated
18   authority over an unaccompanied alien child's
19   access to abortion to any grantee?
20        A   No.
21        Q   That includes any faith-based grantee.
22        A   Correct.
23        MR. PHIPPS:  I have no further
24   questions.  Thank you very much.
25

Page 177

1    EXAMINATION BY COUNSEL FOR DEFENDANT-INTERVENOR
2    BY MR. NOWICKI:
3         Q   Mr. Lloyd, I'm Dan Nowicki.  I represent
4    defendant-intervenor United States Conference of
5    Catholic Bishops called USCCB.
6         Is that all right?
7         A   Yes.
8         Q   Now, you said that you began in your
9    current position in March of 2017; is that right?
10        A   Yes.
11        Q   And before that, you had been an advisor
12   in ORR since February, late February 2017?
13        A   Advisor to the transition since late
14   February, yes.
15        Q   And before that, when was the last time
16   that you had worked at ORR?
17        A   I had not worked at ORR.
18        Q   Or at HHS?
19        A   In HHS?  2009, July 2009.
20        Q   So it would be fair to say that between
21   July of 2009 and February 2017, you had no
22   interaction or control over any kind of
23   negotiations or any grant agreements or anything
24   that ORR had entered into?
25        A   That's correct.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 178

1      Q    And you have been asked today about
2  various abortion requests that UAC may have given
3  to grantees or to you. I'm sure you recall that.
4      A    Yes.
5      Q    And do you believe that the TVAP
6  program, Trafficking Victims Assistance Program,
7  is different from the UAC program?
8      A    Yes.
9      Q    And all of these requests we've been
10  referring to with the UAC, those are again
11  children in UAC care programs, not in TVAP
12  programs; is that correct?
13      A    Correct.
14      Q    Do you know if any of the UACs that we
15  discussed today were in USCCB's subgrantee
16  facilities or under subgrantee care of USCCB?
17      A    Of the ones, specific ones discussed
18  today?
19      Q    Mm-hmm.
20      A    I don't think so.
21      Q    Do you know of any that have -- any UACs
22  that have given abortion requests during your time
23  here that were in the care of USCCB subgrantees?
24      A    I don't know.
25          MR. NOWICKI: I believe that's my

Page 179

1  questions. Thank you.
2          MS. AMIRI: I don't have anything
3  further, so I'll keep the deposition open and
4  wait for the supplemental production and go
5  from there.
6          MR. PHIPPS: Okay. Very good.
7          THE VIDEOGRAPHER: Going off record
8  at 5:54.
9          THE REPORTER: And I just need to
10  ask who wants a transcript.
11          MS. AMIRI: Me, please.
12          MR. PHIPPS: We do.
13          THE REPORTER: And Mr. Nowicki, do
14  you want a transcript?
15          MR. NOWICKI: We do, yes.
16          (Discussion held off the record.)
17          MS. AMIRI: Can we get a rough?
18  Yeah, let's do a rough now.
19          THE REPORTER: Okay. Do you want a
20  rough, Mr. Phipps?
21          MR. PHIPPS: No. I will probably
22  take -- is your standard time --
23          THE REPORTER: Two weeks, ten
24  business days.
25          MR. PHIPPS: All right. If you

Page 180

1  pick a date, probably sometime after
2  Christmas, between Christmas and New Year's,
3  we'll agree to that date. We want the same
4  date you want. I don't think we want it this
5  week.
6          MS. AMIRI: I don't think so.
7  That's fine.
8          (Signature having not been
9          waived, the video deposition of
10          SCOTT LLOYD, ESQUIRE was
11          concluded at 5:54 p.m.)

Page 181

5          ACKNOWLEDGEMENT OF WITNESS
6      I, Scott Lloyd, Esquire, do hereby
7  acknowledge that I have read and examined the
8  foregoing testimony, and the same is a true,
9  correct and complete transcription of the
10  testimony given by me, and any corrections
11  appear on the attached Errata sheet signed by
12  me.
13
14
15  _____ _____
16  (DATE)        (SIGNATURE)

46 (Pages 178 to 181)

Page 182

```
 1        E R R A T A   S H E E T
 2  IN RE:  ACLU vs. HARGAN & USCCB
 3  RETURN BY:
 4  PAGE   LINE         CORRECTION AND REASON
 5  ____  ____  _____
 6  ____  ____  _____
 7  ____  ____  _____
 8  ____  ____  _____
 9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23
24  _____    _____
25  (DATE)            Scott Lloyd, Esq.
```

Page 183

```
 1
 2
 3
 4
 5
 6  CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
 7        I, Laurie Donovan, Registered
        Professional Reporter, Certified Realtime
 8      Reporter, the officer before whom the
        foregoing deposition was taken, do hereby
 9      certify that the foregoing transcript is a
        true and correct record of the testimony
10      given; that said testimony was taken by me
        stenographically and thereafter reduced to
11      typewriting under my supervision; and that I
        am neither counsel for, related to, nor
12      employed by any of the parties to this case
        and have no interest, financial or otherwise,
13      in its outcome.
14           IN WITNESS WHEREOF, I have hereunto
        set my hand and affixed my notarial seal this
15      2yth day of December, 2017.
16      My commission expires:  March 14th, 2021
17
18
19  _____
20  LAURIE DONOVAN
    NOTARY PUBLIC IN AND FOR
21  THE DISTRICT OF COLUMBIA
22
23
24
25
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com