**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROCHELLE GARZA, as guardian ad litem to unaccompanied minor J.D., on behalf of herself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ERIC D. HARGAN, *et al.,*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 17-cv-02122 (TSC)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rochelle Garza, on behalf of a putative class of unaccompanied, undocumented minors, has sued Eric Hargan, Acting Secretary of the Department of Health and Human Services, Stephen Wagner, Acting Assistant Secretary of the Administration for Children and Families, and E. Scott Lloyd, Director of the Office of Refugee Resettlement, alleging that Defendants have violated the minors' constitutional rights by preventing them from terminating their pregnancies or otherwise availing themselves of the full panoply of legally available reproductive healthcare services while in federal custody. Pending before the court are Plaintiffs' Motion for Class Certification (ECF No. 18) and Motion for a Preliminary Injunction (ECF No. 5). Having reviewed the parties' filings (including the briefs of *amici curiae*), the record, and the relevant case law, the court hereby GRANTS Plaintiffs' Motion for Class Certification. The relevant class is defined as all pregnant, unaccompanied immigrant minor children (UCs) who are or will be in the legal custody of the federal government. For the

1

reasons set forth below, the court further GRANTS Plaintiffs' Motion for a Preliminary
Injunction.

## I. BACKGROUND

The Office of Refugee Resettlement (ORR), which is headed by its Director, E. Scott
Lloyd, is responsible for "coordinating and implementing the care and placement of
unaccompanied alien children who are in Federal custody by reason of their immigration status."
6 U.S.C. § 279(b)(1)(A). As part of that responsibility, ORR is charged with "making placement
determinations" for UCs, "implementing the placement determinations," "implementing policies
with respect to the care and placement" of UCs, and housing them. *Id.* § 279(b)(1)(C)–(L). In
executing these duties, ORR is charged with "ensuring that the interests of the child are
considered in decisions and actions relating to the care and custody of an unaccompanied minor
child." *Id.* § 279(b)(1)(B). ORR places UCs with federal grantee organizations that provide
shelter and services in compliance with ORR policies and procedures. (ECF No. 10-1 ¶¶5–6).

In March 2017, ORR instructed employees at federally funded shelters that they "are
prohibited from taking any action that facilitates an abortion without direction and approval from
the Director of ORR," (ECF No. 5-4), are required to "notify ORR through [assigned federal
staff] immediately of any request or interest on any girl's part in terminating her pregnancy,"
(ECF No. 5-5 at 5), and are not permitted to "support[] abortion services pre or post-release; only
pregnancy services and life-affirming options counseling." (ECF No. 5-6 at 2). The Director's
approval must be in the form of written authorization, and is required "whether the procedure
will be paid for with Federal funds or by other means." (ECF No. 5-5 at 3). "Facilitation"
includes all actions relating to scheduling appointments, arranging transportation, pursuing a
judicial bypass, "or any other facilitative step" in relation to an abortion procedure. (ECF No. 5-

5 at 5).  The record indicates that a UC seeking an abortion must also obtain an ultrasound and options counseling from a provider on a pre-approved list, and "obtain parental consent, which will necessitate options counseling with [her parents], plus signed, notarized declaration of consent." (ECF No. 5-10 at 3; *see also* ECF No. 5-9 at 2).

### A.  Proposed Class and Class Representatives

Plaintiffs seek to form a class that would include all pregnant UCs who are or will be in federal custody and, accordingly, are or will be subject to ORR's policies or practices.  Named Plaintiffs include four female UCs—Jane Doe (J.D.), Jane Roe (J.R.), Jane Poe (J.P.), and Jane Moe (J.M.)—each of whom has at some point been both pregnant and in ORR custody since Plaintiffs filed the case in October 2017.

#### 1.  Jane Doe

 J.D., the original named plaintiff in this case, is a UC who entered the United States in September 2017, when she was 17 years old.  She was apprehended at the U.S. border and remanded to ORR custody at a shelter in Texas.  (Findings of Fact in Supp. of Am. TRO ¶¶1–2, ECF No. 30).  After a medical examination confirmed that she was pregnant, J.D. sought to terminate her pregnancy, and with the assistance of a guardian *ad litem* and an attorney *ad litem*, sought and received a judicial bypass of Texas's parental notification and consent requirements. (ECF No. 30 ¶¶3–4).  J.D. obtained private funding for the procedure, and her guardian and/or attorney *ad litem* agreed to transport her to have the procedure.  (ECF No. 30 ¶10). Nevertheless, when J.D. attempted to complete the final stages of Texas's procedure for obtaining an abortion, Defendants refused to transport her to the facility and refused to allow anyone else to transport her, claiming that transporting J.D. or allowing her transportation would constitute "facilitation." (ECF No. 30 ¶6).  Defendants maintained that under ORR policy, J.D.

could obtain an abortion by leaving ORR's custody in one of two ways: (1) if a third party were to indicate a willingness to serve as a sponsor for J.D., qualify for that position under applicable legal requirements, complete the administrative review process, and obtain ORR approval; or (2) if J.D. were to voluntarily self-deport to her home country, where Defendants conceded that abortion is illegal.  (ECF No. 30 ¶8).

Defendants also employed other means to dissuade J.D. from having an abortion, such as requiring her to undergo counseling from a religiously-affiliated crisis pregnancy center (some version of which appears to be mandatory for all pregnant minors seeking termination while in ORR custody)[1], and requiring her to view a sonogram.  (ECF No. 30 ¶7). ORR also notified J.D.'s mother of her decision, despite the fact that J.D. had informed ORR that her parents were abusive, and that she fears returning to her home country for that reason.  (Decl. of Marie Christine Cortez ¶¶8, 11, ECF No. 41-1).

This court granted J.D.'s request for injunctive relief on October 18, 2017.  Defendants immediately sought an emergency stay pending appeal, which a divided panel of the D.C. Circuit granted in part on October 20, over the dissenting statement of Circuit Judge Millett.  On October 24, however, the D.C. Circuit, sitting *en banc*, permitted the injunction to go into effect, "substantially for the reasons set forth in the October 20, 2017 dissenting statement of Circuit Judge Millett."  *Garza v. Hargan,* 874 F.3d 735, 736 (D.C. Cir. 2017) (mem).  J.D. was able to terminate her pregnancy, and was released to a sponsor on January 15, 2018.  (Decl. of Jonathan White ¶4, ECF No. 115-1).

---

[1] (*See* ECF No. 121-3 at 2, 4 (noting requirement for "spiritual counseling" and "life-affirming options counseling"); ECF No. 121-15 at 161–62.

2. <u>Jane Poe</u>

J.P. is a 17-year old UC who was detained at the U.S. border and remanded to ORR custody at a shelter in an undisclosed location.  In or around the week of December 11, 2017, J.P.'s physician informed her that her pregnancy had entered the second trimester.  After discussing her options with her physician, J.P. decided to terminate the pregnancy.  (TRO ¶7, ECF No. 73).  J.P. was prevented from doing so by the ORR policy, and Government counsel subsequently produced, at the court's request, a document memorializing that decision.  (ORR Decision Doc., ECF No. 92-1).  The document indicates that J.P.'s pregnancy was a result of rape in her home country, prior to her journey to the United States.  (ECF No. 92-1 at 1–2).  J.P. also reported that although she faced substantial family pressure to continue with the pregnancy, she had made three requests to have an abortion.  (ECF No. 92-1 at 2).  The document also reveals the basis of ORR's decision to forbid J.P. from obtaining an abortion—namely, Director Lloyd's belief that abortion constitutes "violence that has the ultimate destruction of another human being as its goal," that "abortion does not here cure the reality that she is the victim of an assault," that "[t]o decline to assist in an abortion here is to decline to participate in violence against an innocent life."  (ECF No. 92-1 at 7–8).  Lloyd also stated:

> At bottom, this is a question of what is in the interest of the young woman and her child. How could abortion be in their best interest where other options are available, and where the child might even survive outside the womb at this stage of the pregnancy? Here there is no medical reason for abortion, it will not undo or erase the memory of the violence committed against her, and it may further traumatize her. I conclude that it is not in her interest.

(ECF No. 92-1 at 8).  The Decision Document concluded:

> Refuge is the basis of our name and is at the core of what we provide, and we provide this to all the minors in our care, including their unborn children, every day.  In this request, we are being asked to participate in killing a human being in our care.  I cannot direct the program to proceed in this manner.  We cannot be a

> place of refuge while we are at the same time a place of violence.  We have to
> choose, and we ought to choose to protect life rather than to destroy it.

(ECF No. 92-1 at 8).

This court granted J.P.'s request for injunctive relief on December 18, 2017.  (ECF No. 73).  ORR elected not to appeal this court's order, and allowed J.P. to obtain an abortion procedure.  (*See* Appellants' Emergency Mot. for Stay Pending Appeal at 1 n.1, ECF No. 79-1).  As far as the court is aware, J.P. remains in ORR custody.

### 3.  Jane Roe

J.R. is a 17-year old UC who was detained at the U.S. border and remanded to ORR custody at a shelter in an undisclosed location.  (ECF No. 73 ¶¶1–2).  She learned of her pregnancy after a medical examination on November 21, 2017.  (ECF No. 73 ¶3).  Her physician explained her options to her, and she elected to terminate the pregnancy.  (ECF No. 73 ¶3).  ORR, citing its policy, refused to allow J.R. to terminate her pregnancy, despite the fact that—as with all the named Plaintiffs—the procedure would have been paid for with private funds.  (ECF No. 73 ¶14).  This court granted J.R.'s request for injunctive relief on December 18, 2017, and ORR appealed that decision to the D.C. Circuit.  (*See* ECF No. 73; Defs. Notice of Appeal, ECF No. 74).  Defendants subsequently moved for dismissal of that appeal in light of new information indicating that J.R. was not in fact a minor.  (*See* Resp. to Ct. Order at 2, ECF No. 84).  J.R. was later transferred to the custody of the Department of Homeland Security, where, as ORR acknowledges, regulations permit her obtain an abortion.  (*See* ECF No. 84 at 2).

### 4.  Jane Moe

J.M. is a 17-year old UC who was detained after entering the United States and remanded to ORR custody at a shelter in an undisclosed location.  (Decl. of J.M. ¶¶1–4, ECF No. 105-2).  J.M. requested an abortion, but was not permitted to obtain one, pursuant to the ORR policy.

(Decl. of J.M. ¶5).  She filed a motion seeking a temporary restraining order in this court on

January 11, 2018.  (Appl. for TRO, ECF No. 105).  Defendants responded on January 12, 2018,

reasserting the positions they maintained with respect to J.D., J.P., and J.R., and noting that ORR

had identified a sponsor for J.M. (Defs. Opp. to Pls. Mot. TRO at 1, ECF No. 108; Decl. of

Jonathan White ¶4, ECF No. 113-1).  On January 13, ORR informed the court that it had

received all necessary documents and had begun the process of releasing J.M. into the sponsor's

custody, (ECF No. 113-1 ¶¶4–5), and on January 14, ORR informed the court of J.M.'s release.

(Defs. Notice of Completion of the Transfer of Ms. Jane Moe, ECF No. 114).

### B.  Class-Wide Preliminary Injunction

Plaintiffs argue that Defendants' policies amount to a series of obstacles and restrictions

designed to "coerce and control all UCs' pregnancy decisions to ensure that they carry their

pregnancies to term while in ORR custody," such that pregnant UCs are: (1) "deprived of

comprehensive and unbiased options counseling" in favor of "coercive counseling" designed

more to influence their decision-making than to "meet their medical needs"; (2) "denied the

power to decide for themselves whether to involve their parents in their pregnancy decision-

making" by a system of disclosure and parental consent requirements that cannot be bypassed;

and (3) "stripped of their right to make autonomous decisions about whether and when to

become a parent" by ORR's retention of an ultimate veto power over abortion access, which is

exercised as a *de facto* ban on abortion.  (Pls. Reply to Opp. to Mot. for Class Certification at 3,

6, ECF No. 56; Mot. for Prelim. Inj. at 4, ECF No. 5-1).  Plaintiffs allege that these obstacles and

restrictions violate the First and Fifth Amendments to the U.S. Constitution, and seek to

preliminarily enjoin Defendants from further enforcing the terms of the above policy, pattern, or

set of practices.  (*See* Pls. Second Am. Compl. ¶¶55–63, ECF No. 61-1).

## II.   MOTION FOR CLASS CERTIFICATION

The court has discretion to grant or deny class certification pursuant to Fed. R. Civ. P. 23(c)(1), *see McCarthy v. Kleindienst*, 741 F.2d 1406, 1410 (D.C. Cir. 1984).  Under Fed. R. Civ. P. 23(a), the proponent of the class action must establish that: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  *Id.*  The proposed class must also meet one of the three additional requirements set forth in Rule 23(b): (1) that separate actions by or against individual class members would create the risk of (a) inconsistency in adjudications concerning those members, thus establishing incompatible conduct standards for the opposing party, or (b) adjudications relating to individual class members that would be practically dispositive of the interests of other nonparty members or would substantially impair or impede their ability to safeguard their interests; (2) that the opposing party acted or refused to act on grounds that apply generally to the class, such that injunctive and declaratory relief is appropriate as to the whole class; or (3), that common questions of law or fact predominate over questions affecting individual members only, and a class action is the best method to fairly and efficiently adjudicate the controversy.  Fed. R. Civ. P. 23(b)(1)–(3).

The proponent of the class action bears the burden of establishing that Rule 23's requirements are met.  *McCarthy*, 741 F.2d at 1414 n.9.  Class certification is not automatic, and sets forth more than a pleading standard—Rule 23 demands affirmative demonstration of compliance, and requires proof that "there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,

725 F.3d 244, 249 (D.C. Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350

(2011)) (internal quotation marks omitted).  While the court may find it "necessary . . . to probe

behind the pleadings before coming to rest on the certification question," *id.* at 249 (quoting *Gen.*

*Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)) (internal quotation marks omitted), in

determining whether to certify a class, a court may not examine whether "plaintiffs have stated a

cause of action or will prevail on the merits."  *In re Veneman*, 309 F.3d 789, 794 (D.C. Cir.

2002) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)) (internal quotation

marks omitted).

## A. <u>Numerosity</u>

Certification of a class action is permitted where the proposed class is "so numerous that

joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Courts in this district generally

recognize that "[t]here is no specific threshold that must be surpassed in order to satisfy the

numerosity requirement; rather, the determination 'requires examination of the specific facts of

each case and imposes no absolute limitations.'" *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D.

33, 37 (D.D.C. 2007) (quoting *Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 330

(1980)).  Accordingly, a plaintiff "need not provide the exact number of potential class members

to satisfy the requirement, so long as there is a reasonable basis for the estimate provided."

*Lightfoot v. D.C.*, 246 F.R.D. 326, 335 (D.D.C. 2007) (citing *Bynum v. D.C.*, 214 F.R.D. 27, 32–

33 (D.D.C. 2003)).  Nevertheless, plaintiffs must in all cases "provide evidence that joinder of all

[members of the proposed class] would be impracticable." *Bynum*, 214 F.R.D. at 41.

Plaintiffs argue that they have met the numerosity requirement because "Government

documents suggest there are hundreds of pregnant UCs in federal government custody each

year," because documents received through discovery in another case revealed that over one

thousand UCs in ORR custody were pregnant between August 2015 and March 2017, and because on March 6, 2017 alone, there were 38 pregnant minors in 18 programs in ORR's national network.  (ECF No. 18 at 4).  Plaintiffs also maintain that joinder is "inherently impractical" because:  (1) the proposed class includes unnamed and unknown members who will be pregnant in ORR custody; (2) pregnancy is an inherently temporal condition, and the UC population is transitory in nature.  (ECF No. 18 at 4).  Plaintiffs further note that the proposed class is geographically dispersed throughout the United States and is composed of young women with no financial independence or knowledge of their rights, making it difficult for class members to seek to enforce their rights on their own.  (ECF No. 18 at 5).

The court finds that: (1) there is a reasonable basis for Plaintiffs' estimated number of class members; and (2) that joinder is impracticable in this scenario.  Plaintiffs' estimated number of class members is sourced from ORR documents obtained during the course of this and other litigation.  These documents estimate that there were 726 pregnant UCs in custody during 2014, 450 during 2015, and 682 during 2016.  (ECF No. 18-5 at 2; ECF No. 19, Ex. C).  Plaintiffs' calculations—based on data provided by additional documentation—suggest that over one thousand pregnant UCs were in ORR custody between 2015 and 2017, (ECF No. 19, Ex. C; ECF No. 18-3 ¶5), and Defendants admit that there were at least 420 pregnant UCs in custody during FY 2017.  (ECF No. 53 at 22).  While Plaintiffs' estimates are necessarily imprecise—in part due to limitations on the information in their possession, and in part due to the facts that pregnancy is a temporary state and residence in an ORR-funded shelter is temporary by design—they do establish a clear trend that in turn provides a reasonable basis to believe that over 100 pregnant minors are currently in ORR custody or will be in ORR custody in the foreseeable future.  *See Lightfoot*, 246 F.R.D. at 335 (noting that "plaintiff need not

provide the exact number of potential class members to satisfy the requirement, so long as there

is a reasonable basis for the estimate provided"); *see also Kifafi v. Hilton Hotels Retirement*

*Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999) ("So long as there is a reasonable basis for the estimate

provided, the numerosity requirement can be satisfied without precise numbers.").  These

numbers render joinder impractical, especially given that the proposed class members are

undocumented minors who are geographically dispersed and who are not at liberty—financially

or otherwise—to move or act at will inside the United States.  *See Kifafi*, 189 F.R.D. at

176 (finding geographical dispersion relevant to impracticability of joinder).  The court therefore

finds that Plaintiffs have met Rule 23(a)'s numerosity requirement.[2]

## B. <u>Commonality</u>

A proposed class must demonstrate commonality—that "there are questions of law or fact

common to the class."  Fed. R. Civ. P. 23(a)(2).  Members of the proposed class must "have

suffered the same injury," *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (quoting *Gen. Tel. Co. of Sw.,*

*Inc. v. Falcon*, 457 U.S. 147, 152 (1982)) (internal quotation marks omitted), to support the

existence of a common contention that "is capable of classwide resolution," meaning "that

determination of its truth or falsity will resolve an issue that is central to the validity of each one

of the claims in one stroke."  *Id*.  The commonality requirement is satisfied where the challenge

is to "a uniform policy or practice that affects all class members."  *DL v. District of Columbia*,

---

[2] Defendants do not directly challenge the accuracy of most of Plaintiffs' estimates.  Instead, Defendants claim that a subset of the pregnant UCs whom Plaintiffs identify—those who have actually requested an abortion—represents a more pertinent estimate of the number of proposed class members, since only these individuals can show that they were "injured" by the challenged policy or practices.  Defendants' argument is misplaced, however.  The numerosity requirement is not fundamentally about whether an injury is shared among the potential members of a proposed class; that is the province of Rule 23(a)'s commonality requirement.  *See Wal-Mart Stores, Inc.*, 564 U.S. at 350 (noting that commonality requires a showing that proposed class members "have suffered the same injury").

713 F.3d 120, 128 (D.C. Cir. 2013); *see also R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 181 (D.D.C. 2015).

Plaintiffs argue that all the proposed class members suffer the same injury—deprivation of their right to pregnancy-related care, including abortion, without interference—as a result of the same policies and practices.  In particular, Plaintiffs highlight questions such as whether ORR has policies and practices that obstruct or prevent access to an abortion or abortion-related care, whether ORR can constitutionally force UCs to tell their parents or sponsors about their decision, or tell those persons themselves, and whether any such policies or practices would violate the First or Fifth Amendments.  (ECF No. 18 at 6–7).  Defendants contend that Plaintiffs cannot establish commonality because each class member's factual circumstances are different.  Defendants claim that these differing factual circumstances—including whether an abortion would be elective or medically necessary, whether a UC could be reunited with a parent, the availability and timing of sponsorship, and state legal requirements relating to abortion—mean that no single ruling would resolve the claims of all class members.  (ECF No. 53 at 13–18).

Based on the record before it, the court concludes that Plaintiffs have satisfied the commonality requirement.  Plaintiffs have offered evidence to support their contention that (a) ORR maintains a policy or engages in a set of practices regarding access to reproductive choice, pursuant to which it (b) imposes a series of restrictions that apply to all pregnant UCs in its custody and affects their ability to make certain choices regarding whether to continue or terminate their pregnancies, and (c) as part of those restrictions, maintains a parental notification requirement that cannot be bypassed and a veto power over the choice to terminate, which it exercises as a *de facto* ban on access to abortion.  This amounts to "a uniform policy or practice that affects all class members," *DL*, 713 F.3d at 128, and supports a finding that class members

suffer a unified injury—namely that ORR's policy or set of practices unconstitutionally violates

their rights to privacy and reproductive choice.  *See Wal-Mart Stores, Inc.*, 564 U.S. at 350.

Accordingly, Plaintiffs present a common question—the constitutionality of ORR's general

policy regarding reproductive options—that is "capable of classwide resolution."  *Id.*

Defendants' primary argument—that factual variations affecting individual class

members defeat commonality—is unavailing.  While Defendants identify a number of variations

in individual class members' factual circumstances—such as whether a particular class member

has requested an abortion procedure, or differences in state regulations and legal requirements

concerning abortion procedures—none are fatal to the court's commonality determination

because none diminish any of the key common circumstances that form the basis of the central

question in this case.  The circumstances relevant to the issue of commonality are: (1) that class

members are pregnant UCs; (2) that class members retain a right to privacy regarding their

pregnancy-related healthcare decisions and a right to choose to terminate their pregnancy; and

(3) that class members are subject to the same policies and/or practices that allegedly violate

both of those rights.  The combination of these shared circumstances provides a basis for the

common question at the core of this litigation—whether ORR's policies and/or practices

regarding the reproductive decisions of pregnant UCs violate their constitutional rights.  Based

on this common legal question and any other common legal or factual sub-questions that flow

from it, the court finds that the commonality requirement is satisfied.

### C.  <u>Typicality</u>

A proposed class meets Rule 23's typicality requirements when "the claims or defenses

of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P.

23(a)(3).  Unlike commonality, which is concerned with the similarity of class members'

injuries, the typicality requirement "focuses on whether the *representatives* of the class suffered

a similar injury from the same course of conduct." *Bynum*, 214 F.R.D. at 34.  The requirement

"ensures that the claims of the representative and absent class members are sufficiently similar so

that the representatives' acts are also acts on behalf of, and safeguard the interests of, the class."

*Littlewolf v. Hodel*, 681 F. Supp. 929, 935 (D.D.C. 1988), *aff'd sub nom.  Littlewolf v. Lujan*, 877

F.2d 1058 (D.C. Cir. 1989).  Typicality is established if "[a] plaintiff's claim . . . arises from the

same event or practice or course of conduct that gives rise to a claim of another class member's

where his or her claims are based on the same legal theory."  *Stewart v. Rubin*, 948 F. Supp.

1077, 1088 (D.D.C. 1996), *aff'd* 124 F.3d 1309 (D.C. Cir. 1997) (quoting *EEOC v. Printing*

*Industry*, 92 F.R.D. 51, 54 (D.D.C. 1981)).  Furthermore, "factual variations between the claims

of class representatives and the claims of other class members . . . do not negate typicality."

*Bynum*, 214 F.R.D. at 34; *see also Wagner v. Taylor*, 836 F.2d 578, 591 (D.C. Cir. 1987) (noting

that "[c]ourts have held that typicality is not destroyed merely by 'factual variations'"); *United*

*States Trucking Emp., Inc.*, 75 F.R.D. 682, 688 (D.D.C. 1977) (collecting cases and noting that

"where the claims or defenses raised by the named parties are typical of those of the class,

differences in the factual patterns underlying the claims or defenses of individual class members

will not defeat the action").

Plaintiffs argue that J.D.'s claims are typical of the class because the deprivation of her

constitutional rights is common to all members of the proposed class.  In other words, they

argue, J.D.—like every other pregnant UC in or soon to be in ORR custody—faced a series of

obstacles that interfered with the exercise of her right to choose to end her pregnancy.

Accordingly, "J.D. and the proposed class are united in their interest and injury," as well as in

their legal claims.  (ECF No. 18 at 9).  Defendants counter with the same arguments that they

proffered against commonality, and claim that J.D. and the proposed class are not united in their interest because the proposed class definition would include minors who are undecided or who do not want an abortion.  (ECF No. 53 at 18–19).

The court finds Defendants' arguments unavailing for the same reasons as it did those regarding commonality.  Defendants' view of what would constitute a divergence between the claims of the Named Plaintiffs and other class members is premised on an apparent misunderstanding regarding the nature of Plaintiffs' alleged injury.  Plaintiffs claim that ORR's policies and/or practices deprive pregnant UCs of the ability to make their own *choices* regarding whether to seek an abortion or disclose pregnancy-related information.  If true, this deprivation would constitute an injury to all class members, regardless of which option an individual class member might ultimately choose.  Thus, the fact that the Named Plaintiffs sought to terminate their pregnancies—while some class members presumably have not—does not defeat Plaintiffs' showing on the typicality requirement.

The court concludes that J.D.'s claims and the claims of Named Plaintiffs J.R., J.P., and J.M. are typical of those of the proposed class.  The record in this case establishes that the course of conduct at issue (the application of Defendants' policies), the injury itself, and the legal theory underlying the claims are identical in all material respects to those driving the legal question that is common to the class.  *See Stewart*, 948 F. Supp. at 1088 (noting that claims arising from "the same event or practice or course of conduct" and based on the same legal theory as other class members are considered typical).  Typicality is therefore established.

## D.  **Adequacy**

A proposed class meets Rule 23's adequacy requirements where a court is persuaded that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R.

Civ. P. 23(a)(4). The adequacy of representation is typically measured according to two criteria: (1) whether the named representative has antagonistic or conflicting interests with the members of the class; and (2) whether the representative appears capable of vigorously prosecuting class interests through qualified counsel. *See Nat'l Veterans Legal Servs. Program v. United States*, 235 F. Supp. 3d 32, 41 (D.D.C. 2017); *Twelve John Does v. Dist. of Columbia,* 117 F.3d 571, 575–76 (D.C. Cir. 1997). The first criterion focuses on conflicts of interest, which "prevent named plaintiffs from satisfying the adequacy requirement only if they are fundamental to the suit and . . . go to the heart of the litigation." *Nat'l Veteran Legal Servs. Program*, 235 F. Supp. 3d at 41 (quoting *Keepseagle v. Vilsack,* 102 F. Supp. 3d 205, 216 (D.D.C. 2015)). Speculative or hypothetical conflicts will not defeat the adequacy requirement. *Id.* at 41. The second criterion focuses on ensuring that class counsel is competent. *See id.* at 43.

Plaintiffs argue that the adequacy requirement is met because J.D.'s interests do not conflict with those of the class, since all class members, including J.D., seek a declaration that Defendants' policies and practices are unconstitutional. (ECF No. 18 at 9). Plaintiffs also assert that their counsel is competent to represent the class, based on her substantial experience in reproductive freedom litigation and constitutional impact litigation more generally.[3] (ECF No. 18 at 10). Defendants argue that J.D. is not an adequate representative because she obtained an abortion procedure in October 2017, and thus "her interests are moot[, she] no longer has any rights to vindicate before the court," and therefore cannot vigorously prosecute class interests. (ECF No. 53 at 9). Defendants further argue that since this court has previously moved

---

[3] Defendants indicated in a footnote that they also dispute whether Plaintiffs' counsel is qualified, although they muster no specific argument in support of that contention. (ECF No. 53 at 8 n.4). The court has had ample opportunity to observe and evaluate the abilities of Plaintiffs' counsel— who has thus far brought two successful motions for injunctive relief, and defended one decision on appeal—and finds her to be fully competent and qualified.

expeditiously to address Named Plaintiffs' requests for injunctive relief, it could employ the same procedure to certify a class the next time it receives a request for injunctive relief from a pregnant UC, and so the facts that pregnancy is temporary and that residence in an ORR-funded shelter is transitory do not support Plaintiffs' adequacy arguments. (ECF No. 53 at 10–11).

The court concludes that the class representatives in this case—J.D., J.R., J.P., and J.M.—are capable of adequately protecting class interests through qualified counsel. The court rejects Defendants' contention that J.D. (and by extension, J.R., J.P., and J.M.), are unable to vigorously prosecute class interests because their claims are now moot, whether because they left ORR custody or because they obtained an abortion prior to this ruling. A case becomes moot where "'the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated' in circumstances where 'it becomes impossible for the court to grant any effectual relief whatever to the prevailing party.'" *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009) (quoting *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1135 (D.C. Cir. 2009)). The court notes that J.P. still has claims arising out of Defendants' policies or practices that involve forced disclosure of her decision to obtain an abortion, claims shared by all members of the proposed class.[4] Accordingly, this case does not present a situation in which it is "impossible for the court to grant any effectual relief whatever," since the court is able to grant relief in the form of a declaration and permanent injunction addressing ORR's disclosure policy for the entire class, including J.P. *Id.* (noting that "a plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy"). J.P.'s claims are therefore not moot.

---

[4] (*See, e.g.*, ECF No. 52) (describing continued risks to privacy of abortion decision while formerly pregnant UC remains in ORR custody).

Indeed, even if J.P. no longer possessed live claims, the fact that this court previously granted J.D. and J.P.'s request for injunctive relief—thereby enabling them to obtain abortions—would not moot this case.  Courts have recognized an exception to the mootness doctrine where an action involves claims that "are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires."  *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980); *see also Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991); *Sosna v. Iowa*, 419 U.S. 393, 402 n.11 (1975) ("There may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion.").  This case fits within the *Geraghty* exception for at least two reasons.

First, this case involves claims from unaccompanied minors in ORR custody, a transitory population whose membership is not fixed at any given time.  Accordingly, the length of time that pregnant UCs will remain in ORR custody is uncertain and unpredictable, and while the proposed class likely includes a number of pregnant UCs who will remain in custody long enough for the court to rule on class certification, Plaintiffs have no way to ensure that any particular class representative will be one of that number.  *See Thorpe v. Dist. of Columbia*, 916 F. Supp. 2d 65, 67 (D.D.C. 2013) (applying the "inherently transitory" exception for claims regarding nursing facility placement because "[t]he length of any individual's stay in a nursing facility is impossible to predict, so even though there are certainly individuals whose claims will not expire within the time it would take to litigate their claims, there is no way for plaintiffs to ensure that the Named Plaintiffs will be those individuals").

Second, the right of every pregnant minor in ORR custody to seek an abortion is necessarily time limited, and with the passage of time, the risk that she will no longer be afforded a choice—along with the associated health risks—increase.  As a result, class members will consistently face irreparable harm requiring the kind of emergency relief that could moot a part of their claim.  Moreover, the nature of litigation means that there may be circumstances in which a court is required to rule on emergency requests for injunctive relief in a shorter timeframe than it could feasibly rule on a class certification motion, such as if a class member seeks to terminate a pregnancy that is approaching the point of viability.  Rigid application of the mootness doctrine would punish Plaintiffs for seeking relief in response to urgent needs, and would effectively condition access to justice for many pregnant UCs on their willingness or ability to brave escalating risks to their health and future, as the complexity of the necessary procedure increases.

Plaintiffs name four class representatives in their Second Amended Complaint: J.D., J.P., J.R., and J.M.  (ECF No. 104).  Each of these minors has had claims brought on her behalf during the pendency of the motions for class certification and preliminary injunction.  J.D. and J.P. each presented a clear case of irreparable harm justifying temporary relief, and accordingly received the injunctive relief they sought.  J.R. and J.M.—both of whom also presented clear showings of irreparable harm—were released from ORR custody.  Meanwhile, the claims of numerous potential class members remain unaddressed.  The court concludes that: (1) because exceptions to the mootness doctrine apply, the fact that the Named Plaintiffs have either obtained injunctive relief or been transferred out of ORR custody does not render their claims moot, *see Thorpe,* 916 F. Supp. 2d at 67; and (2) the Named Plaintiffs have no conflicts of interest with the

class and are capable of vigorously prosecuting class interests.  *Twelve John Does*, 117 F.3d at 575–76.  Accordingly, the court finds that the adequacy requirement is satisfied.

### E.  Rule 23(b)(2)

A plaintiff seeking class certification must also satisfy one of the three Rule 23(b) requirements.  The relevant Rule 23(b) requirement in this case is 23(b)(2)—that the defendant "has acted or refused to act on grounds that apply generally to the class," such that declaratory or injunctive relief is appropriate as to the whole class.  Fed. R. Civ. P. 23(b)(2).  A Rule 23(b)(2) action is specifically "intended for civil rights cases" involving allegations of class-based discrimination.  *In re D.C.*, 792 F.3d 96, 102 (D.C. Cir. 2015).  Under Rule 23(b)(2), "(1) the defendant's action or refusal to act must be 'generally applicable to the class', and (2) plaintiff must seek final injunctive relief or corresponding declaratory relief on behalf of the class." *Steele v. United States*, 159 F. Supp. 3d 73, 81 (D.D.C. 2016), *on reconsideration in part,* 200 F. Supp. 3d 217 (D.D.C. 2016) (quoting *Disability Rights Council of Greater Wash.,* 239 F.R.D. 9, 28 (2006)); *see also Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1003 n.7 (D.C. Cir. 1986). Certification under Rule 23(b)(2) is appropriate "when a single injunction or declaratory judgment would provide relief to each member of the class," and not where each member would have grounds to seek a different injunction or declaratory judgment from the same defendant. *Wal-Mart Stores, Inc.*, 564 U.S. at 360–61.

Plaintiffs argue that the requirements of Rule 23(b)(2) are met because (1) the proposed class seeks uniform injunctive relief to prevent Defendants from violating UCs' right to make reproductive decisions, and (2) a single injunction would afford this relief to all class members, meaning that Defendants' actions or refusals to act are generally applicable to the entire class. Plaintiffs further argue that the temporal and transitory nature of pregnancy and residence in an

ORR shelter support class certification as a means to obtain a single injunction that would circumvent mootness problems, and that a class action would promote judicial economy. (ECF No. 18 at 11–12). Defendants respond with the same arguments they advanced regarding commonality and typicality—that because of factual differences in class members' individual circumstances, Defendants' actions or omissions do not apply generally to the class. (ECF No. 53 at 23–24). Defendants further argue that these factual variations make it impossible to issue a single injunction that would address all class members' claims. (ECF No. 53 at 24–25).

The central issue in this case is the impact of ORR policies and/or practices on pregnant UCs' ability to freely make reproductive choices. ORR documents reveal that its policies apply to all pregnant UCs in its custody—even those whose pregnancy is the result of rape. (*See* ECF No. 92-1). Furthermore, because pregnant UCs cannot freely *choose* whether to terminate and with whom to share information regarding their reproductive decisions, the injury—the inability to make a choice—is shared by the entire proposed class, regardless of whether individual members might choose different courses of action. Accordingly, in this case, "the defendant's action or refusal to act [is] 'generally applicable to the class,'" *Steele v. United States*, 159 F. Supp. 3d at 81, such that "a single injunction or declaratory judgment would provide relief to each member of the class," notwithstanding the fact that class members may make different choices. *Wal-Mart Stores, Inc.*, 564 U.S. at 360–61. Therefore, the court finds that the proposed class meets Rule 23(b)(2)'s requirements.

### III.   MOTION FOR PRELIMINARY INJUNCTION

A preliminary injunction is an "extraordinary remedy" that is "never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren, 553 U.S. 674, 689–90 (2008)). A plaintiff seeking a preliminary injunction must show that: (1)

she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest.  *Id.* at 20; *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017).  The D.C. Circuit has traditionally evaluated claims for injunctive relief on a sliding scale, whereby "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  It has been suggested, however, that a movant's showing of likelihood of success on the merits "is an independent, free-standing requirement for a preliminary injunction." *Id.* at 393 (quoting *Davis v. Pension Ben. Guar. Corp.,* 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring)).

The court finds that Plaintiffs have carried their burden of showing that preliminary injunctive relief is warranted here.  Indeed, there is essentially no substantive difference between the class issues currently before this court and the issues underpinning the prior requests for temporary relief on which this court—and in one case, the D.C. Circuit—have already ruled.  *See Baker DC v. Nat'l Labor Relations Bd.*, 102 F. Supp. 3d 194, 198 (D.D.C. 2015) ("The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction") (quoting *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001)) (internal quotation marks omitted).  Nevertheless, for the sake of completeness, the court will briefly discuss each factor here.

A.  <u>**Likelihood of Success on the Merits**</u>

Plaintiffs' have made a strong showing of likelihood of success on the merits.  The Supreme Court clarified in 1992—and again in 2016—that laws or regulations restricting abortion are scrutinized under the "undue burden" standard.  *Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992); *see also Whole Woman's Health v. Hellerstedt*, 136 S.Ct. 2292, 2299

(2016).  "An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability."  *Casey*, 505 U.S. at 878; *see also Whole Woman's Health*, 136 S.Ct. at 2299, 2309.  The Court in *Casey* further explained that:

> A statute with this purpose is invalid because the means chosen by the [government] to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it.  And a statute which, while furthering the interest in potential life or some other valid [government] interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

*Casey*, 505 U.S. at 877.  Accordingly, while "[t]he woman's liberty is not so unlimited . . . that from the outset the [government] cannot show its concern for the life of the unborn," it is beyond dispute that the Constitution responds to "the urgent claims of the woman to retain the ultimate control over her destiny and her body" with at least one unequivocal constitutional command: that the government "may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."  *Casey*, 505 U.S. at 869, 879.  This basic proscription remains the law of the land and controls the outcome in this case.[5]

The record before the court uniformly supports the conclusion that ORR policies and practices violate the standard and principles announced in *Casey* and reaffirmed in *Whole Woman's Health.*  The record reveals that ORR effectively retains an absolute veto over the reproductive decision of any young woman in its custody, a veto that is exercised routinely to bar

---

[5] Plaintiffs' Fifth Amendment right to decide whether to continue or terminate their pregnancies is not diminished by their status as undocumented immigrants.  *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Jean v. Nelson*, 472 U.S. 846, 875 (1985) (noting that the Due Process Clause applies to all "persons" within the territorial jurisdiction of the United States, no matter their immigration status). The Government does not contend otherwise. *Garza v. Hargan,* 874 F.3d 735, 737 (D.C. Cir. 2017) (Millett, J., Concurring).

UCs from obtaining abortions, despite the fact that no public funds are expended to procure the procedures and notwithstanding the UC's own wishes or intentions.   In other words, ORR's absolute veto nullifies a UC's right to make her own reproductive choices, including the decision of whether to continue or terminate her pregnancy.   Accordingly, the court concludes that ORR's policies and practices infringe on female UC's constitutional rights by effectively prohibiting them from "making the ultimate decision" on whether or not to continue their pregnancy prior to viability—a quintessential undue burden.  *Casey*, 505 U.S. at 879.

ORR's policy vests the power to decide the future of a UC's pregnancy in one man: Director Lloyd.  (ECF No. 5-4).  The policy provides no mechanism to ensure compliance with established constitutional dictates, or to afford a UC the opportunity to bypass the Director and effectuate her constitutional rights.  Apart from his personal opinion that abortion is not in any pregnant UC's "best interest," the ORR policy does not require Director Lloyd to provide any justification or legal authority to unilaterally deny UCs their right to make their own reproductive choices.  Moreover, the ORR decision document reveals that the Director's ultimate decision is substantially controlled by—if not entirely based on—his ideological opposition to abortion, and even a UC who becomes pregnant as a result of rape, with all its attendant physical and psychological harms, will not be allowed to decide whether she wishes to continue that pregnancy.  (*See* ECF No. 92-1 at 7–8).  In short, ORR's policy is premised on the notion that the Director is entitled to exercise complete control over female UCs' reproductive decisions by virtue of the fact that they are undocumented minors in ORR custody.  The adoption and implementation of such a policy is itself sufficient to raise constitutional flags.  *See Casey*, 505 U.S. at 879 (noting that "[r]egardless of whether exceptions are made for particular

circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability").[6]  But Defendants' actions extend even further.

ORR implements its policy via a ban on "any action that facilitates an abortion," (ECF No. 5-4 at 2), which includes, *inter alia*, any action relating to scheduling appointments, arranging transportation, making the UC available to be transported, pursuing a judicial bypass, "draft[ing] approval documents," "review[ing] information relevant to her health and the procedure," and even "maintain[ing] custody of her (while ensuring her health remains stable) during and after the abortion procedure." (Defs. Mem. in Opp. to Pls. TRO & Mot. Prelim. Inj. at 12–13, ECF No. 10; ECF No. 5-5 at 5).  Indeed, ORR's interpretation of "facilitation" appears to be so capacious that it prevents not only government officials or employees from assisting pregnant UCs, but also applies to private contractors and persons who are unaffiliated with the government.  Defendants even suggest that acting to ensure that a UC's health remains stable following an abortion constitutes "facilitation," a position which would presumably allow them to withhold medical treatment from a UC who suffered post-procedure complications.[7]  (*See* ECF No. 10 at 12–13).  Defendants' position on what constitutes "facilitation" appears to be divorced from any commonsense understanding of that term and at odds with reality.  As Judge

---

[6] Defendants suggest that the only relevant policy in operation at ORR is one requiring Director approval for "major" surgical procedures, a category which they contend happens to include abortions, but which also applies to other procedures.  However, Defendants do not deny that the policy acts to prevent a UC from obtaining an abortion, and they present no evidence that ORR's approach to abortion is even remotely similar to its approach to other medical procedures, including childbirth.  (*See* ECF No. 53 at 25).

[7] While such a scenario is hypothetical, it is not necessarily unrealistic.  J.D. obtained an abortion pursuant to this court's Order in October 2017, and remained in ORR custody for months thereafter.  J.P. obtained an abortion pursuant to this court's Order in December 2017, and remains in ORR custody at the time of this writing.  Thus, had a complication arisen following either of their procedures, under Defendants' policy, J.D or J.P could have found themselves without medical assistance.

Millett noted, "facilitation" is about promoting or making an action or process easier. *Garza v. Hargan,* 874 F.3d 735, 740 (D.C. Cir. 2017) (Millett, J., Concurring). Here, the government is not required to promote, transport, pay for, or otherwise further a UC's decision to have an abortion. But it cannot "interfere or make things harder" by adopting a policy and practice to "categorically blockade exercise of [UCs'] constitutional right" to choose. *Id.* at 737.

Defendants have consistently maintained that the ORR policy does not impose an undue burden because pregnant UCs have the option of either: (1) voluntarily returning to their home countries, thereby removing themselves from ORR custody; or (2) being placed with a sponsor. (ECF No. 10 at 2, 11–12). This court does not find that either of these "options" mitigates the undue burden that ORR's policy imposes on the young women in its custody. In light of the court's previous orders and the D.C. Circuit's extensive examination of Defendants' contentions in its consideration of J.D.'s case, *see Garza v. Hargan,* 874 F.3d at 740, this court pretermits lengthy discussion of these arguments, but offers two points in response. First, Defendants' voluntary departure argument conditions the exercise of UCs' constitutional rights on their willingness to relinquish any claim that may entitle them to remain in the United States, and to return to what is in many instances—including the cases of J.D. and J.P.—a country from which they fled due to alleged abuse.[8] Such a proposal renders the exercise of constitutional rights a Hobson's choice, wherein one set of rights must be waived in order to effectuate another. That proposal in and of itself likely constitutes a substantial obstacle to a UC's exercise of her rights—especially when voluntary departure could mean exposing herself to the risk of further abuse. This court will not sanction any policy or practice that forces vulnerable young women to

---

[8] The court also notes that there is no guarantee that a minor's country of origin will permit abortion, and in fact the government conceded that abortion was illegal in J.D.'s home country. (ECF No. 30 ¶8).

make such a choice.  Second, Defendants' characterization of sponsorship as an "option" for pregnant UCs ignores at least two key aspects of this court's previous findings of fact: (1) that locating a sponsor is typically a lengthy, complex process involving multiple stages, over which the UC has no control; and (2) that ORR makes the final decision of whether to approve a particular sponsor.  (*See* ECF No. 30 ¶¶8–9).  For these reasons, the sponsorship option does not allow the UC any control over her reproductive decisions, and therefore does not cure the constitutional infirmity inherent in the ORR policy.  In sum, Plaintiffs have demonstrated that ORR's policies and practices likely constitute an undue burden on the right of UCs in ORR custody to make their own reproductive choices.  *See Casey*, 505 U.S. at 877, 879; *Whole Woman's Health*, 136 S.Ct. at 2299, 2309.

**B.  <u>Remaining Factors for Preliminary Injunctive Relief.</u>**

The court finds that the three remaining requirements for preliminary injunctive relief are met in this case.  First, the irreparable harm confronting each member of the class is the same as for each Named Plaintiff throughout these proceedings: at a minimum, increased health risks, and perhaps the permanent inability to obtain the abortion to which they are legally entitled.  Accordingly, the court finds that Plaintiffs have demonstrated irreparable harm sufficient to justify issuance of a preliminary injunction.  Second, Defendants have not shown they have any legitimate interest that will be harmed by the issuance of a preliminary injunction.  Accordingly, the balance of equities tips in Plaintiffs' favor.  Finally, the public interest weighs in favor of a preliminary injunction because: (1) this case involves the protection of constitutional rights, and (2) "the public has an interest in the government maintaining procedures that comply with constitutional requirements," *Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Fed.*

*Emergency Mgmt. Agency (FEMA)*, 463 F. Supp. 2d 26, 36 (D.D.C. 2006) (citing *O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992)).

## IV.   CONCLUSION

While ORR and its Director are certainly entitled to maintain an interest in fetal life, and even to prefer that pregnant UCs in ORR custody choose one course over the other, ORR may not create or implement any policy that strips UCs of their right to make their own reproductive choices. *See Casey,* 505 U.S. at 879.  Accordingly, Plaintiffs' motion for a class-wide preliminary injunction is hereby GRANTED.