# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROCHELLE GARZA, as guardian ad litem to unaccompanied minor J.D., on behalf of herself and others similarly situated, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )   No. 17-cv-02122-TSC ) |
| ALEX M. AZAR II, *et al.*, | ) ) |
| Defendants. | ) ) |

## PLAINTIFFS' NOTICE OF FILING DEPOSITION TRANSCRIPTS

Plaintiffs submit the attached deposition transcripts of Defendant Lloyd and Jonathon White taken on February 13, 2018, in *ACLU of Northern California v. Azar*, No. 16-cv-3539-LB. The transcripts have been redacted pursuant to the parties' protective order in that case. These transcripts are the continuation of the depositions taken on December 18 and 19, 2018, that were previously filed with this Court (ECF No. 121-5, ECF No. 121-15).

April 4, 2018

Respectfully submitted,

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
Shana Knizhnik (D.C. Bar No. 1020840)
American Civil Liberties Union Foundation
of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel. 202-457-0800
Fax 202-457-0805
*aspitzer@acludc.org*
*smichelman@acludc.org*
*sknizhnik@acludc.org*

/s/*Brigitte Amiri*
Brigitte Amiri*
Meagan Burrows
Jennifer Dalven
Lindsey Kaley

1

American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2633
Fax (212) 549-2652
*bamiri@aclu.org*
*mburrows@aclu.org*
*jdalven@aclu.org*
*lkaley@aclu.org*

Daniel Mach (D.C. Bar No. 461652)
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Tel. (202) 675-2330
*dmach@aclu.org*

Elizabeth Gill
American Civil Liberties Union Foundation of
Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel. (415) 621-2493
Fax (415) 255-8437
*egill@aclunc.org*

Melissa Goodman
American Civil Liberties Union Foundation of
Southern California
1313 West 8th Street
Los Angeles, California 90017
Tel. (213) 977-9500
Fax (213) 977-5299
*mgoodman@aclusocal.org*

Mishan Wroe
Riley Safer Holmes & Cancila LLP
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Tel. (415) 275-8522
*mwroe@rshc-law.com*

*\*Admitted pro hac vice*


*Attorneys for Plaintiffs*

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

- - - - - - - - - - - - - - - -

AMERICAN CIVIL LIBERTIES
UNION OF NORTHERN
CALIFORNIA,

        Plaintiff,    |  Case Number:

v.    |  3:16-cv-3539-LB

ERIC G. HARGAN, Acting
Secretary of Health and
Human Services, et al.,

        Defendants,
v.

U.S. CONFERENCE OF
CATHOLIC BISHOPS,

   Defendant-Intervenor.

- - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF

SCOTT LLOYD, ESQUIRE, VOLUME II

Washington, D.C.

Tuesday, February 13, 2018 - 10:25 a.m.

Reported by:

Ann Medis, RPR

Job No. 20790

1

2              Videotaped Deposition of

3            SCOTT LLOYD, ESQUIRE, VOLUME II

4

5   Held at the offices of:

6            U.S. Department of Justice

7            20 Massachusetts Avenue, N.W.

8            Washington, D.C.  20001

9            202.353.4556

10

11

12

13

14

15

16            Taken pursuant to notice, before Ann

17       Medis, Registered Professional Reporter,

18       and notary public in and for the District

19       of Columbia.

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFF

 3           ACLU Foundation
             BY:  BRIGITTE AMIRI, ESQUIRE
 4           AND  MEAGAN BURROWS, ESQUIRE
             125 Broad Street
 5           New York, New York  10004
             212.519.7897
 6           bamiri@aclu.org
             mburrows@aclu.org

 7

 8   ON BEHALF OF DEFENDANTS ERIC G. HARGAN and DEPARTMENT
     OF HEALTH AND HUMAN SERVICES
 9
             UNITED STATES DEPARTMENT OF JUSTICE
10           BY:  MARTIN M. TOMLINSON, ESQUIRE
             20 Massachusetts Avenue, N.W.
11           Room 6139
             Washington, D.C.  20001
12           202.353.4556
             martin.m.tomlinson@usdoj.gov
13

14   ON BEHALF OF DEFENDANT-INTERVENOR USCCB

15           GIBSON DUNN & CRUTCHER, LLP
             BY:  JACOB SPENCER, ESQUIRE
16           AND  ROBERT DUNN, ESQUIRE  (by phone)
             333 South Grand Avenue
17           Los Angeles, California  90071
             213.229.7000
18           jspencer@gibsondunn.com
             rdunn@gibsondunn.com
19

20   ALSO PRESENT

21           Kim Johnson, Videographer

22           Llewellyn Woolford, Esquire, HHS

23           Caitlin Palacios, Esquire, HHS

24           Rachel Chrisinger, Paralegal

25
```

1                    P R O C E E D I N G S

2                         - - - -

3            THE VIDEOGRAPHER:  This is Media Number

4    1 in the videotaped deposition of Scott Lloyd

5    taken in the matter of American Civil Liberties

6    Union of Northern California versus Burwell,

7    et al., Case No. 3:16-cv-3539-LV in the U.S.

8    District Court of Northern California, San

9    Francisco division.

10       This deposition is being held at 20

11   Massachusetts Avenue, Northwest, Washington, D.C.,

12   on February 13, 2018 at approximately 10:25 a.m.

13       My name is Kim Johnson, and I'm a legal video

14   specialist.  The court reporter today is Ann

15   Medis.  Both are in association with TransPerfect.

16       Will counsel please introduce yourself and

17   state whom you represent.

18            MS. AMIRI:  Brigitt Amiri for the

19   plaintiff.

20            MS. BURROWS:  Meagan Burrows for the

21   plaintiff.

22            MR. TOMLINSON:  Martin Tomlinson for the

23   federal defendants.

24            MR. WOOLFORD:  Llewellyn Woolford for

25   the federal defendants U.S. Department of Health

1    and Human Resources.

2              MS. PALACIOS:  Caitlin Palacios, U.S.

3    Department of Health and Human Services.

4              MR. SPENCER:  Jacob Spencer for the

5    defendant-intervenor USCCB.  Rob Dunn also for the

6    defendant-intervenor.

7              THE VIDEOGRAPHER:  Will the court

8    reporter please swear in the witness.

9                   SCOTT LLOYD, ESQUIRE,

10      having been first duly sworn, was examined

11                  and testified as follows:

12                  EXAMINATION (Continued)

13   BY MS. AMIRI:

14        Q.   Good morning, Mr. Lloyd.

15        A.   Good morning.

16        Q.   Have you finalized any policies related

17   to abortion since your deposition on December 18?

18        A.   No.

19        Q.   Have you spoken with anyone at the U.S.

20   Conference of Catholic Bishops about abortion

21   since your deposition on December 18?

22        A.   Abortion, no.

23        Q.   Have you spoken with anyone at Catholic

24   Charities about abortion since your deposition on

25   December 18?

1      A.   No.

2      Q.   Have you spoken with any religiously

3   affiliated shelter about abortion since

4   December 18?

5      A.   I don't think so.

6      Q.   Have you spoken with any shelter about

7   abortion since December 18?

8      A.   I believe so, yes.

9      Q.   And do you know whether any of those

10   shelters had a religious objection to providing

11   access to abortion?

12      A.   I don't know, but I don't think so.

13      Q.   What shelters did you speak with about

14   abortion since your deposition?

15      A.   I don't recall.

16      Q.   How many shelters did you speak with

17   about it?

18      A.   Two or three.

19      Q.   And you don't remember the names of

20   those shelters?

21      A.   No.

22      Q.   What was the substance of the

23   conversation?

24      A.   Instructions regarding the handling of

25   termination requests.

1      Q.   Were those instructions from you to the

2  shelters?

3      A.   In some cases, yeah.

4      Q.   Let's start in the case that -- in one

5  or more cases, did you provide instructions to

6  shelters about abortion requests?

7      A.   Yes, either directly or through our

8  staff.

9      Q.   So let's start with the ones directly.

10     A.   I think it's more through our staff

11 actually.

12     Q.   Let's start with any direct

13 communication you had with shelters with respect

14 to abortion since your deposition.

15     A.   Okay.

16     Q.   What were those communications?

17     A.   Answering questions.

18     Q.   What types of questions?

19     A.   How should we proceed if this or that

20 happens.

21     Q.   And what were your answers?  What were

22 your instructions?

23     A.   It depended on the question.

24     Q.   So let's isolate a particular time that

25 you were in direct conversation with a shelter

1    about an abortion request.

2        Were any of those conversations about

3    religious objection that the shelter had to

4    providing access to abortion?

5        A.   No.

6        Q.   Were any of those shelters raising

7    religious objections that their staff had about

8    access to abortion?

9        A.   No.

10       Q.   We'll get to some documents that were

11   produced since your last deposition.  So perhaps

12   as we're going through those, we can talk about

13   the different conversations you may have had

14   directly with shelters, and that may refresh your

15   recollection.  If there's any shelters that you

16   have talked to that are not in the documents that

17   we produce, then we can try to isolate those when

18   we get there.

19       How many abortion requests have come to your

20   attention since your deposition on December 18?

21       A.   I don't know.

22       Q.   More than five?

23       A.   No.

24       Q.   Less than five?

25       A.   Yes.

1       Q.   Have any of them been from

2   religiously-affiliated shelters that have an

3   objection to providing access to abortion?

4       A.   I don't know, but I don't think so.

5       Q.   Since your deposition, have there been

6   any transfers from religiously-affiliated shelters

7   to a nonreligiously-affiliated shelter because of

8   an abortion request?

9       A.   I don't think so.

10      Q.   How about for a contraception request?

11      A.   I don't think so.

12      Q.   Since your deposition, have there been

13  placement decisions that ORR has made based on the

14  fact that a minor is seeking an abortion?

15      A.   No.

16      Q.   There have been no decisions that take

17  into account whether a particular shelter has a

18  religious objection to providing abortion before

19  placing a minor who is seeking an abortion with a

20  shelter since your deposition?

21      A.   I don't think so.

22      Q.   Since your deposition, have you spoken

23  with Maggie Wynne about abortion?

24      A.   Yes.

25      Q.   On how many occasions?

1          A.   There were several.  I work with her

2     regularly.

3          Q.   Were they about abortion policies or

4     specific abortion requests?

5          A.   Both.

6               MR. TOMLINSON:  I'm going to object and

7     instruct the witness not to answer to the extent

8     this line of questioning calls for internal

9     deliberations about policy.

10    BY MS. AMIRI:

11         Q.   Just to clarify, with Mr. Tomlinson's

12    objection, I'm not yet asking about the nature of

13    the conversations.  But just to clarify, you have

14    spoken with Ms. Wynne about both abortion policy

15    and about specific abortion requests of minors?

16         A.   Yes.

17         Q.   I think I asked you this at the top of

18    your deposition, but since your deposition on

19    December 18, has ORR made any final policy

20    pronouncements about abortion since your

21    deposition?

22         A.   No.

23         Q.   Since your deposition, have you spoken

24    with Steven Wagner about abortion policies?

25              MR. TOMLINSON:  Same objection and

1    instruction.

2              THE WITNESS:  Yes.

3    BY MS. AMIRI:

4        Q.   About abortion policies?

5        A.   Yes.

6        Q.   And have you spoken with Steven Wagner

7    about any specific abortion requests for minors?

8        A.   Yes.

9        Q.   Same line of questioning for the HHS

10   secretary that's new, Alex Azer, have you had

11   conversations with him about abortion policies

12   since your deposition on December 18?

13             MR. TOMLINSON:  With the same objection

14   and instruction.

15             THE WITNESS:  No.

16   BY MS. AMIRI:

17       Q.   Have you had any conversation with Alex

18   Azer about abortion requests from individual

19   minors since your deposition?

20       A.   No.

21       Q.   Since your deposition on December 18,

22   have you spoken to any minors who are pregnant?

23       A.   No.

24       Q.   Since your deposition in --

25       A.   I don't think so.  It's possible that

1    they were pregnant and I didn't know it.

2        Q.   So to your knowledge, at the time that

3    you were speaking with a minor, you were unaware

4    of whether the minor was pregnant or not?

5        A.   Right.  No.

6        Q.   Did you speak to any minor who was

7    seeking abortion --

8        A.   No.

9        Q.   -- since your deposition?  Since your

10   deposition, have you discussed religion with

11   minors?

12       A.   No.  Wait.  In our care?

13       Q.   Yes.

14       A.   In our care.

15       Q.   This all in your personal -- in your

16   official capacity, not in your personal capacity,

17   yes.

18       A.   Okay.

19       Q.   Have you discussed any -- have you

20   prayed with any minors in ORR care?

21       A.   No.

22       Q.   Have there been any contract or

23   cooperative agreement negotiations with shelters

24   since your deposition in December that involve

25   terms relating to reproductive health access?

 1        A.    I think so.

 2        Q.    What were the cooperative agreements

 3   that were negotiated or discussed with shelters

 4   that included some aspect of reproductive health?

 5        A.    I don't recall the exact party.

 6        Q.    One party or more than one party?

 7        A.    One party.

 8        Q.    Was it a shelter that had a religious

 9   objection to providing access to contraception or

10   abortion?

11        A.    I think that's the case.

12        Q.    If you don't remember the party, who

13   would?

14        A.    It's possible that Jonathan White would

15   or Jallyn Sualog.

16        Q.    Do you remember the term relating to

17   abortion or contraception that was being discussed

18   in the cooperative agreement with the shelter that

19   had an objection?

20        A.    Vaguely.

21        Q.    And what is your recollection?

22        A.    They were seeking an exception to

23   providing certain reproductive services.

24        Q.    And does that include both abortion and

25   contraception?

1          A.    I don't recall.

2          Q.    Did ORR make a decision about whether to

3     grant that religiously-affiliated shelter an

4     exception to providing access to reproductive

5     healthcare?

6          A.    Yes.

7          Q.    Was that decision memorialized in an

8     agreement with the shelter?

9          A.    My belief is that it was.  It's possible

10    that it went on to an additional round of review

11    after that.

12         Q.    Do you sign cooperative agreements or

13    contracts with shelters in general?

14         A.    Yes.

15         Q.    Did you sign this particular contract or

16    cooperative agreement with a shelter?

17         A.    I think so.

18         Q.    And the general term of the agreement

19    was that the shelter does not have to provide

20    access to abortion and contraception?  Was that

21    the final decision?

22         A.    Something along those lines.  I don't

23    remember if it was both abortion and contraception

24    or one or the other.

25         Q.    Was there a discussion in the

1    negotiations with the shelter about what would

2    happen if a minor in their care sought

3    reproductive healthcare that they were unwilling

4    to provide access to?

5         A.   My recollection is that the minor would

6    be transferred according to the agreement.

7         Q.   So according to the agreement, the minor

8    would be transferred to a shelter that did not

9    have a religious objection to providing access to

10   that care?

11        A.   I believe so.

12        Q.   And is it your understanding that --

13   strike that.

14        Do you know what region of the country the

15   shelter was located in?

16        A.   No.

17        Q.   Do you know whether that shelter was

18   part of the U.S. Conference of Catholic Bishops'

19   list of subgrantees?

20        A.   That would be my guess.

21        Q.   Was it a Catholic Charities?

22        A.   I don't recall.

23        Q.   Other than the cooperative agreement we

24   just discussed, have there been any other

25   discussions with shelters that have a religious

1   objection to providing access to abortion or

2   contraception since your deposition?

3       A.   No.

4       Q.   Are there shelters still operating

5   without a signed cooperative agreement, generally

6   speaking?

7       A.   No, I don't think so.

8            MS. AMIRI:  We're going to mark our

9   first Exhibit 22.  We're just going to continue

10  with where we left off the last time.

11           (Lloyd Exhibit 22 was marked.)

12  BY MS. AMIRI:

13      Q.   Do you recognize this document that's

14  been marked as Exhibit 22?

15      A.   Yes.

16      Q.   And what is it?

17      A.   It's the errata sheet from my last

18  deposition, from the transcript of my last

19  deposition.

20      Q.   Is this your handwriting in the Page,

21  Line and Correction and Reason columns?

22      A.   No.

23      Q.   I don't want to ask a question that's

24  going to require revelation of attorney/client

25  privilege.  But this represents the corrections

1   that you wanted to make?

2       A.   Yes.

3       Q.   I just wanted some clarity on the two

4   corrections that you made, one on page 35 and one

5   on page 56.  I'm happy to hand to you your

6   deposition.  But on page 35, line 18, there was a

7   substantive change that you had requested made.

8       And the question preceding on page 35, line

9   15 of your deposition, I had asked:  "Do you have

10  any involvement as the director of ORR in making

11  determinations about whether an unaccompanied

12  minor can have access to contraception?"

13      The answer at your deposition on line 19 was:

14  "No."

15      And in your errata you said that you wanted

16  to replace "No" with, quote, "No, not generally,

17  unless that might be a specific question."

18      I didn't really understand the correction.  I

19  wanted to ask you what you meant by your

20  correction in your errata.

21      A.   It's not a question that typically comes

22  to my attention in the operation of our shelters.

23      Q.   So unless, you say -- you added though

24  that there might be a specific question about

25  contraception.

1      A.    Sure.

2      Q.    So are there situations that you have

3  had the occasion of considering a question from a

4  shelter about access to contraception in your time

5  at ORR?

6      A.    Yes.

7      Q.    And what was that?

8      A.    They wanted to know whether they ought

9  to be filling a contraception prescription.

10     Q.    The shelter did?

11     A.    Um-hum.

12     Q.    Can you just say "Yes" or "No" for the

13 reporter.

14     A.    Sure.  So the question I guess was --

15 can you repeat the question?  I'm sorry.

16     Q.    Yes.  I was just clarifying that it was

17 the shelter who was asking the question about

18 whether they were supposed to fill a prescription

19 for contraception.

20     A.    Yes.

21     Q.    And what was your response to them?

22     A.    They should follow the recommendation of

23 their medical director essentially.

24     Q.    Have you ever instructed a shelter to

25 refrain from filling a contraception prescription?

1      A.   No.

2      Q.   Why did that specific request come to

3  you?

4      A.   I don't know.

5      Q.   Normally do contraception prescription

6  questions come to you before a shelter acts on

7  whether they can fill a particular contraception

8  prescription?

9      A.   No.

10     Q.   So this was out of the ordinary, but you

11 don't know why?

12     A.   Right.

13     Q.   Was the request from a

14 religiously-affiliated shelter that had an

15 objection to contraception?

16     A.   I don't think they were religiously

17 affiliated, no.

18     Q.   The next correction is on page 46, line

19 2.  And I just wanted to ask for some clarity as

20 well.  Starting on page 45, line 24, I asked:

21 "Has there ever been a minor's request for

22 contraception that has reached your level, a

23 request for contraception?"

24          And on line 2 of page 46, you said:  "No."

25          And then on your errata, you wanted to

1   replace "No" with "No, not in a way where I

2   approved or disapproved a specific request."

3         So I wanted clarity as to what you meant by

4   that change.

5         A.   Where I was the final decision-maker on

6   a request for contraception, the answer is no.

7         Q.   So the correction is that a minor's

8   request for contraception may have reached your

9   level, but you were not the ultimate

10  decision-maker about whether to approve or

11  disapprove that request?

12        A.   That's correct.

13        Q.   You had started answering some of my

14  earlier questions about directions or instructions

15  that you had given to shelters about specific

16  abortion requests for individuals, and there are

17  some documents that were produced after your

18  deposition that I'd like to start to discuss with

19  you to see if some of those shelters are some of

20  the ones that you either spoke with directly or

21  provided instructions through your staff.

22               MS. AMIRI:  Let's do 23.

23               (Lloyd Exhibit 23 was marked.)

24               (Witness reviewed the exhibit.)

25

1   BY MS. AMIRI:

2        Q.   Sir, I've handed to you what I've marked

3   as Exhibit 23.  I will also represent on the

4   record that the documents that I'll be handing you

5   that have been produced by the government haven't

6   been fully redacted pursuant to our agreement or

7   the confidentiality order.

8            MS. AMIRI:  So that's something I want

9   some clarity on before -- or once we go off the

10  record at some point, one of my housekeeping

11  things I wanted to talk to you about.

12  BY MS. AMIRI:

13       Q.   But just so you know, these are not in a

14  version -- these are in a version that's protected

15  by the confidentiality order and have not been

16  further redacted.

17       With this particular shelter where this minor

18  had requested an abortion, did you speak directly

19  to the shelter about this abortion request?

20       A.   I don't think so.

21       Q.   Did you provide any instructions to

22  staff to give to the shelter -- and we'll get to

23  some other emails -- that weren't captured in

24  emails in general?

25       A.   Yes.

1       Q.    What were those instructions?

2       A.    Instructions to the?

3       Q.    Instructions that -- I'll repeat the

4   question.  Did you give any instructions to staff

5   to give to the shelter that were verbal only and

6   were not captured in emails?

7       A.    My recollection is that most of our

8   instructions in this case were memorialized in

9   email.

10      Q.    For this particular minor, did you

11  instruct the federal field specialist or any other

12  ORR staff member to read a description of an

13  abortion procedure to her?

14      A.    Yes.

15      Q.    Did that happen?

16      A.    I believe so.

17      Q.    Why would you require that?

18      A.    For informed consent.

19      Q.    Is it part of ORR's job to provide

20  medical informed consent to minors?

21      A.    Informed consent, yes.

22      Q.    It is ORR's job to provide medical

23  informed consent to minors?

24      A.    It's appropriate.

25      Q.    In what circumstances is it appropriate?

1       A.    Well, in a case where, for example,

2   they're having a medical procedure done on them.

3       Q.    In all instances in which unaccompanied

4   minors undergo medical procedures while they're in

5   ORR custody, does ORR provide medical informed

6   consent to those minors?

7       A.    They ensure that it's given.

8       Q.    Given by whom?

9       A.    Providers.

10      Q.    What kind of providers?

11      A.    The providers who are giving the

12  procedure.

13      Q.    The medical providers?

14      A.    Um-hum.

15      Q.    Are there other circumstances outside of

16  the abortion context where you have instructed

17  your staff to provide medical informed consent to

18  a minor undergoing a medical procedure?

19      A.    Not that I recall.

20      Q.    Have you ever instructed that a minor

21  who was delivering a baby either vaginally or via

22  C-section be provided with a description of the

23  experience they were about to undergo?

24      A.    No.

25      Q.    Did you also instruct that this minor be

1    offered a publication by the State of Texas about

2    abortion?

3         A.   Something along those lines, yeah.

4         Q.   Is this the first minor that you have

5    made such an instruction for?

6         A.   I don't recall, but I don't think so.

7         Q.   This minor wasn't in Texas, was she?

8         A.   No.

9         Q.   Why then would she be asked to read a

10   publication from the State of Texas?

11        A.   We found it to be a good resource.

12        Q.   Who is "we"?

13        A.   People in the department.

14        Q.   Who would that include?

15        A.   Me and legal counsel and Maggie Wynne,

16   Steve Wagner, decision-makers.

17        Q.   I'm not asking about any conversations

18   that you had with counsel, but any conversations

19   that you have had outside the presence of counsel

20   about the use of the Texas book to be provided to

21   minors.

22             MR. TOMLINSON:  I'm going to object and

23   instruct him not to answer the question about the

24   substance of those conversations on the basis of

25   deliberative process.

1          MS. AMIRI:  About whether to use a --

2    whether to give a booklet to people, you think

3    that's deliberative process?

4          MR. TOMLINSON:  Yes.  If we're saying

5    that the agency's practice is to give booklets to

6    minors, I think that is a decision about policy or

7    practice potentially.

8          THE WITNESS:  Can you repeat the

9    question?

10   BY MS. AMIRI:

11        Q.   Did you have conversations with people

12   in your department or above you outside the

13   presence of counsel about whether to provide to

14   unaccompanied minors a book published by Texas

15   about abortion?

16        A.   I don't think so.

17        Q.   They were all within the presence of

18   counsel?

19        A.   I think so.

20        Q.   Did you require this particular minor

21   that is discussed in Exhibit 23 to read the

22   pamphlet that the State of Texas publishes?

23        A.   I don't think so.

24        Q.   For this particular minor, you also

25   asked a series of questions to be posed to the

1  provider; is that right?

2      A.   Yes.

3      Q.   About the nature of the abortion

4  procedure?

5      A.   Yes.

6      Q.   Why did you ask those questions?

7      A.   Because I wanted to know the answers to

8  those questions.

9      Q.   Why?

10     A.   We were responsible for the kids in our

11  care.  I wanted to know what was happening to this

12  particular one.

13     Q.   Why this particular one as opposed to

14  any other?

15     A.   Because she's undergoing a major

16  procedure where a human life was being destroyed.

17  I wanted to know the details of that.

18     Q.   Do you think that abortion is less safe

19  than childbirth?

20     A.   I would defer to whatever the science

21  says on that.

22     Q.   Do you happen to know yourself whether

23  childbirth is safer than abortion?

24     A.   It depends on what kind of childbirth

25  and what kind of abortion.  I don't have

1    statistics committed to memory.

2         Q.   So this particular minor was -- had your

3    attention about the type of procedure that she was

4    going to undergo because in your mind, it was a

5    procedure that would involve the destruction of

6    human life?

7         A.   Well, it's not just in my mind.  That's

8    objective.

9         Q.   That's objective?

10        A.   Um-hum.

11        Q.   You believe everyone regardless of their

12   belief systems believes that abortion is the

13   destruction of human life?

14        A.   I think the objective facts are that it

15   involves the destruction of a human life.  How

16   people internalize every element is a different

17   question.

18        Q.   Is your belief that the abortion is the

19   destruction of human life informed by your

20   religion faith?

21        A.   It's informed by the reality of the

22   situation and the scientific facts.

23        Q.   You also believe that abortion is a sin?

24        A.   What does that have to do with anything?

25        Q.   It has to do with a lot.  This case is

1  about -- involves an Establishment Clause

2  violation.  Your religious imposition is directly

3  relevant to the case.  So I get to ask the

4  questions.  Mr. Tomlinson can object.

5       So my question is:  Do you believe abortion

6  is a sin?

7       A.   Yes.

8            MR. TOMLINSON:  I'm going to object to

9  this line of questioning going any further because

10  he's testified in the past that he does not let

11  religion guide his job as ORR director.  We're

12  getting pretty far afield into personal religious

13  beliefs.

14            MS. AMIRI:  You can certainly ask him on

15  redirect any questions that you want.  I don't see

16  that there's a basis for an instruction not to

17  answer.  The political individuals who are

18  involved in enforcing the policy and their

19  personal religious belief and whether that is

20  imposed on the minors in their care is directly

21  relevant to this case, and there's no basis for

22  instructing him not to answer.  If you want to

23  clarify on your redirect, that is certainly your

24  prerogative.

25            MR. TOMLINSON:  Let me clarify.  I did

1    not instruct him not to answer.  I just wanted to

2    put this objection on the record as to this

3    questioning.

4              MS. AMIRI:  Fair enough.

5    BY MS. AMIRI:

6         Q.   I believe you answered the question.

7    You think abortion is a sin.  Yes?

8         A.   I answered the question.

9              (Lloyd Exhibit 24 was marked.)

10   BY MS. AMIRI:

11        Q.   I'm going to hand you what has been

12   marked as Exhibit 24, if you'd like to take a

13   look.

14             (Witness reviewed the exhibit.)

15   BY MS. AMIRI:

16        Q.   Do you recognize what has been marked as

17   Exhibit 24?

18        A.   Most of it.

19        Q.   Which parts do you not recognize?

20        A.   The cover -- the cover email I hadn't

21   seen before.

22        Q.   Just by background for this particular

23   minor that we've been discussing, Jonathan White

24   made a recommendation to you that this particular

25   minor be allowed to have access to abortion; is

1  that correct?

2       A.   Yes.

3       Q.   This minor had been raped; correct?

4       A.   Well, she claimed to have been raped,

5  yes.

6       Q.   Do you have any reason to disbelieve

7  her?

8       A.   No.

9       Q.   This minor had thoughts of self harm?

10      A.   She expressed something along those

11  lines, yes.

12      Q.   And Mr. White sent you a decision memo

13  about whether to approve or deny the abortion

14  access and funding; is that right?

15      A.   Yes.

16      Q.   Has Mr. White sent you a decisional memo

17  like this for any other abortion?

18      A.   I don't think so.

19      Q.   If you flip to Bates-stamp 15607, in the

20  middle paragraph, about halfway in the middle

21  paragraph, you reference an information session

22  that imparted information about fetal development

23  and the abortion procedure she requests.

24      A.   Can you repeat that last part?

25      Q.   Yes.  I just wanted to draw your

1    attention to the middle paragraph.  About halfway

2    through that middle paragraph, the sentence says,

3    "She has had an information session that imparted

4    information about fetal development and the

5    abortion procedure she requests."

6         A.   Yes.

7         Q.   What information session are you

8    referring to there?

9         A.   She met with her clinician and our -- a

10   child welfare specialist from our program to go

11   through information regarding her request for

12   termination.  I believe the medical director from

13   the program was there, too.

14        Q.   So there were three individuals that

15   were at the informational session?

16        A.   At least three and a translator.

17        Q.   When you mentioned her provider, is that

18   an ob-gyn?

19        A.   I believe it was the medical -- the

20   medical staff from the program as opposed to the

21   provider.

22        Q.   Was there a clinician, a medical

23   provider who was not associated with the shelter

24   at the informational session?

25        A.   I don't know, but I don't think so.

1    Q.   Did you provide any instructions for

2  this particular minor that she visit a crisis

3  pregnancy center?

4    A.   I don't recall, but I actually don't

5  think that happened in this case.

6    Q.   So even if you provided the instruction,

7  you don't think that she went to a crisis

8  pregnancy center?

9    A.   That would be my recollection, but it's

10  possible that my recollection is off.

11    Q.   Did you instruct that this particular

12  minor go to any particular ob-gyn for the

13  provision of care?

14    A.   No.

15    Q.   On Price production 15609, you say in

16  the last paragraph, "Although formal research on

17  this matter appears to be sparse...," that

18  sentence.

19    A.   Um-hum.

20    Q.   I believe you're talking about trauma

21  from abortion; is that correct?

22    A.   Yes.

23    Q.   Have you done a literature review of the

24  science literature about whether abortion causes

25  trauma?

1    A.    Me personally?

2    Q.    Yes.

3    A.    No.

4    Q.    Have you read any summaries about the

5  scientific literature about whether abortion

6  causes trauma?

7    A.    Yes.

8    Q.    And what were those summaries that you

9  read?

10   A.    Compilations, various compilations of

11  scientific literature on the harms of abortion.

12   Q.    And who provided that to you?

13   A.    I believe the staff -- well, I mean,

14  over the years, many different places.  Usually

15  you find this stuff on the internet.  It may have

16  been part of my own research on this or that

17  project.  But in the context of this -- in these

18  responsibilities, ACF staff provided me some

19  literature, and we were also working with ASPE,

20  the assistant secretary for planning and

21  evaluation, regarding related topics.  But I don't

22  think it goes directly to abortion trauma.

23   Q.    Who is the ASPE director?

24   A.    It was just -- who is ASPE director?

25  John.  I don't know his last name.

1        Q.   So just to back up, did any of your

2   staff give you medical or scientific literature

3   about abortion trauma that you considered in the

4   context of this particular memo?

5        A.   No.

6        Q.   Do you know what the American

7   Psychological Association says about whether

8   abortion causes trauma?

9        A.   I don't have that committed to memory.

10       Q.   What did the scientific literature that

11  you were provided say about whether abortion

12  causes trauma?

13       A.   If I recall, there's some studies that

14  have found an increased likelihood of self harm,

15  suicide, that sort of thing.

16       Q.   Were those studies conducted by a man

17  named Vincent Rue?

18       A.   I don't know.

19       Q.   Priscilla Coleman?

20       A.   I don't know.

21       Q.   Did you ever speak to the minor who is

22  at issue in this memo?

23       A.   No.

24       Q.   The next page, 15610, in the fourth

25  paragraph, second sentence, you say, "How could

1    abortion be in their best interest where other

2    options are available..."

3         Is it your position that abortion is never in

4    the best interest of a minor because there are

5    other options for the pregnancy available to the

6    minor?

7         A.   Where are we?

8         Q.   Fourth paragraph on 15610, second

9    sentence.

10        A.   Okay.

11        Q.   Is it your position that abortion is

12   never in the best interest of a minor because

13   there are other options available to a minor?

14        A.   In this -- it's a case-by-case

15   determination for each minor in our care.

16        Q.   But do you believe that abortion would

17   never be in the best interest of a minor where the

18   minor has other options for the pregnancy?

19             MR. TOMLINSON:   Objection.   Calls for

20   speculation.

21   BY MS. AMIRI:

22        Q.   You can answer.

23        A.   It's a case-by-case determination.

24        Q.   So what did you mean here when you said,

25   "How could abortion be in their best

Page 221

1    interest...where other options are available..."?

2         A.    I should have said her best interest,

3    and that would have clarified, I think.

4         Q.    You ultimately made the determination

5    not to allow this particular minor access to the

6    abortion; correct?

7         A.    Yes.

8         Q.    Does that mean it was not in her best

9    interest?

10        A.    If I could clarify, I made the

11   determination that the program would not assist

12   her in obtaining an abortion.

13        Q.    Now I'm confused because I believe that

14   you have said in this memo, "At bottom, this is a

15   question of what is in the interest of the young

16   woman..."

17        A.    Um-hum.

18        Q.    So if you're charged with acting in the

19   best interest of a minor, how does what the

20   program wants to do relate to what is in the best

21   interest of a particular minor?

22        A.    Our determination about the best

23   interest of a minor is going to determine how we

24   expend our resources in pursuit of that best

25   interest.

1      Q.   So you believe as part of the best

2   interest determination of a minor, that that

3   includes an assessment of ORR resources?

4           MR. TOMLINSON:  Objection.  I think that

5   mischaracterizes what he said.

6           MS. AMIRI:  That's why I'm trying to get

7   clarification here.

8           THE WITNESS:  No.  The best -- once we

9   determine what's in the best interest of a child

10   in a certain situation, then we determine how our

11   program is going to pursue those best interests.

12   BY MS. AMIRI:

13      Q.   But for this particular minor, you made

14   the determination that the abortion was not in her

15   best interest.

16      A.   Yes.

17      Q.   She was asking for the abortion; right?

18      A.   That's the way it was reported to us,

19   yes.

20      Q.   So in this decision memo, you have

21   supplanted your decision for hers based on your

22   determination that the abortion is not in her best

23   interest?

24      A.   No.

25      Q.   So please correct me and explain why

1    that's wrong.

2         A.    Whatever she feels about what's in her

3    best interest is one matter, and then what we do

4    as a program serving her is a different matter.

5         Q.    How then do you reconcile your

6    determination about what is in her best interest

7    with what you just said in terms of the program?

8    I don't quite understand.

9         A.    We are charged with acting in the best

10   interest of the children in our care.

11        Q.    Yes.

12        A.    And that's what we did in this case.

13        Q.    So you think that denying her access to

14   abortion was in her best interest?

15        A.    In this case, it was.

16        Q.    Why?

17        A.    For the reasons that I laid out in the

18   memo.

19        Q.    If that is true, how would -- strike

20   that.

21        You're never going to approve an abortion

22   request; right?

23             MR. TOMLINSON:  Objection.  Speculative.

24   BY MS. AMIRI:

25        Q.    You can answer the question.

1        A.    I'm sorry?

2        Q.    You can answer the question.  That's an

3   objection.  That's not an answer.

4        A.    I'm going to look at each case and make

5   a determination on a case-by-case basis.

6        Q.    As the ORR director, you have to

7   personally approve any abortion request, correct,

8   putting aside medical emergencies?

9        A.    Yeah.  We determine whether the program

10  is going to assist in that, yes.

11       Q.    And it would require your explicit

12  approval for a minor to have an abortion outside

13  of the emergency medical context?

14       A.    Yes.

15       Q.    If you believe that an abortion is a sin

16  and you approved an abortion, wouldn't you be

17  complicit in sin?

18            MR. TOMLINSON:  Object to the form.  I

19  object to the form of that question.

20            THE WITNESS:  Potentially.

21  BY MS. AMIRI:

22       Q.    What is the potential?  What's potential

23  about it?

24       A.    I mean, we're speculating.  That, too,

25  is a case-by-case determination according to my

Page 225

1    understanding.

2         Q.   If you have to sign on a line approving

3    an abortion request, wouldn't you be complicit in

4    sin?

5              MR. TOMLINSON:  I'm going to renew the

6    objection.  We're talking about his religious

7    beliefs, not his -- how he does his official

8    duties here.

9    BY MS. AMIRI:

10        Q.   You can answer the question.

11        A.   Can you restate the question?

12        Q.   Yes.  Mr. Tomlinson's objection will

13   stand.  If you were to approve an abortion

14   request, wouldn't you be complicit in sin?

15        A.   I could be.  It depends.  It's a

16   case-by-case determination.

17        Q.   Depends on what?

18        A.   A number of factors.

19        Q.   So it depends on the factors that are

20   involved in the minor seeking the abortion?

21        A.   It depends on all the factors and

22   including what you just said, according to my

23   understanding.  But I'm not here as an expert on

24   my faith.  I'm here as the director of the Office

25   of Refugee Reassignment.

Page 226

1      Q.   I understand.  I'm trying to understand

2  what the policy really is here with respect to

3  abortion requests.

4      A.   Okay.  Then let's talk about the policy.

5      Q.   I'm trying to understand whether there

6  is any abortion request that you are ever going to

7  approve.

8      A.   The answer is I don't know.

9      Q.   You don't know?

10     A.   It's a case-by-case determination.

11     Q.   I will get a speculative objection.  We

12  can just put that on the record right now.

13     Let's say there's a minor who's pregnant as a

14  result of rape.  She's eight weeks pregnant.

15  She's requested an abortion.  She has threatened

16  self harm if she's not allowed to have the

17  abortion.  She's voluntarily told her parents and

18  her sponsor, all of whom are supportive of her

19  abortion decision and would like her to have the

20  abortion.  She has obtained a judicial bypass.

21     Would you in that case still deny the

22  request?

23     A.   I don't know.

24     Q.   What do you mean you don't know?

25     A.   I don't know.

1          Q.    You don't know if you would?

2          A.    Right.

3          Q.    What facts would you need that I have

4     not laid out that would help you with your

5     decision?

6          A.    It would have to be a real case.

7                MR. TOMLINSON:   Object to form.

8     BY MS. AMIRI:

9          Q.    It would have to be a real case?

10         A.    Yeah.

11         Q.    Why?

12         A.    Because I'm not going to engage in a

13    speculation session.

14         Q.    Well, hypothetical questions are

15    perfectly acceptable to ask at depositions.  I

16    understand there's a speculation objection that's

17    put on the record.  That's fine.  I'm trying to

18    understand if there are any constellation of facts

19    that would be presented to you --

20         A.    And the answer, which I've answered, is

21    I don't know.

22         Q.    Are all the facts that you considered in

23    making a determination about what's in the minor's

24    best interest related to the minor's specific

25    circumstances, or are there other facts that you

Page 228

1    consider in making a decision?

2         A.    There are other facts --

3         Q.    Like what?

4         A.    -- for consideration.  I think we went

5    through this in some detail in my last deposition.

6    I don't think my answer has changed.

7         Q.    Was this minor that we're talking about

8    in this memo required to tell her parents about

9    her abortion decision?

10        A.    I don't recall.

11        Q.    Why did you --

12        A.    Yeah, I think she did tell her parents.

13   I don't remember if she was required to or not.

14        Q.    In the past there have been minors that

15   you have instructed that they tell their parents

16   or the shelter will tell their parents; correct?

17        A.    Um-hum.

18        Q.    Can you say "Yes" for the court

19   reporter.

20        A.    Yes.

21        Q.    You don't know whether that particular

22   instruction happened for this particular minor?

23        A.    I don't recall if she already had the

24   conversation or if we directed the program to

25   arrange the parental notification.

1      Q.   You've made many instructions with

2   respect to this particular minor including that

3   she receive a description of the medical

4   procedure, that she have the informational

5   session.  Nevertheless, you denied her request for

6   an abortion.

7      And my question to you is:  Why would you

8   make her go through all of what you made her go

9   through simply to then just deny her abortion

10  request?

11     A.   Without informed consent, then there

12  isn't really a real request in my mind.

13     Q.   But you didn't deny her abortion request

14  because you felt like she was uninformed about the

15  abortion, did you?

16     A.   If she was uninformed about the

17  abortion, then she never would have made the

18  request.

19     Q.   But she had made the request before you

20  had required her to hear a description of the

21  abortion procedure and offer her the Texas

22  pamphlet; correct?

23     A.   It wasn't clear -- yes.

24     Q.   So she had already made that request.

25  And in fact, the only time that she rescinded her

1   request is when her parent and her sponsor

2   threatened to beat her if she had the abortion;

3   right?

4        A.    That's correct.

5        Q.    So my question is:  Why subject her to

6   the things that you subjected her to only to deny

7   her abortion request?

8             MR. TOMLINSON:  Object to the form.

9             THE WITNESS:  We were sharing

10  information about the procedure that she was

11  requesting so that we knew that she knew what she

12  was asking for.

13  BY MS. AMIRI:

14       Q.    But that didn't factor into your

15  decision about whether to deny her request?

16       A.    Yes, it did.

17       Q.    How so?

18       A.    Because without it being clear that she

19  knew what she was asking for, it wouldn't be clear

20  that she was actually making a request for what

21  she was -- she seemed to be requesting.

22       Q.    Do you think that minors outside the

23  abortion context know what they're asking for when

24  they ask for a particular medical procedure even

25  without having been read a description of the

1    medical procedure?

2              MR. TOMLINSON:  Object to the form.

3              THE WITNESS:  That's going to depend on

4    the circumstances.

5    BY MS. AMIRI:

6         Q.   So going back to the issue carried to

7    term, a minor who is perhaps making a decision

8    about whether to have a vaginal delivery or

9    C-section, ORR, I believe you said, had never

10   required a particular minor to read a description

11   about a C-section; right?

12        A.   I don't believe -- no, we haven't -- I

13   don't know.  I don't know.

14        Q.   You have never instructed that?

15        A.    Right.

16             (Lloyd Exhibit 25 was marked.)

17   BY MS. AMIRI:

18        Q.   I hand you what has been marked as

19   Exhibit 25.

20             (Witness reviewed the exhibit.)

21   BY MS. AMIRI:

22        Q.   Just to clarify, what's on page 15452 is

23   the description of the abortion procedure that you

24   required be read.  It's from the Supreme Court

25   decision Gonzales versus Carhart.

1       A.   Yes.

2       Q.   Have you ever required that a minor be

3  read a description of any medical procedure from

4  any court case outside the context of abortion?

5       A.   No.

6       Q.   Do you know whether anyone on your staff

7  has the training to provide options counseling

8  about abortion?

9       A.   I don't know.

10           (Lloyd Exhibit 26 was marked.)

11  BY MS. AMIRI:

12       Q.   On that first page I wanted to ask you

13  about what is in No. 2 of the email from Jonathan

14  White to you.  There's a sentence that starts,

15  "███████ has indicated that the DHUC staff are not

16  able to participate..."

17       A.   Okay.

18       Q.   What does DHUC stand for?

19       A.   Division of Health for Unaccompanied

20  Children.

21       Q.   And ███████ referred to in this sentence

22  is ███████████████?

23       A.   Yes.

24       Q.   So just reflecting on this email, back

25  to my question about whether you had anyone on

1    your staff who had the clinical training and

2    expertise to provide options counseling, isn't

3    Jonathan White indicating to you that the DHUC

4    staff do not have that competency?

5         A.   Well, Jonathan is characterizing a

6    conversation he had with ███████ who represented

7    that DHUC staff doesn't have that.

8         Q.   Do you have any reason to believe that

9    that is incorrect?

10        A.   I don't have -- I don't know.  If I had

11   to think about it, I'd probably have a discussion

12   with ███████ to see if we were talking about the

13   same thing.

14        Q.   What is your concern about whether you

15   might be talking about something different?

16        A.   I don't know.  What he meant by options

17   counseling outside their clinical training, I

18   mean, the DHUC staff are not clinicians.  I

19   suppose that's what he was talking about.

20        Q.   Do you think that that is an incorrect

21   assessment then that Jonathan was reporting that

22   ███████ said?

23        A.   Well -- so it's speaking to the clinical

24   training.  I didn't second guess their

25   characterization.

1      Q.   Have you dispatched anyone from your

2   staff to provide options counseling to a minor who

3   is seeking an abortion?

4      A.   No.

5      Q.   As the term options counseling is used

6   in this exhibit, what do you think Jonathan is

7   referring to?  How do you think he defines options

8   counseling?

9           MR. TOMLINSON:  Objection.  Calls for

10  speculation.

11          THE WITNESS:  It's providing options

12  about pregnancy, information about options.

13  BY MS. AMIRI:

14     Q.   And what would those options include?

15     A.   Well, we discussed this in the last

16  deposition.  Termination, adoption and childbirth.

17     Q.   It does look like this email refers to

18  and some other emails involving ████████.  I

19  probably pronounced that wrong.

20     A.   That's right.

21     Q.   ████████████. ████████████████, who is

22  she?

23     A.   She's our child welfare specialist on

24  staff.

25     Q.   Is she based here in D.C.?

1        A.    Yeah.

2        Q.    And did you instruct ████████████ to

3   go visit this particular minor?

4        A.    Yes.

5        Q.    And why did you do so?

6        A.    To make sure that she -- well, it's in

7   the email.  But to make sure that she's aware of

8   her options and that she has informed consent

9   about the procedure.

10        Q.    So to your knowledge, ██████ is the one

11   who read to this minor the description of the

12   abortion procedure from Gonzales versus Carhart?

13        A.    I don't think that's correct.

14        Q.    So who from your staff read that portion

15   of that --

16        A.    I believe it was the minor's clinician,

17   the program staff, shelter staff.

18        Q.    The shelter staff.  ██████ does, in

19   fact, report to you, correct, about the meeting?

20        A.    Yes.

21        Q.    We have it somewhere.

22              (Lloyd Exhibit 27 was marked.)

23   BY MS. AMIRI:

24        Q.    I've handed you what's been marked as

25   Exhibit 27.  Is this an email communication

1    between you and ████  about the visit for the

2    particular minor?

3         A.   Yes.

4         Q.   So there are a number of things that you

5    had asked ████  to communicate to her on page

6    15522?

7         A.   Yes.

8         Q.   Do you know if the minor requested

9    spiritual counseling?

10        A.   I don't know.  I don't think she did.

11        Q.   Do you know if ORR or the shelter

12   required her to attend spiritual counseling even

13   if she did not want it?

14        A.   Do I know?

15        Q.   Yes.  Do you know whether ORR or the

16   shelter staff required her to attend spiritual

17   counseling?

18        A.   I know that nobody required her to do

19   that.

20        Q.   That somebody required -- sorry.  I

21   didn't hear.

22        A.   I know that nobody required her to do

23   that.

24        Q.   So in number three, you had asked

25   ████  to talk to her about the abortion

1  procedure, if she knows what a dilation and

2  extraction abortion is.  But to confirm your

3  earlier testimony, you did not have ███████ read

4  the description of Gonzales to her; correct?

5       A.   Right.  ███████ did not.

6       Q.   Did ███████ offer an illustration of an

7  abortion at 23 weeks?

8       A.   I believe that she did.

9       Q.   Do you know if the minor decided to view

10 that image?

11      A.   She decided not to.

12      Q.   Do you know what information ███████

13 communicated to her about what was in your No. 4

14 about abortion, she may experience abortion as

15 trauma on top of the trauma from her rape?

16      A.   Well, this was -- well, it's for all

17 three scenarios, parenting, adoption and abortion.

18 I don't recall there being much details about that

19 discussion.

20      Q.   You don't know whether ███████ said to

21 her if you have an abortion, you may experience

22 that as trauma?

23      A.   I don't know if she said that.

24      Q.   In number five you said that she should

25 know that the program is able to do for her -- I'm

1   sorry -- she should know what the program is able

2   to do for her if she decides to carry her baby to

3   term or give him or her up for adoption and that

4   if born in the U.S., the baby would be a U.S.

5   citizen.

6          Why did you want ████ to communicate this

7   to this particular minor?

8          A.   So that the minor would know that for

9   communicating her decision.

10         Q.   Why do you think it was important for

11  her to know her baby, if born in the United

12  States, would be a U.S. citizen?

13         A.   I don't know.  It's just good

14  information to have.

15              (Lloyd Exhibit 28 was marked.)

16  BY MS. AMIRI:

17         Q.   I hand you what's been marked as Exhibit

18  28.  What I've just handed to you marked as

19  Exhibit 28 is ████'s report back to you; is

20  that correct?

21         A.   Yes.

22         Q.   In the first paragraph, I understand

23  there have been some redactions made to protect

24  the names of individuals, but I'm wondering if

25  anyone was present during the visit from ORR

1    staff, including federal field specialists, or

2    whether those names that have been redacted are

3    nongovernmental employees.

4         A.   The federal staff that I know was there

5    was ███████.   I don't remember if the federal

6    field staff was there.

7              MS. AMIRI:   This might be a good place

8    for a break.

9              THE VIDEOGRAPHER:   We are off the record

10   at 11:38.

11             (Recess from 11:38 a.m. to 11:54 a.m.)

12             THE VIDEOGRAPHER:   This is Media Number

13   2 in the video recorded deposition of Scott Lloyd.

14   We're back on the record at 11:54.

15             (Lloyd Exhibit 29 was marked.)

16   BY MS. AMIRI:

17        Q.   I'm going to hand you what's been marked

18   as Exhibit No. 29.

19             (Witness reviewed the exhibit.)

20   BY MS. AMIRI:

21        Q.   In Exhibit 29 now we're talking about a

22   different minor than the one we were talking about

23   before the break; is that right?

24        A.   Yes.

25        Q.   It looks like there's one instruction

Page 240

1    that you gave to the federal field specialist

2    through Jonathan White on 15592 about ███████

3    notification of the pregnancy and the termination

4    request; is that accurate?

5         A.   Yes.

6         Q.   Did you give any other instructions with

7    respect to this particular minor either directly

8    to the shelter or through your staff?

9         A.   I don't recall.

10        Q.   Did you speak to the shelter where this

11   minor was living at the time directly?

12        A.   I don't think so.

13        Q.   If you don't recall whether you had any

14   other further instructions, just to see if this

15   refreshes your recollection at all, did you

16   instruct that this particular minor be taken to

17   visit a center on the trusted list of HHS approved

18   in crisis pregnancy centers?

19        A.   It's possible.  I don't recall.

20        Q.   Did you speak personally to this

21   particular minor?

22        A.   No.

23        Q.   Did you instruct that this particular

24   minor read a description of an abortion procedure?

25        A.   No.

1        Q.    Did you instruct that this particular

2    minor receive information about adoption?

3        A.    That would be one of the -- if we gave

4    the instruction that she have options counseling,

5    that would be one of the reasons for the options

6    counseling.

7        Q.    Separate and apart from options

8    counseling, did you direct the shelter staff, for

9    example, to provide this minor with anything very

10   specific with respect to adoption?

11       A.    That be would the purpose of options

12   counseling, so no.

13       Q.    Who do you anticipate would do that

14   options counseling?

15       A.    The pregnancy center.

16       Q.    Did you instruct this minor to undergo

17   an ultrasound?

18       A.    No.

19       Q.    So other than what's in the email with

20   respect to the direction about notification of the

21   sister, are there any specific instructions that

22   you remember for this specific minor that you

23   provided?

24       A.    Yes, I don't recall.

25       Q.    Since your deposition in December, have

1   you had any conversations with ICE about abortion?

2        A.   I don't think so.

3        Q.   Have you instructed your staff to have

4   any conversations with ICE about abortion since

5   your deposition?

6        A.   I don't think so.

7        Q.   So before we talked about other minor

8   abortion requests that came in since your

9   deposition.  So this represents two.  I want to

10  talk about others.  There was one in January, and

11  I wanted to ask you questions about what

12  instructions you made with respect to her, to her

13  abortion.

14       A.   January?

15       Q.   Um-hum.

16       A.   I don't recall.  I would need more

17  specifics.

18       Q.   So this will be under the

19  confidentiality order.  ████████████████████

20  ████████████████████.  Does that ring a bell?

21       A.   It does.

22       Q.   What instruction did you provide for

23  this particular minor when her abortion request

24  came in?

25       A.   I don't recall.  It would be along the

1   lines of I would instruct the staff to develop the

2   record if there was something missing.  I don't

3   recall the specific instructions given to staff

4   with regard to that request.

5       Q.   When you -- strike that.

6       When you said develop the record and see if

7   there's anything missing, what are the types of

8   things that you're looking for when you get an

9   abortion request?

10      A.   Same as in the last deposition, just the

11   full facts.

12      Q.   Were you involved in this particular

13   minor's release decision to her sponsor?

14      A.   This is █████████?

15      Q.   Yeah.

16      A.   I don't think so.

17      Q.   Are you typically personally involved in

18   decisions to release minors to their sponsors?

19      A.   Not typically.

20      Q.   If you are not, who is in your staff?

21      A.   That's a determination made by field

22   staff in conjunction with their case manager.

23      Q.   So on a routine basis, decisions to

24   release a minor to her sponsor don't reach your

25   desk; is that fair?

1      A.    Yeah.   On a routine basis, most

2   decisions do not reach my desk.

3      Q.    About release to sponsors?

4      A.    Right.

5      Q.    And is that also true for any sort of

6   release or transfer to ICE upon a minor reaching

7   the age of maturity, or is that a different

8   question?

9      A.    Usually I would not be involved in that.

10   There's some releases for -- that do reach our --

11   reach the office of the director on a routine

12   basis, but it's a very minor segment of the

13   population.

14      Q.    What is the criteria for that minor

15   segment of the population?

16      A.    Potential danger to the community/gang

17   involvement.

18      Q.    So far none of the minors that we have

19   talked about fall into that category; is that

20   fair?

21      A.    That's fair.

22      Q.    With respect to the minor that we're

23   talking about in ███████ now, did you request

24   that she be read information about an adoptive

25   family?

Page 245

1     A.   Yes, I believe so.  I think we're

2  talking about the same case.

3     Q.   What did that information about the

4  adoptive family say?

5     A.   It was an offer that we received from a

6  family interested in adoption that was directed

7  toward that particular minor.  That was just --

8  they were able to do that because of news reports

9  about the case.  So we asked that the offer be

10 translated into ███████ to the UAC.

11    Q.   Did you know this prospective adoptive

12 couple?

13    A.   No.

14    Q.   You never heard their names before?

15    A.   No.

16    Q.   Is this the first type of offer for

17 adoption that has made its way to you in the

18 context of having someone seeing a news story

19 about the abortion request and ORR custody?

20    A.   No.

21    Q.   Sorry.  It's not the first one?

22    A.   (Nodding.)

23    Q.   Typically when you get an offer for

24 adoption, what do you do with that?

25    A.   It's not a typical situation.  It's

1    really only, in my recollection, arose twice.  I

2    think the circumstances of the first time were

3    such that we couldn't do much with the offer.  And

4    the second time, we just passed it on to the girl.

5         Q.   And in the first circumstance, why were

6    you unable to do anything?

7         A.   I think, if memory serves -- well,

8    first, there's no real procedure for that.  So

9    that may have been a delaying factor.  Then the

10   other, I believe the UAC either left custody or

11   obtained an abortion before it was material.

12        Q.   So with this minor, going back to the

13   ███████████ minor, when you received this offer of

14   adoption, did you do anything to vet the couple

15   that was making the offer?

16        A.   No.

17        Q.   Any assessment of whether they would be

18   good adoptive parents?

19        A.   No.

20        Q.   Why did you instruct that the minor

21   receive the offer?

22        A.   To discern whether that is something

23   she'd be interested in pursuing.

24        Q.   Had the minor given any indication that

25   you were aware of that she was interested in

1    carrying the pregnancy to term and placing the

2    baby for adoption?

3         A.   No.

4         Q.   Was the offer of adoption read to the

5    minor by shelter staff or someone on your staff?

6         A.   I think that it was.  I actually don't

7    recall receiving confirmation of that.

8         Q.   Any other instructions with respect to

9    this particular minor that you either communicated

10   directly to the shelter or directly -- I'm

11   sorry -- through staff?

12        A.   Not that I -- I don't recall.

13        Q.   I'm sorry if I forgot this, but did you

14   speak directly to this other particular shelter?

15        A.   I don't think so.

16        Q.   So earlier when we started the

17   deposition, you indicated there may have been a

18   shelter or more than one shelter that you had

19   spoken directly to about a minor's abortion

20   request.  So far in the three minors that we've

21   talked about thus far, none of those shelters

22   you've spoken to directly; is that fair?

23        A.   Yeah.  That sounds right.

24        Q.   So in what other circumstances -- what

25   other minors have we not yet talked about where

Page 248

1    you may have talked to the shelter directly?

2         A.    I can say that I really don't think that

3    I have been in direct contact with a shelter in

4    any circumstance since our last deposition.

5         Q.    So we have talked about three minors.

6    There's a minor that recently requested access to

7    abortion in ███████.

8         A.    How recently?

9         Q.    Very recently, this month.

10        A.    Okay.

11        Q.    Were you aware of that abortion request?

12        A.    Yes, if we're talking about the same

13   thing.

14        Q.    What instructions have you given with

15   respect to that minor?

16        A.    To ascertain whether she desires legal

17   counsel in the matter.

18        Q.    And how did you instruct that that

19   determination be reached?

20        A.    Just through her caseworker, clinical

21   caseworker.

22        Q.    At the shelter?

23        A.    Yeah.

24        Q.    Have you made any instructions with

25   respect to any of the other types of instructions

1   we have seen with other abortion requests, for

2   example, telling the parents in the home country

3   or requiring the minor to tell the parents in the

4   home country?

5        A.   Yes.

6        Q.   A visit to a crisis pregnancy center?

7        A.   No.

8        Q.   Spiritual counseling?

9        A.   No.

10       Q.   So the only instructions that you have

11  made with respect to this particular minor that

12  made the request for abortion this month is

13  pertaining to whether she wants legal counsel?

14       A.   Right.  I may have mentioned to ensure

15  that she knows that spiritual counseling is

16  available if she wants it.

17       Q.   Do you know if she requested spiritual

18  counseling?

19       A.   I don't think that she did.

20       Q.   So we talked about four minors.  We had

21  talked about that you thought there would be less

22  than five abortion requests.

23       Are there any abortion requests that have

24  been made that have been brought to your attention

25  since your deposition on December 18 that we have

Page 250

```
 1    not discussed?

 2         A.   No, not to my recollection.  I think

 3    we've covered them all.

 4         Q.   Have you provided instruction to legal

 5    services attorneys funded by ORR about what they

 6    may or may not say about abortion to their

 7    clients?

 8         A.   I'm sorry.  Could you repeat the

 9    question?  I missed the first part.

10         Q.   Have you made an instruction to legal

11    services attorneys, organizations rather, that

12    receive funding through ORR about what they may or

13    may not say about abortion?

14         A.   No.

15         Q.   Do you know whether anyone on your staff

16    has?

17         A.   No.

18         Q.   Is it your position that a legal

19    services organization that receives funding

20    through ORR either directly or through the Vera

21    Institute is not prohibited from discussing

22    abortion with their clients?

23         A.   Is it my position that they're not

24    prohibited from?  Yes.  It's my position.  Because

25    that's my understanding of the contract that they
```

Page 251

1   sign, but I would defer to the contract officer as

2   to what the specific terms are.

3        Q.   You personally have not instructed your

4   staff to communicate to the Vera Institute that

5   their grantees or subcontractors, rather, should

6   not discuss abortion with their clients?

7        A.   No.  I did not make that.

8        Q.   Did you make that request with respect

9   to any Know Your Rights material used by those

10  organizations?

11       A.   No.

12            MS. AMIRI:  If we can step out for about

13  five minutes, I'm probably pretty close to being

14  done.

15            THE VIDEOGRAPHER:  We're off the record

16  at 12:12.

17            (Recess from 12:12 p.m. to 12:17 p.m.)

18            THE VIDEOGRAPHER:  We're back on the

19  record at 12:17.

20            MS. AMIRI:  I don't have anything

21  further at this time.  Mr. Tomlinson may have

22  questions for you which may then trigger questions

23  for me, but at this time, I have nothing further.

24            MR. TOMLINSON:  Do you mind if we just

25  take a minute?

1          THE VIDEOGRAPHER:  Off the record at

2     2:17.

3          (Recess from 12:17 p.m. to 12:25 p.m.)

4          THE VIDEOGRAPHER:  We're back on the

5     record at 12:25.

6                    EXAMINATION

7     BY MR. TOMLINSON:

8          Q.   Mr. Lloyd, I have just a couple

9     questions for you.  I'm going to ask you to look

10    at what plaintiff's counsel marked as Exhibit 24.

11    And specifically I'm going to ask you to look at

12    the note to file that starts on the second page of

13    that exhibit, the one that's with the Bates number

14    15607.  Do you see that?

15         A.   Yes.

16         Q.   You said in your deposition that this

17    is -- that decisions like this about whether to

18    approve a minor's request for termination of

19    pregnancy are made on a case-by-case basis; right?

20         A.   Yes.

21         Q.   You said that that considers all the

22    facts available to you; right?

23         A.   Yes.

24         Q.   Is there anywhere in this memo where you

25    reference religion or your personal religious

1   beliefs?

2        A.   No.

3        Q.   How important are your personal

4   religious beliefs in making the case-by-case best

5   interest determination?

6        A.   My religious beliefs form the -- they're

7   at the core of anything I would do in all

8   settings.  They motivate me to treat other people

9   the way that I do and to -- they are in a sense --

10  they're just part of who I am, core part of who I

11  am.  But they're not a part of an analysis as to

12  what happens in the termination request when I'm

13  acting as director of the Office of Refugee

14  Resettlement.

15            MR. TOMLINSON:  That's all the questions

16  I have.  Thank you.

17                      EXAMINATION

18  BY MR. SPENCER:

19       Q.   I just have a few clarifying questions.

20            Earlier in your deposition, you discussed an

21  agreement that was negotiated or signed with a

22  religiously-affiliated shelter since your last

23  deposition; is that right?

24       A.   Yes.

25       Q.   And you testified that you did not know

1    which shelter that was.

2         A.    That's correct.

3         Q.    And you did not know whether that

4    shelter was a subgrantee of the USCCB?

5         A.    That's correct.

6         Q.    So your answer that it was likely part

7    of USCCB's list of subgrantees and possibly

8    Catholic Charities was speculation?

9         A.    Yes.

10             MR. SPENCER:   I don't have any other

11   questions.

12                          RE-EXAMINATION

13   BY MS. AMIRI:

14        Q.    I have just one follow-up drawn out by

15   Mr. Tomlinson's questions.

16        On Exhibit 24 that's in front of you, on

17   Price production 15609, footnote 6, there's a

18   reference to an organization called Hope After

19   Abortion.

20        A.    Yes.

21        Q.    What is Hope After Abortion?

22        A.    It's a ministry for women who have had

23   abortions and come to regret them and seek

24   healing.

25        Q.    Have you had any connections with them

Page 255

1    professionally prior to joining ORR?

2         A.   No.

3         Q.   Have you had any conversations with them

4    since your time at ORR?

5         A.   No.

6              MS. AMIRI:  I have nothing further.

7              THE VIDEOGRAPHER:  This concludes the

8    video recorded deposition of Scott Lloyd.  We're

9    off the record at 12:30.

10             (Whereupon, at 12:30 p.m., the taking of

11   the instant deposition ceased.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2     DISTRICT OF COLUMBIA:

3

4          I, Ann Medis, Registered Professional Reporter

5     and Notary Public, hereby certify the witness, SCOTT

6     LLOYD, ESQUIRE, was by me first duly sworn to testify

7     to the truth, that the foregoing deposition was taken

8     at the time and place stated herein, and that the said

9     deposition was recorded stenographically by me and

10    then reduced to printing under my direction, and

11    constitutes a true record of the testimony given by

12    said witness.

13         I certify the inspection, reading and signing of

14    said deposition were NOT waived by counsel for the

15    respective parties and by the witness.

16         I certify I am not a relative or employee of any

17    of the parties, or a relative or employee of either

18    counsel, and I am in no way interested directly or

19    indirectly in this action.

20         IN WITNESS WHEREOF, I have hereunto set my hand

21    and affixed my seal of office this 26th day of

22    February, 2018.

23

24                    _____
                              Notary Public
25

Page 257

```
1              TRANSPERFECT DEPOSITION SERVICES
                    216 East 45th Street
2                        Suite 903
                 New York, New York  10017
3                      212.400.8845

4                       ERRATA SHEET

5    CASE:      ACLU v HARGAN, ET AL.
     DATE:      FEBRUARY 13, 2018
6    WITNESS:   SCOTT LLOYD, ESQUIRE

7    Page  Line    Change and reason for change:

8    ____  ____  _____

9    ____  ____  _____

10   ____  ____  _____

11   ____  ____  _____

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21

22
     Subscribed and sworn to me this
23
     _____ day of _____, 2018.
24

25   _____
```

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

- - - - - - - - - - - - - - - -

AMERICAN CIVIL LIBERTIES
UNION OF NORTHERN
CALIFORNIA,

   Plaintiff,

v.

ERIC G. HARGAN, Acting
Secretary of Health and
Human Services, et al.,

   Defendants,

v.

U.S. CONFERENCE OF
CATHOLIC BISHOPS,

 Defendant-Intervenor.

- - - - - - - - - - - - - - - -

Case Number:

3:16-cv-3539-LB


VIDEOTAPED DEPOSITION OF COMMANDER JONATHAN WHITE, AS

A FACT WITNESS AND U.S. PUBLIC HEALTH SERVICE'S

DESIGNATED 30(B)(6) REPRESENTATIVE, VOLUME II

Washington, D.C.

Tuesday, February 13, 2018 - 1:41 p.m.


Reported by:

Ann Medis, RPR

Job No. 20790

1

2                    Videotaped Deposition of

3                    COMMANDER JONATHAN WHITE

4

5     Held at the offices of:

6

7                    U.S. Department of Justice

8                    20 Massachusetts Avenue, N.W.

9                    Washington, D.C.   20001

10                   202.353.4556

11

12

13

14

15

16

17                       Taken pursuant to notice,

18                   before Ann Medis, Registered

19                   Professional Reporter, and notary

20                   public in and for the District of

21                   Columbia.

22

23

24

25

```
 1              A P P E A R A N C E S

 2    ON BEHALF OF PLAINTIFF

 3              ACLU Foundation
                BY:  BRIGITTE AMIRI, ESQUIRE
 4              AND  MEAGAN BURROWS, ESQUIRE
                125 Broad Street
 5              New York, New York  10004
                212.519.7897
 6              bamiri@aclu.org
                mburrows@aclu.org
 7

 8    ON BEHALF OF DEFENDANTS ERIC G. HARGAN and DEPARTMENT
      OF HEALTH AND HUMAN SERVICES
 9
                UNITED STATES DEPARTMENT OF JUSTICE
10              BY:  MARTIN M. TOMLINSON, ESQUIRE
                20 Massachusetts Avenue, N.W.
11              Room 6139
                Washington, D.C.  20001
12              202.353.4556
                martin.m.tomlinson@usdoj.gov
13

14    ON BEHALF OF DEFENDANT-INTERVENOR USCCB

15              GIBSON DUNN & CRUTCHER, LLP
                BY:  JACOB SPENCER, ESQUIRE
16              AND  ROBERT DUNN, ESQUIRE  (by phone)
                333 South Grand Avenue
17              Los Angeles, California  90071
                213.229.7000
18              jspencer@gibsondunn.com
                rdunn@gibsondunn.com
19

20    ALSO PRESENT

21              Kim Johnson, Videographer

22              Llewellyn Woolford, Esquire, HHS

23              Caitlin Palacios, Esquire, HHS

24              Rachel Chrisinger, Paralegal

25
```

```
 1                P R O C E E D I N G S

 2                    - - - -

 3            THE VIDEOGRAPHER:  Here begins Media

 4   Number 1 in the videotaped deposition of Jonathan

 5   White taken in the matter of American Civil

 6   Liberties Union of Northern California versus

 7   Burwell, et al., Case No. 3:16-cv-3539-LV in the

 8   U.S. District Court of Northern California, San

 9   Francisco Division?

10       This deposition is being held at 20

11   Massachusetts Avenue, Northwest, Washington, D.C.

12   on February 13, 2018 at approximately 1:41 p.m.

13   My name is Kim Johnson.  I'm a legal video

14   specialist.  The court reporter today is Ann

15   Medis.  Both are in association with TransPerfect.

16       Will counsel please introduce yourselves and

17   state who you represent.

18            MS. AMIRI:  Brigitt Amiri for the

19   plaintiff.

20            MS. BURROWS:  Meagan Burrows for the

21   plaintiff.

22            MR. TOMLINSON:  Martin Tomlinson for the

23   federal defendants.

24            MR. WOOLFORD:  Llewellyn Woolford for

25   the defendant U.S. Department of Health and Human
```

1   Resources.

2           MS. PALACIOS:  Caitlin Palacios of the

3   U.S. Department of Health and Human Services.

4           MR. SPENCER:  Jacob Spencer for the

5   defendant-intervenor and the USCCB.  Also on the

6   phone is Robert Dunn.

7           THE VIDEOGRAPHER:  Will the court

8   reporter please swear in the witness.

9               COMMANDER JONATHAN WHITE,

10      having been first duly sworn, was examined

11                and testified as follows:

12                     EXAMINATION

13  BY MS. AMIRI:

14      Q.   Mr. White, thank you so much for joining

15  us again today.  A lot of questions I'm going to

16  ask you are going to be about things that have

17  happened since your deposition.  So I'll try to

18  keep saying that in my questions, but generally,

19  we're here to finish up the deposition from

20  documents that we received since then, and I'll

21  ask you questions about some things that have

22  happened since your deposition.

23      Has ORR finalized any policies with respect

24  to abortion access since your deposition in

25  December?

1      A.    No.   There have been no additional

2   policies since we last spoke in December at the

3   last deposition.

4      Q.    And by policies I also include final

5   guidance, final statements, broad statements to

6   shelters, things like that.  So I'll use the term

7   more broadly than like a formal policy, but

8   guidelines or anything that would fall into the

9   category of a final statement from ORR about

10   abortion access.

11      A.    I understand.  There's been no

12   additional guidance, policy or direction

13   promulgated to providers by ORR on this issue.

14      Q.    Have there been any contracts that have

15   been negotiated with religiously-affiliated

16   shelters that have objections to providing access

17   to abortion and contraception since your

18   deposition in December?

19      A.    Contracts, we operate those typically on

20   a grant basis.

21      Q.    I'll amend my question with grant

22   instead of contract.

23      A.    Could you repeat your question?

24      Q.    Since your deposition in December, have

25   there been any negotiations with any

1    religiously-affiliated shelter about the terms of

2    their grant or a Memorandum of Understanding about

3    access to abortion and contraception for

4    unaccompanied minors?

5        A.   I believe we have formalized an addendum

6    to the cooperative agreement with USCCB and also

7    with Lutheran Immigration and Refugee -- Human

8    Refugee Services.

9        Q.   Does the addendum for the cooperative

10   agreement with USCCB speak to the issue of access

11   to abortion or contraception for unaccompanied

12   minors?

13       A.   It formalizes the prior operational

14   practice.

15       Q.   I know we talked about it the last time,

16   but just for purposes of our conversation right

17   now, what was the prior operational practice?

18       A.   That in the event that any long-term

19   foster care grantee in that network were to

20   receive a request from a minor in care for a

21   healthcare intervention that would be inconsistent

22   with Catholic doctrine, that the grantee's

23   requirement would be to notify the ORR federal

24   field specialists of that request.

25       Q.   And does the contract or, sorry, the

1    Memorandum of Understanding also say what happens

2    after the notification from USCCB's subgrantees to

3    the federal field specialist?

4         A.    I don't believe it specifies that.

5         Q.    In practice we talked at your deposition

6    last time about what has happened in the past.  Is

7    it your understanding that that would be the same

8    practice, and roughly I'll just kind of

9    paraphrase, that the federal field specialist

10   would then contact ORR and arrangements for a

11   transfer of the minor would take place to a

12   shelter that didn't have objections to providing

13   the specific healthcare?

14        A.    That has been the practice in the past.

15   We've not had such a request from a minor in a

16   sheltered -- in a residential care facility that

17   has a document-based objection.  I have not

18   received direction on what our federal actions

19   would be in that circumstance now, but that is an

20   accurate statement about the previous operational

21   activities.

22        Q.    Were you personally involved in the

23   contract negotiations -- grantee negotiations --

24   I'll back up and strike that altogether.

25        Were you personally involved in the

1    Memorandum of Understanding negotiation with USCCB

2    about the religious exception that they have in

3    the addendum that you just referenced?

4        A.    No, I was not.

5        Q.    Do you know what the conversations did

6    consist of in terms of any of those negotiations

7    with USCCB?

8        A.    I'm not privy to the content of those

9    conversations.

10        Q.    Who at ORR would be?

11        A.    I believe that would most likely be our

12    division of policy and procedure.

13        Q.    And who is the director of the division

14    of policy and procedure now?

15        A.    The division director is Anna Marie

16    Bennett.

17        Q.    But as it stands now since your

18    deposition in December, there is an addendum to

19    USCCB's cooperative agreement signed by both USCCB

20    and ORR that memorializes a religious exception to

21    providing certain forms of healthcare?

22        A.    I have not seen a version that's signed

23    by both parties.  I have seen a version signed by

24    ORR that does formalize our prior practice.

25        Q.    You also mentioned Lutheran Immigration

1   Refugee Services as well.  Did the agreement

2   signed with LIRS speak to the issue of access to

3   abortion and contraception?

4        A.   It did not.  To my knowledge, it did

5   not.

6        Q.   To your knowledge, does LIRS have a

7   religious objection to providing access to

8   abortion and contraception for unaccompanied

9   minors in their care?

10        A.   I don't know.

11        Q.   So other than the USCCB and LIRS

12   agreement, are you aware of any other discussions

13   with any other grantee about the terms of their

14   Memorandum of Understanding with respect to

15   abortion or contraception?

16        A.   I don't believe there are any.

17        Q.   You mentioned there had not been any

18   requests for abortion from religiously-affiliated

19   shelters that have a religious objection to

20   providing access to abortion.  And I just want to

21   clarify the timeframe.  I know we talked about it

22   at your last deposition.

23        So let's say since your last deposition, is

24   that the case, that there's been no request for

25   abortion from a religiously-affiliated shelter

1   that has had objection to providing access to

2   abortion?

3       A.   I have not been notified of any request

4   for access to abortion services by a minor

5   sheltered in a program which has such an

6   objection.

7       Q.   And my same question would be true with

8   respect to contraception, are you aware of any

9   sort of instance where a religiously-affiliated

10  shelter has had a minor in their care who's

11  requested access to contraception and not been

12  provided with access to contraception because of

13  the religious affiliation of the shelter?

14      A.   I'm not aware of any such request.  As a

15  reminder, that is not a covered service in any of

16  our providers.

17      Q.   I think just to clarify that, last time

18  I believe you said with respect to medical

19  indications, contraception can be prescribed.

20      A.   Correct.

21      Q.   And I'm also guessing based on the

22  Prison Rape Elimination Act, that emergency

23  contraception for unaccompanied minors who suffer

24  sexual assault in the facility is a covered

25  service?

1        A.    Under our interim final rule, any minor

2    who is sexually assaulted while in ORR care has

3    access to emergency contraception.

4        Q.    And I think last time we met, there had

5    not been an instance of a sexual assault at a

6    facility that necessitated the need for access to

7    emergency contraception or abortion.

8        So my question is:  Since your deposition,

9    has there been any such request?

10        A.    There has not.  I have not received any

11    report of any minor becoming pregnant as a result

12    of sexual assault while in ORR custody.

13        Q.    Have you received a report of a minor

14    who hasn't yet become pregnant as a result of

15    sexual assault, but has requested emergency

16    contraception to prevent pregnancy?

17        A.    No.  I've not received any such request.

18        Q.    Since your deposition, have you become

19    aware of any abortion requests from shelters?

20             MR. TOMLINSON:  Before we move on, can I

21    just state for the record what we discussed before

22    we went on the record, which is that Mr. White was

23    prepared as a 30(b)(6) witness with regard to

24    events and documents that were generated prior to

25    December 22, 2017, and he can speak as a 30(b)(6)

1    witness on behalf of the federal defendants in his

2    capacity as a 30(b)(6) witness with regard to

3    those events.  Anything outside of that timeframe

4    he is testifying as a fact witness in his personal

5    capacity.

6           MS. AMIRI:  Thank you.  Yes.

7    BY MS. AMIRI:

8        Q.  So with that caveat -- and that can

9    stand for any of the questions.  I might ask you

10   specifically something as falling within the scope

11   of the 30(b)(6) that I would have anticipated that

12   you would have been prepared for.  That's a

13   different thing.  But I'm happy for that objection

14   to stand.  If we need further clarification for

15   any of those specific questions, we can certainly

16   do that.

17        Since your deposition, have you been made

18   aware of abortion requests from shelters?

19       A.  Yes.

20       Q.  How many?

21       A.  I believe five subsequent to the

22   deposition.

23       Q.  There should be a pile of exhibits in

24   front of you.  Let's start with the first one.

25   Hopefully 22 is the first.

1      A.   22?

2      Q.   Yep.  I'm sorry.  I mean 23.  I did not

3   mean 22.

4      A.   I don't know if I should see 22.  I

5   think it's speaking to Mr. Lloyd's deposition.

6      We're looking at 23?

7      Q.   23.

8      A.   Can you give me just a moment to review

9   this?

10      Q.   Yes, absolutely.  Take you time.  Let me

11   know when you're ready.

12      A.   Yes.  I'm familiar with this email

13   exchange.

14      Q.   When you spoke about the five minors

15   since your deposition that have come to your

16   attention that have sought abortion, is this one

17   of them?

18      A.   No.  This is a minor whose request was

19   outstanding when we spoke last and had continued

20   through the period of the last deposition.

21      Q.   Is it your understanding -- well, let me

22   back up and just ask the question.  Do you believe

23   that there is anyone on staff at ORR that has the

24   clinical training or competency to do options

25   counseling with respect to pregnancy and abortion?

```
1          A.    Could you sort of clarify which

2     component of options counseling?

3          Q.    Sure.   Actually, I'm going to try to

4     find it.   In one of the emails, there's a

5     reference to a conversation that you had with

6     ███████████████    about whether there was anyone

7     from ORR that had the clinical training to do

8     options counseling and specifically in the context

9     of this particular minor.   So we can find it and

10    pull it up, but I wanted to ask you some questions

11    about it.   And I just wasn't able to put my

12    fingers on it yet.

13         Exhibit 26, do you recognize the email in

14    Exhibit 26?

15         A.    Yes, I do.

16         Q.    It's an email from you to Scott Lloyd?

17         A.    Correct.

18         Q.    Who is ████████████?

19         A.    ████████████ is a special assistant.

20    █████████████████████    ██████████████████████

21    █████████████████.   She's a nonsupervisory

22    individual, career, who is a special assistant.

23    She's not a decision-maker.

24         Q.    In number two in your email, that is

25    what I was referencing, that ████████ has indicated
```

1   that the DHUC staff are not able to participate.

2   I wanted to ask you in the context of this email,

3   it seems like there was maybe a conversation that

4   you had with ████████ or knowledge that you had

5   about the clinical training, expertise and

6   practice scope of the HUC staff members.

7        A.   Correct.

8        Q.   So kind of going back to my question,

9   was there a determination made that there was

10  nobody on ORR staff that had the clinical training

11  or expertise or practice scope to provide option

12  counseling to this minor who was considering

13  termination?

14       A.   It was -- it was my view and that of the

15  medical team that there was no one on our medical

16  team who was trained to provide medical options

17  counseling.

18       Q.   Was that view disputed by Scott Lloyd or

19  anyone higher up?

20       A.   No, not to my knowledge.  We did not

21  have a discussion.

22       Q.   Was it your understanding that ████████

23  ████████ was being asked to provide options

24  counseling to the minor in this email?

25       A.   ████████████████ was not directed to

1    provide options counseling.  She was directed to

2    observe the interactions to it and to determine --

3    to ensure that the minor was able to verbalize her

4    options.

5         Q.   Do you know who did the options

6    counseling for this particular minor?

7         A.   It was provided by the medical director

8    of the sheltering program is my understanding.

9         Q.   Do you understand know whether -- do you

10   know whether Scott Lloyd instructed this

11   particular minor to attend a counseling session at

12   a crisis pregnancy center?

13        A.   I believe this minor did attend a crisis

14   pregnancy center counseling session.

15        Q.   Do you know whether this particular

16   minor was required to tell her parents about her

17   abortion decision?

18        A.   There was a parental notification

19   conducted to my recollection.

20        Q.   Was that at the requirement of ORR?

21        A.   Yes.

22        Q.   Did you know that Scott Lloyd had

23   directed that this particular minor be read a

24   description of a dilation and extraction

25   procedure?

1      A.    I'm aware that that was his direction.

2      Q.    Do you know whether anyone at ORR

3   carried out that direction?

4      A.    I believe that that description was read

5   to the minor but not by federal personnel.

6      Q.    By someone at the shelter?

7      A.    That is my understanding, yes.

8      Q.    Is this the first time that Scott Lloyd

9   had ever required a minor considering abortion to

10   be read a description of abortion from a Supreme

11   Court case?

12      A.    I have not received any direction prior

13   to this for that to happen in any other case.

14      Q.    Have you received any instruction after

15   this case for that to happen?

16      A.    No.

17      Q.    This is you, Jonathan White personally.

18   Do you think it's appropriate for a minor

19   considering abortion to be required to listen to a

20   description of an abortion procedure that is

21   discussed in a Supreme Court case?

22          MR. TOMLINSON:  Objection.  Foundation.

23          THE WITNESS:  Could you just articulate

24   sort of what you mean?  Appropriate in what sense?

25

1    BY MS. AMIRI:

2        Q.    Appropriate in terms of whether this is

3    appropriate for counseling, options counseling or

4    medical informed consent.

5        A.    It is my understanding that it would not

6    meet JCAHO standards for medical informed consent.

7        Q.    What is your understanding of what

8    JCAHO -- well, let's back up and say what the

9    acronym for JCAHO is.

10       A.    It's the Joint Commission for the

11   Accreditation for Health Organizations.

12       Q.    And what is your understanding of what

13   JCAHO's standards are for informed consent.

14       A.    At a medical intervention that informed

15   consent would be based on information provided by

16   the provider who will perform the procedure.

17       Q.    Are you aware of ORR providing this type

18   of medical informed consent to a minor in any

19   context other than abortion?

20       A.    I'm not sure I understand the question.

21       Q.    So a minor undergoing any other medical

22   procedure, not abortion, are you aware of whether

23   ORR has required this type of medical informed

24   consent be given by the shelter staff or ORR

25   staff?

1      A.    I'm not aware of another instance for a
2  different intervention that would require that.
3      Q.    Do you know whether Scott Lloyd issued
4  any instructions with respect to this particular
5  minor that were not communicated over email?
6  Sorry.  I'll ask it a different way.
7      Did Scott Lloyd have any verbal conversations
8  with you about instructions for this particular
9  minor as prerequisites for her abortion request to
10 be considered by him?
11     A.    We had a number of conversations about
12 this minor's case in which direction was provided.
13     Q.    What direction was provided to you about
14 this minor's case from Scott Lloyd?
15     A.    I don't recall any direction which is
16 not contained or summarized in the email.  Most of
17 the direction had to do with what would need to be
18 communicated with the minor and by whom.
19     Q.    We talked about one component of what
20 needed to be communicated with the minor, which
21 was the description in the Gonzales case; correct?
22     A.    That's correct.
23     Q.    Another was an offer for her to view a
24 picture of a 23-week abortion.  Does that sound
25 familiar?

1          A.    It does.  That's also correct.

2          Q.    And is there anything else in the bucket

3     of information that needed to be communicated with

4     the minor that we haven't talked about?

5          A.    The minor also had the option to carry

6     the child -- to carry the pregnancy to term and

7     parent, to carry the pregnancy to term and place

8     the resulting baby up for adoption in addition to

9     the option for termination.

10         Q.    You're aware that Scott Lloyd also

11    proposed a certain list of questions to a medical

12    provider about which type of abortion would be

13    performed.  Do you remember that?

14         A.    Yes, but is there a document you can

15    direct me to so it will help me?

16         Q.    Yes.  I'm not sure that we have

17    introduced it yet.  Give me just a second.  I

18    think we might not have made it an exhibit yet.

19              MS. AMIRI:  Marty, do you have a

20    preference?  Do you want to start with White 1?

21              MR. TOMLINSON:  How did we do it last

22    time?

23              MS. AMIRI:  I didn't have any new

24    exhibits for Mr. White last time.  We only used

25    ones that we had done for Lloyd last time.

1          MR. TOMLINSON:  I leave it up to you.

2    We can do White 1, but if you just want to do 30

3    or whatever.

4          MS. AMIRI:  33?

5          MR. TOMLINSON:  I think that would be

6    fine.

7          (White Exhibit 30 was marked.)

8    BY MS. AMIRI:

9        Q.  I'll hand you what has been marked as

10   Exhibit 30.

11       A.  Thank you.  Yes.  I do recall being

12   directed to have these questions posed.

13       Q.  Do you know why Scott posed these

14   questions to the provider?

15       A.  I do not know why.

16       Q.  Do you know whether those questions were

17   answered by a medical provider?

18       A.  I don't believe they were ever answered

19   or if they were, that answer was not provided to

20   me.

21       Q.  Did you have any conversations with

22   Scott Lloyd about whether he intended to influence

23   which type of abortion procedure this minor would

24   undergo to maximize the chance of a live birth?

25       A.  We did not have any such conversation.

1        Q.   Do you know whether Scott Lloyd had

2   those conversations with anybody?

3        A.   I'm not aware of any such conversations.

4             (White Exhibit 31 was marked.)

5   BY MS. AMIRI:

6        Q.   I'll hand you what's been marked as

7   Exhibit 31.

8        A.   Thank you, ma'am.

9             (Witness reviewed the exhibit.)

10            THE WITNESS:   Yes.  I've reviewed it.

11  BY MS. AMIRI:

12       Q.   I had a question, if you happen to know.

13  In the email that is from ██████████████████ to

14  you, in the sentence that begins, "The medical

15  exam at ██ conducted on," and then it's been

16  redacted, I wanted to ask you if you knew what ██

17  stood for.

18       A.   I believe in this context, it likely

19  refers to the name of the sheltering program where

20  the minor was prior to her transfer.

21       Q.   So this particular minor had been at one

22  shelter, was transferred to another shelter?

23       A.   Correct.

24       Q.   The shelter that she originated at, was

25  it a religiously-affiliated shelter?

1       A.   I don't believe it has any religious

2  affiliation.  Yeah, I don't believe it has any

3  religious affiliation.

4       Q.   So are ██ initials?  Does it stand for

5  something?

6       A.   It does.

7       Q.   What does it stand for?

8       A.   It stands for ████████████████.

9       Q.   So with this particular minor -- I'll

10  hand you a document before I ask you a question.

11  Oh, it may already be an exhibit.

12       Put Exhibit 25 in front of you and see if

13  we're on the same page.  Is it Bates 15441 that

14  you have in front of you at the bottom?

15       A.   Yeah.  The production stamp is 15450 and

16  15451.

17       Q.   No.  We'll make a new one.

18            (White Exhibit 32 was marked.)

19  BY MS. AMIRI:

20       Q.   I hand you what's been marked as Exhibit

21  32.

22            (Witness reviewed the exhibit.)

23            THE WITNESS:  Yes.

24  BY MS. AMIRI:

25       Q.   You recognize this document?

1          A.   I do.  I produced this document.

2          Q.   Have you provided Mr. Lloyd with any

3     decisional documents like this for any other

4     minor?

5          A.   This is the only case for which I've

6     produced a full memorandum of this kind.

7          Q.   And why did you do it in this case but

8     not any other?

9          A.   I did it in this case because the minor

10    in this case was covered by an exception to the

11    Hyde Amendment.

12         Q.   So this decisional memo is both about

13    approval for the abortion procedure and for the

14    use of federal funds; is that correct?

15         A.   That is correct.

16         Q.   So in the other circumstances where

17    there has been an abortion request, the request

18    has not necessarily involved the request to use

19    federal funds; is that correct?

20         A.   That is correct.

21         Q.   And you recommended --

22              MS. AMIRI:  I'm guessing it's redacted

23    because you're claiming deliberation privilege?

24              MR. TOMLINSON:  Over the recommendation.

25    Well, over the reason behind the recommendation.

1          MS. AMIRI:  But the fact that Mr. White

2     recommended the abortion is not --

3          MR. TOMLINSON:  Correct.

4     BY MS. AMIRI:

5          Q.   I can clarify that you recommended to

6     Mr. Lloyd that he approve the abortion and approve

7     the use of federal funds for the abortion?

8          A.   I recommended that he approve the

9     authorization for the minor to receive the

10    abortion procedure, and I recommended that he

11    authorize the use of federal funds for the

12    procedure and the facilitation of the procedure.

13         Q.   But he did not accept your

14    recommendation?

15         A.   The final decision was not to approve

16    the procedure or the use of federal funds.

17         Q.   Let's look at Exhibit 24 in front of

18    you.  I should have the right one.

19         A.   Yes.

20         Q.   So the page starting Price production

21    15607, that's Mr. Lloyd's final decision; is that

22    correct?

23         A.   Correct.  This is his note to the file

24    explaining the reasoning behind his decision.

25    What is before that is a cover email from me

1    sharing it with members of our team.

2         Q.   Were members of your team concerned

3    about Mr. Lloyd's ultimate determination not to

4    authorize access to abortion for this particular

5    minor?

6         A.   Yes.

7         Q.   Since your deposition, have you had any

8    conversations about abortion access with anyone

9    above Mr. Lloyd, for example, Steven Wagner or the

10   new HHS secretary?

11        A.   I have been in meetings where updates on

12   cases were made.  I do not recall being in any

13   decision-making discussions.

14        Q.   If you could look at Exhibit 28 in front

15   of you, please.

16             (Witness reviewed the exhibit.)

17             THE WITNESS:  Yes.  I'm familiar with

18   this communication.

19   BY MS. AMIRI:

20        Q.   Do you know -- some of it is redacted to

21   protect their personal identities, but my question

22   is not about the names of people who are with the

23   minor at the time that ████████ visited.  But were

24   any of the people who were with ████████ when she

25   visited the minor staff of the federal government?

1      A.   It is possible that a federal field

2  specialist would have been there also.  I'm not

3  certain.

4      Q.   Do you know whether any clinician from a

5  crisis pregnancy center was at that meeting?

6      A.   I'm trying to reacquaint myself.

7      Q.   Sure.  Take your time.

8      A.   I do not believe at this meeting there

9  ended up being any CBC personnel.  I believe that

10 it involved staff from the sheltering program and

11 ███████████████ .

12      MS. AMIRI:  Marty, I'd like to ask about

13 the conclusion on the last page and wanted to see

14 if there were any parameters I could ask about

15 what's been redacted.  We can put a pin in it, and

16 then maybe during a break, we can see if there's

17 anything that -- I'd like to know whether there

18 was some --

19 BY MS. AMIRI:

20      Q.   My question would be like whether there

21 was an ultimate recommendation made from this

22 visit that ██████████ .  But you can discuss at

23 the break with Mr. Tomlinson whether the answer to

24 that would reveal some sort of deliberative

25 process.  So we can come back to it.

1          A.    I understand.

2          Q.    Before we move on, I just wanted to go

3     back to my earlier line of questions when we

4     started this.  Since your deposition, have there

5     been any initial placement decisions made based on

6     the fact that a minor is seeking an abortion?

7          A.    None of which I'm aware, no.

8          Q.    Turn to Exhibit 29.

9          A.    Yes.  I recall this email exchange.

10         Q.    So this is about a different minor;

11    correct?

12         A.    This is not the same minor we were just

13    discussing.

14         Q.    On page 15592, it looks like an email

15    from you to the federal field specialist -- I

16    think she's a federal field specialist -- ███████

17    ████, relaying Scott's instructions that the

18    ██████ receive notification of the pregnancy and

19    the termination request.

20         A.    That's correct.

21         Q.    Were there any other instructions that

22    Mr. Lloyd told you to relay to the shelter or the

23    federal field specialist with respect to this

24    particular minor?

25         A.    Yes.  Those instructions were that the

1    program should request consent to notify parents

2    of the pregnancy and termination request.  That

3    was the previous instruction.  The determination

4    was made since it was the ████ who had been her

5    care provider in the home country and she had not

6    been in contact with her parents that the ████

7    should be viewed acting in place of the parents.

8         Q.   And is it your understanding if the

9    minor does not consent to telling the ████ about

10   her pregnancy and termination, that the shelter or

11   the federal field specialist would be required to

12   do so anyway?

13        A.   The direction that I received and

14   conveyed was if she does not consent, the program

15   should proceed without consent.  That notification

16   would be done by the program staff, not the

17   federal staff specialist.

18        Q.   So I understand the difference, who

19   comprises the program staff?  Are you talking

20   about the shelter?

21        A.   The program staff would be individuals

22   who work at that grantee residential care shelter

23   provider.  That's distinct from ORR federal

24   personnel.

25        Q.   Thank you.  So there's the instruction

1    to tell the ███████ in the home country.  Were

2    there any other instructions that Mr. Lloyd

3    conveyed to you about this particular minor?

4         A.    One moment.

5         Q.    Sure.  Feel free to take your time and

6    see if there's anything in the email that jogs

7    your memory.

8         A.    It is my recollection that in this

9    minor's case, the set of instructions involved

10   options counseling from a crisis pregnancy center,

11   notification of parents, later ███████ in home

12   country, continued ob-gyn prenatal care, the

13   option for spiritual counseling if the minor so

14   wished and/or supportive psychosocial counseling

15   services for the minor while in our care.  That is

16   my recollection of the full set of instructions.

17        Q.    If you could look on page No. 15595.  In

18   the email from ████████████ to you, in I guess the

19   fourth paragraph, there's the discussion of the

20   minor undergoing an ultrasound.

21        A.    Um-hum.

22        Q.    Do you know whether that ultrasound took

23   place at a crisis pregnancy center or at a

24   different type of doctor's office?

25        A.    I don't recall whether that was provided

1   in a community ob-gyn clinic or in a CPC.

2        Q.   It also says that minor has requested

3   that during this ultrasound, the screen is turned

4   to the side where she is not able to see the

5   screen.

6        Did you have any conversations with Mr. Lloyd

7   about whether this minor would be required to view

8   the ultrasound?

9        A.   We had no conversation on that topic.

10       Q.   Have you had any conversations with

11  Mr. Lloyd, either in writing or verbally, about

12  whether a minor would be required to view an

13  ultrasound in the context of seeking an abortion?

14       A.   I don't recall any such conversation at

15  any time.

16       Q.   You enumerated a certain list of

17  instructions that you believe you had received

18  from Scott Lloyd with respect to this particular

19  minor.  Do you know whether they were carried out?

20  For example, do you know whether she was taken to

21  the crisis pregnancy center?

22       A.   I believe that she did visit a crisis

23  pregnancy center.  That's my recollection.  I do

24  not recall whether she opted to receive spiritual

25  counseling services.  I do know that the parental

1    or in this case the ███████ notification of her

2    pregnancy and wish for termination was conducted.

3    That was performed.  And I do know that she

4    received routine prenatal care.

5         Q.   Do you believe that she continued to

6    receive prenatal care even though this email that

7    we were just talking about says she does not want

8    to start any prenatal appointments?

9         A.   I do not know if she had any subsequent

10   appointments following the date of this email.

11        Q.   So those were the two minors that I

12   think we talked about that had abortion requests

13   pending during our last meeting.

14        A.   Yes, that's correct.

15        Q.   Then there have been five since

16   approximately?

17        A.   I believe so.

18        Q.   So one of them, and this will be subject

19   to the protective order, was in a shelter in

20   ████████████████████.  Does that sound familiar?

21        A.   Yes, that is correct.

22        Q.   Do you know what Mr. Lloyd's

23   instructions were for her abortion request?

24             MR. TOMLINSON:  Can I just state for the

25   record we're moving into non-30(b)(6) personal

1   territory.

2          THE WITNESS:  In the case of the minor

3   with the request from the ████████ shelter in

4   ████████, the instructions included parental

5   notification.  However, that was ultimately not

6   performed.

7   BY MS. AMIRI:

8      Q.   The instructions were for parental

9   notification, but it was not performed for this

10  particular minor?

11     A.   That's correct.

12     Q.   Do you know why?

13     A.   Due to concerns from federal and program

14  staff regarding ████████ law regarding

15  notifications of the parents without the minor's

16  consent.

17     Q.   Do you know whether this particular

18  minor was instructed by Mr. Lloyd to be taken to a

19  crisis pregnancy center?

20     A.   I do not believe this minor was taken to

21  a crisis pregnancy center.  I do not recall such

22  an instruction.

23     Q.   Do you recall an instruction regarding

24  an adoptive family offer be read to the minor?

25     A.   Yes.

1      Q.   And what is your recollection of that

2   adoptive family letter?

3      A.   There was an unsolicited communication

4   that we received in ORR from a community dwelling

5   family offering to adopt should the minor carry

6   her pregnancy to term.  We were directed to convey

7   this communication from that individual to the

8   minor through reading his message.  We redacted

9   the email and phone number since he had not been

10  vetted.

11     Q.   You mentioned community dwelling.  What

12  does that mean?

13     A.   Sorry.  That's a term of art meaning

14  basically living out in the world and not

15  connected with the program.

16     Q.   Got it.  Do you know if ORR vetted this

17  adoptive -- prospective adoptive family before

18  they communicated this offer to the minor?

19     A.   He was not vetted.  For this reason, we

20  did not permit direct contact between that

21  individual and the minor.

22     Q.   Is this the only minor that was

23  instructed to receive by Scott Lloyd this letter

24  of prospective adoptive parents?

25     A.   I've not received any other instruction

1    to have any other such offer communicated to a

2    minor by Scott.

3         Q.   Did this minor independently indicate

4    that she was interested in carrying her pregnancy

5    to term and placing her child for adoption?

6         A.   She never expressed an interest in

7    adoption.  She indicated after this communication

8    that she was maintaining her request to terminate

9    the pregnancy.

10        Q.   From a social work perspective, do you

11   think it's appropriate for a minor who is

12   requesting an abortion to be read a letter from a

13   prospective family seeking to adopt her baby

14   should she carry to term?

15             MR. TOMLINSON:  Objection.  Foundation.

16        You can answer.

17             THE WITNESS:  I would not recommend such

18   an intervention.

19   BY MS. AMIRI:

20        Q.   What has happened -- sorry.  Let me just

21   go back.  Do you know whether Mr. Lloyd or anyone

22   else at ORR knew the couple who was making the

23   adoption offer prior to the solicitation coming

24   in?

25        A.   To my knowledge, no one had any prior

1    contact or was familiar with that individual.

2         Q.   Do you know whether this particular

3    minor was also given a brochure put out by the

4    State of Texas about abortion?

5         A.   I do not believe that the Texas options

6    counseling curriculum materials were provided to

7    this minor.

8         Q.   Those materials have been provided to

9    other minors in other circumstances?

10        A.   Yes.

11        Q.   You mentioned that there were other

12   abortion requests.  There's one currently pending

13   in ████ now.  What has Mr. Lloyd's instructions

14   been with respect to that particular minor?

15        A.   We've not received an abortion request

16   from a minor in ████ .

17        Q.   Were you aware before I had just asked

18   the question there was a minor in ████ seeking

19   abortion?

20        A.   Yes.  I'm aware of a minor who

21   previously had a request that was not conveyed to

22   ORR.  I'm aware that a minor made a request and

23   engaged counsel.  She has since advised that she

24   does not wish to have the abortion.  There was

25   never a request made to us.

Page 141

1        Q.    Do you know whether there were any

2    instructions to take this minor to a crisis

3    pregnancy center or offer spiritual counseling or

4    any of the other list of things that have happened

5    to prior minors?

6        A.    None of those interventions have been

7    directed to be performed as the minor has not made

8    a request to us and has stated that she does not

9    wish an abortion.

10       Q.    What are the other abortion requests

11   that have happened since your deposition that we

12   have not talked about and what have the

13   instructions been from Mr. Lloyd and the outcomes?

14       A.    I'm relying on my memory.  I believe

15   there have been other cases.  These have involved

16   minors who at one point expressed interest in or

17   request for TOP and subsequently withdrew that

18   request.

19       Q.    So the ones we have not talked about had

20   requested access to abortion and then decided

21   against an abortion?

22       A.    I believe that's correct.  I would need

23   to check.  There may be one other minor who also

24   aged out or was age rated.  The status of her

25   request I'm not sure about.

1      Q.   Do you know whether these minors have

2  been instructed to go through the list of things

3  that you have mentioned before in terms of a

4  crisis pregnancy center visit, parental

5  notification, things that have happened in the

6  prior abortion requests?

7      A.   In some cases.  In others, the minor

8  rescinded the request prior to those instructions.

9      Q.   So for some yes and for others no?

10     A.   Correct.

11          MS. AMIRI:  This might be a good place

12  to take a break.

13          THE VIDEOGRAPHER:  We are off the record

14  at 2:37.

15          (Recess from 2:37 p.m. to 2:58 p.m.)

16          THE VIDEOGRAPHER:  We are back on the

17  record at 2:58.

18  BY MS. AMIRI:

19     Q.   Just a few more questions, Mr. White.

20  There's something we haven't talked about yet, and

21  it's whether you have any knowledge about whether

22  ORR has restricted the discussion of abortion with

23  legal services organizations that are funded by

24  ORR, and I just wanted to see if you had any

25  knowledge of that issue.

1      A.   There has been no policy direction to

2   our legal services providers not to -- there's

3   been no direction not to discuss abortion with

4   legal services organizations.

5      Q.   We're going to ask you about the email

6   sorry, the email findings from ███████ , which is

7   Exhibit 28.

8      A.   Okay.

9      Q.   So I guess one of the questions I asked

10  before and perhaps you have some clarity now is

11  whether there were any other federal government

12  staff employees present during the meeting with

13  this particular minor other than ████████████ .

14     A.   I've gone back and reviewed, and

15  ██████████████    was the only federal official

16  present.

17     Q.   And I understand per your counsel I'm

18  allowed to ask whether ████████████ made any

19  particular recommendations in this summary, in

20  this exhibit that perhaps had been unredacted.

21     A.   She made no recommendations regarding

22  providing or not providing TOP.

23     Q.   Did she provide any findings relating

24  to --

25     A.   She did.  She did.  She had two

1    findings.  The first is that the minor was able to

2    verbalize that she understood she had the options

3    of termination, carrying the pregnancy to term and

4    parenting and carrying the pregnancy to term and

5    placing the baby for adoption.  That was her first

6    finding.

7         The second finding was that the minor was not

8    able to verbalize what would happen in the

9    surgical termination procedure.  Those were her

10   two factual findings.

11        Q.   I don't think I have anything further,

12   but there is a document that I would want to ask

13   you about, but it has been redacted.  Maybe we can

14   go ahead and mark it.  I'm going to look for the

15   unredacted version.  We'll mark it as 33.

16             (Exhibit 33 was marked.)

17   BY MS. AMIRI:

18        Q.   I hand you what has been marked as

19   Exhibit 33, but I understand that your counsel

20   will pull an unredacted version.  But I wanted to

21   to be able to see if there was anything I could

22   ask you about an email that you wrote starting on

23   page 1555 and continuing onto 1556 that is

24   completely blacked out.

25             MR. TOMLINSON:  At this point, I'm going

1    to instruct him.

2              MS. AMIRI:  You're going to take a break

3    and see if there's anything that I can ask that

4    isn't going to raise a question of whether

5    something is protected by privilege.  Then that's

6    my last line of questioning subject to anything

7    that you all are going to ask.

8              MR. TOMLINSON:  So we'll go off the

9    record.

10             THE VIDEOGRAPHER:  Off the record at

11   3:02.

12             (Recess from 3:02 p.m. to 3:43 p.m.)

13             THE VIDEOGRAPHER:  We're back on the

14   record at 3:43.

15   BY MS. AMIRI:

16       Q.   You have in front of you Exhibit 33.

17   And I wanted to ask you about your email, which

18   starts on 1555 and goes onto the next page.  So I

19   believe there's some questions I can ask, and

20   Mr. Tomlinson will jump in if I have overstepped,

21   but I wanted to start first by just getting a

22   general sense of what this email is.

23       A.   This email is guidance from me to my

24   team on steps they need to take to take next steps

25   designed to inform Scott Lloyd's decision-making

1  on my recommendation to him to approve

2  authorization and federal funding for the abortion

3  of the minor in ████████ whom we have discussed.

4       Q.   And were there any specific instructions

5  laid out in this memo either from you or from

6  Mr. Lloyd?

7       A.   I conveyed Mr. Lloyd's direction to the

8  team that ████████████████████ and one member

9  of the health division UAC program should travel

10  to ████████ to meet with the minor.

11       Q.   And those instructions are in other

12  emails in the chain that we have already discussed

13  at deposition already; is that fair?

14       A.   Yes, ma'am, that's correct.

15       Q.   Is there anything with respect to those

16  instructions that we have not already discussed or

17  that isn't in an exhibit that we have reviewed in

18  your deposition?  Is there something else

19  basically, some other instruction that we haven't

20  already talked about?

21       A.   No.  The instructions are those we've

22  discussed and that were executed by ████████

23  ████████.

24       Q.   I don't think I have anything further.

25  I think those are my limits on that document.  So

Page 147

1    I don't have any further questions at this time.

2            MR. TOMLINSON:  The federal defendants

3    do not have any follow-up questions.

4            MR. SPENCER:  Neither does the

5    defendant-intervenor.

6            THE VIDEOGRAPHER:  This concludes the

7    video deposition of Jonathan White.  We're off the

8    record at 3:46.

9            (Whereupon, at 3:46 p.m., the taking of

10   the instant deposition ceased.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2   DISTRICT OF COLUMBIA:

 3

 4        I, Ann Medis, Registered Professional Reporter

 5   and Notary Public, hereby certify the witness,

 6   COMMANDER JONATHAN WHITE, was by me first duly sworn

 7   to testify to the truth, that the foregoing deposition

 8   was taken at the time and place stated herein, and

 9   that the said deposition was recorded stenographically

10   by me and then reduced to printing under my direction,

11   and constitutes a true record of the testimony given

12   by said witness.

13        I certify the inspection, reading and signing of

14   said deposition were NOT waived by counsel for the

15   respective parties and by the witness.

16        I certify I am not a relative or employee of any

17   of the parties, or a relative or employee of either

18   counsel, and I am in no way interested directly or

19   indirectly in this action.

20        IN WITNESS WHEREOF, I have hereunto set my hand

21   and affixed my seal of office this 26th day of

22   February, 2018.

23

24                    _____

                                Notary Public
25
```

Page 149

1                    TRANSPERFECT DEPOSITION SERVICES
                          216 East 45th Street
2                              Suite 903
                       New York, New York   10017
3                          212.400.8845

4                           ERRATA SHEET

5     CASE:       ACLU v HARGAN, ET AL.
      DATE:       FEBRUARY 13, 2018
6     WITNESS:    COMMANDER JONATHAN WHITE

7     Page   Line    Change and reason for change:

8     ____   ____   _____

9     ____   ____   _____

10    ____   ____   _____

11    ____   ____   _____

12    ____   ____   _____

13    ____   ____   _____

14    ____   ____   _____

15    ____   ____   _____

16    ____   ____   _____

17    ____   ____   _____

18    ____   ____   _____

19    ____   ____   _____

20    ____   ____   _____

21

22
      Subscribed and sworn to me this
23
      _____ day of _____, 2018.
24

25    _____

1                    ACKNOWLEDGMENT OF DEPONENT

2

3          I, COMMANDER JONATHAN WHITE, do here certify

4     that I have read the foregoing pages 1 to 45 and

5     that the same is a correct transcription of the

6     answers given by me to the questions herein

7     propounded, except for the corrections or changes in

8     form or substance, if any, noted in the attached

9     errata sheet.

10

11

12    _____              _____
      DATE                      COMMANDER JONATHAN WHITE

13

14

15

16

17

18

19

20    Subscribed and sworn to me this

21    _____ day of _____, 2018.

22    _____

23                 Notary Public

24

25