# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

- - - - - - - - - - - - - - - -

AMERICAN CIVIL LIBERTIES
UNION OF NORTHERN
CALIFORNIA,

        Plaintiff,    |  Case Number:

v.    |  3:16-cv-3539-LB

ERIC G. HARGAN, Acting
Secretary of Health and
Human Services, et al.,

        Defendants,
v.

U.S. CONFERENCE OF
CATHOLIC BISHOPS,

   Defendant-Intervenor.

- - - - - - - - - - - - - - - -


VIDEOTAPED DEPOSITION OF

SCOTT LLOYD, ESQUIRE, VOLUME II

Washington, D.C.

Tuesday, February 13, 2018 - 10:25 a.m.




Reported by:

Ann Medis, RPR

Job No. 20790

Page 185

```
 1

 2                 Videotaped Deposition of

 3              SCOTT LLOYD, ESQUIRE, VOLUME II

 4

 5   Held at the offices of:

 6              U.S. Department of Justice

 7              20 Massachusetts Avenue, N.W.

 8              Washington, D.C.  20001

 9              202.353.4556

10

11

12

13

14

15

16              Taken pursuant to notice, before Ann

17         Medis, Registered Professional Reporter,

18         and notary public in and for the District

19         of Columbia.

20

21

22

23

24

25
```

Page 186

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFF

 3              ACLU Foundation
                BY:  BRIGITTE AMIRI, ESQUIRE
 4              AND  MEAGAN BURROWS, ESQUIRE
                125 Broad Street
 5              New York, New York  10004
                212.519.7897
 6              bamiri@aclu.org
                mburrows@aclu.org

 7

 8   ON BEHALF OF DEFENDANTS ERIC G. HARGAN and DEPARTMENT
     OF HEALTH AND HUMAN SERVICES
 9
                UNITED STATES DEPARTMENT OF JUSTICE
10              BY:  MARTIN M. TOMLINSON, ESQUIRE
                20 Massachusetts Avenue, N.W.
11              Room 6139
                Washington, D.C.  20001
12              202.353.4556
                martin.m.tomlinson@usdoj.gov

13

14   ON BEHALF OF DEFENDANT-INTERVENOR USCCB

15              GIBSON DUNN & CRUTCHER, LLP
                BY:  JACOB SPENCER, ESQUIRE
16              AND  ROBERT DUNN, ESQUIRE  (by phone)
                333 South Grand Avenue
17              Los Angeles, California  90071
                213.229.7000
18              jspencer@gibsondunn.com
                rdunn@gibsondunn.com

19

20   ALSO PRESENT

21              Kim Johnson, Videographer

22              Llewellyn Woolford, Esquire, HHS

23              Caitlin Palacios, Esquire, HHS

24              Rachel Chrisinger, Paralegal

25
```

Page 189

1              P R O C E E D I N G S

2                    - - - -

3         THE VIDEOGRAPHER:  This is Media Number

4   1 in the videotaped deposition of Scott Lloyd

5   taken in the matter of American Civil Liberties

6   Union of Northern California versus Burwell,

7   et al., Case No. 3:16-cv-3539-LV in the U.S.

8   District Court of Northern California, San

9   Francisco division.

10      This deposition is being held at 20

11  Massachusetts Avenue, Northwest, Washington, D.C.,

12  on February 13, 2018 at approximately 10:25 a.m.

13      My name is Kim Johnson, and I'm a legal video

14  specialist.  The court reporter today is Ann

15  Medis.  Both are in association with TransPerfect.

16      Will counsel please introduce yourself and

17  state whom you represent.

18         MS. AMIRI:  Brigitt Amiri for the

19  plaintiff.

20         MS. BURROWS:  Meagan Burrows for the

21  plaintiff.

22         MR. TOMLINSON:  Martin Tomlinson for the

23  federal defendants.

24         MR. WOOLFORD:  Llewellyn Woolford for

25  the federal defendants U.S. Department of Health

Page 190

1   and Human Resources.

2            MS. PALACIOS:  Caitlin Palacios, U.S.

3   Department of Health and Human Services.

4            MR. SPENCER:  Jacob Spencer for the

5   defendant-intervenor USCCB.  Rob Dunn also for the

6   defendant-intervenor.

7            THE VIDEOGRAPHER:  Will the court

8   reporter please swear in the witness.

9                 SCOTT LLOYD, ESQUIRE,

10      having been first duly sworn, was examined

11                and testified as follows:

12                EXAMINATION (Continued)

13  BY MS. AMIRI:

14       Q.   Good morning, Mr. Lloyd.

15       A.   Good morning.

16       Q.   Have you finalized any policies related

17  to abortion since your deposition on December 18?

18       A.   No.

19       Q.   Have you spoken with anyone at the U.S.

20  Conference of Catholic Bishops about abortion

21  since your deposition on December 18?

22       A.   Abortion, no.

23       Q.   Have you spoken with anyone at Catholic

24  Charities about abortion since your deposition on

25  December 18?

Page 191

 1      A.   No.

 2      Q.   Have you spoken with any religiously

 3  affiliated shelter about abortion since

 4  December 18?

 5      A.   I don't think so.

 6      Q.   Have you spoken with any shelter about

 7  abortion since December 18?

 8      A.   I believe so, yes.

 9      Q.   And do you know whether any of those

10  shelters had a religious objection to providing

11  access to abortion?

12      A.   I don't know, but I don't think so.

13      Q.   What shelters did you speak with about

14  abortion since your deposition?

15      A.   I don't recall.

16      Q.   How many shelters did you speak with

17  about it?

18      A.   Two or three.

19      Q.   And you don't remember the names of

20  those shelters?

21      A.   No.

22      Q.   What was the substance of the

23  conversation?

24      A.   Instructions regarding the handling of

25  termination requests.

Page 192

1       Q.   Were those instructions from you to the

2   shelters?

3       A.   In some cases, yeah.

4       Q.   Let's start in the case that -- in one

5   or more cases, did you provide instructions to

6   shelters about abortion requests?

7       A.   Yes, either directly or through our

8   staff.

9       Q.   So let's start with the ones directly.

10      A.   I think it's more through our staff

11  actually.

12      Q.   Let's start with any direct

13  communication you had with shelters with respect

14  to abortion since your deposition.

15      A.   Okay.

16      Q.   What were those communications?

17      A.   Answering questions.

18      Q.   What types of questions?

19      A.   How should we proceed if this or that

20  happens.

21      Q.   And what were your answers?  What were

22  your instructions?

23      A.   It depended on the question.

24      Q.   So let's isolate a particular time that

25  you were in direct conversation with a shelter

Page 193

1    about an abortion request.

2         Were any of those conversations about

3    religious objection that the shelter had to

4    providing access to abortion?

5         A.    No.

6         Q.    Were any of those shelters raising

7    religious objections that their staff had about

8    access to abortion?

9         A.    No.

10        Q.    We'll get to some documents that were

11   produced since your last deposition.  So perhaps

12   as we're going through those, we can talk about

13   the different conversations you may have had

14   directly with shelters, and that may refresh your

15   recollection.  If there's any shelters that you

16   have talked to that are not in the documents that

17   we produce, then we can try to isolate those when

18   we get there.

19        How many abortion requests have come to your

20   attention since your deposition on December 18?

21        A.    I don't know.

22        Q.    More than five?

23        A.    No.

24        Q.    Less than five?

25        A.    Yes.

Page 194

1        Q.   Have any of them been from
2   religiously-affiliated shelters that have an
3   objection to providing access to abortion?
4        A.   I don't know, but I don't think so.
5        Q.   Since your deposition, have there been
6   any transfers from religiously-affiliated shelters
7   to a nonreligiously-affiliated shelter because of
8   an abortion request?
9        A.   I don't think so.
10       Q.   How about for a contraception request?
11       A.   I don't think so.
12       Q.   Since your deposition, have there been
13  placement decisions that ORR has made based on the
14  fact that a minor is seeking an abortion?
15       A.   No.
16       Q.   There have been no decisions that take
17  into account whether a particular shelter has a
18  religious objection to providing abortion before
19  placing a minor who is seeking an abortion with a
20  shelter since your deposition?
21       A.   I don't think so.
22       Q.   Since your deposition, have you spoken
23  with Maggie Wynne about abortion?
24       A.   Yes.
25       Q.   On how many occasions?

1      A.   There were several.  I work with her

2   regularly.

3      Q.   Were they about abortion policies or

4   specific abortion requests?

5      A.   Both.

6           MR. TOMLINSON:  I'm going to object and

7   instruct the witness not to answer to the extent

8   this line of questioning calls for internal

9   deliberations about policy.

10  BY MS. AMIRI:

11     Q.   Just to clarify, with Mr. Tomlinson's

12  objection, I'm not yet asking about the nature of

13  the conversations.  But just to clarify, you have

14  spoken with Ms. Wynne about both abortion policy

15  and about specific abortion requests of minors?

16     A.   Yes.

17     Q.   I think I asked you this at the top of

18  your deposition, but since your deposition on

19  December 18, has ORR made any final policy

20  pronouncements about abortion since your

21  deposition?

22     A.   No.

23     Q.   Since your deposition, have you spoken

24  with Steven Wagner about abortion policies?

25          MR. TOMLINSON:  Same objection and

1    instruction.

2              THE WITNESS:  Yes.

3    BY MS. AMIRI:

4         Q.   About abortion policies?

5         A.   Yes.

6         Q.   And have you spoken with Steven Wagner

7    about any specific abortion requests for minors?

8         A.   Yes.

9         Q.   Same line of questioning for the HHS

10   secretary that's new, Alex Azer, have you had

11   conversations with him about abortion policies

12   since your deposition on December 18?

13             MR. TOMLINSON:  With the same objection

14   and instruction.

15             THE WITNESS:  No.

16   BY MS. AMIRI:

17        Q.   Have you had any conversation with Alex

18   Azer about abortion requests from individual

19   minors since your deposition?

20        A.   No.

21        Q.   Since your deposition on December 18,

22   have you spoken to any minors who are pregnant?

23        A.   No.

24        Q.   Since your deposition in --

25        A.   I don't think so.  It's possible that

1   they were pregnant and I didn't know it.

2       Q.   So to your knowledge, at the time that

3   you were speaking with a minor, you were unaware

4   of whether the minor was pregnant or not?

5       A.   Right.  No.

6       Q.   Did you speak to any minor who was

7   seeking abortion --

8       A.   No.

9       Q.   -- since your deposition?  Since your

10  deposition, have you discussed religion with

11  minors?

12      A.   No.  Wait.  In our care?

13      Q.   Yes.

14      A.   In our care.

15      Q.   This all in your personal -- in your

16  official capacity, not in your personal capacity,

17  yes.

18      A.   Okay.

19      Q.   Have you discussed any -- have you

20  prayed with any minors in ORR care?

21      A.   No.

22      Q.   Have there been any contract or

23  cooperative agreement negotiations with shelters

24  since your deposition in December that involve

25  terms relating to reproductive health access?

1          A.    I think so.

2          Q.    What were the cooperative agreements

3     that were negotiated or discussed with shelters

4     that included some aspect of reproductive health?

5          A.    I don't recall the exact party.

6          Q.    One party or more than one party?

7          A.    One party.

8          Q.    Was it a shelter that had a religious

9     objection to providing access to contraception or

10    abortion?

11         A.    I think that's the case.

12         Q.    If you don't remember the party, who

13    would?

14         A.    It's possible that Jonathan White would

15    or Jallyn Sualog.

16         Q.    Do you remember the term relating to

17    abortion or contraception that was being discussed

18    in the cooperative agreement with the shelter that

19    had an objection?

20         A.    Vaguely.

21         Q.    And what is your recollection?

22         A.    They were seeking an exception to

23    providing certain reproductive services.

24         Q.    And does that include both abortion and

25    contraception?

1        A.    I don't recall.

2        Q.    Did ORR make a decision about whether to

3   grant that religiously-affiliated shelter an

4   exception to providing access to reproductive

5   healthcare?

6        A.    Yes.

7        Q.    Was that decision memorialized in an

8   agreement with the shelter?

9        A.    My belief is that it was.  It's possible

10  that it went on to an additional round of review

11  after that.

12       Q.    Do you sign cooperative agreements or

13  contracts with shelters in general?

14       A.    Yes.

15       Q.    Did you sign this particular contract or

16  cooperative agreement with a shelter?

17       A.    I think so.

18       Q.    And the general term of the agreement

19  was that the shelter does not have to provide

20  access to abortion and contraception?  Was that

21  the final decision?

22       A.    Something along those lines.  I don't

23  remember if it was both abortion and contraception

24  or one or the other.

25       Q.    Was there a discussion in the

Page 200

1    negotiations with the shelter about what would

2    happen if a minor in their care sought

3    reproductive healthcare that they were unwilling

4    to provide access to?

5         A.    My recollection is that the minor would

6    be transferred according to the agreement.

7         Q.    So according to the agreement, the minor

8    would be transferred to a shelter that did not

9    have a religious objection to providing access to

10   that care?

11        A.    I believe so.

12        Q.    And is it your understanding that --

13   strike that.

14        Do you know what region of the country the

15   shelter was located in?

16        A.    No.

17        Q.    Do you know whether that shelter was

18   part of the U.S. Conference of Catholic Bishops'

19   list of subgrantees?

20        A.    That would be my guess.

21        Q.    Was it a Catholic Charities?

22        A.    I don't recall.

23        Q.    Other than the cooperative agreement we

24   just discussed, have there been any other

25   discussions with shelters that have a religious

Page 201

1    objection to providing access to abortion or

2    contraception since your deposition?

3        A.    No.

4        Q.    Are there shelters still operating

5    without a signed cooperative agreement, generally

6    speaking?

7        A.    No, I don't think so.

8            MS. AMIRI:  We're going to mark our

9    first Exhibit 22.  We're just going to continue

10   with where we left off the last time.

11           (Lloyd Exhibit 22 was marked.)

12   BY MS. AMIRI:

13       Q.    Do you recognize this document that's

14   been marked as Exhibit 22?

15       A.    Yes.

16       Q.    And what is it?

17       A.    It's the errata sheet from my last

18   deposition, from the transcript of my last

19   deposition.

20       Q.    Is this your handwriting in the Page,

21   Line and Correction and Reason columns?

22       A.    No.

23       Q.    I don't want to ask a question that's

24   going to require revelation of attorney/client

25   privilege.  But this represents the corrections

1    that you wanted to make?

2         A.    Yes.

3         Q.    I just wanted some clarity on the two

4    corrections that you made, one on page 35 and one

5    on page 56.  I'm happy to hand to you your

6    deposition.  But on page 35, line 18, there was a

7    substantive change that you had requested made.

8         And the question preceding on page 35, line

9    15 of your deposition, I had asked:  "Do you have

10   any involvement as the director of ORR in making

11   determinations about whether an unaccompanied

12   minor can have access to contraception?"

13        The answer at your deposition on line 19 was:

14   "No."

15        And in your errata you said that you wanted

16   to replace "No" with, quote, "No, not generally,

17   unless that might be a specific question."

18        I didn't really understand the correction.  I

19   wanted to ask you what you meant by your

20   correction in your errata.

21        A.    It's not a question that typically comes

22   to my attention in the operation of our shelters.

23        Q.    So unless, you say -- you added though

24   that there might be a specific question about

25   contraception.

Page 203

1          A.    Sure.

2          Q.    So are there situations that you have

3    had the occasion of considering a question from a

4    shelter about access to contraception in your time

5    at ORR?

6          A.    Yes.

7          Q.    And what was that?

8          A.    They wanted to know whether they ought

9    to be filling a contraception prescription.

10         Q.    The shelter did?

11         A.    Um-hum.

12         Q.    Can you just say "Yes" or "No" for the

13   reporter.

14         A.    Sure.  So the question I guess was --

15   can you repeat the question?  I'm sorry.

16         Q.    Yes.  I was just clarifying that it was

17   the shelter who was asking the question about

18   whether they were supposed to fill a prescription

19   for contraception.

20         A.    Yes.

21         Q.    And what was your response to them?

22         A.    They should follow the recommendation of

23   their medical director essentially.

24         Q.    Have you ever instructed a shelter to

25   refrain from filling a contraception prescription?

Page 204

1        A.    No.

2        Q.    Why did that specific request come to

3    you?

4        A.    I don't know.

5        Q.    Normally do contraception prescription

6    questions come to you before a shelter acts on

7    whether they can fill a particular contraception

8    prescription?

9        A.    No.

10        Q.    So this was out of the ordinary, but you

11    don't know why?

12        A.    Right.

13        Q.    Was the request from a

14    religiously-affiliated shelter that had an

15    objection to contraception?

16        A.    I don't think they were religiously

17    affiliated, no.

18        Q.    The next correction is on page 46, line

19    2.  And I just wanted to ask for some clarity as

20    well.  Starting on page 45, line 24, I asked:

21    "Has there ever been a minor's request for

22    contraception that has reached your level, a

23    request for contraception?"

24        And on line 2 of page 46, you said:  "No."

25        And then on your errata, you wanted to

Page 205

1    replace "No" with "No, not in a way where I

2    approved or disapproved a specific request."

3            So I wanted clarity as to what you meant by

4    that change.

5            A.    Where I was the final decision-maker on

6    a request for contraception, the answer is no.

7            Q.    So the correction is that a minor's

8    request for contraception may have reached your

9    level, but you were not the ultimate

10   decision-maker about whether to approve or

11   disapprove that request?

12           A.    That's correct.

13           Q.    You had started answering some of my

14   earlier questions about directions or instructions

15   that you had given to shelters about specific

16   abortion requests for individuals, and there are

17   some documents that were produced after your

18   deposition that I'd like to start to discuss with

19   you to see if some of those shelters are some of

20   the ones that you either spoke with directly or

21   provided instructions through your staff.

22                MS. AMIRI:  Let's do 23.

23                (Lloyd Exhibit 23 was marked.)

24                (Witness reviewed the exhibit.)

25

Page 206

1   BY MS. AMIRI:

2        Q.   Sir, I've handed to you what I've marked

3   as Exhibit 23.  I will also represent on the

4   record that the documents that I'll be handing you

5   that have been produced by the government haven't

6   been fully redacted pursuant to our agreement or

7   the confidentiality order.

8             MS. AMIRI:  So that's something I want

9   some clarity on before -- or once we go off the

10  record at some point, one of my housekeeping

11  things I wanted to talk to you about.

12  BY MS. AMIRI:

13       Q.   But just so you know, these are not in a

14  version -- these are in a version that's protected

15  by the confidentiality order and have not been

16  further redacted.

17       With this particular shelter where this minor

18  had requested an abortion, did you speak directly

19  to the shelter about this abortion request?

20       A.   I don't think so.

21       Q.   Did you provide any instructions to

22  staff to give to the shelter -- and we'll get to

23  some other emails -- that weren't captured in

24  emails in general?

25       A.   Yes.

Page 207

1          Q.    What were those instructions?

2          A.    Instructions to the?

3          Q.    Instructions that -- I'll repeat the

4     question.  Did you give any instructions to staff

5     to give to the shelter that were verbal only and

6     were not captured in emails?

7          A.    My recollection is that most of our

8     instructions in this case were memorialized in

9     email.

10         Q.    For this particular minor, did you

11    instruct the federal field specialist or any other

12    ORR staff member to read a description of an

13    abortion procedure to her?

14         A.    Yes.

15         Q.    Did that happen?

16         A.    I believe so.

17         Q.    Why would you require that?

18         A.    For informed consent.

19         Q.    Is it part of ORR's job to provide

20    medical informed consent to minors?

21         A.    Informed consent, yes.

22         Q.    It is ORR's job to provide medical

23    informed consent to minors?

24         A.    It's appropriate.

25         Q.    In what circumstances is it appropriate?

1      A.    Well, in a case where, for example,

2 they're having a medical procedure done on them.

3      Q.    In all instances in which unaccompanied

4 minors undergo medical procedures while they're in

5 ORR custody, does ORR provide medical informed

6 consent to those minors?

7      A.    They ensure that it's given.

8      Q.    Given by whom?

9      A.    Providers.

10      Q.    What kind of providers?

11      A.    The providers who are giving the

12 procedure.

13      Q.    The medical providers?

14      A.    Um-hum.

15      Q.    Are there other circumstances outside of

16 the abortion context where you have instructed

17 your staff to provide medical informed consent to

18 a minor undergoing a medical procedure?

19      A.    Not that I recall.

20      Q.    Have you ever instructed that a minor

21 who was delivering a baby either vaginally or via

22 C-section be provided with a description of the

23 experience they were about to undergo?

24      A.    No.

25      Q.    Did you also instruct that this minor be

1  offered a publication by the State of Texas about

2  abortion?

3      A.   Something along those lines, yeah.

4      Q.   Is this the first minor that you have

5  made such an instruction for?

6      A.   I don't recall, but I don't think so.

7      Q.   This minor wasn't in Texas, was she?

8      A.   No.

9      Q.   Why then would she be asked to read a

10  publication from the State of Texas?

11      A.   We found it to be a good resource.

12      Q.   Who is "we"?

13      A.   People in the department.

14      Q.   Who would that include?

15      A.   Me and legal counsel and Maggie Wynne,

16  Steve Wagner, decision-makers.

17      Q.   I'm not asking about any conversations

18  that you had with counsel, but any conversations

19  that you have had outside the presence of counsel

20  about the use of the Texas book to be provided to

21  minors.

22          MR. TOMLINSON:  I'm going to object and

23  instruct him not to answer the question about the

24  substance of those conversations on the basis of

25  deliberative process.

1            MS. AMIRI:  About whether to use a --

2    whether to give a booklet to people, you think

3    that's deliberative process?

4            MR. TOMLINSON:  Yes.  If we're saying

5    that the agency's practice is to give booklets to

6    minors, I think that is a decision about policy or

7    practice potentially.

8            THE WITNESS:  Can you repeat the

9    question?

10   BY MS. AMIRI:

11       Q.   Did you have conversations with people

12   in your department or above you outside the

13   presence of counsel about whether to provide to

14   unaccompanied minors a book published by Texas

15   about abortion?

16       A.   I don't think so.

17       Q.   They were all within the presence of

18   counsel?

19       A.   I think so.

20       Q.   Did you require this particular minor

21   that is discussed in Exhibit 23 to read the

22   pamphlet that the State of Texas publishes?

23       A.   I don't think so.

24       Q.   For this particular minor, you also

25   asked a series of questions to be posed to the

Page 211

1    provider; is that right?

2        A.    Yes.

3        Q.    About the nature of the abortion

4    procedure?

5        A.    Yes.

6        Q.    Why did you ask those questions?

7        A.    Because I wanted to know the answers to

8    those questions.

9        Q.    Why?

10       A.    We were responsible for the kids in our

11   care.  I wanted to know what was happening to this

12   particular one.

13       Q.    Why this particular one as opposed to

14   any other?

15       A.    Because she's undergoing a major

16   procedure where a human life was being destroyed.

17   I wanted to know the details of that.

18       Q.    Do you think that abortion is less safe

19   than childbirth?

20       A.    I would defer to whatever the science

21   says on that.

22       Q.    Do you happen to know yourself whether

23   childbirth is safer than abortion?

24       A.    It depends on what kind of childbirth

25   and what kind of abortion.  I don't have

Page 212

1    statistics committed to memory.

2        Q.    So this particular minor was -- had your

3    attention about the type of procedure that she was

4    going to undergo because in your mind, it was a

5    procedure that would involve the destruction of

6    human life?

7        A.    Well, it's not just in my mind.  That's

8    objective.

9        Q.    That's objective?

10       A.    Um-hum.

11       Q.    You believe everyone regardless of their

12   belief systems believes that abortion is the

13   destruction of human life?

14       A.    I think the objective facts are that it

15   involves the destruction of a human life.  How

16   people internalize every element is a different

17   question.

18       Q.    Is your belief that the abortion is the

19   destruction of human life informed by your

20   religion faith?

21       A.    It's informed by the reality of the

22   situation and the scientific facts.

23       Q.    You also believe that abortion is a sin?

24       A.    What does that have to do with anything?

25       Q.    It has to do with a lot.  This case is

Page 213

1   about -- involves an Establishment Clause

2   violation.  Your religious imposition is directly

3   relevant to the case.  So I get to ask the

4   questions.  Mr. Tomlinson can object.

5        So my question is:  Do you believe abortion

6   is a sin?

7        A.   Yes.

8             MR. TOMLINSON:  I'm going to object to

9   this line of questioning going any further because

10  he's testified in the past that he does not let

11  religion guide his job as ORR director.  We're

12  getting pretty far afield into personal religious

13  beliefs.

14            MS. AMIRI:  You can certainly ask him on

15  redirect any questions that you want.  I don't see

16  that there's a basis for an instruction not to

17  answer.  The political individuals who are

18  involved in enforcing the policy and their

19  personal religious belief and whether that is

20  imposed on the minors in their care is directly

21  relevant to this case, and there's no basis for

22  instructing him not to answer.  If you want to

23  clarify on your redirect, that is certainly your

24  prerogative.

25            MR. TOMLINSON:  Let me clarify.  I did

1    not instruct him not to answer.  I just wanted to

2    put this objection on the record as to this

3    questioning.

4              MS. AMIRI:  Fair enough.

5    BY MS. AMIRI:

6         Q.   I believe you answered the question.

7    You think abortion is a sin.  Yes?

8         A.   I answered the question.

9              (Lloyd Exhibit 24 was marked.)

10   BY MS. AMIRI:

11        Q.   I'm going to hand you what has been

12   marked as Exhibit 24, if you'd like to take a

13   look.

14             (Witness reviewed the exhibit.)

15   BY MS. AMIRI:

16        Q.   Do you recognize what has been marked as

17   Exhibit 24?

18        A.   Most of it.

19        Q.   Which parts do you not recognize?

20        A.   The cover -- the cover email I hadn't

21   seen before.

22        Q.   Just by background for this particular

23   minor that we've been discussing, Jonathan White

24   made a recommendation to you that this particular

25   minor be allowed to have access to abortion; is

Page 215

1    that correct?

2          A.    Yes.

3          Q.    This minor had been raped; correct?

4          A.    Well, she claimed to have been raped,

5    yes.

6          Q.    Do you have any reason to disbelieve

7    her?

8          A.    No.

9          Q.    This minor had thoughts of self harm?

10         A.    She expressed something along those

11   lines, yes.

12         Q.    And Mr. White sent you a decision memo

13   about whether to approve or deny the abortion

14   access and funding; is that right?

15         A.    Yes.

16         Q.    Has Mr. White sent you a decisional memo

17   like this for any other abortion?

18         A.    I don't think so.

19         Q.    If you flip to Bates-stamp 15607, in the

20   middle paragraph, about halfway in the middle

21   paragraph, you reference an information session

22   that imparted information about fetal development

23   and the abortion procedure she requests.

24         A.    Can you repeat that last part?

25         Q.    Yes.  I just wanted to draw your

Page 216

1    attention to the middle paragraph.  About halfway

2    through that middle paragraph, the sentence says,

3    "She has had an information session that imparted

4    information about fetal development and the

5    abortion procedure she requests."

6          A.   Yes.

7          Q.   What information session are you

8    referring to there?

9          A.   She met with her clinician and our -- a

10   child welfare specialist from our program to go

11   through information regarding her request for

12   termination.  I believe the medical director from

13   the program was there, too.

14         Q.   So there were three individuals that

15   were at the informational session?

16         A.   At least three and a translator.

17         Q.   When you mentioned her provider, is that

18   an ob-gyn?

19         A.   I believe it was the medical -- the

20   medical staff from the program as opposed to the

21   provider.

22         Q.   Was there a clinician, a medical

23   provider who was not associated with the shelter

24   at the informational session?

25         A.   I don't know, but I don't think so.

Page 217

1      Q.   Did you provide any instructions for
2  this particular minor that she visit a crisis
3  pregnancy center?
4      A.   I don't recall, but I actually don't
5  think that happened in this case.
6      Q.   So even if you provided the instruction,
7  you don't think that she went to a crisis
8  pregnancy center?
9      A.   That would be my recollection, but it's
10 possible that my recollection is off.
11     Q.   Did you instruct that this particular
12 minor go to any particular ob-gyn for the
13 provision of care?
14     A.   No.
15     Q.   On Price production 15609, you say in
16 the last paragraph, "Although formal research on
17 this matter appears to be sparse...," that
18 sentence.
19     A.   Um-hum.
20     Q.   I believe you're talking about trauma
21 from abortion; is that correct?
22     A.   Yes.
23     Q.   Have you done a literature review of the
24 science literature about whether abortion causes
25 trauma?

Page 218

1          A.    Me personally?

2          Q.    Yes.

3          A.    No.

4          Q.    Have you read any summaries about the

5     scientific literature about whether abortion

6     causes trauma?

7          A.    Yes.

8          Q.    And what were those summaries that you

9     read?

10         A.    Compilations, various compilations of

11    scientific literature on the harms of abortion.

12         Q.    And who provided that to you?

13         A.    I believe the staff -- well, I mean,

14    over the years, many different places.  Usually

15    you find this stuff on the internet.  It may have

16    been part of my own research on this or that

17    project.  But in the context of this -- in these

18    responsibilities, ACF staff provided me some

19    literature, and we were also working with ASPE,

20    the assistant secretary for planning and

21    evaluation, regarding related topics.  But I don't

22    think it goes directly to abortion trauma.

23         Q.    Who is the ASPE director?

24         A.    It was just -- who is ASPE director?

25    John.  I don't know his last name.

Page 219

1          Q.   So just to back up, did any of your

2     staff give you medical or scientific literature

3     about abortion trauma that you considered in the

4     context of this particular memo?

5          A.   No.

6          Q.   Do you know what the American

7     Psychological Association says about whether

8     abortion causes trauma?

9          A.   I don't have that committed to memory.

10         Q.   What did the scientific literature that

11    you were provided say about whether abortion

12    causes trauma?

13         A.   If I recall, there's some studies that

14    have found an increased likelihood of self harm,

15    suicide, that sort of thing.

16         Q.   Were those studies conducted by a man

17    named Vincent Rue?

18         A.   I don't know.

19         Q.   Priscilla Coleman?

20         A.   I don't know.

21         Q.   Did you ever speak to the minor who is

22    at issue in this memo?

23         A.   No.

24         Q.   The next page, 15610, in the fourth

25    paragraph, second sentence, you say, "How could

Page 220

1    abortion be in their best interest where other

2    options are available..."

3        Is it your position that abortion is never in

4    the best interest of a minor because there are

5    other options for the pregnancy available to the

6    minor?

7        A.    Where are we?

8        Q.    Fourth paragraph on 15610, second

9    sentence.

10       A.    Okay.

11       Q.    Is it your position that abortion is

12   never in the best interest of a minor because

13   there are other options available to a minor?

14       A.    In this -- it's a case-by-case

15   determination for each minor in our care.

16       Q.    But do you believe that abortion would

17   never be in the best interest of a minor where the

18   minor has other options for the pregnancy?

19            MR. TOMLINSON:   Objection.   Calls for

20   speculation.

21   BY MS. AMIRI:

22       Q.    You can answer.

23       A.    It's a case-by-case determination.

24       Q.    So what did you mean here when you said,

25   "How could abortion be in their best

1    interest...where other options are available..."?

2         A.    I should have said her best interest,

3    and that would have clarified, I think.

4         Q.    You ultimately made the determination

5    not to allow this particular minor access to the

6    abortion; correct?

7         A.    Yes.

8         Q.    Does that mean it was not in her best

9    interest?

10        A.    If I could clarify, I made the

11   determination that the program would not assist

12   her in obtaining an abortion.

13        Q.    Now I'm confused because I believe that

14   you have said in this memo, "At bottom, this is a

15   question of what is in the interest of the young

16   woman..."

17        A.    Um-hum.

18        Q.    So if you're charged with acting in the

19   best interest of a minor, how does what the

20   program wants to do relate to what is in the best

21   interest of a particular minor?

22        A.    Our determination about the best

23   interest of a minor is going to determine how we

24   expend our resources in pursuit of that best

25   interest.

Page 222

1      Q.   So you believe as part of the best

2   interest determination of a minor, that that

3   includes an assessment of ORR resources?

4           MR. TOMLINSON:  Objection.  I think that

5   mischaracterizes what he said.

6           MS. AMIRI:  That's why I'm trying to get

7   clarification here.

8           THE WITNESS:  No.  The best -- once we

9   determine what's in the best interest of a child

10  in a certain situation, then we determine how our

11  program is going to pursue those best interests.

12  BY MS. AMIRI:

13     Q.   But for this particular minor, you made

14  the determination that the abortion was not in her

15  best interest.

16     A.   Yes.

17     Q.   She was asking for the abortion; right?

18     A.   That's the way it was reported to us,

19  yes.

20     Q.   So in this decision memo, you have

21  supplanted your decision for hers based on your

22  determination that the abortion is not in her best

23  interest?

24     A.   No.

25     Q.   So please correct me and explain why

Page 223

1    that's wrong.

2        A.    Whatever she feels about what's in her

3    best interest is one matter, and then what we do

4    as a program serving her is a different matter.

5        Q.    How then do you reconcile your

6    determination about what is in her best interest

7    with what you just said in terms of the program?

8    I don't quite understand.

9        A.    We are charged with acting in the best

10   interest of the children in our care.

11       Q.    Yes.

12       A.    And that's what we did in this case.

13       Q.    So you think that denying her access to

14   abortion was in her best interest?

15       A.    In this case, it was.

16       Q.    Why?

17       A.    For the reasons that I laid out in the

18   memo.

19       Q.    If that is true, how would -- strike

20   that.

21       You're never going to approve an abortion

22   request; right?

23            MR. TOMLINSON:    Objection.    Speculative.

24   BY MS. AMIRI:

25       Q.    You can answer the question.

1       A.   I'm sorry?

2       Q.   You can answer the question.  That's an

3   objection.  That's not an answer.

4       A.   I'm going to look at each case and make

5   a determination on a case-by-case basis.

6       Q.   As the ORR director, you have to

7   personally approve any abortion request, correct,

8   putting aside medical emergencies?

9       A.   Yeah.  We determine whether the program

10  is going to assist in that, yes.

11      Q.   And it would require your explicit

12  approval for a minor to have an abortion outside

13  of the emergency medical context?

14      A.   Yes.

15      Q.   If you believe that an abortion is a sin

16  and you approved an abortion, wouldn't you be

17  complicit in sin?

18           MR. TOMLINSON:  Object to the form.  I

19  object to the form of that question.

20           THE WITNESS:  Potentially.

21  BY MS. AMIRI:

22      Q.   What is the potential?  What's potential

23  about it?

24      A.   I mean, we're speculating.  That, too,

25  is a case-by-case determination according to my

Page 225

1    understanding.

2        Q.   If you have to sign on a line approving

3    an abortion request, wouldn't you be complicit in

4    sin?

5            MR. TOMLINSON:  I'm going to renew the

6    objection.  We're talking about his religious

7    beliefs, not his -- how he does his official

8    duties here.

9    BY MS. AMIRI:

10       Q.   You can answer the question.

11       A.   Can you restate the question?

12       Q.   Yes.  Mr. Tomlinson's objection will

13   stand.  If you were to approve an abortion

14   request, wouldn't you be complicit in sin?

15       A.   I could be.  It depends.  It's a

16   case-by-case determination.

17       Q.   Depends on what?

18       A.   A number of factors.

19       Q.   So it depends on the factors that are

20   involved in the minor seeking the abortion?

21       A.   It depends on all the factors and

22   including what you just said, according to my

23   understanding.  But I'm not here as an expert on

24   my faith.  I'm here as the director of the Office

25   of Refugee Reassignment.

Page 226

1          Q.   I understand.  I'm trying to understand
2    what the policy really is here with respect to
3    abortion requests.
4          A.   Okay.  Then let's talk about the policy.
5          Q.   I'm trying to understand whether there
6    is any abortion request that you are ever going to
7    approve.
8          A.   The answer is I don't know.
9          Q.   You don't know?
10         A.   It's a case-by-case determination.
11         Q.   I will get a speculative objection.  We
12   can just put that on the record right now.
13         Let's say there's a minor who's pregnant as a
14   result of rape.  She's eight weeks pregnant.
15   She's requested an abortion.  She has threatened
16   self harm if she's not allowed to have the
17   abortion.  She's voluntarily told her parents and
18   her sponsor, all of whom are supportive of her
19   abortion decision and would like her to have the
20   abortion.  She has obtained a judicial bypass.
21         Would you in that case still deny the
22   request?
23         A.   I don't know.
24         Q.   What do you mean you don't know?
25         A.   I don't know.

1      Q.   You don't know if you would?

2      A.   Right.

3      Q.   What facts would you need that I have

4  not laid out that would help you with your

5  decision?

6      A.   It would have to be a real case.

7           MR. TOMLINSON:   Object to form.

8  BY MS. AMIRI:

9      Q.   It would have to be a real case?

10     A.   Yeah.

11     Q.   Why?

12     A.   Because I'm not going to engage in a

13  speculation session.

14     Q.   Well, hypothetical questions are

15  perfectly acceptable to ask at depositions.  I

16  understand there's a speculation objection that's

17  put on the record.  That's fine.  I'm trying to

18  understand if there are any constellation of facts

19  that would be presented to you --

20     A.   And the answer, which I've answered, is

21  I don't know.

22     Q.   Are all the facts that you considered in

23  making a determination about what's in the minor's

24  best interest related to the minor's specific

25  circumstances, or are there other facts that you

Page 228

1    consider in making a decision?

2        A.    There are other facts --

3        Q.    Like what?

4        A.    -- for consideration.  I think we went

5    through this in some detail in my last deposition.

6    I don't think my answer has changed.

7        Q.    Was this minor that we're talking about

8    in this memo required to tell her parents about

9    her abortion decision?

10       A.    I don't recall.

11       Q.    Why did you --

12       A.    Yeah, I think she did tell her parents.

13   I don't remember if she was required to or not.

14       Q.    In the past there have been minors that

15   you have instructed that they tell their parents

16   or the shelter will tell their parents; correct?

17       A.    Um-hum.

18       Q.    Can you say "Yes" for the court

19   reporter.

20       A.    Yes.

21       Q.    You don't know whether that particular

22   instruction happened for this particular minor?

23       A.    I don't recall if she already had the

24   conversation or if we directed the program to

25   arrange the parental notification.

Page 229

1    Q.   You've made many instructions with

2  respect to this particular minor including that

3  she receive a description of the medical

4  procedure, that she have the informational

5  session.  Nevertheless, you denied her request for

6  an abortion.

7       And my question to you is:  Why would you

8  make her go through all of what you made her go

9  through simply to then just deny her abortion

10  request?

11    A.   Without informed consent, then there

12  isn't really a real request in my mind.

13    Q.   But you didn't deny her abortion request

14  because you felt like she was uninformed about the

15  abortion, did you?

16    A.   If she was uninformed about the

17  abortion, then she never would have made the

18  request.

19    Q.   But she had made the request before you

20  had required her to hear a description of the

21  abortion procedure and offer her the Texas

22  pamphlet; correct?

23    A.   It wasn't clear -- yes.

24    Q.   So she had already made that request.

25  And in fact, the only time that she rescinded her

Page 230

1  request is when her parent and her sponsor

2  threatened to beat her if she had the abortion;

3  right?

4       A.   That's correct.

5       Q.   So my question is:  Why subject her to

6  the things that you subjected her to only to deny

7  her abortion request?

8            MR. TOMLINSON:  Object to the form.

9            THE WITNESS:  We were sharing

10  information about the procedure that she was

11  requesting so that we knew that she knew what she

12  was asking for.

13  BY MS. AMIRI:

14       Q.   But that didn't factor into your

15  decision about whether to deny her request?

16       A.   Yes, it did.

17       Q.   How so?

18       A.   Because without it being clear that she

19  knew what she was asking for, it wouldn't be clear

20  that she was actually making a request for what

21  she was -- she seemed to be requesting.

22       Q.   Do you think that minors outside the

23  abortion context know what they're asking for when

24  they ask for a particular medical procedure even

25  without having been read a description of the

Page 231

1    medical procedure?

2            MR. TOMLINSON:  Object to the form.

3            THE WITNESS:  That's going to depend on

4    the circumstances.

5    BY MS. AMIRI:

6        Q.   So going back to the issue carried to

7    term, a minor who is perhaps making a decision

8    about whether to have a vaginal delivery or

9    C-section, ORR, I believe you said, had never

10   required a particular minor to read a description

11   about a C-section; right?

12       A.   I don't believe -- no, we haven't -- I

13   don't know.  I don't know.

14       Q.   You have never instructed that?

15       A.   Right.

16           (Lloyd Exhibit 25 was marked.)

17   BY MS. AMIRI:

18       Q.   I hand you what has been marked as

19   Exhibit 25.

20           (Witness reviewed the exhibit.)

21   BY MS. AMIRI:

22       Q.   Just to clarify, what's on page 15452 is

23   the description of the abortion procedure that you

24   required be read.  It's from the Supreme Court

25   decision Gonzales versus Carhart.

Page 232

```
 1        A.    Yes.

 2        Q.    Have you ever required that a minor be

 3   read a description of any medical procedure from

 4   any court case outside the context of abortion?

 5        A.    No.

 6        Q.    Do you know whether anyone on your staff

 7   has the training to provide options counseling

 8   about abortion?

 9        A.    I don't know.

10              (Lloyd Exhibit 26 was marked.)

11   BY MS. AMIRI:

12        Q.    On that first page I wanted to ask you

13   about what is in No. 2 of the email from Jonathan

14   White to you.  There's a sentence that starts,

15   "███████ has indicated that the DHUC staff are not

16   able to participate..."

17        A.    Okay.

18        Q.    What does DHUC stand for?

19        A.    Division of Health for Unaccompanied

20   Children.

21        Q.    And ████████ referred to in this sentence

22   is ████████████████████?

23        A.    Yes.

24        Q.    So just reflecting on this email, back

25   to my question about whether you had anyone on
```

1  your staff who had the clinical training and

2  expertise to provide options counseling, isn't

3  Jonathan White indicating to you that the DHUC

4  staff do not have that competency?

5       A.   Well, Jonathan is characterizing a

6  conversation he had with ███████ who represented

7  that DHUC staff doesn't have that.

8       Q.   Do you have any reason to believe that

9  that is incorrect?

10      A.   I don't have -- I don't know.  If I had

11 to think about it, I'd probably have a discussion

12 with ███████ to see if we were talking about the

13 same thing.

14      Q.   What is your concern about whether you

15 might be talking about something different?

16      A.   I don't know.  What he meant by options

17 counseling outside their clinical training, I

18 mean, the DHUC staff are not clinicians.  I

19 suppose that's what he was talking about.

20      Q.   Do you think that that is an incorrect

21 assessment then that Jonathan was reporting that

22 ███████ said?

23      A.   Well -- so it's speaking to the clinical

24 training.  I didn't second guess their

25 characterization.

Page 234

1          Q.   Have you dispatched anyone from your

2    staff to provide options counseling to a minor who

3    is seeking an abortion?

4          A.   No.

5          Q.   As the term options counseling is used

6    in this exhibit, what do you think Jonathan is

7    referring to?  How do you think he defines options

8    counseling?

9               MR. TOMLINSON:  Objection.  Calls for

10   speculation.

11              THE WITNESS:  It's providing options

12   about pregnancy, information about options.

13   BY MS. AMIRI:

14         Q.   And what would those options include?

15         A.   Well, we discussed this in the last

16   deposition.  Termination, adoption and childbirth.

17         Q.   It does look like this email refers to

18   and some other emails involving ████████.  I

19   probably pronounced that wrong.

20         A.   That's right.

21         Q.   ████████████.  ████████████, who is

22   she?

23         A.   She's our child welfare specialist on

24   staff.

25         Q.   Is she based here in D.C.?

Page 235

1        A.    Yeah.

2        Q.    And did you instruct ███████████ to

3   go visit this particular minor?

4        A.    Yes.

5        Q.    And why did you do so?

6        A.    To make sure that she -- well, it's in

7   the email.  But to make sure that she's aware of

8   her options and that she has informed consent

9   about the procedure.

10        Q.    So to your knowledge, ████████ is the one

11   who read to this minor the description of the

12   abortion procedure from Gonzales versus Carhart?

13        A.    I don't think that's correct.

14        Q.    So who from your staff read that portion

15   of that --

16        A.    I believe it was the minor's clinician,

17   the program staff, shelter staff.

18        Q.    The shelter staff.  ████████ does, in

19   fact, report to you, correct, about the meeting?

20        A.    Yes.

21        Q.    We have it somewhere.

22              (Lloyd Exhibit 27 was marked.)

23   BY MS. AMIRI:

24        Q.    I've handed you what's been marked as

25   Exhibit 27.  Is this an email communication

Page 236

1    between you and ███████ about the visit for the

2    particular minor?

3         A.   Yes.

4         Q.   So there are a number of things that you

5    had asked ██████ to communicate to her on page

6    15522?

7         A.   Yes.

8         Q.   Do you know if the minor requested

9    spiritual counseling?

10        A.   I don't know.  I don't think she did.

11        Q.   Do you know if ORR or the shelter

12   required her to attend spiritual counseling even

13   if she did not want it?

14        A.   Do I know?

15        Q.   Yes.  Do you know whether ORR or the

16   shelter staff required her to attend spiritual

17   counseling?

18        A.   I know that nobody required her to do

19   that.

20        Q.   That somebody required -- sorry.  I

21   didn't hear.

22        A.   I know that nobody required her to do

23   that.

24        Q.   So in number three, you had asked

25   ██████ to talk to her about the abortion

1   procedure, if she knows what a dilation and

2   extraction abortion is.  But to confirm your

3   earlier testimony, you did not have ███████ read

4   the description of Gonzales to her; correct?

5         A.   Right.  ███████ did not.

6         Q.   Did ███████ offer an illustration of an

7   abortion at 23 weeks?

8         A.   I believe that she did.

9         Q.   Do you know if the minor decided to view

10  that image?

11        A.   She decided not to.

12        Q.   Do you know what information ███████

13  communicated to her about what was in your No. 4

14  about abortion, she may experience abortion as

15  trauma on top of the trauma from her rape?

16        A.   Well, this was -- well, it's for all

17  three scenarios, parenting, adoption and abortion.

18  I don't recall there being much details about that

19  discussion.

20        Q.   You don't know whether ███████ said to

21  her if you have an abortion, you may experience

22  that as trauma?

23        A.   I don't know if she said that.

24        Q.   In number five you said that she should

25  know that the program is able to do for her -- I'm

Page 238

1    sorry -- she should know what the program is able

2    to do for her if she decides to carry her baby to

3    term or give him or her up for adoption and that

4    if born in the U.S., the baby would be a U.S.

5    citizen.

6         Why did you want ███████ to communicate this

7    to this particular minor?

8         A.   So that the minor would know that for

9    communicating her decision.

10        Q.   Why do you think it was important for

11   her to know her baby, if born in the United

12   States, would be a U.S. citizen?

13        A.   I don't know.  It's just good

14   information to have.

15             (Lloyd Exhibit 28 was marked.)

16   BY MS. AMIRI:

17        Q.   I hand you what's been marked as Exhibit

18   28.  What I've just handed to you marked as

19   Exhibit 28 is ███████'s report back to you; is

20   that correct?

21        A.   Yes.

22        Q.   In the first paragraph, I understand

23   there have been some redactions made to protect

24   the names of individuals, but I'm wondering if

25   anyone was present during the visit from ORR

Page 239

1  staff, including federal field specialists, or

2  whether those names that have been redacted are

3  nongovernmental employees.

4      A.   The federal staff that I know was there

5  was ███████.  I don't remember if the federal

6  field staff was there.

7           MS. AMIRI:  This might be a good place

8  for a break.

9           THE VIDEOGRAPHER:  We are off the record

10 at 11:38.

11          (Recess from 11:38 a.m. to 11:54 a.m.)

12          THE VIDEOGRAPHER:  This is Media Number

13 2 in the video recorded deposition of Scott Lloyd.

14 We're back on the record at 11:54.

15          (Lloyd Exhibit 29 was marked.)

16 BY MS. AMIRI:

17     Q.   I'm going to hand you what's been marked

18 as Exhibit No. 29.

19          (Witness reviewed the exhibit.)

20 BY MS. AMIRI:

21     Q.   In Exhibit 29 now we're talking about a

22 different minor than the one we were talking about

23 before the break; is that right?

24     A.   Yes.

25     Q.   It looks like there's one instruction

1    that you gave to the federal field specialist

2    through Jonathan White on 15592 about █████

3    notification of the pregnancy and the termination

4    request; is that accurate?

5         A.   Yes.

6         Q.   Did you give any other instructions with

7    respect to this particular minor either directly

8    to the shelter or through your staff?

9         A.   I don't recall.

10        Q.   Did you speak to the shelter where this

11   minor was living at the time directly?

12        A.   I don't think so.

13        Q.   If you don't recall whether you had any

14   other further instructions, just to see if this

15   refreshes your recollection at all, did you

16   instruct that this particular minor be taken to

17   visit a center on the trusted list of HHS approved

18   in crisis pregnancy centers?

19        A.   It's possible.  I don't recall.

20        Q.   Did you speak personally to this

21   particular minor?

22        A.   No.

23        Q.   Did you instruct that this particular

24   minor read a description of an abortion procedure?

25        A.   No.

1      Q.    Did you instruct that this particular

2    minor receive information about adoption?

3      A.    That would be one of the -- if we gave

4    the instruction that she have options counseling,

5    that would be one of the reasons for the options

6    counseling.

7      Q.    Separate and apart from options

8    counseling, did you direct the shelter staff, for

9    example, to provide this minor with anything very

10    specific with respect to adoption?

11      A.    That be would the purpose of options

12    counseling, so no.

13      Q.    Who do you anticipate would do that

14    options counseling?

15      A.    The pregnancy center.

16      Q.    Did you instruct this minor to undergo

17    an ultrasound?

18      A.    No.

19      Q.    So other than what's in the email with

20    respect to the direction about notification of the

21    sister, are there any specific instructions that

22    you remember for this specific minor that you

23    provided?

24      A.    Yes, I don't recall.

25      Q.    Since your deposition in December, have

1    you had any conversations with ICE about abortion?

2        A.    I don't think so.

3        Q.    Have you instructed your staff to have

4    any conversations with ICE about abortion since

5    your deposition?

6        A.    I don't think so.

7        Q.    So before we talked about other minor

8    abortion requests that came in since your

9    deposition.  So this represents two.  I want to

10   talk about others.  There was one in January, and

11   I wanted to ask you questions about what

12   instructions you made with respect to her, to her

13   abortion.

14       A.    January?

15       Q.    Um-hum.

16       A.    I don't recall.  I would need more

17   specifics.

18       Q.    So this will be under the

19   confidentiality order.  ██████████████████████

20   ████████████████████.  Does that ring a bell?

21       A.    It does.

22       Q.    What instruction did you provide for

23   this particular minor when her abortion request

24   came in?

25       A.    I don't recall.  It would be along the

1    lines of I would instruct the staff to develop the

2    record if there was something missing.  I don't

3    recall the specific instructions given to staff

4    with regard to that request.

5         Q.   When you -- strike that.

6         When you said develop the record and see if

7    there's anything missing, what are the types of

8    things that you're looking for when you get an

9    abortion request?

10        A.   Same as in the last deposition, just the

11   full facts.

12        Q.   Were you involved in this particular

13   minor's release decision to her sponsor?

14        A.   This is ██████████?

15        Q.   Yeah.

16        A.   I don't think so.

17        Q.   Are you typically personally involved in

18   decisions to release minors to their sponsors?

19        A.   Not typically.

20        Q.   If you are not, who is in your staff?

21        A.   That's a determination made by field

22   staff in conjunction with their case manager.

23        Q.   So on a routine basis, decisions to

24   release a minor to her sponsor don't reach your

25   desk; is that fair?

Page 244

1      A.    Yeah.  On a routine basis, most
2  decisions do not reach my desk.
3      Q.    About release to sponsors?
4      A.    Right.
5      Q.    And is that also true for any sort of
6  release or transfer to ICE upon a minor reaching
7  the age of maturity, or is that a different
8  question?
9      A.    Usually I would not be involved in that.
10  There's some releases for -- that do reach our --
11  reach the office of the director on a routine
12  basis, but it's a very minor segment of the
13  population.
14      Q.    What is the criteria for that minor
15  segment of the population?
16      A.    Potential danger to the community/gang
17  involvement.
18      Q.    So far none of the minors that we have
19  talked about fall into that category; is that
20  fair?
21      A.    That's fair.
22      Q.    With respect to the minor that we're
23  talking about in ███████ now, did you request
24  that she be read information about an adoptive
25  family?

Page 245

1      A.   Yes, I believe so.  I think we're

2  talking about the same case.

3      Q.   What did that information about the

4  adoptive family say?

5      A.   It was an offer that we received from a

6  family interested in adoption that was directed

7  toward that particular minor.  That was just --

8  they were able to do that because of news reports

9  about the case.  So we asked that the offer be

10  translated into ████████ to the UAC.

11      Q.   Did you know this prospective adoptive

12  couple?

13      A.   No.

14      Q.   You never heard their names before?

15      A.   No.

16      Q.   Is this the first type of offer for

17  adoption that has made its way to you in the

18  context of having someone seeing a news story

19  about the abortion request and ORR custody?

20      A.   No.

21      Q.   Sorry.  It's not the first one?

22      A.   (Nodding.)

23      Q.   Typically when you get an offer for

24  adoption, what do you do with that?

25      A.   It's not a typical situation.  It's

Page 246

1    really only, in my recollection, arose twice.  I

2    think the circumstances of the first time were

3    such that we couldn't do much with the offer.  And

4    the second time, we just passed it on to the girl.

5         Q.   And in the first circumstance, why were

6    you unable to do anything?

7         A.   I think, if memory serves -- well,

8    first, there's no real procedure for that.  So

9    that may have been a delaying factor.  Then the

10   other, I believe the UAC either left custody or

11   obtained an abortion before it was material.

12        Q.   So with this minor, going back to the

13   ████████ minor, when you received this offer of

14   adoption, did you do anything to vet the couple

15   that was making the offer?

16        A.   No.

17        Q.   Any assessment of whether they would be

18   good adoptive parents?

19        A.   No.

20        Q.   Why did you instruct that the minor

21   receive the offer?

22        A.   To discern whether that is something

23   she'd be interested in pursuing.

24        Q.   Had the minor given any indication that

25   you were aware of that she was interested in

Page 247

1   carrying the pregnancy to term and placing the

2   baby for adoption?

3        A.   No.

4        Q.   Was the offer of adoption read to the

5   minor by shelter staff or someone on your staff?

6        A.   I think that it was.  I actually don't

7   recall receiving confirmation of that.

8        Q.   Any other instructions with respect to

9   this particular minor that you either communicated

10  directly to the shelter or directly -- I'm

11  sorry -- through staff?

12       A.   Not that I -- I don't recall.

13       Q.   I'm sorry if I forgot this, but did you

14  speak directly to this other particular shelter?

15       A.   I don't think so.

16       Q.   So earlier when we started the

17  deposition, you indicated there may have been a

18  shelter or more than one shelter that you had

19  spoken directly to about a minor's abortion

20  request.  So far in the three minors that we've

21  talked about thus far, none of those shelters

22  you've spoken to directly; is that fair?

23       A.   Yeah.  That sounds right.

24       Q.   So in what other circumstances -- what

25  other minors have we not yet talked about where

Page 248

1    you may have talked to the shelter directly?

2        A.    I can say that I really don't think that

3    I have been in direct contact with a shelter in

4    any circumstance since our last deposition.

5        Q.    So we have talked about three minors.

6    There's a minor that recently requested access to

7    abortion in ███.

8        A.    How recently?

9        Q.    Very recently, this month.

10       A.    Okay.

11       Q.    Were you aware of that abortion request?

12       A.    Yes, if we're talking about the same

13   thing.

14       Q.    What instructions have you given with

15   respect to that minor?

16       A.    To ascertain whether she desires legal

17   counsel in the matter.

18       Q.    And how did you instruct that that

19   determination be reached?

20       A.    Just through her caseworker, clinical

21   caseworker.

22       Q.    At the shelter?

23       A.    Yeah.

24       Q.    Have you made any instructions with

25   respect to any of the other types of instructions

Page 249

1    we have seen with other abortion requests, for

2    example, telling the parents in the home country

3    or requiring the minor to tell the parents in the

4    home country?

5        A.    Yes.

6        Q.    A visit to a crisis pregnancy center?

7        A.    No.

8        Q.    Spiritual counseling?

9        A.    No.

10       Q.    So the only instructions that you have

11   made with respect to this particular minor that

12   made the request for abortion this month is

13   pertaining to whether she wants legal counsel?

14       A.    Right.  I may have mentioned to ensure

15   that she knows that spiritual counseling is

16   available if she wants it.

17       Q.    Do you know if she requested spiritual

18   counseling?

19       A.    I don't think that she did.

20       Q.    So we talked about four minors.  We had

21   talked about that you thought there would be less

22   than five abortion requests.

23       Are there any abortion requests that have

24   been made that have been brought to your attention

25   since your deposition on December 18 that we have

Page 250

1    not discussed?

2        A.    No, not to my recollection.  I think

3    we've covered them all.

4        Q.    Have you provided instruction to legal

5    services attorneys funded by ORR about what they

6    may or may not say about abortion to their

7    clients?

8        A.    I'm sorry.  Could you repeat the

9    question?  I missed the first part.

10       Q.    Have you made an instruction to legal

11   services attorneys, organizations rather, that

12   receive funding through ORR about what they may or

13   may not say about abortion?

14       A.    No.

15       Q.    Do you know whether anyone on your staff

16   has?

17       A.    No.

18       Q.    Is it your position that a legal

19   services organization that receives funding

20   through ORR either directly or through the Vera

21   Institute is not prohibited from discussing

22   abortion with their clients?

23       A.    Is it my position that they're not

24   prohibited from?  Yes.  It's my position.  Because

25   that's my understanding of the contract that they

Page 251

1   sign, but I would defer to the contract officer as

2   to what the specific terms are.

3        Q.   You personally have not instructed your

4   staff to communicate to the Vera Institute that

5   their grantees or subcontractors, rather, should

6   not discuss abortion with their clients?

7        A.   No.  I did not make that.

8        Q.   Did you make that request with respect

9   to any Know Your Rights material used by those

10  organizations?

11       A.   No.

12            MS. AMIRI:  If we can step out for about

13  five minutes, I'm probably pretty close to being

14  done.

15            THE VIDEOGRAPHER:  We're off the record

16  at 12:12.

17            (Recess from 12:12 p.m. to 12:17 p.m.)

18            THE VIDEOGRAPHER:  We're back on the

19  record at 12:17.

20            MS. AMIRI:  I don't have anything

21  further at this time.  Mr. Tomlinson may have

22  questions for you which may then trigger questions

23  for me, but at this time, I have nothing further.

24            MR. TOMLINSON:  Do you mind if we just

25  take a minute?

Page 252

1        THE VIDEOGRAPHER:  Off the record at

2   2:17.

3        (Recess from 12:17 p.m. to 12:25 p.m.)

4        THE VIDEOGRAPHER:  We're back on the

5   record at 12:25.

6                    EXAMINATION

7   BY MR. TOMLINSON:

8        Q.   Mr. Lloyd, I have just a couple

9   questions for you.  I'm going to ask you to look

10  at what plaintiff's counsel marked as Exhibit 24.

11  And specifically I'm going to ask you to look at

12  the note to file that starts on the second page of

13  that exhibit, the one that's with the Bates number

14  15607.  Do you see that?

15       A.   Yes.

16       Q.   You said in your deposition that this

17  is -- that decisions like this about whether to

18  approve a minor's request for termination of

19  pregnancy are made on a case-by-case basis; right?

20       A.   Yes.

21       Q.   You said that that considers all the

22  facts available to you; right?

23       A.   Yes.

24       Q.   Is there anywhere in this memo where you

25  reference religion or your personal religious

Page 253

1    beliefs?

2         A.    No.

3         Q.    How important are your personal

4    religious beliefs in making the case-by-case best

5    interest determination?

6         A.    My religious beliefs form the -- they're

7    at the core of anything I would do in all

8    settings.  They motivate me to treat other people

9    the way that I do and to -- they are in a sense --

10   they're just part of who I am, core part of who I

11   am.  But they're not a part of an analysis as to

12   what happens in the termination request when I'm

13   acting as director of the Office of Refugee

14   Resettlement.

15              MR. TOMLINSON:  That's all the questions

16   I have.  Thank you.

17                         EXAMINATION

18   BY MR. SPENCER:

19        Q.    I just have a few clarifying questions.

20        Earlier in your deposition, you discussed an

21   agreement that was negotiated or signed with a

22   religiously-affiliated shelter since your last

23   deposition; is that right?

24        A.    Yes.

25        Q.    And you testified that you did not know

Page 254

1    which shelter that was.

2          A.    That's correct.

3          Q.    And you did not know whether that

4    shelter was a subgrantee of the USCCB?

5          A.    That's correct.

6          Q.    So your answer that it was likely part

7    of USCCB's list of subgrantees and possibly

8    Catholic Charities was speculation?

9          A.    Yes.

10              MR. SPENCER:    I don't have any other

11   questions.

12                        RE-EXAMINATION

13   BY MS. AMIRI:

14         Q.    I have just one follow-up drawn out by

15   Mr. Tomlinson's questions.

16         On Exhibit 24 that's in front of you, on

17   Price production 15609, footnote 6, there's a

18   reference to an organization called Hope After

19   Abortion.

20         A.    Yes.

21         Q.    What is Hope After Abortion?

22         A.    It's a ministry for women who have had

23   abortions and come to regret them and seek

24   healing.

25         Q.    Have you had any connections with them

Page 255

1   professionally prior to joining ORR?

2       A.   No.

3       Q.   Have you had any conversations with them

4   since your time at ORR?

5       A.   No.

6            MS. AMIRI:  I have nothing further.

7            THE VIDEOGRAPHER:  This concludes the

8   video recorded deposition of Scott Lloyd.  We're

9   off the record at 12:30.

10           (Whereupon, at 12:30 p.m., the taking of

11  the instant deposition ceased.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 256

1                C E R T I F I C A T E

2    DISTRICT OF COLUMBIA:

3

4        I, Ann Medis, Registered Professional Reporter

5    and Notary Public, hereby certify the witness, SCOTT

6    LLOYD, ESQUIRE, was by me first duly sworn to testify

7    to the truth, that the foregoing deposition was taken

8    at the time and place stated herein, and that the said

9    deposition was recorded stenographically by me and

10   then reduced to printing under my direction, and

11   constitutes a true record of the testimony given by

12   said witness.

13       I certify the inspection, reading and signing of

14   said deposition were NOT waived by counsel for the

15   respective parties and by the witness.

16       I certify I am not a relative or employee of any

17   of the parties, or a relative or employee of either

18   counsel, and I am in no way interested directly or

19   indirectly in this action.

20       IN WITNESS WHEREOF, I have hereunto set my hand

21   and affixed my seal of office this 26th day of

22   February, 2018.

23

24                    _____
                              Notary Public
25

Page 257

```
 1              TRANSPERFECT DEPOSITION SERVICES
                     216 East 45th Street
 2                        Suite 903
                   New York, New York  10017
 3                      212.400.8845

 4                      ERRATA SHEET

 5   CASE:      ACLU v HARGAN, ET AL.
     DATE:      FEBRUARY 13, 2018
 6   WITNESS:   SCOTT LLOYD, ESQUIRE

 7   Page  Line    Change and reason for change:

 8   ____  ____  _____

 9   ____  ____  _____

10   ____  ____  _____

11   ____  ____  _____

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21

22
     Subscribed and sworn to me this
23
     _____ day of _____, 2018.
24

25   _____
```