# EXHIBIT B

                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF CALIFORNIA
                         San Francisco Division

- - - - - - - - - - - - - - - -
                                  |
AMERICAN CIVIL LIBERTIES          |
UNION OF NORTHERN                 |
CALIFORNIA,                       |
                                  |
            Plaintiff,            |   Case Number:
                                  |
v.                                |   3:16-cv-3539-LB
                                  |
ERIC G. HARGAN, Acting            |
Secretary of Health and           |
Human Services, et al.,           |
                                  |
            Defendants,           |
                                  |
v.                                |
                                  |
U.S. CONFERENCE OF                |
CATHOLIC BISHOPS,                 |
                                  |
    Defendant-Intervenor.         |
                                  |
- - - - - - - - - - - - - - - -


     VIDEOTAPED DEPOSITION OF COMMANDER JONATHAN WHITE, AS

        A FACT WITNESS AND U.S. PUBLIC HEALTH SERVICE'S

          DESIGNATED 30(B)(6) REPRESENTATIVE, VOLUME II

                        Washington, D.C.

            Tuesday, February 13, 2018 - 1:41 p.m.



     Reported by:

     Ann Medis, RPR

     Job No. 20790

1

2                    Videotaped Deposition of

3                    COMMANDER JONATHAN WHITE

4

5    Held at the offices of:

6

7                    U.S. Department of Justice

8                    20 Massachusetts Avenue, N.W.

9                    Washington, D.C.  20001

10                   202.353.4556

11

12

13

14

15

16

17                        Taken pursuant to notice,

18                   before Ann Medis, Registered

19                   Professional Reporter, and notary

20                   public in and for the District of

21                   Columbia.

22

23

24

25

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFF

 3            ACLU Foundation
              BY:  BRIGITTE AMIRI, ESQUIRE
 4            AND  MEAGAN BURROWS, ESQUIRE
              125 Broad Street
 5            New York, New York  10004
              212.519.7897
 6            bamiri@aclu.org
              mburrows@aclu.org
 7

 8   ON BEHALF OF DEFENDANTS ERIC G. HARGAN and DEPARTMENT
     OF HEALTH AND HUMAN SERVICES
 9
              UNITED STATES DEPARTMENT OF JUSTICE
10            BY:  MARTIN M. TOMLINSON, ESQUIRE
              20 Massachusetts Avenue, N.W.
11            Room 6139
              Washington, D.C.  20001
12            202.353.4556
              martin.m.tomlinson@usdoj.gov
13

14   ON BEHALF OF DEFENDANT-INTERVENOR USCCB

15            GIBSON DUNN & CRUTCHER, LLP
              BY:  JACOB SPENCER, ESQUIRE
16            AND  ROBERT DUNN, ESQUIRE  (by phone)
              333 South Grand Avenue
17            Los Angeles, California  90071
              213.229.7000
18            jspencer@gibsondunn.com
              rdunn@gibsondunn.com
19

20   ALSO PRESENT

21            Kim Johnson, Videographer

22            Llewellyn Woolford, Esquire, HHS

23            Caitlin Palacios, Esquire, HHS

24            Rachel Chrisinger, Paralegal

25
```

Page 107

```
 1                P R O C E E D I N G S

 2                       - - - -

 3            THE VIDEOGRAPHER:  Here begins Media

 4   Number 1 in the videotaped deposition of Jonathan

 5   White taken in the matter of American Civil

 6   Liberties Union of Northern California versus

 7   Burwell, et al., Case No. 3:16-cv-3539-LV in the

 8   U.S. District Court of Northern California, San

 9   Francisco Division?

10        This deposition is being held at 20

11   Massachusetts Avenue, Northwest, Washington, D.C.

12   on February 13, 2018 at approximately 1:41 p.m.

13   My name is Kim Johnson.  I'm a legal video

14   specialist.  The court reporter today is Ann

15   Medis.  Both are in association with TransPerfect.

16        Will counsel please introduce yourselves and

17   state who you represent.

18            MS. AMIRI:  Brigitt Amiri for the

19   plaintiff.

20            MS. BURROWS:  Meagan Burrows for the

21   plaintiff.

22            MR. TOMLINSON:  Martin Tomlinson for the

23   federal defendants.

24            MR. WOOLFORD:  Llewellyn Woolford for

25   the defendant U.S. Department of Health and Human
```

1    Resources.

2              MS. PALACIOS:  Caitlin Palacios of the

3    U.S. Department of Health and Human Services.

4              MR. SPENCER:  Jacob Spencer for the

5    defendant-intervenor and the USCCB.  Also on the

6    phone is Robert Dunn.

7              THE VIDEOGRAPHER:  Will the court

8    reporter please swear in the witness.

9                   COMMANDER JONATHAN WHITE,

10        having been first duly sworn, was examined

11                 and testified as follows:

12                      EXAMINATION

13   BY MS. AMIRI:

14        Q.   Mr. White, thank you so much for joining

15   us again today.  A lot of questions I'm going to

16   ask you are going to be about things that have

17   happened since your deposition.  So I'll try to

18   keep saying that in my questions, but generally,

19   we're here to finish up the deposition from

20   documents that we received since then, and I'll

21   ask you questions about some things that have

22   happened since your deposition.

23        Has ORR finalized any policies with respect

24   to abortion access since your deposition in

25   December?

1      A.   No.  There have been no additional

2   policies since we last spoke in December at the

3   last deposition.

4      Q.   And by policies I also include final

5   guidance, final statements, broad statements to

6   shelters, things like that.  So I'll use the term

7   more broadly than like a formal policy, but

8   guidelines or anything that would fall into the

9   category of a final statement from ORR about

10  abortion access.

11     A.   I understand.  There's been no

12  additional guidance, policy or direction

13  promulgated to providers by ORR on this issue.

14     Q.   Have there been any contracts that have

15  been negotiated with religiously-affiliated

16  shelters that have objections to providing access

17  to abortion and contraception since your

18  deposition in December?

19     A.   Contracts, we operate those typically on

20  a grant basis.

21     Q.   I'll amend my question with grant

22  instead of contract.

23     A.   Could you repeat your question?

24     Q.   Since your deposition in December, have

25  there been any negotiations with any

Page 110

1    religiously-affiliated shelter about the terms of

2    their grant or a Memorandum of Understanding about

3    access to abortion and contraception for

4    unaccompanied minors?

5        A.    I believe we have formalized an addendum

6    to the cooperative agreement with USCCB and also

7    with Lutheran Immigration and Refugee -- Human

8    Refugee Services.

9        Q.    Does the addendum for the cooperative

10   agreement with USCCB speak to the issue of access

11   to abortion or contraception for unaccompanied

12   minors?

13       A.    It formalizes the prior operational

14   practice.

15       Q.    I know we talked about it the last time,

16   but just for purposes of our conversation right

17   now, what was the prior operational practice?

18       A.    That in the event that any long-term

19   foster care grantee in that network were to

20   receive a request from a minor in care for a

21   healthcare intervention that would be inconsistent

22   with Catholic doctrine, that the grantee's

23   requirement would be to notify the ORR federal

24   field specialists of that request.

25       Q.    And does the contract or, sorry, the

Page 111

1    Memorandum of Understanding also say what happens

2    after the notification from USCCB's subgrantees to

3    the federal field specialist?

4         A.   I don't believe it specifies that.

5         Q.   In practice we talked at your deposition

6    last time about what has happened in the past.  Is

7    it your understanding that that would be the same

8    practice, and roughly I'll just kind of

9    paraphrase, that the federal field specialist

10   would then contact ORR and arrangements for a

11   transfer of the minor would take place to a

12   shelter that didn't have objections to providing

13   the specific healthcare?

14        A.   That has been the practice in the past.

15   We've not had such a request from a minor in a

16   sheltered -- in a residential care facility that

17   has a document-based objection.  I have not

18   received direction on what our federal actions

19   would be in that circumstance now, but that is an

20   accurate statement about the previous operational

21   activities.

22        Q.   Were you personally involved in the

23   contract negotiations -- grantee negotiations --

24   I'll back up and strike that altogether.

25        Were you personally involved in the

1    Memorandum of Understanding negotiation with USCCB

2    about the religious exception that they have in

3    the addendum that you just referenced?

4         A.   No, I was not.

5         Q.   Do you know what the conversations did

6    consist of in terms of any of those negotiations

7    with USCCB?

8         A.   I'm not privy to the content of those

9    conversations.

10        Q.   Who at ORR would be?

11        A.   I believe that would most likely be our

12   division of policy and procedure.

13        Q.   And who is the director of the division

14   of policy and procedure now?

15        A.   The division director is Anna Marie

16   Bennett.

17        Q.   But as it stands now since your

18   deposition in December, there is an addendum to

19   USCCB's cooperative agreement signed by both USCCB

20   and ORR that memorializes a religious exception to

21   providing certain forms of healthcare?

22        A.   I have not seen a version that's signed

23   by both parties.  I have seen a version signed by

24   ORR that does formalize our prior practice.

25        Q.   You also mentioned Lutheran Immigration

1    Refugee Services as well.  Did the agreement

2    signed with LIRS speak to the issue of access to

3    abortion and contraception?

4         A.   It did not.  To my knowledge, it did

5    not.

6         Q.   To your knowledge, does LIRS have a

7    religious objection to providing access to

8    abortion and contraception for unaccompanied

9    minors in their care?

10        A.   I don't know.

11        Q.   So other than the USCCB and LIRS

12   agreement, are you aware of any other discussions

13   with any other grantee about the terms of their

14   Memorandum of Understanding with respect to

15   abortion or contraception?

16        A.   I don't believe there are any.

17        Q.   You mentioned there had not been any

18   requests for abortion from religiously-affiliated

19   shelters that have a religious objection to

20   providing access to abortion.  And I just want to

21   clarify the timeframe.  I know we talked about it

22   at your last deposition.

23        So let's say since your last deposition, is

24   that the case, that there's been no request for

25   abortion from a religiously-affiliated shelter

Page 114

1    that has had objection to providing access to

2    abortion?

3         A.   I have not been notified of any request

4    for access to abortion services by a minor

5    sheltered in a program which has such an

6    objection.

7         Q.   And my same question would be true with

8    respect to contraception, are you aware of any

9    sort of instance where a religiously-affiliated

10   shelter has had a minor in their care who's

11   requested access to contraception and not been

12   provided with access to contraception because of

13   the religious affiliation of the shelter?

14        A.   I'm not aware of any such request.  As a

15   reminder, that is not a covered service in any of

16   our providers.

17        Q.   I think just to clarify that, last time

18   I believe you said with respect to medical

19   indications, contraception can be prescribed.

20        A.   Correct.

21        Q.   And I'm also guessing based on the

22   Prison Rape Elimination Act, that emergency

23   contraception for unaccompanied minors who suffer

24   sexual assault in the facility is a covered

25   service?

Page 115

1          A.    Under our interim final rule, any minor
2     who is sexually assaulted while in ORR care has
3     access to emergency contraception.
4          Q.    And I think last time we met, there had
5     not been an instance of a sexual assault at a
6     facility that necessitated the need for access to
7     emergency contraception or abortion.
8          So my question is:  Since your deposition,
9     has there been any such request?
10         A.    There has not.  I have not received any
11    report of any minor becoming pregnant as a result
12    of sexual assault while in ORR custody.
13         Q.    Have you received a report of a minor
14    who hasn't yet become pregnant as a result of
15    sexual assault, but has requested emergency
16    contraception to prevent pregnancy?
17         A.    No.  I've not received any such request.
18         Q.    Since your deposition, have you become
19    aware of any abortion requests from shelters?
20              MR. TOMLINSON:  Before we move on, can I
21    just state for the record what we discussed before
22    we went on the record, which is that Mr. White was
23    prepared as a 30(b)(6) witness with regard to
24    events and documents that were generated prior to
25    December 22, 2017, and he can speak as a 30(b)(6)

Page 116

1   witness on behalf of the federal defendants in his

2   capacity as a 30(b)(6) witness with regard to

3   those events.  Anything outside of that timeframe

4   he is testifying as a fact witness in his personal

5   capacity.

6           MS. AMIRI:  Thank you.  Yes.

7   BY MS. AMIRI:

8       Q.   So with that caveat -- and that can

9   stand for any of the questions.  I might ask you

10  specifically something as falling within the scope

11  of the 30(b)(6) that I would have anticipated that

12  you would have been prepared for.  That's a

13  different thing.  But I'm happy for that objection

14  to stand.  If we need further clarification for

15  any of those specific questions, we can certainly

16  do that.

17      Since your deposition, have you been made

18  aware of abortion requests from shelters?

19      A.   Yes.

20      Q.   How many?

21      A.   I believe five subsequent to the

22  deposition.

23      Q.   There should be a pile of exhibits in

24  front of you.  Let's start with the first one.

25  Hopefully 22 is the first.

1      A.    22?

2      Q.    Yep.  I'm sorry.  I mean 23.  I did not

3  mean 22.

4      A.    I don't know if I should see 22.  I

5  think it's speaking to Mr. Lloyd's deposition.

6      We're looking at 23?

7      Q.    23.

8      A.    Can you give me just a moment to review

9  this?

10     Q.    Yes, absolutely.  Take you time.  Let me

11  know when you're ready.

12     A.    Yes.  I'm familiar with this email

13  exchange.

14     Q.    When you spoke about the five minors

15  since your deposition that have come to your

16  attention that have sought abortion, is this one

17  of them?

18     A.    No.  This is a minor whose request was

19  outstanding when we spoke last and had continued

20  through the period of the last deposition.

21     Q.    Is it your understanding -- well, let me

22  back up and just ask the question.  Do you believe

23  that there is anyone on staff at ORR that has the

24  clinical training or competency to do options

25  counseling with respect to pregnancy and abortion?

Page 118

1      A.    Could you sort of clarify which

2  component of options counseling?

3      Q.    Sure.   Actually, I'm going to try to

4  find it.   In one of the emails, there's a

5  reference to a conversation that you had with

6  ███████████████    about whether there was anyone

7  from ORR that had the clinical training to do

8  options counseling and specifically in the context

9  of this particular minor.   So we can find it and

10 pull it up, but I wanted to ask you some questions

11 about it.   And I just wasn't able to put my

12 fingers on it yet.

13      Exhibit 26, do you recognize the email in

14 Exhibit 26?

15      A.    Yes, I do.

16      Q.    It's an email from you to Scott Lloyd?

17      A.    Correct.

18      Q.    Who is ████████████?

19      A.    ████████████ is a special assistant.

20 ██████████████████    ███████████████████

21 ██████████████.   She's a nonsupervisory

22 individual, career, who is a special assistant.

23 She's not a decision-maker.

24      Q.    In number two in your email, that is

25 what I was referencing, that ████████ has indicated

1    that the DHUC staff are not able to participate.

2    I wanted to ask you in the context of this email,

3    it seems like there was maybe a conversation that

4    you had with ██████ or knowledge that you had

5    about the clinical training, expertise and

6    practice scope of the HUC staff members.

7         A.   Correct.

8         Q.   So kind of going back to my question,

9    was there a determination made that there was

10   nobody on ORR staff that had the clinical training

11   or expertise or practice scope to provide option

12   counseling to this minor who was considering

13   termination?

14        A.   It was -- it was my view and that of the

15   medical team that there was no one on our medical

16   team who was trained to provide medical options

17   counseling.

18        Q.   Was that view disputed by Scott Lloyd or

19   anyone higher up?

20        A.   No, not to my knowledge.  We did not

21   have a discussion.

22        Q.   Was it your understanding that ██████

23   ██████ was being asked to provide options

24   counseling to the minor in this email?

25        A.   ██████████████ was not directed to

Page 120

1   provide options counseling.  She was directed to

2   observe the interactions to it and to determine --

3   to ensure that the minor was able to verbalize her

4   options.

5        Q.   Do you know who did the options

6   counseling for this particular minor?

7        A.   It was provided by the medical director

8   of the sheltering program is my understanding.

9        Q.   Do you understand know whether -- do you

10  know whether Scott Lloyd instructed this

11  particular minor to attend a counseling session at

12  a crisis pregnancy center?

13       A.   I believe this minor did attend a crisis

14  pregnancy center counseling session.

15       Q.   Do you know whether this particular

16  minor was required to tell her parents about her

17  abortion decision?

18       A.   There was a parental notification

19  conducted to my recollection.

20       Q.   Was that at the requirement of ORR?

21       A.   Yes.

22       Q.   Did you know that Scott Lloyd had

23  directed that this particular minor be read a

24  description of a dilation and extraction

25  procedure?

Page 121

1       A.    I'm aware that that was his direction.

2       Q.    Do you know whether anyone at ORR

3    carried out that direction?

4       A.    I believe that that description was read

5    to the minor but not by federal personnel.

6       Q.    By someone at the shelter?

7       A.    That is my understanding, yes.

8       Q.    Is this the first time that Scott Lloyd

9    had ever required a minor considering abortion to

10   be read a description of abortion from a Supreme

11   Court case?

12      A.    I have not received any direction prior

13   to this for that to happen in any other case.

14      Q.    Have you received any instruction after

15   this case for that to happen?

16      A.    No.

17      Q.    This is you, Jonathan White personally.

18   Do you think it's appropriate for a minor

19   considering abortion to be required to listen to a

20   description of an abortion procedure that is

21   discussed in a Supreme Court case?

22           MR. TOMLINSON:  Objection.  Foundation.

23           THE WITNESS:  Could you just articulate

24   sort of what you mean?  Appropriate in what sense?

25

1  BY MS. AMIRI:

2      Q.   Appropriate in terms of whether this is

3  appropriate for counseling, options counseling or

4  medical informed consent.

5      A.   It is my understanding that it would not

6  meet JCAHO standards for medical informed consent.

7      Q.   What is your understanding of what

8  JCAHO -- well, let's back up and say what the

9  acronym for JCAHO is.

10     A.   It's the Joint Commission for the

11  Accreditation for Health Organizations.

12     Q.   And what is your understanding of what

13  JCAHO's standards are for informed consent.

14     A.   At a medical intervention that informed

15  consent would be based on information provided by

16  the provider who will perform the procedure.

17     Q.   Are you aware of ORR providing this type

18  of medical informed consent to a minor in any

19  context other than abortion?

20     A.   I'm not sure I understand the question.

21     Q.   So a minor undergoing any other medical

22  procedure, not abortion, are you aware of whether

23  ORR has required this type of medical informed

24  consent be given by the shelter staff or ORR

25  staff?

Page 123

1       A.    I'm not aware of another instance for a

2   different intervention that would require that.

3       Q.    Do you know whether Scott Lloyd issued

4   any instructions with respect to this particular

5   minor that were not communicated over email?

6   Sorry.  I'll ask it a different way.

7       Did Scott Lloyd have any verbal conversations

8   with you about instructions for this particular

9   minor as prerequisites for her abortion request to

10  be considered by him?

11      A.    We had a number of conversations about

12  this minor's case in which direction was provided.

13      Q.    What direction was provided to you about

14  this minor's case from Scott Lloyd?

15      A.    I don't recall any direction which is

16  not contained or summarized in the email.  Most of

17  the direction had to do with what would need to be

18  communicated with the minor and by whom.

19      Q.    We talked about one component of what

20  needed to be communicated with the minor, which

21  was the description in the Gonzales case; correct?

22      A.    That's correct.

23      Q.    Another was an offer for her to view a

24  picture of a 23-week abortion.  Does that sound

25  familiar?

Page 124

1          A.   It does.  That's also correct.

2          Q.   And is there anything else in the bucket

3    of information that needed to be communicated with

4    the minor that we haven't talked about?

5          A.   The minor also had the option to carry

6    the child -- to carry the pregnancy to term and

7    parent, to carry the pregnancy to term and place

8    the resulting baby up for adoption in addition to

9    the option for termination.

10         Q.   You're aware that Scott Lloyd also

11   proposed a certain list of questions to a medical

12   provider about which type of abortion would be

13   performed.  Do you remember that?

14         A.   Yes, but is there a document you can

15   direct me to so it will help me?

16         Q.   Yes.  I'm not sure that we have

17   introduced it yet.  Give me just a second.  I

18   think we might not have made it an exhibit yet.

19              MS. AMIRI:  Marty, do you have a

20   preference?  Do you want to start with White 1?

21              MR. TOMLINSON:  How did we do it last

22   time?

23              MS. AMIRI:  I didn't have any new

24   exhibits for Mr. White last time.  We only used

25   ones that we had done for Lloyd last time.

Page 125

```
 1              MR. TOMLINSON:  I leave it up to you.
 2    We can do White 1, but if you just want to do 30
 3    or whatever.
 4              MS. AMIRI:  33?
 5              MR. TOMLINSON:  I think that would be
 6    fine.
 7              (White Exhibit 30 was marked.)
 8    BY MS. AMIRI:
 9         Q.  I'll hand you what has been marked as
10    Exhibit 30.
11         A.  Thank you.  Yes.  I do recall being
12    directed to have these questions posed.
13         Q.  Do you know why Scott posed these
14    questions to the provider?
15         A.  I do not know why.
16         Q.  Do you know whether those questions were
17    answered by a medical provider?
18         A.  I don't believe they were ever answered
19    or if they were, that answer was not provided to
20    me.
21         Q.  Did you have any conversations with
22    Scott Lloyd about whether he intended to influence
23    which type of abortion procedure this minor would
24    undergo to maximize the chance of a live birth?
25         A.  We did not have any such conversation.
```

Page 126

```
 1        Q.   Do you know whether Scott Lloyd had

 2   those conversations with anybody?

 3        A.   I'm not aware of any such conversations.

 4             (White Exhibit 31 was marked.)

 5   BY MS. AMIRI:

 6        Q.   I'll hand you what's been marked as

 7   Exhibit 31.

 8        A.   Thank you, ma'am.

 9             (Witness reviewed the exhibit.)

10             THE WITNESS:  Yes.  I've reviewed it.

11   BY MS. AMIRI:

12        Q.   I had a question, if you happen to know.

13   In the email that is from ███████████████  to

14   you, in the sentence that begins, "The medical

15   exam at ██ conducted on," and then it's been

16   redacted, I wanted to ask you if you knew what ██

17   stood for.

18        A.   I believe in this context, it likely

19   refers to the name of the sheltering program where

20   the minor was prior to her transfer.

21        Q.   So this particular minor had been at one

22   shelter, was transferred to another shelter?

23        A.   Correct.

24        Q.   The shelter that she originated at, was

25   it a religiously-affiliated shelter?
```

Page 127

1      A.    I don't believe it has any religious

2   affiliation.   Yeah, I don't believe it has any

3   religious affiliation.

4      Q.    So are ██ initials?  Does it stand for

5   something?

6      A.    It does.

7      Q.    What does it stand for?

8      A.    It stands for ██████████████ .

9      Q.    So with this particular minor -- I'll

10  hand you a document before I ask you a question.

11  Oh, it may already be an exhibit.

12      Put Exhibit 25 in front of you and see if

13  we're on the same page.  Is it Bates 15441 that

14  you have in front of you at the bottom?

15      A.    Yeah.  The production stamp is 15450 and

16  15451.

17      Q.    No.  We'll make a new one.

18          (White Exhibit 32 was marked.)

19  BY MS. AMIRI:

20      Q.    I hand you what's been marked as Exhibit

21  32.

22          (Witness reviewed the exhibit.)

23          THE WITNESS:  Yes.

24  BY MS. AMIRI:

25      Q.    You recognize this document?

Page 128

1        A.    I do.  I produced this document.

2        Q.    Have you provided Mr. Lloyd with any

3    decisional documents like this for any other

4    minor?

5        A.    This is the only case for which I've

6    produced a full memorandum of this kind.

7        Q.    And why did you do it in this case but

8    not any other?

9        A.    I did it in this case because the minor

10   in this case was covered by an exception to the

11   Hyde Amendment.

12       Q.    So this decisional memo is both about

13   approval for the abortion procedure and for the

14   use of federal funds; is that correct?

15       A.    That is correct.

16       Q.    So in the other circumstances where

17   there has been an abortion request, the request

18   has not necessarily involved the request to use

19   federal funds; is that correct?

20       A.    That is correct.

21       Q.    And you recommended --

22            MS. AMIRI:  I'm guessing it's redacted

23   because you're claiming deliberation privilege?

24            MR. TOMLINSON:  Over the recommendation.

25   Well, over the reason behind the recommendation.

Page 129

1          MS. AMIRI:  But the fact that Mr. White

2   recommended the abortion is not --

3          MR. TOMLINSON:  Correct.

4   BY MS. AMIRI:

5      Q.   I can clarify that you recommended to

6   Mr. Lloyd that he approve the abortion and approve

7   the use of federal funds for the abortion?

8      A.   I recommended that he approve the

9   authorization for the minor to receive the

10  abortion procedure, and I recommended that he

11  authorize the use of federal funds for the

12  procedure and the facilitation of the procedure.

13     Q.   But he did not accept your

14  recommendation?

15     A.   The final decision was not to approve

16  the procedure or the use of federal funds.

17     Q.   Let's look at Exhibit 24 in front of

18  you.  I should have the right one.

19     A.   Yes.

20     Q.   So the page starting Price production

21  15607, that's Mr. Lloyd's final decision; is that

22  correct?

23     A.   Correct.  This is his note to the file

24  explaining the reasoning behind his decision.

25  What is before that is a cover email from me

1    sharing it with members of our team.

2        Q.    Were members of your team concerned

3    about Mr. Lloyd's ultimate determination not to

4    authorize access to abortion for this particular

5    minor?

6        A.    Yes.

7        Q.    Since your deposition, have you had any

8    conversations about abortion access with anyone

9    above Mr. Lloyd, for example, Steven Wagner or the

10   new HHS secretary?

11       A.    I have been in meetings where updates on

12   cases were made.  I do not recall being in any

13   decision-making discussions.

14       Q.    If you could look at Exhibit 28 in front

15   of you, please.

16            (Witness reviewed the exhibit.)

17            THE WITNESS:  Yes.  I'm familiar with

18   this communication.

19   BY MS. AMIRI:

20       Q.    Do you know -- some of it is redacted to

21   protect their personal identities, but my question

22   is not about the names of people who are with the

23   minor at the time that ███████ visited.  But were

24   any of the people who were with ██████ when she

25   visited the minor staff of the federal government?

1          A.   It is possible that a federal field

2     specialist would have been there also.  I'm not

3     certain.

4          Q.   Do you know whether any clinician from a

5     crisis pregnancy center was at that meeting?

6          A.   I'm trying to reacquaint myself.

7          Q.   Sure.  Take your time.

8          A.   I do not believe at this meeting there

9     ended up being any CBC personnel.  I believe that

10    it involved staff from the sheltering program and

11    ███████████████ .

12          MS. AMIRI:  Marty, I'd like to ask about

13    the conclusion on the last page and wanted to see

14    if there were any parameters I could ask about

15    what's been redacted.  We can put a pin in it, and

16    then maybe during a break, we can see if there's

17    anything that -- I'd like to know whether there

18    was some --

19    BY MS. AMIRI:

20          Q.   My question would be like whether there

21    was an ultimate recommendation made from this

22    visit that ███████████ .  But you can discuss at

23    the break with Mr. Tomlinson whether the answer to

24    that would reveal some sort of deliberative

25    process.  So we can come back to it.

Page 132

1        A.    I understand.

2        Q.    Before we move on, I just wanted to go

3    back to my earlier line of questions when we

4    started this.  Since your deposition, have there

5    been any initial placement decisions made based on

6    the fact that a minor is seeking an abortion?

7        A.    None of which I'm aware, no.

8        Q.    Turn to Exhibit 29.

9        A.    Yes.  I recall this email exchange.

10       Q.    So this is about a different minor;

11   correct?

12       A.    This is not the same minor we were just

13   discussing.

14       Q.    On page 15592, it looks like an email

15   from you to the federal field specialist -- I

16   think she's a federal field specialist -- ████

17   ████, relaying Scott's instructions that the

18   ████ receive notification of the pregnancy and

19   the termination request.

20       A.    That's correct.

21       Q.    Were there any other instructions that

22   Mr. Lloyd told you to relay to the shelter or the

23   federal field specialist with respect to this

24   particular minor?

25       A.    Yes.  Those instructions were that the

Page 133

1    program should request consent to notify parents

2    of the pregnancy and termination request.  That

3    was the previous instruction.  The determination

4    was made since it was the ████ who had been her

5    care provider in the home country and she had not

6    been in contact with her parents that the ████

7    should be viewed acting in place of the parents.

8        Q.   And is it your understanding if the

9    minor does not consent to telling the ████ about

10   her pregnancy and termination, that the shelter or

11   the federal field specialist would be required to

12   do so anyway?

13       A.   The direction that I received and

14   conveyed was if she does not consent, the program

15   should proceed without consent.  That notification

16   would be done by the program staff, not the

17   federal staff specialist.

18       Q.   So I understand the difference, who

19   comprises the program staff?  Are you talking

20   about the shelter?

21       A.   The program staff would be individuals

22   who work at that grantee residential care shelter

23   provider.  That's distinct from ORR federal

24   personnel.

25       Q.   Thank you.  So there's the instruction

Page 134

1    to tell the ███████ in the home country.  Were

2    there any other instructions that Mr. Lloyd

3    conveyed to you about this particular minor?

4        A.    One moment.

5        Q.    Sure.  Feel free to take your time and

6    see if there's anything in the email that jogs

7    your memory.

8        A.    It is my recollection that in this

9    minor's case, the set of instructions involved

10   options counseling from a crisis pregnancy center,

11   notification of parents, later ███████ in home

12   country, continued ob-gyn prenatal care, the

13   option for spiritual counseling if the minor so

14   wished and/or supportive psychosocial counseling

15   services for the minor while in our care.  That is

16   my recollection of the full set of instructions.

17       Q.    If you could look on page No. 15595.  In

18   the email from ███████████ to you, in I guess the

19   fourth paragraph, there's the discussion of the

20   minor undergoing an ultrasound.

21       A.    Um-hum.

22       Q.    Do you know whether that ultrasound took

23   place at a crisis pregnancy center or at a

24   different type of doctor's office?

25       A.    I don't recall whether that was provided

Page 135

1   in a community ob-gyn clinic or in a CPC.

2       Q.    It also says that minor has requested

3   that during this ultrasound, the screen is turned

4   to the side where she is not able to see the

5   screen.

6       Did you have any conversations with Mr. Lloyd

7   about whether this minor would be required to view

8   the ultrasound?

9       A.    We had no conversation on that topic.

10      Q.    Have you had any conversations with

11  Mr. Lloyd, either in writing or verbally, about

12  whether a minor would be required to view an

13  ultrasound in the context of seeking an abortion?

14      A.    I don't recall any such conversation at

15  any time.

16      Q.    You enumerated a certain list of

17  instructions that you believe you had received

18  from Scott Lloyd with respect to this particular

19  minor.  Do you know whether they were carried out?

20  For example, do you know whether she was taken to

21  the crisis pregnancy center?

22      A.    I believe that she did visit a crisis

23  pregnancy center.  That's my recollection.  I do

24  not recall whether she opted to receive spiritual

25  counseling services.  I do know that the parental

Page 136

1   or in this case the ███████ notification of her

2   pregnancy and wish for termination was conducted.

3   That was performed.  And I do know that she

4   received routine prenatal care.

5       Q.   Do you believe that she continued to

6   receive prenatal care even though this email that

7   we were just talking about says she does not want

8   to start any prenatal appointments?

9       A.   I do not know if she had any subsequent

10  appointments following the date of this email.

11      Q.   So those were the two minors that I

12  think we talked about that had abortion requests

13  pending during our last meeting.

14      A.   Yes, that's correct.

15      Q.   Then there have been five since

16  approximately?

17      A.   I believe so.

18      Q.   So one of them, and this will be subject

19  to the protective order, was in a shelter in

20  ███████████████████.  Does that sound familiar?

21      A.   Yes, that is correct.

22      Q.   Do you know what Mr. Lloyd's

23  instructions were for her abortion request?

24          MR. TOMLINSON:  Can I just state for the

25  record we're moving into non-30(b)(6) personal

1  territory.

2          THE WITNESS:  In the case of the minor

3  with the request from the ███████ shelter in

4  ███████, the instructions included parental

5  notification.  However, that was ultimately not

6  performed.

7  BY MS. AMIRI:

8      Q.   The instructions were for parental

9  notification, but it was not performed for this

10  particular minor?

11     A.   That's correct.

12     Q.   Do you know why?

13     A.   Due to concerns from federal and program

14  staff regarding ███████ law regarding

15  notifications of the parents without the minor's

16  consent.

17     Q.   Do you know whether this particular

18  minor was instructed by Mr. Lloyd to be taken to a

19  crisis pregnancy center?

20     A.   I do not believe this minor was taken to

21  a crisis pregnancy center.  I do not recall such

22  an instruction.

23     Q.   Do you recall an instruction regarding

24  an adoptive family offer be read to the minor?

25     A.   Yes.

1      Q.   And what is your recollection of that

2  adoptive family letter?

3      A.   There was an unsolicited communication

4  that we received in ORR from a community dwelling

5  family offering to adopt should the minor carry

6  her pregnancy to term.  We were directed to convey

7  this communication from that individual to the

8  minor through reading his message.  We redacted

9  the email and phone number since he had not been

10 vetted.

11     Q.   You mentioned community dwelling.  What

12 does that mean?

13     A.   Sorry.  That's a term of art meaning

14 basically living out in the world and not

15 connected with the program.

16     Q.   Got it.  Do you know if ORR vetted this

17 adoptive -- prospective adoptive family before

18 they communicated this offer to the minor?

19     A.   He was not vetted.  For this reason, we

20 did not permit direct contact between that

21 individual and the minor.

22     Q.   Is this the only minor that was

23 instructed to receive by Scott Lloyd this letter

24 of prospective adoptive parents?

25     A.   I've not received any other instruction

Page 139

1    to have any other such offer communicated to a

2    minor by Scott.

3         Q.   Did this minor independently indicate

4    that she was interested in carrying her pregnancy

5    to term and placing her child for adoption?

6         A.   She never expressed an interest in

7    adoption.  She indicated after this communication

8    that she was maintaining her request to terminate

9    the pregnancy.

10        Q.   From a social work perspective, do you

11   think it's appropriate for a minor who is

12   requesting an abortion to be read a letter from a

13   prospective family seeking to adopt her baby

14   should she carry to term?

15             MR. TOMLINSON:  Objection.  Foundation.

16        You can answer.

17             THE WITNESS:  I would not recommend such

18   an intervention.

19   BY MS. AMIRI:

20        Q.   What has happened -- sorry.  Let me just

21   go back.  Do you know whether Mr. Lloyd or anyone

22   else at ORR knew the couple who was making the

23   adoption offer prior to the solicitation coming

24   in?

25        A.   To my knowledge, no one had any prior

1   contact or was familiar with that individual.

2       Q.   Do you know whether this particular

3   minor was also given a brochure put out by the

4   State of Texas about abortion?

5       A.   I do not believe that the Texas options

6   counseling curriculum materials were provided to

7   this minor.

8       Q.   Those materials have been provided to

9   other minors in other circumstances?

10      A.   Yes.

11      Q.   You mentioned that there were other

12  abortion requests.  There's one currently pending

13  in ████  now.  What has Mr. Lloyd's instructions

14  been with respect to that particular minor?

15      A.   We've not received an abortion request

16  from a minor in ████ .

17      Q.   Were you aware before I had just asked

18  the question there was a minor in ████ seeking

19  abortion?

20      A.   Yes.  I'm aware of a minor who

21  previously had a request that was not conveyed to

22  ORR.  I'm aware that a minor made a request and

23  engaged counsel.  She has since advised that she

24  does not wish to have the abortion.  There was

25  never a request made to us.

Page 141

1        Q.   Do you know whether there were any
2   instructions to take this minor to a crisis
3   pregnancy center or offer spiritual counseling or
4   any of the other list of things that have happened
5   to prior minors?
6        A.   None of those interventions have been
7   directed to be performed as the minor has not made
8   a request to us and has stated that she does not
9   wish an abortion.
10       Q.   What are the other abortion requests
11  that have happened since your deposition that we
12  have not talked about and what have the
13  instructions been from Mr. Lloyd and the outcomes?
14       A.   I'm relying on my memory.  I believe
15  there have been other cases.  These have involved
16  minors who at one point expressed interest in or
17  request for TOP and subsequently withdrew that
18  request.
19       Q.   So the ones we have not talked about had
20  requested access to abortion and then decided
21  against an abortion?
22       A.   I believe that's correct.  I would need
23  to check.  There may be one other minor who also
24  aged out or was age rated.  The status of her
25  request I'm not sure about.

Page 142

1        Q.   Do you know whether these minors have

2    been instructed to go through the list of things

3    that you have mentioned before in terms of a

4    crisis pregnancy center visit, parental

5    notification, things that have happened in the

6    prior abortion requests?

7        A.   In some cases.  In others, the minor

8    rescinded the request prior to those instructions.

9        Q.   So for some yes and for others no?

10       A.   Correct.

11            MS. AMIRI:  This might be a good place

12    to take a break.

13            THE VIDEOGRAPHER:  We are off the record

14    at 2:37.

15            (Recess from 2:37 p.m. to 2:58 p.m.)

16            THE VIDEOGRAPHER:  We are back on the

17    record at 2:58.

18    BY MS. AMIRI:

19       Q.   Just a few more questions, Mr. White.

20    There's something we haven't talked about yet, and

21    it's whether you have any knowledge about whether

22    ORR has restricted the discussion of abortion with

23    legal services organizations that are funded by

24    ORR, and I just wanted to see if you had any

25    knowledge of that issue.

Page 143

1      A.   There has been no policy direction to

2    our legal services providers not to -- there's

3    been no direction not to discuss abortion with

4    legal services organizations.

5      Q.   We're going to ask you about the email

6    sorry, the email findings from ████████, which is

7    Exhibit 28.

8      A.   Okay.

9      Q.   So I guess one of the questions I asked

10   before and perhaps you have some clarity now is

11   whether there were any other federal government

12   staff employees present during the meeting with

13   this particular minor other than ████████████.

14     A.   I've gone back and reviewed, and

15   ████████████████ was the only federal official

16   present.

17     Q.   And I understand per your counsel I'm

18   allowed to ask whether ███████████████ made any

19   particular recommendations in this summary, in

20   this exhibit that perhaps had been unredacted.

21     A.   She made no recommendations regarding

22   providing or not providing TOP.

23     Q.   Did she provide any findings relating

24   to --

25     A.   She did.  She did.  She had two

1    findings.  The first is that the minor was able to

2    verbalize that she understood she had the options

3    of termination, carrying the pregnancy to term and

4    parenting and carrying the pregnancy to term and

5    placing the baby for adoption.  That was her first

6    finding.

7        The second finding was that the minor was not

8    able to verbalize what would happen in the

9    surgical termination procedure.  Those were her

10   two factual findings.

11       Q.   I don't think I have anything further,

12   but there is a document that I would want to ask

13   you about, but it has been redacted.  Maybe we can

14   go ahead and mark it.  I'm going to look for the

15   unredacted version.  We'll mark it as 33.

16           (Exhibit 33 was marked.)

17   BY MS. AMIRI:

18       Q.   I hand you what has been marked as

19   Exhibit 33, but I understand that your counsel

20   will pull an unredacted version.  But I wanted to

21   to be able to see if there was anything I could

22   ask you about an email that you wrote starting on

23   page 1555 and continuing onto 1556 that is

24   completely blacked out.

25           MR. TOMLINSON:  At this point, I'm going

Page 145

1    to instruct him.

2            MS. AMIRI:  You're going to take a break

3    and see if there's anything that I can ask that

4    isn't going to raise a question of whether

5    something is protected by privilege.  Then that's

6    my last line of questioning subject to anything

7    that you all are going to ask.

8            MR. TOMLINSON:  So we'll go off the

9    record.

10           THE VIDEOGRAPHER:  Off the record at

11   3:02.

12           (Recess from 3:02 p.m. to 3:43 p.m.)

13           THE VIDEOGRAPHER:  We're back on the

14   record at 3:43.

15   BY MS. AMIRI:

16      Q.   You have in front of you Exhibit 33.

17   And I wanted to ask you about your email, which

18   starts on 1555 and goes onto the next page.  So I

19   believe there's some questions I can ask, and

20   Mr. Tomlinson will jump in if I have overstepped,

21   but I wanted to start first by just getting a

22   general sense of what this email is.

23      A.   This email is guidance from me to my

24   team on steps they need to take to take next steps

25   designed to inform Scott Lloyd's decision-making

Page 146

```
 1    on my recommendation to him to approve
 2    authorization and federal funding for the abortion
 3    of the minor in ████████ whom we have discussed.
 4         Q.   And were there any specific instructions
 5    laid out in this memo either from you or from
 6    Mr. Lloyd?
 7         A.   I conveyed Mr. Lloyd's direction to the
 8    team that ██████████████████████ and one member
 9    of the health division UAC program should travel
10    to ████████ to meet with the minor.
11         Q.   And those instructions are in other
12    emails in the chain that we have already discussed
13    at deposition already; is that fair?
14         A.   Yes, ma'am, that's correct.
15         Q.   Is there anything with respect to those
16    instructions that we have not already discussed or
17    that isn't in an exhibit that we have reviewed in
18    your deposition?  Is there something else
19    basically, some other instruction that we haven't
20    already talked about?
21         A.   No.  The instructions are those we've
22    discussed and that were executed by ██████████
23    ████████.
24         Q.   I don't think I have anything further.
25    I think those are my limits on that document.  So
```

1    I don't have any further questions at this time.

2            MR. TOMLINSON:  The federal defendants

3    do not have any follow-up questions.

4            MR. SPENCER:  Neither does the

5    defendant-intervenor.

6            THE VIDEOGRAPHER:  This concludes the

7    video deposition of Jonathan White.  We're off the

8    record at 3:46.

9            (Whereupon, at 3:46 p.m., the taking of

10    the instant deposition ceased.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 148

1                  C E R T I F I C A T E

2    DISTRICT OF COLUMBIA:

3

4        I, Ann Medis, Registered Professional Reporter

5    and Notary Public, hereby certify the witness,

6    COMMANDER JONATHAN WHITE, was by me first duly sworn

7    to testify to the truth, that the foregoing deposition

8    was taken at the time and place stated herein, and

9    that the said deposition was recorded stenographically

10   by me and then reduced to printing under my direction,

11   and constitutes a true record of the testimony given

12   by said witness.

13       I certify the inspection, reading and signing of

14   said deposition were NOT waived by counsel for the

15   respective parties and by the witness.

16       I certify I am not a relative or employee of any

17   of the parties, or a relative or employee of either

18   counsel, and I am in no way interested directly or

19   indirectly in this action.

20       IN WITNESS WHEREOF, I have hereunto set my hand

21   and affixed my seal of office this 26th day of

22   February, 2018.

23

24                 _____
                             Notary Public
25

Page 149

1              TRANSPERFECT DEPOSITION SERVICES
                    216 East 45th Street
2                         Suite 903
                  New York, New York  10017
3                       212.400.8845

4                       ERRATA SHEET

5    CASE:      ACLU v HARGAN, ET AL.
     DATE:      FEBRUARY 13, 2018
6    WITNESS:   COMMANDER JONATHAN WHITE

7    Page   Line    Change and reason for change:

8    ____   ____    _____

9    ____   ____    _____

10   ____   ____    _____

11   ____   ____    _____

12   ____   ____    _____

13   ____   ____    _____

14   ____   ____    _____

15   ____   ____    _____

16   ____   ____    _____

17   ____   ____    _____

18   ____   ____    _____

19   ____   ____    _____

20   ____   ____    _____

21

22
     Subscribed and sworn to me this
23
     _____ day of _____, 2018.
24

25   _____

Page 150

1                    ACKNOWLEDGMENT OF DEPONENT

2

3          I, COMMANDER JONATHAN WHITE, do here certify

4    that I have read the foregoing pages 1 to 45 and

5    that the same is a correct transcription of the

6    answers given by me to the questions herein

7    propounded, except for the corrections or changes in

8    form or substance, if any, noted in the attached

9    errata sheet.

10

11

     _____              _____
12   DATE                         COMMANDER JONATHAN WHITE

13

14

15

16

17

18

19
     Subscribed and sworn to me this
20
     _____ day of _____, 2018.
21

22   _____
                    Notary Public
23

24

25