**No. 18-5093**  **September Term, 2017**

1:17-cv-02122-TSC

**Filed On:** June 4, 2018

Rochelle Garza, As guardian ad litem to unaccompanied minor J.D., on behalf of herself and others similarly situated, et al.,

     Appellees

     v.

Alex Michael Azar, II, Secretary, Health and Human Services, et al.,

     Appellants

------------------------------

Consolidated with 18-8003

     **BEFORE:**    Rogers,* Griffith,*** and Srinivasan,** Circuit Judges

### O R D E R

     Upon consideration of the motion for stay pending appeal, the opposition thereto, and the reply; the letter filed on April 10, 2018; the petition for leave to file an interlocutory appeal pursuant to Federal Rule of Civil Procedure 23(f); and the Rule 28(j) letters, it is

     **ORDERED** that the petition for leave to appeal be denied. Appellants have not shown that the district court's class certification decision is "manifestly erroneous." In re Lorazepam & Clorazepate Antitrust Litig., 289 F.3d 98, 105 (D.C. Cir. 2002). This court nevertheless has jurisdiction to review the merits of the district court's class certification decision because, as both parties agree, the decision is "inextricably bound up" with the district court's preliminary injunction order, Wagner v. Taylor, 836 F.2d 578, 586 (D.C. Cir. 1987) (internal quotation marks omitted), which this court has jurisdiction to review pursuant to 28 U.S.C. § 1292(a)(1). It is

**FURTHER ORDERED** that the motion to stay the March 30, 2018, order be granted in part and denied in part. The notice of appeal that was filed in connection with the district court's March 30, 2018, order granting a preliminary injunction conferred jurisdiction in the court of appeals "'over those aspects of the case involved in the appeal.'" United States v. DeFries, 129 F.3d 1293, 1302 (D.C. Cir. 1997) (per curiam) (quoting Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58 (1982) (per curiam)). Accordingly, the motion is granted to the extent that the March 30, 2018, preliminary injunction's non-disclosure provision does not contain an exception for instances when a class member provides non-coerced consent to disclosure or when the class member needs emergency medical care and is incapacitated such that she is unable to inform a medical care provider herself. The motion for stay is denied in all other respects because appellants have not satisfied the stringent requirements for a stay pending appeal. See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2018). It is

**FURTHER ORDERED** that the following briefing schedule will apply:

| | |
|---|---|
| Appellants' Brief | July 2, 2018 |
| Appendix | July 2, 2018 |
| Appellees' Brief | July 30, 2018 |
| Appellants' Reply Brief | August 9, 2018 |

The Clerk is directed to calendar this case for oral argument on the first appropriate date in September 2018. The parties will be notified separately of the oral argument date and composition of the merits panel.

All issues and arguments must be raised by appellants in the opening brief. The court ordinarily will not consider issues and arguments raised for the first time in the reply brief.

To enhance the clarity of their briefs, the parties are urged to limit the use of abbreviations, including acronyms. While acronyms may be used for entities and statutes with widely recognized initials, briefs should not contain acronyms that are not

widely known. See D.C. Circuit Handbook of Practice and Internal Procedures 41 (2018); Notice Regarding Use of Acronyms (D.C. Cir. Jan. 26, 2010).

The parties are directed to hand-deliver the paper copies of their briefs and the appendix to the Clerk's office on the date due. All briefs and appendices must contain the date that the case is scheduled for oral argument at the top of the cover. See D.C. Cir. Rule 28(a)(8).

Pursuant to D.C. Circuit Rule 36, the disposition of No. 18-8003 will not be published. Because no appeal has been allowed in No. 18-8003, no mandate will issue. The Clerk is directed to transmit a certified copy of this order to the district court.

**Per Curiam**

          **FOR THE COURT:**
          Mark J. Langer, Clerk

**By:**   /s/
        Laura Chipley
        Deputy Clerk

\* A statement by Circuit Judge Rogers, concurring in the disposition of the motion for stay, is attached to this order.

\*\* A statement by Circuit Judge Srinivasan, concurring in the disposition of the motion for stay, is attached to this order.

\*\*\* A statement by Circuit Judge Griffith, dissenting in part from the partial denial of the motion for stay, is attached to this order.

ROGERS, *Circuit Judge*, concurring: Surprisingly, our colleague in partial dissent concludes that the district court's injunction of March 30, 2018, is overbroad because it conflicts with Supreme Court precedent on post-viability abortions. *See* Partial Dis. at 2–3 (Griffith, J.). This conclusion is unfounded. Any question about the scope of the district court's injunction is resolved by the nature of the underlying action and the memorandum opinion accompanying the injunction. *See Common Cause v. Nucl. Reg. Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982).

First, this litigation is about the constitutional rights to autonomy and privacy of "J.D." and those similarly situated pregnant unaccompanied immigrant minors in federal custody to obtain a pre-viability abortion. The class action complaint seeks to prevent defendants, in light of "recently revised nationwide policies," from wielding an "unconstitutional veto power" over access to such abortion in violation of the Fifth Amendment, by forcing those who, like J.D., request a pre-viability abortion, to visit pre-approved anti-abortion crisis pregnancy centers, which require them, in violation of the First and Fifth Amendments, to "divulge the most intimate details" of their lives, and by notifying, without consent, parents or other family members of their request for an abortion. Second Amended Compl. ¶¶ 3–7, 17, 21, 24, 26–27, 42–59 (Dec. 15, 2017); *see also* Pls.' Reply to Opp. To Mot. for Class Cert. 3, 6 (Nov. 27, 2017); Pls.' Mem. in Support Mot. for TRO & Prelim. Inj. 2, 4–8, 13 (Oct. 14, 2017). In this manner, pregnant unaccompanied immigrant minors who seek pre-viability abortions can avoid both the unconstitutional burden under defendants' practices and the necessity of repeated individual emergency proceedings in the district court and on appeal. The injunction of defendants' practices relieves class members of these burdens and restores their rights to privacy and to choose whether to seek a pre-viability abortion. Avoiding time-consuming litigation of individual cases may alleviate some of the emotional trauma inflicted upon a group of especially vulnerable young women.

Second, in the memorandum opinion accompanying the injunction, the district court recounts defendants' practices forced upon pregnant unaccompanied immigrant minors seeking pre-viability abortions and relies repeatedly on *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), most recently affirmed in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), to conclude defendants "effectively prohibit[] class members from 'making the ultimate decision' on whether or not to continue their pregnancy *prior to viability* — a quintessential undue burden." Mem. Op. 24 (D.D.C. Mar. 30, 2018) (quoting *Casey*, 505 U.S. at 879) (emphasis added). The district court does not refer to post-viability abortions because they were not at issue. *See, e.g.*, Pls.' Reply in Support Mot. for Prelim. Inj. 6 (Oct. 18, 2017) (noting that defendants' delays in permitting abortions might "push[] J.D. so far into her pregnancy that she would cross the line of viability" and no longer be eligible for abortion under Texas law).

Nonetheless, defendants, in moving for a stay pending appeal, argue that the injunction requires them "to facilitate abortion no matter the circumstances, without regard to fetal viability or any other circumstance," ignoring that "[a]fter viability, the government may regulate or even proscribe abortion." Defs.' Mot. for Stay 18 (Apr. 9, 2018) (citing *Casey*, 505 U.S. at 879). Regrettably, my colleague has joined defendants' non-contextual misconception of the injunction to conclude that an opinion on post-viability abortions is required. *See* Partial Dis. at 3. This conclusion too is unfounded. The designated class representatives' own circumstances involve access to pre-viability abortions. *See* Mem. Op. 3–7. Further, as my colleague in concurrence explains upon describing what the district court's memorandum opinion does and does not say,

offering an opinion on post-viability abortions would be advisory. Concurring Op. at 1–2 (Srinivasan, J.).

SRINIVASAN, *Circuit Judge*, concurring: The court today considers whether the government has made the necessary showing to obtain a stay of the preliminary injunction pending resolution of its underlying appeal. *See Nken v. Holder*, 556 U.S. 418, 433-34 (2009). Insofar as the government seeks a stay of the entire injunction pending appeal, the court unanimously denies the motion. The court is also unanimous in denying a stay of the injunction's bar against disclosing the "abortion decisions" of minors in the custody of the Office of Refugee Resettlement (ORR) pursuant to ORR's evident policy of disclosure without regard to the existence or availability of a judicial bypass, except that the court—again unanimously—grants a partial stay of the non-disclosure mandate to allow disclosure when a minor becomes incapacitated or gives consent. Finally, the court once again is unanimous, except in one discrete respect, in denying a stay of the injunction's bar against ORR's "interfering with or obstructing any class member's access to . . . an abortion." Prelim. Inj. & Class Cert. Order 1, *Garza v. Azar*, 17-cv-02122-TSC (D.D.C. Mar. 30, 2018), ECF No. 127.

The lone disagreement involves a single aspect of the access provision's scope: does the bar against interfering with access to an abortion pertain solely to pre-viability abortions, or does it encompass post-viability abortions as well? A majority of the panel understands the injunction's abortion-access mandate to reach only pre-viability abortions, leaving the subject of post-viability abortions unaddressed. My partially dissenting colleague, though, construes the injunction's access mandate to extend to all abortions, including post-viability ones. *See infra* at 1-2 (Griffith, J., dissenting in part). That then leads him to pronounce on the extent to which ORR could restrict a post-viability abortion allowed by state law, if a post-viability abortion in fact were to arise in this case. He would hold that ORR has authority to prohibit a post-viability abortion (unless it is medically necessary), and would stay the injunction insofar as it restrains ORR from doing so.

There is no occasion here, however, to address any potential ORR restrictions on a post-viability abortion allowed by state law, because the injunction's access provision does not speak to post-viability abortions in the first place. That understanding of the access provision is apparent from its context—including, especially, the district court's explanation of the basis for the injunction in its accompanying opinion. When construing an injunction, it of course makes sense to look to a district court's "memorandum opinion accompanying the order [to] clarify its meaning." *Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982); *see United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) (interpreting injunction in "context of the district court's legal conclusions and . . . findings of fact"). Here, the district court's accompanying opinion shows—repeatedly, and consistently—that the injunction's bar against interfering with access to abortion pertains solely to pre-viability abortions.

First, consider what the district court's opinion says. In setting forth why the court believed the plaintiffs were likely to succeed on the merits of their challenge to ORR's policies, the opinion explains that an "undue burden exists" when the "effect is to place a substantial obstacle in the path of a woman seeking an abortion *before the fetus attains viability*." Mem. Op. 23 (D.D.C. Mar. 30, 2018), ECF No. 126 (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992) (plurality)) (emphasis added). Then, in its most significant statement setting out the court's rationale for granting injunctive relief, the opinion announces the "basic proscription" that "controls the outcome in this case": the "unequivocal constitutional command" that "the government 'may not prohibit any woman from making the ultimate decision to terminate her

pregnancy *before viability*.'" *Id.* (quoting *Casey*, 505 U.S. at 879 (plurality)) (emphasis added). Reemphasizing the point still further, the opinion later "concludes that ORR's policies and practices infringe on female [unaccompanied minors'] constitutional rights by effectively prohibiting them from 'making the ultimate decision' on whether or not to continue their pregnancy *prior to viability*—a quintessential undue burden." *Id.* at 24 (quoting *Casey*, 505 U.S. at 879 (plurality)) (emphasis added). At every turn, in short, the opinion grounds the injunction's abortion-access mandate entirely (and exclusively) in the context of pre-viability abortions.

Consider, also, what the opinion does *not* say. In contrast with its numerous statements about pre-viability abortions, the opinion contains no mention of post-viability abortions. It is of course true, as my colleague notes, *infra* at 1-2 (Griffith, J., dissenting in part), that the opinion generally relies on the Supreme Court's decision in *Casey*. And *Casey* in turn states that, "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." 505 U.S. at 879 (plurality) (quoting *Roe v. Wade*, 410 U.S. 113, 164-65 (1973)). But the district court, in its opinion, did not reference that aspect of *Casey*, evidently believing it irrelevant to the basis for granting interim relief. That is unsurprising given that the plaintiffs likewise did not mention that portion of *Casey*—or even once refer to the subject of post-viability abortions—in their filings seeking a preliminary injunction. *E.g.,* Pl.'s Mem. in Support Mot. for Prelim. Inj. 9 (D.D.C. Oct. 14, 2017), ECF No. 5-1 (relying on right to terminate pregnancy without undue burden "before viability"). The government, for its part, did note *Casey*'s statements about post-viability abortions in its arguments to the district court. *See infra* at 2 (Griffith, J., dissenting in part). But the arguments of a party whose position is then *rejected* by a court that enters an injunction against it are not a reliable indicator of the injunction's meaning. Better to look directly to the court's own explanation for issuing the injunction, supplemented by the arguments of the party who successfully sought it. *See Common Cause*, 674 F.2d at 927 (interpreting injunction in context of "the relief sought by the moving party" (citation omitted)).

That party here is the plaintiffs. My colleague suggests that they should be interested in vindicating their right to access not only a pre-viability abortion, but also a post-viability abortion that "is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) (quoting *Casey*, 505 U.S. at 879 (plurality)); *see infra* at 2 (Griffith, J., dissenting in part). The plaintiffs, however, could seek interim relief pertaining to the matter centrally at hand, and the district court could fashion its relief accordingly. After all, to say that the injunction's access provision stops at pre-viability abortions is not to say that constitutional protections stop there. Regardless of whether the injunction's access provision itself extends to post-viability abortions, the Supreme Court has established that constitutional protections apply to post-viability abortions supported by medical necessity. *Id.* To the extent a post-viability abortion related to medical necessity were to arise in this case, and if ORR were to attempt to restrict it, the plaintiffs could seek relief at that time.

So where does all of this leave us in terms of understanding the preliminary injunction's bar against ORR's "interfering with or obstructing any class member's access to . . . an abortion"? It should lead us to conclude (as the court today does) that the injunction prohibits only interference with access to pre-viability abortions, per the district court's explanation in its opinion. To be sure,

the injunction's terms do not specifically say that the access requirement pertains only to pre-viability abortions. But the context makes that intended scope apparent. And there is of course no cause to construe an injunction's restrictive sweep to have the broadest possible reach its language can conceivably bear. Rather, we would ordinarily understand an injunction's scope to cohere with the justifications advanced in support of it, not to extend beyond them so as to impose broader constraints on the enjoined party (here, the government) than is warranted. *See, e.g.*, *Doe v. Mattis*, Nos. 18-5032, 18-5110, 2018 WL 2126393, at *4 (D.C. Cir. May 7, 2018).

In contending that the court is wrong to interpret the injunction's access mandate as limited to pre-viability abortions, my colleague believes that interpretation to be incongruous with the definition of the plaintiffs' class. *See infra* at 2 (Griffith, J., dissenting in part). The class consists of all pregnant, unaccompanied minors in ORR's custody. Prelim. Inj. & Class Cert. Order 1. The injunction's access provision, as understood by the court today, reaches those class members who seek a pre-viability abortion. My colleague thinks it implausible that the injunction's access provision could have a narrower reach than the entire class. I disagree.

There is no need for a complete identity between the members of the class, on one hand, and the beneficiaries of the injunction's access mandate, on the other hand. Those can be conceptually distinct matters, as my colleague ultimately allows. The purpose of a *preliminary* injunction is to "protect plaintiff[s] from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." 11A Wright & Miller, Federal Practice and Procedure § 2947 (3d ed. 2018). Depending on the circumstances, the need for interim relief to preserve the status quo might be most pronounced—or, indeed, might only exist—for a subset of the class. *See Reynolds v. Sheet Metal Workers, Local 102*, 702 F.2d 221, 222, 225-26 (D.C. Cir. 1981) (upholding grant of a preliminary injunction to a subset of a class pending final resolution of the broader class's claims). Here, with regard to the preliminary injunction's provision protecting access to an abortion, the district court awarded interim relief to those class members who would seek a pre-viability abortion, consistent with the scope of the undue-burden right on which the court relied. Other aspects of the injunction aside from the abortion-access provision, meanwhile, could extend more directly to a broader array of class members.

The upshot is that the preliminary injunction's bar against interfering with access to an abortion does not speak to the hypothetical circumstance of a class member's post-viability abortion. It follows that there is no occasion here to address ORR's authority to prohibit a post-viability abortion, in the event the issue were to arise. To the extent a class member might someday seek to obtain a post-viability abortion in a state that allows it, and if ORR were then to bar the abortion, nothing in the preliminary injunction's access provision would speak to the matter.

My colleague, though, would reach out to resolve that issue now. He submits that the government would like to know the extent of ORR's authority to prohibit a post-viability abortion. *See infra* at 3 (Griffith, J., dissenting in part). It is true that the government's motion states that the injunction's access mandate is overbroad to the extent it reaches post-viability abortions. Gov't Stay Motion 18. (The plaintiffs did not specifically respond to the point, perhaps assuming—correctly—that the access provision has no bearing on post-viability abortions.) The government, however, did not (and could not) ask for an advisory opinion about its authority to restrict post-viability abortions regardless of whether the access provision even speaks to them. Because the

court today clarifies that the access provision does not pertain to post-viability abortions, the government now knows that its ability to prohibit such abortions is unaffected by the injunction's access mandate. (And because the fact that the access provision reaches only pre-viability abortions is enough to establish that it has no bearing on ORR's potential restriction of a post-viability abortion, I do not consider whether the underlying class action is confined to pre-viability abortions. *See supra* at 1 (Rogers, J., concurring).)

In short, whether ORR could prohibit a post-viability abortion permitted by state law is not presented by the case as it comes to us, which means we should forgo addressing the issue in an advisory opinion. If the issue does arise in this case, the parties could present any dispute about it at that time. In that regard, it bears noting that there is no reason to assume the issue will necessarily come up in the case: post-viability abortions generally make up a very small share of abortions, *see* Tara C. Jatlaoui et al., Dep't of Health & Human Servs., Abortion Surveillance, United States, 2014, tbls. 7 & 20, https://www.cdc.gov/mmwr/volumes/66/ss/ss6624a1.htm; *see also Gonzalez v. Carhart*, 550 U.S. 124, 134-35 (2007); and a sizable majority of states disallow post-viability abortions unsupported by medical necessity, Kaiser Family Found., State Later-Term Abortion Policies, https://www.kff.org/womens-health-policy/state-indicator/later-term-abortions (last updated Jan. 1, 2018).

Does the court's resolution today, in considering post-viability abortions to be beyond the scope of the issues before us, shortchange the governmental interest in potential life? *See infra* at 3 (Griffith, J., dissenting in part). Respectfully, it does not. *Casey* recognized "a substantial state interest in potential life throughout pregnancy." 505 U.S. at 876 (plurality). The Supreme Court has further explained, as noted, that after viability, "the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Stenberg*, 530 U.S. at 921 (quoting *Casey*, 505 U.S. at 879 (plurality)). Nothing in today's disposition disregards those principles.

Rather, the court determines that the issue of ORR's own authority to prohibit a post-viability abortion allowed by state law is not presented by the stay motion we consider today. We therefore have no cause to pronounce on the issue, no matter how straightforward (or complicated) its resolution could prove to be. *See infra* at 3 (Griffith, J., dissenting in part); *cf.* Gov't Stay Motion 21 (listing various "highly relevant" factors that, in government's view, determine whether "the due process clause would compel ORR to facilitate an abortion" in a given instance, including "whether the abortion would violate state law" and "whether viability has been reached"). Because the preliminary injunction's access provision speaks solely to pre-viability abortions, the prospect of a class member seeking a post-viability abortion allowed by state law—and of ORR then potentially restricting her from doing so—are matters appropriately left for another day.

GRIFFITH, *Circuit Judge*, dissenting in part: The majority has made the government's motion to stay the preliminary injunction more complicated than it is. My view is that we should do no more nor less than stay the injunction to the extent it is unlawful under *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992).

The preliminary injunction contains two provisions that the panel agrees are facially overbroad. First, its non-disclosure provision prevents the Office of Refugee Resettlement (ORR) from "revealing [abortion] decisions to anyone," without any exception for emergency medical circumstances. I join the majority in staying this provision to the extent it does not provide an emergency medical exception. Second, the injunction's abortion-access provision bars ORR from "interfering with or obstructing *any class member's access to . . . an abortion.*" This provision is overbroad as well because it would require ORR to facilitate abortions under any circumstance, and not even U.S. citizens have an abortion right that absolute. After an unborn child reaches viability, the government may "regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) (quoting *Casey*, 505 U.S. at 879 (plurality opinion)). Just as we stayed part of the non-disclosure provision, I would also stay that part of the abortion-access provision that disregards the *Casey* framework.

But the majority eschews such a straightforward approach. Instead of staying the overreach of this provision, they narrow the scope of the injunction itself by interpreting "abortion" to mean "pre-viability abortion." While I am not opposed to interpreting an injunction in light of its context, the majority's saving construction here is unpersuasive. For that reason, I would treat the abortion-access provision just as we did the non-disclosure provision, staying it to the extent it exceeds the right established by the Supreme Court.

\*     \*     \*

When its terms are unclear, we may interpret an injunction through the lens of the district court's accompanying opinion and the arguments advanced by the parties. *See, e.g.*, *Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982) ("[T]he fair notice requirement of Rule 65(d) must be applied in the light of the circumstances surrounding (the injunction's) entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." (internal quotation marks omitted)). Here, the district court relied on *Casey* to support the injunction against ORR, and the parties invoked *Casey* to vindicate their interests. The district court cited *Casey* throughout its opinion. *See, e.g.*, *Garza v. Hargan*, No. 17-2122, 2018 WL 1567600, at \*22-27 (D.D.C. Mar. 30, 2018); *see also supra* at 2 (Srinivasan, J., concurring). The plaintiffs argued for their Fifth

Amendment right to an abortion under *Casey*. *See, e.g.*, Pl. Complaint at 2, 12-13, *Garza*, No. 17-2122, ECF No. 1; Pl. Second Amended Complaint at 2, 15-16, *Garza*, No. 17-2122, ECF No. 104; Pl. Response Mot. for Stay Pending Appeal at 15, *Garza*, No. 17-2122, ECF No. 79 (citing *Casey*). The government advocated for its "legitimate and substantial interest in preserving and promoting fetal life." *Gonzales v. Carhart*, 550 U.S. 124, 145 (2007); *see, e.g.*, Gov't Mot. to Stay at 18-19, *Garza v. Azar*, No. 18-5093, Apr. 9, 2018. And on numerous occasions throughout the litigation the government expressly invoked the full *Casey* framework. *See, e.g.*, Gov't Opp. to Mot. For TRO at 7-8, *Garza*, No. 17-2122, ECF No. 66.

Which is why I am confused that the majority's interpretation does not adopt the full *Casey* framework and instead reads the injunction to address only pre-viability abortions. The plaintiffs have never argued that they are seeking relief only for pre-viability abortions. Indeed, they don't even mention "viability" in their response to the government's motion to stay. Why would they? Under *Casey* the right to an abortion exists after viability if medically necessary to protect the life or health of the mother. But the majority's version of the litigation, which they use to save an overly broad injunction from a stay, would have us believe that the plaintiffs are interested only in protecting some but not all of their right to an abortion under *Casey*. It seems plain to me that an effort to interpret the injunction in light of the litigation should find that the district court's order enjoins ORR's interference with those abortions that are included within the right defined by *Casey*, and that includes some post-viability abortions.

It also seems implausible that the injunction addresses abortion access for only a portion of the class, which is "*all* pregnant, unaccompanied immigrant minor children (UCs) who are or will be in the legal custody of the federal government." *Garza,* 2018 WL 1567600, at *1 (emphasis added). A straightforward reading would assume the injunction reaches all members of that class, who by definition are similarly situated to one another. Interpreting the injunction in light of *Casey* would tell all members of the class on which occasions ORR must subordinate its policies to their rights. Even if injunctions sometimes do not reach the interests of all class members, *see supra* at 3 (Srinivasan, J., concurring), neither party nor the district court suggests that is the case here. I struggle to see why the majority assumes it is.

The majority's interpretation is also hard to square with the logic of *Casey* itself. By applying only part of the *Casey* framework, the majority overlooks that *Casey* "struck a balance" between a woman's right to choose abortion and the government's "legitimate and substantial interest" in protecting unborn life. *Gonzales*, 550 U.S. at 145-46. That "balance was central to its holding." *Id.* at 146. By relying on rights established by *Casey*, the parties and the district court necessarily

acknowledged that after viability the government's interest in unborn life supersedes the right to an elective abortion.

My colleagues think we do not need to decide whether the government may proscribe plaintiffs' access to abortion after viability. In a sense, I agree. We need not *decide* that question because the Supreme Court already has. We need only *apply* the binding precedent agreed to by the parties: absent medical concerns for the life or health of the mother, the government may proscribe abortion after viability. Despite this controlling precedent, the majority refuses to acknowledge the government's interest in "fetal life." The *Casey* framework was premised on recognizing two sets of interests. The majority recognizes only one.

Further, the majority's approach leaves unanswered an important part of the government's stay request. Given the overly broad language in the injunction, the government understandably asks us to clarify which ORR policies it may continue to enforce during the next several months while the appeal is pending. Specifically, the government argues that under *Casey* it must be allowed to vindicate its interests in protecting unborn life by banning elective abortions after viability. *See* Gov't Mot. to Stay at 18-19, *Garza*, No. 18-5093. The majority gives an evasive response, leaving the government to guess at which policies it may enforce between now and resolution of the appeal. Considering that "timing profoundly matters," *Garza v. Hargan*, at 7 (D.C. Cir. Oct. 20, 2017) (Millett, J., dissenting), *rev'd en banc*, 874 F.3d 735 (D.C. Cir. Oct. 24, 2017) (mem.), *vacated sub nom. Azar v. Garza*, No. 17-654 (U.S. June 4, 2018), when a woman seeks an abortion, particularly if the procedure is necessary for her life or health, this is no occasion to shrink from the question presented.[*]

\* \* \*

Interpreting the injunction narrowly might have saved it from a stay, but the majority's interpretation is unpersuasive. It does not reflect the established rights under *Casey* on which the

---

[*] My colleague cites data to suggest that minors in ORR custody might never seek post-viability abortions. *See supra* at 4 (Srinivasan, J., concurring). Table 20 of that document shows that the percentage of post-viability abortions is 7.3% for young women under 15 years old and 2.3% for young women between 15 and 19. I am surprised at the suggestion that the abortion rates for the general U.S. population are somehow representative of the abortion rates for the class members, who are young children in a foreign country without their parents, and I'm skeptical that the cited generic data can inform our decision today. And even if only a small percentage of the class seeks post-viability abortions, we would still have a duty to address the pressing question before us.

parties and district court relied. I would treat the injunction's overbroad abortion-access provision the same way we unanimously agreed to treat the overbroad non-disclosure provision and stay the portion that sweeps beyond the plaintiffs' lawful basis for relief. I respectfully dissent.