## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| J.D., on behalf of herself and others similarly situated, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil No. 17-cv-02122-TSC |
| ALEX M. AZAR II, *et al.*, | ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

## PRELIMINARY STATEMENT

On June 14, 2019, the Court of Appeals affirmed this Court's certification of a class of all pregnant unaccompanied minors in Defendants' custody, and affirmed the portion of this Court's preliminary injunction that prohibits Defendants from obstructing or interfering with class members' access to abortion. *J.D. v. Azar*, 925 F.3d 1291, 1339–40 (D.C. Cir. 2019). The Court of Appeals, however, vacated the portion of this Court's preliminary injunction that prohibited Defendants from revealing a minor's abortion decision or pregnancy to anyone (or coercing the minor into doing so) absent her consent, and remanded to this Court to make further findings of fact and conclusions of law as to this aspect of Defendants' policy to better enable appellate review. *Id.*

The Court of Appeals mandate issued on August 6, 2019, and this Court's preliminary injunction as to the forced disclosure aspect of Defendants' policy is now vacated. Absent immediate action by this Court, Defendants are now free to mandate that unaccompanied immigrant minors' pregnancies and abortion decisions be disclosed to others, including abusive

1

parents or potential sponsors.  Since this Court's March 30, 2018 preliminary injunction, Plaintiffs' counsel have assisted a steady stream of class members who have requested access to abortion, abortion information, or access to the courts to seek a judicial bypass of a parental involvement law, and are in fact currently assisting a class member who is seeking access to abortion as of the date of this submission.  *See* Decl. of Lindsey Kaley (hereinafter, "Kaley Decl.") ¶ 5, attached hereto as Exhibit 1.  Indeed, Defendants' own documents show that since this Court's injunction issued, *at least* 53 minors have requested access to abortion while in ORR custody, 22 of whom made their requests within just the first six months of 2019.  *See* Exhibit A to Kaley Decl., HHS Spreadsheets.  Many of these young women informed Plaintiffs' counsel that they do not want to inform their parents or prospective sponsors of their pregnancy and/or abortion decision.  Kaley Decl. ¶ 6.

Given the frequency of class members coming to Plaintiffs' counsel's attention, it is only a matter of time—and not much time—before a class member will be subjected to Defendants' forced disclosure policy, which will violate their constitutional rights and expose them to further, serious harms.  Indeed, the former ORR Deputy Director admitted that Defendants' policy of mandatory notification could cause minors harm.  Moreover, every major medical organization agrees that minors should not be compelled to tell their parents of their abortion decision.  Accordingly, to prevent irreparable harm to Plaintiff class members, Plaintiffs respectfully request that this Court make the further findings of fact and conclusions of law requested by the D.C. Circuit and issue a new preliminary injunction precluding Defendants from mandating that minors' pregnancies and/or abortion decisions be disclosed to parents and potential sponsors absent the minor's uncoerced consent.

# FACTS

## I.    DEFENDANTS' FORCED DISCLOSURE POLICY.

### Mandatory Disclosure to Parents

Around March 2017, ORR adopted a policy of coercing all unaccompanied immigrant minors into telling their parents and/or immigration sponsors of their pregnancies and abortion decisions, and if they refused, of informing them directly, even in cases where ORR was aware that doing so could harm the minor and/or her family members.[1]  As set forth in detail below, the record is replete with evidence of this forced disclosure aspect of Defendants' anti-abortion policy and its deleterious effect on Plaintiff class members.

1.    Defendants admit that they have a policy of mandating that pregnant unaccompanied immigrant minors in their custody disclose (or have Defendants disclose) their pregnancies and/or abortion decisions to their parents.  For example, in a declaration dated April 3, 2018, Jallyn Sualog, then-Acting Deputy Director for Children's Programs at ORR, said:

a.    "Since March 2017, ORR has implemented [a] policy by requiring grantees to ensure parental notification for UACs that are pregnant and request abortion when such notification would not endanger the UAC's health and well-being."  Decl. of Jallyn Sualog (hereinafter, "Sualog Decl.") ¶ 11, ECF No. 128-1.

---

[1] Around the same time, Defendants also adopted a policy of requiring that all pregnant minors who requested an abortion receive "life-affirming" counseling from an anti-abortion crisis pregnancy center.  *See* Pls.' Third Amended Compl. ¶¶ 3, 66, 72–75, 90, 93–95, ECF No. 143. Although that aspect of Defendants' policy involves coerced disclosure of class members' pregnancies and abortion decisions, Plaintiffs do not discuss that aspect of Defendants' policy here, given that it is enjoined by this Court's March 30, 2018 order, which prohibits Defendants from, *inter alia*, "interfering with or obstructing" any class member's access to "non-directive options counseling, [] abortion counsel, [and] an abortion."  *See* Order at 1, ECF No. 127.

b.      Moreover, regardless of whether a minor has expressed an interest in seeking abortion, ORR "may [] inform[] the UAC's parents of her pregnancy, her options concerning the pregnancy, and her expressed wishes concerning the pregnancy.  Currently, ORR will disclose a UAC's health status or other specific information to a UAC's parent without the UAC's consent if doing so is consistent with state law, and would not endanger the UAC's health and well-being."  *Id.* ¶¶ 8–9.

2.      Directives sent from then-ORR Director Scott Lloyd to his staff and ORR-funded shelters confirm that ORR's policy requires forced disclosure to parents, and contrary to Ms. Sualog's declaration, it applies regardless of whether harm to the minor's health or well-being would result.  For example:

a.      In an email from then-Deputy Director of ORR Jonathan White to an ORR Federal Field Specialist, Commander White says that Lloyd instructed that shelters are "not to take [a minor] to get a termination, or to any appointments to prepare her for a termination, without consent from the Director, *which cannot happen without written and notarized consent of her parents . . . .*"  Ex. B, Decl. of B. Amiri in Supp. of Pls.' Renewed Mot. for Class Cert. & Prelim. Inj. ("Amiri Decl."), ECF No. 121-3, PRICE_PROD_00014889 (emphasis added).

b.      In another email, Lloyd instructed ORR staff that when minors receive positive pregnancy tests "the parents must be notified."  Ex. G, Amiri Decl., ECF No. 122-5, PRICE_PROD_00014816.

c.      In yet another email, Lloyd instructed Commander White that shelters should "notify [parents of the minor's pregnancy] regardless of UAC's wishes."  Ex. F, Amiri Decl., ECF No. 122-4, PRICE_PROD_00014822.

3.      The evidence shows how this policy was enforced.  For example:

a.  In March of 2017, then-Director Lloyd instructed that a minor who was residing in a shelter in Arizona be taken to a crisis pregnancy center (CPC) and that—after that visit—"if [the minor] still desires the abortion, and it is still within the window for a legal abortion, she must obtain parental consent, which will necessitate options counseling with them, plus signed, notarized declaration of consent."  Ex. G, Decl. of B. Amiri in Supp. of Pls.' App. for TRO & Mot. for Prelim. Inj. ("TRO Amiri Decl."), ECF No. 1-21, PRICE_PROD_00010710.

b.  Also in March of 2017, then-Director Scott Lloyd instructed that the parents of yet another minor who was residing at another shelter in Arizona be notified of her abortion decision, "despite the [minor's] affirmative declaration to keep said personal health information confidential."  Ex. I, TRO Amiri Decl., ECF No. 1-23, PRICE_PROD_00010623 (shelter staff confirming instructions from ORR that the minor's mother and sponsor be notified of her abortion decision); *see also* Ex. H, TRO Amiri Decl., ECF No. 1-22, PRICE_PROD_00010867 (Lloyd instructing that the minor's parents must be notified of her abortion).  The shelter responded to that directive by informing both the minor's mother and her sponsor (an older brother) about the minor's abortion.  Ex. H, TRO Amiri Decl., ECF No. 1-22, PRICE_PROD_0010866.  Defendants required parental notification of this minor's abortion decision even after she obtained a judicial bypass to consent to the abortion on her own, and despite the fact that an immigrants' services organization told Defendants that if they told the parents in the home country her father would abuse her mother.  *See* Ex. D, Amiri Decl., ECF No. 121-5, Dep. Tr. of Jonathan White 83:5 – 84:17; Ex. I, Decl. of B. Amiri in Supp. of Pls.' Reply in Further Supp. of Class Cert., ECF No. 56-10, Young Center Best Interests Recommendation, PRICE_PROD_00012935-37.

c.      In August 2017, a minor who was pregnant and had requested an abortion while residing at a shelter in Arizona was taken to a CPC, given spiritual counseling, and ended up participating in a "family session" in which her mother was informed of her pregnancy and desire for abortion, in spite of the minor's expressed desire that her family not be informed because they "would not want her anymore" and scold her.  Ex. A, Amiri Decl., ECF No. 122-2, PRICE_PROD_00014828-29.

d.      In September 2017, Jane Doe, the first named plaintiff in this case, was required to tell her parents about her pregnancy and abortion decision, and when she refused, ORR instructed the shelter to do so, *see* Decl. of Jane Doe ¶ 15, ECF No. 3-3, despite the fact that Jane Doe:  (1) was "strongly opposed to parental notification," Ex. C, Amiri Decl., ECF No. 121-4, PRICE_PROD_00015152-53; Ex. B, Amiri Decl., ECF No. 121-3, PRICE_PROD_00014890 ("minor does not agree to parental consent"); (2) was seeking to obtain (and did obtain) a court order permitting her to bypass Texas's parental involvement requirement, Decl. of Marie Christine Cortez (hereinafter, "Cortez Decl.") ¶ 3, ECF No. 41-1, and (3) had been abused by her parents in the past, *id.* ¶¶ 8–11.  Then-Deputy Director  White declared that the notification of Ms. Doe's mother about her pregnancy was done "[a]t ORR's direction and consistent with ORR policies and procedures."  Decl. of Jonathan White ¶ 9, ECF No. 10-1.

e.      Also around September 2017, another minor was pregnant and contemplating an abortion, and then-Director Lloyd instructed shelter staff to notify her parents of her pregnancy and the fact that she was considering abortion, "regardless of the [minor's] wishes," even though she had previously expressed she did not want to talk to her family and did not give consent for shelter staff to talk to them either.  Ex. E, Amiri Decl., ECF No. 122-3,

PRICE_PROD_00014814; Ex. F, Amiri Decl., ECF No. 122-4, PRICE_PROD_00014822-24;

Ex. P, Amiri Decl., ECF No. 122-7, PRICE_PROD_00014975.

      f.     In October 2017, yet another minor who was pregnant and requesting an

abortion was coerced into notifying her mother at Lloyd's direction.  Ex. G, Amiri Decl., ECF

No. 122-5, PRICE_PROD_00014815-16; Ex. H, Amiri Decl., ECF No. 122-6,

PRICE_PROD_00015133-34.  Upon confirmation of the minor's pregnancy, then-Director

Lloyd instructed shelter staff that the minor's parents "must be notified of [her] pregnancy,"

leaving to the minor only the decision as to whether she would do the notifying herself or the

shelter staff would do it for her.  *See* Ex. G, Amiri Decl., ECF No. 122-5,

PRICE_PROD_00014815-16.  After shelter staff reported that the minor did not want to notify

her mother, Director Lloyd again instructed that the shelter "[r]equest permission to from the

[minor] for the program to inform her parents of her request for an abortion," making clear that

"[i]f she does not consent, the [shelter] will have to proceed anyway" and instructing the shelter

to "please inform her of this if she does not consent at first."  Ex. H, Amiri Decl., ECF No. 122-

6, PRICE_PROD_00015133-34.

      g.     In December 2017, Defendants imposed their policy on two of the other

named plaintiffs in this case.  In Ms. Poe's case, then-Director Lloyd required Ms. Poe to either

notify her parents of her pregnancy and her request for an abortion herself or have them be

notified.  Ex. I, Amiri Decl., ECF No. 121-10, PRICE_PROD_00015509.  During the required

notification session, Ms. Poe's family threatened to harm her if she had the abortion, causing her

to temporarily withdraw her request to obtain an abortion because—as she later stated when

reasserting her request—of the pressure from her mother and potential sponsor to continue the

pregnancy.  Ex. J, Amiri Decl., ECF No. 121-11, PRICE_PROD_00015515; ECF No. 92-1,

Redacted ORR Decision Document at 2 ("the minor disclosed that she was being threatened by her biological [mother] and potential sponsor to keep the baby or they would inflict physical harm on her. . . . [the minor] stated that she felt pressured by her mother and potential sponsor to continue the pregnancy, but she wants to terminate the pregnancy."); *id.* at 5; ECF No. 129-1, Dep. Tr. of Scott Lloyd, 229:24 – 230:4.  This temporary withdrawal of her request for an abortion occurred despite the fact that Ms. Poe had disclosed to clinicians that she preferred to harm herself rather than continue with the pregnancy.  ECF No. 92-1, Redacted ORR Decision Document at 2; *id.* at 5 ("She still desires an abortion, and has on at least one occasion threatened to harm herself if she does not obtain it."); Ex. I, Amiri Decl., ECF No. 121-10, PRICE_PROD_00015506.  Ms. Poe eventually renewed her abortion request.   ECF No. 92-1, Redacted ORR Decision Document at 2; Decl. of Jonathan White ¶ 5, ECF No. 66-1; Ex. J, Amiri Decl., ECF No. 121-11, PRICE_PROD_00015515.

> h.      Defendants also required Ms. Roe or her shelter to notify Ms. Roe's family member who raised her in her home country of her pregnancy and abortion decision.  Ex. M, Amiri Decl., ECF No. 121-14, PRICE_PROD_00015591-94; *see also* Dep. Tr. of Jonathan White, 132:14 – 133:17, ECF. No 129-2; Dep. Tr. of Scott Lloyd, 239:21 – 240:5, ECF No. 129-1.

> 4.      Defendants enforced this mandatory disclosure policy even while admitting that informing a minor's parents of her pregnancy and abortion decision without her consent can cause harm.  For example, then-Deputy Director of ORR White testified that, based on his social work background and training, he would "not recommend" notifying a minor's parents of her abortion decision over the minor's objection "[b]ecause of the potential of additional harm or risk."  Ex. D, Amiri Decl., ECF No. 121-5, Dep. Tr. of Jonathan White, 41:11 – 43:1.

**Mandatory Disclosure to Potential Sponsors**

The evidence also shows that Defendants' policy requires that minors' prospective sponsors be notified of their pregnancies and/or abortion decisions.  These sponsors are generally "qualified parents, guardians, relatives, or other adults" with whom the minor has a close relationship,[2]  who already reside in the United States and who assume physical custody of the minor and become responsible for caring for the minor while he/she awaits his/her immigration hearing, thereby often acting as a de facto parent or legal guardian.[3]  For example:

1.      In March of 2017, ORR requested confirmation that the prospective sponsor of a minor residing in a shelter in Phoenix who had requested an abortion be notified of her pregnancy.  Ex. C, TRO Amiri Decl., ECF No. 1-17, PRICE_PROD_00010706.

2.      Also in March of 2017, ORR directed that the prospective sponsor of a minor discussed above who was residing in a shelter in Arizona and who had obtained an abortion be notified of her abortion decision, over the minor's objection.  Ex. I, TRO Amiri Decl., Doc. 1-23, PRICE_PROD_00010623 ("If the UC desires to proceed with statement placement, the UC will be advised that the UC Sponsor, the UC's biological brother, will also be advised that; UC was impregnated in COO and further that the UC terminated said pregnancy in the United States while in ORR Care, *despite the UC's affirmative declaration to keep said personal health information confidential*."); Ex. H, TRO Amiri Decl., ECF No. 1-22, PRICE_PROD_00010867 (confirming shelter has "informed the UC mother and sponsor about the procedure which

---

[2] *See* ORR, Sponsors and Placement, https://www.acf.hhs.gov/orr/about/ucs/sponsors; *see also* Kaley Decl. ¶ 6.

[3] *See* ACF Fact Sheet, Unaccompanied Alien Children Program, December 2018, https://www.acf.hhs.gov/sites/default/files/orr/unaccompanied_alien_children_program_fact_sheet_december_2018.pdf; *see also* Kaley Decl. ¶ 6.

terminated [her] pregnancy"). ORR compelled this disclosure despite concerns that the minor's

sponsor (her brother) would share the information with their parents, which would result in their

father retaliating against their mother. ECF No. 56-10, Young Center Best Interests

Recommendation, PRICE_PROD_00012935-37.

       3.      In December 2017, Defendants required Ms. Poe to notify her potential sponsor of

her pregnancy and desire to obtain an abortion. *See* Ex. H, Amiri Decl., ECF No. 121-11,

PRICE_PROD_00015514-15. As explained above, during the required notification session, Ms.

Poe's sponsor threatened to harm her if she had the abortion, causing her to temporarily

withdraw her request to obtain an abortion, even though she disclosed that she would prefer to

harm herself rather than continue with the pregnancy. *See supra* 7–8. Ms. Poe's sponsor's

threats of violence in reaction to the forced disclosure of her desired abortion likely prevented

Ms. Poe's release from ORR custody to a sponsor, despite the existence of that sponsor.

## II.     THE EFFECT OF FORCED DISCLOSURE ON MINORS.

      While the majority of minors who are pregnant and facing the decision whether to obtain

an abortion in the United States involve at least one parent in their decision, research has

consistently shown that minors who do not involve their parents have compelling reasons to

avoid disclosure. *See* Decl. of J. Shoshanna Ehrlich (hereinafter, "Ehrlich Decl.") ¶¶ 14–15,

attached hereto as Exhibit 2. As detailed below, and in the accompanying declarations,

Defendants' policy of disregarding these compelling reasons, and mandating that minors' parents

and/or potential sponsors be notified of minors' pregnancies and abortion requests over their

objections, risks subjecting these young women to serious physical, emotional and psychological

harms.

For example, some minors have been subjected to harsh treatment at the hands of one or both parents, and fear that disclosure of their abortion decision would result in further physical or emotional abuse or being thrown out of their homes.  Ehrlich Decl. ¶¶ 16–18, 24–26, 28 (citing study finding that 30% of minors who did not tell their parents about their abortion decision had already experienced violence in their family, feared that violence would occur, or were afraid of being forced to leave home); Decl. of Rebecca Garcia Rangel (hereinafter, "Rangel Decl.) ¶¶ 10, 12–13, attached hereto as Exhibit 3.  Indeed, many unaccompanied immigrant minors have fled to the United States because they have suffered abuse, abandonment, and/or neglect at the hands of their parents in their countries of origin already.  *See* Rangel Decl. ¶¶ 3, 9–10; *see also* Ehrlich Decl. ¶ 35.  That unaccompanied immigrant minors may be physically separated from their parents and/or potential sponsors when the disclosure is made does not ameliorate their concerns. *See* Ehrlich Decl. ¶ 35; Rangel Decl. ¶¶ 10, 12.  If these young women are ultimately sent back to their home countries and/or released to their sponsors, they may well be at risk of physical or emotional abuse or rejection.  *Id.*  Moreover, like U.S. minors who express concern about being thrown out of the house, unaccompanied immigrant minors may reasonably fear that disclosure of their pregnancy and/or abortion decision to their prospective sponsor will jeopardize their release, as the sponsor may withdraw his or her sponsorship and refuse to assume care of the minor due to, among other things, a religious or cultural objection to pregnancy outside of marriage and/or abortion.  *See* Ehrlich Decl. ¶ 35; Rangel Decl. ¶¶ 10, 13; Kaley Decl. ¶ 6.

Other minors do not disclose out of fear that doing so will incite parental or familial disapproval, disappointment, or rejection, and irreparably damage their familial relationships. Ehrlich Decl. ¶¶ 19, 35; Rangel Decl. ¶¶ 9–10, 12–13.  Such concerns are likely to be heightened in the unaccompanied immigrant minor context, given that the engrained gender inequities,

increased violence against women and girls, high religiosity, and illegality of abortion in these minors' countries of origin tends to create a culture of conservatism and taboo around pre-marital sex and abortion.  Rangel Decl. ¶¶ 6–7, 9; *see also id.* ¶ 5 (detailing one minor's fear regarding what her close indigenous Guatemalan community would think about her if she was forced to disclose her pregnancy and planned abortion and how that fear became an obstacle to the abortion she would otherwise choose); Cortez Decl. ¶¶ 8–11; Ehrlich Decl. ¶¶ 19, 27 (noting that such fears may be rooted in history of parents making negative remarks about sex).  In cultural contexts such as these, where abortion is viewed with particular disapproval, its disclosure can further strain and fracture family relationships and risk leaving young women isolated and alone, with limited or no familial or community support.  Rangel Decl. ¶¶ 9, 13.

Still other minors worry that the stress of disclosure would be too much for their parents to handle, given their knowledge of the existing financial, physical, social or psychological burdens their parents are carrying, and thus choose not to disclose their situation to their parents in order to protect them from this undue stress.  *See, e.g.*, Ehrlich Decl. ¶¶ 20, 27, 29, 36.  These fears also have particular salience for unaccompanied minors, whose parents often face extraordinarily difficult situations in home countries ravaged by violence and poverty.  *See generally* Ehrlich Decl. ¶ 36; Rangel Decl. ¶¶ 3, 6.

On top of all this, many unaccompanied immigrant minors who arrive at the border discover they are pregnant after having been raped or sexually assaulted in either their home countries or in transit to the United States.  *See* Rangel Decl. ¶¶ 7–8.  These young women may be afraid or unready to reveal the rape or sexual assault that resulted in their pregnancies to their families.  *Id.* ¶ 7.  Coercing them into reliving an extremely traumatic experience by making a

painful disclosure over a phone call before they are emotionally ready to do so, and without

consideration of the possible consequences, only risks further traumatizing them.  *Id.* ¶ 9.

Regardless of their specific reasons for doing so, minors do not make the decision not to

involve a parent in their abortion decision lightly.  Ehrlich Decl. ¶ 22.  To the contrary, minors'

concerns about disclosure tend to be well thought out, and deeply rooted in their intimate

knowledge of their individualized family history and the complex realities of their lives,

including their experience with long-standing patterns of parental mistreatment and parental

behaviors.  *Id.* ¶¶ 21–22.  Drawing on their unique lived experience, minors are extremely well-

positioned to make assessments as to who in their lives will react negatively to their disclosure,

and who will provide support and assistance in the decision making process; this is reflected in

the fact that many minors considering abortion often choose to confide in and discuss their

abortion decision with another trusted adult, often an older sibling, attorney, or social worker.

Rangel Decl. ¶ 14; Kaley Decl. ¶ 7.  Indeed, as the Committee on Adolescence of the American

Academy of Pediatrics has concluded, "[a]dolescents who are strongly opposed to informing

parents about their intent to have an abortion tend to predict family reactions accurately."

Ehrlich Decl. ¶ 23 (quoting the Committee).  It is therefore critically important that their

individual assessments regarding the potential risks of parental disclosure be listened to and

respected.  *Id.* ¶ 23.

For these reasons, and out of recognition of the harms that can arise from forced

notification, major medical professional organizations, including the American Academy of

Pediatrics, the American Medical Association, and the American Public Health Association,

have uniformly concluded that a minor should not be compelled or required to involve her

parents in her decision to obtain an abortion.  *See* Ehrlich Decl. ¶¶ 13, 30–33.  For example, in

13

their policy statement on the issue, the Committee on Adolescence of the American Academy of

Pediatrics (AAP) recognizes that "[i]nvoluntary parental notification can precipitate a family

crisis," and that in addition to being met by violence, disclosure may irreparably damage the

parent-child bond, including actual rejection.[4]  *Id.* ¶ 31 (quoting AAP).  Accordingly, the AAP

has concluded that "mandating parental involvement does not achieve the intended benefit of

promoting family communication but does increase the risk of harm to the adolescent by

delaying access to appropriate medical care or increasing the rate of unwanted births."[5]  *Id.*

Likewise, the American Medical Association's (AMA) Medical Ethics Opinions on the

provision of health care for minors also make clear that when minors request that their abortion

decisions be kept confidential, physicians should "[n]ot feel or be compelled to require a minor

patient to involve her parents before she decides whether to undergo an abortion."[6]  *Id.* ¶ 32

(quoting AMA).  As the AMA explains, "[t]he patient, even an adolescent, generally must decide

whether, on balance, parental involvement is advisable.  Accordingly, minors should ultimately

be allowed to decide whether parental involvement is appropriate."[7]  *Id.*

---

[4] Committee on Adolescence, American Academy of Pediatrics, *The Adolescent's Right to Confidential Care When Considering Abortion*, https://pediatrics.aappublications.org/content/139/2/e20163861 (2017).

[5] *Id.*

[6] *See* AMA, Code of Medical Ethics Opinion 2.2.3, Mandatory Parental Consent to Abortion, https://www.ama-assn.org/delivering-care/ethics/mandatory-parental-consent-abortion; *see also* AMA, Code of Medical Ethics Opinion 2.2.2, Confidential Health Care for Minors, https://www.ama-assn.org/delivering-care/ethics/confidential-health-care-minors.

[7] *See* AMA Council on Ethical and Judicial Affairs, AMA Code of Medical Ethics Opinions on Confidential Care for Sexually Active Minors and Physicians' Exercise of Conscience in Refusal of Services, Opinion 2.015 – Mandatory Parental Consent to Abortion, https://journalofethics.ama-assn.org/article/ama-code-medical-ethics-opinions-confidential-care-sexually-active-minors-and-physicians-exercise/2012-02.

Similarly, the American Public Health Association (APHA) has explained in its policy statements that "[p]arental involvement [requirements] do not promote family communication as intended, and can elevate pregnant minors' risks by delaying access to care," and create "[o]ther negative consequences" including, among other things, "parentally coerced termination of pregnancy, physical violence between the parents or against the pregnant minor, the pregnant minor being forced to leave the home, damage to the parents' health, the pregnant minor being delayed in informing her parents, negative experiences when informing parents, the potential to aggravate family conflicts, and pregnant minors from dysfunctional and nonsupportive families carrying unwanted pregnancies to term without receiving adequate prenatal care." [8] *Id.* ¶ 33 (quoting APHA).  Accordingly, the APHA urges that "minors' access to abortion services not be made conditional on parental involvement." [9] *Id.*

In sum, as the major medical organizations and experts in the field attest, minors themselves tend to be the best situated to assess the likely outcome of disclosure based on the complex realities of their own lives, and forced disclosure to a parent or prospective sponsor irrespective of a minor's fears risks unnecessarily exposing a minor to emotional, psychological, and physical harms.  *See generally* Ehrlich Decl.; Rangel Decl.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must establish (1) "that [s]he is likely to succeed on the merits," (2) "that [s]he is likely to suffer irreparable harm in the absence of

---

[8] *See* APHA, *Policy No. 20115, Ensuring Minors' Access to Confidential Abortion Services*, (Nov. 1, 2011), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/03/11/14/ensuring-minors-access-to-confidential-abortion-services.

[9] *Id.*

preliminary relief," (3) "that the balance of equities tips in [her] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit have traditionally applied these factors on a "sliding scale," where a stronger showing on some factors can compensate for a weaker showing on others. *See, e.g.*, *Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999). It has been suggested, but not decided, that a likelihood of success on the merits may be required. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (citing *Winter*, 555 U.S. at 20–22). Under either approach, Plaintiffs make the necessary showing here.

I.   **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.**

   A.   **Defendants' Requirement of Parental and Sponsor Notification Violates the Fifth Amendment.**

The Supreme Court has made clear that, although a state can require parental involvement for minors seeking abortions, such a requirement must also have an avenue for minors to "bypass" parental involvement. *Bellotti v. Baird*, 443 U.S 622, 647 (1979) ("We conclude, therefore, that . . . every minor must have the opportunity—if she so desires—to go directly to court [to obtain access to an abortion] without first consulting or notifying her parents"). As the Fifth Circuit has held, if *Bellotti* means anything, "it surely means that States seeking to regulate minors' access to abortion must offer a credible bypass procedure, *independent of parents or legal guardians*." *Causeway Med. Suite v. Ieyoub*, 109 F.3d 1096, 1112 (5th Cir. 1997) (striking down statute that required judicial bypass court to notify the minor's parents under certain circumstances), *overruled on other grounds by Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001).

Nevertheless, Defendants have argued in this case that they are entitled to notify (or require minors to notify) parents and prospective sponsors of the minors' abortion decisions in every circumstance, without any mechanism for those minors who object to "bypass" such notification, and even in cases where a minor has already obtained or will seek to obtain a court order waiving a state parental involvement requirement. *See, e.g.*, Defs.' Opp. to Pls.' Renewed Motion for Class Cert & PI at 10-13, ECF No. 124; *supra* 5–6 (examples of Defendants mandating that parents be notified even when minors were seeking or had already obtained a judicial bypass order). Neither the Supreme Court nor any lower court has upheld a parental notification requirement for all minors that lacked a bypass. *See, e.g.*, *Lambert v. Wicklund*, 520 U.S. 292 (1997) (upholding parental notification law because it had a bypass); *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1460 (8th Cir. 1995) (holding that a state "may not impose a parental-notice requirement without also providing a confidential, expeditious mechanism by which mature and 'best interest' minors can avoid it"); *Ind. Planned Parenthood Affiliates Ass'n v. Pearson*, 716 F.2d 1127, 1140–41 (7th Cir. 1983) (striking down state law requiring parents to be notified of a minor's petition for a bypass even after the bypass petition is denied); *Planned Parenthood v. Wasden*, 376 F. Supp. 2d 1012, 1019-1020 (D. Idaho 2005) (preliminarily enjoining law that allowed for notice to a parent after a minor obtained an emergency abortion, noting that "when the minor is mature enough to make her own decisions independent of her parents, the State has no more interest in notifying her parents than it would in notifying the parents of an adult woman — namely, none.") (citing *Miller*, 63 F.3d at 1460); *Planned Parenthood of Ind. and Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 258 F. Supp. 3d 929, 946 (S.D. Ind. 2017) (striking down parental notification requirement that required post-bypass parental notice for some minors), *appeal argued*, No. 17-2428 (7th Cir. Jan. 5, 2018).

As noted above, *supra* 9, sponsors to whom class members may be released often act as de facto parents or guardians.  Accordingly, the same concerns identified by the courts in considering forced parental consent or notice requirements without an adequate bypass, including, for example, the risk of minors incurring "disappointment and disapproval, withdrawal of financial support," or "domestic abuse at the hands" of their custodian, *Comm'r, Ind. State Dep't of Health*, 258 F. Supp. 3d at 946–47 (S.D. Ind. 2017), are also implicated in the context of forced sponsor notification.  *See, e.g.*, Rangel Decl. ¶¶ 8, 10, 12, 14.

The harm of forced parental or familial involvement in a minor's abortion decision is not limited to the possibility that a custodian might physically block the minor's abortion access. Rather, as detailed above, forced disclosure can trigger harm to the minor or other family members, in the form of physical or emotional abuse, rejection or ostracization, or destruction of familial relationships, and can also create a chilling effect on the minor's decision.  *See supra* 10–15; *see generally* Rangel Decl.; Ehrlich Decl.  For these reasons, courts have invalidated statutes that require notification even *after* a minor's request for a judicial bypass has been denied on the basis that such notification (and the possibility of such notification) could cause "additional trauma" and have a "chilling effect" on minors' attempting to effectuate their abortion decisions in the first place.  *See Pearson*, 716 F.2d at 1141 ("[i]t is hardly speculative to imagine that even some mature minors will be deterred from going to court if they know that their parents will be notified if their petitions are denied…[n]otification will inevitably result from denial of the petition because pregnancy cannot be hidden forever, but the state's form of notification is likely to cause additional trauma to the minor and is unlikely to encourage family harmony"); *see also Comm'r, Ind. State Dep't of Health*, 258 F. Supp. 3d at 946–47 (finding, *inter alia*, that parental notification can lead to "parental disappointment and disapproval,

withdrawal of financial support," and "abuse [that] can take several forms – physical, sexual, or

emotional," and that even fear of abuse that can lead to suicidal thoughts or self-abortion, or

deterrence from seeking abortion altogether); *Wasden*, 376 F. Supp. 2d at 1019–1020 (enjoining

law that allowed for post-abortion notice on the basis that failure to provide an exemption from

such notice would "operate as a substantial obstacle to their choice to undergo an abortion"

because it would have a "substantial pre-abortion chilling effect.").

   Defendants do not even attempt to contest the fact that forced notification puts minors at

risk of harm. *Supra* 8; Ex. D, Amiri Decl., ECF No. 121-5, Dep. Tr. of Jonathan White, 41:11 –

43:1. Nor could they, as these harms are evidenced by the facts in this very case. For example,

when Jane Poe was forced to tell her parents and sponsor that she wanted an abortion, they

threatened to harm her. *See supra* 7–8. This threat may turn into actual abuse if she sees her

parents or her potential sponsor (a relative) again, and, in the short term, led Ms. Poe briefly to

change her mind about the abortion, despite the fact that she had expressed a desire to self-harm

if forced to carry her pregnancy to term. *Id.*

   Moreover, Defendants' claim that they do not notify a parent or sponsor of a minor's

pregnancy or abortion decision if it would cause a risk of harm to the minor, *see* Sualog Decl. ¶¶

9–10, is belied by the evidence showing how Defendants' implemented their policy. As

discussed above, Defendants contacted Jane Doe's mother in her home country about her

pregnancy, over her objections, despite the fact that Ms. Doe suffered abuse at the hands of her

parents, and even though she was seeking to obtain (and obtained) a court order permitting her to

bypass Texas's parental involvement requirement. *See supra* 6. Ms. Poe's situation also makes

clear that the government's policy contains no exception for when disclosure would endanger the

minor. *See supra* 7–8. And in one of the cases out of Arizona, Defendants required parental

notification after the minor had already obtained a judicial bypass to consent to the abortion on

her own, and over the minor's advocate's concern that it could lead to violence by the minor's

father against her mother.  *See supra* 5.  In sum, there is absolutely no evidence that Defendants

have ever exempted a minor from their forced notification policy out of fear that notification

would lead to threats of abuse or other harms to her.  Accordingly, Plaintiffs are likely to succeed

on the merits of their Fifth Amendment claim.

### B.  Defendants' Forced Disclosure Policy Violates Plaintiffs' Right to Informational Privacy.

In addition, Defendants' forced disclosure policy violates Plaintiffs' right to

informational privacy by requiring that parents and potential sponsors be informed about minors'

pregnancy and/or abortion decisions.  *See* Pls.' Third Amended Compl. ¶ 94, ECF No. 143.  As

the Supreme Court has made clear, people have a right to privacy "in avoiding disclosure of

personal matters," *Whalen v. Roe*, 429 U.S. 589, 599 (1977), and the government violates that

right when it discloses a person's deeply private information to others, *see, e.g.*, *Doe v. City of

New York*, 15 F.3d 264 (2d Cir. 1994).  Accordingly, numerous courts have recognized

constitutional claims in cases where an individual's private, sensitive personal information—

including their HIV status, sexual orientation, gender identity, or details about their sexual

assault—was disclosed, or threatened to be disclosed, without their consent.  *See, e.g.*, *Doe*, 15

F.3d at 267 (recognizing constitutional claim based on government disclosure of employees'

HIV status, and noting that "[e]xtension of the right to confidentiality to personal medical

information recognizes there are few matters that are quite so personal as the status of one's

health, and few matters the dissemination of which one would prefer to maintain greater control

over"); *A.L.A. v. West Valley City*, 26 F.3d 989 (10th Cir. 1994) (same, for arrestee's HIV

status); *Sterling v. Borough of Minersville*, 232 F.3d 190, 197–98 (3rd Cir. 2000) (finding

officer's threat to disclose arrestee's suspected homosexuality to arrestee's grandfather violated arrestee's constitutional right to privacy, and stating that "[i]t is difficult to imagine a more private matter than one's sexuality"); *Powell v. Schriver*, 175 F.3d 107, 111–12 (2d Cir. 1999) (recognizing constitutional right to privacy regarding an individual's identification as transgender, noting that an individual would rightly "desire to preserve one's [] confidentiality" as to their gender identity, and that revelation could incite "hostility and intolerance from others"); *Bloch v. Ribar*, 156 F.3d 673, 685–86 (6th Cir. 1998) (recognizing a rape victim's fundamental right of privacy in preventing government officials from unnecessarily releasing details of her rape and noting that "revealing information regarding [our sexuality and choices related to it] exposes an aspect of our lives that we regard as highly personal and private.").

Notably, judicial acknowledgment of an individual's right to informational privacy has not been limited to claims involving disclosures to the public at large; to the contrary, courts have recognized that this right may be implicated even when the disclosure at issue is to parents or other family members. *See, e.g.*, *Nguon v. Wolf*, 517 F. Supp. 2d 1177, 1191–1193 (C.D. Cal. 2007) (recognizing that a student has "a Constitutionally protected privacy right with respect to disclosure of [their] sexual orientation" and requiring a compelling government interest that outweighs the student's privacy interest to justify revealing, even implicitly, a student's sexual orientation to their parents under both the federal and state constitutions); *Sterling*, 232 F.3d at 197–98 (recognizing privacy interest implicated in case involving disclosure of 18-year-old arrestee's suspected homosexuality to arrestee's grandfather).

Like an individual's HIV status, sexual orientation, gender identity, or sexual assault, the "personal matter" at issue here—the decision to have an abortion—is highly sensitive, intimate, and emotionally charged. *See, e.g.*, *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*,

476 U.S. 747, 772 (1986), *overruled on other grounds by Casey*, 505 U.S. at 882 ("[f]ew

decisions are more personal and intimate, more properly private, . . . than a woman's decision . . .

whether to end her pregnancy"); *cf. Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678,

685 (11th Cir. 2001) (citing a number of decisions that have "pointed to abortion as the

paradigmatic example of the type of highly sensitive and personal matter that warrants a grant of

anonymity" in legal proceedings); *Nat'l Ass'n of Waterfront Employers v. Chao*, 587 F. Supp. 2d

n.8 (D.D.C. 2008) (identifying "matters of a sensitive and highly personal nature" that may

justify permitting a party to proceed in litigation anonymously to include "those dealing with

birth control, abortion, homosexuality or the welfare rights of illegitimate children or abandoned

families").

       As detailed above, mandating that minors either breach their own privacy (or have their

privacy breached) by revealing the intimate and sensitive fact that they are pregnant and/or

seeking abortion can result in serious, concrete harm beyond just the privacy invasion, including,

*inter alia*, further traumatization of minors who are pregnant as a result of rape or sexual

assault,[10] and abuse or rejection at the hands of parents or sponsors upon their being made aware

that the minors were or are engaged in culturally taboo activities (*i.e.*, having sex or seeking or

obtaining an abortion).  *See supra* 10–15.  Indeed, the record in this case shows that fears of

"discrimination and intolerance," *Doe*, 15 F.3d at 267; *see also Powell*, 175 F.3d at 111–12, and

retaliation if this extremely sensitive, private health information is disclosed are not speculative.

For example, Defendants told Ms. Poe's prospective sponsor about her pregnancy and abortion

---

[10] Moreover, compelling minors who are pregnant as a result of rape or sexual assault to reveal
their pregnancies and abortion decisions to parents or sponsors may also require them to reveal
the circumstances by which they became pregnant (*i.e.*, their sexual assault), which – as noted
above – is another extremely sensitive type of information that courts have recognize deserve
privacy protections.  *See Bloch*, 156 F.3d at 685–86.

decision; he then threatened her with harm.  *See supra* 7.  This threat in turn likely scuttled Ms.

Poe's prospect of release to this sponsor and the opportunity to be reunited with a family

member.  Defendants simply cannot justify this blatant violation of minors' informational

privacy rights and all associated harms, especially where (as here) the evidence shows that, *inter*

*alia*, their blanket policy applies regardless of the harm it would impose on a minor and/or her

family, *supra* 19–20, and that minors often already have a trusted adult to discuss their decision

with, should they choose to do so.  Rangel Decl. ¶ 14; Kaley Decl. ¶ 7.  Accordingly, Plaintiffs

are likely to succeed on their informational privacy claim.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY UNLESS DEFENDANTS ARE ENJOINED.

As explained above, there has been a steady stream of class members who have requested

abortion information or access to abortion since this Court's preliminary injunction on March 30,

2018.  *See* Kaley Decl. ¶ 5 & Exhibit A (showing that at least 31 minors requested access to

abortion after March 30, 2018 through to the end of 2018, and that at least 22 minors requested

access to abortion in just the first six months of 2019).  In fact, Plaintiffs' counsel are currently

helping a class member seeking access to abortion as of the date of this submission, and have

assisted five other class members who requested abortion within just the last two months.  *Id.*

The frequency of unaccompanied immigrant minors seeking access to abortion while in

ORR custody underscores that Plaintiff class members will imminently experience irreparable

harm if Defendants are permitted to resume their policy of coercing minors to tell (or have

Defendants tell) parents or sponsors that they are pregnant and/or seeking or have obtained an

abortion.  As discussed above, and in the attached declarations, there are myriad reasons why

some minors do not want to tell their parents and/or sponsors of their pregnancy and abortion

decision, including, *inter alia*, fear of abuse and rejection, fear of harm to parental and familial

relationships, and concern that disclosure will impose undue stress and additional burdens on their parents. *See supra* 10–12; Ehrlich Decl. ¶¶ 9–29; Rangel Decl. ¶¶ 4–14; *see also Comm'r, Ind. State Dep't of Health*, 258 F. Supp. 3d at 946–47.

These fears and concerns are not unfounded. To the contrary, as established above, experts in the field and major medical organizations confirm that mandating that minors' parents and/or potential sponsors be informed of their pregnancies and desire for an abortion risks, among other things: exposing minors to emotional or physical abuse once they are reunified with or released to their parents and/or sponsor, Rangel Decl. ¶ 12; Ehrlich Decl. ¶ 33 (citing APHA opinion); *id.* ¶ 35; undermining minors' opportunity to be placed with their sponsor, Rangel Decl. ¶¶ 10, 13; Ehrlich Decl. ¶ 33 (citing APHA opinion that minors may be forced to leave home upon disclosure); straining or fracturing family relationships, and leaving minors isolated and ostracized, Rangel Decl. ¶¶ 9, 13; Ehrlich Decl. ¶ 19; *id.* ¶ 31 (citing AAP opinion); *id.* ¶ 33 (citing APHA opinion); and further traumatizing minors who are not emotionally ready to discuss the potentially traumatic experience (*i.e.*, rape or sexual assault) that resulted in their pregnancies, Rangel Decl. ¶ 9. Indeed, as detailed above, Defendants themselves admit the forced disclosure to parents can cause harm, *supra* 8, and this harm is further evidenced by the record in this case, including Ms. Poe's example where both her parent and her sponsor threatened abuse if she had an abortion, causing her to briefly retract her abortion request, even though she expressed a desire to self-harm if forced to carry her pregnancy to term. *See supra* 7–8. Furthermore, Ms. Poe's sponsor's threats of violence in reaction to the forced disclosure of her desired abortion likely prevented that sponsor from taking custody of Ms. Poe. Subjecting minors to these risks and harms under the pretense that doing so will "help lead to the best decisions" and "advance the [minor's] best interests," Sualog Decl. ¶ 7, is especially unwarranted

where, as here, the evidence shows that many minors considering abortion already have a trusted adult (often an older sibling, attorney or social worker) in whom they can confide and with whom they can discuss their abortion decision.  Rangel Decl. ¶ 14; Kaley Decl. ¶ 7.

## III.    THE BALANCE OF HARM STRONGLY FAVORS PLAINTIFFS.

Plaintiffs will suffer irreparable harm in the absence of relief from this Court, while Defendants will suffer none.  Defendants have already been enjoined from enforcing their compelled disclosure policy for over a year, since this Court first issued preliminary injunctive relief on May 30, 2018.  And in the many years prior to the confirmation of then-Director Scott Lloyd, ORR did not coerce minors into telling anyone about their pregnancy or abortion decision against their will, and there is no evidence that the absence of a forced disclosure policy interfered with ORR's operations.  Thus, the balance of harm is heavily in Plaintiffs' favor.

## IV.    A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.

The public interest is served when constitutional rights are protected.  "It is always in the public interest to prevent the violation of a party's constitutional rights."  *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quoting *Abdah v. Bush*, No. 04-cv-1254, 2005 WL 711814 at *6 (D.D.C. Mar. 29, 2005)); *accord Lamprecht v. F.C.C.*, 958 F.2d 382, 390 (D.C. Cir. 1992) ("a [government] policy that is unconstitutional would inherently conflict with the public interest"); *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("Surely, upholding constitutional rights serves the public interest."); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) ("the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional"); *Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980) ("the public interest … requires obedience to the Constitution").  In the instant case, there is no conceivable way the

public interest will be adversely affected by prohibiting Defendants from mandating that minors'

parents and sponsors be notified of minors' pregnancies and/or abortion decisions against the

minors' will.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court issue a

preliminary injunction prohibiting Defendants from revealing a minor's pregnancy or abortion

decision, or coercing the minor into revealing her pregnancy or abortion decision herself, unless

the minor provides uncoerced consent.

August 8, 2019

Respectfully submitted,

*/s/ Brigitte Amiri*
Brigitte Amiri*
Meagan Burrows
Jennifer Dalven
Lindsey Kaley
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2633
Fax (212) 549-2652
*bamiri@aclu.org*
*mburrows@aclu.org*
*jdalven@aclu.org*
*lkaley@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel. 202-457-0800
Fax 202-457-0805
*aspitzer@acludc.org*
*smichelman@acludc.org*

Daniel Mach (D.C. Bar No. 461652)
American Civil Liberties Union Foundation
915 15th Street NW
Washington, D.C. 20005
Tel. (202) 675-2330
*dmach@aclu.org*

Elizabeth Gill
American Civil Liberties Union Foundation
of Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel. (415) 621-2493
Fax (415) 255-8437
*egill@aclunc.org*

Melissa Goodman
American Civil Liberties Union Foundation
of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Tel. (213) 977-9500
Fax (213) 977-5299
*mgoodman@aclusocal.org*

Mishan Wroe
Riley Safer Holmes & Cancila LLP
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Tel. (415) 275-8522
*mwroe@rshc-law.com*

*\*Admitted pro hac vice*

*Attorneys for Plaintiffs*